# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) Case No. 19-[____] (___) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

## DECLARATION OF RUSSELL L. STEINHORST, CHIEF EXECUTIVE OFFICER, OF SPECIALTY RETAIL SHOPS HOLDING CORP., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Russell L. Steinhorst, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of Specialty Retail Shops Holding Corp. ("Shopko") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").  In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am above 18 years of age, and I am competent to testify.

2.      I have served as Shopko's Chief Executive Officer since November 2017, prior to which I served as Shopko's CFO and Senior Vice President of Finance, after initially joining Shopko in 2009 as Vice President and Controller.  I have over 20 years of industry experience and previously served as CFO at Hudson Sharp Machine Co. and O'Sullivan Industries.  I hold a BBA in accounting from the University of Wisconsin-Oshkosh.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); ShopKo Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin, 54304.

3.      I submit this declaration to assist this Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on January 16, 2019 (the "Petition Date"); and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications described herein.

4.      Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, input by the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge.  If called upon to testify, I could and would testify competently to the facts set forth herein.

**Preliminary Statement**

5.      Shopko, founded in 1962 and headquartered in Green Bay, Wisconsin, is a leading operator of over 300 general merchandise stores throughout the Midwestern, Northwestern, and Southwestern regions of the United States.  The Debtors employ over 15,000 individuals, and offer a broad assortment of name brand and private brand merchandise including clothing and accessories, electronics, and home furnishings, as well as Debtor-operated pharmacy and optical services departments.  In many instances, the Debtors' stores are an integral part of the fabric of the communities in which they operate.

6.      Unfortunately, the Debtors, like many other retail companies, have recently fallen victim to adverse macro-trends, including the general shift away from brick-and-mortar stores to online retail channels.  More specifically, retail companies like Shopko, with a substantial physical footprint, bear higher expenses than web-based retailers and are heavily dependent on store traffic, which has decreased significantly as consumers increasingly shop online rather than in malls or

shopping centers.  In addition to competing against online retailers, the Debtors have struggled against other established brick-and-mortar retailers, such as Walmart and Target, who have less leveraged capital structures and greater economies of scale.  These factors allow the Debtors' competitors to offer lower prices than the Debtors and still bear the high operating expenses associated with brick-and-mortar retail.  Further, consolidation in the pharmacy industry has led to a lack of pricing power for retail pharmacies of Shopko's size.

7.      These market developments, compounded with an underdeveloped online presence and wholesale platform and certain above-market lease obligations, have adversely impacted the Debtors' sales and operations, with EBITDA declining by 21% over the last year, from approximately $45.2 million in 2017 to approximately $35.6 million in 2018.  These declines have directly—and negatively—impacted liquidity and left the Debtors overleveraged.  Moreover, the Debtors' pharmacy business has not performed as well as the Debtors anticipated, due in part to high inventory costs from the Debtors' primary pharmaceutical provider, McKesson Corporation ("McKesson").

8.      To protect the inherent value in their businesses and to address the existing macro-economic challenges, the Debtors retained advisors to assist management and the board of directors regarding potential strategic alternatives to enhance the Debtors' leverage and liquidity and address their capital structure.  With the assistance of their advisors, the Debtors began a series of steps in late 2017 to address their balance sheet.  These steps include processes to market the Debtors' assets, efforts to right-size their debt and lease obligations, and pursuing deleveraging and financing opportunities.  Among other successes, Debtors obtained additional financing from Spirit Realty L.P. ("Spirit")—their primary landlord—in January 2018.

9.      Over the past year and a half, the Debtors began implementing real-estate rationalization measures and other operational efficiency initiatives and developing their wholesale business and online sales presence.  After an initial marketing process for the Debtors' business in 2017 led by Houlihan Lokey, the Debtors, through receipt of feedback from the buyers and as a result of their own analysis, learned that they would have greater value if they exited the pharmacy business.   Using this analysis, the Debtors commenced another comprehensive marketing process in mid-2018 for both a sale of their entire business as well as a separate process for the sale of their pharmacy assets.  As a result of these efforts, the Debtors were able to close approximately $95 million in transactions in the months leading up to the Petition Date.   The Debtors intend to finish these marketing efforts postpetition in an expedited auction and sale process that will maximize the value of the Debtors' remaining pharmacy assets.  The Debtors also began the process of closing their unprofitable locations in late 2018, and intend to complete that process at some point during these cases.

10.      These steps provided the Debtors the runway to negotiate a debtor-in-possession financing facility with their secured lenders (the "DIP Facility") and a transaction structure and process that the Debtors believe will preserve and capitalize on the value inherent in their business and brand.  With the support of these stakeholders, the Debtors commence these cases with a chapter 11 plan (the "Plan") that includes a "sale toggle" feature contemplating either (a) a reorganization supported by a Plan sponsor or (b) the sale of the Debtors' assets to a third party.

11.      Consistent with this process, the Debtors have been marketing their non-pharmacy assets for several months and today file a motion seeking approval of bidding procedures to continue these efforts. The proposed DIP Facility, the Plan, and the related bidding procedures all are designed to facilitate a process that will maximize value, the likelihood of a going-concern

transaction for the benefit of stakeholders enterprise-wide, including thousands of jobs, and the confirmation of the Plan, all within three months.

12.    This process is supported by the Debtors' existing secured lenders, who have agreed to provide $50 million of liquidity through the DIP Facility.  If the Debtors are able to secure an acceptable Plan sponsor, (a) certain of the Debtors' first-out secured lenders, led by Wells Fargo, the Debtors' prepetition agent, have indicated that they would be willing to provide an exit facility that will satisfy all remaining first-out DIP Facility claims and (b) the Debtors' last-out secured lenders have agreed to equitize their DIP Facility claims.  The key milestones under the DIP Facility, subject in all respects to the Court's availability, contemplate the following:

- On or before January 26, the Debtors shall conduct an auction of their remaining pharmacy assets;

- On or before January 29, the Debtors shall have obtained entry of a final order approving the pharmacy sales;

- On or before March 2, 2019, the Debtors shall have consummated the pharmacy sales, which shall provide the proceeds provided for in the DIP Facility budget;

- On or before March 14, the Debtors shall either secure a Plan sponsor or otherwise demonstrate their ability to consummate the Plan;

- On or before March 22, the Debtors shall have obtained entry of an order approving the Debtors' disclosure statement;

- On or before April 12, the Debtors shall have obtained entry of an order approving the Plan; and

- On or before April 15, the Debtors shall have emerged from these chapter 11 cases,

13.    The overall process itself will minimize the Debtors' expected stay in chapter 11 and related costs.  This streamlined process is critical to the Debtors' ability to continue operating as a going concern and preserving thousands of jobs.  While the Debtors were able to secure the support of their lenders for a reorganization under the Plan, if the Debtors fail to satisfy the above milestones or otherwise are forced to languish in chapter 11, the Debtors will be required to

commence an orderly liquidation of their remaining assets and implement the "sale toggle" in the Plan.

14.     To familiarize the Court with the Debtors, their business and the relief the Debtors are seeking in the first days of these chapter 11 cases, I have organized this declaration into five sections.  The *first* section provides background information on the Debtors' corporate history and operations.[2]  The *second* section offers detailed information on the Debtors' prepetition capital structure.  The *third* section describes the circumstances leading to the filing of these chapter 11 cases.  The *fourth* section describes the Debtors' prepetition restructuring efforts, including the relevant terms of the DIP Facility and Plan.  The *fifth* section summarizes the relief requested in, and the legal and factual basis supporting, the Debtors' first-day motions.

## Corporate History and Operations

### I.     History.

15.     When pharmacist James Ruben opened the first Shopko store in Green Bay in 1962, he envisioned a company focused on quality, convenience, and value.  He saw the opportunity to combine health care services with a large discount store, and in 1971 Shopko became one of the first mass retailers to feature a pharmacy in its stores.  In another innovative step, Shopko added optical care centers to its stores in 1978.

16.     Shopko has grown significantly since its founding in 1962 through a combination of new store openings, acquisitions, and mergers.  In 1971, Shopko merged with SUPERVALU Inc., a Minneapolis-based grocery wholesale company.  Following opening its 100th store, in 1991, Shopko was spun-off by SUPERVALU and became an independent, publicly owned

---

[2]     Many of the financial figures presented in this declaration are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their business.  The Debtors reserve all rights to revise and supplement the figures presented herein.

company.  In 1997, Shopko acquired Penn-Daniels Inc., a retailer operating 18 Jacks Discount Stores.  The Debtors' largest acquisition came in 1999, with Shopko acquiring Pamida Holding Co., a retailer operating 148 discount stores in small rural markets.

17.    In December 2005, Sun Capital Partners, Inc. ("Sun Capital") acquired Shopko. The acquisition was effectuated through a merger with an affiliate of Sun Capital on December 15, 2005.  Subsequently, on May 31, 2006, Spirit purchased nearly all of the Debtors' real estate assets through a financing provided through Spirit SPE SK Acquisition, LLC.  A corporate organizational chart is attached hereto as **Exhibit B**.

18.    As of late, the Debtors have suffered from evolving customer preferences and the rapid decline of brick-and-mortar retail which, combined with an inability to achieve anticipated growth and a highly leveraged balance sheet, has led to recent losses and impairment of liquidity. In the face of these headwinds, the Debtors have been implementing key initiatives to preserve and maximize value, including implementing real-estate rationalization measures and other operational efficiency initiatives.  These measures, coupled with Shopko's anticipated deleveraging, are targeted to enable Shopko to return to financial and operational success.

### A.    Business Operations.

19.    The Debtors specialize in offering a broad assortment of name brand and private brand merchandise including clothing and accessories, electronics, and home furnishings, as well as Debtor-operated pharmacy and optical services departments.  The Debtors outsource certain operational functions such as customer service, credit card processing, logistics, and store communications to various third-party service providers, allowing the Debtors to focus primarily on product strategy and development.

### 1.    The Debtors' Brick-and-Mortar Model.

20.    The Debtors operate general merchandise stores throughout the Midwestern, Northwestern, and Southwestern regions of the United States.  Additionally, the Debtors operate an optical lab in De Pere, Wisconsin and have three third-party managed distribution centers in De Pere, Wisconsin, Omaha, Nebraska, and Boise, Idaho.  As of the Petition Date, the Debtors operate approximately 367 store locations in addition to the distribution centers and optical lab. All of the Debtors' stores are identified on the map below.



21.    The Debtors lease space for their domestic stores in a variety of different locations, such as regional malls, lifestyle centers, outlet centers, strip centers, and street-level shops. Approximately 40 percent of their real estate leasing arrangements is concentrated with Spirit, with the remainder of the Debtors' leasing arrangements spread out among a variety of other landlord entities.

22.    The Debtors use an operations model that organizes their retail stores into three distinct store formats:  Shopko, Shopko Hometown, and Shopko Express, each described in further detail below.[3]

---

[3]    The Debtors also operate four free standing optical centers.

### 2.    The Debtors' Product Offerings.

23.    The Debtors provide three different store formats to consumers:



24.    Shopko—a big-box store serving primarily mid-to-larger-sized communities—is the original and largest of the Debtors' brands, with approximately 125 stores.  These stores combine pharmacy services, optical services, and a comprehensive household goods and dry grocery assortment, with a broad and dynamic offering of strong national brands and high-value private label brands of apparel, home goods, toys, consumer electronics, seasonal items, and lawn and garden products—all in an attractive, well laid out, easy-to-shop store format that average 80,000 square feet.



25.    In 2010, Shopko introduced a retail concept to augment Shopko's larger store format:  Shopko Hometown.  The Shopko Hometown format offers a differentiated and financially successful merchandising strategy.  Shopko Hometown locations ranges in size from 15,000 to 35,000 square feet and offer approximately 70 percent of the products offered in the Shopko big-box stores described above.  Shopko Hometown, with approximately 235 stores, is a smaller concept store developed to meet the needs of smaller communities.



26.     Lastly, Shopko Express, with approximately 10 stores, serves as a neighborhood drugstore offering a smaller range of products.  Shopko Express carries a more limited selection of general merchandise, groceries, beer, wine, health and beauty supplies, over-the-counter medicines, and lottery tickets.

### 3.     The Debtors' Design and Marketing Processes.

27.     The Debtors maintain control over all of their proprietary brands by designing and sourcing in-house to drive sales, margin, and customer engagement.  Merchant leaders collaborate to ensure compatibility of product offerings across brands, while maintaining each brand's unique identity and core tenets.  The design and merchandising process operates on a six to twelve month design-to-store cycle to allow management to create and source the best quality at the lowest cost, while also providing ample time for development and execution of product strategy, concept, costs, product review, inventory strategy, and logistics, among others.

28.     Additionally, the Debtors operate a multi-faceted marketing and advertising strategy to reach the target audience for these brands.  The Debtors employ marketing tactics that include direct mail, newspaper inserts, email, digital, and social media platforms.  The Debtors' current marketing strategy marks a shift to include an integrated, more advanced advertising structure, which taps into personalized connections via email, digital channels and direct mail, while continuing to capitalize on the Debtors' historical marketing strategies. The Debtors utilize

their customer database as well as technology provided by Salesforce and Session M to launch these targeted campaigns.

### 4. The Debtors' Sourcing and Procurement Procedures.

29. Generally, the Debtors use a combination of an internal design team and third-party contract services to develop private-label goods. These private-label goods and third-party merchandise are generally manufactured in Asia. In some instances, the Debtors consolidate their foreign merchandise in China, and the merchandise is then shipped to one of the Debtors' three third-party-managed distribution centers in De Pere, Wisconsin, Omaha, Nebraska, and Boise, Idaho. In other cases, the Debtors rely on a product supplier to import the product and deliver to Debtors once it has cleared US Customs. Most of the inventory is then shipped to Debtors stores, with some remaining in the distribution centers to replenish the Debtors' brick and mortar stores.

## II. The Debtors' Prepetition Capital Structure.

30. As of the Petition Date, the Debtors have approximately $440 million in total funded debt obligations, consisting of approximately $327 million and $30 million in two senior secured asset-based revolving loans (the "Revolving Loans A" and "Revolving Loans A-1," respectively), and $49 million and $34.4 million under two asset-based term loans (the "Term Loan B" and "Term Loan B-1," respectively, and, collectively with the Revolving Loans A and Revolving Loans A-1, the "Prepetition Credit Facility"). The following table depicts the Debtors' prepetition capital structure.[4]

| Funded Debt | Maturity | Outstanding Principal Amount |
|---|---|---|
| Revolving Loans A | June 2020 | $326,278,423 |
| Revolving Loans A-1 | June 2020 | $30,000,000 |

---

[4]    There is currently approximately $5,000 outstanding on account of the bonds.

| Funded Debt | Maturity | Outstanding Principal Amount |
|---|---|---|
| Term Loan B | June 2020 | $49,055,312 |
| Term Loan B-1 | June 2020 | $34,416,375 |
| Total Funded Debt Outstanding: | $439,750,110 ||

31.     The Debtors, as borrowers and guarantors, the revolving loan lenders party thereto (the "Prepetition ABL Lenders"), the term loan lenders party thereto (the "Prepetition Term Loan Lenders," and together with Prepetition ABL Lenders, the "Prepetition Lenders"), Wells Fargo Bank, N.A., as administrative agent and collateral agent for the Revolving Loans A, Revolving Loans A-1, and Term Loan B, Spirit, as the administrative agent and collateral agent for the Term Loan B-1 (Wells Fargo Bank, N.A. and Spirit collectively, in such capacities, the "Credit Agreement Agents" and together with the Prepetition Lenders, the "Prepetition Secured Parties"), are parties to that certain Third Amended and Restated Credit Agreement, dated as of February 7, 2012 (as further amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement") governing the Prepetition Credit Facility.

**A.     Revolving Loans.**

32.     The Prepetition Credit Agreement provides for a senior secured revolving credit facility:  (a) Revolving Loans A, with a maximum availability of $700 million; and (b) Revolving Loans A-1, with a maximum availability of $30 million (the Revolving Loans A and Revolving Loans A-1, together, the "Prepetition ABL Loans" and such obligations owing thereunder the "Prepetition ABL Obligations").  The Prepetition ABL Loans mature in June 2020.   As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Loans was approximately $357 million.  Each of the Debtors are either borrowers of or have guaranteed the Prepetition ABL Obligations.  The Prepetition ABL Obligations are secured by a first-priority lien

on substantially all of the Debtors' assets that are not Term Loan Priority Collateral (as defined in the Prepetition Credit Agreement), including accounts receivable, inventory, cash and cash equivalents, and by a second-priority lien on the Debtors' capital stock and other personal property, including the Debtors' intellectual property and investment contracts (collectively, the "Prepetition ABL Collateral").

**B.      Term Loans.**

33.      The Prepetition Credit Agreement also provides for term loans:  (a) Term Loan B, with a maximum availability of $72.5 million; and (b) Term Loan B-1, with a maximum availability of $35 million (the Term Loan B and Term Loan B-1, together, the "Prepetition Term Loans" and such obligations owing thereunder, the "Prepetition Term Loan Obligations").  The Prepetition Term Loans mature in June 2020.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loans was approximately $83.4 million.  Each of the Debtors are either borrowers of or have guaranteed the Prepetition Term Loan Obligations. The Prepetition Term Loan Obligations are secured by first-priority liens on the Term Loan Priority Collateral, including the Debtors' intellectual property, equipment, and intangibles and books and records related to the Debtors' intellectual property and equipment (collectively, the "Prepetition Term Loan Collateral" and together with the Prepetition ABL Collateral, the "Prepetition Collateral").

**III.     Circumstances Leading Up to these Chapter 11 Cases.**

34.      A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases, including the general downturn in the retail industry and the marked shift away from brick-and-mortar retail to online channels.  The combination of these factors has made it increasingly difficult for Debtors to maintain their cost and capital structure as sales have remained depressed, impairing the Debtors' liquidity.

### A.   Challenging Operating Environment.

35.    The Debtors, like many other apparel and retail companies, have faced a challenging commercial environment as of late brought on by a shift away from traditional shopping at brick-and-mortar stores.  Given the Debtors' substantial brick-and-mortar presence and associated expenses, the Debtors' businesses have been heavily dependent on in-store traffic and resulting sales conversions to meet sales and profitability targets.  In addition, the increased traffic to larger retailers such as Walmart, Target, and Kohl's have further contributed to the Debtors' negative or declining same store sales trends since 2016, with accelerating declines to date.  The significant 2018 fiscal year performance decline was the result of a combination of factors, including: (i) merchandising, pricing, and inventory planning operational challenges; (ii) increased pharmacy business cost and reimbursement pressures; and (iii) the opening of new stores in 2015 and 2016 at a pace and quantity in excess of historical precedents for growth.

36.    Additionally, as a result of consolidation trends in the pharmacy industry, direct and indirect remuneration fees imposed on pharmacies, sometimes weeks or months after a medication is dispensed, has decreased pharmacy profit on a prescription transaction, sometimes leading to a loss on the prescription.  Although Shopko has been able to reduce operating costs in its pharmacies, continually reducing costs in the face of declining margins has reached its limit.  Shopko lacks purchasing scale to purchase drugs at costs similar to large national pharmacy chains, and has seen cost increases in excess of industry trends from its primary pharmaceutical supplier, McKesson.

### B.   Supply Chain Challenges and McKesson Actions.

37.    In the months leading up to the Petition Date, the Debtors began to experience significant pressure from McKesson Corporation ("McKesson")—the Debtors' primary pharmaceutical provider.  In December 2018, McKesson sent the Debtors a letter notifying them

that it intended to reduce trade terms from 45 days to one day under that certain Restated Supply Agreement, dated February 1, 2017 (as amended, supplement, restated or otherwise modified from time to time, the "Supply Agreement"), and thereby accelerate approximately $70 million of accounts payable.  While the Debtors disputed McKesson's ability to force reduce trade terms, the Debtors had no alternative pharmaceutical supplier available on such short notice, and were forced into a negotiated reduction in trade terms from 45 days to 21 days.

38.     Moreover, the Debtors believe they may have a claim against McKesson under the Supply Agreement for overcharging Debtors in violation of the Cost Indexing Program implemented in the Supply Agreement.  The Debtors have been attempting to work with McKesson to investigate and resolve these claims since well before the commencement of these proceedings, but McKesson has consistently refused to cooperate in any meaningful way.  The Debtor and their advisors intend to continue to investigate these claims during these chapter 11 proceedings for the benefit of the estates.

39.     Accordingly, after careful deliberation, on December 27, 2018, Shopko ceased payments to McKesson to preserve liquidity and manage their overall inventory position.  In response, McKesson stopped shipping inventory to Shopko.  In the following days, Shopko attempted to negotiate a resolution with McKesson, as Shopko wanted to work with McKesson to preserve the value of the prescription files, and offered to pay cash-on-delivery for new inventory. McKesson was not receptive to these efforts and instead took a series of actions that caused harm to Shopko.

40.     On December 30, 2018, McKesson sent Shopko a letter asserting reclamation rights against all inventory it sent Shopko in the preceding 45 days.  Debtors denied the allegations in the letter, and denied McKesson's purported right to reclamation.  While the parties were still

discussing McKesson's request, McKesson filed a motion in the Circuit Court of Brown County, Wisconsin, on Saturday January 5, 2019, seeking a temporary restraining order (the "TRO") to effectuate McKesson's reclamation demand.

41.     McKesson's TRO motion sought an immediate court order to physically remove tens of millions of dollars of prescription drugs from the shelves of Debtors' pharmacies.  The effect would have been to shut down every single Shopko pharmacy—if not every Shopko store— in the country.  During the TRO Hearing, on January 7, 2019, the court denied McKesson's motion. The court articulated that McKesson's TRO request would likely have caused harm to the Debtors' customers—who would lose access to medication necessary for their health and well-being. Moreover, the court explained that it was not clear that McKesson had such reclamation rights because another party had a senior security interest in the inventory.

## IV.     Appointment of Independent Directors.

42.     In December 2017, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the board of directors or Shopko (the "Board of Directors") appointed Steve Winograd and Mohsin Meghji to the Board of Directors as disinterested directors (the "Independent Directors"). Each of the Independent Directors has extensive experience serving on boards of managers and boards of directors in distressed situations.  On November 26, 2018, the Board of Directors authorized the formation of a special committee comprised of the Independent Directors (the "Special Committee") to, among other things, review matters regarding transactions or negotiations which the Special Committee determines in whole or in part may result in conflicts of interest.  The Independent Directors subsequently retained Willkie Farr & Gallagher LLP ("Willkie Farr") and Ducera Partners LLP as independent counsel and independent financial advisor, respectively, to assist the Independent Directors in their review.  As part of this mandate, the Special Committee commenced an

investigation, among other things, into certain dividend payments to the Debtors' direct or indirect equity owners to determine whether the Debtors' estates may have any claims related to such transactions. The investigation is progressing, and the Special Committee and their advisors continue their efforts to evaluate potential claims, if any, the Debtors may have with respect to their relationship with, among others, the Debtors' direct or indirect equity owners, lenders, and other creditors.

### V.      Prepetition Restructuring Efforts.

43.      The Debtors have diligently worked with their financial advisors since 2017 to develop and explore strategic alternatives to maximize value for the Debtors and their assets.  These Bidding Procedures represent the final stage of a thorough and effective marketing process conducted by the Debtors and their advisors over the course of nearly 18 months.  In May 2017, the Debtors engaged Houlihan Lokey, Inc. ("Houlihan Lokey") to act as their financial advisor and to explore alternatives.  The Debtors and their advisors engaged in a significant marketing process to solicit bids for an equity investment or the purchase of the Debtors' assets in order to obtain the greatest proceeds to maximize the value for the Debtors' stakeholders.  Despite significant interest, this process failed ultimately to yield a mutually acceptable transaction.

44.      In August 2018, the Debtors and their advisors commenced another process to market the Debtors assuming an exit from the pharmacy business (which was separately marketed and yielded numerous successful transactions).  While this process yielded some interest, it became

clear that the Debtors would be more attractive if marketed as part of a comprehensive restructuring.

45.     The Debtors contacted a select group of potential bidders, and intend to combine to build off this process in connection with the chapter cases.  To that end, the Debtors have proposed the plan sponsor bidding procedures for the process to obtain a plan sponsor's equity investment.

46.     Recognizing the need to explore restructuring alternatives, in December 2017, the Debtors retained Kirkland & Ellis LLP, as legal advisor.   As a result of the Debtors' initial efforts, the Debtors obtained an additional $35 million in financing from Spirit in January 2018.  The Debtors used this incremental liquidity to right-size its store footprint and pursue potential sale transactions.

47.     In November 2018, the Debtors retained Berkeley Research Group, LLC ("BRG"), as restructuring and financial advisor, and in July 2018 the Debtors retained Houlihan Lokey as investment banker.  Together, the Debtors and their advisors analyzed the Debtors' capital structure, potential sources of liquidity, and runway to facilitate the operational changes necessary to reduce the burdensome operational costs associated with their brick-and-mortar footprint, including various restructuring and recapitalization options.  These efforts are more fully set forth below.

**A.     Pharmacy Sale Process.**

48.     Because the Debtors have not been able to profitably operate their pharmacy business, the Debtors diligently worked with Houlihan Lokey and the Debtors' other advisors to develop and explore several strategic alternatives to maximize value for the Debtors' prescription pharmaceutical inventory, prescription files and records, and pharmacy customer lists and patient profiles (the "Pharmacy Assets").  As a result of this analysis, in August 2018, the Debtors and

their advisors engaged in a thorough marketing process to solicit bids for the Debtors' Pharmacy Assets to maximize value for the Debtors' stakeholders.

49.     The Debtors and their advisors contacted a total of 19 strategic buyers, including national pharmacies, pharmacy cooperatives, pharmacy wholesalers, and regional pharmacies.  Of these, 12 parties executed non-disclosure agreements with the Debtors and began conducting due diligence.

50.     By mid-September 2018, the deadline for interested parties to submit bids, the Debtors received eight bids for varying subsets of the Debtors' Pharmacy Assets.  Houlihan Lokey and the Debtors conducted multiple rounds of negotiations with these bidders and provided detailed analyses of the value of the Pharmacy Assets at each location.

51.     Having begun the process with approximately 234 pharmacy locations, the Debtors and Houlihan Lokey identified 134 locations with then actionable bids from six parties for the purchase of such respective Pharmacy Assets.  Of the 134 locations with attractive bids, the Debtors were able to execute and close agreements for 82 of the locations prior to the Petition Date.  The closing of the sales for the Pharmacy Assets at these 82 locations resulted in approximately $95 million in proceeds.  As discussed below, the Debtors intend to continue these sale efforts postpetition and consummate sales of the remaining Pharmacy Assets within the first 45 days of these chapter 11 cases.

**B.     Investor Marketing Process.**

52.     In addition to the marketing and sale of the Pharmacy Assets, the Debtors and their advisors spent considerable efforts seeking out parties who would be willing to invest new capital in the Debtors' business.  As part of this process, Houlihan Lokey contacted 14 potential sponsors in late November.  Five of these parties attended in-person meetings with the Debtors' management and advisors in New York on December 6, 2018.  Following the December 6, 2018

meeting, those five parties and one party that did not attend the meetings carried out extensive due diligence of the Debtors' business.

53.     Although the Debtors continued discussions with several of the potential sponsors following their due diligence, no party has made a proposal at this time.  The Debtors intend to continue these efforts postpetition and locate a Plan sponsor under a court-approved marketing process.

### C.     Real Estate Rationalization.

54.     The Debtors hired Houlihan Lokey and BRG, in part, to help address the disparity between productive and non-productive stores and rationalize the Debtors' store footprint.  With the assistance of their advisors, the Debtors identified approximately 70 unprofitable stores that are in the process of closing.  The Debtors anticipate that they will further reduce their footprint by more than 40 stores following the Petition Date, freeing up net-working capital and allow for more efficient operations and inventory management.  The Debtors continue to analyze whether they can improve their operations by closing additional unproductive locations.

### D.     DIP Facility.

55.     In connection with the strategic initiatives described above, the Debtors recognized they would need to explore capital structure alternatives and address their liquidity issues.  The Debtors, aided by Houlihan Lokey, began to explore comprehensive restructuring alternatives that would strengthen the Debtors' balance sheet and provide near-term liquidity support.

56.     Accordingly, the Debtors initiated discussions with their prepetition secured lenders to seek additional sources of liquidity.  Certain of these lenders signed confidentiality agreements to review the Debtors' liquidity position.  After significant arm's length and good faith negotiations, the Debtors and Wells Fargo Bank, N.A., ("Wells Fargo") as agent under the Prepetition Credit Agreement, reached several key agreements to address the Debtors' prepetition

liquidity concerns in order to help the Debtors continue as a going-concern and maximize the value of the Debtors for all stakeholders. Specifically, on December 13, 2018, Wells Fargo agreed to relax certain liquidity requirements as required under the Prepetition Credit Agreement.

57.     In tandem with the foregoing negotiations over the Prepetition Credit Agreement, the Debtors and Wells Fargo also engaged in discussions on restructuring options for the Debtors. For several weeks preceding the Petition Date, the Debtors and their advisors negotiated a term sheet detailing the terms of proposed postpetition financing with Wells Fargo and its advisors.

58.     This term sheet contemplated that the Prepetition Lenders would provide liquidity to the Debtors during these chapter 11 cases and that certain of the Prepetition Lenders would submit a term sheet to provide an exit facility provided for pursuant to the Plan. After significant arm's length and good-faith negotiations to refine the proposal contemplated by the term sheet, the Debtors and the Prepetition Lenders agreed to the terms of the DIP Facility. Under the DIP Facility, certain of the Prepetition Lenders would provide $480,000,000 million in postpetition financing, and support the Plan process described above.

**E.     Chapter 11 Plan.**

59.     The Debtors commenced these cases with a chapter 11 plan contemplated under the DIP Facility—*i.e.*, the Plan. The Plan contemplates value-maximizing transactions that will significantly delever the Debtors' balance sheet. The Debtors' current Plan includes a toggle feature, resulting in either (a) an equitization reorganization, which is a reorganization resulting in either exit facility financing or a debt for equity conversion for the Debtors' lenders under the Revolving Loan A, Revolving Loan A-1, Term Loan B, and the Term Loan B-1 or (b) an all sale reorganization, which allows the Debtors to enter into sales transactions for the sale or disposition the Debtors' assets. Moreover, the equitization restructuring provides for the implementation of the terms of an acceptable plan sponsor investment. The Plan toggle provides the Debtors with

the latitude necessary to negotiate the precise terms of their ultimate emergence from chapter 11 and the terms of the Plan may be revised as necessary. The Pharmacy Bidding Procedures, the Plan Sponsor Bidding Procedures, and the Plan provide for substantial flexibility with respect to the structure of any transaction—*e.g.*, the sale the Debtors' Pharmacy Assets and a reorganization that provides equity interest in reorganized company to the Debtors' lenders or the sale and disposition of all or only some of the Debtors' assets. The Bidding Procedures are designed to provide the Debtors with a cost-effective mechanism to realize value for the Debtors' Pharmacy Assets.

60.     Preserving value for the benefit of the Debtors' estates depends in large part on the Debtors proceeding swiftly to confirmation of the Plan and minimizing the effects of the Debtors' chapter 11 cases on the value of the Debtors.   The Debtors intend to swiftly proceed with a fair and efficient process to preserve and maximize the value of that achievement for enterprise-wide stakeholders. Throughout these chapter 11 cases, the Debtors will endeavor to garner even greater support for the Plan from their various creditor constituencies.

**VI.     DIP Financing, Pharmaceutical Sales, Store Closing, and Other First Day Motions.**[5]

61.     The Debtors have filed a number of first day motions in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, execute on their remaining sales of Pharmacy Assets, continue necessary store closings, and provide postpetition financing.

---

[5]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective first day motions.

A.      **DIP Financing Motion.**

62.      As discussed above, after a series of significant, arm's length, and good-faith negotiations, a subset of the Prepetition Lenders provided commitments for $480 million in the aggregate of senior and junior debtor-in-possession financing, largely consistent with the amounts and structure of the Prepetition Facility, in addition to the consensual use of cash collateral.  The DIP Facility was preceded by a marketing process designed to secure postpetition financing on the best available terms.  In addition to providing the Debtors with incremental liquidity, the DIP Facility will provide the Debtors with access to the use of the Prepetition Lenders' cash collateral on a consensual basis, and will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders.  The terms of the DIP Facility are described in further detail in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* (the "DIP and Cash Collateral Motion"), filed contemporaneously herewith and incorporated by reference herein.

63.      The provisions of the DIP Facility were extensively negotiated, and I believe that entry into this facility is in the best interests of the Debtors' estates.  The Debtors have an urgent need for the DIP Facility, that will ensure the Debtors are able to maintain their operations while pursuing a value-maximizing transaction.  Without prompt postpetition financing and access to cash collateral, the Debtors will be unable to pay wages for their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

64.     Indeed, in determining the Debtors' debtor-in-possession financing needs, I reviewed and analyzed the Debtors' 13-week and long-term cash flow forecasts.  These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with the DIP Facility, professional fees, and required operational payments.  Based on the Debtors' liquidity forecast, I do not expect the Debtors to be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases.  In fact, the Debtors are entering chapter 11 with almost no cash on hand.

65.     The Debtors' need for the DIP Facility, as well as details regarding the marketing process and terms of the DIP Facility, are outlined in further detail in the Spencer Declaration in support of the DIP and Cash Collateral Motion, filed contemporaneously herewith.

**B.     Pharmaceutical Bidding Procedures and Sale Motion.**

66.     The Debtors have also filed the *Debtors' Motion for Entry of Order (I) Establishing Bidding Procedures Related to the Disposition of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Approving the Transactions, and Granting Related Relief* (the "Pharmacy Sale Motion").  Pursuant to the Pharmacy Sale Motion, the Debtors seek approval of: (a) bidding procedures by which the Debtors will solicit and select the highest or otherwise best offer(s) for dispositions of the Pharmacy Assets that were not sold prepetition; (b) approving certain notices therewith; (c) scheduling a final hearing to seek approval the sales of the Pharmacy Assets; (d) approving the form agreements attached to the Pharmacy Sale Motion; and (e) approving procedures for selling certain Pharmacy Assets not sold at the Auction.

67.     In fact, due to recent headlines surrounding the Debtors during the marketing process for the Pharmacy Assets, Houlihan Lokey has seen material bidders reduce their offer

price by over 50 percent. These bidders have indicated that their offer price will continue to decrease the longer the Pharmacy Assets remain unsold.

68.     The Bidding Procedures are similar to other bidding procedures Debtors typically use in chapter 11 cases to sell certain assets.  And, crucially, at this time, the Debtors are only seeking approval of the Bidding Procedures to initiate a court-supervised process to sell their remaining Pharmacy Assets.

69.     The Bidding Procedures include the following proposed key dates and deadlines:

- **Bid Deadline**:  January 21, 2019 at 4:00 p.m., prevailing Central Time, as the deadline by which bids for the Pharmacy Assets must be actually received;

- **Objection Deadline**:  January 21, 2019 at 4:00 p.m., prevailing Central Time, as the deadline to object to the sale of the Pharmacy Assets;

- **Auction**:  January 23, 2019 at 9:00 a.m., prevailing Central Time, will be the date, if needed, which the Auction will be held at the offices of Kirkland & Ellis LLP, located at 300 N. LaSalle, Chicago, Illinois 60654 (or at any other location as the Debtors may hereafter designate on proper notice); and

- **Sale Hearing**:  January 28, 2019 at 10:00 a.m., prevailing Central Time.

70.     I understand that the process outlined in the Bidding Procedures is an integral component of the milestones included in the DIP Facility, and as such believe that proceeding on the above timeline is critical to the Debtors' ability to achieve success in these chapter 11 cases. If the Debtors are unable to comply with the milestones under the DIP Facility, their ability to seek a Plan sponsor and effect a going-concern transaction that will preserve thousands of jobs will be put at risk.

71.     Further, because McKesson is no longer providing inventory to the Debtors, the Debtors are facing the potential that prescription pharmaceuticals will run out of stock, after which they will be unable to fulfill customer demands.  While the Debtors have been mitigating this risk of reduced inventory via other sources—including purchasing inventory on a pre-pay basis—if the Debtors are not able to consummate the sales under the above timeline, I believe that the value of the Pharmacy Assets will significantly diminish.  Any delay in approval of the Bidding Procedures would likely materially reduce the recoveries received from the sale of the Pharmacy Assets, to the detriment of all parties in interest.

**C.     Store Closing Motion.**

72.     The Debtors have also filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* (the "Store Closing Motion").  Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) assume a consulting agreement with Gordon Brothers Retail Partners ("Gordon Brothers"), and (b) close stores in accordance with the terms of the Sale Guidelines with such sales to be free and clear of all liens, claims and encumbrances, and (ii) approving procedures to wind-up any Additional Closing Stores pursuant to the Sale.

73.     Recognizing the need to right-size their store footprint to align with industry conditions, the Debtors' management team and advisors, including Gordon Brothers and Hilco Real Estate, LLC, undertook an extensive analysis of the Debtors' existing store footprint, and whether and how many stores the Debtors should close in connection with their broader financial and operational restructuring initiatives.  The Debtors' management team and advisors ultimately determined that it was appropriate to close and wind down up to 41 underperforming brick-and-mortar store locations (contingent on lease negotiations with the Debtors' landlords) (the "Store

Closings") based off factors such as historical store profitability, recent sales trends, the geographic market in which the store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to each store's performance. However, management continues to review the real estate portfolio for additional closures.

74.    I believe that the Store Closings and the Sales provide the best and most efficient means of selling the Store Closure Assets to maximize the value to their estates. Delay in consummating the Store Closings would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons. These Stores have presented various problems, ranging from failing to generate positive cash flow and therefore are a drain on liquidity, to Stores producing negative cash flow, as well as others that are not generating a sufficient return on the inventory investment the Debtors have at the location. Thus, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sales of the Store Closure Assets and the termination of operations at the Stores. Further, the swift and orderly commencement of the Sale will allow the Debtors to timely reject the applicable Store leases, and therefore avoid the accrual of unnecessary administrative expenses for rent payment. Delaying the Store Closings may cause the Debtors to pay postpetition rent at many of these stores, at a possible cost to the estate of approximately $1.5 to $2.1 million per month.

75.    Furthermore, I believe that assumption of the Gordon Brothers' consulting agreement will allow the Debtors to utilize the experience and resources of Gordon Brothers in performing large-scale liquidations in a format that allows the Debtors to retain control over the sale process and which will provide the maximum benefit to the estates. Indeed, the Debtors estimate that the proceeds from the Sales will be approximately $80 million to $95 million.

### D.      Wages Motion.

76.      Additionally, the Debtors have filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*.  Pursuant to the Wages Motion, the Debtors seek entry of an order:  (a) authorizing the Debtors to (i) pay all prepetition and postpetition wages, salaries, other compensation, and reimbursable expenses on account of the Employee Compensation and Benefits Programs in the ordinary course of business and (ii) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto; and (b) granting related relief.

77.      In November 2018, retention payments were made to key corporate non-insiders (the "Corporate Retention Program").  The employees identified are key to the future success of the Debtor.  In November 9, 2018 a payment was made to a small group of corporate-level employees.  Twenty-two non-insider employees are scheduled to receive a second payment in April 12, 2019, so long as they met certain terms and conditions, such as remaining employed one year from the date of payment unless terminated by the Company, not for cause.  The payment obligation that will accrue on April 12, 2019 is approximately $280,000.  Without the continued, uninterrupted services of the Debtors' Employees and Temporary/Outsourced Staff, the Debtors' reorganization efforts will be threatened.

### E.      Other First Day Motions.

78.      Additionally, the Debtors have filed a number of first day motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, minimize the adverse effects of the commencement of these chapter 11 cases, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the

Debtors' balance sheet. Further, a vast majority of these motions are both procedural and non-adversarial, in addition to having the support of the secured lenders. These motions include:

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief;*

- *Debtors' (I) Request for an Expedited Hearing, (II) Request for Shortened Notice; and (III) Request for Expedited Ruling with Respect to Debtors' Motion to (I) Establish Bidding Procedures and (II) Approve the Bid Protections Related to the Disposition of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Interests;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Lien Claimants, Import Claimants, and 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue and Renew Their Liability, Property, Casualty, and Other Insurance Policies and Honor All Obligations in Respect Thereof, (B) Continue and Renew Their Prepetition Insurance Premium Financing Agreements, and (C) Continue the Surety Bond Programs, and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, of Discontinuing Services, (III) Approving the Debtor's Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief;*

- *Debtors' Application for Entry of an Order (I) Authorizing the Debtors to Employ and Retain Prime Clerk LLC as Claims, Noticing, and Agent, Effective* Nunc Pro Tunc *to the Petition Date and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (II) Granting Related Relief;*

- *Debtors' Motion for (I) Authority to (A) Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (C) Redact Personal Information for Individual Creditors, (II) Approval of the Form and Manner of Notice of the Commencement of These Chapter 11 Cases, (III) Waiver of the Requirement to File a List of and Provide Notices Directly to Equity Security Holders, and (IV) Related Relief;*

- *Debtors' Motion for Approval of Procedures to Reject or Assume Executory Contracts and Unexpired Leases;*

- *Debtors' Motion to Seal Fee Letter;*

- *Debtors' Motion for (I) Approval of Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Related Relief; and*

- *Debtors' Motion for an Order (I) Setting a Bar Date for Filing Proofs of Claim, Including Claims Arising Under Section 503(B)(9) of the Bankruptcy Code, (II) Setting a Bar Date for the Filing of Proof of Claim by Governmental Units, (III) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (IV) Setting an Amended Schedules Bar Date, (V) Setting a Rejection Damages Bar Date, (VI) Setting a Premise Liability Claims Bar Date, (VII) Approving the Form of and Manner for Filing Proofs of Claim, (VIII) Approving the Notice of the Bar Dates, and (IX) Granting Related Relief.*

79.     These motions seek authority to, among other things, ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the motions is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

80.     Several of these motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm."  In light of this requirement, the Debtors have narrowly tailored

their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

81.     I am familiar with the content and substance of the motions.  In my opinion, approval of the relief sought in each of the motions is critical to successfully implementing the Debtors' chapter 11 strategy efficiently and with minimal disruption to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

*[Remainder of Page Left Intentionally Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief.

Dated:  January 16, 2019                   /s/ _____

                                           Russell L. Steinhorst
                                           Chief Executive Officer
                                           Specialty Retail Shops Holding Corp

## Exhibit A

**Corporate Organizational Structure**

