**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| In re: | ) Chapter 11 |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) Case No. 19- 80064-TLS |
| Debtors. | ) (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF
AN ORDER (I) AUTHORIZING THE DEBTORS TO
MAINTAIN AND ADMINISTER THEIR EXISTING CUSTOMER
PROGRAMS AND HONOR CERTAIN PREPETITION OBLIGATIONS RELATED
THERETO AND (II) GRANTING RELATED RELIEF**

Specialty Retail Shops Holding Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully state as follows in support of this motion (this "Motion"):

**Relief Requested**

1. The Debtors seek entry of a final order: (a) authorizing the Debtors to maintain and administer their customer-related programs (collectively, the "Customer Programs") as described in this motion and honor certain prepetition obligations related thereto; and (b) granting related relief. The Debtors also respectfully request leave to submit a proposed form of order granting the relief requested in this Motion on a final basis.[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592). The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2] The relief sought herein would be subject to: (a) any order approving the Debtors' use of cash collateral and/or any postpetition financing facilities (the "DIP Order"), the documentation in respect of any such postpetition financing facilities and/or use of cash collateral (the "DIP Documents"), the budget governing any such postpetition financing and/or use of cash collateral (the "DIP Budget"); and (b) any and all claims, liens, security

**Jurisdiction, Venue, and Procedural Background**

2. The United States Bankruptcy Court for the District of Nebraska (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rule 6003, and Rule 9013.1C of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules").

**Background**

5. The Debtors are engaged in the sale of general merchandise including clothing, accessories, electronics, and home furnishings, as well as company operated pharmacy and optical services departments. The Debtors are headquartered in Green Bay, Wisconsin, and operate approximately 367 stores in 25 states throughout the United States, as well as e-commerce operations. The Debtors and their non-Debtor subsidiaries generated approximately $2.6 billion in revenue in fiscal year 2017 and currently employ approximately 14,000 people throughout the United States.

---

interests, and priorities granted in connection with such postpetition financing facilities and/or use of cash collateral (the "DIP Claims").

6.  On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

7.  A description of the Debtors' businesses is more fully set forth in the *Declaration of Russell L. Steinhorst, Chief Executive Officer of Specialty Retail Shops Holding Corp., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

## Description of Customer Programs[3]

8.  The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand. Accordingly, maintaining the goodwill of their customers is important to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

9.  The Debtors estimate that, of their prepetition obligations under the Customer Programs, approximately $8.1 million constitutes accrued credits, adjustments, discounts, or other similar obligations owing to their customers, including amounts owing under

---

[3] Although this motion is intended to be comprehensive, the Debtors may have inadvertently omitted some Customer Programs. The debtors request relief with respect to all Customer Programs, regardless of whether such Customer Program is specifically identified herein.

the Gift Card and Merchandise Credit Program and Rewards Program, the vast majority of which *do not* entail the expenditure of cash.

**I.     The Shopko Credit Card.**

10.     The Debtors offer a private label credit card (the "Shopko Credit Card") through a third party, First Bankcard, a division of First National Bank of Omaha. Shopko Credit Card holders earn special discounts, coupons, and reward points as benefits of being cardholders. First National Bank of Omaha approves the applications for the Shopko Credit Card, collects all the receivables for charges made to the Shopko Credit Card, bears all risk of loss associated with the credit extended to cardholders, and receives all fees associated with the card. The Debtors recognize sales charges to the Shopko Credit Card at the point of sale in the same manner as all other credit cards. By this motion, the Debtors seek authority, but not direction, to continue offering the Shopko Credit Card in a manner consistent with their past practices.

**II.    The Refund and Exchange Program.**

11.     The primary Customer Program that the Debtors seek to continue to honor is their refund and exchange program (the "Refund and Exchange Program"). As is customary in the retail industry, the Debtors allow their customers to return or exchange purchased merchandise within 120 days of purchase so long as it is returned in saleable condition, with tags attached and accompanied by the original receipt or within 30 days for most electronic items. Pursuant to the Refund and Exchange Program, customers are refunded the full purchase price of a returned item in the manner in which they purchased the item. Shipping and handling costs for online returns are not refunded. Extended holiday returns are offered for certain electronic items purchased between November 1, 2018 and December 27, 2018, where the customers were offered a period of 90 days of original purchase with receipt to return specific items. If merchandise is returned without a receipt, the Debtors typically offer a credit to be redeemed for merchandise only, for the

amount of the price paid or the current selling price, whichever is lower. However, all sales are final after 365 days. Programs like the Refund and Exchange Program are common in the retail industry, and similar programs are used by the Debtors' competitors.

12. Maintaining the Refund and Exchange Program is critical to maintaining the goodwill of the Debtors' customer base. Without the Refund and Exchange Program, potential customers may be unwilling to shop at the Debtors' stores at all, which could lead to a decline in revenues, the ultimate cost of which would be borne by the Debtors' estates. Accordingly, the Debtors seek authorization to continue honoring their obligations in connection with the Refund and Exchange Program in a manner consistent with their past practices.

### III. The Specialty Retail Shops Holding Corp. Brand Rewards Program.

13. In the ordinary course of business, the Debtors offer promotional certificates (collectively, the "Certificates"), special discounts and/or prices, in addition to dollar discounts for repeated prescription refills (the "10 Club") in a loyalty program (collectively, the "Rewards Program"). As of the Petition Date, there are approximately 3.2 million active customers enrolled as Rewards Program members (collectively, the "Rewards Members"). Members of the Rewards Program receive a $5 certificate (each such certificate, a "Reward Certificate") to be redeemed in-store or online for every 500 points spent, for which Reward Members earn 3 points for every $1 spent. The Reward Certificates have an expiration date of 30 days measured from the end of the month in which the rewards points were earned. The Reward Certificate is only issued in stores, and "on-demand," under which Rewards Members would receive the Reward Certificates immediately upon reaching the 500 points or $166.67 spending threshold. Rewards Members also receive coupons and discounts through the mail and email.

14. As of the Petition Date, the Debtors estimate that 623,000 Reward Certificates under the Rewards Program remain outstanding. The estimated 623,000 Reward Certificates

outstanding translate to a value of approximately $3.1 million, assuming all Reward Certificates are redeemed within the prescribed periods. The Reward Certificates and points earned under the Rewards Program are not legal tender and are not redeemable for cash or other monetary value. Points are non-assignable and nontransferable. The Debtors retain all rights, title, and interest, including property rights, in such points. Shopko rewards members do not hold "claims," as defined in section 101(5) of the Bankruptcy code, or qualify as "creditors" under section 101(10) of the Bankruptcy Code, on account of their participation in the Shopko Rewards program. Accordingly, the Debtors do not believe that Shopko rewards members are entitled to service on account of such participation, unless otherwise requested in these chapter 11 cases.

15. The Debtors believe that continuing the Rewards Program is essential to maintaining customer relationships and driving sales. Accordingly, the Debtors request authority, but not direction to, in a manner consistent with their past practices to (a) honor all Shopko Rewards program amounts accrued prior to the Petition Date and (b) continue and maintain the Rewards Program after the Petition Date.

### IV. The Gift Card and Certificate Program.

16. The Debtors maintain a program (the "Gift Card and Merchandise Credit Program") pursuant to which their customers can purchase physical or electronic, pre-paid, non-expiring gift cards (collectively, the "Gift Cards") or are issued merchandise credit in the form of a gift card (the "Merchandise Credit") in exchange for a return in various denominations, which historically do not exceed $200. The Gift Cards and Merchandise Credit can then be redeemed in-store or online for merchandise at a later date. The Debtors sell the Gift Cards in the ordinary course to their customers in their retail stores, online, at the corporate headquarters, and at certain third-party locations. The Merchandise Credit and Gift Cards may only be redeemed in-store for merchandise.

6

17. In addition to regular Gift Card sales to customers above, the Debtors offer promotional gift cards and certificates to customers who participate in the Shopko Rewards credit card program and to employees upon reaching certain anniversary milestones[4] (collectively, the "<u>Shopko Credit Card Rewards Program</u>"). Under the Shopko Credit Card Rewards Program, customers who utilize their Shopko credit card receive 5% back on each purchase made with the Shopko Credit Card. Once a customer reaches $10 of value, they receive a gift card in the amount of $10 in the mail. The applicable rewards are issued as they are earned in the form of gift cards ( the "<u>Shopko Rewards Gift Cards</u>"). Employees also receive Shopko Rewards Gift Cards upon certain employment anniversaries.

18. The Debtors estimate that as of the Petition Date, approximately $5.3 million[5] in issued Gift Cards are outstanding.

19. By this Motion, the Debtors seek authority, but not direction, to, in a manner consistent with their past practices: (a) honor all Gift Cards purchased by, and Merchandise Credit issued to, customers prior to the Petition Date; and (b) maintain the Gift Card and Merchandise Credit Program on a postpetition basis.

**V.    The Sales Promotions.**

20. In the ordinary course of business, the Debtors regularly conduct sales promotions, either online or at selected stores, including occasionally providing free standard shipping for orders over $99 everyday, $49 occasionally, and free shipping on all purchases in rare instances in

---

[4] The Debtors do not seek authority to continue this employee benefit or to pay prepetition amounts related to employment benefit component of the Gift Card Rewards Program under this Motion. Such relief is instead requested in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, filed concurrently herewith.

[5] This $5.3 million amount is current through the Debtors' most recent financial data available through December 31, 2018

value (collectively, the "Sales Promotions"). The Sales Promotions include clearance discounts, seasonal discounts, and other promotions.

21. The Debtors also issue coupons for discounts on future purchases (collectively, the "Coupons") to customers through direct mail and magazines. A customer need not be a Rewards Member to utilize the Coupons.

22. By this Motion, the Debtors seek authorization to honor the Sales Promotions, and the Coupons in a manner consistent with their past practices.

### VI. Credit Card and Other Payment Processors.

23. In addition to cash, the Debtors accept the following methods of payment from customers at in-store and online points of sale: (a) Visa, MasterCard, Discover, American Express, and JCB credit cards; and (b) checks at in-store points of sale only (collectively, the "Non-Cash Payments"). To process Non-Cash Payments, the Debtors are party to certain agreements (collectively, the "Payment Processing Agreements") with payment processors (collectively, the "Payment Processing Companies"). Pursuant to the Payment Processing Agreements, the Debtors generally receive the net customer sales less any chargebacks, returns, and processing fees charged. The processing fees charged by each company vary, but are in the range of 1% to 5% (the "Processing Fees"). The fees owing to these companies are set off from the funds that are remitted to the Debtors on account of the Non-Cash Payments on a daily basis.

24. When customers either return merchandise to the Debtors following a purchase made by Non-Cash Payment or dispute charges with a Payment Processing Company, the Debtors may be obligated to refund to such Payment Processing Company the purchase price of the returned or disputed merchandise, subject to certain adjustments (collectively, "Chargebacks," and together with the Processing Fees, the "Processing Obligations"). Generally, Chargebacks are satisfied by netting the amount charged against pending payments owed by a Payment Processing

8

Company to the Debtors. It is possible that certain Processing Obligations incurred by the Debtors immediately prior to the Petition Date may not have been fully netted out against the payments received by the Debtors prior to the Petition Date.

25. The Debtors' continued acceptance of Non-Cash Payments is essential to the operation of the Debtors' business because the majority of the Debtors' retail sales are made using Non-Cash Payments. Declining to accept Non-Cash Payments would have a severe negative effect on the Debtors' ongoing operations, the cost of which would be borne by their estates. To avoid disrupting these vital payment processing services, the Debtors seek authority, but not direction, to continue to pay the Processing Obligations in the ordinary course of their business pursuant to the terms of the Payment Agreements, and request that the Court authorize the Payment Processing Companies to continue to set off the Processing Obligations against amounts remitted to the Debtors, whether arising before or after the Petition Date, in a manner consistent with past practices.

## Basis for Relief

**I.  Continuing to Honor the Customer Programs in the Ordinary Course Is Warranted Under Sections 105(a) and 363(b) of the Bankruptcy Code.**

26. Section 363(b) of the Bankruptcy Code authorizes the payment of prepetition obligations where a sound business reason exists for doing so. 11 U.S.C. § 363(b). Indeed, Courts in this district have authorized payment of prepetition obligations and the continuation of customer programs under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g.*, *In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. Apr. 15, 2016) (authorizing debtor to honor customer obligations relating to coal delivered prepetition); *In re Arch Coal, Inc.*, No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 14, 2016) (authorizing debtors to

honor prepetition customer obligations); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

27. Additionally, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, bankruptcy courts may "authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor." *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999). Specifically, a bankruptcy court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").

28. The "doctrine of necessity" or the "necessity of payment" rule has long been recognized by courts in this Circuit and others. *See In re Payless Cashways, Inc.*, 268 B.R. 543, 546 (Bankr. W.D. Mo. 2001) (describing the "doctrine of necessity" as the idea "that payment of [pre-petition] claims was necessary to keep the debtor in business, and that keeping the debtor in business, and its employees at wage-paying jobs, was in the best interest of all concerned"); *Ionosphere*, 98 B.R. at 174-75. Today, the rationale for the necessity of payment rule—the rehabilitation of a debtor's reorganization case—is "the paramount policy and goal of Chapter 11." *Id.* at 176; *see also Just For Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11

reorganization"); *In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D.Mo. 2001)(authorizing debtor to pay prepetition claims of vendors because the vendors are "critical to the Debtor's reorganization").

29. This flexible approach is particularly critical where prepetition creditors—here, the Debtors' customers—are vital to the survival of a debtor's business. *See, In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (quoting *In re Chateaugay Corp.*, 80 B.R. 279, 287 (Bankr. S.D.N.Y. 1987)) ("a bankruptcy court may exercise its equity powers under Section 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately.'"). The Court in *In re Structurlite Plastics Corporation* explained that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the [Bankruptcy] Code." *Id.* at 932.

30. Authorizing the Debtors to pay prepetition amounts due on account of, and honor prepetition commitments pursuant to, the Customer Programs will allow the Debtors' operations to continue without interruption during the pendency of these chapter 11 cases. While the Debtors' estates and their creditors will not be harmed by the Debtors' ability to pay prepetition amounts and to honor prepetition commitments under the Customer Programs, the Debtors' failure to do so would likely lead to the loss of customer satisfaction, resulting in reduced future sales, deterioration of goodwill, and irreparable harm to the Debtors' businesses and revenues. *See In re Coserv, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing instances where the debtor in possession can only fulfill its fiduciary duty by pre-plan satisfaction of prepetition claims of "customers which, if not honored, could so harm the debtor's good will as to destroy its going

concern value"); *see also In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (noting that the continuance of even insignificant customer business transactions can be "critical to the survival of the business," and failure to continue such transactions risks eroding the business' customer base and going concern value).

31.     Accordingly, the Court has authority to authorize the Debtors to continue the Customer Programs, and pay prepetition claims arising thereunder, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.  Continuing to administer the Customer Programs without interruption during the pendency of these chapter 11 cases is critical to preserve the value of the Debtors' assets by, most importantly, preserving customer goodwill and market share.  This value will inure to the benefit of the Debtors' estates and their creditors.

32.     Where retaining the loyalty and patronage of customers is critical to successful chapter 11 cases, courts in this district and other jurisdictions in the Eighth Circuit have granted relief similar to that requested herein. *See, e.g.*, *In re Gordmans Stores, Inc.*, No. 17-80304 (TLS) (Bankr. D. Neb. Mar., 14, 2017) (approving continuation of customer programs); *In re Pawn Am., LLC*, No. 17-31145 (RJK) (Bankr. D. Minn. Apr., 14, 2017) (same); *In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (same); *In re Gander Mountain Co.*, No. 17-30673 (MER) (Bankr. D. Minn. Mar. 15, 2017) (same); *In re Vanity Shop of Grand Forks, Inc.*, No. 17-30112 (SFH) (Bankr. D. N.D. Mar. 23, 2017) (same).[6]

**II.    Continuing the Customer Programs and Honoring the Customer Obligations is in the Best Interests of the Debtors' Businesses and Their Estates.**

33.     In addition, section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to sections 1107 and 1108 of the Bankruptcy Code to

---

[6] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

12

use property of the estate in the ordinary course of business without notice or a hearing. Consequently, the postpetition continuation, renewal, and replacement of obligations under the Customer Programs in the ordinary course of business is permitted by sections 363(c), 1107(a), and 1108 of the Bankruptcy Code, without further application to the Court. Out of an abundance of caution, however, the Debtors request the relief described herein.

34. Courts in this district and courts in other jurisdictions in the Eighth Circuit and others have consistently granted similar relief where retaining the loyalty and patronage of customers is critical to a successful reorganization. *See, e.g.*, *In re Gordmans Stores, Inc.*, No. 17-80304 (TLS) (Bankr. D. Neb. Mar., 14, 2017) (authorizing debtor to honor customer obligations); *In re Pawn Am., LLC*, No. 17-31145 (RJK) (Bankr. D. Minn. Apr., 14, 2017) (same); *In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (same); *In re Gander Mountain Co.*, No. 17-30673 (MER) (Bankr. D. Minn. Mar. 15, 2017) (same); *In re Vanity Shop of Grand Forks, Inc.*, No. 17-30112 (SFH) (Bankr. D. N.D. Mar. 23, 2017) (same).[7]

35. Thus, failure to honor the Customer Programs could also place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings. Such uncertainty could erode the Debtors' hard-earned reputation and brand loyalty, which, in turn, could adversely impact their prospects for a successful emergence from bankruptcy. Additionally, the Debtors' Customer Programs are essential marketing strategies for attracting new customers.

36. The Debtors believe that the relief requested herein will pay dividends with respect to the long-term reorganization of their businesses, both in terms of profitability and the

---

[7] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases. Accordingly, the Debtors respectfully submit that similar relief is warranted in these chapter 11 cases. The Debtors' ability to successfully reorganize is dependent upon the continued relationship with their Customers. Hence, the Debtors have sought the relief requested herein to assure their customers, and potential future customers, that the Debtors' reorganization will cause minimal, if any, disruption to the Debtors' operations.

### III.    The Gift Card and Merchandise Credit Program Is Entitled to Priority Treatment.

37.    Section 507(a)(7) of the Bankruptcy Code establishes a priority for "unsecured claims of individuals, to the extent of $2,850 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental or property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided." 11 U.S.C. § 507(a)(7). The Debtors submit that the holders of gift cards under the Gift Card Program cards may be entitled to priority claims under section 507(a)(7) of the Bankruptcy Code if this Court does not authorize the Debtors to honor such gift cards pursuant to the Motion. *See, In re WW Warehouse, Inc.*, 313 B.R. 588, 592-94 (Bankr. D. Del. 2004) (finding that gift certificate holders are entitled to priority status under section 507 of the Bankruptcy Code). As priority claimholders, holders of gift cards issued pursuant to the Gift Card Program would be paid in full before any general unsecured obligations of the Debtors are satisfied. Accordingly, the relief requested herein may affect only the timing of the Debtors' performance of their obligations to honor these Gift Card Program obligations and will not prejudice the rights of general unsecured creditors or other parties-in-interest. In addition, continuing to honor the Gift Card Program without interruption will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all the Debtors' creditors and benefit the estates. Thus, satisfaction of claims arising under these particular

Customer Programs on a postpetition basis will not enhance the priority of the customers or prejudice the rights of general unsecured creditors or other parties in interest. The Debtors' ability to reorganize and implement their restructuring is dependent upon preventing the erosion of their customer base and maintaining goodwill, a task that will prove extremely difficult if the Debtors are unable to honor their obligations under the Customer Programs.

38. Accordingly, the Debtors submit that the substantial benefit conferred on the Debtors' estates by the Customer Programs warrants the authority to honor the Customer Programs and any customer obligations relating thereto, and respectfully request the authority to continue their Customer Programs and honor prepetition commitments related thereto.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

39. The Debtors have sufficient funds to pay any amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, anticipated debtor-in-possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Customer Programs. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

40. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to maintain and administer their existing

customer programs and honor certain prepetition obligations related thereto as well as granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. As supported by the First Day Declaration, failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

41.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Reservation of Rights

42.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under

16

the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

43. The Debtors have provided notice of this Motion to the following parties or their respective counsel: (a) the office of the U.S. Trustee for the District of Nebraska; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition asset-based facility; (d) the agents under the proposed DIP Facility; (e) the agents under the Debtors' prepetition term loan facility; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the District of Nebraska; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

44. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated: January 16, 2019<br>Omaha, Nebraska | /s/ *Michael T. Eversden*<br>James J. Niemeier (NE Bar No. 18838)<br>Michael T. Eversden (NE Bar No. 21941)<br>Lauren R. Goodman (NE Bar No. 24645)<br>**MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**<br>First National Tower, Suite 3700<br>1601 Dodge Street<br>Omaha, Nebraska 68102<br>Telephone: (402) 341-3070<br>Facsimile: (402) 341-0216<br>Email: jniemeier@mcgrathnorth.com<br>meversden@mcgrathnorth.com<br>lgoodman@mcgrathnorth.com |

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Travis M. Bayer (*pro hac vice* pending)
Jamie Netznik (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
patrick.nash@kirkland.com
travis.bayer@kirkland.com
jamie.netznik@kirkland.com

- and -

Steven Serajeddini (*pro hac vice* pending)
Daniel Rudewicz (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: steven.serajeddini@kirkland.com
daniel.rudewicz@kirkland.com

*Proposed Co-Counsel to the Debtors*