## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) | Case No. 19-80064-TLS |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER
### (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE
### AND RENEW THEIR LIABILITY, PROPERTY, CASUALTY, AND
### OTHER INSURANCE POLICIES AND HONOR ALL OBLIGATIONS IN
### RESPECT THEREOF, (B) CONTINUE AND RENEW THEIR PREPETITION
### INSURANCE PREMIUM FINANCING AGREEMENTS, AND (C) CONTINUE
### THE SURETY BOND PROGRAMS, AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.     The Debtors seek entry of an order authorizing the Debtors to:  (a) continue

insurance coverage entered into prepetition and satisfy payment of prepetition obligations related

thereto in the ordinary course of business and renew, supplement, or purchase insurance coverage

in the Debtors' discretion on a postpetition basis; (b) continue performance under prepetition

insurance premium financing agreements and renew, supplement, or enter into insurance premium

financing agreements in the Debtors' discretion on a postpetition basis; (c) continue and renew

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

their surety bond program on an uninterrupted basis; and (d) granting related relief.  The requested

relief includes paying all amounts arising in connection with the Insurance Policies or Premium

Financing Agreements, including Broker's Fees and Insurance Deductibles (each, as defined

herein, and collectively, the "Insurance Obligations"), and the Surety Bond Program (as defined

herein), whether due and payable before or after the Petition Date.[2]

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Nebraska (the "Court") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and and Nebraska General

Rule 1.5 of the United States District Court for the District of Nebraska.  The Debtors confirm

their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion

to the extent that it is later determined that the Court, absent consent of the parties, cannot enter

final orders or judgments in connection herewith consistent with Article III of the United States

Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a) and 363(b) of

the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

### Background

5.      The Debtors are engaged in the sale of general merchandise including clothing,

accessories, electronics, and home furnishings, as well as company operated pharmacy and optical

---

[2]     The relief sought herein would be subject to:  (a) any order approving the Debtors' use of cash collateral and/or
any postpetition financing facilities (the "DIP Order"), the documentation in respect of any such postpetition
financing facilities and/or use of cash collateral (the "DIP Documents"), the budget governing any such
postpetition financing and/or use of cash collateral (the "DIP Budget"); and (b) any and all claims, liens, security
interests, and priorities granted in connection with such postpetition financing facilities and/or use of cash
collateral (the "DIP Claims").

services departments.  The Debtors are headquartered in Green Bay, Wisconsin, and operate approximately 367 stores in 25 states throughout the United States, as well as e-commerce operations.  The Debtors and their non-Debtor subsidiaries generated approximately $2.6 billion in revenue in fiscal year 2017 and currently employ approximately 14,000 people throughout the United States.

6.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b)  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

7.      A description of the Debtors' businesses is more fully set forth in the *Declaration of Russell L. Steinhorst, Chief Executive Officer of Specialty Retail Shops Holding Corp., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

### The Insurance Policies and Related Payment Obligations

8.      In the ordinary course of business, the Debtors maintain 33 insurance policies (collectively, the "Insurance Policies," and each individually, an "Insurance Policy") that are administered by various third-party insurance carriers (collectively, the "Insurance Carriers").  These Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, workers' compensation, umbrella coverage, excess liability, executive protection, commercial crime, special risk, cyber liability, cargo liability, employers' liability, and directors' and officers' liability.  All of the Insurance Policies referenced above are

3

essential to the ongoing operation of the Debtors' businesses.  The aggregate annual premium for the Insurance Policies is approximately \$3.2 million,[3] plus applicable taxes and surcharges. A schedule of the Insurance Policies is attached hereto as **Exhibit A**.[4]  In addition to the Insurance Policies, the Debtors maintain several workers' compensation policies or self-insurance policies that are not reflected in **Exhibit A,** and for which relief is not sought in this Motion.[5]

9.       The Insurance Policies renew throughout the year.  The Debtors ordinarily enter into premium financing agreements to facilitate the prepayment of the entire annual premium associated with each of the Insurance Policies on or around the start date of each Insurance Policy period.  The Debtors estimate that, as of the Petition Date, there is approximately \$1.3 million in outstanding premiums remaining due on account of the Insurance Policies.  The Debtors seek authority to continue honoring any amounts on account of the Insurance Policies and premium financing agreements in the ordinary course of business to ensure uninterrupted coverage under the Insurance Policies.

10.       Pursuant to certain of the Insurance Policies, the Debtors are required to pay various deductibles or retention amounts (collectively, the "Insurance Deductibles"), depending upon the type of claim and Insurance Policy involved.   Under such Insurance Policies, the Insurance Carriers may pay claimants and then invoice the Debtors for any Insurance Deductible.  In such

---

[3]   The annual premiums paid by the Debtors include commission payments to the Debtors' insurance brokers.

[4]   The descriptions of the Insurance Policies set forth in this Motion constitute a summary only.  The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the description in this Motion.  The Debtors request authority to honor obligations and renew all Insurance Policies, as applicable, regardless of whether the Debtors inadvertently fail to include a particular Insurance Policy on **Exhibit A**.

[5]   In addition to the Insurance Policies listed on **Exhibit A**, the Debtors maintain numerous Insurance Policies in connection with their employees with respect to, among other things, workers' compensation, employee health, dental, disability, and life insurance benefits.  These policies are described, and relief is requested with respect to such policies in the *Debtors' Motion for Entry of An Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*, filed contemporaneously herewith.

situations, the Insurance Carriers may have prepetition claims against the Debtors.  If the Debtors

fail to make any Insurance Deductible payments, the Debtors would be in jeopardy of losing that

Insurance Policy, being in violation of state laws, and having their letter of credit drawn.  The

Debtors seek authority, but not direction, to honor any amounts owed on account of any Insurance

Deductible in the ordinary course of business.

11.     Continuation of the Insurance Policies and entry into new Insurance Policies is

essential to the preservation of the value of the Debtors' businesses and operations.  Moreover, in

many instances, insurance coverage is required by the regulations, laws, and contracts that govern

the Debtors' commercial activities, including the Office of the United States Trustee's (the

"U.S. Trustee") requirement that a debtor maintain adequate coverage given the circumstances of

its chapter 11 case.  Accordingly, the Debtors request authority to maintain their existing Insurance

Policies, pay prepetition obligations related thereto, and enter into new Insurance Policies in the

ordinary course of business.

### The Debtors' Insurance Brokers and Servicers

12.     The Debtors retain the services of insurance brokers and claims servicers to help

manage their risk portfolios.  The Debtors obtain the majority of their Insurance Policies through

their insurance brokers, Marsh USA Inc. ("Marsh") and Lockton Companies, Inc. ("Lockton," and

together with Marsh, the "Insurance Brokers").  The Insurance Brokers assist the Debtors in

obtaining comprehensive insurance coverage for their operations in a cost-effective manner,

manages renewal data, markets the Insurance Policies, provide all interactions with carriers

including negotiating policy terms, provisions, and premiums, handle claims, and provides

ongoing support throughout the applicable policy periods.  The Insurance Brokers collect

commission payments for services rendered as part of the premiums paid on the Insurance Policies.

As of the Petition Date, the Debtors believe they owe $12,500 to Marsh and Lockton on account

of fees, commissions, or any other prepetition obligations.  The Debtors seek authority to honor any amounts owed to Marsh and Lockton to ensure uninterrupted coverage under their Insurance Policies.

13.     Marsh is also broker of record with respect to the Debtors' directors' and officers' Insurance Policies (collectively, the "D&O Policies").  In this capacity, Marsh is authorized to negotiate changes with respect to, or cancel, the Debtors' existing D&O Policies.  Marsh is further authorized to procure new D&O Policies for the Debtors and, before the Petition Date, Marsh assisted the Debtors with procuring a new directors' and officers' runoff policy.[6]  The Debtors pay Marsh a commission in connection with these services, payable as part of the premiums paid on the D&O Policies.  As of the Petition Date, the Debtors do not believe that they owe any amounts to Marsh on account of fees, commissions, or any other prepetition obligations.  Out of an abundance of caution, however, the Debtors seek authority to honor any amounts owed to Marsh to ensure uninterrupted coverage under their D&O Policies.

14.     Certain of the Debtors' Insurance Policies are maintained by a third-party claims administrator, Gallagher Bassett Services, Inc. ("Gallagher"), which provides claims services support.  More specifically, Gallagher manages processing and payment of the general liability and workers' compensation claims asserted against the Debtors.  In addition, Gallagher, among other things, conducts factual investigations into the asserted claims and negotiates settlements related thereto.  The Debtors estimate that, as of the Petition Date, they owe Gallagher approximately $150,000 for its services.  Accordingly, the Debtors seek authority to pay Gallagher any amounts owing on account of prepetition claims management services and to continue the claims management services program on a postpetition basis in the ordinary course of business.

---

[6]    As of the Petition Date, the Debtors have purchased and bound the new directors' and officers' runoff policy.

## The Debtors' Premium Financing Agreements

15.    The Debtors finance premiums of all of their Insurance Policies (collectively, the "Financed Policies") because it is not economically advantageous for the Debtors to consistently pay the premiums on the Financed Policies in full on a lump-sum or quarterly basis. Accordingly, in the ordinary course of business, the Debtors finance the premiums on the Financed Policies through premium financing agreements (collectively, the "Premium Financing Agreements") with certain third-parties (collectively, the "Premium Financiers") to equalize the impact of such payments throughout the year. The Premium Financing Agreements entered into by the Debtors and outstanding as of the Petition Date are attached hereto as **Exhibit B**.

16.    The Debtors' obligations under the Premium Financing Agreements are secured by all sums payable to the applicable Debtor under the Insurance Policies included in the Premium Financing Agreements, including, among other things, any gross unearned premiums and any payment on account of loss which results in a reduction of unearned premiums in accordance with the terms of the Insurance Policies.

17.    If the Debtors were unable to continue honoring their obligations under the Premium Financing Agreements, the Premium Financiers may seek relief from the automatic stay to terminate the Financed Policies to recoup their losses. The Debtors could then be required to obtain replacement insurance on an expedited basis and likely at significant cost to their estates. If the Debtors were required to obtain replacement insurance and pay a lump-sum premium for the Financed Policies in advance, this payment would likely result in greater costs for the Debtors. Even if the Financed Policies were not terminated, any interruption in the Debtors' payments could have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

18.    As of the Petition Date, the Premium Financing Agreements outstanding are the AFCO Premium Financing Agreement, between the Debtors and AFCO, and the Premium

Case 19-80064-TLS    Doc 13    Filed 01/16/19    Entered 01/16/19 08:57:41    Desc Main
Document    Page 8 of 29

Assignment Corporation ("PAC") Premium Financing Agreement, between the Debtors and PAC. The Premium Financing Agreements require the Debtors to pay an initial down payment followed by monthly payments (due on the 1st of each month), in exchange for AFCO and PAC's obligation to pay the Debtors' insurance premiums on account of the Financed Policies.  As of the Petition Date, approximately $1.6 million is accrued and unpaid under the Premium Financing Agreements.

19.     By this Motion, the Debtors seek authority to pay prepetition amounts owing on account of Premium Financing Agreements and to continue honoring their obligations under the Premium Financing Agreements on a postpetition basis.  In view of the importance of maintaining insurance coverage with respect to their business activities and the preservation of the Debtors' cash flow and estates by financing the premiums under the Financed Policies, the Debtors believe it is in the best interests of their estates to seek authorization for the Debtors to honor their obligations under the Premium Financing Agreements. Any other alternative would likely require considerable additional cash expenditure at a time when the Debtors face liquidity constraints and would cause direct harm to the Debtors' estates.

20.     In addition, to the extent that the Premium Financing Agreements expire during the course of these chapter 11 cases, the Debtors seek authority to renew their Premium Financing Agreements without further Court approval. The Debtors respectfully submit that renewal of the Premium Financing Agreements falls squarely within their ordinary course of business and, but for the constraints of section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to renew the Premium Financing Agreements.  To reduce the administrative burden, as well as to confirm their ability to satisfy one of their obligations of operating as debtors in possession, the Debtors seek the Court's authority now to renew the Premium Financing Agreements when and as necessary in the Debtors' business judgment.

## The Debtors' Surety Bond Program

21.     In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties, often governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations (the "Surety Bond Program"). These obligations include general customs bonds and Importer Security Filing single transaction bonds with the United States Customs and Border Protection Agency.

22.     When a party that transacts with the Debtors requests a bond and the Debtors determine that they have better operational uses for cash and do not wish to provide the cash and cash equivalents necessary to satisfy such request, they may pursue a surety bond.  In such situations, sureties provide, upfront, the full amount of the requested cash and cash equivalents to the requesting party on behalf of the Debtors, in exchange for a fee from the Debtors and an amount of collateral to secure the bond issuance on the Debtors' behalf.  The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from an obligee (here, the United States government) to a surety.

23.     The Debtors have 18 primary surety bonds underwritten by Westchester Fire Insurance Company ("Westchester"), with Marsh as the agent to surety company, in the amount of $13.9 million (individually, the "Surety," and collectively, the "Sureties").  The premiums for the surety bonds generally are determined on an annual basis and are paid by the Debtors when the bonds are issued and annually upon renewal.  The annual premium for the Debtors' surety bond with Marsh is approximately $237,000.  A schedule of the surety bonds currently maintained by the Debtors is attached hereto as **Exhibit C**.

24.     In addition, sureties also often require the Debtors to sign an agreement promising to pay the surety in the event the bond is called.  Unlike an insurance policy, if a surety incurs a loss on a surety bond, it is entitled to recover the full amount of that loss from the principal (i.e.,

9

the Debtors).    To that end, the Debtors are party to an indemnity agreement (the "<u>General</u> <u>Indemnity Agreement</u>") with Chubb Limited ("<u>Chubb</u>") that sets forth Chubb's right to recover from the Debtors.    Pursuant to the General Indemnity Agreement, the Debtors agree to indemnify Chubb from any loss, charge, claim, demand, cost, liability, or expense that Chubb may incur on account of the issuance of any bonds on behalf of the Debtors.    Specifically, the General Indemnity Agreement with Chubb allows Chubb to request collateral security from the Debtors from time to time.

25.    To continue their business operations during the reorganization process, the Debtors must be able to provide financial assurance to state governments, regulatory agencies, and other third parties.    This, in turn, requires the Debtors to maintain the existing Surety Bond Program, including paying bond premiums as they come due, providing collateral, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of business, and executing other agreements, as needed, in connection with the Surety Bond Program. Failing to provide, maintain, or timely replace their surety bonds will prevent the Debtors from complying with their state and federal law obligations, and consequently prevent them from undertaking essential functions related to their operations, such as shipping goods.

26.    As of the Petition Date, the Debtors do not believe that they owe any amounts to the Sureties on account of the annual premiums or any other prepetition obligations.    Out of an abundance of caution, however, the Debtors seek authority to honor any amounts owed to the Sureties to ensure the Surety Bond Program remains uninterrupted postpetition.

10

**Basis for Relief**

**I.     Continuation of the Insurance Policies Is Required by the Bankruptcy Code and U.S. Trustee Operating Guidelines.**

27.     Section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.  11 U.S.C. § 1112(b)(4)(C).  In addition, the *Chapter 11 Guidelines for Debtors-in-Possession* require that a debtor "shall maintain" certain types of insurance coverage following the Petition Date, and "make all premium payments thereon when due."  *See U.S. Trustee Guidelines*, §§ I.I, II.A.  Given this backdrop, the Debtors believe it is essential to their estates, and consistent with the Bankruptcy Code and the U.S. Trustee Guidelines, that they maintain and continue to make all payments required under their Insurance Policies, and have the authority to supplement, amend, extend, renew, or replace their Insurance Policies as needed, in their judgment, without further order of the Court.

**II.    Continuing the Insurance Policies and the Surety Bond Program Is Necessary to Preserve the Value of the Debtors' Estates.**

28.     The nature of the Debtors' businesses makes it essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted basis.  The non-payment of any premiums, deductibles, or related fees under the Insurance Policies could result in one or more of the Insurance Carriers terminating or declining to renew their insurance policies or refusing to enter into new insurance policies with the Debtors in the future.  If any of the Insurance Policies lapse without renewal, the Debtors could be exposed to substantial personal liability or property damages, to the detriment of all parties in interest.

29.     As a prerequisite for operations, certain of the Debtors' leases and financing agreements obligate the Debtors to remain current with respect to certain of their primary Insurance Policies.  Thus, in order for the Debtors to maintain their operations in compliance with various

legal and contractual obligations, the Debtors must be able to continue their Insurance Policies without disruption.

30.     The continued retention of the Insurance Brokers allows the Debtors and their employees to focus on the core operational matters associated with manufacturing, marketing, and retailing children's apparel.  The Debtors are not well-suited to bring the services provided by Marsh in-house.  If the Debtors failed to make timely payments to Marsh, the Debtors may lose access to valuable claims management, requiring them to retain more expensive litigation servicers who are less familiar with existing files, to the detriment of all stakeholders.

31.     Continuing the Surety Bond Program is necessary to maintain the Debtors' current business operations.  Based on the Debtors' current circumstances, it is not likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the Sureties.  Moreover, the process of establishing a new Surety Bond Program would be burdensome to the Debtors, and it is doubtful that the Debtors could replace all of the surety bonds in time to avoid defaults or other consequences of the applicable obligations.

## III.    Continuing the Insurance Policies and Paying Obligations Under the Insurance Policies and the Surety Bond Program in the Ordinary Course of Business Is Warranted.

32.     Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1). Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Insurance Policies and to renew or obtain new insurance policies, as such actions are in the ordinary course of the Debtors' businesses.  Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to avoid any disruptions to their business operations.

33.     The Court may also grant the relief requested herein pursuant to section 363(b) of the Bankruptcy Code. Section 363(b) provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b), courts in this jurisdiction require only that the debtor "show that a sound business purpose" justifies the proposed use of property. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *see also James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants); *In re Trilogy Dev. Co.*, LLC, 2010 Bankr. LEXIS 5636, at *3–4 (Bankr. W.D. Mo. 2010).

34.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), courts may authorize preplan payments of prepetition obligations when doing so is essential to the continued operation of a debtor's businesses.  *See, e.g.*, *In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor." (citation omitted)); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); *see also In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where

13

such payments are critical to the debtor's organization"). Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *Ionosphere Clubs*, 98 B.R. at 176.

35.     The Debtors submit that there is sufficient business justification to grant the relief requested herein because failure to pay premiums and related insurance expenses under the Insurance Policies and the Financing Agreements when due may harm the Debtors' estates in a number of ways. Specifically, the Insurance Carriers may refuse to renew the Insurance Policies, which will require the Debtors to obtain replacement policies and possibly reconfigure their risk management program. That scenario would require the commitment of significant resources and could result in less favorable coverage or terms. Additionally, the Insurance Carriers could attempt to terminate the Debtors' existing policies, which could threaten the Debtors' ability to continue operating their business given the Debtors' myriad regulatory and contractual obligations to maintain specific amounts and types of insurance coverage.

36.     The Debtors submit that it is also in the best interests of their estates to have the ability to revise, extend, supplement, or otherwise change insurance coverage, as necessary, on a postpetition basis. Indeed, the Insurance Policies are essential to the preservation of the value of the Debtors' estates and their ability to successfully prosecute these chapter 11 cases. Accordingly, in the event any of the Insurance Policies lapse or new coverage becomes necessary, it is imperative that the Debtors be able to renew, supplement, or purchase insurance coverage on a postpetition basis in the ordinary course of business. The Insurance Policies protect the Debtors and other parties in interest from losses caused by casualty, natural disaster, fraud, and other unforeseen events. Courts in this circuit and other jurisdictions have routinely granted relief

similar to that requested herein. *See, e.g.*, *In re Gordmans Stores, Inc.*, No. 17-80304 (TLS)

(Bankr. D. Neb. Mar. 14, 2017) (authorizing debtors to pay prepetition premiums and enter into

new insurance policies pursuant to sections 105(a) and 363(b) of the Bankruptcy Code); *In re*

*Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. May 17, 2016) (same); *In re*

*Abengoa Bioenergy US Holding, LLC*, No. 16-41161-659 (CAS) (Bankr. E.D. Mo. Apr. 12, 2016)

(same); *In re Arch Coal, Inc.*, No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 14, 2016) (same); *In re*

*Magnetation LLC*, No. 15-50307 (GFK) (Bankr. D. Minn. May 7, 2015) (same).[7]

## IV.   The Court Should Authorize the Debtors to Honor and Renew Their Premium Financing Agreements.

37.   Payment of prepetition premiums and amounts owing under the Premium

Financing Agreements is necessary and appropriate and may be authorized under sections 105(a)

and 363(b) of the Bankruptcy Code.   Moreover, pursuant to section 364(c) of the

Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured postpetition

debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best

interests of the estate. *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y.

1990) (stating that with respect to postpetition credit, courts "permit debtors in possession to

exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Prod.*

*Co.*, 47 B.R. 444, 448–49 (D. Colo. 1985) (authorizing interim financing agreement where debtor's

business judgment indicated financing was necessary and reasonable for benefit of estate).   As

discussed above, the Debtors believe that continuing to perform under the Premium Financing

Agreements on a postpetition basis is in the best interests of their estates.   Moreover, in light of

their financial circumstances, alternative Premium Financiers may not be willing to provide

---

[7]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.
Copies of these orders are available upon request to the Debtors' proposed counsel.

insurance premium financing to the Debtors on attractive market terms on a postpetition basis. Simply put, it is critical for the Debtors to continue to perform under their existing Premium Financing Agreements.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

38.    The Debtors have sufficient funds to pay any amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing and cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Insurance Policies, Insurance Obligations, and the Surety Bond Program.  Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

39.    Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to (a) continue existing insurance coverage entered into prepetition and satisfy payment obligations related thereto in the ordinary course of business, and (b) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business, as well as granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases.  As supported by the First Day Declaration, failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.

For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

40. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

41. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

42.     The Debtors have provided notice of this Motion to the following parties or their respective counsel: (a) the office of the U.S. Trustee for the District of Nebraska; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition asset-based facility; (d) the agents under the proposed DIP Facility; (e) the agents under the Debtors' prepetition term loan facility; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the District of Nebraska; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

43.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an Order granting the

relief requested herein and such other relief as the Court deems appropriate under the

circumstances.

| | |
|---|---|
| Dated:  January 16, 2019 | /s/ Michael T. Eversden |
| Omaha, Nebraska | James J. Niemeier (NE Bar No. 18838) |

James J. Niemeier (NE Bar No. 18838)
Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Telephone:      (402) 341-3070
Facsimile:       (402) 341-0216
Email:             jniemeier@mcgrathnorth.com
                       meversden@mcgrathnorth.com
                       lgoodman@mcgrathnorth.com

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Travis M. Bayer (*pro hac vice* pending)
Jamie Netznik (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:             james.sprayregen@kirkland.com
                       patrick.nash@kirkland.com
                       travis.bayer@kirkland.com
                       jamie.netznik@kirkland.com

- and -

Steven Serajeddini (*pro hac vice* pending)
Daniel Rudewicz (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:             steven.serajeddini@kirkland.com
                       daniel.rudewicz@kirkland.com

*Proposed Co-Counsel to the Debtors*

**Proposed Order**[1]

---

[1]     **NTD**:  to remove prior to filing.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) | Case No. 19-[_____] (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | **Re:  Docket No. __** |

## ORDER (I) AUTHORIZING THE DEBTORS
## TO CONTINUE AND RENEW THEIR INSURANCE
## COVERAGE AND POLICIES ENTERED INTO PREPETITION
## AND SATISFY OBLIGATIONS RELATED THERETO AND RELATED
## TO THE SURETY BOND PROGRAM, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy payment of prepetition obligations related thereto in the ordinary course of business and renew, supplement, or purchase insurance coverage in the ordinary course of business and (ii) continue performance under prepetition insurance premium financing agreements and renew, supplement, or enter into insurance premium financing agreements in the ordinary course of business, and (iii) continue and renew their surety bond program on an uninterrupted basis; and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

matter pursuant to 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5 of the United States

District Court for the District of Nebraska; and that this Court may enter an order consistent with

Article III of the United States Constitution; and this Court having found that venue of this

proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

this Court having found that the relief requested in the Motion is in the best interests of the Debtors'

estates, their creditors, and other parties in interest; and this Court having found that the Debtors'

notice of the Motion and opportunity for a hearing on the Motion were appropriate under the

circumstances and no other notice need be provided; and this Court having reviewed the Motion

and having heard the statements in support of the relief requested therein at a hearing before this

Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth

in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of

the proceedings had before this Court; and after due deliberation and sufficient cause appearing

therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. The Debtors shall serve a copy of the Motion and this Order on each Insurance

Carriers and Surety listed on **Exhibits A and C** within two business days after the date this Order

is entered.

3. Subject to: (a) any order approving the Debtors' use of cash collateral and/or any

postpetition financing facilities (the "DIP Order"), the documentation in respect of any such

postpetition financing facilities and/or use of cash collateral (the "DIP Documents"), and the

budget governing any such postpetition financing and/or use of cash collateral (the "DIP Budget");

and (b) any and all claims, liens, security interests, and priorities granted in connection with such

postpetition financing facilities and/or use of cash collateral (the "DIP Claims"), the Debtors are

authorized to:

(a)      continue the Insurance Policies identified on **Exhibit A** to the Motion and pay any prepetition or postpetition obligations related to the Insurance Policies in accordance with the same practices and procedures as were in effect prior to the commencement of the Debtors' chapter 11 cases;

(b)      maintain the Surety Bond Program without interruption, including the payment of premiums, performance under any General Indemnity Agreement (including posting collateral as security), renewal or obtainment of new surety bonds, and execution of other agreements in connection with the Surety Bond Program;

(c)      renew, amend, supplement, extend, or purchase insurance policies to the extent that the Debtors determine that such action is in the best interest of their estates;

(d)      honor any amounts owed on account of any Insurance Policy Audits in the ordinary course of business;

(e)      honor obligations under their Premium Financing Agreements without interruption and in accordance with the same practices and procedures as were in effect prior to the commencement of the Debtors' chapter 11 cases; and

(f)      renew or enter into new premium financing agreements in connection with their Insurance Policies, including, without limitation, upon the expiration or termination of any Premium Financing Agreement.

4.      Notwithstanding anything to the contrary contained in this Order or otherwise: (i) nothing in this Order shall amend, modify, or impair any provision of the DIP Order or DIP Budget, or the rights of agent under the DIP Facility (the "Agent") and lenders thereunder; and (ii) to the

3

extent of any conflict between the terms of this Order and the terms of the DIP Order, the terms of

the DIP Order shall control.

5.      The banks and financial institutions on which checks were drawn or electronic

payment requests made in payment of the prepetition obligations approved herein are authorized

to receive, process, honor, and pay all such checks and electronic payment requests when presented

for payment, and all such banks and financial institutions are authorized to rely on the Debtors'

designation of any particular check or electronic payment request as approved by this Order.

6.      Notwithstanding the relief granted in this Order and any actions taken pursuant to

such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any

prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in

interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to

pay any prepetition claim; (d) an implication or admission that any particular claim is of a type

specified or defined in this Order or the Motion; (e) a request or authorization to assume any

prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a

waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any

other applicable law.

7.      The Debtors are authorized to issue postpetition checks, or to effect postpetition

fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored

as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection

with the relief granted herein.

8.      Nothing in this Order or the Motion shall be construed as prejudicing the rights of

the Debtors to dispute or contest the amount of or basis for any claims against the Debtors in

connection with or relating to the Debtors' Insurance Policies, Insurance Obligations, or Surety Bond Program.

9.      Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in the Motion or this Order or any payment made pursuant to this Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim or lien against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or lien, or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

10.     Notwithstanding the relief granted in this Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to any order authorizing use of cash collateral.

11.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

12.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

13.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

14.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

15.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____, 2019                    _____
Omaha, Nebraska                                    United States Bankruptcy Judge

5

## Exhibit A

### Insurance Policies

| Type | Insurance Issuer | Policy Number | Policy Term Start | Policy Term End | Premium |
|---|---|---|---|---|---|
| D&O & Employment Practices Liability (Annual Installment) | National Union Fire (Chartis) | 16157913 | 07/31/16 | 07/31/18 | 150,463 |
| Excess D&O / EPL (Annual Installment) | Chubb | 82480975 | 07/31/16 | 07/31/18 | - |
| D&O - Side A (Annual Installment) | Chubb | ELU135499-14 | 07/31/16 | 07/31/18 | 27,500 |
| Fiduciary Liability  (Annual Installment) | National Union Fire (Chartis) | 16157913 | 07/31/16 | 07/31/18 | 14,045 |
| Crime (Annual Installment) | Chubb | 82480975 | 07/31/16 | 07/31/18 | 62,928 |
| Special Crime (prem. Is 2 year term) | Chubb | 82480963 | 07/31/16 | 07/31/18 | 968 |
| Property - Ocean Cargo | AIG | 051760701 | 11/1/2017 | 11/1/2018 | 30,982 |
| Property - Flood Policy | Homesite | 300002008 Contents 300002006 Building | 04/18/18 | 04/18/19 | 1,398 |
| Property - Flood Policy | Homesite | 3000018144 | 07/10/18 | 07/10/19 | 4,337 |
| Property - Flood Policy | Homesite | 3000016580 Bldg. 3000079693 Contents | 09/06/18 | 09/06/19 | 1,778 |
| Property - Flood Policy | Homesite | 3000018647 | 05/05/18 | 05/05/19 | 1,173 |
| Property - Flood Policy | Homesite | 3000018648 | 02/11/18 | 02/11/19 | 17,642 |
| Property - Flood Policy | Homesite | 3000018645 | 08/23/18 | 08/23/19 | 1,355 |
| Property - Flood Policy | Homesite | 3000018644 | 03/18/18 | 03/18/19 | 3,323 |
| Property - Flood Policy | Homesite | 3000068494 Bldg 3000068497 Contents | 03/17/18 | 03/17/19 | 3,543 |
| Property - Flood Policy | Homesite | 3000068852 Bldg 3000068854 Contents | 03/20/18 | 03/20/19 | 1,564 |
| Property - Flood Policy | Homesite | 3000068860 Bldg 3000068862 Contents | 03/20/18 | 03/20/19 | 1,509 |
| Property - Flood Policy | Homesite | 3000018462 | 09/22/18 | 09/22/19 | 1,715 |
| Casualty - Work Comp | ACE American | WLRC65434386 | 11/01/18 | 11/01/19 | 547,700 |
| Casualty - Work Comp | ACE American | SCFC65434428 | 11/01/18 | 11/01/19 | 60,252 |
| Casualty - General Liability | ACE American | XSLG71209015 | 11/01/18 | 11/01/19 | 226,496 |
| Casualty - General Liability (Spirit Locations) | ACE American | XSLG71209052 | 11/01/18 | 11/01/19 | 5,000 |
| Casualty - Michigan Liquor Policy | ACE American | HDOG71208977 | 11/01/18 | 11/01/19 | 500 |
| Casualty - Automobile Liability | ACE American | CALH26271713 | 11/01/18 | 11/01/19 | 8,192 |
| Casualty - Umbrella Liability | ACE Prop & Cas | XOOG27918852004 | 11/01/18 | 11/01/19 | 259,478 |
| Casualty - Excess Liability ($25M xs $25M) | Liberty Ins. Underwriters, Inc. | ECO1959277970 | 11/01/18 | 11/01/19 | 50,727 |
| Casualty - Excess Liability ($25M xs $50M) | Indemnity Insurance Company of North America | XSMG46831974002 | 11/01/18 | 11/01/19 | 35,000 |
| Miscellaneous - Optometrist Professional Liability | Coverys Specialty Insurance Co. | 5-10315 | 11/01/18 | 11/01/19 | 109,151 |
| Miscellaneous - Pharmacy Professional Liability | Coverys Specialty Insurance Co. | 5-10314 | 11/01/18 | 11/01/19 | 357,622 |

| Type | Insurance Issuer | Policy Number | Policy Term Start | Policy Term End | Premium |
|---|---|---|---|---|---|
| Miscellaneous - Storage Tank Liability | Liberty Surplus Insurance Co. | TXENYB1225518 | 11/01/18 | 11/01/19 | 11,219 |
| Miscellaneous - Foreign Package | Great Northern | 73195563 | 11/01/18 | 11/01/19 | 2,750 |
| Cyber | Lloyd's of London | B0713MEDTE1800964 | 2/7/18 | 4/30/19 | 224,897 |
| Property | XL Insurance America, Inc. | US00084156PR18A | 4/30/18 | 4/30/19 | 1,522,115 |
| Total | | | | | 3,747,322 |

## Exhibit B

### Premium Financing Agreements

| Type of Agreement | Issuer | Agreement Number | Policy Term Start | Policy Term End | Total Premiums |
|---|---|---|---|---|---|
| PROPERTY | Lloyds of London | PRNPNA180 & related policies | 4/30/2018 | 4/30/2019 | 1,522,115.41 |
| STLB | Liberty | TXENYB122 & related policies | 11/1/2018 | 11/1/2019 | 11,219.00 |
| AUTO | Ace | CALH252717 & related policies | 11/1/2018 | 11/1/2019 | 8,192.00 |
| CARGO | National Union Fire | 51760701 & related policies | 11/1/2018 | 11/1/2019 | 30,982.00 |
| CARGO | National Union Fire | 51760701 | 11/1/2018 | 11/1/2019 | 30,982.00 |
| XSLB | Ohio Casualty | 100006517807 | 11/1/2018 | 11/1/2019 | 50,727.00 |
| MDPL | Proselect | 5-10314 | 11/1/2018 | 11/1/2019 | 357,622.00 |
| MDPL | Proselect | 5-10315 | 11/1/2018 | 11/1/2019 | 109,151.00 |
| CARGO | Great Northern | 73195563 | 11/1/2018 | 11/1/2019 | 2,750.00 |
| BOND | Westchester Fire | K08338292 | 11/1/2018 | 11/1/2019 | 207,375.00 |
| GL | ACE | XSLG71209015 | 11/1/2018 | 11/1/2019 | 226,494 |
| GL | ACE | XSLG71209052 | 11/1/2018 | 11/1/2019 | 5,000 |
| GL | ACE | HDOG712089 | 11/1/2018 | 11/1/2019 | 500 |
| WC | ACE | WLRC65434386 | 11/1/2018 | 11/1/2019 | 521,799 |
| WC | ACE | SFC6543442 | 11/1/2018 | 11/1/2019 | 42,098 |
| UMB | ACE | XOOG279188 | 11/1/2018 | 11/2/2019 | 259,478 |
| XSLB | Ohio Casualty | 100006517807 | 11/1/2018 | 11/1/2019 | 50,727 |
| XSLB | Indemnity Insurance | XSMG468319 | 11/1/2018 | 11/1/2019 | 35,000 |

## Exhibit C

## Surety Bonds

| Type | Bond Number | Surety Writing Company | Bond Amount |
|------|-------------|------------------------|-------------|
| Customs & Excise Tax | 060321007 | Westchester Fire Insurance Company | 1,500,000 |
| Financial Guarantee | K04194639 | Westchester Fire Insurance Company | 545,000 |
| License & Permit | K04194792 | Westchester Fire Insurance Company | 5,000 |
| License & Permit | K07338491 | Westchester Fire Insurance Company | 100,000 |
| Financial Guarantee | K08338292 | Westchester Fire Insurance Company | 11,500,000 |
| Financial Guarantee | K08633708 | Westchester Fire Insurance Company | 2,500 |
| License & Permit | K08759911 | Westchester Fire Insurance Company | 1,000 |
| License & Permit | K08759959 | Westchester Fire Insurance Company | 13,000 |
| License & Permit | K08759996 | Westchester Fire Insurance Company | 5,000 |
| License & Permit | K0876007A | Westchester Fire Insurance Company | 2,000 |
| License & Permit | K08760196 | Westchester Fire Insurance Company | 20,000 |
| License & Permit | K08760378 | Westchester Fire Insurance Company | 10,000 |
| Financial Guarantee | K0881790A | Westchester Fire Insurance Company | 48,000 |
| Notary | K09270218 | Westchester Fire Insurance Company | 500 |
| License & Permit | K09520466 | Westchester Fire Insurance Company | 10,000 |
| Financial Guarantee | K09520909 | Westchester Fire Insurance Company | 67,238 |
| License & Permit | K09606142 | Westchester Fire Insurance Company | 5,000 |
| Notary | K13541887 | Westchester Fire Insurance Company | 500 |
| Total | | | $    13,834,738 |