## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) Case No. 19-80064-TLS |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO
THE PREPETITION LENDERS, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Specialty Retail Shops Holding Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested[2]

1. The Debtors seek entry of an interim order and final order (the "Interim Order" and the "Final Order," and collectively, the "DIP Orders"):

    a.    authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis consisting of (i), a senior secured superpriority revolving credit facility up to the aggregate principal amount of up to $400,000,000 (the "DIP Revolving A Loan" or

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592). The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2]    Capitalized terms used but not defined in this section have the meanings ascribed to such terms further below in this Motion or in the Interim Order, as applicable.

"DIP Revolving Loans A Limit," as applicable), (ii), a senior secured first-in-last-out revolving credit facility of up to $30,000,000 (the "DIP Revolving A-1 Loan" or "DIP Revolving Loans A-1 Limit," as applicable, and the DIP Revolving A-1 Loan together with the DIP Revolving A Loan, the "DIP ABL Loans"), and (iii) a senior secured term loan of up to $49,055,312.50 (the "DIP Term Loan B" or the "DIP Term Loan B Limit," as applicable) (collectively, the DIP ABL Loans and DIP Term Loan B, the "DIP Facility"), substantially in the form of **Exhibit A.**[3]

b.      authorizing the Debtors to execute and deliver the Ratification Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other Financing Agreements (as defined in the Loan Agreement) and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the Ratification Agreement, the "Financing Agreements") and to perform such other acts as may be necessary or desirable in connection with the Financing Agreements;

c.      granting the DIP Facility and all obligations owing thereunder and under, or secured by, the Financing Agreements to the Agent, and Lenders (collectively, and including all "Post-Petition Obligations" as described in the Ratification Agreement, the "Post-Petition Obligations") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases;

d.      granting to the Agent, for the benefit of itself and the Lenders (as defined in the Loan Agreement), and the other Secured Parties under the applicable Financing Agreements, automatically perfected security interests in and liens on all of the Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth in the Interim Order;

e.      authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the Financing Agreements as such become earned, due and payable, including, letter of credit fees (including issuance and other related charges),

---

3   Upon entry of the Interim Order, all Pre-Petition ABL Obligations (as defined in the Interim Order) and all accrued and unpaid interest thereon and fees and expenses shall begin to be rolled into the DIP Facility and upon entry of the Final Order, will be fully "rolled up" along with the Pre-Petition Term Loan B Obligations into the DIP Facility and constitute Post-Petition Obligations thereunder.

continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable fees and disbursements of the Agents' attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the Financing Agreements;

f. authorizing the Debtors to use the Pre-Petition Collateral (as defined herein), including the Cash Collateral of the Prepetition Secured Parties under the Pre-Petition Loan Agreement, and providing adequate protection to the Prepetition Secured Parties for any diminution in value resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Pre-Petition Collateral, including Cash Collateral, the priming of their respective interests in the Pre-Petition Collateral, including by the Carve Out, ("Diminution in Value") of their respective interests in the Pre-Petition Collateral, including the Cash Collateral in accordance with the Interim Order;

g. vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Financing Agreements and the Interim Order;

h. scheduling a final hearing (the "Final Hearing") within 30 days of the Petition Date to consider the relief requested in this Motion and approving the form of notice with respect to the Final Hearing; and

i. granting related relief.

2. In support of this Motion, the Debtors respectfully submit:  (a) the *Declaration of Russell L. Steinhorst, Chief Executive Officer of Specialty Retail Shops Holding Corp., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), (b) the *Declaration of Stephen Spencer in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Spencer Declaration"), filed contemporaneously herewith.

3

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the District of Nebraska (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101—1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002 and 4001, and 9014, and Rule 9013-1 of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules").

## Background

6.      The Debtors are engaged in the sale of general merchandise including clothing, accessories, electronics, and home furnishings, as well as company operated pharmacy and optical services departments.  The Debtors are headquartered in Green Bay, Wisconsin, and operate approximately 367 stores in 25 states throughout the United States, as well as e-commerce operations.  The Debtors and their non-Debtor subsidiaries generated approximately $2.6 billion in revenue in fiscal year 2017 and currently employ approximately 14,000 people throughout the United States.

7.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b)  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

8.      A description of the Debtors' businesses is more fully set forth in the *Declaration of Russell L. Steinhorst, Chief Executive Officer of Specialty Retail Shops Holding Corp., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

## Basis for Emergency Relief

9.      As set forth in the Spencer Declaration and the First Day Declaration, this Motion is brought on an emergency basis in light of the immediate and irreparable harm that would be suffered by the Debtors' bankruptcy estates if the Debtors were denied the financing needed to sustain on-going business operations during the critical first weeks of these cases.  Several extraordinary circumstances justify the relief requested here:

a.    **The Debtors' Estates will Suffer Immediate and Irreparable Harm if the Requested Relief Is not Granted**:

(1)    As set forth herein and in the Spencer Declaration, the Debtors are entering chapter 11 with limited cash on hand, and the Debtors require immediate access to the liquidity provided by the DIP Facility to operate their businesses postpetition.

(2)    As set forth herein and in the Spencer Declaration, the DIP Facility represent the most favorable and executable transaction available to the Debtors.  Because the Debtors have no other viable source of available third-party debtor-in-possession financing, absent the funds provided by the DIP Facility, on the terms negotiated, the Debtors would run out of cash and would have no alternative but to convert these cases to cases under chapter 7.  Under such a forced liquidation, stakeholders would receive lesser recoveries than they would in a chapter 11 reorganization, and all

parties in interest, including thousands of employees, would suffer in the process.

(3)    The requested relief is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the liquidity that would be provided through their proposed interim borrowings, on the terms and conditions set forth in the Financing Agreements and the Interim Order and Final Order.

b.    **The Proposed DIP Facility Is the Best and Only Available Option For the Debtors**

(1)    The Debtors, with assistance from experienced financial and legal advisors, sought to solicit offers from third parties to provide postpetition financing on more favorable terms than the Lenders.

(2)    Negotiations with potential and interested financing parties, including the Lenders, were conducted in good faith and at arms' length. Notwithstanding the marketing efforts of the Debtors' advisors, the DIP Facility remain the best and only workable option.

(3)    The DIP Facility provides the Debtors with reasonable restructuring milestones and covenants, and represents the only source of financing available to the Debtors that provides a reasonable prospect of a successful balance sheet restructuring, thereby maximizing value for all stakeholders.

c.    **The Proposed DIP Facility Will Send a Positive Signal to the Market**:

(1)    As described in the First Day Declaration, the Debtors operate in a highly competitive market, which has faced increasing headwinds in recent years.

(2)    The Debtors expect that their vendors, landlords, and other stakeholders will be focused on whether the chapter 11 cases are appropriately capitalized, such that the Debtors can continue operating as a going concern. If there is any significant doubt about the Debtors' viability, vendors may not be willing to accept new purchase orders on anything other than cash-in-advance terms, especially purchase orders with long-lead times. By contrast, access to the DIP Facility will allow the Debtors to purchase fresh inventory, to maintain normalized trade credit terms with their vendors, and to negotiate credibly with their landlords.

(3)    The Debtors' industry is highly seasonal, and the proposed DIP Facility will provide the Debtors with the liquidity necessary to fund their operations. Any delay in the delivery of inventory would irreparably harm the Debtors' estates.

d.    **The Debtors' Proposed Conversion of Certain of Their Obligations Under the Pre-Petition Loan Agreement into Post-Petition Obligations Will Benefit Stakeholders**:

(1)    The conversion of the applicable obligations under the Pre-Petition Loan Agreement into Post-Petition Obligations will benefit the Debtors and their estates and was a necessary condition to the extension of the Post-Petition Obligations.

(a)    The conversion of the applicable obligations under the Pre-Petition Loan Agreement into Post-Petition Obligations is expected to create availability under the DIP Facility over the pendency of the case, allowing the Debtors to purchase critical inventory at an interest rate under the DIP Facility that represents the best available market rate for the Debtors. The conversion of the applicable obligations under the Pre-Petition Loan Agreement into Post-Petition Obligations also allows the Debtors to borrow at increased advance rates against their inventory.

(b)    As set forth more fully herein and in the Spencer Declaration, the Debtors believe that the applicable obligations outstanding under the Pre-Petition Loan Agreement are fully secured by perfected, first priority liens with respect to, among other things, inventory and receivables, with a value in excess of outstanding borrowings. The conversion merely accelerates the satisfaction of the Pre-Petition Loan Agreement obligations and converts such obligations into Post-Petition Obligations without affecting recovery to other creditors.

(c)    The Debtors seek to use Cash Collateral. Nevertheless, as set forth herein, in the Spencer Declaration and in the First Day Declaration, the Cash Collateral alone is not sufficient to meet the Debtors' liquidity needs during these chapter 11 cases, and the use of Cash Collateral requires the consent or adequate protection of the Prepetition Lenders. Similarly, access to the proposed DIP Facility (i) would be insufficient to fund these

7

chapter 11 cases alone and (ii) is conditioned upon availability of commitments under the DIP Facility.

(d)     The Debtors intend to convert certain of the obligations under the Pre-Petition Loan Agreement into Post-Petition Obligations following entry of the Interim Order, and to draw on the DIP Facility to fund their working capital needs during the pendency of these chapter 11 cases, in each case on a daily basis. Without the additional liquidity provided by the DIP Facility the Debtors would be forced to liquidate, to the detriment of all parties in interest.

e.     **The Proposed Lenders Have Proceeded in "Good Faith"**:

(1)     As further detailed herein and in the Spencer Declaration, the Debtors' negotiations with their Lenders were vigorous, hard fought, and conducted at arms' length with the assistance of the Debtors' advisors.

(2)     Each alternative proposal was duly reviewed and analyzed by the Debtors and their experienced professionals. Ultimately, the Debtors selected the postpetition financing that was fully-committed with favorable terms, including substantial operational flexibility and appropriate case milestones. After exploring alternative proposals, no third party provided a proposal that could serve as a viable alternative for the Debtors. Therefore, the DIP Facility represent the best and only option available to provide the Debtors with access to liquidity to bridge the Debtors from the Petition Date through emergence from chapter 11.

10.     The DIP Facility provides the Debtors with the funding needed to operate and maintain their business, to pay necessary expenses during the pendency of their chapter 11 cases, and to pursue what is currently the best and only path to the continuation of their business as a going concern. Indeed, the proposed DIP Facility works in tandem with the Debtors' proposed chapter 11 plan (the "Plan"), and the related bidding procedures filed contemporaneously herewith, as all are designed to facilitate a process that will maximize value, the likelihood of a going-concern transaction for the benefit of stakeholders enterprise-wide, including thousands of jobs, and the confirmation of the Plan. Indeed, if the Debtors are able to secure an acceptable Plan

sponsor, certain of the Debtors' first-out secured lenders, led by the Agent, have indicated that they would be willing to provide an exit facility that will satisfy all remaining Post-Petition ABL Obligations and Post-Petition Term Loan B Obligations.

11.    Moreover, the Debtors are unable to obtain such financing as unsecured credit pursuant to sections 364(a) or (b) of the Bankruptcy Code, allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or as secured credit pursuant to section 364(c) of the Bankruptcy Code on more favorable terms from other sources. Absent the DIP Facility, on the terms negotiated, the Debtors would run out of cash and be forced to liquidate their business, with all stakeholders receiving lesser recoveries than they would in a reorganization. Failure to obtain the financing provided by the DIP Facility would also result in future harm to the Debtors' vendors (through loss of future orders), landlords (through loss of a stable tenant), and thousands of employees (through loss of their employer).

12.    The use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs. The Debtors therefore respectfully request approval of the DIP Facility, which is consented to by each of the Lenders (pursuant to the Loan Agreement), and the terms and conditions described herein and set forth in the Financing Agreements.

Case 19-80064-TLS    Doc 35    Filed 01/16/19    Entered 01/16/19 11:34:11    Desc Main
Document    Page 10 of 127

**Concise Statements Pursuant to Bankruptcy Rule 4001(b)**[4]

## I.    Concise Statement Regarding the DIP Facility

13.    The chart below contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B).

| Bankruptcy Code | DIP Facility |
|---|---|
| **Borrower(s)**<br>Bankruptcy Rule 4001(c)(1)(B) | ShopKo Properties, LLC<br>Penn-Daniels, LLC<br>ShopKo Stores Operating Co., LLC<br>ShopKo Holding Company, LLC<br>ShopKo Optical Manufacturing, LLC<br>Specialty Retail Shops Holding Corp.<br>ShopKo Institutional Care Services Co., LLC<br>Retained R/E SPE, LLC<br>Pamida Stores Operating Co., LLC<br><br>*See* Ratification Agreement Preamble |
| **Guarantor(s)**<br>Bankruptcy Rule 4001(c)(1)(B) | ShopKo Finance, LLC<br>SVS Trucking, LLC<br>Shopko Gift Card Co., LLC<br>Pamida Transportation, LLC<br>Place's Associates' Expansion, LLC<br>*See* Ratification Agreement Preamble |
| **Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association, a national banking association as Agent and Term Loan B Agent, Shopko Note Holding, LLC, successor to Spirit Realty L.P., as Term Loan B-1 Agent, and each lender from time to time party to the Loan Agreement.<br><br>*See* Ratification Agreement Preamble. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B) | Delivery of all reports and notices and other documents set forth under the sections entitled "Collateral Reporting", "Inventory Covenants", "Equipment and Real Property Covenants", "Prescription File Covenants", and "Access to Premises", in each case, when and as required under of the Loan Agreement.<br><br>*See* Loan Agreement §§ 7.1, 7.3, 7.4, 7.5, 7.9 |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | Agent and Lenders under the Pre-Petition Loan Documents<br>*See* Interim Order Preamble. |

---

[4]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the Loan Agreement and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the Financing Agreements or the Interim Order, as applicable.

| Bankruptcy Code | DIP Facility |
|---|---|
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | Renewal Date-the earliest of: (a) the date that is three hundred and sixty-five (365) days after the commencement of the Chapter 11 Case, (b) thirty (30) days after the entry of the Interim Financing Order if the Permanent Financing Order has not been entered prior to the expiration of such thirty (30) day period, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of the Plan of Reorganization, or (d) the date of confirmation of a plan of liquidation for Borrowers or Guarantors in the Chapter 11 Cases.<br><br>*See* Loan Agreement § 14.1. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Replacement Liens.  As adequate protection for the diminution in value of their interests in the Collateral (including Cash Collateral) on account of the Borrowers' use of such Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out on a dollar-for dollar basis (collectively, the "Diminution in Value"), the Agent, for the benefit of itself and the Lenders, is hereby granted pursuant to §§ 361 and 363 of the Bankruptcy Code, and solely to the extent of the Diminution in Value, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "Pre-Petition Replacement Lien").   The Pre-Petition Replacement Lien shall be junior and subordinate only to (A) the Carve-Out, (B) the Permitted Liens, and (C) Agent's and Lenders' liens on the Collateral to secure the Post-Petition Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.<br><br>Section 507(b) Priority Claims.  As adequate protection for the Diminution in Value, the Agent, for the benefit of itself and Lenders, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to the extent of the Diminution in Value, an allowed superpriority administrative expense claim in each of the Cases and any successor bankruptcy cases (the "Pre-Petition Adequate Protection Superpriority Claim").   The Pre-Petition Adequate Protection Superpriority Claim shall be junior only to (A) the Carve-Out, and (B) the Post-Petition Superpriority Claim, and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.<br><br>Adequate Protection Payments and Protections.  As further adequate protection (the "Adequate Protection Payments") for the Diminution in Value, the Debtors are authorized and directed to provide adequate protection to the Agent and Lenders in the form of payment in cash (i) upon entry of the Interim Order of the reasonable fees, expenses, and disbursements (including, without limitation, the reasonable and documented fees, expenses, and disbursements of counsel and third-party consultants and other vendors, including, without limitation, financial advisors and auditors) incurred by the Agent arising prior to the Petition Date, and (ii) the reasonable fees, expenses, and disbursements (including, without limitation, the fees, expenses, and disbursements of counsel and third-party consultants and other vendors, including, without limitation, financial advisors and auditors) incurred by the Agent arising subsequent to the Petition Date.<br><br>*See* Interim Order ¶ 2.6(b), (c), and (d). |
| **Waiver/Modification of the Automatic Stay** | Modification of Automatic Stay.  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the |

| Bankruptcy Code | DIP Facility |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(iv) | Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit Agent and each Lender to perform any act authorized or permitted under or by virtue of this Interim Order or the Financing Agreements, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the Financing Agreements, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Pre-Petition Obligations or the Post-Petition Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the Financing Agreements (subject to Section 5.12 of this Interim Order) and apply such payments to the Pre-Petition Obligation or Post-Petition Obligations pursuant to the Financing Agreements and/or this Interim Order, as applicable, and upon an Event of Default, (d) declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral and (e) to take any other action and exercise all other rights and remedies provided to it by this Interim Order, the Financing Agreements or applicable law other than those rights and remedies against the Collateral upon the expiration of the Default Notice Period (as defined below).  In addition, and without limiting the foregoing, upon the occurrence of an Event of Default and after providing five (5) business days (the "Default Notice Period") prior written notice (the "Enforcement Notice") to (i) counsel for the Debtors, (ii) counsel for the Committee (if appointed), and (iii)  the U.S. Trustee, the Agent, acting on behalf of itself and the Lenders, without notice, application or order of the Court, shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the Financing Agreements or applicable law that Agent may deem appropriate in its sole discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the Agent, for the benefit of itself and the applicable Lenders, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all Obligations. Notwithstanding anything to the contrary, any action that Agent is otherwise permitted to take pursuant to this Interim Order to (i) terminate the commitments under the Financing Agreements, (ii) accelerate the Loans, (iii) send blocking notices or activation notices pursuant to the terms of any Deposit Account Control Agreement, (iv) repay any amounts owing in respect of the Obligations (including, without limitation, fees, indemnities and expense reimbursements) and (v) cash collateralize Letters of Credit and/or Bank Products issued pursuant to the Financing Agreements, in each case, shall not require any advance notice to the Debtors.  During the Default Notice Period, the Debtors and the Committee (if appointed) shall be entitled to seek an emergency hearing, and the Agent, and Lenders shall consent to such emergency hearing, within the Default Notice Period with the Court; provided that the sole issue that may be raised by the Debtors are whether an Event of Default has occurred and/or is continuing and the Debtors hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Agents or the Lenders set forth in the Interim Order or the Financing Agreements.

*See* Interim Order ¶ 3.4. |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B); | Carve-Out.

(a)     Carve-Out.  As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States |

| Bankruptcy Code | DIP Facility |
|---|---|
| | Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise (and, in the case of the Committee Professionals (as defined below), subject to the Budget), all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and, (subject to the Budget) the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Post-Petition Obligations under the Loan Agreement, respectively, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>(b)      _Fee Estimates_.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Closing Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date") (collectively, "Estimated Fees and Expenses"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided, that within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Accounts (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget (as defined in the Ratification Agreement, the "Budget") for such period for such Professional Person; provided, that such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to |

| Bankruptcy Code | DIP Facility |
|---|---|
| | paragraph 2.3(c) below.  Solely as it relates to the ABL Agent, the Prepetition ABL Lenders, and ABL Lenders, any deemed draw and borrowing pursuant to paragraph 2.3(c)(i)(x) for amounts under paragraph 2.3(a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date plus, without duplication, and (II) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date, and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the Termination Declaration Date (such amount, the "ABL Professional Fee Carve Out Cap").  For the avoidance of doubt, the Agent shall be entitled to maintain at all times a reserve (the "Carve-Out Reserve") in an amount (the "Carve-Out Reserve Amount") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, plus (ii) the Post-Carve Out Trigger Notice Cap, plus (iii) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the following week occurring after the most recent Calculation Date, plus (iv) the amounts contemplated under paragraph 2.3(a)(i) and 2.3(a)(ii) above.  Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the Closing Date, the Debtors shall deliver to the ABL Agent or Term Loan B Agent a report setting forth the Carve-Out Reserve Amount as of such time, and, in setting the Carve-Out Reserve, the ABL Agent or Term Loan B Agent shall be entitled to rely upon such reports in accordance with the Loan Agreement.  Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the Agent shall calculate the Carve-Out Reserve Amount by reference to the Budget for subsection (i) of the Carve-Out Reserve Amount.<br><br>(c)　　Carve Out Reserves.  The delivery of each Weekly Statement shall be (i) deemed a draw request and notice of borrowing by the Debtors for Revolving Loans under the Loan Agreement in an amount equal to the difference between (a) the current balance of the Pre-Carve Out Trigger Notice Reserve (as defined below) and (b) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time; and (ii) a direction from the Debtors to Agent to immediately wire the proceeds of such draw request to the Pre-Carve Out Trigger Notice Reserve (as defined below); provided that, upon the foregoing funding, the Lenders shall have no further obligation to fund the Pre-Carve Out Trigger Notice Reserve on account of any Allowed Professional Fees incurred through the Calculation Date for the most recent Weekly Statement delivered in accordance with Section 2.3(b) above.  On the day on which a Carve Out Trigger Notice is given by the Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall be deemed a draw request and notice of borrowing by the Debtors for Revolving Loans under the Loan Agreement in an amount equal to the sum of (x) the amounts set forth in paragraphs (a)(i) and (a)(ii), above, and (y) the then unpaid amounts of the Allowed Professional Fees up to the ABL Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute Revolving Loans), and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held |

| Bankruptcy Code | DIP Facility |
|---|---|
| | by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable Revolving Loans pursuant to the foregoing clause of this paragraph (c)).  The Debtors shall deposit and hold such amounts in a segregated account at the Agent in trust exclusively to pay such unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve").  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the Debtors for (1) Revolving Loans under the Loan Agreement in an amount equal to the Post Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Revolving Loans), and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to Post-Carve Out Trigger Notice Cap (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable Revolving Loans pursuant to the foregoing clause of this paragraph (c)).  The Debtors shall deposit and hold such amounts in a segregated account at the Agent in trust exclusively to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves").  On the third business day following the Termination Declaration Date and the deemed requests for the making of Revolving Loans as provided in this paragraph (c),  notwithstanding anything in the Loan Agreement to the contrary, including with respect to (1) the existence of a Default or Event of Default, (2) the failure of the Debtors to satisfy any or all of the conditions precedent for the making of any Revolving Loans under the Loan Agreement, (3) any termination of the Commitments following an Event of Default, or (4) the occurrence of the Maturity Date, each Lender with an outstanding Commitment shall make available to the Agent, as applicable, such Lender's pro rata share of such Loans, as applicable.  For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order to secure payment of the Carve Out shall be limited to any shortfall in funding as provided below.<br><br>(d)      Application of Carve Out Reserves.  (i)  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in subparagraphs (a)(i) through (a)(iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap (other than amounts up to $500,000 to the extent the Pre-Carve Out Amounts exceed the ABL Professional Fee Carve Out Cap), until paid in full.  If the Pre Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed first to the ABL Agent on account of the applicable Obligations until indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Issuing Bank), and thereafter  to the Prepetition ABL Lenders in accordance with their rights and priorities as of the Petition Date.<br><br>(ii)      All funds in the Post-Carve Out Trigger Notice Reserve (other than up to $500,000, which may be used to pay Pre-Carve Out Amounts to the extent they exceed the ABL Professional Fee Carve Out Cap) shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth |

| Bankruptcy Code | DIP Facility |
|---|---|
| | above (the "Post-Carve Out Amounts").  If the Post Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed first to the ABL Agent on account of the applicable Obligations until indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the applicable Issuing Bank), and thereafter  to the Prepetition ABL Lenders in accordance with their rights and priorities as of the Petition Date.<br><br>(iii)      Notwithstanding anything to the contrary in the Financing Agreements or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph (c), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve to the extent of any shortfall in funding prior to making any payments to the ABL Agent or the Prepetition ABL Lenders, as applicable.<br><br>(iv)      Notwithstanding anything to the contrary in the Financing Agreements or the Interim Order, following the third business day after delivery of a Carve Out Trigger Notice, the ABL Agent, the Prepetition ABL Agent, the Term Loan B Agent, and the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid as provided in paragraphs (ii) and (iii) above.<br><br>(v)      Notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (ii) subject to the limitations with respect to the ABL Agent, ABL Lenders, Prepetition ABL Agent and Prepetition ABL Lenders set forth in paragraph (b), above, in no way shall the Initial Budget, any Approved Budget, Annual Operating Forecast, Carve Out, Post-Carve Out Trigger Notice Cap or Carve Out Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Loan Agreement, the Carve Out shall be senior to all liens and claims securing the Loan Agreement, the Adequate Protection Liens, and the Diminution in Value claims, and any and all other forms of adequate protection, liens, or claims securing the Post-Petition Obligations or the Pre-Petition Obligations.<br><br>(d)      No Direct Obligation To Pay Allowed Professional Fees.  The Agent and the Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the Agent or the Lenders, or any Issuing Bank, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.<br><br>(e)      Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out; provided that, upon the funding in the first sentence of Section 2.3(c) above, and solely as it relates to |

| Bankruptcy Code | DIP Facility |
|---|---|
|  | the ABL Agent, the Prepetition ABL Lenders, and ABL Lenders, such parties shall have no further obligation to fund the Pre-Carve Out Trigger Notice Reserve on account of any Allowed Professional Fees incurred through the Calculation Date for the most recent Weekly Statement delivered in accordance with Section 2.3(b) above. |
|  | (f) <u>Payment of Carve Out On or After the Termination Declaration Date.</u> Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the Obligations secured by the Post-Petition Collateral and shall be otherwise entitled to the protections granted under this Final Order, the Financing Agreements, the Bankruptcy Code, and applicable law. |
|  | *See* Interim Order ¶ 2.3. |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) | <u>Section 506(c) Claims.</u> Subject to entry of the Final Order, no costs or expenses of administration which have or may be incurred in the Cases shall be charged against Agent or any Lender, their respective claims or the Collateral pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise without the prior written consent of Agent, and no such consent shall be implied from any other action, inaction or acquiescence by Agent or any Lender. |
|  | *See* Interim Order ¶ 4.3. |
| **Section 552(b)** <br> Bankruptcy Rule 4001(c)(l)(B) | <u>Marshalling.</u> Subject to entry of the Final Order granting such relief, in no event shall Agent or any Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral. Agent and Lender shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to Agent or any Lender with respect to proceeds, products, offspring or profits of any of the Collateral, as applicable |
|  | *See* Interim Order ¶ 5.9. |
| **Commitment** <br> Bankruptcy Rule 4001(c)(1)(B) | <u>Commitments.</u> As of the Ratification Closing Date, the commitments total $513,471,687.50. |
|  | *See* Loan Agreement Exhibit D. |
| **Conditions of Borrowing** <br> Bankruptcy Rule 4001(c)(1)(B) | <u>Conditions of Effectiveness of Ratification Agreement-</u> Ratification Agreement shall only become effective upon satisfaction (or waiver) of all of the following conditions precedent: |
|  | • as of the Petition Date, the Pre-Petition Financing Agreements shall not have been terminated; |
|  | • Borrowers and Guarantors shall have commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court having exclusive jurisdiction over the Chapter 11 Cases by no later than January 16, 2019; |
|  | • Borrowers and Guarantors shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to |

| Bankruptcy Code | DIP Facility |
|---|---|
| | Agent and its counsel, with respect to the Interim Financing Order and Agent shall have received such evidence thereof as it shall reasonably require; |
| | • no trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Borrower or Guarantor or their respective business, properties or assets and no motion shall be pending seeking any such relief; |
| | • all of the first day orders shall have been entered by the Bankruptcy Court by the third (3rd) day following the Petition Date and shall be in form and substance satisfactory to Agent; |
| | • a cash management order approving the cash management arrangements of Borrowers and Guarantors consistent with the requirements under the Financing Agreements shall have been entered, in form and substance satisfactory to Agent, and shall be in full force and effect, and has not been vacated, reversed or modified (except as consented to by Agent) and is not subject to any pending appeal or stay; |
| | • the Interim Financing Order as entered by the Bankruptcy Court authorizing the secured financing under the Financing Agreements and, inter alia, modifying the automatic stay, authorizing and granting the security interests and liens described herein, and granting a super-priority administrative expense claim to Agent and other Secured Parties with respect to all obligations to Agent and other Secured Parties, subject to no priority claim or administrative expenses of the Chapter 11 Cases or any other entity, and any future proceeding which may develop out of any such cases, including liquidation in bankruptcy, shall have been entered within three (3) days after the commencement of the Chapter 11 Cases and be in full force and effect and not have been vacated, reversed, modified, amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it, except as consented to by Agent; |
| | • receipt by Agent of a proposed Plan of Reorganization, on terms and conditions reasonably satisfactory to Agent, which provides for, among other things, either (i) the entry by Debtors into an exit financing facility on terms and conditions acceptable to Agent or (ii) the indefeasible payment in full of all [Pre-Petition Obligations] owing under the Pre-Petition Financing Agreements and Post-Petition Obligations owing under the Financing Agreements on or before the "effective date" of the Plan of Reorganization (provided that nothing in this section shall constitute a vote by Agent or any Lender in favor of the Plan of Reorganization or a commitment by Agent or any Lender to vote in favor of the Plan of Reorganization; |
| | • receipt by Agent, each in form and substance satisfactory to Agent, of (i) the initial Budget, (ii) any updates or modifications to the projected financial statements of Borrowers and Guarantors previously received by Agent, in each case in form and substance satisfactory to Agent, and (iii) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available; |

| Bankruptcy Code | DIP Facility |
|---|---|
|  | • Agent's completion of its due diligence, with results satisfactory to Agent, which diligence may include receipt by Agent and Lenders of the documentation and other information that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act. Agent shall be satisfied with the corporate and capital structure and management of Borrowers and Guarantors and with all legal, tax, accounting and other matters relating to Borrowers and Guarantors. Agent and its counsel will have had the opportunity to conduct customary legal due diligence (the results of which shall be satisfactory to Agent and its counsel);<br><br>• no material adverse change in the business, operations, profits, assets or prospects of Borrowers and Guarantors or the Collateral shall have occurred as of the entry of the Interim Financing Order (it being understood that the commencement of the Chapter 11 Cases, and any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof shall not be deemed a material adverse change).<br><br>• no defaults or events of default on the closing date under any of the Financing Agreements or on any other debt or any material contract of Borrowers or Guarantors shall exist (other than any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof);<br><br>• Agent and Lenders shall have received the payment of all fees required to be paid under the terms hereof or otherwise under the Financing Agreements, including the DIP Fee Letter executed and delivered in connection herewith;<br><br>• there shall be no material misstatements in or omissions from the materials previously furnished to Agent by Borrowers and Guarantors;<br><br>• Agent shall not become aware of any material information or other matter that is inconsistent in a material and adverse manner with any previous due diligence, information or matter (including any financial information);<br><br>• the receipt by Agent of this Ratification Agreement, executed and delivered by Borrowers, Guarantors, Lenders and the other parties hereto;<br><br>• the implementation of the terms of this Ratification Agreement and the other Financing Agreements, as modified pursuant to this Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Agent and its counsel;<br><br>• the receipt by Agent of the following documents, agreements, or other information, in each case, in form and substance satisfactory to Agent and executed and delivered by the parties thereto: (a) the Information Certificate, (b) the DIP Fee Letter, (c) an update to the latest Borrowing Base Certificate that Agent has received from Borrowers that reflects, on a pro forma basis, the changes to the Financing Agreements evidenced by this Ratification Agreement, (d) the Store Closing Liquidation Agreement, (e) the Rx Bidding Procedures Order, and (f) [Store Closing GOB Sale Order]; |

| Bankruptcy Code | DIP Facility |
|---|---|
| | • other than the voluntary commencement of the Chapter 11 Case, the Store Closing GOB Sales, and the Rx Sale, no material impairment of the priority of Agent's security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent to the Petition Date; <br><br> • Borrowers shall have (i) engaged the Financial Advisor in accordance with Section 5.8 of the Ratification Agreement, and (ii) have provided the Financial Advisor with such information as they may reasonably require; <br><br> • Agent, for the benefit of itself and the other Secured Parties, shall hold perfected, first priority security interests in and liens upon the Collateral (subject to the liens permitted under Section 9.8 of the Loan Agreement and the Carve-Out) and Agent shall have received such evidence thereof as it requires; and <br><br> • no Default or Event of Default shall have occurred or be existing under any of the Financing Agreements, as modified pursuant hereto, and assumed by Borrowers and Guarantors. <br><br> Conditions Precedent to All Credit Extensions- the following are conditions to Agent's and Lenders' obligation to extend further loans, advances, or other financial accommodations to Borrowers: <br><br> • with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered the Permanent Financing Order. Neither Agent nor any Lender shall provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order and the time to appeal to contest such order shall have expired; <br><br> • requests for further credit shall only be for purposes and in amounts in accordance with the Budget for the week in which such requests are made; <br><br> • subject to the Financing Order, all fees and expenses required to be paid to the Agent and the Lenders pursuant to the Ratification Agreement and the Loan Agreement, as amended thereby, shall have been paid or shall be paid concurrently with the making of the Loans after the Ratification Closing Date; and <br><br> • no Default or Event of Default shall have occurred or be existing under any of the Financing Agreements, as amended, supplemented or otherwise modified pursuant this Ratification Agreement and assumed by Borrowers and Guarantor. <br><br> *See* Ratification Agreement §§ 9, 10. |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) | (a) Subject to clause (b) of this definition below: |

| Bankruptcy Code | DIP Facility |
|---|---|
| | <ul><li>Revolving Loans A: a rate equal to the then Applicable Margin for Prime Rate Loans on a per annum basis plus the Prime Rate</li><li>Revolving Loans A-1: a rate equal to the then Applicable Margin for Prime Rate Loans on a per annum basis plus the Prime Rate</li><li>Term Loans B: a rate equal to the then Applicable Margin for Prime Rate Loans on a per annum basis plus the Prime Rate</li><li>Term Loans B-1: a rate equal to fourteen (14.00%) percent per annum</li></ul>"Applicable Margin" shall mean, at any time, as to the Interest Rate for Prime Rate Loans the applicable percentage (on a per annum basis) set forth below:<br><br>_(table below)_<br><br>"Prime Rate" shall mean, on any date, the greatest of (a) the rate from time to time publicly announced by Wells Fargo, or its successors, as its prime rate, whether or not such announced rate is the best rate available at such bank (and, if any such announced rate is below zero, the rate determined pursuant to this clause (a) shall be deemed to be zero), (b) the Federal Funds Rate in effect on such day plus one half (0.50%) percent and (c) the Adjusted Eurodollar Rate for a six (6) month Interest Period on such date plus one (1.00%) percent.<br><br>(b) Notwithstanding anything to the contrary contained in clause (a) of this definition, the Interest Rate shall mean the per annum rates set forth above plus (in each case) two (2%) percent per annum, at Agent's option or upon the written request of Required Revolving Lenders A (in the case of Revolving Loans A), Required Revolving Lenders A-1 (in the case of Revolving Loans A-1), Required Term Lenders B (in the case of Term Loans B) or Required Term Lenders B-1 (in the case of Term Loans B-1), without notice, (i) either (A) for the period on and after the date of termination or non-renewal hereof until such time as all of the Obligations are paid and satisfied in full in immediately available funds, or (B) from and after the date of the occurrence of any Event of Default, and for so long as such Event of Default is continuing as determined by Agent in good faith, (ii) on the Revolving Loans A at any time outstanding in excess of Borrowing Base A or the Revolving Loan A Limit (whether or not such excess(es) arise or are made with or without Agent's or any Lender's knowledge or consent and whether made before or after an Event of Default) and (iii) on the Revolving Loans A-1 at any time outstanding in excess of Borrowing Base A-1 or the Revolving Loan A-1 Limit (whether or not such excess(es) arise or are made with or without Agent's or any Lender's knowledge or consent and whether made before or after an Event of Default). Agent shall promptly notify Administrative Borrower in writing if the Interest Rate specified in this clause (b) is in effect.<br><br>*See* Loan Agreement §§ 1.31, 1.114, 1.184, 3.1 |

| Applicable Prime Rate Margin for Revolving Loans A | Applicable Prime Rate Margin for Revolving Loans A-1 | Applicable Prime Rate Margin for Term Loans B |
|---|---|---|
| 2.75% | 4.00% | 9.50% |

| Bankruptcy Code | DIP Facility |
|---|---|
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | Milestones.<br><br>The Debtors must achieve each of the following milestones:<br><br>• On or prior to Petition Date, the Debtors shall have commenced going out of business sales at the 126 store locations identified on Schedule 1, attached to the Ratification Agreement, on terms and conditions acceptable to Agent;<br><br>• On the Petition Date, the Debtors shall file motions, each in form and substance satisfactory to the Agent, requesting approval from the Bankruptcy Court:<br><br>    o to (A) conduct the Debtors' going out of business sales in accordance with Section 363 of the Bankruptcy Code at the 126 store locations identified in Loan Agreement (as may be amended from time to time with the prior written consent of Agent) on terms and conditions acceptable to Agent (the "Store Closing GOB Sales"); and (B) to assume Debtors' prepetition store closing liquidation agreement, entered into between Debtors and Gordon Brothers Retail Partners, LLC (the "Store Closing Liquidation Agreement"), in each case on terms and conditions satisfactory to the Agent;<br><br>    o of bidding and auction procedures, in form and substance satisfactory to Agent, in connection with the sale or sales of all or substantially all of the Debtors' Pharmacy Inventory and Prescription Files and related assets (the "Rx Bidding Procedures Motion");<br><br>    o of a Disclosure Statement and proposed plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Plan of Reorganization"), each on terms and conditions satisfactory to Agent (provided that nothing this clause shall constitute a vote by Agent or any Lender to vote in favor of the Plan of Reorganization); and<br><br>    o of the senior secured financing under the Financing Agreements on the terms and conditions contemplated by the Loan Agreement, granting to Agent the security interests and liens and super-priority administrative expense claim status described above, modifying the automatic stay and other provisions required by the Agent and its counsel (the "DIP Financing")<br><br>• On or before the third (3rd) day following the Petition Date, the Bankruptcy Court shall have entered interim orders, each in form and substance satisfactory to Agent, authorizing (i) the Store Closing GOB Sales, and the assumption of the Store Closing Liquidation Agreement, and (ii) the bidding and auction procedures set forth in the Rx Bidding Procedures Motion (the "Rx Bidding Procedures Order"), and (iii) the DIP Financing, and scheduling a hearing to approve the Disclosure Statement;<br><br>• On or before the tenth (10th) day following the Petition Date, the Debtors shall have conducted an auction (the "Rx Auction") for the sale or sales of all or substantially all of the Debtors' Pharmacy Inventory, Prescription Files and related assets and properties and |

| Bankruptcy Code | DIP Facility |
|---|---|
| | selected the winning bid(s) (the "Rx Sale") and is otherwise in form and substance reasonably satisfactory to Agent in connection with such Rx Sale;<br><br>• On or before the thirteenth (13th) day following the Petition Date, the Bankruptcy Court shall have entered a (i) final Rx Bidding Procedures Order, and (ii) a final order approving the Rx Sale, which order shall be in form and substance acceptable to the Agent;<br><br>• On or before the fourteenth (14th) day following the Petition Date, the Debtors shall have delivered an amendment to the Budget, in form and substance acceptable to Agent, solely to reflect adjustments directly arising from the Store Closing Liquidation Agreement.<br><br>• On or before the thirtieth (30th) day following the Petition Date, the Bankruptcy Court shall have entered final orders, each in form and substance satisfactory to Agent authorizing (i) the Store Closing GOB Sales, (ii) the assumption of the Store Closing Liquidation Agreement, and (iii) the DIP Financing.<br><br>• On or before March 1, 2019, the Debtors shall deliver to Agent a business plan for the Reorganized Debtors in form and substance acceptable to the Agent, including without limitation any financial projections, assumptions, and calculations reasonably requested by the Agent.<br><br>• On or before the forty-fifth (45th) day following the Petition Date the Debtors shall have received court approval to extend the general time period to accept/reject leases from the permitted 120 day time period to not less than 210 days;<br><br>• If the final Store Closing GOB Sales Order does not allow the Debtors to conduct going out of business sales for all or substantially all of the Debtors' remaining assets and properties, then on or before March 6, 2019, the Debtors shall have selected a "stalking horse" offer for the sale of all or substantially all of the Debtors' assets and properties and/or liquidation of the Debtors' assets, in form and substance acceptable to Agent;<br><br>• If the final Store Closing GOB Sales Order does not allow the Debtors to conduct going out of business sales for all or substantially all of the Debtors' remaining assets and properties, then on or before March 8, 2019, the Debtors shall have filed in the Bankruptcy Court a motion (the "Sale Motion") seeking entry of a final order (the "Bidding Procedures Order") approving (A) the stalking horse sale agreement for all or substantially all of the Debtors' remaining assets ("Stalking Horse APA") and/or liquidation of the Debtors' assets, and (B) bidding and auction procedures (if necessary) in connection with a sale of all or substantially all remaining assets of each Debtor, pursuant to Section 363 of the Bankruptcy Code, which Sale Motion (including all deadlines contained therein) shall be reasonably satisfactory to the Agent (the "363 Sale");<br><br>• On or before the forty-fifth (45th) day following the Petition Date, the Debtors shall have consummated the Rx Sale, pursuant to one or more purchase agreements, in form and substance acceptable to Agent, entered into among the Debtors and the winning bidder(s) at the Rx Auction; provided that failure to comply with this milestone shall result |

| Bankruptcy Code | DIP Facility |
|---|---|
| | in the commencement of the Sale Milestones (as defined below) and not constitute an Event of Default;<br><br>• The Debtors shall comply with the following milestones ("Plan Milestones"); <u>provided</u> that failure to comply with these milestones shall result in the commencement of the Sale Milestones (as defined below) and not constitute an Event of Default:<br><br> o on or before March 14, 2019, Debtors shall deliver to Agent (A) a commitment letter in form and substance reasonably acceptable to Agent from one or more sponsors or other financial institutions reasonably acceptable to Agent (such sponsors or financial institutions referred to herein collectively as the "Sponsor"), reflecting, among other things, such Sponsor's commitment and financial wherewithal to provide financing sufficient to support the feasibility and confirmation of the Plan, on terms and conditions acceptable to Agent (the "Commitment Letter") (provided that nothing in this clause shall constitute a vote by Agent or any Lender in favor of the Plan of Reorganization or a commitment by Agent or any Lender to vote in favor of the Plan of Reorganization), or (B) such other financial information and commitments in form and substance acceptable to Agent sufficient to demonstrate that Debtors will have sufficient liquidity and are otherwise likely to consummate the Plan of Reorganization and reorganize, in each case as Agent may determine in its sole discretion;<br><br> o on or before March 22, 2019, the Debtors shall obtain an order from the Bankruptcy Court approving the Disclosure Statement on terms and conditions reasonably satisfactory to the Agent, and such order is not thereafter vacated, reversed, modified or altered on appeal or by reconsideration without the prior written consent of the Agent;<br><br> o on or before April 5, 2019, Debtors shall have received, in form and substance acceptable to Agent, a proposed order confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to Agent (the "Proposed Confirmation Order"), which plan shall include procedures for the orderly wind down and liquidation of the Debtors' assets and properties in the event the conditions for reorganization are not satisfied (provided that nothing in this clause shall constitute a vote by Agent or any Lender in favor of the Plan of Reorganization or a commitment by Agent or any Lender to vote in favor of the Plan of Reorganization);<br><br> o on or before April 12, 2019, the Debtors shall obtain an order from the Bankruptcy Court confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to the Agent; and<br><br> o on or before April 15, 2019, the Effective Date under (and as defined in) the Plan of Reorganization shall occur; |

| Bankruptcy Code | DIP Facility |
|---|---|
| | • If (i) the final Store Closing GOB Sales Order does not allow the Debtors to conduct going out of business sales for all or substantially all of the Debtors' remaining assets and properties, and (ii) Debtors fail to satisfy the Plan Milestone listed above, then on or before March 15, 2019, Debtors shall deliver to Agent the Bidding Procedures Order entered by the Bankruptcy Court in form and substance acceptable to Agent; <br><br>• If (i) Debtors fail to satisfy the first Plan Milestone listed above, and (ii) the Debtors have filed the Sale Motion in accordance with paragraphs above, then on or before March 20, 2019, the Debtors shall have obtained an order from the Bankruptcy Court approving the 363 Sale in form and substance acceptable to Agent, and providing for, among other things, the receipt by Agent of all cash proceeds from the 363 Sale to be applied to the indefeasible payment in full of all Obligations in accordance with Section 6.4 of the Loan Agreement and Financing Orders (the "363 Sale Order"); <br><br>• Notwithstanding anything to the contrary contained above, if at any time prior to expiration of the term of the Loan Agreement, (i) an Event of Default occurs and is continuing under the Loan Agreement without being waived in writing by Agent and to the extent required pursuant to the Loan Agreement, by the requisite number of Lenders, (ii) there is a negative variance in the actual proceeds received from Rx Sales from the projected proceeds from Rx Sales, as set forth in the line item of the Budget titled "Proceeds from Rx Asset Sales", in any given Measurement Period of the Budget in excess of 15% or (iii) Debtors fail to comply with the Plan Milestones (each of the forgoing, a "Sale Trigger Event"), then Debtors shall comply with the following milestones ("Sale Milestones"): <br><br>   o (A) on or before the date that is seven days following the date on which the Sale Trigger Event occurs, Debtors shall deliver to Agent a new 13-week statement of availability, cash receipts and disbursements for the immediately following consecutive 13 weeks ("Sale Budget") in form and substance acceptable to Agent, which upon Agent's written acceptance shall be the Budget, and (B) on or before the date that is two days following the date on which the Sale Trigger Event occurs, the Debtors shall either (i) commence the sale of all or substantially all of the Debtors' remaining assets and properties to the extent permitted by the final Store Closing GOB Sales Order and Store Closing Liquidation Agreement, or (ii) file the Sale Motion seeking entry of the Bidding Procedures Order in connection with a sale of all or substantially all remaining assets of each Debtor, pursuant to Section 363 of the Bankruptcy Code, which Sale Motion (including all deadlines contained therein) shall be satisfactory to the Agent; and <br><br>   o if the final Store Closing GOB Sales Order does not allow the Debtors to conduct going out of business sales for all or substantially all of the Debtors' remaining assets and properties, then: |

| Bankruptcy Code | DIP Facility |
|---|---|
| | ▪ on or before the date that is five days following the date on which the Sale Trigger Event occurs, the Bankruptcy Court shall have entered the Bidding Procedures Order; |
| | ▪ on or before the date that is seven days following the date on which the Sale Trigger Event occurs, the Debtors shall have distributed Bid Packages (as defined in the Bidding Procedures Order) to each Person meeting the criteria for receipt of a Bid Package as set forth in the Bidding Procedures Order; |
| | ▪ on or before the date that is ten days following the date on which the Sale Trigger Event occurs, the Debtors shall have received one or more qualified bids in form and substance acceptable to Agent; |
| | ▪ on or before the date that is twelve days following the date on which the Sale Trigger Event occurs, the Debtors shall have conducted an auction for the sale or sales of all or substantially all of the Debtors' assets and properties and selected the winning bid(s) in connection with such 363 Sale; |
| | ▪ on or before the date that is fourteen days following the date on which Sale Trigger Event occurs, the Bankruptcy Court shall have entered an order approving the 363 Sale, which order shall be in form and substance acceptable to the Agent and shall provide for, among other things, the receipt by Agent of all cash proceeds from the 363 Sale to be applied to the indefeasible payment in full of all Obligations in such manner as the Agent shall determine in accordance with Section 6.4 of the Loan Agreement and Financing Orders. |
| | *See* Ratification Agreement § 5.4. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B) | Objections to Pre-Petition Obligations.   Notwithstanding anything to the contrary in this Interim Order, any action, claim, defense, complaint, motion or other written opposition (hereinafter, an "Objection") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition Obligations as of the Petition Date, or (b) the extent, legality, validity, perfection or enforceability of Agent's and Lenders' pre-petition liens and security interests in the Pre-Petition Collateral shall be properly filed with the Court on or before the earlier of (x) sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, or (y) seventy-five (75) calendar days from the Petition Date; provided, however, that nothing herein shall permit any party to challenge the extent or validity of the Post-Petition Obligations for any disbursements in excess of the Pre-Petition Obligations.  If any such Objection is timely and properly filed and a final, non-appealable order is entered by a court of competent jurisdiction sustaining and ordering some or all of the relief requested in such Objection, then nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the Pre-Petition Obligations or |

| Bankruptcy Code | DIP Facility |
|---|---|
| | Agent's or Lenders' pre-petition liens on the Pre-Petition Collateral. If no Objection is timely and properly filed, or if an Objection is timely and properly filed but denied, (i) the Pre-Petition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction, or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Agent's and Lenders' pre-petition liens on and security interest in the Pre-Petition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Carve-Out and Permitted Liens, and (ii) the Agent and the Lenders, and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns (each in their respective capacities as such) shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Pre-Petition Loan Documents and shall not be subject to any further objection or challenge relating thereto or arising therefrom by any party at any time. Nothing contained in this Section 4.1(a) or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to Agent or any Lenders in connection with all post-petition Loans and Letters of Credit, and any other post-petition financial and credit accommodations provided by Agent and the Lenders to Debtors in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the Financing Agreements. <br><br>*See* Interim Order ¶ 4.1. |
| **Use of DIP Facility and Cash Collateral** <br> **Bankruptcy Rule** <br> 4001(b)(l)(B)(ii) | All Loans and Letters of Credit provided by Agent or any Lender to Borrowers pursuant to the Financing Order, the Loan Agreement or otherwise, shall only be used by Debtors for the working capital and general corporate purposes of Borrowers, including allowed administrative expenses incurred during the Chapter 11 Cases, all in accordance with the Budget. Except for claims of Professionals in an amount not to exceed the Carve Out (which, for the avoidance of doubt, may not be funded with the Revolving Loans or Letters of Credit for any purpose provided in paragraph 2.5 of the Interim Order), no portion of the administrative expenses or priority claims in the Chapter 11 Cases, other than those identified in the Budget to which Agent has specifically agreed in writing, shall be funded with the Revolving Loans or Letters of Credit and the percentages and categories of permitted allocations of such claims and expenses shall be subject to approval by Agent. Notwithstanding the foregoing, proceeds shall not be used by Borrowers or Guarantors to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Agent's liens, claims and rights. <br><br>*See* Ratification Agreement § 5.2. |
| **Stipulations to Prepetition Liens and Claims** <br> Bankruptcy Rule <br> 4001(c)(1)(B)(iii) <br><br> **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** | <u>Debtors' Acknowledgments and Agreements</u>. After consultation with their attorneys and financial advisors, and without prejudice to the rights of any Committee appointed in these Cases or other parties-in-interest as and to the extent set forth in Section 4.1 of the Interim Order, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge and agree with respect to the Prepetition Lenders and the liens, claims, and rights of the Prepetition Lenders, as to the validity and extent of such liens, claims, and rights. <br><br>*See* Interim Order ¶ F. |

| Bankruptcy Code | DIP Facility |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(vii) | |
| **Repayment Features** | <u>Mandatory Prepayments</u>.<br><br>In the event that (i) the aggregate amount of the Loans and the Letter of Credit Obligations outstanding at any time exceeds the Maximum Credit, or (ii) except as otherwise provided in Section 12.11(a) hereof, the aggregate principal amount of the Revolving Loans A and Letter of Credit Obligations outstanding at any time exceeds Borrowing Base A or the Revolving Loan A Limit, or (iii) the aggregate principal amount of Revolving Loans A-1 outstanding at any time exceeds Borrowing Base A-1 or the Revolving Loan A-1 Limit, or (iv) the aggregate principal amount of the Revolving Loans and the Letter of Credit Obligations outstanding at any time based on Eligible Accounts consisting of Other Government Accounts, Medicaid Accounts and/or Medicare Accounts exceeds $20,000,000, such event shall not limit, waive or otherwise affect any rights of Agent or Lenders in such circumstances or on any future occasions and Borrowers shall, upon demand by Agent, which may be made at any time or from time to time, immediately repay to Agent the entire amount of any such excess(es) for which payment is demanded. In the event that Borrowers fail to meet the DIP Milestones (other than the Plan Milestones), Borrowers shall, upon demand by Agent, which may be made at any time or from time to time, immediately repay Loans and other Obligations to Agent in an amount equal to 100% of the net cash proceeds from asset sales generating during the Chapter 11 Cases, which shall be applied in accordance with Section 6.4 hereof.<br><br>*See* Loan Agreement § 2.1(d). |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Fee Letter</u>- In consideration of Agents' services under the DIP credit facilities, Borrowers shall pay to Agents fees described in a separate fee letter.<br><br><u>Loan Agreement Fees</u> -<br>(a) Borrowers shall pay to Agent, for the account of Revolving Loan A Lenders (excluding any Defaulting Lenders) monthly, an unused line fee in an amount equal to the Applicable Unused Line Fee Percentage times the amount by which the Revolving Loan A Limit (as reduced by the unfunded portion of the Revolving Loan A Commitment of each Defaulting Lender, if any) exceeds the Monthly Average Outstanding Revolving Loans A and Letters of Credit during the immediately preceding calendar month, which fee shall be payable on the first day of each month in arrears while this Agreement is in effect and for so long thereafter as any of the Obligations are outstanding. Borrowers shall pay to Agent, for the account of Revolving Loan A-1 Lenders (excluding any Defaulting Lenders) monthly, an unused line fee in an amount equal to (i) the Applicable Unused Line Fee Percentage times the amount by which the Revolving Loan A-1 Limit (as reduced by the unfunded portion of the Revolving Loan A-1 Commitment of each Defaulting Lender, if any) exceeds the Monthly Average Outstanding Revolving Loans A-1 during the immediately preceding calendar month, which fee shall be payable on the first day of each month in arrears while this Agreement is in effect and for so long thereafter as any of the Obligations are outstanding.<br><br>(b) Borrowers shall pay to Agent, for the benefit of Revolving Loan A Lenders, monthly a letter of credit fee at a rate per annum equal to (i) the Applicable Margin for Revolving Loans A on the daily outstanding balance of the Standby Letters of Credit during the immediately preceding month (or part |

| Bankruptcy Code | DIP Facility |
|---|---|
| | thereof) and (ii) the Applicable Margin for Revolving Loans A minus one half (0.50%) percent on the daily outstanding balance of the Commercial Letters of Credit during the immediately preceding month (or part thereof), in each case payable in arrears as of the first day of each succeeding month; provided, that, notwithstanding anything to the contrary contained herein, Agent may, and upon the written direction of Required Revolving Lenders A shall, require Borrowers to pay to Agent for the benefit of Revolving Loan A Lenders, such letter of credit fee at a rate equal to two (2.00%) percent per annum on such daily outstanding balance in excess of the rates set forth above: (i) for the period (A) from and after the effective date of termination or non-renewal hereof until such time as all of the Obligations are paid and satisfied in full in immediately available funds and (B) from and after the date of the occurrence of an Event of Default and for so long as such Event of Default is continuing and (ii) on the Letters of Credit at any time outstanding in excess of the Letter of Credit Limit (whether or not such excess(es) arise or are issued with or without the knowledge or consent of Agent or any Lender and whether issued before or after an Event of Default). Such letter of credit fees shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed and the obligation of Borrowers to pay such fee shall survive the termination or non-renewal of this Agreement. In addition to the letter of credit fees provided above, Borrowers shall pay to Issuing Bank for its own account (without sharing with Lenders) a letter of credit fronting and negotiation fee with respect to each Letter of Credit at the rate per annum of one-eighth (0.125%) percent of the daily outstanding balance of Letters of Credit during the immediately preceding month (or part thereof), payable in arrears as of the first day of each succeeding month, and the customary charges from time to time of Issuing Bank with respect to the issuance, amendment, transfer, administration, cancellation and conversion of, and drawings under, such Letters of Credit.<br><br>(c) Borrowers shall pay to Agent the other fees and amounts set forth in the Fee Letter in the amounts and at the times specified therein. To the extent payment in full of the applicable fee is received by Agent from Borrowers on or about the date hereof, Agent shall pay to each Lender its share of such fees in accordance with the terms of the arrangements of Agent with such Lender.<br><br>(d) In view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Term Loan B Lender's lost profits as a result thereof, if for any reason any outstanding principal amount of the Term Loans B is repaid or prepaid (other than with respect to payments made pursuant to Sections 2.1A(b) hereof) or purchased pursuant to Section 14.12 hereof (i) prior to January 10, 2019, on the date of any such repayment or prepayment Borrowers shall pay to Agent, for the benefit of the Term Loan B Lenders, a fee equal to two (2%) percent of the principal amount so repaid or prepaid and (ii) on or after January 10, 2019 and prior to January 10, 2020, on the date of any such repayment or prepayment Borrowers shall pay to Agent, for the benefit of the Term Loan B Lenders, a fee equal to one (1%) percent of the principal amount so repaid or prepaid. Such fee shall be presumed to be the amount of damages sustained by Term Loan B Lenders as a result of such repayment or prepayment and Borrowers and Guarantors agree that it is reasonable under the circumstances. In addition, Agent (for the benefit of the Term Loan B Lenders) shall be entitled to such fee (a) upon any acceleration (whether automatic or otherwise) of the Obligations upon the occurrence of any Event of Default (including, but |

| Bankruptcy Code | DIP Facility |
|---|---|
| | not limited to, any Event of Default described in Sections 10.1(g) and (h) hereof), whether or not any such Event of Default is caused intentionally by a Borrower or Guarantor and (b) upon the occurrence of any Event of Default described in Sections 10.1(g) and (h) hereof even if Agent and Lenders do not exercise their right to terminate this Agreement, but elect, at their option, to provide financing to Borrowers or permit the use of cash collateral under the United States Bankruptcy Code. Notwithstanding anything to the contrary contained in Section 3.2 (d) above, in the event of the termination of the Commitments by Borrowers prior to January 10, 2020 and the full and final repayment of all of the Obligations (other than unasserted contingent indemnification obligations) and the receipt by Agent of cash collateral all as provided in Section 14.1(a) hereof (or a letter of credit, at Agent's option, as provided therein) with the proceeds of the sale of all or substantially all of the assets of the Borrowers or the Voting Stock of Parent or of one or more of the Borrowers that would result in a Change of Control under one or more of the clauses of the definition thereof or with the proceeds of a Qualifying IPO, Borrowers shall not be required to pay the fee provided for in Section 3.2(d) above .<br><br>(e) In view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Term Loan B-1 Lender's lost profits as a result thereof, if for any reason any outstanding principal amount of the Term Loans B-1 is repaid or prepaid (other than with respect to payments made pursuant to Sections 2.1B(b) of the Loan Agreement) (i) prior to January 10, 2019, on the date of any such repayment or prepayment Borrowers shall pay to Agent, for the benefit of the Term Loan B-1 Lenders, a fee equal to two (2%) percent of the principal amount so repaid or prepaid and (ii) on or after January 10, 2019 and prior to January 10, 2020, on the date of any such repayment or prepayment Borrowers shall pay to Agent, for the benefit of the Term Loan B-1 Lenders, a fee equal to one (1%) percent of the principal amount so repaid or prepaid. Such fee shall be presumed to be the amount of damages sustained by Term Loan B-1 Lenders as a result of such repayment or prepayment and Borrowers and Guarantors agree that it is reasonable under the circumstances. In addition, Agent (for the benefit of the Term Loan B-1 Lenders) shall be entitled to such fee (a) upon any acceleration (whether automatic or otherwise) of the Obligations upon the occurrence of any Event of Default (including, but not limited to, any Event of Default described in Sections 10.1(g) and (h) hereof), whether or not any such Event of Default is caused intentionally by a Borrower or Guarantor and (b) upon the occurrence of any Event of Default described in Sections 10.1(g) and (h) hereof even if Agent and Lenders do not exercise their right to terminate this Agreement, but elect, at their option, to provide financing to Borrowers or permit the use of cash collateral under the United States Bankruptcy Code. Notwithstanding anything to the contrary contained in Section 3.2(e) above, in the event of the termination of the Commitments by Borrowers prior to January 10, 2020 and the full and final repayment of all of the Obligations (other than unasserted contingent indemnification obligations) and the receipt by Agent of cash collateral all as provided in Section 14.1(a) hereof (or a letter of credit, at Agent's option, as provided therein) with the proceeds of the sale of all or substantially all of the assets of the Borrowers or the Voting Stock of Parent or of one or more of the Borrowers that would result in a Change of Control under one or more of the clauses of the definition thereof or with the proceeds of a Qualifying IPO, |

| Bankruptcy Code | DIP Facility |
|---|---|
| | Borrowers shall not be required to pay the fee provided for in Section 3.2(e) above.<br><br>*See* Loan Agreement § 3.2. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | Borrowers shall deliver to Agent, in form and substance satisfactory to Agent, the following:<br><br>(i)       on the Petition Date, a 13-week statement of availability, cash receipts and disbursements for the immediately following consecutive 13 weeks (the "Initial Budget Period"), set forth on a weekly basis, including the anticipated uses of the Financing Agreements for such period (the "Budget", as may be updated, amended or modified from time to time with the written consent of the Agent); and on or before April 5, 2019 an amendment to the Budget, in form and substance acceptable to the Agent, updating the Budget to include the 13-week period immediately following the Initial Budget Period.  Subsequent amendments shall be delivered to the Agent, in form and substance satisfactory to the Agent, two weeks prior to the final day of the Budget then in effect, updating the Budget to include the subsequent thirteen (13) week period.  Upon approval by the Agent, such budget shall be deemed to be the Budget for the next thirteen (13) week period;<br><br>(ii)      commencing on the Wednesday following the second full week following the Petition Date, a weekly variance/reconciliation report on the Wednesday of each week setting forth on a weekly basis for the prior week and on a cumulative basis from the Petition Date through the fourth (4th) full week after the Petition Date and then on a rolling four (4) week basis at all times thereafter (each of the forgoing, a "Measurement Period"), (i) a comparison of the actual results to the projected amounts set forth in the Budget during such periods for the following line items: (A) total cash receipts, and (B) total disbursements, noting therein variances from amounts set forth for such periods in the Budget; and (ii) an explanation for all material variances, in form satisfactory to the Agent and certified by the chief financial officer of the Company ("DIP Variance Report"); provided that prior to the entry of an interim order approving the Store Closing Liquidation Agreement, the total cash receipts line item shall be tested without regard to the proceeds from Store Closing GOB Sales.  The DIP Variance Report shall also note any variances with values set forth in the Budget as of the day of such report/reconciliation; and<br><br>(iii)     a monthly update of financial projections on the 15th day of each month, setting forth updated projections for each line item of the Budget.<br><br>*See* Ratification Agreement §5.3. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B) | Each Debtor acknowledges, confirms and agrees that the following covenants shall be tested pursuant to the DIP Variance Report for the applicable Measurement Period ending as of each Saturday, with such testing commencing on the Wednesday following the first full two (2) weeks ending after the Petition Date: (i) the actual total cash receipts shall not be less than eighty five percent (85%) of the projected total cash receipts set forth in the Budget as set forth in line item of the Budget titled "Total Receipts" in respect of such Measurement Period, and (ii) the actual total cash disbursements shall not be more than fifteen percent (15%) of the projected total cash disbursements as set forth in line item of the Budget titled "Total Disbursements" in respect of such Measurement Period.<br><br>*See* Ratification Agreement § 5.3(b). |

31

| Bankruptcy Code | DIP Facility |
|---|---|
| **Liens and Priorities** <br> Bankruptcy Rule <br> 4001(c)(l)(B)(i) | Lien Priority in Collateral.  The liens and security interests of Agent and Lenders granted under the Financing Agreements and the Interim Order in the Collateral securing all Post-Petition Obligations (as defined in the Loan Agreement) shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with §§ 363, 364, or any other section of the Bankruptcy Code or other applicable law; provided, however, that Agent's and Lenders' liens on and security interests in the Collateral shall be subject only to (a) Permitted Liens, and (b) the Carve-Out (as defined below). <br><br> *See* Interim Order ¶ 2.1(b) |
| **Events of Default** <br> Bankruptcy Rule 4001(c)(l)(B) | Usual and customary for financings of this type, including non-payment of obligations, failure to observe a covenant, intentional breach of a covenant, breach of representations and warranties, judgment defaults, dissolution or suspension of a Borrower or Guarantor which is a partnership, limited liability company, limited liability partnership, or corporation, any default in respect of any Indebtedness in an amount in excess of $15,000,000, any default under an Material Contract which has a Material Adverse Effect, suspension of payments from a Credit Card Issuer or Credit Card Processor to any Borrower to Guarantor (other than due to certain bankruptcy events), failure of a bank at which any deposit account is maintained to comply with material terms of any Deposit Account Control Agreement, any material provision of the Financing Agreements ceasing to be valid or any party (other than Agent) shall challenge the enforceability of such terms in writing, failure to comply with ERISA rules and regulations resulting in liability in excess of $15,000,000, change in control, indictment or threatened indictment by any government authority, termination of one or more real property leases, an event of default under any of the other Financing Agreements; event of default under the Financing Order; termination or non-renewal of the Financing Agreements as provided for in any Financing Order; Borrower or Guarantor suspension of business; act occurring after Petition Date reasonably expected to have a Material Adverse Effect; conversion from Chapter 11 Cases to Chapter 7; dismissal of the Chapter 11 Cases; grant of certain liens superior in priority other than permitted under Loan Agreement; failure of Borrower or Guarantor to comply with any Financing Order; any Financing Order is revoked/remanded/etc; failure of Borrowers to comply with certain DIP Milestones; appointment of trustee for Borrowers or Guarantors in the Chapter 11 Cases; any administrative expense claim with higher priority or in parity to rights of Agent; plan of reorganization confired without Agent's consent; tested items in Budget adversely deviate more than 15%; and material adverse change in business of Borrowers or Guarantors. <br><br> *See* Ratification Agreement § 11.5; Loan Agreement § 10.1. |
| **Indemnification** <br> Bankruptcy Rule <br> 4001(c)(1)(B)(ix) | Each Borrower and Guarantor shall, jointly and severally, indemnify and hold Collateral Agent, Agent, each Lender and Issuing Bank, and their respective officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such person being an "Indemnitee"), harmless from and against any and all losses, claims, damages, liabilities, costs or expenses (including attorneys' fees and expenses) imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Financing Agreements, or any undertaking or |

| Bankruptcy Code | DIP Facility |
|---|---|
| | proceeding related to any of the transactions contemplated hereby or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the fees and expenses of counsel except that Borrowers and Guarantors shall not have any obligation under this Section 11.5 to indemnify an Indemnitee with respect to a matter covered hereby resulting from the gross negligence or willful misconduct of such Indemnitee as determined pursuant to a final, non-appealable order of a court of competent jurisdiction (but without limiting the obligations of Borrowers or Guarantors as to any other Indemnitee (other than any officers, directors, agents or employees of the Indemnitee whose gross negligence or willful misconduct resulted in such losses, claims, damages, liabilities, costs or expenses)). To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrowers and Guarantors shall pay the maximum portion which it is permitted to pay under applicable law to Collateral Agent, Agent and Lenders in satisfaction of indemnified matters under this Section. To the extent permitted by applicable law, no Borrower or Guarantor shall assert, and each Borrower and Guarantor hereby waives, any claim against any Indemnitee, on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Financing Agreements or any undertaking or transaction contemplated hereby. No Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or any of the other Financing Agreements or the transaction contemplated hereby or thereby, except for damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined pursuant to a final, non-appealable order of a court of competent jurisdiction (but without limiting the exculpation as to any other Indemnitee (other than any officers, directors, agents or employees of the Indemnitee whose gross negligence or willful misconduct resulted in such damages)). All amounts due under this Section shall be payable upon demand. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.<br><br>*See* Loan Agreement § 11.5 |

### Prepetition Capital Structure[5]

14.    As of the Petition Date, the Debtors have approximately $403 million in total funded debt obligations, consisting of approximately $289 million and $30 million in two senior secured asset-based revolving loans (the "Revolving Loans A" and "Revolving Loans A-1," respectively), $49 million outstanding under an asset-based term loan (the "Term Loan B"), and $34.4 million outstanding under another asset-based term loan (the "Term Loan B-1," and, together with the Revolving Loans, Revolving A-1 Loans, and the Term Loan, B, the "Pre-Petition Loan Agreement"). The following table depicts the Debtors' prepetition capital structure:

| Funded Debt | Maturity | Outstanding Principal Amount |
|---|---|---|
| Revolving Loans A | June 2020 | $289,228,220 |
| Revolving Loans A-1 | June 2020 | $30,000,000 |
| Term Loan B | June 2020 | $49,055,312 |
| Term Loan B-1 | June 2020 | $34,416,375 |
| Total Funded Debt: | $402,699,907 | |

## II.    Pre-Petition Loan Agreement

15.    The Debtors, as borrowers and guarantors, the revolving loan lenders party thereto (the "Prepetition ABL Lenders"), the term loan lenders party thereto (the "Prepetition Term Loan B Lenders," or "Prepetition Term Loan B-1 Lenders," as applicable, and together with Prepetition ABL Lenders, the "Prepetition Lenders"), Wells Fargo Bank, N.A., as administrative agent and collateral agent for the Revolving Loans A, Revolving Loans A-1, and Term Loan B, Spirit Realty L.P. ("Spirit"), as the administrative agent and collateral agent for the Term Loan B-1 (Wells Fargo Bank, N.A. and Spirit collectively, in such capacities, the "Credit Agreement Agents" and together

---

[5]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.  In the event of inconsistency between this summary (including the defined terms therein) and such documents, the source documents shall control and govern.

with the Prepetition Lenders, the "<u>Prepetition Secured Parties</u>"), are parties to that certain Third

Amended and Restated Credit Agreement, dated as of February 7, 2012 (as further amended,

restated, supplemented, or otherwise modified from time to time, the "<u>Pre-Petition Loan</u>

<u>Agreement</u>") governing the Pre-Petition Loan Agreement.

### A.    Revolving Loans

16.    The Pre-Petition Loan Agreement provides for a senior secured revolving credit

facility: (i) Revolving Loans A, with a maximum availability of $700 million, and (ii) a senior

secured term loan, Revolving Loans A-1, with a maximum availability of $30 million (the

Revolving Loans A and Revolving Loans A-1, together, the "<u>Prepetition ABL Loans</u>" and such

obligations owing thereunder the "<u>Prepetition ABL Obligations</u>").  The Prepetition ABL Loans

mature in June 2020.  As of the Petition Date, the aggregate principal amount outstanding under

the Prepetition ABL Loans was not less than $315 million.  Each of the Debtors have guaranteed

the Prepetition ABL Obligations.  The Prepetition ABL Obligations are secured by a first priority

lien on substantially all of the Debtors' assets that are not Term Loan Priority Collateral (as defined

in the Pre-Petition Loan Agreement), including accounts receivable, inventory, cash and cash

equivalents and  by a second priority lien on the Debtors' capital stock and other personal property,

including the Debtors' intellectual property and investment contracts (all together, the "<u>Prepetition</u>

<u>ABL Collateral</u>").

### B.    Term Loans

17.    The Pre-Petition Loan Agreement also provides for term loans:  (a) Term Loan B,

with a maximum availability of $72.5 million; and (b) Term Loan B-1, with a maximum

availability of $35 million (the Term Loan B and Term Loan B-1, together, the "<u>Prepetition Term</u>

<u>Loans</u>" and such obligations owing thereunder, the "<u>Prepetition Term Loan Obligations</u>").  The

Prepetition Term Loans mature in June 2020.  As of the Petition Date, the aggregate principal

amount outstanding under the Prepetition Term Loans was approximately $83.4 million. Each of the Debtors are either borrowers of or have guaranteed the Prepetition Term Loan Obligations. The Prepetition Term Loan Obligations are secured by first-priority liens on the Term Loan Priority Collateral, including the Debtors' intellectual property, equipment, and intangibles and books and records related to the Debtors' intellectual property and equipment (together with the Prepetition ABL Collateral, the "Prepetition Collateral").

**The Debtors' Liquidity Need and Marketing Efforts**

**I.     The Debtors Cannot Prudently Operate Their Business With Cash Collateral Alone**

18.     The Debtors, in consultation with their proposed restructuring advisor, Berkeley Research Group, LLC ("BRG"), reviewed and analyzed the Debtors' projected cash needs and prepared a projection (as updated from time to time in accordance with the terms of the Loan Agreement, the "Budget")[6] outlining the Debtors' postpetition cash needs in the initial 13 weeks of the chapter 11 cases. The Debtors believe that the Budget and their projections provide an accurate reflection of their funding requirements over the identified period and are reasonable and appropriate under the circumstances.

19.     The Debtors relied on these forecasts to determine the amount of postpetition financing required to administer these chapter 11 cases. The DIP Facility is critical to the Debtors' ability to operate smoothly postpetition, including by providing sufficient liquidity to fund payments to the Debtors' vendors and other participants in the Debtors' supply chain to ensure the uninterrupted flow of inventory to the Debtors' stores and distribution centers. The Debtors believe that the DIP Facility provides the Debtors with sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to implement

---

[6]     A copy of the Budget is attached to the Interim Order as **Schedule 1**.

the restructuring contemplated by the Debtors chapter 11 plan filed contemporaneously herewith and are therefore essential to the preservation of their estates during the pendency of these cases. *See* First Day Declaration, ¶ 61, 62; Spencer Declaration, ¶ 14.

20.    The Debtors enter chapter 11 with liquidity insufficient to operate their enterprise and continue paying their debts as they come due. *See* Spencer Declaration ¶ 6. The costs associated with administering these chapter 11 cases will also impose demands on the Debtors' liquidity. Spencer Declaration ¶ 7. Immediate access to the DIP Facility and Cash Collateral is necessary to provide liquidity to ensure the Debtors' businesses are stabilized and value is maximized for the benefit of all parties in interest. *See* Spencer Declaration ¶ 14.

21.    Due to minimal cash on hand, the Debtors require interim approval of the DIP Facility to preserve and maximize the value of their estates and to position their estates to reorganize as a going concern. Absent the immediate relief requested by this Motion, the Debtors face a material risk of irreparable harm. Without the infusion of funds available from the DIP Facility, access to cash collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their businesses and lose support from important stakeholders on whom the Debtors' businesses depend—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their stakeholders. Spencer Declaration, ¶ 22.

## II.    The Debtors Negotiated Their Proposed Financing in Good Faith

22.    The Debtors retained investment banker, Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to begin exploring balance sheet restructuring alternatives with the Debtors. With Houlihan Lokey's assistance, in December 2018, the Debtors approached the Prepetition Lenders to seek additional sources of liquidity and explore restructuring options. Spencer Declaration ¶ 10.

From that time forward, the Debtors and their advisors engaged in numerous meetings with the Prepetition Lenders and the advisors to the Agent (the "DIP Agent Advisors") regarding restructuring alternatives that would strengthen the Debtors' balance sheet and provide for the Debtors' swift exit from chapter 11. Spencer Declaration ¶ 8.

23.    After a series of significant, arms'-length and good faith negotiations, the Debtors' Prepetition Lenders agreed to provide the postpetition financing required to support the Debtors' estates during the chapter 11 cases. Specifically, the Prepetition Lenders agreed to provide an approximately $480 million DIP Facility on terms similar to those provided under the Pre-Petition Loan Agreement. Additionally, upon entry of the Interim Order, certain Pre-Petition Obligations under the Pre-Petition Loan Agreement will be "rolled-up" on a "creeping" basis and converted into Post-Petition Obligations as the DIP Facility is drawn down. Spencer Declaration ¶ 10.

24.    Upon entry of the Final Order, any remaining applicable Pre-Petition Obligations, other than with respect to the Term Loans B-1, not already "rolled-up" will be converted into Post-Petition Obligations. The roll-up of certain of the obligations under the Pre-Petition Loan Agreement into Post-Petition Obligations was a prerequisite to the Lenders agreeing to provide the financing necessary to support a reorganization of the Debtors' estates. Spencer Declaration ¶¶ 10, 11.

25.    Additionally, the Debtors' most recent appraisal report indicated that the Prepetition ABL Lenders and Prepetition Term Loan B Lenders were oversecured. As a result, no parties will be harmed by the "roll-up" contemplated by this Motion, the Interim Order, the Final Order, and the Loan Agreement. Spencer Declaration ¶¶ 11

III.    **The Proposed DIP Facility Represents the Best Available Financing Option for these Chapter 11 Cases**

26.    In light of the Debtors' liquidity constraints, and contemporaneously with negotiating the DIP Facility with the Debtors' existing debtholders, the Debtors with the assistance of Houlihan Lokey, ran a marketing process for alternative debtor-in-possession financing. Spencer Declaration ¶ 15.  Houlihan Lokey reached out to 17 third-party lenders, including many well-known financing institutions, to see if any third-party would be willing to offer debtor-in-possession financing.  *See* Spencer Declaration ¶ 15.  From that group, 3 parties executed confidentiality agreements and received access to non-public information.  *See* Spencer Declaration ¶ 16.  Ultimately, no third-party offered a workable proposal such that it could serve as a viable alternative to the proposed DIP Facility.  *See* Spencer Declaration ¶ 17.  Therefore, the Debtors were unable to develop an alternative source of financing with terms as favorable as those of the DIP Facility.  Spencer Declaration ¶ 18.

27.    The Prepetition Secured Parties assert that all of the Debtors' material assets are encumbered under their existing capital structure, which, along with the Debtors' uncertain financial condition and overall weakness in the retail industry, restricts the availability of, and options for, postpetition financing.  *See* Spencer Declaration ¶16.  Given the collateral coverage of the Prepetition Lenders, providing postpetition financing was not economical for many third-party lenders.  *See* Spencer Declaration ¶ 16-17.  The Debtors did not receive any viable offers for any such third-party DIP financing despite their marketing efforts.  *See* Spencer Declaration ¶ 16. At this time, the DIP Facility is the best postpetition financing option to the Debtors.  *See* Spencer Declaration ¶ 12.

28.    Additionally, with any third-party proposal, the Debtors would incur execution risk associated with a new lender transaction, including material timing and due diligence constraints,

necessarily involving the payment of additional professional fees.   In contrast, the proposed

DIP Facility offered by the Lenders allow the Debtors to avoid the need to engage in a costly and

time-consuming priming fight at the outset of these chapter 11 cases.   For all of these reasons, the

DIP Facility is reasonable, appropriate, and provide the best terms presently available. Spencer

Declaration ¶ 17.

### **Basis for Relief**

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the Financing Agreements**

A.    **Entry into the Financing Agreements is an Exercise of the Debtors' Sound Business Judgment**

29.    The Court should authorize the Debtors, as an exercise of their sound business

judgment, to enter into the Financing Agreements, obtain access to the DIP Facility, and continue

using the Cash Collateral.   Section 364 of the Bankruptcy Code authorizes a debtor to obtain

secured or superpriority financing under certain circumstances that are present in these cases, as

discussed herein.   Courts grant a debtor-in-possession considerable deference when acting in

accordance with its business judgment in obtaining postpetition secured credit, so long as the

agreement to obtain such credit does not run afoul of the provisions of, and policies underlying,

the Bankruptcy Code.   *See, e.g.*, *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo.

2003) ("Business judgments should be left to the board room and not to this Court"); *In re Trans

World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and

receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re

L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer

to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*,

115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion

under section 364 is to be utilized on grounds that permit reasonable business judgment to be

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

30.     Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "'as long as the proposed action appears to enhance the debtor's estate.'" *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (citation omitted) (emphasis in original, text modifications removed); *see also In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"). Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

31.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). The Court may also

appropriately take into consideration non-economic benefits to the Debtors offered by a proposed

postpetition facility.  For example, in *In re ION Media Networks Inc.*, the bankruptcy court for the

Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms, a
> business decision to obtain credit from a particular lender is almost
> never based purely on economic terms.  *Relevant features of the
> financing must be evaluated, including non-economic elements such
> as the timing and certainty of closing, the impact on creditor
> constituencies and the likelihood of a successful reorganization.*
> This is particularly true in a bankruptcy setting where cooperation
> and establishing alliances with creditor groups can be a vital part of
> building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan. That which helps foster consensus
> may be preferable to a notionally better transaction that carries the
> risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at \*4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

32.    The Debtors' decision to move forward with the DIP Facility following an

arms'-length marketing and negotiation process is well within the Debtors' sound business

judgment.  Specifically, and in the face of insufficient cash on hand, the Debtors and their advisors

determined that the Debtors would require significant postpetition financing to support their

operational and chapter 11 activities. The Debtors negotiated the Ratification Agreement and other

Financing Agreements with the Lenders in good faith, at arms'-length, and with the assistance of

their respective advisors, and the Debtors believe that they have obtained the best financing

available. Accordingly, the Court should authorize the Debtors' entry into the Financing

Agreements, as it is a reasonable exercise of the Debtors' business judgment.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

33.    The Debtors propose to obtain financing under the DIP Facility by providing

security interests, liens, and superpriority claims as set forth in the Financing Agreements pursuant

to sections 364(c) and 364(d) of the Bankruptcy Code.  Specifically, the Debtors propose to

provide to the Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the Collateral, which includes substantially all of the Debtors' assets.

34.    Pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, the Lenders will receive the following security interests:[7]

> a.    The liens securing the Post-Petition Obligations (the "DIP Liens") will be senior in priority and superior to any security, mortgage, collateral interest, lien, or claim to any of the Collateral, except that the DIP Liens shall be subject to the Carve Out in all respects and shall otherwise be junior only to the Permitted Liens.

35.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look at whether:

> a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;
>
> b.    the credit transaction is necessary to preserve the assets of the estate; and
>
> c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

---

[7]    *See* Interim Order ¶ 2.1(b).

See, e.g., *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37-40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

36.    As described above and as set forth in the Spencer Declaration, the Debtors are in need of an immediate capital infusion, yet substantially all of the Debtors' existing assets are encumbered under their existing capital structure. In light of the foregoing and following discussions with potential lenders regarding potential postpetition financing, the Debtors, in consultation with their advisors, concluded that the best financing option would be one that was provided by the Debtors' existing lenders. See Spencer Decl. ¶¶ 16, 17, 18, 19. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these chapter 11 cases. *See* Spencer Decl. ¶ 6.  Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the Financing Agreements, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

37.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." As described

above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the Lenders is also reasonable and appropriate.

38.    Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected"). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) Prepetition Secured Parties' interests in collateral are adequately protected.

39.    Here, the Prepetition Secured Parties have consented to the DIP Facility and, as described herein and in the Spencer Declaration, the interest of the Prepetition Secured Parties are adequately protected. Under Section 12.9 of the Loan Agreement, the Prepetition Secured Parties have agreed that actions taken by the Agent that are required by the Loan Agreement are binding on all Prepetition Lenders. Furthermore, the DIP Facility maintains the status quo with respect to payment priority among the Prepetition Lenders. Under Section 6.4 of the Loan Agreement, the Term Loan B-1 Agent receives payment only after the Prepetition ABL Agent and the Prepetition Term Loan B Agent. The DIP Facility keeps such priority in place. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.    No Comparable Alternative to the DIP Facility Is Reasonably Available

40.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

41.    As noted above and as borne out by the marketing process, the Debtors do not believe that any alternative sources of financing exist or are reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' unsuccessful solicitation of alternative financing proposals. The Prepetition Lenders assert that substantially all of the Debtors' existing assets are encumbered under their existing capital structure. *See* Spencer Decl. 9. Thus, the Debtors have determined that the DIP Facility provides the most favorable terms available to the Debtors under the circumstances to fund these chapter 11 cases. *See* Spencer Declaration ¶ 18. Therefore, the Debtors submit that the requirement of section 364 of the

Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.      The Debtors Should Be Authorized to Use Cash Collateral

42.      Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.   Here, the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral (as well as the other Pre-Petition Collateral), subject to the terms and limitations set forth in the Interim Order.

43.      Section 363(e) provides for adequate protection against diminution in value of interests in property when a debtor uses cash collateral.   Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Rocco*, 319 B.R. 411 (Bankr. W.D. Pa. 2005); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).   It was the intent of Congress in Section 361 to give courts flexibility to fashion relief in light of each case in general equitable principals.  *In re Wilson*, 30 B.R. 371 (Bankr. E.D. Pa. 1983).

44.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition

Secured Parties with a variety of forms of adequate protection to protect against the postpetition

diminution in value of the Cash Collateral (as well as the Pre-Petition Collateral) resulting from

the use of the Cash Collateral (and other Pre-Petition Collateral) by the Debtors and the imposition

of the automatic stay collectively, the "Adequate Protection Obligations"), including:

> a.    continuing, valid, binding, enforceable, non-avoidable, and
> perfected postpetition security interests in and liens on the
> Collateral;

> b.    superpriority administrative claims under section 507(b) of the
> Bankruptcy Code;

> c.    the professional fees and expenses incurred by the Agent; and

> d.    with respect to the Prepetition ABL Lenders and Prepetition Term
> Loan B Lenders, payment of interest, fees, and principal due under
> the Prepetition ABL Loans and Prepetition Term Loan B.

45.     The Debtors submit that the proposed Adequate Protection Obligations are

sufficient to protect the Prepetition Secured Parties from any diminution in value of the Cash

Collateral and the other Pre-Petition Collateral.  In light of the foregoing, the Debtors further

submit that the proposed Adequate Protection Obligations to be provided for the benefit of the

Prepetition Secured Parties are adequate and appropriate.  The Debtors' provision of the Adequate

Protection Obligations is not only necessary to protect against any diminution in value but is fair

and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able

to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim

Order, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Fees and Payments Required by the
Agents and the Lenders Under the Financing Agreements**

46.     Under the Financing Agreements, the Debtors have agreed, subject to Court

approval, to pay certain fees and payments to the Agents and the Lenders.

47.     It is understood and agreed by all parties, that these fees are an integral component of the overall terms of the DIP Facility, and were required by the Agent and the Lenders as consideration for the extension of postpetition financing and are reasonable, customary, and appropriate under the circumstances.  *See* Spencer Declaration ¶ 21.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the Financing Agreement in connection with entering into those agreements.

## IV.     The Repayment Feature Is Appropriate

48.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled that such transactions should be approved when they are supported by a sound business purpose.  *See, e.g.*, *In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  Furthermore, conversions of prepetition claims into postpetition claims, or "roll-ups," as well as similar refinancings of prepetition claims with postpetition credit, may be authorized under section 363(b) of the Bankruptcy Code.  *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 510-11 (Bankr. D. Del. 2010) ("Post-petition refinancing of uneconomical *secured* debt through a DIP loan may be authorized by section 363(b) of the Bankruptcy Code as a use of estate property outside the ordinary course of business . . .  similarly, prepetition secured claims can be paid off through a roll-up."); *In re Energy Future Holding Corp.*, 527 B.R. 157, 167 (D. Del. 2015).  As the United States District Court for the District of Delaware recently observed:

> [P]repetition secured claims can be paid off through a "roll-up." Most simply, a [roll-up] is the payment of a pre-petition debt with the proceeds of a post-petition loan. Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy

> Code. The proceeds of the DIP loan are used to pay off or replace
> the pre-petition debt, resulting in a post-petition debt equal to the
> pre-petition debt plus any new money being lent to the debtor. As a
> result, the entirety of the prepetition and post-petition debt enjoys
> the post-petition protection of section 364(c) and/or (d) as well as
> the terms of the DIP order. In both a refinancing and a rollup, the
> pre-petition secured claim is paid through the issuance of new debt
> rather than from unencumbered cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 2015 U.S. Dist. LEXIS 19684, 20-21 (D. Del. Feb. 9, 2015) (*quoting In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010)).

49.    Courts consider a number of factors when determining whether to authorize roll-ups of prepetition debt into postpetition financing facilities, including whether: (a) the proposed financing is an exercise of sound and reasonable business judgment; (b) no alternative financing is available on any other basis; (c) the financing is in the best interests of the estate and its creditors; (d) no better offers, bids, or timely proposals are before the court; (e) the credit transaction is necessary to preserve the assets of the estate; (f) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender(s); (g) the financing is necessary, essential, and appropriate for the continued operating of the Debtors' business and the preservation of their estates; and (h) the financing agreement was negotiated in good faith and at arms'-length between the Debtors and the proposed lenders. *See In re Farmland Indus., Inc.*, 294 B.R. at 879–80 (surveying opinions authorizing roll-ups and listing relevant factors considered by courts in those cases).

50.    Recognizing exigent circumstances like those described above, courts in this Circuit and others have approved repayments funded by debtor-in-possession financing proceeds in recent chapter 11 cases, including on the first day of the case. *See, e.g.*, *In re Payless Holdings LLC*, Case No. 17-42267 (Bankr. E.D.Mo. May 17, 2017) (authorizing $385 million DIP facility

and a roll-up of approximately $187 million, pursuant to a final order); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing $1.23 billion DIP and a roll-up of approximately $639 million, pursuant to interim and final orders); *In re VER Technologies Holdco LLC., et al.*, No. 18-10834 (KG) (Bankr. D. Del. Apr. 6, 2018) (authorizing a $364.7 million DIP and a roll-up of $314.7 million pursuant to interim and final order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re Real Indus. Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to interim order and a full roll-up pursuant to final order of approximately $266 million prepetition debt); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (authorizing approximately $90 million DIP that included a full ABL roll-up of approximately $22 million prepetition debt pursuant to interim order); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP and a roll-up of approximately $250 million prepetition debt, including a full ABL roll-up of $215 million, pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included a full roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re BCBG Max Azria Global Holdings LLC*, No. 17-10466 (Bankr. S.D.N.Y. Mar. 2, 2017) (authorizing a $157 million DIP and a roll-up of $117 million, including a full ABL roll-up of $82 million pursuant to final order following a creeping roll-up pursuant to the interim order); *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y.

Feb. 2, 2018) (authorizing a $290 million DIP, including a full ABL roll-up of $190 million, pursuant to interim order); *In re Gymboree Corporation*, No. 17-32986 (Bankr. E.D. Va. June 12, 2017) (authorizing a $378 million DIP and $247 million roll-up, including a full ABL roll-up of $177 million); *In re Toys "R" US, Inc.*, No. 17-34665 (Bankr. E.D. Va. Sept. 20, 2017) (authorizing a $2.3 billion DIP and a full roll-up of approximately $948 million in the prepetition ABL and FILO facilities).[8]

51.      As set forth above, the DIP Facility includes a roll-up of certain Pre-Petition Obligations.   Under the terms of the Loan Agreement, upon entry of the Interim Order, the Prepetition ABL Obligations will begin to roll-up into the DIP Facility.   Upon entry of the Final Order, any remaining Prepetition ABL Obligations and the Prepetition Term Loan B Obligations will be fully converted into Post-Petition Obligations. The conversion of the Prepetition ABL Obligations and Prepetition Term Loan B Obligations into Post-Petition Obligations will create availability under the DIP Facility, allowing the Debtors to continue operating in the ordinary course during these chapter 11 cases.

52.      The repayment of the Prepetition Facility is a sound exercise of the Debtors' business judgment, is a material component of the structure of the DIP Facility, and was required by the Lenders as a condition to their commitment to provide postpetition financing.  *See* Spencer Decl. ¶¶ 11, 12.  The Debtors were unable to obtain debtor-in-possession financing on similar terms.  *See* Spencer Decl. ¶ 16.  The roll-up of the Prepetition Obligations is a condition to the DIP Facility, without which, the Lenders would not have agreed to provide the DIP Facility.  *See* Spencer Decl. ¶ 11.  Absent funds available from the DIP Facility, access to cash collateral, and

---

[8]      Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their businesses and lose support from important stakeholders on whom the Debtors' businesses depend—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors.  *See* Spencer Decl. ¶ 22.  Preserving the ability to continue as a going concern is of immense benefit to the Debtors' estates and stakeholders.

53.    The Debtors and their advisors reviewed an analysis of the Debtors' assets from a reputable appraisal firm, which indicated that the Prepetition ABL Lenders and Prepetition Term Loan B Lenders are oversecured.  The Debtors agreed to roll-up the Prepetition ABL Obligations because, among other things, it (a) will not prejudice the Debtors' stakeholders and (ii) provides significant benefits to the Debtors' estates.  A prepetition ABL facility that is oversecured and which is being rolled up into another ABL facility—in other words, an ABL-to-ABL roll-up—does not harm the Debtors' stakeholders—including the general unsecured creditors—because the only variable is timing, not certainty, of repayment.  Courts in place particular importance on whether a prepetition secured creditor is oversecured in determining whether to approve a roll-up. *See, e.g.*, *In re Real Industry, Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017), Hr'g Tr. 39:9-19 ("So, let's talk about the roll-up. I had the same issue on Friday and I did something that, as you might imagine, a Court would be reluctant to do, and I approved the roll-up on the first day, and I did it in those circumstances in which there didn't seem to be any dispute over whether that lender that was the beneficiary of the roll-up was oversecured."); *In re Velocity Holding Company, Inc.*, No. 17-12442 (KJC) (Bankr. D. Del. Nov. 17, 2017), Hr'g Tr. 38:1-2 (court remarking that whether a secured creditor is oversecured "directly affects whether they should have a roll-up");

*In re Pacific Sunwear of California, Inc.*, No. 16- 10882 (LSS) (Bankr. D. Del. April 8, 2016),
Hr.'g Tr. 65:7-17 ("[A]s noted in the colloquia of counsel, Wells Fargo has the first [lien] on all
the current assets and they are, it has been represented to me, over-secured. So in that event I don't
see the harm in letting this [roll-up of prepetition obligations] go out on first day."). Furthermore,
the roll-up of the Prepetition Obligations is subject to review and challenge—and potentially to
being unwound—by a creditors' committee, if appointed, or another party-in-interest with
requisite standing if a committee is not appointed.  The DIP Facility, in addition to providing
critical access to funding throughout the chapter 11 cases, also provides the Debtors with other
important benefits.  Significantly, certain of the Lenders have indicated they would be willing to
convert their Post-Petition Obligations into an exit facility under the Debtors' Plan.  Having an
interested partner early in the chapter 11 cases sends a strong and positive message to the Debtors'
constituencies that they are already beginning to lay the groundwork to emerge with sufficient
liquidity to implement their reorganization strategy.

54.     The simple economic reality is that a peaceful, going concern transition into chapter
11 comes at a price, which in this case the Debtors believe to be reasonable.  The Prepetition
Lenders are unlikely to continue to lend postpetition without some assurance regarding their
prepetition claims.  Absent the Prepetition Lenders' support, the first month of the Debtors' chapter
11 cases would likely devolve into a costly priming fight, severely jeopardizing the Debtors' ability
to seek a plan sponsor and emerge as a going concern.

55.     Thus, after careful consideration of all available alternatives, the Debtors have
determined that conversion of the applicable Pre-Petition Obligations into Post-Petition
Obligations is necessary to obtain access to the liquidity necessary to preserve the value of their
business for the benefit of all stakeholders.

## V. The Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e)

56. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

57. As explained herein, and in the Spencer Declaration, the Financing Agreement are the result of extensive good-faith, arms'-length negotiations between the Debtors, the Agents and the Lenders. Spencer Declaration, ¶ 10. The terms and conditions of the Financing Agreements are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the Financing Agreements other than as described herein. Accordingly, the Court should find that the Lenders are "good-faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## VI. The Automatic Stay Should Be Modified on a Limited Basis

58. The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim

Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the Lenders and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the Agent to exercise all rights and remedies in accordance with the Financing Agreements, or applicable law.

59.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and cash collateral orders and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Gordmans Stores Inc.*, Case No. 17-80304 (Bankr. D. Neb. March 17, 2017) (modifying the automatic stay as necessary to effectuate the terms of the order); *In re Payless Holdings LLC,* Case No. 17-42267 (Bankr. E.D.Mo. May 17, 2017) (same); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VII.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm

60.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to

section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service

of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing

on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary

to avoid immediate and irreparable harm to a debtor's estate.

61.     For the reasons noted above, the Debtors have an immediate postpetition need to

use Cash Collateral, and access the liquidity provided by the DIP Facility.  The Debtors cannot

maintain the value of their estates during the pendency of these chapter 11 cases without access to

cash.  The Debtors will use cash, among other things, to fund the operation of their business,

including to ensure that vendors continue to manufacture and ship inventory, and to fund the

administration of these chapter 11 cases.  Substantially all of the Debtors' available cash

constitutes the Prepetition Secured Parties' Cash Collateral.  The Debtors will therefore be unable

to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral,

and will suffer immediate and irreparable harm to the detriment of all creditors and other parties

in interest.  In short, the Debtors' ability to administer these chapter 11 cases through the use of

Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

62.     The Debtors request that the Court conduct a hearing to consider entry of the

Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final

Hearing, to receive initial funding under the DIP Facility on the terms and conditions set forth in

the Interim Order.  This relief will enable the Debtors to preserve and maximize value and,

therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in

interest.  *See* Spencer Declaration ¶ 22.

### Request for Final Hearing

63.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that

the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 30 days

after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

64.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Reservation of Rights

65.    Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

## Notice

1.    The Debtors have provided notice of this Motion to the following parties or their respective counsel: (a) the office of the U.S. Trustee for the District of Nebraska; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition asset-based facility; (d) the agents under the proposed DIP Facility; (e) the agents under the Debtors' prepetition term loan facility; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the office of the attorneys general

for the states in which the Debtors operate; (i) the United States Attorney's Office for the District of Nebraska; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

2.      No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders,

granting the relief requested herein and such other relief as the Court deems appropriate under the

circumstances.

| | |
|---|---|
| Dated:  January 16, 2019 | /s/ Michael T. Eversden |
| Omaha, Nebraska | James J. Niemeier (NE Bar No. 18838) |

Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Telephone:     (402) 341-3070
Facsimile:     (402) 341-0216
Email:          jniemeier@mcgrathnorth.com
                  meversden@mcgrathnorth.com
                  lgoodman@mcgrathnorth.com

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Travis M. Bayer (*pro hac vice* pending)
Jamie Netznik (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          james.sprayregen@kirkland.com
                  patrick.nash@kirkland.com
                  jamie.netznik@kirkland.com
                  travis.bayer@kirkland.com

- and -

Steven Serajeddini (*pro hac vice* pending)
Daniel Rudewicz (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          steven.serajeddini@kirkland.com
                  daniel.rudewicz@kirkland.com

*Proposed Co-Counsel to the Debtors*

## Exhibit A

**Ratification Agreement**

[Execution]

<u>RATIFICATION AND AMENDMENT AGREEMENT</u>

This RATIFICATION AND AMENDMENT AGREEMENT (as the same may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, the "**Ratification Agreement**"), dated as of January 16, 2019, is by and among Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association, a national banking association ("**Wells Fargo**"), in its capacity as agent for the Lenders (as hereinafter defined) pursuant to the Loan Agreement defined below (in such capacity, "**Agent**"), Wells Fargo, in its capacity as agent for the Term Loan B Lenders (in such capacity, "**Term Loan B Agent**" and collectively with Agent, the "**Agents**"), Shopko Note Holding, LLC, a Delaware limited liability company, successor to Spirit Realty L.P., in its capacity as agent for the Term Loan B-1 Lenders (in such capacity, "**Term Loan B-1 Agent**"), the parties to the Pre-Petition Loan Agreement as lenders (individually, each a "**Lender**" and collectively, "**Lenders**"), Wells Fargo, in its capacity as Collateral Agent (in such capacity, "**Collateral Agent**"), Wells Fargo, in its capacity as Issuing Bank (in such capacity, "**Issuing Bank**"), ShopKo Properties, LLC, a Minnesota limited liability company, as Debtor and Debtor-in-Possession ("**Properties**"), Penn-Daniels, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**Penn**"), ShopKo Stores Operating Co., LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**ShopKo Operating**"), ShopKo Holding Company, LLC, a Wisconsin limited liability company formerly known as ShopKo Holding Company, Inc. , as Debtor and Debtor-in-Possession ("**ShopKo Holdco**"), ShopKo Optical Manufacturing, LLC, a Wisconsin limited liability company, as Debtor and Debtor-in-Possession ("**Optical**"), Specialty Retail Shops Holding Corp., a Delaware corporation formerly known as SKO Group Holding Corp. , as Debtor and Debtor-in-Possession ("**Parent**"), ShopKo Institutional Care Services Co., LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**ShopKo Institutional**"), Retained R/E SPE, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**Retained R/E**"), Pamida Stores Operating Co., LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**Pamida Operating**", and together with Properties, Penn, ShopKo Operating, ShopKo Holdco, Optical, Parent, ShopKo Institutional and Retained R/E, each individually a "**Borrower**" and collectively, "**Borrowers**"), ShopKo Finance, LLC, a Delaware limited liability company, as Debtor and Debtor-in-Possession ("**ShopKo Finance**"), SVS Trucking, LLC, a Minnesota limited liability company, as Debtor and Debtor-in-Possession ("**SVS**"), ShopKo Gift Card Co., LLC, a Minnesota limited liability company, as Debtor and Debtor-in-Possession ("**GiftCard**"), Pamida Transportation, LLC, a Nebraska limited liability company, as Debtor and Debtor-in-Possession ("**Transportation**"), and Place's Associates' Expansion, LLC, a Missouri limited liability company, as Debtor and Debtor-in-Possession ("**Expansion**", and together with ShopKo Finance, SVS, GiftCard and Transportation, each individually a "**Guarantor**" and collectively, "**Guarantors**").

<u>W I T N E S S E T H</u>:

WHEREAS, Borrowers and Guarantors (collectively, the "**Debtors**") have commenced cases under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the District of Nebraska and each Borrower and each Guarantor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Case (as defined below), Agent and Lenders made loans and advances and provided other financial or credit accommodations to Borrowers secured by substantially all assets and properties of Borrowers and Guarantors as set forth in the Pre-Petition Financing Agreements (as defined below);

WHEREAS, the Debtors are requesting that the Bankruptcy Court enter a Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantor as set forth in the Financing Order and the Financing Agreements (as defined below);

WHEREAS, Borrowers and Guarantors have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to Borrowers and make certain amendments to the Pre-Petition Loan Agreement (as defined below) and the other Pre-Petition Financing Agreements, and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein; and

WHEREAS, Borrowers and Guarantors desire to reaffirm their obligations to Agent and Lenders pursuant to the Pre-Petition Financing Agreements and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers and Guarantors set forth in the Financing Order.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agents, Term Loan B-1 Agent, Collateral Agent, Issuing Banks, Lenders, Borrowers, and Guarantors mutually covenant, warrant and agree as follows:

1.    DEFINITIONS.

1.1    Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Pre-Petition Loan Agreement and the other Pre-Petition Financing Agreements shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "**Adequate Protection Liens**" means the "Pre-Petition Replacement Lien" as defined in the Financing Order.

(b)    **"Bankruptcy Court"** means the United States Bankruptcy Court or the United States District Court for the District of Nebraska.

(c)    **"Bankruptcy Code"** means the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(d)    **"Bankruptcy Events"** means the commencement of the Chapter 11 Cases, the events and conditions leading up to the commencement of the Chapter 11 Cases, the Store Closing GOB Sales, and the Rx Sale.

(e)    **"Budget"** means the thirteen (13) week budget delivered to Agent in accordance with Section 5.3 of the Ratification Agreement (a summary of such initial Budget attached to the Ratification Agreement as <u>Exhibit A</u>, in form and substance approved by the Agent), together with any subsequent or amended budgets thereto delivered to Agent and Lenders, in form and substance reasonably satisfactory to Agent (each such subsequent budget, a "**Budget**"), in accordance with the terms and conditions of the Ratification Agreement.

(f)    **"Carve-Out"** shall have the meaning set forth in the Financing Order.

(g)    **"Chapter 11 Case"** or **"Chapter 11 Cases"** means the cases under Chapter 11 of the Bankruptcy Code commenced by Debtors which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

(h)    **"Committee"** means any official committee of unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

(i)    **"Debtors"** means, collectively, Borrowers and Guarantors, each as Debtor and Debtor-in-Possession in the Chapter 11 Case.

(j)    **"DIP Fee Letter"** means the Fee Letter, dated as of the Ratification Closing Date, by and among Borrowers and Agent.

(k)    **"DIP Milestones"** has the meaning specified therefor in Section 5.4 of the Ratification Agreement.

(l)    **"Excluded Contracts"** has the meaning specified therefor in the definition of Post-Petition Collateral.

(m)    **"Financing Order"** means, as applicable, the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Agent and Lenders to Borrowers on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(n)    **"Interim Financing Order"** means, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, in the form attached hereto as <u>Exhibit B</u> and/or otherwise in form and substance satisfactory to the Agent, together with all supplements, modifications, and amendments thereto consented to by the Agent, which, among other matters but not by way of limitation, authorizing, on an interim basis, the Borrowers to execute and perform under the terms of the Pre-Petition Financing Agreements, as amended and supplemented by the terms and conditions of the Ratification Agreement.

(o)   **"Loan Agreement"** means, the Pre-Petition Loan Agreement as ratified, amended, supplemented and otherwise modified by the Ratification Agreement, as the same now exists or may hereafter be amended from time to time.

(p)   **"Permanent Financing Order"** means, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing of the Bankruptcy Court, which order shall be in form and substance satisfactory to the Agent and from which no appeal or motion to reconsider has been filed, together with all supplements, modifications and amendments thereto, consented to by the Agent, which among other matters, but not by way of limitation, authorizes the Borrowers to obtain credit, incur the Post-Petition Obligations, assume or otherwise "roll-up" all Pre-Petition Obligations, and grant liens therefor and granting super-priority expense claims to Agent and Lenders with respect to all obligations due Agent and Lenders, subject to no priority claim or administrative expenses of the Chapter 11 Case or any other entity (other than the Carve-Out and Pre-Petition Priority Liens).

(q)   **"Petition Date"** means the date of the commencement of the Chapter 11 Case.

(r)   **"Plan of Reorganization"** has the meaning specified therefor in Section 5.4 of the Ratification Agreement.

(s)   **"Post-Petition Collateral"** means, collectively, all now existing and hereafter acquired real and personal property of each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent or Collateral Agent pursuant to the Financing Agreements, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

(i)   all of the Pre-Petition Collateral;

(ii)   all Accounts;

(iii)   all general intangibles, including, without limitation, all Intellectual Property;

(iv)   all goods, including, without limitation, Inventory and Equipment but excluding fixtures (as such term is defined in the UCC);

(v)   all Real Property and fixtures;

(vi)   all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(vii)   all instruments, including, without limitation, all promissory notes;

(viii)   all documents and all credit card sales drafts, credit card sales slips or charge slips or receipts and other forms of store receipts;

(ix)     all deposit accounts;

(x)     all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(xi)     all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (A) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (B) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (C) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Post-Petition Collateral, including returned, repossessed and reclaimed goods, and (D) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(xii)     all (A) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (B) monies, credit balances, deposits and other property of each Debtor now or hereafter held or received by or in transit to any Agent, any Lender or its Affiliates or at any other depository or other institution from or for the account of each Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiii)     all commercial tort claims, including, without limitation, those identified in the Information Certificate;

(xiv)     to the extent not otherwise described above, all Receivables;

(xv)     all Prescription Files and other Records;

(xvi)     all proceeds of any Excluded Contract;

(xvii)     effective upon entry of a Permanent Financing Order, all claims, rights, interests, assets and properties recovered by or on behalf of each Borrower and Guarantor or any trustee of such Borrower or Guarantor (whether in the Chapter 11 Case or any subsequent case to which any Chapter 11 Case is converted), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to (among others) Sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code (but not, for the avoidance of doubt, such avoidance actions themselves); and

(xviii)     all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Post-Petition Collateral.

Notwithstanding anything herein to the contrary, "Post-Petition Collateral" shall not include any security interests or liens (i) on any leasehold interest in Real Property that was not previously encumbered by security interests or liens in favor of Agent or Collateral Agent, for itself and the

5551993.6                                          5

benefit of Secured Parties, as of the Petition Date, but shall instead include all proceeds of such leasehold interests subject to any valid senior encumbrances; or (ii) any executory contract or agreement to the extent the contract or agreement does not permit the grant of a lien thereon and was not previously encumbered by security interest or liens in favor of Agent, for itself and the benefit of Secured Parties (the items described in clauses (i) and through (ii) above, collectively, the "**Excluded Contracts**").

(t)        **"Post-Petition Obligations"** means all Obligations (as defined in the Pre-Petition Loan Agreement) of any Debtor arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether arising under or related to this Ratification Agreement, the Loan Agreement, the other Financing Agreements, a Financing Order, by operation of law or otherwise, and whether incurred by such Debtor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, prepayment fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.  For the avoidance of doubt, the Post-Petition Obligations shall include that portion of the outstanding Pre-Petition Obligations, which have been "rolled-up" from time to time as provided in the Financing Order.

(u)        **"Pre-Petition Collateral"** means, collectively, (i) all "Collateral" as such term is defined in the Pre-Petition Loan Agreement as in effect immediately prior to the Petition Date, (ii) all "Collateral" and "Pledged Property" (and terms of similar import) as such terms are defined in each of the other Pre-Petition Financing Agreements as in effect immediately prior to the Petition Date, and (iii) all other security for the Pre-Petition Obligations as provided in the Pre-Petition Loan Agreement and the other Pre-Petition Financing Agreements immediately prior to the Petition Date.

(v)        **"Pre-Petition Financing Agreements"** means the Financing Agreements (as defined in the Pre-Petition Loan Agreement), as in effect immediately prior to the Petition Date.

(w)        **"Pre-Petition Loan Agreement"** means the Third Amended and Restated Loan and Security Agreement, dated February 7, 2012, by and among Borrowers, Guarantors, Lenders, Agents and others, as amended by Amendment No. 1 to Third Amended and Restated Loan and Security Agreement, dated as of March 29, 2012, Amendment No. 2 to Third Amended and Restated Loan and Security Agreement, dated as of December 18, 2012, Amendment No. 3 to Third Amended and Restated Loan and Security Agreement and Consent, dated as of March 29, 2013, Amendment No. 4 to Third Amended and Restated Loan and Security Agreement and Consent, dated as of October 2, 2013, Amendment No. 5 to Third Amended and Restated Loan and Security Agreement, dated as of February 27, 2014, Amendment No. 6 to Third Amended and Restated Loan and Security Agreement, dated as of October 1, 2014, Amendment No. 7 to Third Amended and Restated Loan and Security Agreement, dated as of June 19, 2015, Amendment No. 8 to Third Amended and Restated Loan and Security Agreement, dated as of January 16, 2018 and Amendment No. 9 to Third Amended

and Restated Loan and Security Agreement, dated as of December 13, 2018, as in effect immediately prior to the Petition Date.

(x)     **"Pre-Petition Obligations"** means all Obligations (as such term is defined in the Pre-Petition Loan Agreement) arising at any time before the Petition Date.

(y)     **"Pre-Petition Priority Liens"** means, collectively, the liens permitted by the Pre-Petition Financing Agreements, to the extent any such permitted liens are valid, enforceable, properly perfected, non-avoidable and senior in priority to the liens securing the Pre-Petition Obligations as of the Petition Date (including any that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

(z)     **"Professionals"** means the Debtors' and any Committee's professionals, retained by either of them by final order of the Bankruptcy Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under Sections 327, 328 or 1103(a) of the Bankruptcy Code.

(aa)     **"Ratification Agreement"** means the Ratification and Amendment Agreement, dated as of January 16, 2019, by and among Borrowers, Guarantors, Agents, Term Loan B-1 Agent, Collateral Agent, Issuing Banks and Lenders, as the same may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(bb)     **"Ratification Closing Date"** means the date on which all of the conditions precedent in Section 9 of the Ratification Agreement have been satisfied (or waived).

(cc)     **"Rx Auction"** has the meaning specified therefor in Section 5.4 of the Ratification Agreement.

(dd)     **"Rx Sale"** has the meaning specified therefor in Section 5.4 of the Ratification Agreement.

(ee)     **"Store Closing GOB Sales"** has the meaning specified therefor in Section 5.4 of the Ratification Agreement.

(ff)     **"Store Closing Liquidation Agreement"** has the meaning specified therefor in Section 5.4 of the Ratification Agreement.

1.2     Amendments to Definitions.

(a)     Applicable Margin. The definition of "Applicable Margin" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Applicable Margin' shall mean, at any time, as to the Interest Rate for Prime Rate Loans the applicable percentage (on a per annum basis) set forth below:

| Applicable | Applicable | Applicable |
|---|---|---|

| Prime Rate Margin for Revolving Loans A | Prime Rate Margin for Revolving Loans A-1 | Prime Rate Margin for Term Loans B |
|---|---|---|
| 2.75% | 4.00% | 9.50% |

(b)      Agents and Lenders, etc.  All references to the terms "Agent", "Term Loan B Agent", "Term Loan B-1 Agent", "Collateral Agent", "Issuing Banks" and "Lenders" shall include their respective successors and assigns.

(c)      Borrowers, Guarantors and Debtors.  All references to the terms "Borrowers", "Guarantors" or "Debtors" in the Financing Agreements shall be deemed and each such reference is hereby amended to mean and include (as applicable) the Debtors, each as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as any Debtor's legal representative, as applicable, or with respect to any Debtor the property of the estate of such Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases and its successor upon conclusion of the Chapter 11 Case of such Debtor, as the case may be).

(d)      Collateral.  All references to the term "Collateral" in the Loan Agreement or the other Financing Agreements, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.  For the avoidance of doubt, any reference in the Ratification Agreement or any other Financing Agreement to a lien, security interest or other encumbrance of Agent shall include, without limitation, any lien, security interest or other encumbrance of Collateral Agent as an agent of Agent; it being understood that any lien, security interest or other encumbrance of the Collateral Agent shall be deemed to be also a lien, security interest or encumbrance of Agent.

(e)      Debtors.  All references to Debtors, including, without limitation, to the terms "Borrower," "Borrowers," "Guarantor" or "Guarantors" in the Loan Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean and include the Debtors as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such Debtor).

(f)      Direct Remittance Period.  The definition of "Direct Remittance Period" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Direct Remittance Period' shall mean the period of all times during the Chapter 11 Cases."

(g)      Disqualified Lender.  The definition of "Disqualified Lender" in the Pre-Petition Loan Agreement is hereby amended by deleting the phrase "prior to the date of Amendment No. 7" and replacing it with "prior to the date of the Ratification Agreement".

(h)     Eligible Prescription Files.  The definition of "Eligible Prescription Files" in the Pre-Petition Loan Agreement is hereby amended by adding the following new sentence at the end thereof:

"Notwithstanding anything to the contrary contained herein or in any of the other Financing Agreements, no Prescription File shall be deemed to be an Eligible Prescription File unless (i) such Prescription File satisfies the eligibility criteria set forth in the definition of Eligible Prescription Files and (ii) either (A) such Prescription File is the subject of a sale agreement, in form and substance acceptable to Agent, or (B) Agent otherwise deems such Prescription File to be acceptable in its sole discretion."

(i)     Eligible Transferee.  The definition of "Eligible Transferee" in the Pre-Petition Loan Agreement is hereby amended by (i) deleting the phrase "Sections 10.1(a)(i), 10.1(g), 10.1(h) or 10.1(o)" from clause (e) of such definition and replacing it with "Section 10.1(a)(i)" and (ii) deleting the phrase "unless an Event of Default has occurred and is continuing at the time such assignment is effected hereunder," from clause (i) of the proviso to such definition and replacing it with "unless an Event of Default under Section 10.1(a)(i) has occurred and is continuing at the time such assignment is effected hereunder,".

(j)     Financing Agreements.  All references to the term "Financing Agreements" in the Loan Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Pre-Petition Financing Agreements, as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms of the Ratification Agreement, as amended and supplemented thereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(k)     Indebtedness.  The definition of "Indebtedness" in the Pre-Petition Loan Agreement is hereby amended by deleting clause (b) therein and replacing it with the following:

"(b) representing the balance deferred and unpaid of the purchase price of any property or services (except any such balance that constitutes an account payable to a trade creditor (whether or not an Affiliate) created, incurred, assumed or guaranteed by such Person in the ordinary course of business of such Person or during the pendency of the Chapter 11 Case and, in each case, payable in accordance with the Budget);"

(l)     Information Certificate.   The definition of "Information Certificate" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Information Certificate' shall mean the Information Certificate of Borrowers and Guarantors constituting Exhibit C to the Ratification

Agreement containing material information with respect to Borrowers and Guarantors, their respective business and assets provided by or on behalf of Borrowers and Guarantors to the Agent in connection with the preparation of this Agreement and the other Financing Agreements and the financing arrangements provided for herein."

(m)     Interest Rate.  Clause (a)(vii) of the definition of "Interest Rate" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

"(vii) as to Term Loans B-1, a rate equal to fourteen (14.00%) percent per annum."

(n)     Letter of Credit Limit.  The definition of "Letter of Credit Limit" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Letter of Credit Limit' shall mean $50,000,000."

(o)     Loan Agreement.  All references to the term "Agreement" in the Pre-Petition Loan Agreement or the term "Loan Agreement" in the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean the Loan Agreement (as defined in the Ratification Agreement), and as ratified, assumed and adopted by each Borrower and Guarantor pursuant to the terms hereof and the Financing Order.

(p)     Material Adverse Effect.  All references to the term "Material Adverse Effect," "material adverse effect" or "material adverse change" in the Loan Agreement, the Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to add at the end thereof: "provided, that, the Bankruptcy Events shall not, individually or collectively, constitute a Material Adverse Effect."

(q)     Maximum Credit.  The definition of "Maximum Credit" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Maximum Credit' shall mean the amount of $513,471,687.50."

(r)     Obligations.  All references to the term "Obligations" in the Loan Agreement, this Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(s)     Renewal Date.  The definition of "Renewal Date" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Renewal Date' shall mean the earliest of: (a) the date that is three hundred and sixty-five (365) days after the commencement of the Chapter 11 Case, (b) thirty (30) days after the entry of the Interim Financing Order if the Permanent Financing Order has not been entered prior to the

expiration of such thirty (30) day period, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of the Plan of Reorganization, or (d) the date of confirmation of a plan of liquidation for Borrowers or Guarantors in the Chapter 11 Cases."

(t)    Reserves.  The definition of "Reserves" in the Pre-Petition Loan Agreement is hereby amended by adding the following clause at the end thereof:

"(d) In addition and not in limitation of the foregoing, Agent may establish Reserves in respect of: (i) the Carve-Out, (ii) the amount of any senior liens or claims in or against the Collateral that have priority over the liens and claims of Agent, and (iii) the amount of priority or administrative expense claims that require payment during the Chapter 11 Cases."

(u)    Revolving Loan A Limit.  The definition of "Revolving Loan A Limit" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Revolving Loan A Limit' shall mean $400,000,000."

(v)    Term Loan B Limit.  The definition of "Term Loan B Limit" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Term Loan B Limit' shall mean $49,055,312.50."

(w)    Term Loan B-1 Limit.  The definition of "Term Loan B-1 Limit" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

" 'Term Loan B-1 Limit' shall mean $34,416,375."

(x)    Term Loan Priority Collateral Proceeds Event.  The definition of "Term Loan Priority Collateral Proceeds Event" in the Pre-Petition Loan Agreement is hereby amended by adding the following new sentence at the end thereof:

"Notwithstanding anything to the contrary contained herein or in any other Financing Agreement, a Term Loan Priority Collateral Proceeds Event shall be deemed to have occurred and be continuing at all times during the Chapter 11 Cases."

(y)    Term Loans B Action Default.  The definition of "Term Loans B Action Default" in the Pre-Petition Loan Agreement is hereby amended by deleting the reference to "10.1(f), 10.1(g), 10.1(h),".

(z)    Term Loans B-1 Action Default.  The definition of "Term Loans B-1 Action Default" in the Pre-Petition Loan Agreement is hereby amended by deleting the reference to "10.1(f), 10.1(g), 10.1(h),".

(aa)    Triggering Event.  The definition of "Triggering Event" in the Pre-Petition Loan Agreement is hereby amended by (i) deleting the phrase "the occurrence and continuance of an Event of Default under Section 10.1(f), 10.1(g) or 10.1(h) hereof" and replacing it with "[reserved]" and (ii) adding the following new sentence at the end thereof:

> "Notwithstanding anything to the contrary contained herein or in any other Financing Agreement, a Triggering Event shall be deemed to have occurred and be continuing at all times during the Chapter 11 Cases."

**1.3**    Interpretation.

(a)    For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Pre-Petition Loan Agreement, as amended, supplemented or otherwise modified by this Ratification Agreement.

(b)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(c)    All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

**2.**    ACKNOWLEDGMENTS.

**2.1**    Pre-Petition Obligations.    Each Borrower and Guarantor hereby acknowledges, confirms and agrees that, as of January 15, 2019, Borrowers are indebted to Agent and Lenders in respect of all Pre-Petition Obligations in an aggregate principal amount of not less than $402,699,907.17 consisting of (a) Loans to each Borrower made pursuant to the Pre-Petition Financing Agreements, together with interest accrued and accruing thereon, and (b) Letter of Credit Obligations outstanding under the Pre-Petition Loan Agreement together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses), plus all other charges now or hereafter owed by Borrowers to Agent and Lenders, all of which are unconditionally owing by the Borrowers to the Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

**2.2**    Guaranteed Obligations.  Each Guarantor hereby acknowledges, confirms and agrees that:

(a)     all obligations of such Guarantors under the Pre-Petition Financing Agreements are unconditionally owing by such Guarantor to Agent and Lenders without offset, defense or counterclaim of any kind, nature and description whatsoever, and

(b)     the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by such Guarantor pursuant to the Pre-Petition Financing Agreements extends to all Post-Petition Obligations.

**2.3**     Acknowledgment of Security Interests.   Each Borrower and Guarantor hereby acknowledges, confirms and agrees that Agent and/or Collateral Agent, for the benefit of itself and the other Secured Parties, has and shall continue to have (a) valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent and/or Collateral Agent pursuant to the Pre-Petition Financing Agreements as in effect immediately prior to the Petition Date to secure all of the Obligations, and (b) valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Agent and/or Collateral Agent, for the benefit of itself and the Secured Parties, under the Financing Order or hereunder or under any of the other Financing Agreements or otherwise granted to or held by Agent and/or Collateral Agent, in each case, subject only Pre-Petition Priority Liens and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent.

**2.4**     Binding Effect of Documents.   Each Borrower and Guarantor hereby acknowledges, confirms and agrees that: (a) each of the Pre-Petition Financing Agreements to which it is a party was duly executed and delivered to Agent, Collateral Agent and Lenders by such Borrower or Guarantor and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Borrower or Guarantor contained in the Pre-Petition Financing Agreements constitute the legal, valid and binding obligations of such Borrower or Guarantor enforceable against it in accordance with the terms thereof, and such Borrower or Guarantor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Agent, Collateral Agent and Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in (i), subject to the entry and terms of the Financing Order, the Financing Agreements and (ii) the Financing Order.

**3.**     ADOPTION AND RATIFICATION.

Each Borrower and Guarantor hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Financing Agreements to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Pre-Petition Financing Agreements, as supplemented and amended by this Ratification Agreement, and in accordance with the Financing Order. All of the Pre-Petition Financing Agreements are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers and Guarantors, each as Debtor and Debtor-in-Possession and considered as agreements between such Borrowers or Guarantors, on the one hand, and Agent, Collateral Agent and Lenders, on the other hand. Each Borrower and Guarantor party hereto hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Pre-Petition Financing Agreements, as amended and supplemented pursuant hereto and the Financing Order,

and each Borrower and Guarantor, as Debtor and Debtor-in-Possession, agrees to be fully bound by the terms of the Financing Agreements to which such Borrower or Guarantor is a party.

**4.**    GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), Borrowers and Guarantors, each as Debtor and Debtor-in-Possession, hereby grant, pledge and assign to the Agent, for the benefit of itself and the other Secured Parties, and also confirm, reaffirm and restate the prior grant to Agent and/or Collateral Agent, for the benefit of itself and the other Secured Parties of, continuing senior priority security interests in and liens upon, and rights of setoff against, all of the Collateral.

**5.**    ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.

In addition to the representations, warranties and covenants made by Borrowers and Guarantors to Agent and Lenders, under the Loan Agreement or the other Financing Agreements (in each case, for the avoidance of doubt, as amended by or provided in this Ratification Agreement) each Borrower and Guarantor hereby represents, warrants and covenants to Agent and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition precedent to the making of Loans by Agent and Lenders or the issuance of Letters of Credit under the Financing Agreements:

**5.1**    Financing Order.

(a)    No Borrower or Guarantor shall seek to have any Financing Order vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than with the prior written consent of Agent).

(b)    On or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered the Permanent Financing Order authorizing the secured financing under the Financing Agreements on the terms and conditions contemplated herein, granting to Agent the security interests and liens and super-priority administrative expense claim status described in Section 5.9 hereof, modifying the automatic stay and containing other provisions required by Agent and its counsel. Agent, Lenders, Issuing Bank and other Secured Parties will not provide any loans or other financial accommodations other than those authorized under the Interim Financing Order unless, on or before the thirtieth day following the date of the commencement of the Chapter 11 Cases, such Permanent Financing Order shall have been entered, there shall be no appeal or other contest with respect to either of such orders and the time to appeal or contest such orders shall have expired.

(c)    Each Borrower and Guarantor hereby represents and warrants with, to and in favor of Agent and Lenders that each Financing Order has been duly entered, is valid, subsisting and continuing (and provides for, among other things, a valid, perfected, continuing, enforceable, non-avoidable first priority lien on the Collateral of each Borrower and Guarantor in favor of Agent and/or Collateral Agent, subject to the Carve-Out) and except as

otherwise expressly consented to by the Agent and the Lenders, has not been vacated, modified, reversed on appeal, or vacated or modified by any Bankruptcy Judge or District Court Judge and is not subject to any pending stay and on and after the date any other Financing Order is entered by the Bankruptcy Court, such other Financing Order shall have been duly entered, valid, subsisting and continuing and shall not have been vacated, modified, reversed on appeal, or vacated or modified by any Bankruptcy Judge or District Court Judge and shall not be subject to any pending stay.

     **5.2**   <u>Use of Proceeds</u>.  All Loans and Letters of Credit provided by Agent or any Lender to Borrowers pursuant to the Financing Order, the Loan Agreement or otherwise, shall only be used by Debtors for the working capital and general corporate purposes of Borrowers, including allowed administrative expenses incurred during the Chapter 11 Cases, all in accordance with the Budget.  Except for claims of Professionals in an amount not to exceed the Carve-Out (which, for the avoidance of doubt, may not be funded the Revolving Loans or Letters of Credit for any purpose provided in paragraph 2.5 of the Interim Financing Order), no portion of the administrative expenses or priority claims in the Chapter 11 Cases, other than those identified in the Budget to which Agent has specifically agreed in writing shall be funded with the Revolving Loans or Letters of Credit and the percentages and categories of permitted allocations of such claims and expenses shall be subject to approval by Agent.  Notwithstanding the foregoing, proceeds shall not be used by Borrowers or Guarantors to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Agent's liens, claims and rights.

     **5.3**   <u>Budget</u>.

       (a)    Borrowers shall deliver to Agent, in form and substance satisfactory to Agent, the following, each in form and substance satisfactory to Agent:

       (i)    on the Petition Date, a 13-week statement of availability, cash receipts and disbursements for the immediately following consecutive 13 weeks (the "**Initial Budget Period**"), set forth on a weekly basis, including the anticipated uses of the Financing Agreements for such period (the "**Budget**", as may be updated, amended or modified from time to time with the written consent of the Agent); and on or before April 5, 2019 an amendment to the Budget, in form and substance acceptable to the Agent, updating the Budget to include the 13-week period immediately following the Initial Budget Period.  Subsequent amendments shall be delivered to the Agent, in form and substance satisfactory to the Agent, two weeks prior to the final day of the Budget then in effect, updating the Budget to include the subsequent thirteen (13) week period.  Upon approval by the Agent, such budget shall be deemed to be the Budget for the next thirteen (13) week period;

       (ii)    commencing on the Wednesday following the second full week following the Petition Date, a weekly variance/reconciliation report on the Wednesday of each week setting forth on a weekly basis for the prior week and on a cumulative basis from the Petition Date through the fourth (4th) full week after the Petition Date and then on a rolling four (4) week basis at all times thereafter (each of the forgoing, a "**Measurement Period**"), (i) a comparison of the actual results to the projected amounts set forth in the Budget during such

periods for the following line items: (A) total cash receipts, and (B) total disbursements, noting therein variances from amounts set forth for such periods in the Budget; and (ii) an explanation for all material variances, in form satisfactory to the Agent and certified by the chief financial officer of the Company ("**DIP Variance Report**"); and

(iii)    a monthly update of financial projections on the 15th day of each month, setting forth updated projections for each line item of the Budget.

(b)    Each Debtor acknowledges, confirms and agrees that the following covenants shall be tested pursuant to the DIP Variance Report for the applicable Measurement Period ending as of each Saturday, with such testing commencing on the Wednesday following the first full two (2) weeks ending after the Petition Date: (i) the actual total cash receipts shall not be less than eighty five percent (85%) of the projected total cash receipts set forth in the Budget as set forth in line item of the Budget titled "Total Receipts" in respect of such Measurement Period, and (ii) the actual total cash disbursements shall not exceed by more than fifteen percent (15%) the projected total cash disbursements as set forth in line item of the Budget titled "Total Disbursements" in respect of such Measurement Period.

(c)    Each Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Agent, (i) a failure to maintain the deviations in the Budget in an amount equal to or less than the percentage set forth in Section 5.3(b) hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a "**Material Budget Deviation**") and (ii) the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Agent, as provided in Section 5.3(a) hereof shall constitute an Event of Default; provided that failure to maintain such deviations on account of Rx Sales receipts (which shall be deemed to be a variance in the actual proceeds received from Rx Sales from the projected proceeds from Rx Sales, as set forth in the line item of the Budget titled "Proceeds from Rx Asset Sales", in any given Measurement Period in excess of 15%), shall not constitute an Event of Default but shall result in the implementation of Sale Milestones (as defined below) reasonably acceptable to Agent.  Notwithstanding any approval by Agent of the Budget or any subsequent or amended Budget(s), Agent and Lenders will not, and shall not be required to, provide any Loans or Letters of Credit to any Borrower pursuant to the Budget, but shall only provide Loans and Letters of Credit in accordance with the terms and conditions set forth in the Loan Agreement as amended by this Ratification Agreement, the other Financing Agreements and the Financing Order.  Agent and Lenders are relying upon the Borrowers' delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

(d)    Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Agent and the other Secured Parties that are reimbursable by Borrowers or any other amounts owing by Borrowers to Agent and the Secured Parties (including, without limitation reasonable attorneys and consulting fees and expenses) in accordance with the Loan Agreement and the other Financing Agreements, such projections shall not limit, impair, modify or waive the Debtors' obligation to pay the actual amounts due to Agent and/or the other Secured Parties in respect of such costs, expenses and other amounts owing to Agent and such other Secured Parties in accordance with the Loan Agreement and the other Financing Agreements and the actual amounts paid in respect of such costs, expenses and

other amounts other shall not be subject to the variance compliance set forth in Section 5.3(b) hereof.

> 5.4    <u>DIP Milestones</u>.  In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Borrowers and Guarantors to Agent and Lenders, whether pursuant to the Financing Agreements or otherwise, and not in limitation thereof, each Borrower and Guarantor represents, warrants and covenants to the following (the "**DIP Milestones**"):

> (a)    On or prior to the commencement of the Chapter 11 Cases ("Petition Date"), the Debtors shall have commenced going out of business sales at the 126 store locations identified on Schedule 1, attached hereto, on terms and conditions acceptable to Agent;

> (b)    On the Petition Date, the Debtors shall file motions, each in form and substance satisfactory to the Agent, requesting approval from the Bankruptcy Court:

>> (i)    to (A) conduct the Debtors' going out of business sales in accordance with Section 363 of the Bankruptcy Code at the 126 store locations identified on Schedule 1 attached hereto (as may be amended from time to time with the prior written consent of Agent) on terms and conditions acceptable to Agent (the "Store Closing GOB Sales"); and (B) to assume Debtors' prepetition store closing liquidation agreement, entered into between Debtors and Gordon Brothers (the "Store Closing Liquidation Agreement"), in each case on terms and conditions satisfactory to the Agent;

>> (ii)    of bidding and auction procedures, in form and substance satisfactory to Agent, in connection with the sale or sales of all or substantially all of the Debtors' Pharmacy Inventory and Prescription Files and related assets (the "Rx Bidding Procedures Motion");

>> (iii)    of a Disclosure Statement and proposed plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Plan of Reorganization"), each on terms and conditions  satisfactory to Agent (provided that nothing in this clause (iii) shall constitute a vote by Agent or any Lender in favor of the Plan of Reorganization or a commitment by Agent or any Lender to vote in favor of the Plan of Reorganization); and

>> (iv)    of the senior secured financing under the Financing Agreements on the terms and conditions contemplated by the Loan Agreement, granting to Agent the security interests and liens and super-priority administrative expense claim status described above, modifying the automatic stay and other provisions required by the Agent and its counsel (the "DIP Financing")

> (c)    On or before the third (3rd) day following the Petition Date, the Bankruptcy Court shall have entered interim orders, each in form and substance satisfactory to Agent, authorizing (i) the Store Closing GOB Sales, and the assumption of the Store Closing Liquidation Agreement, and (ii) the bidding and auction procedures set forth in the Rx Bidding Procedures Motion (the "Rx Bidding Procedures Order"), and (iii) the DIP Financing, and scheduling a

hearing to approve the Disclosure Statement;

(d)    On or before the tenth (10th) day following the Petition Date, the Debtors shall have conducted an auction (the "Rx Auction") for the sale or sales of all or substantially all of the Debtors' Pharmacy Inventory, Prescription Files and related assets and properties and selected the winning bid(s) (the "Rx Sale") and is otherwise in form and substance reasonably satisfactory to Agent in connection with such Rx Sale;

(e)    On or before the thirteenth (13th) day following the Petition Date, the Bankruptcy Court shall have entered a (i) final Rx Bidding Procedures Order, and (ii) a final order approving the Rx Sale, which order shall be in form and substance acceptable to the Agent;

(f)    On or before the fourteenth (14th) day following the Petition Date, the Debtors shall have delivered an amendment to the Budget, in form and substance acceptable to Agent, solely to reflect adjustments directly arising from the Store Closing Liquidation Agreement.

(g)    On or before the thirtieth (30th) day following the Petition Date, the Bankruptcy Court shall have entered final orders, each in form and substance satisfactory to Agent authorizing (i) the Store Closing GOB Sales, (ii) the assumption of the Store Closing Liquidation Agreement, and (iii) the DIP Financing.

(h)    On or before March 1, 2019, the Debtors shall deliver to Agent a business plan for the Reorganized Debtors in form and substance acceptable to the Agent, including without limitation any financial projections, assumptions, and calculations reasonably requested by the Agent.

(i)    On or before the forty-fifth (45th) day following the Petition Date the Debtors shall have received court approval to extend the general time period to accept/reject leases from the permitted 120 day time period to not less than 210 days;

(j)    If the final Store Closing GOB Sales Order does not allow the Debtors to conduct going out of business sales for all or substantially all of the Debtors' remaining assets and properties, then on or before March 6, 2019, the Debtors shall have selected a "stalking horse" offer for the sale of all or substantially all of the Debtors' assets and properties and/or liquidation of the Debtors' assets, in form and substance acceptable to Agent;

(k)    If the final Store Closing GOB Sales Order does not allow the Debtors to conduct going out of business sales for all or substantially all of the Debtors' remaining assets and properties, then on or before March 8, 2019, the Debtors shall have filed in the Bankruptcy Court a motion (the "Sale Motion") seeking entry of a final order (the "Bidding Procedures Order") approving (A) the stalking horse sale agreement for all or substantially all of the Debtors' remaining assets ("Stalking Horse APA") and/or liquidation of the Debtors' assets, and (B) bidding and auction procedures (if necessary) in connection with a sale of all or substantially all remaining assets of each Debtor, pursuant to Section 363 of the Bankruptcy Code, which Sale Motion (including all deadlines contained therein) shall be reasonably satisfactory to the Agent (the "363 Sale");

(l)    On or before the forty-fifth (45th) day following the Petition Date, the Debtors

shall have consummated the Rx Sale, pursuant to one or more purchase agreements, in form and substance acceptable to Agent, entered into among the Debtors and the winning bidder(s) at the Rx Auction; <u>provided</u> that failure to comply with this milestone shall result in the commencement of the Sale Milestones (as defined below) and not constitute an Event of Default;

(m)     The Debtors shall comply with the following milestones ("Plan Milestones"); <u>provided</u> that failure to comply with these milestones shall result in the commencement of the Sale Milestones (as defined below) and not constitute an Event of Default:

(i) on or before March 14, 2019, Debtors shall deliver to Agent (A) a commitment letter in form and substance reasonably acceptable to Agent from one or more sponsors or other financial institutions reasonably acceptable to Agent (such sponsors or financial institutions referred to herein collectively as the "Sponsor"), reflecting, among other things, such Sponsor's commitment and financial wherewithal to provide financing sufficient to support the feasibility and confirmation of the Plan, on terms and conditions acceptable to Agent (the "Commitment Letter") (provided that nothing in this clause (i) shall constitute a vote by Agent or any Lender in favor of the Plan of Reorganization or a commitment by Agent or any Lender to vote in favor of the Plan of Reorganization), or (B) such other financial information and commitments in form and substance acceptable to Agent sufficient to demonstrate that Debtors will have sufficient liquidity and are otherwise likely to consummate the Plan of Reorganization and reorganize, in each case as Agent may determine in its sole discretion;

(ii) on or before March 22, 2019,  the Debtors shall obtain an order from the Bankruptcy Court approving the Disclosure Statement on terms and conditions reasonably satisfactory to the Agent, and such order is not thereafter vacated, reversed, modified or altered on appeal or by reconsideration without the prior written consent of the Agent;

(iii) on or before April 5, 2019, Agent shall have received, in form and substance acceptable to Agent, a proposed order confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to Agent (the "Proposed Confirmation Order"), which plan shall include procedures for the orderly wind down and liquidation of the Debtors' assets and properties in the event the conditions for reorganization are not satisfied (provided that nothing in this clause (iii) shall constitute a vote by Agent or any Lender in favor of the Plan of Reorganization or a commitment by Agent or any Lender to vote in favor of the Plan of Reorganization);

(iv) on or before April 12, 2019, the Debtors shall obtain an order from the Bankruptcy Court confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to the Agent; and

(v) on or before April 15, 2019, the Effective Date under (and as defined in) the Plan of Reorganization shall occur;

(n)     If (i) the final Store Closing GOB Sales Order does not allow the Debtors to conduct going out of business sales for all or substantially all of the Debtors' remaining assets and properties, and (ii) Debtors fail to satisfy the Plan Milestone set forth in section (m)(i), then on or before March 15, 2019, Debtors shall deliver to Agent the Bidding Procedures Order entered by the Bankruptcy Court in form and substance acceptable to Agent;

(o)     If (i) Debtors fail to satisfy the Plan Milestone set forth in section (m)(i) above, and (ii) the Debtors have filed the Sale Motion in accordance with paragraph (k) above, then on or before March 20, 2019, the Debtors shall have obtained an order from the Bankruptcy Court approving the 363 Sale in form and substance acceptable to Agent, and providing for, among other things, the receipt by Agent of all cash proceeds from the 363 Sale to be applied to the indefeasible payment in full of all Obligations in accordance with Section 6.4 of the Loan Agreement and Financing Orders (the "363 Sale Order");

(p)     Notwithstanding anything to the contrary contained above, if at any time prior to expiration of the term of the Loan Agreement, (i) an Event of Default occurs and is continuing under the Loan Agreement without being waived in writing by Agent and, to the extent required pursuant to the Loan Agreement, by the requisite number of Lenders, (ii) there is a negative variance in the actual proceeds received from Rx Sales from the projected proceeds from Rx Sales, as set forth in the line item of the Budget titled "Proceeds from Rx Asset Sales", in any given Measurement Period of the Budget in excess of 15% or (iii) Debtors fail to comply with the Plan Milestones (each of the forgoing, a "Sale Trigger Event"), then Debtors shall comply with the following milestones ("Sale Milestones"):

(i)     (A) on or before the date that is seven days following the date on which the Sale Trigger Event occurs, Debtors shall deliver to Agent a new 13-week statement of availability, cash receipts and disbursements for the immediately following consecutive 13 weeks ("Sale Budget") in form and substance acceptable to Agent, which upon Agent's written acceptance shall be the Budget, and (B) on or before the date that is two days following the date on which the Sale Trigger Event occurs, the Debtors shall either (i) commence the sale of all or substantially all of the Debtors' remaining assets and properties to the extent permitted by the final Store Closing GOB Sales Order and Store Closing Liquidation Agreement, or (ii) file the Sale Motion seeking entry of the Bidding Procedures Order in connection with a sale of all or substantially all remaining assets of each Debtor, pursuant to Section 363 of the Bankruptcy Code, which Sale Motion (including all deadlines contained therein) shall be satisfactory to the Agent; and

(ii)     if the final Store Closing GOB Sales Order does not allow the Debtors to conduct going out of business sales for all or substantially all of the Debtors' remaining assets and properties, then:

(A)     on or before the date that is five days following the date on which the Sale Trigger Event occurs, the Bankruptcy Court shall have entered the Bidding Procedures Order;

(B)      on or before the date that is seven days following the date on which the Sale Trigger Event occurs, the Debtors shall have distributed Bid Packages (as defined in the Bidding Procedures Order) to each Person meeting the criteria for receipt of a Bid Package as set forth in the Bidding Procedures Order;

(C)      on or before the date that is ten days following the date on which the Sale Trigger Event occurs, the Debtors shall have received one or more qualified bids in form and substance acceptable to Agent;

(D)      on or before the date that is twelve days following the date on which the Sale Trigger Event occurs, the Debtors shall have conducted an auction for the sale or sales of all or substantially all of the Debtors' assets and properties and selected the winning bid(s) in connection with such 363 Sale;

(E)      on or before the date that is fourteen days following the date on which Sale Trigger Event occurs, the Bankruptcy Court shall have entered an order approving the 363 Sale, which order shall be in form and substance acceptable to the Agent and shall provide for, among other things, the receipt by Agent of all cash proceeds from the 363 Sale to be applied to the indefeasible payment in full of all Obligations in accordance with Section 6.4 of the Loan Agreement and Financing Orders.

5.5      Ratification of Deposit Account Control Agreement.  To the extent Agent deems it necessary in its reasonable discretion and promptly upon Agent's request, Borrowers and Guarantors shall promptly provide Agent with evidence, in form and substance satisfactory to Agent, that the Deposit Account Control Agreements (as defined in the Financing Order) and other deposit account arrangements provided for under Section 6.3 of the Loan Agreement have been ratified and amended by the parties thereto, or their respective successors in interest to reflect the commencement of the Chapter 11 Case, that each Borrower and each Guarantor, as Debtor and Debtor-in-Possession, is the successor in interest to such Borrower or Guarantor, that the Obligations secured by the Lien relating to each Deposit Account Control Agreement include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral covered by each Deposit Account Control Agreement includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in the Ratification Agreement.

5.6      ERISA.  Each Borrower and Guarantor hereby represents and warrants with, to and in favor of Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower or Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "**PBGC**") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of any Borrower or Guarantor and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of any Borrower or Guarantor.

5.7      Maximum Outstanding Loans and Letters of Credit.  Notwithstanding anything to the contrary contained in the Loan Agreement or the other Financing Agreements, Agent and Lenders shall have no obligation whatsoever to make any Loan to the Borrowers or issue any Letters of Credit on behalf of the Borrowers to the extent that, immediately after giving effect to the making of such Loan or issuance of such Letter of Credit, the then aggregate

outstanding amount of all Loans and Letter of Credit Obligations would exceed at any time the Maximum Credit as determined by Agent in its discretion.

       5.8       <u>Financial Advisor</u>.

       (a)       The Debtors shall retain, at all times during which the Obligations remain outstanding, Berkeley Research Group LLC as its financial advisor (the "**Financial Advisor**"), at the sole cost and expense of the Debtors, on terms and conditions acceptable to Agent. The Financial Advisor shall, in consultation with the Debtors other advisors, (i) negotiate the terms of debtor in possession financing facilities for Parent and related adequate protection arrangements in respect of the Debtors' credit facilities, (ii) negotiate the terms of any plan or pre- or post-petition asset purchase agreement, and to enter into binding and definitive agreement(s) on behalf of the Debtors with respect to the foregoing, and (iii) supervise the structuring and conduct a sale or plan process for the Debtors, including negotiating the terms of any competing bids. The Debtors hereby irrevocably authorize and direct the Financial Advisor to consult with Agent and to share with Agent and Lenders, upon reasonable request therefor by Agent, all financial reports, budgets and any variances from same, other financial information, operational issues, matters related to the Collateral, all reports prepared or reviewed by the Financial Advisor, information on the sale and maintenance of the Debtors' businesses and assets and such other matters as the Agent may reasonably request; provided that the Financial Advisor shall not be required to provide copies of any reports (financial or otherwise) that are in "draft" or "work product" form or privileged. The Debtors agree to provide the Financial Advisor with complete access to all of the books and records of the Debtors, all of premises of the Debtors and to all management and employees of the Debtors as and when deemed necessary by the Financial Advisor.

       (b)       Any amendment, modification or termination of the retention agreement with the Financial Advisor without the prior written consent of Agent shall constitute an Event of Default. The Debtors acknowledge and agree that the Debtors shall cause the Financial Advisor, as further described in clause (a) above, (i) to keep Agent fully informed of the progress of the business and operations of the Debtors and to respond to any reasonable inquiries of Agent regarding the maintenance of the Borrower's businesses and the sale of their assets and (ii) to communicate and cooperate with Agent and share all information, as reasonably requested thereby, with Agent regarding the Debtors, and the sale and maintenance of the Debtors' businesses and assets.

       (c)       If the Financial Advisor resigns, the Debtors shall immediately notify Agent in writing and promptly after receipt thereof, provide Agent with a copy of any notice of resignation from such Financial Advisor. Any replacement or successor Financial Advisor shall be reasonably acceptable to Agent, shall be retained pursuant to a new retention agreement on terms and conditions reasonably acceptable to Agent within five (5) Business Days immediately following the notice of resignation of the resigning Financial Advisor and shall be approved by the Bankruptcy Court. Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

       5.9       <u>Super-Priority Administrative Expense</u>. Each Borrower and Guarantor hereby represents and warrants with, to and in favor of Agent and Lenders that all amounts

owing by Borrowers and Guarantors under the Loan Agreement at all times after entry of the Permanent Financing Order and for all sums advanced by Lenders during the period on and after the entry of the Interim Financing Order will constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out to the extent provided in any Financing Order.

        **5.10**    <u>Early Termination</u>.  Notwithstanding anything to the contrary contained in this Ratification Agreement, the Loan Agreement or the other Financing Agreements, the parties hereto acknowledge and agree that, solely for purposes of Sections 3.2(d) and 3.2(e) of the Loan Agreement, the Events of Default described in Sections 10.1(g) and 10.1(h) of the Pre-Petition Loan Agreement have occurred and are continuing and survive the execution and effectiveness of this Ratification Agreement.

        **6.**    <u>[Reserved]</u>.

        **7.**    <u>AMENDMENTS</u>.

        **7.1**    <u>Mandatory Prepayments</u>.  Section 2.1(d) of the Pre-Petition Loan Agreement is hereby amended by adding the following sentence at the end thereof:

> "In addition, in the event that Borrowers fail to meet the DIP Milestones (other than the Plan Milestones), Borrowers shall, upon demand by Agent, which may be made at any time or from time to time, immediately repay Loans and other Obligations to Agent in an amount equal to 100% of the net cash proceeds from asset sales generating during the Chapter 11 Cases, which shall be applied in accordance with Section 6.4 hereof."

        **7.2**    <u>Limits and Sublimits</u>.  Section 2 of the Pre-Petition Loan Agreement is hereby amended by adding the following new Section 2.6 at the end of such Section:

> "2.6    <u>Limit and Sublimit Construction</u>.  All limits and sublimits set forth in this Agreement, and any formula or other provision to which a limit or sublimit may apply, shall be determined on an aggregate basis considering together both the Pre-Petition Obligations and the Post-Petition Obligations."

        **7.3**    <u>Elimination of Eurodollar Rate Loans</u>.

        (a)    Section 3.1(b) of the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following is substituted therefor "(b) [Reserved]."

        (b)    Section 3.1(c) of the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following is substituted therefor "(c) [Reserved]."

        (c)    Notwithstanding anything to the contrary contained in the Loan Agreement, (i) all Eurodollar Rate Loans shall automatically convert to Prime Rate Loans as of the Ratification Closing Date without any action taken or required to be taken by any Person, (ii)

Borrowers shall not request or have any right to receive any Eurodollar Rate Loans from Agent and Lenders, and Borrowers shall not request or have any right to convert any Prime Rate Loans to Eurodollar Rate Loans, and (iii) Agent and Lenders shall not have any obligation to make any Eurodollar Rate Loans to any Borrower or to convert any Prime Rate Loans into Eurodollar Rate Loans. Notwithstanding anything to the contrary contained herein or in the Loan Agreement, the reference to the Adjusted Eurodollar Rate in the definition of "Prime Rate" is only with reference to determining the Prime Rate and any Loan made in reference to such rate shall not constitute a Eurodollar Rate Loan such that the provisions under Sections 3.3(b), (c) and (d) would have any application to the Prime Rate Loans.

7.4    <u>Letter of Credit Fees</u>.  Section 3.2(b) of the Pre-Petition Loan Agreement is hereby amended by deleting each reference to "which are Eurodollar Rate Loans".

7.5    <u>Special Provisions Regarding Collateral</u>.  Section 5.3 of the Pre-Petition Loan Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following "5.3 [Reserved]."

7.6    <u>Payments</u>.  Section 6.4 of the Pre-Petition Loan Agreement is hereby amended by adding the following new subsection (h) at the end of such Section:

"(h) Notwithstanding anything to the contrary contained in this Agreement or any of the other Financing Agreements, Agent shall, to the extent authorized by the Financing Orders, apply any such payments or proceeds <u>first</u>, to the Pre-Petition Obligations in accordance with Section 6.4 hereof until such Pre-Petition Obligations are paid and satisfied in full and <u>second</u>, to the Post-Petition Obligations in accordance with Section 6.4 hereof until such Post-Petition Obligations are paid and satisfied in full."

7.7    <u>Collection and Administration</u>.  Section 6 of the Pre-Petition Loan Agreement is hereby amended by adding the following new Section 6.13 at the end of such Section:

"6.13    <u>Misapplied Payments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if Agent in good faith determines that any amount of proceeds of Term Loan Priority Collateral have been applied to repay Obligations in accordance with Section 6.4(b):

(a) Agent may establish a Reserve in an amount equal to such amount of proceeds, and

(b) Borrowers shall be deemed to have requested, automatically and without the need for any further action, the borrowing of Revolving Loans A in an amount equal to such amount of proceeds, which Revolving Loans A shall be applied to repay Obligations in accordance with Section 6.4(d)."

**7.8**    <u>Collateral Reporting</u>.  Section 7.1(a) of the Pre-Petition Loan Agreement is hereby amended by (i) deleting the "." at the end of such section and substituting ";" therefor; and (ii) adding the following new subsections at the end of Section 7.1(a) as follows:

"(viii)  daily, on each business day during the Chapter 11 Cases, a "roll-forward" of the Inventory (including without limitation Pharmacy Inventory) and Prescription Files;

(ix)    no less frequently than weekly, on the Wednesday of each week during the Chapter 11 Cases, a report, in reasonable detail with respect to all Store Closing GOB Sales, Real Property sales, Rx Sales and sales, proposed sales or assignments of other Collateral outside the ordinary course of Debtors' businesses that have been made during the prior week including but not limited to all sales of the following categories of Collateral:  (A) inventory, (B) furniture, fixtures and equipment,(C) real property (including leases) and (D) intellectual property;

(x)    upon Agent's request, monthly reports of the number of employees of Borrower and Guarantors to which any wage, salary or benefit statute or other law may apply as determined by Agent.

(xi)    upon Agent's request, reports on the status of any sales or proposed sales of Collateral outside the ordinary course of Debtors' businesses, including any "going out of business" sales or pharmacy asset sales conducted prior to or during the Chapter 11 Cases."

**7.9**    <u>Inventory Covenants</u>.

(a)    Section 7.3(c) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(c) other than as a result of the Store Closing GOB Sales and the Rx Sale, and except as permitted under Section 9.2 hereof, each Borrower and Guarantor shall not remove any Inventory from the locations set forth or permitted herein, without the prior written consent of Agent, except for sales of Inventory in the ordinary course of its business and except to move Inventory directly from one location set forth or permitted herein to another such location and except for Inventory shipped from the manufacturer thereof to a Borrower or Guarantor which is in transit to the locations set forth or permitted herein;"

(b)    Section 7.3(d) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(d) Borrowers shall, deliver or cause to be delivered to Agent written appraisals as to the Inventory in form, scope and methodology acceptable to Agent and by an appraiser acceptable to Agent, addressed to Agent and Lenders and upon which Agent and Lenders are expressly permitted to

rely, (i) one (1) time in any calendar quarter at Borrowers' expense, (ii) [reserved], (iii) in addition to the appraisals delivered pursuant to clauses (i) and (ii) above, at any time or times as Agent may reasonably request at Borrowers' expense upon the occurrence and during the continuance of an Event of Default and (iv) in addition to the appraisals delivered pursuant to clauses (i), (ii) and (iii) above, at any additional time or times as Agent may request at the expense of Lenders;"

**7.10** <u>Equipment and Real Property Covenants</u>.

(a) Section 7.4(a) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(a)(i) Borrowers shall, deliver or cause to be delivered to Agent written appraisals as to the Eligible Equipment in form, scope and methodology acceptable to Agent and by an appraiser acceptable to Agent, addressed to Agent and Lenders and upon which Agent and Lenders are expressly permitted to rely, (A) no more than one (1) time in any calendar quarter at Borrowers' expense upon Agent's request, (B) [reserved], (C) in addition to the appraisals delivered pursuant to clauses (A) and (B) above, at any time or times as Agent may reasonably request at Borrowers' expense upon the occurrence and during the continuance of an Event of Default and (D) in addition to the appraisals delivered pursuant to clauses (A), (B) and (C) above, at any additional time or times as Agent may request at the expense of Lenders, and (ii) Borrowers shall, deliver or cause to be delivered to Agent written appraisals as to the Eligible Real Property in form, scope and methodology acceptable to Agent and by an appraiser acceptable to Agent, addressed to Agent and Lenders and upon which Agent and Lenders are expressly permitted to rely, (A) no more than one (1) time in any calendar quarter at Borrowers' expense upon Agent's request, (B) [reserved], (C) in addition to the appraisals delivered pursuant to clauses (A) and (B) above, at any time or times as Agent may request at Borrowers' expense upon the occurrence and during the continuance of an Event of Default and (D) in addition to the appraisals delivered pursuant to clauses (A), (B) and (C) above, at any additional time or times as Agent may request at the expense of Lenders;"

(b) Section 7.4(e) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(e) other than as a result of the Store Closing GOB Sales, and without limitation upon the rights of Borrowers and Guarantors to dispose of Equipment pursuant to Section 9.7(b) hereof, each Borrower and Guarantor shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of its business or to move Equipment directly from one location set forth or permitted herein to

another such location and except for the movement of motor vehicles used by or for the benefit of Borrowers or Guarantors in the ordinary course of business;"

**7.11**   Prescription Files Covenants.   Section 7.5(c) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(c) Borrowers shall, deliver or cause to be delivered to Agent written appraisals as to the Prescription Files in form, scope and methodology acceptable to Agent and by an appraiser acceptable to Agent, addressed to Agent and Lenders and upon which Agent and Lenders are expressly permitted to rely, (i) one (1) time in any calendar quarter at Borrowers' expense, (ii) [reserved], (iii) in addition to the appraisals delivered pursuant to clauses (i) and (ii) above, at any time or times as Agent may reasonably request at Borrowers' expense upon the occurrence and during the continuance of an Event of Default and (iv) in addition to the appraisals delivered pursuant to clauses (i), (ii) and (iii) above, at any additional time or times as Agent may request at the expense of Lenders;"

**7.12**   Access to Premises.   Section 7.9 of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"From time to time as requested by Agent, at the cost and expense of Borrowers, (a) Agent or its designee shall have complete access to all of each Borrower's and Guarantor's premises during normal business hours and after reasonable notice to Administrative Borrower, or at any time and without notice to Administrative Borrower if an Event of Default exists or has occurred and is continuing, for the purposes of inspecting, verifying and auditing the Collateral and all of each Borrower's and Guarantor's books and records, including the Records (it being agreed that unless an Event of Default shall exist or have occurred and be continuing, Agent shall not conduct more than one (1) field audit of the Collateral and books and records, including the Records of Borrowers and Guarantors, in any calendar quarter at the expense of Borrowers, provided, that, Agent may conduct additional field audits of the Collateral and books and records at the expense of Lenders, and (b) each Borrower and Guarantor shall promptly furnish to Agent such copies of such books and records or extracts therefrom as Agent may request, and any Lender's designee may use during normal business hours such of any Borrower's and Guarantor's personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing and if an Event of Default exists or has occurred and is continuing for the collection of Receivables and realization of other Collateral.  Notwithstanding the foregoing, Agent may, at the expense of Borrowers, conduct field audits as Agent may reasonably require at any time upon the occurrence and during the continuance of an Event of Default."

**7.13**    <u>Existence; Power and Authority</u>.  Section 8.1 of the Pre-Petition Loan Agreement is hereby amended by (i) lower casing the word "The" in the second sentence therein and inserting immediately prior to such second sentence the following phrase "Subject to any entry of any required orders of the Bankruptcy Court including, without limitation, the entry of the Interim Financing Order and the Permanent Financing Order, as applicable," and (ii) lower casing the word "This" in the third sentence therein and inserting immediately prior to such third sentence the following phrase "Subject to the entry of the Interim Financing Order and the Permanent Financing Order, as applicable,".

**7.14**    <u>Litigation</u>. Section 8.6 of the Pre-Petition Loan Agreement is hereby amended by lower casing the word "Except" in the first sentence therein and inserting immediately prior to such first sentence the following phrase "Except for the Bankruptcy Events and".

**7.15**    <u>Compliance with Other Agreements and Applicable Laws</u>. (i) Section 8.7(a) of the Pre-Petition Loan Agreement is hereby amended by inserting immediately prior to the first sentence therein the following phrase "Other than as a result of the Bankruptcy Event (the exercise of remedies as a result of which are stayed under the Bankruptcy Code), the" and (ii) Section 8.7(b) of the Pre-Petition Loan Agreement is hereby amended by inserting immediately prior to the first sentence therein the following phrase "Subject to the entry of the Interim Financing Order and the Permanent Financing Order, as applicable, the".

**7.16**    <u>Solvency</u>. Section 8.12 of the Pre-Petition Loan Agreement is hereby amended by deleting clause (d) of such Section in its entirety and replacing it with "(d) [Reserved]."

**7.17**    Material Contracts. Section 8.15 of the Pre-Petition Loan Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

"8.15    <u>Material Contracts</u>. Schedule 8.15 to the Information Certificate sets forth all Material Contracts to which any Borrower or Guarantor is a party or is bound as of the date hereof.  Borrowers and Guarantors have delivered true, correct and complete copies of such Material Contracts to Agent on or before the date hereof.  Other than the Bankruptcy Events, Borrowers and Guarantors are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract, except where such breach, default or termination has not had or could not reasonably be expected to have a Material Adverse Effect or would otherwise be stayed by the filing of the Chapter 11 Case."

**7.18**    <u>Credit Card Agreements</u>.  Section 8.16 of the Pre-Petition Loan Agreement is hereby amended (i) by lower casing the word "No" in the fourth sentence therein and inserting immediately prior to such fourth sentence the following phrase "Other than the Bankruptcy Events," and (ii) by lower casing the word "Each" in the fifth sentence therein and inserting immediately prior to such fifth sentence the following phrase "Other than the Bankruptcy Events,".

      **7.19**   <u>Payable Practices</u>. Section 8.17 of the Pre-Petition Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

> "8.17  <u>Payable Practices</u>. Each Borrower and Guarantor has not made any material change in the historical accounts payable practices from those in effect immediately prior to the Ratification Closing Date (it being understood that the issuance of a Letter of Credit for the benefit of a vendor shall not, in and of itself, constitute a material change in the historical payable practices), except (i) as in accordance with the Budget, or (ii) with the written consent of the Agent."

      **7.20**   <u>Accuracy and Completeness of Information</u>.  Section 8.22 of the Pre-Petition Loan Agreement is hereby amended by lower casing the word "Since" in the last sentence therein and inserting immediately prior to such last sentence the following phrase "Other than the Bankruptcy Events,".

      **7.21**   <u>Compliance with Laws, Regulations, Etc</u>.  Section 9.3(a) of the Pre-Petition Loan Agreement is hereby amended by lower casing the word "Each" in the first sentence therein and inserting immediately prior to such first sentence the following phrase "Except to the extent non-compliance is permitted under the Bankruptcy Code,".

      **7.22**   <u>Financial Statements and Other Information</u>.  Section 9.6(b) of the Pre-Petition Loan Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

> "(b)    Borrowers and Guarantors shall promptly notify Agent and (solely in the case of clause (vii) below) Term Loan B Agent and Term Loan B-1 Agent in writing of the details of (i) any loss, damage, investigation, action, suit, proceeding or claim relating to Collateral having a value of more than $4,000,000 or which if adversely determined could reasonably be expected to result in a Material Adverse Effect, other than events arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code, (ii) any Material Contract being terminated or amended or any new Material Contract entered into (in which event Borrowers and Guarantors shall provide Agent with a copy of such Material Contract), (iii) any order, judgment or decree in excess of $4,000,000 shall have been entered against any Borrower or Guarantor any of its or their properties or assets, (iv) any notification of a material violation of laws or regulations received by any Borrower or Guarantor, (v) any ERISA Event, (vi) the occurrence of any Default or Event of Default, and (vii) the sale or other disposition of any Term Loan Priority Collateral during the continuance of a Term Loan Priority Collateral Proceeds Event."

      **7.23**   <u>Financial Statements and Other Information</u>.  Section 9.6 of the Pre-Petition Loan Agreement is hereby amended by adding the following new subsection at the end of such Section:

"(f) Borrowers and Guarantors shall also provide Agent and Lenders with copies of all financial reports, schedules and other materials and information at any time furnished by or on behalf of any Borrower or Guarantor to the Bankruptcy Court (other than those filed on the docket of the Bankruptcy Court), or the U.S. Trustee, or any material information not previously provided to Agent with respect to the Chapter 11 Case that is provided to any creditors' committee or such Borrower or Guarantor's shareholders, substantially concurrently with the delivery thereof to the Bankruptcy Court, creditors' committee, U.S. Trustee or shareholders, as the case may be."

**7.24**    Sale of Assets, Consolidation, Merger, Dissolution, Etc.

(a)    Section 9.7(b)(v) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(v) the Store Closing GOB Sales, the Rx Sale and any other sale or disposition of assets of Borrowers or Guarantors in connection with the Chapter 11 Case, in each case, in accordance with this Agreement, the Budget, Financing Orders, and any other order entered by the Bankruptcy Court in form and substance reasonably acceptable to Agent; provided, that, as to any such sale or disposition, Borrowers and Guarantors shall promptly apply all proceeds payable or deliverable to any Borrower or Guarantor in respect of such sale or disposition to the Obligations in accordance with the Loan Agreement ;"

(b)    Section 9.7(c) of the Pre-Petition Loan Agreement is hereby amended by (i) inserting immediately prior to the first sentence therein the following phrase "other than with respect to the Store Closing GOB Sales,", and (ii) deleting clause (vii) therein in its entirety.

**7.25**    Encumbrances.

(a)    Section 9.8(m) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(m) [reserved];".

(b)    Section 9.8 of the Pre-Petition Loan Agreement is hereby amended by (i) deleting the period appearing at the end of clause (u) of such definition and replacing it with a semi-colon, and (ii) adding the following clauses at the end thereof:

"(v) all liens existing on the Petition Date that were permitted under the Pre-Petition Loan Agreement to the extent such liens were legal, valid, binding, enforceable and non-avoidable as of the Petition Date (including any that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), and are not otherwise avoided, recharacterized or subordinated after the Petition Date;

(w) the Adequate Protection Liens; and

(x) liens on the Collateral in respect of the Carve-Out."

**7.26**     Indebtedness.     Notwithstanding anything to the contrary contained in Section 9.9 of the Loan Agreement or any other provision of the Loan Agreement or any of the other Financing Agreements, the Borrowers and Guarantors will not, and will not permit any Subsidiary, after the Ratification Closing Date, to optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness for borrowed money (other than the Obligations or as otherwise made in accordance with the Budget) without the prior written consent of the Agent.

**7.27**     Loans, Investments, Etc.

(a)     Section 9.10(d) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(d) [reserved];".

(b)     Section 9.10(h) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(h) [reserved];".

(c)     Section 9.10(i) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(i) [reserved];".

(d)     Section 9.10(j) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(j) [reserved];".

(e)     Section 9.10(k) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(k) [reserved];".

(f)     Section 9.10 of the Pre-Petition Loan Agreement is hereby amended by (i) deleting the "and" at the end of clause (m) thereof, (ii) deleting the "." at the end of clause (n) thereof and substituting ";" therefor, and (iii) adding the following new subsection (o) at the end of such Section:

"(o) in accordance with an express and separate line item in the Budget entitled "Permitted Investments"."

**7.28**     Dividends and Redemptions.

(a)     Section 9.11(d) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(d) [reserved];".

(b)     Section 9.11(e) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

"(e) in accordance with an express and separate line item in the Budget entitled "Permitted Distributions"."

**7.29**     Transactions with Affiliates.

(a)      Section 9.12(b)(iv) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(iv) [reserved];".

(b)      Section 9.12(b)(vi) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(vi) [reserved];".

(c)      Section 9.12(b)(vii) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(vii) [reserved];".

(d)      Section 9.12(b)(viii) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(viii) [reserved];".

(e)      Section 9.12(b)(ix) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(ix) [reserved];".

(f)      Section 9.12(b)(x) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(x) [reserved];".

(g)      Section 9.12 of the Pre-Petition Loan Agreement is hereby amended by adding the following new clause at the end thereof:

> "provided, that, any action otherwise prohibited by this Section 9.12 shall be authorized if such action is in accordance with an express and separate line item in the Budget entitled "Permitted Transactions with Affiliates"."

**7.30**    <u>Credit Card Agreements</u>.    Section 9.13 of the Pre-Petition Loan Agreement is hereby amended by lower casing the word "Each" in the first sentence therein and inserting immediately prior to such first sentence the following phrase "Other than the Bankruptcy Events,".

**7.31**    <u>Costs and Expenses</u>.  Section 9.22 of the Pre-Petition Loan Agreement is hereby amended by (i) deleting the "." at the end of such section and substituting ";" therefor, (ii) deleting "and" before clause (h) thereof, and (iii) adding the following new subsection (i) at the end of such Section:

> "and (i) the reasonable costs and expenses incurred by Agent (including, without limitation attorneys and consulting fees and expenses) in connection with the Chapter 11 Cases."

**7.32**    <u>Minimum Excess Availability</u>.    Section 9.25 of the Pre-Petition Loan Agreement is hereby amended by deleting such Section in its entirety and replacing it with "9.25 [Reserved]."

**7.33**    <u>Events of Default</u>.  Section 10.1 of the Pre-Petition Loan Agreement is hereby amended as follows:

(a)      Section 10.1(f) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(f) [reserved];".

(b)    Section 10.1(g) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(g) [reserved];".

(c)    Section 10.1(h) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(h) [reserved];".

(d)    Section 10.1(i) of the Pre-Petition Loan Agreement is hereby amended by inserting immediately at the beginning thereof the following phrase "other than the Bankruptcy Events, any of the following shall occur:".

(e)    Section 10.1(j) of the Pre-Petition Loan Agreement is hereby amended and restated as follows:

> "(j) any Credit Card Issuer or Credit Card Processor shall send notice to any Borrower that it is ceasing to make or suspending payments (excluding, for the avoidance of doubt, any additional reserves or holdbacks put in place as a result of the Bankruptcy Events) to any Borrower or Guarantor of amounts due or to become due to any Borrower or Guarantor or shall cease or suspend such payments, or shall send notice to any Borrower or Guarantor that it is terminating its arrangements with any Borrower or Guarantor or such arrangements shall terminate as a result of any event of default under such arrangements, which continues for more than the applicable cure period, if any, with respect thereto, unless such Borrower or Guarantor shall have entered into arrangements with another Credit Card Issuer or Credit Card Processor, as the case may be, within sixty (60) days after the date of any such notice;"

(f)    Section 10.1 of the Pre-Petition Loan Agreement is hereby amended by (i) deleting the word "or" at the end of Section 10.1(p), (ii) replacing the period appearing at the end of Section 10.1(q) with a semicolon, and (iii) adding the following at the end of such Section:

> "(r) the occurrence of any condition or event which permits Agent or Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in any Financing Order);

> (s) the termination or non-renewal of the Financing Agreements as provided for in any Financing Order;

> (t) any Loan Party suspends or discontinues all or any material part of its business (other than with respect to the Store Closing GOB Sales as defined in and permitted by the Ratification Agreement), or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or a trustee or examiner with expanded powers is appointed for any Loan Party, or any of their respective properties;

(u)  any act, condition or event occurring after the Petition Date that has or could reasonably expect to have a Material Adverse Effect;

(v) conversion of the Chapter 11 Cases to Chapter 7 case(s);

(w) the dismissal of the Chapter 11 Cases (or any subsequent Chapter 7 case) either voluntarily or involuntarily;

(x) grant of a lien on or other interest in any property of any Loan Party, other than a lien or encumbrance permitted by the Loan Agreement or any Financing Order (including the Carve-Out), which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral;

(y) the failure of Borrowers or Guarantors to comply with any Financing Order;

(z) any Financing Order is revoked, remanded, vacated, reversed, stayed, rescinded, modified, or amended on appeal;

(aa) the failure of Borrowers to comply with any of the DIP Milestones (excluding the Plan Milestones);

(bb) appointment of a trustee, examiner or disinterested person with expanded powers relating to the operations or the business of Borrowers or Guarantors in the Chapter 11 Cases;

(cc) any administrative expense claim is allowed having priority or ranking in parity with the rights of Agent (excluding the Carve-Out);

(dd) any plan of reorganization is confirmed without Agent's and Required Lender's consent;

(ee) any tested line items (other than proceeds from Rx Sales) set forth in the Budget adversely deviate from the projected amounts set forth for such line items by more than 15% for the applicable Measurement Period;

(ff) material adverse change in the assets, or business or prospects of Borrowers and Guarantors (taken as a whole) (it being understood that the commencement of the Chapter 11 Cases, and any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof shall not be deemed a material adverse change)."

**7.34**  <u>Remedies</u>.

(a)    Section 10.2(f) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(f) [Reserved]."

(b)    Section 10.2(j) of the Pre-Petition Loan Agreement is hereby amended by deleting such subsection in its entirety and replacing it with "(j) [Reserved]."

7.35    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver. Sections 11.1(a) and (b) of the Pre-Petition Loan Agreement are hereby amended by deleting such Sections in their entirety and replacing them with the following:

"(a)    The validity, interpretation and enforcement of this Agreement and the other Financing Agreements (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by (i) the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York, and (ii) to the extent applicable, the Bankruptcy Code.

(b)    Borrowers, Guarantors, Agents, Collateral Agent, Term Loan B-1 Agent, Lenders and Issuing Bank irrevocably consent and submit to the non-exclusive jurisdiction of the Bankruptcy Court, the Supreme Court of New York County, New York and the United States District Court for the Southern District of New York whichever Agent may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Agent and Lenders shall have the right to bring any action or proceeding against any Borrower or Guarantor or its or their property in the courts of any other jurisdiction which Agent deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against any Borrower or Guarantor or its or their property)."

7.36    Waiver of Notices, etc. Section 11.2 of the Pre-Petition Loan Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following:

"11.2    Waiver of Notices, etc.    Each Borrower and Guarantor hereby expressly waives:

(a) demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all instruments and chattel paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such

as are expressly provided for herein.  No notice to or demand on any Borrower or Guarantor which Agent, Collateral Agent or any Lender may elect to give shall entitle such Borrower or Guarantor to any other or further notice or demand in the same, similar or other circumstances; and

(b) any right that any Borrower or Guarantor may have to seek authority (i) to use cash collateral of Agent, Lenders, Issuing Bank or any other Secured Party under Section 363 of the Bankruptcy Code, (ii) to obtain post-petition loans or other financial accommodations pursuant to Sections 364(c) or (d) of the Bankruptcy Code without the prior written consent of Agent, (iii) to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Agent's post-petition liens and claims, (iv) to challenge the application of any payments or collections received by Agent, Lenders, Issuing Bank or any other Secured Party to the obligations of Borrowers and Guarantors as provided for herein, (v) to propose or support a plan of reorganization that does not provide for the indefeasible payment in full in cash and satisfaction of all Obligations on the effective date of such plan, (vi) to surcharge the Collateral pursuant to Section 506(c) of the Bankruptcy Code, or (vii) to seek relief under the Bankruptcy Code, including without limitation, under Section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of Agent or any Lender, Issuing Bank or other Secured Party as provided herein, the Financing Agreements or the Financing Orders."

     **7.37**   <u>Amendments and Waivers</u>.  Section 11.3 of the Pre-Petition Loan Agreement is hereby amended by adding the following new subsection at the end of such Section:

"(f) Notwithstanding anything to the contrary contained herein or in any other Financing Agreement, amendments, waivers and consents with respect to the provisions of the Financing Agreements relating to the Budget, Financing Orders, Store Closing GOB Sales, Store Closing Liquidation Agreement, the Rx Auction or Rx Sales, any other sale or disposition of the Collateral, any of the DIP Milestones, any bankruptcy Reserves, or clauses (b), (c) or (d) of the definition of Renewal Date shall not require approval of any Secured Party other than the Agent."

     **7.38**   <u>Term</u>.  Section 14.1 of the Pre-Petition Loan Agreement is hereby amended by deleting the phrase "June 19, 2020 (the 'Renewal Date')" and replacing it with "the Renewal Date".

     **7.39**   <u>Assignments; Participations</u>.  Section 14.7(b) of the Pre-Petition Loan Agreement is hereby amended by deleting the reference to "$20,000,000" and substituting "$5,000,000" therefor.

**7.40**    <u>Schedule of Commitments</u>.  Schedule 1 to the Loan Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with Schedule 1 in the form attached hereto as <u>Exhibit D</u> to this Ratification Agreement.

**7.41**    <u>Schedule of Existing Letters of Credit</u>.  Schedule 1.79 to the Pre-Petition Loan Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with Schedule 1.79 in the form attached hereto as <u>Exhibit E</u> to this Ratification Agreement.

**7.42**    <u>Schedule of Credit Card Agreements</u>.  Schedule 8.16 to the Pre-Petition Loan Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with Schedule 8.16 in the form attached hereto as <u>Exhibit F</u> to this Ratification Agreement.

**8.**    <u>RELEASE</u>.

**8.1**    <u>Release of Pre-Petition Claims</u>.

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of Agent, Lenders and each other Secured Party contained herein and the making of any Loans by Agent and Lenders, each Borrower and Guarantor, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Agents, Term Loan B-1 Agent, Collateral Agent, each Lender, each other Secured Party and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Agents, Term Loan B-1 Agent, Collateral Agent, each Lender, each other Secured Party and all such other parties being hereinafter referred to collectively as the "**Releasees**" and individually as a "**Releasee**"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "**Pre-Petition Released Claim**" and collectively, "**Pre-Petition Released Claims**") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Borrower or Guarantor, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the Ratification Closing Date, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Pre-Petition Loan Agreement and the other Financing Agreements, as amended and supplemented through the date hereof.

(b)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, each Borrower and Guarantor, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at

law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Borrower and Guarantor pursuant to this Section 8.1. If any Borrower or Guarantor violates the foregoing covenant, Borrowers and Guarantors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

        **8.2**    <u>Release of Post-Petition Claims</u>. Upon the payment in full of all of the Obligations, in consideration of the agreements of Agents, Term Loan B-1 Agent, Collateral Agent, Issuing Banks and Lenders contained herein and the making of any Loans by Agent and Lenders, each Borrower and Guarantor hereby covenants and agrees to execute and deliver in favor of Agents, Term Loan B-1 Agent, Collateral Agent, Issuing Banks, Lenders and other Secured Parties a valid and binding termination and release agreement, in form and substance satisfactory to Agent. If any Borrower or Guarantor violates such covenant, Borrowers and Guarantors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

        **8.3**    <u>Releases Generally</u>.

        (a)    Each Borrower and Guarantor understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

        (b)    Each Borrower and Guarantor agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

        **9.**    <u>CONDITIONS PRECEDENT</u>.

        The amendments, representations and warranties, covenants, defaults and all other agreements and obligations contained in Sections 1 through 8 of this Ratification Agreement shall only become effective upon the satisfaction (or waiver) of all of the following conditions precedent (the time of such satisfaction (or waiver) referred to herein as the "**Ratification Closing Date**"):

        **9.1**    as of the Petition Date, the Pre-Petition Financing Agreements shall not have been terminated;

        **9.2**    Borrowers and Guarantors shall have commenced a voluntary case under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court having exclusive jurisdiction over the Chapter 11 Cases by no later than January 16, 2019;

        **9.3**    Borrowers and Guarantors shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to Agent and its counsel, with

respect to the Interim Financing Order and Agent shall have received such evidence thereof as it shall reasonably require;

9.4     no trustee, or other disinterested person with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Borrower or Guarantor or their respective business, properties or assets and no motion shall be pending seeking any such relief;

9.5     all of the first day orders shall have been entered by the Bankruptcy Court by the third (3rd) day following the Petition Date and shall be in form and substance satisfactory to Agent;

9.6     a cash management order approving the cash management arrangements of Borrowers and Guarantors consistent with the requirements under the Financing Agreements shall have been entered, in form and substance satisfactory to Agent, and shall be in full force and effect, and has not been vacated, reversed or modified (except as consented to by Agent) and is not subject to any pending appeal or stay;

9.7     the Interim Financing Order as entered by the Bankruptcy Court authorizing the secured financing under the Financing Agreements and, inter alia, modifying the automatic stay, authorizing and granting the security interests and liens described herein, and granting a super-priority administrative expense claim to Agent and other Secured Parties with respect to all obligations to Agent and other Secured Parties, subject to no priority claim or administrative expenses of the Chapter 11 Cases or any other entity, and any future proceeding which may develop out of any such cases, including liquidation in bankruptcy, shall have been entered within three (3) days after the commencement of the Chapter 11 Cases and be in full force and effect and not have been vacated, reversed, modified, amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it, except as consented to by Agent;

9.8     receipt by Agent of a proposed Plan of Reorganization, on terms and conditions reasonably satisfactory to Agent, which provides for, among other things, either (i) the entry by Debtors into an exit financing facility on terms and conditions acceptable to Agent or (ii) the indefeasible payment in full of all Pre-Petition Obligations owing under the Pre-Petition Financing Agreements and Post-Petition Obligations owing under the Financing Agreements on or before the "effective date" of the Plan of Reorganization (provided that nothing in this Section 9.8 shall constitute a vote by Agent or any Lender in favor of the Plan of Reorganization or a commitment by Agent or any Lender to vote in favor of the Plan of Reorganization);

9.9     receipt by Agent, each in form and substance satisfactory to Agent, of (i) the initial Budget, (ii) any updates or modifications to the projected financial statements of Borrowers and Guarantors previously received by Agent, in each case in form and substance satisfactory to Agent, and (iii) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available;

39

**9.10**     Agent's completion of its due diligence, with results satisfactory to Agent, which diligence may include receipt by Agent and Lenders of the documentation and other information that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act. Agent shall be satisfied with the corporate and capital structure and management of Borrowers and Guarantors and with all legal, tax, accounting and other matters relating to Borrowers and Guarantors.  Agent and its counsel will have had the opportunity to conduct customary legal due diligence (the results of which shall be satisfactory to Agent and its counsel);

**9.11**     no material adverse change in the business, operations, profits, assets or prospects of Borrowers and Guarantors or the Collateral shall have occurred as of the entry of the Interim Financing Order (it being understood that the commencement of the Chapter 11 Cases, and any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof shall not be deemed a material adverse change);

**9.12**     no defaults or events of default on the closing date under any of the Financing Agreements or on any other debt or any material contract of Borrowers or Guarantors shall exist (other than any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof);

**9.13**     Agent and Lenders shall have received the payment of all fees required to be paid under the terms hereof or otherwise under the Financing Agreements, including the DIP Fee Letter executed and delivered in connection herewith;

**9.14**     there shall be no material misstatements in or omissions from the materials previously furnished to Agent by Borrowers and Guarantors;

**9.15**     Agent shall not become aware of any material information or other matter that is inconsistent in a material and adverse manner with any previous due diligence, information or matter (including any financial information);

**9.16**     the receipt by Agent of this Ratification Agreement, executed and delivered by Borrowers, Guarantors, Lenders and the other parties hereto;

**9.17**     the implementation of the terms of this Ratification Agreement and the other Financing Agreements, as modified pursuant to this Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Agent and its counsel;

**9.18**     the receipt by Agent of the following documents, agreements, or other information, in each case, in form and substance satisfactory to Agent and executed and delivered by the parties thereto:

        (a)     the Information Certificate,

        (b)     the DIP Fee Letter,

(c)    an update to the latest Borrowing Base Certificate that Agent has received from Borrowers that reflects, on a pro forma basis, the changes to the Financing Agreements evidenced by this Ratification Agreement,

(d)    the Store Closing Liquidation Agreement,

(e)    the Rx Bidding Procedures Order, and

(f)    Store Closing GOB Sale Order;

9.19    other than the voluntary commencement of the Chapter 11 Case, the Store Closing GOB Sales, and the Rx Sale, no material impairment of the priority of Agent's security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent to the Petition Date;

9.20    Borrowers shall have (i) engaged the Financial Advisor in accordance with Section 5.8 of the Ratification Agreement, and (ii) have provided the Financial Advisor with such information as they may reasonably require;

9.21    Agent, for the benefit of itself and the other Secured Parties, shall hold perfected, first priority security interests in and liens upon the Collateral (subject to the liens permitted under Section 9.8 of the Loan Agreement and the Carve-Out) and Agent shall have received such evidence thereof as it requires; and

9.22    no Default or Event of Default shall have occurred or be existing under any of the Financing Agreements, as modified pursuant hereto, and assumed by Borrowers and Guarantors.

For the purpose of determining satisfaction with the conditions specified in this <u>Section 9</u>, each Lender that has signed and delivered this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this <u>Section 9</u> unless the Agent shall have received written notice from such Lender prior to the Ratification Closing Date specifying its objection thereto.

**10.    ADDITIONAL CONDITIONS PRECEDENT TO ALL LOANS AND LETTERS OF CREDIT.**

In addition to the satisfaction of the conditions precedent under Section 9 of this Ratification Agreement with respect to the effectiveness of the noted Sections of this Ratification Agreement and the making of the initial Loans under the Loan Agreement, and the satisfaction of the conditions precedent in Section 4.2 of the Loan Agreement with respect to all Loans and other financial accommodations available to Borrowers (such conditions in Section 4.2 shall remain applicable to the Loans and be applicable to other financial accommodations available to Borrowers), the following are conditions to Agent's and Lenders' obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Loan Agreement:

**10.1**    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered the Permanent Financing Order. Neither Agent nor any Lender shall provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order and the time to appeal to contest such order shall have expired;

**10.2**    requests for further credit shall only be for purposes and in amounts in accordance with the Budget for the week in which such requests are made;

**10.3**    subject to the Financing Order, all fees and expenses required to be paid to the Agent and the Lenders pursuant to the Ratification Agreement and the Loan Agreement, as amended thereby, shall have been paid or shall be paid concurrently with the making of the Loans after the Ratification Closing Date; and

**10.4**    no Default or Event of Default shall have occurred or be existing under any of the Financing Agreements, as amended, supplemented or otherwise modified pursuant this Ratification Agreement and assumed by Borrowers and Guarantor.

**11.**    <u>MISCELLANEOUS</u>.

**11.1**    <u>Amendments and Waivers</u>.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.    Notwithstanding anything to the contrary contained herein or in any other Financing Agreement, amendments, waivers and consents with respect to the provisions of this Ratification Agreement or any other Financing Agreement relating to the Budget, Store Closing GOB Sales, Store Closing Liquidation Agreement, the Rx Auction or Rx Sales, any other sale or disposition of the Collateral, any of the DIP Milestones, any bankruptcy Reserves, or clauses (b), (c) or (d) of the definition of Renewal Date shall not require the approval of any Secured Party other than the Agent.

**11.2**    <u>Further Assurances</u>.  Each Borrower and Guarantor shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's reasonable opinion to evidence, perfect, maintain and enforce the security interests of Agent and/or Collateral Agent, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Financing Agreements or the Financing Order.  Upon the reasonable request of Agent, at any time and from time to time, each Borrower and Guarantor shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Collateral Agent with respect to the Intellectual Property with the United States Patent and Trademark Office or the United States Copyright Office, the financing statements, and other instruments, acts, pledges,

assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be reasonably requested by Agent.

      **11.3**   <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

      **11.4**   <u>Counterparts</u>.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other means of electronic transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

      **11.5**   <u>Additional Events of Default</u>.  The parties hereto acknowledge, confirm and agree that the failure of any Borrower or Guarantor to comply with any of the covenants, conditions and agreements contained herein or in any other Financing Agreement shall constitute an Event of Default under the Financing Agreements.

      **11.6**   <u>Costs and Expenses</u>.  Subject to the terms of the Financing Order, Borrowers shall pay to Agent on demand all costs and expenses that Agent pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Financing Agreements and the Financing Order.  Subject to the terms of the Financing Order, the foregoing shall not be construed to limit any other provisions of the Financing Agreements regarding costs and expenses to be paid by Borrowers.  Subject to the terms of the Financing Order, all sums provided for in this Section 11.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Financing Agreements.  Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to any Borrower or Guarantor.

      **11.7**   <u>Effectiveness</u>.  This Ratification Agreement shall become effective upon the satisfaction of the conditions precedent set forth in Section 9 hereof, and the entry of the Interim Financing Order.

      **11.8**   <u>Patriot Act</u>.  Each Lender subject to the Act hereby notifies Borrowers and Guarantors that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of Borrowers and Guarantors and other information that will allow such Lender to identify such person in

accordance with the Act.  Borrowers and Guarantors are hereby advised that this commitment is subject to satisfactory results of such verification.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

BORROWERS

SHOPKO PROPERTIES, LLC
PENN-DANIELS, LLC
SHOPKO OPTICAL MANUFACTURING, LLC
RETAINED R/E SPE, LLC

By: _____
Name:
Title:


SHOPKO STORES OPERATING CO., LLC
SPECIALTY RETAIL SHOPS HOLDING CORP.,
  formerly known as SKO Group Holding Corp.
SHOPKO HOLDING COMPANY, LLC, formerly
  known as ShopKo Holding Company, Inc.
SHOPKO INSTITUTIONAL CARE SERVICES
CO., LLC

By: _____
Name:
Title:


PAMIDA STORES OPERATING CO., LLC

By: _____
Name:
Title:

<u>GUARANTORS</u>

SHOPKO FINANCE, LLC

By:    _____
Name:
Title:


SVS TRUCKING, LLC
SHOPKO GIFT CARD CO., LLC,
  formerly known as ShopKo Ventures-Duluth, LLC

By:    _____
Name:
Title:


PAMIDA TRANSPORTATION, LLC

By:    _____
Name:
Title:


PLACE'S ASSOCIATES' EXPANSION, LLC

By:    Pamida Stores Operating Co., LLC,
       its Sole Member and Manager

By:    _____
Name:
Title:

<u>AGENTS</u>

WELLS FARGO BANK, NATIONAL
ASSOCIATION,
successor by merger to Wachovia Bank,
National Association, as Agent, Term Loan B
Agent, Collateral Agent and Issuing Bank

By: _____
Name:
Title:

TERM LOAN B-1 AGENT

SHOPKO NOTE HOLDING, LLC,
as Term Loan B-1 Agent

By: _____
Name:
Title:

<u>LENDERS</u>

WELLS FARGO BANK, NATIONAL
ASSOCIATION

By: _____
Name:
Title:

TD BANK, N.A.

By: _____
Name:
Title:

CITIZENS BUSINESS CAPITAL, a division of
Citizens Asset Finance, Inc.


By: _____
Name:
Title:

BANK OF AMERICA, N.A.


By: _____
Name:
Title:

PNC BANK, NATIONAL ASSOCIATION

By: _____
Name:
Title:

CIT BANK, N.A.

By: _____
Name:
Title:

JPMORGAN CHASE BANK, N.A.

By: _____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION

By: _____
Name:
Title:

GORDON BROTHERS FINANCE COMPANY,
LLC


By: _____
Name:
Title:

BANK OF MONTREAL

By: _____
Name:
Title:

SHOPKO NOTE HOLDING, LLC

By: _____
Name:
Title:

EXHIBIT A
to
RATIFICATION AND AMENDMENT AGREEMENT

**SUMMARY BUDGET**

(see attached)

EXHIBIT B

to

RATIFICATION AND AMENDMENT AGREEMENT

**Form of Interim Financing Order**

(see attached)

EXHIBIT C
to
RATIFICATION AND AMENDMENT AGREEMENT

**Information Certificate**

(see attached)

EXHIBIT D
to
RATIFICATION AND AMENDMENT AGREEMENT

**Schedule 1**

Commitments

| | Revolving Loan A | Revolving Loan A-1 | Term Loan B | Term Loan B-1 | Total |
|---|---|---|---|---|---|
| Wells Fargo Bank, National Association | $83,882,583.17 | $9,305,479.45 | $23,005,250.00 | - | $116,193,312.62 |
| PNC Bank, National Association | $41,643,835.62 | $3,123,287.67 | $7,104,562.50 | - | $51,871,685.79 |
| CIT Bank, N.A. | $13,142,857.14 | $4,000,000.00 | $2,029,875.00 | - | $19,172,732.14 |
| Bank of America, N.A. | $72,571,428.57 | $6,000,000.00 | - | - | $78,571,428.57 |
| Citizens Business Capital, a division of Citizens Asset Finance, Inc. | $35,616,438.35 | $2,671,232.88 | - | - | $38,287,671.23 |
| Bank of Montreal | $67,428,571.43 | $4,900,000.00 | - | - | $72,328,571.43 |
| TD Bank, N.A. | $28,571,428.57 | - | - | - | $28,571,428.57 |
| JPMorgan Chase Bank, N.A. | $37,142,857.14 | - | - | - | $37,142,857.14 |
| US Bank National Association | $20,000,000.00 | - | - | - | $20,000,000.00 |
| Gordon Brothers Finance Company, LLC | - | - | $16,915,625.00 | - | $16,915,625.00 |
| Shopko Note Holding, LLC | - | - | - | $34,416,375.00 | $34,416,375.00 |
| **TOTAL** | $400,000,000.00 | $30,000,000.00 | $49,055,312.50 | $34,416,375.00 | $513,471,687.50 |

EXHIBIT E
to
RATIFICATION AND AMENDMENT AGREEMENT

**Schedule 1.79**

**Existing Letters of Credit**

(see attached)

EXHIBIT F
to
RATIFICATION AND AMENDMENT AGREEMENT

**Schedule 8.16**

**Credit Card Agreements**

(see attached)

SCHEDULE 1
to
RATIFICATION AND AMENDMENT AGREEMENT

**Store Closing GOB Sales**

(see attached)