**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) | Case No. 19-80064-TLS |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

---

**DISCLOSURE STATEMENT FOR THE**
**JOINT CHAPTER 11 PLAN OF**
**SPECIALTY RETAIL SHOPS HOLDING CORP AND ITS DEBTOR AFFILIATES**

---

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Travis M. Bayer (*pro hac vice* pending)
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

- and -

Steven Serajeddini (*pro hac vice* pending)
Daniel Rudewicz (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

James J. Niemeier (NE Bar No. 18838)
Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**McGRATH NORTH MULLIN & KRATZ, PC LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: January 16, 2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF SPECIALTY RETAIL SHOPS HOLDING CORP. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN CREDITORS OF THE DEBTORS.  ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL HAVE NOT BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW ("BLUE SKY LAWS").  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS ARE RELYING ON THE EXEMPTION FROM THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND EQUIVALENT STATE LAW REGISTRATION REQUIREMENTS PROVIDED BY SECTION 1145(A)(1) OF THE BANKRUPTCY CODE, TO EXEMPT THE OFFERING AND ISSUANCE OF NEW SECURITIES PURSUANT TO THE PLAN FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  YOU ARE CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS THEREFORE HIGHLY SPECULATIVE.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ....................................................................................................................1

II. PRELIMINARY STATEMENT ..............................................................................................1

III. OVERVIEW OF THE PLAN...................................................................................................2

    A.  Purpose and Effect of the Plan ..........................................................................................2
    A.  Equitization Restructuring .................................................................................................3
    B.  The Asset Sale Restructuring .............................................................................................5
    C.  Releases .............................................................................................................................6

IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
    PLAN.......................................................................................................................................7

    A.  What is chapter 11?............................................................................................................7
    B.  Why are the Debtors sending me this Disclosure Statement? ...........................................7
    C.  Am I entitled to vote on the Plan?......................................................................................7
    D.  What will I receive from the Debtors if the Plan is consummated? ....................................8
    E.  What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
        Claim, or a Priority Tax Claim?.......................................................................................10
    F.  Are any regulatory approvals required to consummate the Plan? ....................................11
    G.  What happens to my recovery if the Plan is not confirmed or does not go effective? ......11
    H.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
        Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
        "Consummation?"............................................................................................................11
    I.  What are the sources of Cash and other consideration required to fund the Plan?...........12
    J.  Are there risks to owning the New Shopko Interests upon emergence from chapter 11?.............12
    K.  Will the final amount of Allowed General Unsecured Claims affect my recovery under
        the Plan?..........................................................................................................................12
    L.  Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............13
    M.  What impact does the Claims Bar Date have on my Claim? ...........................................15
    N.  What is the deadline to vote on the Plan? ........................................................................16
    O.  How do I vote for or against the Plan?..............................................................................16
    P.  Why is the Bankruptcy Court holding a Confirmation Hearing? .....................................16
    Q.  When is the Confirmation Hearing set to occur? .............................................................16
    R.  What is the purpose of the Confirmation Hearing?..........................................................17
    S.  What is the effect of the Plan on the Debtors' ongoing business? ...................................17
    T.  Will any party have significant influence over the corporate governance and operations of
        the Reorganized Debtors? ................................................................................................17
    U.  Who do I contact if I have additional questions with respect to this Disclosure Statement
        or the Plan? .....................................................................................................................18
    V.  Do the Debtors recommend voting in favor of the Plan?.................................................18
    W.  Who Supports the Plan?..................................................................................................18

V.  THE DEBTORS' PLAN .........................................................................................................18

    A.  The Plan ..........................................................................................................................18
    B.  Certain Key Terms Used in this Disclosure Statement ...................................................21
    C.  Additional Important Information ....................................................................................22

VI. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW...........24

    A.  The Debtors......................................................................................................................24
    B.  Prepetition Capital Structure ...........................................................................................24

VII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS.................................................25

    A.    Challenging Operating Environment and Operational Right Sizing....................25
    B.    Supply Chain Challenges and McKesson Actions .............................................25
    C.    Exploration of Strategic Alternatives ...............................................................26

VIII.    PRIOR TRANSACTIONS ...........................................................................................28

    A.    SUPERVALU Transaction and Pamida Acquisition .........................................28
    B.    Sun Capital Transaction ....................................................................................28
    C.    Special Committee .............................................................................................28

IX.    EVENTS OF THE CHAPTER 11 CASES .....................................................................28

    A.    Corporate Structure upon Emergence ...............................................................28
    B.    Expected Timetable of the Chapter 11 Cases.....................................................28
    C.    First Day Relief.................................................................................................29
    D.    Approval of the DIP Facility.............................................................................29
    E.    Executory Contracts and Unexpired Leases ......................................................29
    F.    Lease Renegotiation and Store Closing Process ................................................32
    G.    Schedules and Statements .................................................................................32
    H.    Litigation Matters .............................................................................................32

X.    PROJECTED FINANCIAL INFORMATION.................................................................32

XI.    RISK FACTORS .........................................................................................................32

    A.    Bankruptcy Law Considerations .......................................................................33
    B.    Risks Related to Recoveries under the Plan ......................................................35
    C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses...........37

XII.    SOLICITATION AND VOTING PROCEDURES ..........................................................39

    A.    Holders of Claims Entitled to Vote on the Plan ................................................39
    B.    Voting Record Date ..........................................................................................39
    C.    Voting on the Plan.............................................................................................39
    D.    Ballots Not Counted.........................................................................................39

XIII.    CONFIRMATION OF THE PLAN................................................................................40

    A.    Requirements for Confirmation of the Plan .......................................................40
    B.    Best Interests of Creditors/Liquidation Analysis ..............................................40
    C.    Feasibility..........................................................................................................41
    D.    Acceptance by Impaired Classes.......................................................................41
    E.    Confirmation Without Acceptance by All Impaired Classes ..............................41
    F.    Valuation of the Debtors ...................................................................................42

XIV.    CERTAIN SECURITIES LAW MATTERS ...................................................................42

    A.    Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers ...........42

XV.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN.........................................................................................................................43

    A.    Introduction.......................................................................................................43
    B.    Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized
Debtors..............................................................................................................45
    C.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of of Allowed
Claims Entitled to Vote.....................................................................................47

D.      Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims .............52

**XVI.    RECOMMENDATION** ............................................................................................................................**56**

**EXHIBITS**

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Corporate Structure Chart

EXHIBIT C      Disclosure Statement Order

EXHIBIT D      Financial Projections

EXHIBIT E      Valuation Analysis

EXHIBIT F      Liquidation Analysis

## I.      INTRODUCTION

Specialty Retail Shops Holding Corp. ("Shopko") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the **_Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and Its Debtor Affiliates_** (the "Plan"), dated January 16, 2019.[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for Shopko and each of its affiliated Debtors.

Each of the Debtors' boards of managers or directors has approved the Plan and believes the Plan is in the best interests of the Debtors' Estates.  As such, the Debtors recommend that all Holders of Claims entitled to vote accept the Plan by returning their ballots (each, a "Ballot") so as to be **actually received** by the Solicitation Agent (as defined herein) no later than **March 25, 2019, at 5:00 p.m. (prevailing Central Time)**.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## II.     PRELIMINARY STATEMENT

Shopko, founded in 1962 and headquartered in Green Bay, Wisconsin, is a leading operator of over 300 general merchandise stores throughout the Midwestern, Northwestern, and Southwestern regions of the United States. The Debtors employ over 15,000 individuals, and offer a broad assortment of name brand and private brand merchandise including clothing and accessories, electronics, and home furnishings, as well as Debtor-operated pharmacy and optical services departments.  In many instances, the Debtors' stores are an integral part of the fabric of the communities in which they operate.

Unfortunately, the Debtors, like many other retail companies, have recently fallen victim to adverse macro-trends, including the general shift away from brick and mortar stores to online retail channels.  More specifically, retail companies like Shopko, with a substantial physical footprint, bear higher expenses than web-based retailers and are heavily dependent on store traffic, which has decreased significantly as consumers increasingly shop online rather than in malls or shopping centers.  In addition to competing against online retailers, the Debtors have struggled against other established brick and-mortar retailers, such as Walmart and Target, who have less leveraged capital structures and greater economies of scale.  These factors allow the Debtors' competitors to offer lower prices than the Debtors and still bear the high operating expenses associated with brick-and-mortar retail.  Further, consolidation in the pharmacy industry has led to a lack of pricing power for retail pharmacies of Shopko's size.

These market developments, compounded with an underdeveloped online presence and wholesale platform and certain above-market lease obligations, have adversely impacted the Debtors' sales and operations, with EBITDA declining by 21% over the last year, from approximately $45.2 million in 2017 to approximately $35.6 million in 2018.  These declines have directly—and negatively—impacted liquidity and left the Debtors overleveraged. Moreover, the Debtors' pharmacy business has not performed as well as the Debtors anticipated, due in part to high inventory costs from the Debtors' primary pharmaceutical provider, McKesson Corporation ("McKesson").

To protect the inherent value in their businesses and to address the existing macro-economic challenges, the Debtors retained advisors to assist management and the board of directors regarding potential strategic alternatives to enhance the Debtors' leverage and liquidity and address their capital structure.  With the assistance of their advisors, the Debtors began a series of steps in late 2017 to address their balance sheet.  These steps include processes to market the Debtors' assets, efforts to right-size their debt and lease obligations, and pursuing deleveraging and financing opportunities.  Among other successes, Debtors obtained additional financing from Spirit Realty L.P. ("Spirit")—their primary landlord—in January 2018.

Over the past year and a half, the Debtors began implementing real-estate rationalization measures and other operational efficiency initiatives and developing their wholesale business and online sales presence.  After an initial

---

[2]      Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

marketing process for the Debtors' business in 2017 led by Houlihan Lokey, the Debtors, through receipt of feedback from the buyers and as a result of their own analysis, learned that they would have greater value if they exited the pharmacy business. Using this analysis, the Debtors commenced another comprehensive marketing process in mid-2018 for both a sale of their entire business as well as a separate process for the sale of their pharmacy assets. As a result of these efforts, the Debtors were able to close approximately $95 million in transactions in the months leading up to the Petition Date. The Debtors intend to finish these marketing efforts postpetition in an expedited auction and sale process that will maximize the value of the Debtors' remaining pharmacy assets. The Debtors also began the process of closing their unprofitable locations in late 2018, and intend to complete that process at some point during these cases.

With debtor-in-possession financing and key creditor support in place, the Debtors intend to move expeditiously through these cases and emerge as a stronger, better-capitalized business positioned to thrive for years to come.

As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $403 million, consisting primarily of approximately (a) $289 million under the ABL Revolving Loans A, (b) $30.0 million outstanding under the Revolving Loans A-1, (c) $49.1 million outstanding under the Term Loan B, and (d) $34.4 million under the Term Loan B-1.

## III.    OVERVIEW OF THE PLAN

The Plan contemplates a restructuring of the Debtors through either (a) a sponsor-led Equitization Restructuring or (b) an orderly liquidation under the Asset Sale Restructuring.

The key terms of the Plan are as follows:

### A.    Purpose and Effect of the Plan

The Debtors propose to reorganize under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders. The consummation of a chapter 11 plan of reorganization is the principal objective of a chapter 11 case. A chapter 11 plan sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan does not contemplate the substantive consolidation of the Debtors' estates. Instead, the Plan, although proposed jointly, constitutes a separate plan for each of the Debtors in these Chapter 11 Cases. Holders of Allowed Claims or Interests against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class.

The Debtors contemplate two different possible paths forward under their Plan, the Equitization Restructuring and the Asset Sale Restructuring.

The Plan includes a "toggle" feature which will determine whether the Debtors complete the Equitization Restructuring or the Asset Sale Restructuring. The Plan thus provides the Debtors with the necessary latitude to negotiate the precise terms of their ultimate emergence from chapter 11.

The Plan contemplates the following transactions under the Equitization Restructuring:

- The issuance of the New Shopko Interests;

- The Debtors Prepetition ABL Obligations and certain Prepetition Term Loan Obligations being rolled up into the DIP Facility that consists of (a) $400 million Revolving A Loans, (b) $30 million in Revolving A-1 Loans, and (c) $50 million in a senior secured term loan;

- The entrance by the Reorganized Debtors into the Exit Facility, pursuant to which either (i) the DIP Lenders will convert their DIP Claims into commitments under such an Exit Facility; or (ii) the Reorganized Debtors will enter into a new credit facility sufficient to both repay the portion of the DIP Facility provided by the DIP Lenders and to provide incremental liquidity;

- The investment by the Plan Sponsor in exchange for New Shopko Interests; and

- Interests in Shopko being canceled and extinguished.

Under the Asset Sale Restructuring, the Debtors will conduct a series of Asset Sales to sell substantially all of the Debtors' assets. The Asset Sale Restructuring contemplates the following transactions:

- Selection by the Debtors of the Plan Administrator who will act in the fiduciary capacity as a board of managers or directors. As of the Effective Date, the Plan Administrator would become the sole manager, director, and officer of Reorganized Shopko and act to wind down the business affairs of the Debtors and Reorganized Shopko;

- The Debtors Prepetition ABL Obligations and certain Prepetition Term Loan Obligations being rolled up into the DIP Facility that consists of (a) $400 million Revolving A Loans, (b) $30 million in Revolving A-1 Loans, and (c) $50 million in a senior secured term loan;

- The Plan Administrator will establish each of the Distribution Reserve Accounts in accordance with Article VIII of the Plan and administer the distribution thereof to Holders of Allowed Claims;

- Vesting of all assets of the Debtors in Reorganized Shopko for the purpose of liquidating the Estates; and

-  Interests in Shopko being canceled and extinguished.

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to achieve the goals of its long-range business plan, make the distributions contemplated under the Plan and pay certain continuing obligations in the ordinary course of the Reorganized Debtors' business. The Reorganized Debtors' financial projections are set forth on **Exhibit D**. Although the Debtors' believe the projections are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty. Actual results may differ from the projections, and the differences may be material.

### A.    Equitization Restructuring

Unless otherwise determined by the Debtors before the Confirmation Hearing, the Debtors shall effectuate the Equitization Restructuring.

The Equitization Restructuring shall be governed by the following provisions.

1.    Sources of Consideration for Plan of Reorganization Distributions

3

The Reorganized Debtors shall fund distributions under the Plan from the following sources:

a.      Cash on Hand

The Reorganized Debtors shall use Cash on hand to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan.

b.      Issuance and Distribution of New Shopko Interests

On the Effective Date, the Reorganized Debtors shall issue the New Shopko Interests to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan. The issuance of New Shopko Interests under the Plan, as well as options, or other equity awards, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims.

On the Effective Date, Holders of New Shopko Interests shall be parties to the New Stockholders' Agreement, in substantially the form included in the Plan Supplement. On the Effective Date, Reorganized Shopko shall enter into and deliver the New Stockholders' Agreement to each Entity that is intended to be a party thereto, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Shopko Interests shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Shopko.

c.      Exit Facility

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility. Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facility.

d.      Plan Sponsor Investment

On the Effective Date, the Plan Sponsor shall consummate the Plan Sponsor Investment, if any, in exchange for [●]% of the New Shopko Interests, subject to dilution by Management Incentive Plan. The Cash received from the Plan Sponsor Investment shall be contributed to the Reorganized Debtors on the Effective Date.

2.      Management Incentive Plan

As of the Effective Date, the Reorganized Shopko Board will be authorized to implement the Management Incentive Plan. The Management Incentive Plan shall provide for the issuance of options and/or equity based compensation to certain members of management of Reorganized Shopko. New Shopko Interests representing up to 10% of the New Shopko Interests outstanding as of the Effective Date on a fully-diluted basis shall be reserved for issuance in connection with the Management Incentive Plan.

3.      Reporting Upon Emergence

On the Effective Date, none of the New Shopko Interests will be registered under the Securities Act or the Securities Exchange Act or listed on a national securities exchange, Reorganized Shopko will not be a reporting company under the Securities Exchange Act, Reorganized Shopko shall not be required to and will not file Securities Exchange Act reports with the Securities and Exchange Commission or any other entity or party, and Reorganized Shopko shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date. In order to prevent Reorganized Shopko from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, a separate agreement or Reorganized Shopko's organizational documents may impose certain trading restrictions, and the New Shopko Interests may be subject to certain transfer and other restrictions designed to maintain Reorganized Shopko as a private, non-reporting company.

4

Notwithstanding the foregoing in this Section 3, from and after the Effective Date, Reorganized Shopko shall be required to provide (via separate agreement or in its organizational documents) to its shareholders audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP (for the avoidance of doubt, no SAS 100 review, compliance with any other requirement of Regulation S-X under the Securities Act or narrative disclosure required to be provided by reporting companies under the Securities Exchange Act in periodic or other reports (including, without limitation, a Management's Discussion and Analysis of Financial Condition and Results of Operations) is required in connection with the delivery of the required financial statements). Reorganized Debtors may also be required to provide certain financial information to other parties pursuant to contracts that are in effect on or after the Effective Date.

### B.    The Asset Sale Restructuring

Under the Asset Sale Restructuring, the Debtors will conduct a series of Asset Sales to sell substantially all of the Debtors' assets.

If the Asset Sale Restructuring occurs, the following provisions shall govern.

1.    Reorganized Shopko

On and after the Effective Date, the Reorganized Shopko shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) establishing and funding the Distribution Reserve Accounts, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Purchase Agreements, if any; and (h) administering the Plan in an efficacious manner.  The Reorganized Shopko shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

2.    Plan Administrator

The Plan Administrator shall act for the Reorganized Shopko in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, sale director of the Reorganized Shopko shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Shopko, and shall succeed to the powers of the Reorganized Shopko's managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Shopko as further described in Article VII of the Plan.

3.    Dissolution and Board of the Debtors

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to its affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the

Debtors, and shall:  (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of Shopko under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of Shopko or any of its affiliates.

4.     Release of Liens

Except as otherwise expressly provided herein, on the Effective Date, all Liens on any property of any Debtors or the Reorganized Shopko shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Reorganized Shopko shall be automatically discharged and released.

C.     **Releases.**[3]

The Plan contains certain releases (as described more fully in Article IV.L hereof), including mutual releases between  (a) the Debtors; (b) the Credit Agreement Primary Agent; (c) the Term Loan B-1 Agent; (d) each Holder of a Claim or Interest entitled to vote to accept or reject the Plan that (i) votes to accept the Plan or (ii) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; (e) each Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan; (f) each Holder of a Claim or Interest that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; and (g) with respect each of the Debtors, the Reorganized Debtors and the foregoing entities described in clauses (a) through (g), such entities' current and former affiliates, and such entities' and such affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, officers, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns

Holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in Voting Classes who abstain from voting on the Plan _and_ do not object to the releases will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things: (a) the releases, exculpations, and injunctions are specific; (b) the releases provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (c) the releases are a condition to the global settlement and a necessary part of the Plan; and (d) each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of  a value-maximizing restructuring.  Further, the releases, exculpations, and injunctions have the support of the vast majority of the Holders of the Debtors' Revolving Loan A Claims, Revolving Loan A-1 Claims, and Term Loan B Claims.  The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Debtors to propose the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital

---

[3]     The Special Committee, with the assistance of its counsel and advisors, is currently undertaking an investigation into Estate claims and Causes of Action. The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, and the Debtors reserve all rights and claims with respect thereto.

structure.  The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.[4]

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Impaired | Entitled to Vote |
| 3 | Revolving Loan A Claims | Impaired | Entitled to Vote |
| 4 | Revolving Loan A-1 Claims | Impaired | Entitled to Vote |
| 5 | Term Loan B Claims | Impaired | Entitled to Vote |
| 6 | Term Loan B-1 Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 9 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 10 | Interests in Shopko | Impaired | Deemed to Reject |
| 11 | Section 510(b) Claims | Impaired | Deemed to Reject |

---

[4]    The foregoing paragraph is subject to Article X.E of the Plan.

D.        **What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[5]**

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim will receive, at the Debtors' election: (a) payment in full in Cash, which may come from the Other Secured Claims Reserve; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired. | $[●] | [●]% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim will receive its Pro Rata share of the Priority Claims Reserve.  The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code. | $[●] | [●]% |

---

[5]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

| 3 | Revolving Loan A Claims | If the Equitization Restructuring occurs, each Holder of an Allowed Revolving Loan A Claim will either: (a) receive payment in full in Cash of such Holder's Allowed Revolving Loan A Claim or (b) with the consent of such Holder, receive its Pro Rata share of the Exit Facility.<br><br>If the Asset Sale Restructuring occurs, each Holder of an Allowed Revolving Loan A Claim shall receive its Pro Rata share of: the Distribution Proceeds available for distribution from time to time as provided in Article VIII.G of the Plan, until such Allowed Revolving Loan A Claims are paid in full. | $[●] | [●]% |
| 4 | Revolving Loan A-1 Claims | If the Equitization Restructuring occurs, each Holder Allowed Revolving Loan A-1 Claim will either: (a) receive payment in full in Cash of such Holder's Allowed Revolving Loan A-1 Claim or (b) with the consent of such Holder, receive its Pro Rata share of the Exit Facility.<br><br>If the Asset Sale Restructuring occurs, each Holder of an Allowed Revolving Loan A-1 Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution from time to time as provided in Article VIII.G of the Plan, until such Allowed Revolving Loan A-1 Claims are paid in full. | $[●] | [●]% |
| 5 | Term Loan B Claims | If the Equitization Restructuring occurs, each Holder of an Allowed Term Loan B Claim will receive either: (a) payment in full in cash; or (b) as agreed by such Holder of an Allowed Term Loan B Claim and the Debtors, its Pro Rata share of the Exit Facility.<br><br>If the Asset Sale Restructuring occurs, each Holder of an Allowed Term Loan B Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution from time to time as provided in Article VIII.G of the Plan, until such Allowed Term Loan B Claims are paid in full. | $[●] | [●]% |
| 6 | Term Loan B-1 Claims | If the Equitization Restructuring occurs, each Holder of an Allowed Term Loan B-1 Claim will receive its Pro Rata share of 19.9% of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and the Management Incentive Plan.<br><br>If the Asset Sale Restructuring occurs, each Holder of an Allowed Term Loan B-1 Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution from time to time as provided in Article VIII.G of the Plan, until such Allowed Term Loan B-1 Claims are paid in full. | $[●] | [●]% |

| 7 | General Unsecured Claims | If the Equititization Restructuring occurs, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of, at the election of the Debtors, [either (a) 80.1 % of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and the Management Incentive Plan or (b) its Pro Rata share of the GUC Equititization Distribution in one or more distributions.<br><br>If the Asset Sale Restructuring occurs, each Holder of a General Unsecured Claim will receive its Pro Rata share of the Distribution Proceeds as provided in Article VIII.G of the Plan. | $[●] | [●]% |
|---|---|---|---|---|
| 8 | Intercompany Claims | Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; provided, that no distributions shall be made on account of any such Intercompany Claims. | N/A | N/A |
| 9 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for administrative convenience or cancelled and released without any distribution on account of such interests at the option of the Debtors. | N/A | N/A |
| 10 | Interests in Shopko | Each Allowed Interest in Shopko shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Shopko shall be entitled to any recovery or distribution under the Plan on account of such Interests | N/A | N/A |
| 11 | Section 510(b) Claims | Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist. | N/A | N/A |

### E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### (i)    Administrative Claims and Priority Tax Claims

Administrative Claims and Priority Tax Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein.

Except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for

10

payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim or Priority Tax Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim or Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Priority Claims Reserve.

The failure to object to Confirmation by a Holder of an Allowed Administrative Claim or Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code; provided, however, that the Holders of such Claims shall be deemed to consent to the treatment on account of such Claims as provided herein. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

If the Asset Sale Restructuring occurs, any amounts remaining in the Priority Claims Reserve after payment of all Allowed Administrative Claims and all Allowed Priority Claims shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.G of the Plan without any further action or order of the Court.

## (ii)    DIP Claims

DIP Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein. As of the Effective Date, the DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, and expenses.

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction of the Allowed DIP Claims, each Holder of an Allowed DIP Claim: (i) if the Equitization Restructuring occurs, will either be: (a) indefeasibly repaid in full in Cash on the Effective Date; or (b) with the consent of such Holder, receive its Pro Rata share of the Exit Facility; or (ii) if the Asset Sale Restructuring occurs, paid *all Distribution Proceeds* available for distribution under Article VIII.G of the Plan *until such Allowed DIP Claims are repaid in full.* As used in this paragraph "repaid in full in Cash" shall mean the indefeasible payment in full in Cash of all DIP Claims, the cancelation, backing, or cash collateralization of letters of credit under the DIP Facility in accordance with the terms of the DIP Documents, and the termination of the DIP Agent's and DIP Lenders' obligation to extend credit under the DIP Facility.

## F.    Are any regulatory approvals required to consummate the Plan?

There are no known regulatory approvals that are required to consummate the Plan. However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

## G.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative transaction may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* "*Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis*," which begins on page 41 of this Disclosure Statement.

## H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims and Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* "*Confirmation of the Plan*," which begins on page 46 of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

> **I.**    **What are the sources of Cash and other consideration required to fund the Plan?**

If the Equitization Restructuring occurs, the Plan and distributions thereunder will be funded by the following sources of Cash and consideration: (a) Cash on hand, (b) the issuance and distribution of New Shopko Interests, (c) proceeds from the Exit Facility, and (d) the Plan Sponsor Investment.

> **J.**    **Are there risks to owning the New Shopko Interests upon emergence from chapter 11?**

Yes.  *See* "Risk Factors," which begins on page 33 of this Disclosure Statement.

> **K.**    **Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that Allowed General Unsecured Claims total approximately $[●] million  If Class 7 votes to accept the Plan, then each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the GUC Equitization Distribution.  If Class 7 votes to reject the Plan, then no distributions under the Plan shall be made on account of Allowed General Unsecured Claims. If the Asset Sale Restructuring occurs, each Holder of a General Unsecured Claim will receive its Pro Rata share of the Distribution Proceeds as provided in the Plan. Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

Moreover, the Debtors may in the future reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages claims not accounted for in this estimate.  Further, the Debtors may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the total amount of Allowed General Unsecured Claims could change as well.

Finally, the Debtors may object to certain proofs of claim, and any such objections ultimately could change the total amount of Allowed General Unsecured Claims, and such changes could be material.

The Management Incentive Plan shall provide for the issuance of options and/or equity based compensation to certain members of management of Reorganized Shopko. The issuance of options and/or equity based compensation under the Management Incentive Plan will dilute the New Shopko Interests being distributed to certain Holders of Allowed Claims under the Plan.

**L.        Will there be releases and exculpation granted to parties in interest as part of the Plan?[6]**

Yes, Article X of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and their creditors in obtaining their support for the Plan and reorganization.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

All Holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan <u>and</u> do not opt out of the release provisions contained in Article X of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Eighth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

*1.    Release of Liens*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or Reorganized Shopko, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, Reorganized Debtors or Reorganized Shopko, as applicable.  The DIP Agent, the Credit Agreement Primary Agent and the Term Loan B-1 Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

*2.    Debtor Release*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, Plan Administrator and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, Plan Administrator, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

---

[6]    The Special Committee, with the assistance of its counsel and advisors, is currently undertaking an investigation into Estate claims and Causes of Action. The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, and the Debtors reserve all rights and claims with respect thereto.

(a)     the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the other Restructuring Documents;

(b)     any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, or the Plan;

(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Credit Agreements, the DIP Facilities, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the New Shopko Interests) pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 3.    *Release by Holders of Claims or Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, or Reorganized Shopko, as applicable, and other Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a)     the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the other Restructuring Documents;

(b)     any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, or the Plan;

(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Credit Agreements, the DIP Facilities, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any

14

document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 4.  *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Credit Agreements, the DIP Facilities, the Exit Facility Credit Agreement, the Exit Facility Documents, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 5.  *Injunction*

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or Reorganized Shopko, as applicable or the other Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

### M.    What impact does the Claims Bar Date have on my Claim?

The Bankruptcy Court has established February 15, 2019, at 5:00 p.m., prevailing Eastern Time, as the Claims bar date (the "Bar Date") in the Chapter 11 Cases.  The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, must file proofs of claim on or before the Bar Date:  (1) any entity whose Claim against a Debtor is not listed in the applicable Debtor's schedules of assets and liabilities ("Schedules") or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (2) any entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim Allowed in a different classification or amount from that identified in the Schedules;

(3) any entity that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim Allowed against a Debtor other than that identified in the Schedules; and (4) any entity that believes its Claim against a Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the Bar Date: (1) such person or entity will be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such person or entity will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such person or entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are filed on or before the Bar Date.

**N.       What is the deadline to vote on the Plan?**

The Voting Deadline is March 25, 2019, at 5:00 p.m. (prevailing Eastern Time).

**O.       How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed and signed so that it is **actually  received** by March 25, 2019, at 5:00 p.m. (prevailing Eastern Time) at the following address: Shopko Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022 (or returned in accordance with the instructions otherwise set forth on your ballot).  *See* Article XII of this Disclosure Statement, which begins on page 45 of this Disclosure Statement.

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**P.       Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.       When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for April 3,  2019, at 11:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than March 25, 2019, at 5:00 (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national editions of the *Omaha World-Herald* and *USA Today* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**R.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.    What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, Confirmation means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived.  *See* Article IX of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**T.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

If an Equitization Restructuring occurs, then as of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  Provisions regarding the removal, appointment, and replacement of members of the subsequent Reorganized Shopko shall be determined by Reorganized Shopko.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Reorganized Shopko Board, as well as those Persons that will serve as an officer of Reorganized Shopko.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the Reorganized Shopko Board will be disclosed in the New Organizational Documents.

As of the Effective Date, the New Shopko Interests shall be subject to a stockholders' agreement, substantially in the form included in the Plan Supplement, containing terms and conditions that are commercially reasonable, and each holder of the New Shopko Interests will be bound thereby without the need for execution by any party thereto other than Reorganized Shopko.

17

U.      **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Notice and Claims Agent, Prime Clerk LLC:

> *By regular mail at:*
> **Shopko Ballot Processing**
> **c/o Prime Clerk LLC**
> **830 Third Avenue, 3rd Floor**
> **New York, NY 10022**
>
> *By hand delivery or overnight mail at:*
> **Shopko Ballot Processing**
> **c/o Prime Clerk LLC**
> **830 Third Avenue, 3rd Floor**
> **New York, NY 10022**
>
> *By electronic mail at:*
> **shopkoeballots@primeclerk.com**
>
> *By telephone at:*
> **(844)-205-7495 (Domestic)**
> **(347)-576-1550 (International)**

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' notice, claims, and solicitation agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at https://cases.primeclerk.com/shopko (free of charge) or the Bankruptcy Court's website at www.neb.uscourts.gov (for a fee).

V.      **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significantly reduced physical footprint and the Plan Sponsor Investment under the Equitization Restructuring, is in the best interest of all Holders of Claims and Interests, and that other alternatives fail to realize or recognize the value inherent under the Plan.

W.      **Who Supports the Plan?**

The Plan is supported by the Debtors and a large number of the Debtors' creditors and stakeholders.

V.      **THE DEBTORS' PLAN**

A.      **The Plan**

As discussed in Article III herein, the Plan contemplates two different paths forward, each effectuated through a chapter 11 plan under the following applicable key terms:

1.      *Issuance and Distribution of New Shopko Interests*

If an Equitization Restructuring occurs, on the Effective Date, the Reorganized Debtors shall issue the New Shopko Interests to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan. The issuance of New Shopko Interests under the Plan, as well as options, or other equity awards, if any, reserved under

the Management Incentive Plan, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims.

If an Equitization Restructuring occurs, on the Effective Date, Holders of New Shopko Interests shall be parties to the New Stockholders' Agreement, in substantially the form included in the Plan Supplement. On the Effective Date, Reorganized Shopko shall enter into and deliver the New Stockholders' Agreement to each Entity that is intended to be a party thereto, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Shopko Interests shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Shopko.

### 2. *Exit Facility*

If an Equitization Restructuring occurs, on the Effective Date, the Reorganized Debtors shall enter into the Exit Facility. Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facility.

On the later of (i) the Effective Date and (ii) the satisfaction of the DIP Claims in accordance with Article II.D of the Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3. *Plan Sponsor Investment*

If an Equitization Restructuring occurs, on the Effective Date, the Plan Sponsor shall consummate the Plan Sponsor Investment, if any, in exchange for [●]% of the New Shopko Interests, subject to dilution by the Management Incentive Plan. The Cash received from the Plan Sponsor Investment shall be contributed to the Reorganized Debtors on the Effective Date.

### 4. *Plan Administrator*

If the Asset Sale Restructuring occurs, the Plan Administrator shall act for Reorganized Shopko in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, sale director of Reorganized Shopko shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Shopko, and shall succeed to the powers of Reorganized Shopko's managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, Reorganized Shopko as further described in Article VII of the Plan.

#### 5.   *Recovery to Holders of Revolving Loan A Claims*

If an Equitization Restructuring occurs, in full and final satisfaction of each Allowed Revolving Loan A Claim, each Holder of an Allowed Revolving Loan A Claim will either: (a) receive payment in full in Cash of such Holder's Allowed Revolving Loan A Claim or (b) with the consent of such Holder, receive its Pro Rata share of the Exit Facility.

If the Asset Sale Restructuring occurs, each Holder of an Allowed Revolving Loan A Claim shall receive its Pro Rata share of: the Distribution Proceeds available for distribution from time to time as provided in Article VIII.G of the Plan, until such Allowed Revolving Loan A Claims are paid in full.

#### 6.   *Recovery to Holders of Revolving Loan A-1 Claims*

If an Equitization Restructuring occurs, in full and final satisfaction of each Allowed Revolving Loan A-1 Claim, each Holder Allowed Revolving Loan A-1 Claim will either: (a) receive payment in full in Cash of such Holder's Allowed Revolving Loan A-1 Claim or (b) with the consent of such Holder, receive its Pro Rata share of the Exit Facility.

If the Asset Sale Restructuring occurs, each Holder of an Allowed Revolving Loan A-1 Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution from time to time as provided in Article VIII.G of the Plan, until such Allowed Revolving Loan A-1 Claims are paid in full.

#### 7.   *Recovery to Holders of Term Loan B Claims*

If an Equitization Restructuring occurs, in full and final satisfaction of each Allowed Term Loan B Claim, each Holder of an Allowed Term Loan B Claim will receive either (a) payment in full in cash; or (b) as agreed by such Holder of an Allowed Term Loan B Claim and the Debtors, its Pro Rata share of the Exit Facility.

If the Asset Sale Restructuring occurs, each Holder of an Allowed Term Loan B Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution from time to time as provided in Article VIII.G of the Plan, until such Allowed Term Loan B Claims are paid in full.

#### 8.   *Recovery to Holders of Term Loan B-1 Claims*

If an Equitization Restructuring occurs, in full and final satisfaction of each Allowed Term Loan B-1 Claim, each Holder of an Allowed Term Loan B-1 Claim will receive its Pro Rata share of 19.9% of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and the Management Incentive Plan.

If the Asset Sale Restructuring occurs, each Holder of an Allowed Term Loan B-1 Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution from time to time as provided in Article VIII.G of the Plan, until such Allowed Term Loan B-1 Claims are paid in full.

#### 9.   *Recovery to Holders of General Unsecured Claims*[7]

If an Equitization Restructuring occurs, in full and final satisfaction of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of, at the election of the Debtors, either (a) 80.1 % of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and the Management Incentive Plan or (b)] its Pro Rata share of the GUC Equitization Distribution in one or more distributions.

If the Asset Sale Restructuring occurs, each Holder of a General Unsecured Claim will receive its Pro Rata share of the Distribution Proceeds as provided in Article VIII.G of the Plan.

---

[7]   The Debtors reserve the right to increase the recovery to Holders of Allowed General Unsecured Claims after solicitation of the votes of such Holders.  In that event, such Holder's votes on the Plan will be deemed to be the votes on the Plan as modified to provide for any more favorable treatment to Holders of Allowed General Unsecured Claims.

### 10. *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The Plan shall  be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

Critical components of such settlement include the Debtor releases and third-party releases incorporated into the Plan, treatment of and distributions to creditors under the Plan, post-emergence governance rights incentive programs, conditions precedent to Plan confirmation, the treatment of avoidance actions, debtor-in-possession financing, milestones, and covenants.  The components of the Plan reflect and implement the concessions and compromises agreed to by the Debtors and their stakeholders.  The parties to be released under the Plan afforded value to the Debtors and aided in the reorganization process by playing a role in the formulation of the Plan and have expended time and resources analyzing and negotiating the complex issues presented by the Debtors' capital structure.  The release provisions in the Plan were a component of the Debtors' ability to achieve consensus and a prearranged plan of reorganization that maximizes recoveries to the Debtors' creditors and affords the Reorganized Debtors the opportunity to restructure their business to compete effectively post-emergence.  Absent the prearranged bankruptcy filing and expeditious implementation of the Plan (which preserves trade relationships and, therefore, enterprise value), the Debtors could face a longer, costlier, and uncertain chapter 11 process mired with contentious litigation or a near-term liquidation, which could materially delay and reduce distributions to creditors.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### B.        Certain Key Terms Used in this Disclosure Statement

The following are some of the defined terms used in this Disclosure Statement.  This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only.  Please refer to the Plan for additional defined terms.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Nebraska having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the District of Nebraska.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

"Chapter 11 Cases" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code, asserted against a Debtor.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court, if any, to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

"Cure/Assumption Objection Deadline" means the date that is 14 days after filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, or an Executory Contract or Unexpired Lease proposed to be assumed by the Reorganized Debtors is proposed to be assigned to a third party after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification and (b) the date of the scheduled Confirmation Hearing.

"Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

"Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 14 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement.  If a Equitization Restructuring occurs, the Plan Supplement shall comprise, among other documents, the following:  (a) New Organizational Documents; (b)  Exit Facility Credit Agreements, if any; (c) Schedule of Assumed Executory Contracts and Unexpired Leases; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) New Stockholders' Agreement, if any; (g) Plan Sponsor Agreement; (h) a document listing the members of the New Boards and the officers of the Reorganized Debtors, if any; (i) under the Asset Sale Restructuring, the identity of the Plan Administrator and the compensation of the Plan Administrator; (j) the Management Incentive Plan and (k) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X of the Plan

C.    **Additional Important Information**

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "*Risk Factors*," and the Plan before submitting your ballot to vote on the Plan.

***The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the New Shopko Interests as contemplated by the Plan are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Shopko Interests are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof, subject to compliance with the New Organizational Documents and the New Stockholders' Agreement, that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

There is not and there may not be a public market for the New Shopko Interests, and Shopko does not intend to seek any listing of the New Shopko Interests on any stock exchange or other trading market of any type whatsoever. Accordingly, there can be no assurance that an active trading market for the New Shopko Interests will ever develop or, if such a market does develop, that it will be maintained.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtors':

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- general economic and business conditions;

- counterparty credit risk;

- the outcome of pending and future litigation;

- uncertainty regarding the Debtors' future operating results; and

- plan, objections, and expectations.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include the following: the Debtors' ability to confirm and consummate the Plan; the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer and vendor responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business, and market conditions; exposure to litigation; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; and adverse tax changes.

## VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    The Debtors

Shopko, along with its affiliated Debtors, are engaged in the sale of general merchandise including clothing, accessories, electronics, and home furnishings, as well as company operated pharmacy and optical services departments. The Debtors are headquartered in Green Bay, Wisconsin, and operate over 300 stores in 25 states throughout the United States, as well as e-commerce operations. The Debtors and their non-Debtor subsidiaries generated approximately $2.6 billion in revenue in fiscal year 2017 and currently employ approximately 14,000 people throughout the United States. A corporate organization chart is attached to the Disclosure Statement as **Exhibit B**.

### B.    Prepetition Capital Structure

As of the Petition Date,[8] the Debtors reported approximately $403 million in total funded debt. As described in greater detail below, the Debtors' significant funded debt obligations include: (a) approximately $289 million in principal amount of obligations under the Debtors' Revolving Loans A; (b) approximately $30 million in principal amount of obligations under the Debtors' Revolving Loans A-1; (c) approximately $49 million in principal amount of obligations under the Debtors' Term Loan B; and (d) approximately $34.4 million in principal obligations under the Debtors' Term Loan B-1.

#### 1.    *Prepetition Credit Agreement*

Specialty Retail Shops Holding Corp. and its debtor affiliates, as borrowers and guarantors; the revolving loan lenders party thereto (the "Prepetition ABL Lenders"); the term loan lenders party thereto (the "Prepetition Term Loan Lenders," and together with Prepetition ABL Lenders, the "Prepetition Lenders"), Wells Fargo Bank, N.A., as administrative agent and collateral agent for the Revolving Loans A, Revolving Loans A-1, and Term Loan B, Spirit, as the administrative agent and collateral agent for the Term Loan B-1 (Wells Fargo Bank, N.A. and Spirit collectively, in such capacities, the "Credit Agreement Agents" and together with the Prepetition Lenders, the "Prepetition Secured Parties"), are parties to that certain Third Amended and Restated Credit Agreement, dated as of February 7, 2012 (as further amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement").

The Prepetition Credit Agreement provides for a senior secured revolving credit facility: (i) Revolving Loans A, with a maximum availability of $700 million, and (ii) a senior secured term loan, Revolving Loans A-1, with a maximum availability of $30 million (the Revolving Loans A and Revolving Loans A-1, together, the "Prepetition ABL Loans" and such obligations owing thereunder the "Prepetition ABL Obligations"). As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Loans was not less than $357 million. Each of the Debtors or either borrowers or have guaranteed the Prepetition ABL Obligations. The Prepetition ABL Obligations are secured by a first priority lien on substantially all of the Debtors' assets that are not Term Loan Priority Collateral (as defined in the Prepetition Credit Agreement), including accounts receivable, inventory, cash and cash equivalents and then also by a second priority lien on the Debtors' capital stock and other personal property, including the Debtors' intellectual property and investment contracts (all together, the "Prepetition ABL Collateral"). Upon entry of the interim DIP Order, as the Prepetition ABL Obligations are paid down, such Prepetition ABL Obligations will begin converting into DIP ABL Obligations.

The Prepetition Credit Agreement also provides for term loans: (a) Term Loan B, with a maximum availability of $72.5 million; and (b) Term Loan B-1, with a maximum availability of $35 million (the Term Loan B and Term Loan B-1, together, the "Prepetition Term Loans" and such obligations owing thereunder, the "Prepetition Term Loan Obligations"). The Prepetition Term Loans mature in June 2020. As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loans was approximately $83.4 million. Each of the Debtors are either borrowers of or have guaranteed the Prepetition Term Loan Obligations. The Prepetition Term Loan Obligations are secured by first-priority liens on the Term Loan Priority Collateral, including the Debtors' intellectual

---

[8]    These financial figures reflect the Debtors' most recent review of their businesses. The Debtors reserve all rights to revise and supplement the figures presented herein.

property, equipment, and intangibles and books and records related to the Debtors' intellectual property and equipment (collectively, the "Prepetition Term Loan Collateral" and together with the Prepetition ABL Collateral, the "Prepetition Collateral").

## VII.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases. These factors include the general downturn in the retail industry, which led to a decrease in sales and increased operating losses, and the marked shift away from brick-and-mortar retail to online channels. These factors have made it increasingly difficult for Debtors to maintain their cost structure as sales have remained slightly depressed, and impaired the Debtors' liquidity.

### A.   Challenging Operating Environment and Operational Right Sizing

The Debtors, like many other apparel and retail companies, have faced a challenging commercial environment as of late brought on by a shift away from traditional shopping at brick-and-mortar stores. Given the Debtors' substantial brick-and-mortar presence and associated expenses, the Debtors' businesses have been heavily dependent on in-store traffic and resulting sales conversions to meet sales and profitability targets. In addition, the increased traffic to larger retailers such as Walmart, Target, and Kohl's have further contributed to the Debtors' negative or declining same store sales trends since 2016, with accelerating declines to date. The significant 2018 fiscal year performance decline was the result of a combination of factors, including: (i) merchandising, pricing, and inventory planning operational challenges; (ii) increased pharmacy business cost and reimbursement pressures; and (iii) the opening of new stores in 2015 and 2016 at a pace and quantity in excess of historical precedents for growth.

Additionally, as a result of consolidation trends in the pharmacy industry, direct and indirect remuneration fees imposed on pharmacies, sometimes weeks or months after a medication is dispensed, has decreased pharmacy profit on a prescription transaction, sometimes leading to a loss on the prescription. Although Shopko has been able to reduce operating costs in its pharmacies, continually reducing costs in the face of declining margins has reached its limit. Shopko lacks purchasing scale to purchase drugs at costs similar to large national pharmacy chains, and has seen cost increases in excess of industry trends from its primary pharmaceutical supplier, McKesson.

### B.   Supply Chain Challenges and McKesson Actions

In the months leading up to the Petition Date, the Debtors began to experience significant pressure from McKesson Corporation ("McKesson")—the Debtors' primary pharmaceutical provider. In December 2018, McKesson sent the Debtors a letter notifying them that it intended to reduce trade terms from 45 days to one day under that certain Restated Supply Agreement, dated February 1, 2017 (as amended, supplement, restated or otherwise modified from time to time, the "Supply Agreement"), and thereby accelerate approximately $70 million of accounts payable. While the Debtors disputed McKesson's ability to force reduce trade terms, the Debtors had no alternative pharmaceutical supplier available on such short notice, and were forced into a negotiated reduction in trade terms from 45 days to 21 days.

Moreover, the Debtors believe they may have a claim against McKesson under the Supply Agreement for overcharging Debtors in violation of the Cost Indexing Program implemented in the Supply Agreement. The Debtors have been attempting to work with McKesson to investigate and resolve these claims since well before the commencement of these proceedings, but McKesson has consistently refused to cooperate in any meaningful way. The Debtor and their advisors intend to continue to investigate these claims during these chapter 11 proceedings for the benefit of the estates.

Accordingly, after careful deliberation, on December 27, 2018, Shopko ceased payments to McKesson to preserve liquidity and manage their overall inventory position. In response, McKesson stopped shipping inventory to Shopko. In the following days, Shopko attempted to negotiate a resolution with McKesson, as Shopko wanted to work with McKesson to preserve the value of the prescription files, and offered to pay cash-on-delivery for new inventory. McKesson was not receptive to these efforts and instead took a series of actions that caused harm to Shopko.

On December 30, 2018, McKesson sent Shopko a letter asserting reclamation rights against all inventory it sent Shopko in the preceding 45 days. Debtors denied the allegations in the letter, and denied McKesson's purported right to reclamation. While the parties were still discussing McKesson's request, McKesson filed a motion in the Circuit Court of Brown County, Wisconsin, on Saturday January 5, 2019, seeking a temporary restraining order (the "TRO") to effectuate McKesson's reclamation demand.

McKesson's TRO motion sought an immediate court order to physically remove tens of millions of dollars of prescription drugs from the shelves of Debtors' pharmacies. The effect would have been to shut down every single Shopko pharmacy—if not every Shopko store—in the country. During the TRO Hearing, on January 7, 2019, the court denied McKesson's motion. The court articulated that McKesson's TRO request would likely have caused harm to the Debtors' customers—who would lose access to medication necessary for their health and well-being. Moreover, the court explained that it was not clear that McKesson had such reclamation rights because another party had a senior security interest in the inventory.

During these chapter 11 cases, Shopko and its advisors intend to investigate these issues and claims for the benefit of the estates.

###    C.    Exploration of Strategic Alternatives

The Debtors have diligently worked with their financial advisors since 2017 to develop and explore strategic alternatives to maximize value for the Debtors and their assets. In May 2017, the Debtors engaged Houlihan Lokey, Inc. ("Houlihan Lokey") to act as their financial advisor and to explore alternatives. The Debtors and their advisors engaged in a significant marketing process to solicit bids for an equity investment or the purchase of the Debtors' assets in order to obtain the greatest proceeds to maximize the value for the Debtors' stakeholders. Despite significant interest, this process failed ultimately to yield a mutually acceptable transaction.

The Debtors contacted a select group of potential bidders, and intend to combine to build off this process in connection with the chapter cases. To that end, the Debtors have proposed the plan sponsor bidding procedures for the process to obtain a plan sponsor's equity investment.

Recognizing the need to explore restructuring alternatives, in December 2017, the Debtors retained Kirkland & Ellis LLP, as legal advisor. As a result of the Debtors' initial efforts, the Debtors obtained an additional $35 million in financing from Spirit in January 2018. The Debtors used this incremental liquidity to right-size its store footprint and pursue potential sale transactions.

In August 2018, the Debtors and their advisors commenced another process to market the Debtors assuming an exit from the pharmacy business (which was separately marketed and yielded numerous successful transactions). While this process yielded some interest, it became clear that the Debtors would be more attractive if marketed as part of a comprehensive restructuring.

In November 2018, the Debtors also retained Berkeley Research Group, LLC ("BRG"). Together, the Debtors and their advisors analyzed the Debtors' capital structure, potential sources of liquidity, and runway to facilitate the operational changes necessary to reduce the burdensome operational costs associated with their brick-and-mortar footprint, including various restructuring and recapitalization options. These efforts are more fully set forth below.

###    1.    Pharmacy Sale Process

Because the Debtors have not been able to profitably operate their pharmacy business, the Debtors diligently worked with Houlihan Lokey and the Debtors' other advisors to develop and explore several strategic alternatives to maximize value for the Debtors' prescription pharmaceutical inventory, prescription files and records, and pharmacy customer lists and patient profiles (the "Pharmacy Assets"). As a result of this analysis, in August 2018, the Debtors and their advisors engaged in a thorough marketing process to solicit bids for the Debtors' Pharmacy Assets to maximize value for the Debtors' stakeholders.

The Debtors and their advisors contacted a total of 19 strategic buyers, including national pharmacies, pharmacy cooperatives, pharmacy wholesalers, and regional pharmacies. Of these, 12 parties executed non-disclosure agreements with the Debtors and began conducting due diligence.

By mid-September 2018, the deadline for interested parties to submit bids, the Debtors received eight bids for varying subsets of the Debtors' Pharmacy Assets. Houlihan Lokey and the Debtors conducted multiple rounds of negotiations with these bidders and provided detailed analyses of the value of the Pharmacy Assets at each location.

Having begun the process with approximately 234 pharmacy locations, the Debtors and Houlihan Lokey identified 134 locations with then actionable bids from six parties for the purchase of such respective Pharmacy Assets. Of the 134 locations with attractive bids, the Debtors were able to execute and close agreements for 82 of the locations prior to the Petition Date. The closing of the sales for the Pharmacy Assets at these 82 locations resulted in approximately $95 million in proceeds. As discussed below, the Debtors intend to continue these sale efforts postpetition and consummate sales of the remaining Pharmacy Assets within the first 45 days of these chapter 11 cases.

### 2.  *Plan Sponsor Marketing Process*

In addition to the marketing and sale of the Pharmacy Assets, the Debtors and their advisors spent considerable efforts seeking out parties who would be willing to invest new capital in the Debtors' business. As part of this process, Houlihan Lokey contacted 14 potential sponsors in late November. Five of these parties attended in-person meetings with the Debtors' management and advisors in New York on December 6, 2018. Following the December 6, 2018 meeting, those five parties and one party that did not attend the meetings carried out extensive due diligence of the Debtors' business.

Although the Debtors continued discussions with several of the potential sponsors following their due diligence, no party has made a proposal at this time. The Debtors intend to continue these efforts postpetition and locate a Plan sponsor under a court-approved marketing process.

### 3.  *Real Estate Rationalization*

The Debtors hired Houlihan Lokey and BRG, in part, to help address the disparity between productive and non-productive stores and rationalize the Debtors' store footprint. With the assistance of their advisors, the Debtors identified approximately 70 unprofitable stores that are in the process of closing. The Debtors anticipate that they will further reduce their footprint by more than 40 stores following the Petition Date, freeing up net-working capital and allow for more efficient operations and inventory management. The Debtors continue to analyze whether they can improve their operations by closing additional unproductive locations.

### 4.  *Discussions with Creditors*

Beginning in December 2018, the Debtors commenced comprehensive restructuring negotiations with certain prepetition lenders, including certain of their advisors (the "Prepetition Lenders' Advisors"). The Debtors have facilitated the diligence of such advisors for the last several months.

Since, December 2018, the Debtors and their advisors have engaged in a number of substantive meetings and telephone conferences with the Prepetition Lenders' Advisors regarding comprehensive restructuring alternatives that would strengthen the Debtors' balance sheet and provide necessary liquidity.

### 5.  *DIP Financing*

To fund the administration of these chapter 11 cases, the Prepetition ABL Lenders and certain Prepetition Term Loan Lenders have agreed to provide debtor-in-possession financing. The Prepetition ABL Lenders and Prepetition Term Loan Lenders have agreed to continue to lend money on terms similar to those under the Debtors' existing asset-based lending facility, providing the $505 million DIP Facility, pursuant to which both the revolving loans and certain of the term loan commitments under the Debtors' existing asset-based credit facility will convert into the DIP Facility.

The DIP Facility consists of (a) $400 million in Revolving A Loans, (b) $30 million in Revolving A-1 Loans (the "DIP ABL Loans"), and (c) $50 million in a senior secured term loan (the "DIP Term Loan B").

## VIII.    PRIOR TRANSACTIONS

### A.    SUPERVALU Transaction and Pamida Acquisition

Shopko has grown significantly since its founding in 1962 through a combination of new store openings, acquisitions, and mergers. In 1971, Shopko merged with SUPERVALU Inc., a Minneapolis-based grocery wholesale company. Following opening its 100th store, in 1991, Shopko was spun-off by SUPERVALU and became an independent, publicly owned company. In 1997, Shopko acquired Penn-Daniels Inc., a retailer operating 18 Jacks Discount Stores. The Debtors' largest acquisition came in 1999, with Shopko acquiring Pamida Holding Co., a retailer operating 148 discount stores in small rural markets.

### B.    Sun Capital Transaction

December 2005, Sun Capital Partners, Inc. ("Sun Capital") acquired Shopko. The acquisition was effectuated through a merger with an affiliate of Sun Capital on December 15, 2005. Subsequently, on May 31, 2006, Spirit purchased nearly all of the Debtors' real estate assets through a financing provided through Spirit SPE SK Acquisition, LLC.

### C.    Special Committee

In December 2017, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the board of directors or Shopko (the "Board of Directors") appointed Steve Winograd and Mohsin Meghji to the Board of Directors as disinterested directors (the "Independent Directors"). Each of the Independent Directors has extensive experience serving on boards of managers and boards of directors in distressed situations. On November 26, 2018, the Board of Directors authorized the formation of a special committee comprised of the Independent Directors (the "Special Committee") to, among other things, review matters regarding transactions or negotiations which the Special Committee determines in whole or in part may result in conflicts of interest. The Independent Directors subsequently retained Willkie Farr & Gallagher LLP ("Willkie Farr") and Ducera Partners LLP as independent counsel and independent financial advisor, respectively, to assist the Independent Directors in their review. As part of this mandate, the Special Committee commenced an investigation, among other things, into certain dividend payments to the Debtors' direct or indirect equity owners to determine whether the Debtors' estates may have any claims related to such transactions. The investigation is progressing, and the Special Committee and their advisors continue their efforts to evaluate potential claims, if any, the Debtors may have with respect to their relationship with, among others, the Debtors' direct or indirect equity owners, lenders, and other creditors.

## IX.    EVENTS OF THE CHAPTER 11 CASES

### A.    Corporate Structure upon Emergence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B.    Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. Should the Debtors' projected timelines prove

accurate, the Debtors could emerge from chapter 11 within approximately 90 days of the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Russell L. Steinhorst, Chief Executive Officer of Specialty Retail Shops Holding Corp., in Support of Chapter 11 Petitions and First Day Motions*, filed on the Petition Date. Significantly, pursuant to the First Day Motions, the Debtors sought the authority to pay the Claims of a number of their vendors in full, in the regular course of business.

The First Day Motions, and all proposed orders for relief in the Chapter 11 Cases, can be viewed free of charge at https://cases.primeclerk.com/shopko.

### D.    Approval of the DIP Facility

Based on the Debtors' need for debtor-in-possession financing and their conclusion that the DIP Facility represents the best terms available, on the Petition Date, the Debtors filed a motion on the Petition Date seeking authorization to enter into the DIP Facility on an interim and final basis (the "DIP Motion").

### E.    Executory Contracts and Unexpired Leases

#### 1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

As set forth in the *Debtors' Motion For Entry of an Order For Approval of Procedures to Assume or Reject Executory Contracts and Unexpired Leases* (the "Lease Rejection Procedures Motion") that was filed on the Petition Date, the Debtors are party to a large number of unexpired non-residential real property leases. Further, the Debtors are party to a substantial number of executory contracts. In connection with their restructuring efforts, the Debtors are attempting to enhance the competitiveness of their operations, which, among other things, involves a careful and comprehensive evaluation of all aspects of the Debtors' leases and supply chain. The Debtors intend to utilize the tools afforded a chapter 11 debtor to achieve the necessary cost savings and operational effectiveness envisioned in their revised strategic business plan, including modifying or, in some cases eliminating, burdensome or underutilized agreements and leases.

As such, the Debtors are conducting a comprehensive analysis of their executory contracts and unexpired leases and have, and intend to continue to, engage in extensive discussions with contract and lease counterparties regarding the contributions such parties are making to the restructuring process and can make to the post-emergence businesses.

The Debtors intend to file the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases no later than eight days before the Voting Deadline, as part of the Plan Supplement.

If the Equitization Restructuring occurs, on the Confirmation Date, except as otherwise provided in the Plan

or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.  Except as otherwise provided in the Plan, the Debtors shall assume, assume and assign, or reject, as the case may be, Executory Contracts and Unexpired Leases set forth in the applicable Schedules in the Plan Supplement. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order.  Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

If the Asset Sale Restructuring occurs, on the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order.  Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

### 2. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the latest to occur of: (1) 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) 30 days after the Debtors provide notice of surrender of possession to a landlord of a rejected lease where surrender occurs after entry of an order approving such rejection; and (3) 30 days after notice of any rejection that occurs after the Effective

Date.  **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, Reorganized Shopko, or the property for any of the foregoing without the need for any objection by the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

If the Equitization Restructuring occurs, counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Bankruptcy Court pursuant to the Bankruptcy Court order approving the Disclosure Statement as soon as reasonably practicable following entry of the Bankruptcy Court order approving the Disclosure Statement.

### 3. Cure of Default for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least eight days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim.  To the extent that the Debtors seek to assume and assign an Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

In the event of an unresolved dispute regarding (1) the amount of any Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, assignment, or payments of any Cure Claims required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order(s) of the Bankruptcy Court.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract

or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 4. Adequate Assurance of Future Performance Under Assumed Executory Contracts and Unexpired Leases

The Debtors have provided Financial Projections attached hereto as **Exhibit D** and are prepared to demonstrate the feasibility of the Plan at the Confirmation Hearing in satisfaction of any obligation to provide adequate assurance of future performance under Executory Contracts and Unexpired Leases that are assumed under the Plan.

### F.     Lease Renegotiation and Store Closing Process

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* (the "Store Closing Motion") seeking to implement a key component of their restructuring strategy and right-size their operations by closing underperforming or geographically undesirable stores. These efforts, which are ongoing, are part of the Debtors' attempt to rationalize their store fleet.

### G.     Schedules and Statements

On the Petition Date, the Debtors filed their *Motion For Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditure, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (II) Granting Related Relief* (the "SOFA Extension Motion").

### H.     Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

## X.     PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit D** is a projected consolidated income statement, which includes consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "Financial Projections") for the period beginning 2018 and continuing through 2022.  The Financial Projections are based on an assumed Effective Date of April 15, 2019.  To the extent that the Effective Date occurs before or after April 15, 2019, recoveries on account of Allowed Claims could be impacted.

Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## XI.     RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.    *Parties in Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    *The Conditions Precedent to the Effective Date of the Plan May Not Occur*

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

#### 3.    *The Debtors May Fail to Satisfy Vote Requirements*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

#### 4.    *The Debtors May Not Be Able to Secure Confirmation of the Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently

provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.  *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.  *Continued Risk Upon Confirmation*

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.  *The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8.  *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus

may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.   Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10.   Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11.   Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### B.    Risks Related to Recoveries under the Plan

### 1.   The Debtors May Not Be Able to Achieve Their Projected Financial Results

With respect to Holders of Interests in the Reorganized Debtors, the Reorganized Debtors may not be able to achieve their projected financial results.  The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the particular industry segments in which the Debtors operate in particular, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Court may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the ability of the Debtors to make payments with respect to indebtedness following the Effective Date.  Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur.  Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement.  Such events may have a material impact on the information contained in the Disclosure Statement.  The Debtors do not intend to update the projections and, therefore, the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections. If the Debtors do not achieve their projected financial results, (a) the value of the New Shopko Interests may be negatively affected, (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, and (c) the Debtors may be unable to service their debt obligations as they come due.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2.    The Plan Exchanges Senior Securities for Junior Securities

If the Plan is confirmed and consummated, certain Holders of Claims will receive New Shopko Interests. Thus, in agreeing to the Plan, certain of such Holders will be consenting to the exchange of their interests in senior debt for junior securities that will be subordinate to all future creditor claims.

### 3.    A Liquid Trading Market for the New Shopko Interests

The Debtors make no assurance that a liquid trading market for the New Shopko Interests will develop. The liquidity of any market for the New Shopko Interests will depend, among other things, upon the number of holders of the New Shopko Interests, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.   The New Shopko Interests may also be subject to trading restrictions by the New Organizational Documents and the New Stockholders' Agreement.

On the Effective Date, none of the New Shopko Interests will be registered under the Securities Act or the Securities Exchange Act or listed on a national securities exchange, Reorganized Shopko will not be a reporting company under the Securities Exchange Act, Reorganized Shopko shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and Reorganized Shopko shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date.  In order to prevent Reorganized Shopko from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, a separate agreement or the New Organizational Documents may impose certain trading restrictions, and the New Shopko Interests may be subject to certain transfer and other restrictions designed to maintain Reorganized Shopko as a private, non-reporting company.

Notwithstanding the foregoing in this risk factor, from and after the Effective Date, Reorganized Shopko will be required to provide (via separate agreement or in the New Organization Documents) to its shareholders audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP (for the avoidance of doubt, no SAS 100 review, compliance with any other requirement of Regulation S-X under the Securities Act or narrative disclosure required to be provided by reporting companies under the Securities Exchange Act in periodic or other reports (including, without limitation, a Management's Discussion and Analysis of Financial Condition and Results of Operations) is required in connection with the delivery of the required financial statements).

### 4.    The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes

Under federal income tax law, a corporation is generally permitted to deduct from taxable income NOLs carried forward from prior years. The Debtors have federal NOL carryforwards of approximately $241.2 million as of January 31, 2018.  The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes, and are also currently generating additional taxable income and gains from the sale of pharmacy assets, which will ultimately decrease the Debtors' NOLs and other tax attributes.

The Debtors' ability to utilize their NOL carryforwards and other tax attributes to offset future taxable income and to reduce federal income tax liability is subject to certain requirements and restrictions.  In general, such NOLs and other tax attributes could be reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the Internal Revenue Code of 1986, as amended (the "Tax Code") or to offset any taxable gains recognized by the Debtors attributable to the restructuring transactions.  In addition, if the Debtors experience an "ownership change," as defined in section 382 of the Tax Code, then their ability to use the NOL carryforwards may be substantially limited, which could have a negative impact on the Debtors' financial position and results of operations.  Generally, there is an "ownership change" if one or more stockholders owning 5 percent or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period.  Following the implementation of a plan of reorganization, it is possible that an "ownership change" may be deemed to occur.  Under section 382 of the Tax Code, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs that may be utilized to offset future taxable income generally is subject to an annual limitation.   The Debtors currently expect that their net operating loss

carryforwards and other tax attributes may be significantly reduced, eliminated, or limited in connection with the restructuring transactions, through a combination of one or more of the above factors.

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "*Certain United States Federal Income Tax Consequences of the Plan*," which begins on page 45 herein.

### C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 5.    *The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness*

The Debtors' ability to make scheduled payments on, or refinance their debt obligations depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control (including the factors discussed in Article XI, which begins on page 32, herein). The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including the notes.

#### 6.    *The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases*

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, vendors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 7.    *Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses*

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.  So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 8.    Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 9.    The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors. In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 10.    The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 11.    Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## XII.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of claims and interests against a debtor are entitled to vote on a chapter 11 plan.  The table in Article IV.C of this Disclosure Statement, which begins on page 4 hereof, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 2, 3, 4, 5, 6, and 7 (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 1, 8, 9, 10, and 11. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is February 22, 2019**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.    Voting on the Plan

**The Voting Deadline is March 25, 2019, at 5:00 p.m.** prevailing Eastern Time; *provided*, *however*, that the Voting Deadline with respect to an Executory Contract or Unexpired Lease that is included on a Schedule of Assumed Executory Contracts and Unexpired Leases filed in advance of March 25, 2019, but is added to the Schedule of Rejected Executory Contracts and Unexpired Leases after March 25, 2019, shall be April 3, 2019, the date of the Confirmation Hearing.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' voting and claims agent (the "Voting and Claims Agent") on or before the Voting Deadline:

### D.    Ballots Not Counted

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as

contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS,
PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE (844) 205-7495.
ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE
NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## XIII.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **<u>Exhibit F</u>** and incorporated herein by reference is a liquidation analysis (the "<u>Liquidation Analysis</u>") prepared by the Debtors with the assistance of BRG, the Debtors' financial advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Shopko Interests to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following their emergence from chapter 11 and that the Plan will meet the feasibility requirements of the Bankruptcy Code.  The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference.

### D.        Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[9]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of Allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.        Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, *however*, the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.        No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account

---

[9]      A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. The Valuation Analysis is set forth in **Exhibit E** attached hereto and incorporated herein by reference.

## XIV. CERTAIN SECURITIES LAW MATTERS

The issuance of, and the distribution under, the Plan of the New Shopko Interests will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

### A. Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property. In reliance upon this exemption, the Debtors believe that the offer and sale, under the Plan, of the New Shopko Interests will be exempt from registration under the Securities Act and state securities laws with respect to any Holder of Allowed Claims who is not deemed to be an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code.

In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. Accordingly, subject to compliance with the New Organizational Documents and the New Stockholders' Agreement, such securities generally may be resold: (a) without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code; and (b) without registration under state securities or Blue Sky laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "**underwriter**" as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities

issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"*Control*," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "**controlling person**" and, therefore, an underwriter.

To the extent that persons deemed to be "underwriters" receive New Shopko Interests pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such Plan Securities, unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act.

The issuer of the New Shopko Interests will not be required to file periodic reports under the Securities Exchange Act or seek to list the New Shopko Interests for trading on a national securities exchange. Consequently, there may not be "current public information" (as such term is defined in Rule 144) regarding the issuer of the New Shopko Interests.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Shopko Interests to be issued pursuant to the Plan, or an "affiliate" of the issuer of the New Shopko Interests would depend upon various facts and circumstances applicable to that person. Accordingly, we express no view as to whether any such person would be such an "underwriter" or "affiliate."

PERSONS WHO RECEIVE NEW SHOPKO INTERESTS UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW SHOPKO INTERESTS OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH PARTY-IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW SHOPKO INTERESTS

## XV.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders (which, solely for purposes

of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims and New Shopko Interests. This summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims or who will hold the New Shopko Interests as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions include a taxable sale of the Debtors' assets and/or stock.

If the transaction undertaken pursuant to the Plan is structured as a taxable sale of the assets and/or stock of any Debtor (a "Taxable Transaction"), such Debtor would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets sold and the Debtor's tax basis in such assets.  The Debtors have not yet determined whether or not they intend to structure the Restructuring Transactions as a Taxable Transaction, whether in whole or in part.  Such decision will depend on, among other things, whether assets being sold pursuant to a Taxable Transaction have a fair market value in excess of tax basis (i.e., a "built-in gain") or a fair market value less than tax basis (i.e., a "built-in loss"), in the case of assets with built-in gains, whether sufficient tax attributes are available to offset any such built-in gains, and how the fair market value of such assets compares to the expected tax bases of such assets after their tax basis is reduced for COD Income.

If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock.  However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, subject to reduction due to COD Income, as described below.

For the period ending January 31, 2018, the Debtors had approximately $241.2 million of federal NOLs.  The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes, and are also currently generating additional taxable income and gains from the sale of pharmacy assets, which will ultimately decrease the Debtors' NOLs and other tax attributes.  Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising in tax years beginning before January 1, 2018 and indefinitely for NOLs arising in taxable years starting in 2018 (including the Debtors' tax year starting January 31, 2018), thereby reducing the Debtors' future aggregate tax obligations.  Subject to the limitations discussed below, NOLs arising before 2018 may offset 100% of future taxable income and NOLs arising in taxable years starting with 2018 may be used to offset 80% of taxable income in a given year.

*1.      Cancellation of Debt and Reduction of Tax Attributes*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor), in each case, given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the debtor with respect to the sale of all or a portion of their assets in a taxable transaction).  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income.  The amount of the tax attributes required to be reduced will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction.  The exact amount of any COD Income that will be realized by

the Debtors, and accordingly, the amount of tax attributes required to be reduced (if any), will depend in part on the fair market value of the New Shopko Interests and may depend on the "issue price" of the loans under the Exit Facility (as described below) and will not be determinable until the consummation of the Plan.  Regardless of the implemented structure, the Debtors expect, however, that the amount of such COD Income will be sufficient to eliminate all of their NOLs and tax credits allocable to periods prior to the Effective Date pursuant to section 108 of the Tax Code.  In addition, depending on the structure of the transactions undertaken pursuant to the Plan, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

As discussed above, the Debtors' NOLs will likely be materially reduced or eliminated after computing the Debtors' taxes for the year in which the Plan is implemented.  To the extent that any remain, they will be subject to limitation as described below, subject to the exceptions described below.

### 2.    Limitation of NOL Carryforwards and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, to the extent the Reorganized Debtors succeed to the Debtors' tax attributes (i.e., if the Restructuring Transactions are not structured as a Taxable Transaction pursuant to which the Debtors' assets, and not stock of corporate entities, are being transferred to the Reorganized Debtors for U.S. federal income tax purposes), the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Code.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Shopko pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

### (a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs:  2.51 percent for January 2019).  The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed

chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation would be determined under the regular rules for ownership changes.

As discussed above, the Debtors expect that all of the Debtors' NOLs allocable to periods prior to the Effective Date will be eliminated and hence will not be subject to the section 382 limitation following the year in which the Effective Date occurs.  The availability to the Debtors of either the 382(l)(5) Exception or the 382(l)(6) Exception will depend on the structure of the transactions undertaken pursuant to the Plan.

### 3.  Excess Loss Accounts

Generally, when corporations are members of an affiliated group filing a consolidated return, a parent corporation's basis in the stock of a subsidiary in such a group is (a) increased by the sum of (i) income of such subsidiary and (ii) contributions to such subsidiary, and (b) reduced by the sum of (i) losses or deductions of such subsidiary that are used by the affiliated group and (ii) distributions from such subsidiary.  In the case that the amount described in clause (b) above exceeds the amount described in clause (a) above, and such excess is greater than the parent corporation's basis in the subsidiary stock before the adjustments specified in clauses (a)-(b) are made, the amount by which such excess is greater than the parent corporation's basis in the subsidiary stock is called an "excess loss account" and is treated as negative basis for U.S. federal income tax purposes. The affiliated group must recognize income equal to the excess loss account in the subsidiary's stock in certain events, including (x) to the extent the subsidiary recognizes COD Income that is excluded from gross income pursuant to section 108 of the Code (as discussed above), and the affiliated group does not reduce its tax attributes by such excluded COD Income, and (y) if the stock of the subsidiary is treated as disposed of for no consideration.  It is possible that a Debtor will exclude COD Income in excess of available tax attributes and that there could be an excess loss account in the stock of that Debtor. In that case, the Debtors will recognize taxable income in the amount of such excess COD Income, but not to exceed the amount of the excess loss account.

### C.   Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims Entitled to Vote

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

### 1.   U.S. Federal Income Tax Consequences to Holders of Allowed Class 3, Class 4, and Class 5 Claims

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Class 3, Class 4, and Class 5 Claims, each Holder thereof will receive either Cash or its Pro Rata share of the Exit Facility.

The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed Class 3, Class 4, and Class 5 Claims who receive their Pro Rata share of the Exit Facility will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute a Taxable Transaction or a transaction that qualifies in whole or in part as an exchange of stock or securities in a tax-free reorganization under the reorganization provisions of the Tax Code (a "Reorganization").   The determination of whether the transactions undertaken pursuant to the Plan constitute a Reorganization will depend on whether the Claims surrendered and the loans under the Exit Facility both constitute "securities" for U.S. federal income tax purposes.

### a.      Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  The Allowed Revolving Loan A Claims (i.e., the Allowed Class 3 Claims), Revolving Loan A-1 Claims (i.e., the Allowed Class 4 Claims), and Term Loan B Claims (i.e., the Allowed Class 5 Claims) each had a term to maturity of approximately five years when issued.  The terms of the loans under the Exit Facility, including the term to maturity thereof, have not yet been finalized.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Allowed Revolving Loan A Claims, Revolving Loan A-1 Claims, and Term Loan B Claims and the loans under the Exit Facility as "securities" for U.S. federal income tax purposes.

### a.      Taxable Transaction

To the extent that the transactions undertaken pursuant to the Plan constitute a Taxable Transaction (including where the debt instrument underlying the Allowed Claim and/or the loan under the Exit Facility is not a security for U.S. federal income tax purposes), a U.S. Holder of an Allowed Class 3, Class 4, or Class 5 Claim would be treated as exchanging its Claims for its Pro Rata Share of the Exit Facility or Cash in a fully taxable exchange under section 1001 of the Tax Code.

A U.S. Holder of an Allowed Class 3, Class 4, or Class 5 Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) the sum of the Cash received, if any, plus the "issue price" of the loans under the Exit Facility received, if any (in each case to the extent such consideration is not allocable to accrued but untaxed interest on the obligations underlying such Claim), and (b) the U.S. Holder's adjusted tax basis, if any, in the obligation constituting such Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  To the extent that a portion of the consideration received in exchange for its Allowed Class 3, Class 4, or Class 5 Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income.  *See* "Accrued Interest" and "Market Discount" below.  A U.S. Holder's tax basis in the loans under the Exit Facility should be equal to the issue price of such loan as of the date such loan is issued to the U.S. Holder.  The determination of the "issue price" of the loans under the Exit Facility for purposes of this analysis will depend, in part, on whether the loans under either the Allowed Class 3, Class 4 or Class 5 Claims or the loans under the Exit Facility are traded on an "established securities market" for U.S. federal income tax purposes.  The issue price of a debt instrument that is traded on an established market is the fair market value of such debt instrument.  The issue price of a debt instrument that is not so traded is its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).  Although not free from doubt, the Debtors believe that either loans underlying the Exit Facility or the debt instruments underlying the Class 3, Class 4, and Class 5 Claims that are tendered for loans under the Exit Facility

may be treated as traded on an established securities market for U.S. federal income tax purposes, in which case the issue price of the loans under the Exit Facility would be equal to its fair market value, but no assurances can be given in this regard. The rules regarding the determination of issue price are complex and highly detailed and you should consult your tax advisor regarding the determination of the issue price of the loans under the Exit Facility. A U.S. Holder's holding period for loans received under the Exit Facility should begin on the day following the Effective Date.

### 2. Reorganization

If a U.S. Holder receives loans under the Exit Facility in exchange for its Claim, and both the loans under the Exit Facility and the debt instruments underlying such Claim are "securities" for U.S. federal income tax purposes, the exchange of a U.S. Holder's Allowed Class, 3, Class 4 or Class 5 Claim should be treated as a Reorganization under the Tax Code. If the exchange is treated as a Reorganization, a U.S. Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of accrued interest below). To the extent that a portion of the loans under the Exit Facility is allocable to accrued but untaxed interest, however, the U.S. Holder may recognize ordinary income (as discussed in greater detail in "Accrued Interest" below). A U.S. Holder who is subject to this treatment will take an aggregate tax basis in its interest in the loans under the Exit Facility received (apart from amounts allocable to accrued but untaxed interest) equal to the U.S. Holder's tax basis in the surrendered Allowed Claim. A U.S. Holder's holding period for its interest in the loans under the Exit Facility received (except to the extent attributable to accrued but untaxed interest) should generally include the holding period for the obligation underlying the surrendered Allowed Claim exchanged for such loans.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 3. U.S. Federal Income Tax Consequences to Holders of Allowed Class 6 and Class 7 Claims

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Class 6 and Class 7 Claims, each Holder thereof will receive either Cash or its Pro Rata share of a portion of the New Shopko Interests.

The receipt of Cash by a U.S. Holder of an Allowed Class 6 or Class 7 Claim should be treated as a taxable exchange under section 1001 of the Code. The U.S. Holder should recognize capital gain or loss equal to the difference between (1) the Cash received (to the extent such Cash is not allocable to accrued but untaxed interest that is received in exchange for the Claim) and (2) the U.S. Holder's adjusted tax basis in the obligation constituting its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. See the discussions of accrued interest and market discount below.

The receipt of New Shopko Interests by a U.S. Holder of an Allowed Class 6 or Class 7 Claim depends on whether the Allowed Class 6 or Class 7 Claim constitutes a "security" for U.S. federal income tax purposes. See the discussion of whether a debt instrument constitutes a "security" for U.S. federal income tax purposes above. The Allowed Term Loan B-1 Claims (i.e., the Allowed Class 6 Claims) had a term to maturity of approximately two years when issued. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Allowed Term Loan B-1 Claims as "securities" for U.S. federal income tax purposes and whether any Allowed Class 7 Claims may constitute a "security" for U.S. federal income tax purposes.

If the debt underlying the Allowed Class 6 or Class 7 Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of the Allowed Class 6 or Class 7 Claim for New Shopko Interests should constitute a "recapitalization" for U.S. federal income tax purposes. The U.S. federal income tax consequences to such U.S.

Holder will be substantially similar to the consequences described above in Section C.1(c) of this Article XVI (substituting "New Shopko Interests" for "loans under the Exit Facility") that a U.S. Holder of Allowed Class 3, Class 4 or Class 5 Claims would experience if the debt underlying the Claims and the consideration received in exchange therefore are both treated as "securities" for U.S. federal income tax purposes.

If the New Shopko Interests and the debt or obligations underlying the Allowed Class 6 or Class 7 Claim are not both treated as "securities" for U.S. federal income tax purposes, the exchange of the Allowed Class 6 or Class 7 Claim for New Shopko Interests should be treated by such U.S. Holder as a fully taxable exchange under section 1001 of the IRC. Accordingly, each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Shopko Interests and (2) such U.S. Holder's adjusted tax basis, if any, in the obligation constituting such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. See the discussions of accrued interest and market discount below. A U.S. Holder's tax basis in any New Shopko Interests received should equal the fair market value of such stock or issue price of such loan as of the date such stock is distributed to the U.S. Holder. A U.S. Holder's holding period for the New Shopko Interests received should begin on the day following the Effective Date.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 4.    *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a surrendered Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 5.    *Medicare Tax*

Certain U.S. Holders that are individual, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 6.    *Market Discount*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder

of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 7.    *Dividends on New Shopko Interests*

Any distributions made on account of New Shopko Interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

### 8.    *Sale, Redemption, or Repurchase of New Shopko Interests*

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Shopko Interests.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Shopko Interests for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.  Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Shopko Interests as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for New Shopko Interests.

### 9.    *Limitation on Use of Capital Losses*

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a)

$3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holders and the ownership and disposition of the New Shopko Interests.

#### 1.    Gain Recognition

Any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). To claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

#### 2.    Accrued Interest

Payments to a non-U.S. Holder that are attributable to accrued interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the Reorganized Debtor's stock entitled to vote;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Reorganized Debtor (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a

U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

### 3.    *Dividends on New Shopko Interests*

Any distributions made with respect to New Shopko Interests will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtor's current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below, dividends paid with respect to New Shopko Interests held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Shopko Interests held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### 4.    *Sale, Redemption, or Repurchase of New Shopko Interests*

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Shopko Interests unless:

(i)     such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

(ii)    such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

(iii)   the Reorganized Debtors are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources

during the taxable year of disposition of New Shopko Interests. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The Debtors consider it unlikely, based on their current business plans and operations, that any of the Reorganized Debtors will become a "U.S. real property holding corporation" in the future.

### 5. *FATCA*

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Shopko Interests), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Shopko Interests). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules currently apply to U.S.-source payments of fixed or determinable, annual or periodic income. The Internal Revenue Service has issued proposed regulations that, when finalized, will provide for the repeal of the 30% withholding tax that existing regulations released in January 2013 and subsequent guidance by the Service would have applied to all payments of gross proceeds from the sale, exchange or other disposition of property of a type which can produce U.S. source interest or dividends occurring after December 31, 2018. In the preamble to the proposed regulations, the Service provided that taxpayers may rely upon this repeal until the issuance of final regulations.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder's ownership of New Shopko Interests.

### E.    Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY**

**THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

## XVI.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  January 16, 2019

<div style="margin-left: 40%;">

Respectfully submitted,

**Specialty Retail Shops Holding Corp.,**
on behalf of itself and each of the other Debtors

By:    */s/ Russell L. Steinhorst*
Name: Russell L. Steinhorst
Title:   Chief Executive Officer

</div>

Prepared by:

Dated:  January 16, 2019
Omaha, Nebraska

*/s/ Michael T. Eversden*
*James J. Niemeier (NE Bar No. 18838)*
*Michael T. Eversden (NE Bar No. 21941)*
*Lauren R. Goodman (NE Bar No. 24645)*
**MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**
*First National Tower, Suite 3700*
*1601 Dodge Street*
*Omaha, Nebraska 68102*
*Telephone:*        *(402) 341-3070*
*Facsimile:*        *(402) 341-0216*
*Email:*            *jniemeier@mcgrathnorth.com*
                    *meversden@mcgrathnorth.com*
                    *lgoodman@mcgrathnorth.com*
*- and -*
*James H.M. Sprayregen, P.C.*
*Patrick J. Nash, Jr., P.C. (pro hac vice pending)*
*Travis M. Bayer (pro hac vice pending)*
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
*300 North LaSalle*
*Chicago, Illinois 60654*
*Telephone:*        *(312) 862-2000*
*Facsimile:*        *(312) 862-2200*
*Email:*            *james.sprayregen@kirkland.com*
*patrick.nash@kirkland.com*
*jamie.netznik@kirkland.com*
*- and -*
*Steven Serajeddini (pro hac vice pending)*
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
*601 Lexington Avenue*
*New York, New York 10022*
*Telephone:*        *(212) 446-4800*
*Facsimile:*        *(212) 446-4900*
*Email:*            *steven.serajeddini@kirkland.com*

*Proposed Co-Counsel to the Debtors*
*Co-Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Plan of Reorganization**

**<u>Exhibit B</u>**

**Corporate Structure Chart**

**<u>Exhibit C</u>**

**Disclosure Statement Order**

**<u>Exhibit D</u>**

**Financial Projections**

**<u>Exhibit E</u>**

**Valuation Analysis**

**<u>Exhibit F</u>**

**Liquidation Analysis**