## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) ) Case No. 19-80064 (TLS) |
| Debtors. | ) ) (Jointly Administered) |

### DEBTORS' APPLICATION FOR ENTRY OF
### AN ORDER AUTHORIZING EMPLOYMENT AND
### RETENTION OF HOULIHAN LOKEY CAPITAL, INC.
### AS FINANCIAL ADVISOR AND INVESTMENT BANKER
### TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE

Specialty Retail Shops Holding Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") respectfully state as follows in support of this application (this "Application").

### **Relief Requested**

1.      The Debtors seek entry of an order, authorizing the Debtors (a) the employment and retention of Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as financial advisor and investment banker to the Debtors *nunc pro tunc* to January 16, 2019 (the "Petition Date"), to provide financial advisory and investment banking services during these chapter 11 cases, pursuant to and in accordance with the terms and conditions set forth in that certain engagement agreement,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

dated December 19, 2018 (the "Engagement Agreement"),[2] annexed as **Exhibit A** attached hereto,

(b) approving the provisions of the Engagement Agreement, including the proposed compensation

arrangement set forth therein, under section 328(a) of title 11 of the United States Code (the

"Bankruptcy Code"), (c) exempting Houlihan Lokey from the time-keeping requirements, and (d)

granting related relief.  In further support of this application, the Debtors rely on the Declaration

of Saul E. Burian (the "Burian Declaration"), which is being filed contemporaneously herewith.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Nebraska (the "Court") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5

of the United States District Court for the District of Nebraska.  The Debtors confirm their consent,

pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to

the entry of a final order by the Court in connection with this motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in

connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 327(a) and 328(a) of the

Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and rules 9013-1.C of the Nebraska Rules

of Bankruptcy Procedure (the "Local Rules").

## Background

5.      The Debtors are engaged in the sale of general merchandise including clothing,

accessories, electronics, and home furnishings, as well as company operated pharmacy and optical

---

[2]    Capitalized terms used but not otherwise defined herein, shall have the meanings ascribed to such terms in the
Engagement Agreement.

services departments.  The Debtors are headquartered in Green Bay, Wisconsin, and operate approximately 370 stores in 26 states throughout the United States, as well as e-commerce operations.  The Debtors and their non-Debtor subsidiaries generated approximately $2.7 billion in revenue in fiscal year 2017 and currently employ approximately 14,000 people throughout the United States.

6.      On January 16, 2019 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 25].  No party has requested the appointment of a trustee or examiner in these chapter 11 cases.  On January 18, 2019, the United States Trustee for the District of Nebraska (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 95].

7.      A description of the Debtors' businesses is more fully set forth in the *Declaration of Russell L. Steinhorst, Chief Executive Officer of Specialty Retail Shops Holding Corp., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.

**Houlihan Lokey's Qualifications**

8.      The Debtors have determined, in the exercise of their business judgment, that the size of their business operations and the complexity of their financial difficulties require them to employ an investment banker and financial advisor with knowledge of the Debtors' industry and businesses, experience with the chapter 11 process, and ability to advise them with respect to their global restructuring.  The Debtors further believe that Houlihan Lokey is well-qualified to provide

3

its services to the Debtors in a cost-effective and efficient manner. Houlihan Lokey will coordinate with the other retained professionals in these chapter 11 cases to eliminate unnecessary duplication of work. Retaining such an advisor will enable the Debtors to carry out their duties in the chapter 11 cases and to assist in the reorganization of the estate.

9.      Houlihan Lokey is well-suited to provide the services that the Debtors require. Houlihan Lokey is an internationally recognized investment banking and financial advisory firm with 26 offices worldwide and approximately 1,200 employees. Houlihan Lokey provides corporate finance and financial advisory services, as well as execution capabilities, in a variety of areas, including financial restructuring. In 2017, Houlihan Lokey ranked as the No. 1 M&A advisor for U.S. transactions, according to Thomson Reuters. The firm is one of the leading providers of M&A fairness opinions and has the largest worldwide financial restructuring practice of any investment bank. Houlihan Lokey annually serves more than 1,000 clients ranging from closely held companies to Global 500 corporations.

10.      As more fully described in the Burian Declaration, Houlihan Lokey's Financial Restructuring Group, which has approximately 190 professionals, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties-in-interest involved in financially troubled companies based in a variety of industries and requiring complex financial restructurings, both in and outside of bankruptcy. Houlihan Lokey has been, and is, involved in a number of large restructuring cases in the United States, including representing debtors recently in: *In re Seadrill Limited,* No. 17-60079 (DRJ) (Bankr. S.D. Tex. Oct. 31, 2017); *In re Angelica Corp.,* Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. May 9, 2017); *In re Roust Corp*, No. 16-23786 (RDD) (Bankr. S.D.N.Y Apr. 3, 2017); *In re American Apparel, LLC,* No. 16-12551 (BLS) (Bankr. D. Del. Dec. 8, 2016); *In re SandRidge Energy, Inc.,* No. 16-

4

32488 (DRJ) (Bankr. S.D. Tex. July 1, 2016); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. May 6, 2016); *In re Relativity Fashion, LLC*, No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 1, 2016); *In re Cubic Energy, Inc.*, No. 15-12500 (CSS) (Bankr. D. Del. Jan. 12, 2016); *In re Forest Park Medical Center at Frisco, LLC*, No. 14-41684 (BTR) (Bankr. S.D. Tex. Sept. 22, 2015); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Apr. 27, 2015); *In re BPZ Res., Inc.*, No. 15-60016 (DRJ) (Bankr. S.D. Tex. Mar. 9, 2015); *In re ALCO Stores, Inc.* No. 14-34941 (SGK) (Bankr. N.D. Tex. Nov. 14, 2014); *In re MSR Hotels & Resorts Inc.*, No. 13-11512 (SHL) (Bankr. S.D.N.Y. Mar. 4, 2014); *In re Erickson Retirement Communities, LLC,* No. 09-37010 (SGJ) (Bankr. N.D. Tex. Nov. 24, 2009); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 22, 2008.  In addition, Houlihan Lokey has been involved in restructuring situations representing official creditors' committees including recent retentions in:  *In re Sears Holdings Corporation,* No. 18-23538 (RDD) (Bankr. S.D.N.Y. Dec. 18, 2018); *In re Nine West Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. June 18, 2018), *In re Emerald Oil Inc.*, No. 16-10704 (KG) (Bankr. D. Del. Jun. 1, 2016); *In re Walter Energy Inc.,* No. 15-02741-TOM11 (Bankr. S.D. Alabama. Jan. 11, 2016); *In re Radioshack Corporation,* No. 15-10197 (BLS) (Bankr. D. Del. Mar. 18, 2015); *In re Caesar's Entertainment Operating Company, Inc.,* No. 15-01145 (ABG) (Bankr. N.D. IL Mar. 11, 2015); *In re Breitburn Energy Partners LP*, No. 16-11390 (SMB) (Bankr. S.D.N.Y Jun. 24, 2016); *In re Patriot Coal Corporation, No. 12-12900* (Bankr. S.D.N.Y. Dec. 18, 2012); *In re Overseas Shipping Grp., Inc.*, No. 12-20000 (PJW) (Bankr. D. Del. Nov. 14, 2012); and *In re Arcapita Bank B.S.C.*, No. 12-11076 (SHL) (Bankr. S.D.N.Y. Mar. 19, 2012).

11.    In addition to those situations identified above, Houlihan Lokey's Financial Restructuring Group has also been involved in the publicly announced restructurings or chapter 11

reorganizations of multiple retail situations including: *Sears Holdings Corporation*, *Nine West Holdings, Inc.*, *Toys "R" Us, Inc.*, *Claire's Stores, Inc.*, *Payless Inc.*, *Sports Authority, Inc.*, *Quiksilver, Inc.*, *Gander Mountain Company, Inc.*, *Performance Sports Group, Ltd.*, *American Apparel, Inc.*, *and The Wet Seal, Inc.*, among others.

12.     The Debtors have selected Houlihan Lokey as their investment banker and financial advisor based upon, among other things, (a) the Debtors' need to retain an investment banking and financial advisory firm to provide advice with respect to the restructuring, and (b) Houlihan Lokey's extensive experience and excellent reputation in providing investment banking and financial advisory services in complex chapter 11 cases.

### Houlihan Lokey's Prepetition Services

13.     The Debtors originally engaged Houlihan Lokey on May 17, 2017 to pursue M&A transactions, financing transactions, and/or a restructuring of the Debtors' master lease agreement with Spirit Realty Capital, Inc. ("Spirit"). That process culminated in a junior secured financing extended to the Debtors by Spirit, as well as negotiated modifications to the relevant master lease. The Debtors re-engaged Houlihan Lokey on August 1, 2018 to provide financial advisory and investment banking services in connection with one or more potential sale or merger (including Pharmacy) \or other transactions involving the Debtors, one or more potential financing transactions for the Company, and/or with respect to such other financial matters as to which the Debtors and Houlihan Lokey may agree in writing. The Houlihan Lokey engagement letter was subsequently amended as of December 19, 2018.

14.     In rendering prepetition services to the Debtors in connection with these matters, Houlihan Lokey has worked closely with the Debtors' management and other retained professionals and has become well-acquainted with the Debtors' business operations and capital structure. Accordingly, Houlihan Lokey has developed significant expertise regarding the Debtors

that will assist it in providing effective and efficient services during these chapter 11 cases. Should the Court approve the Debtors' retention of Houlihan Lokey as investment bankers, Houlihan Lokey will continue, without interruption, to perform the services for the Debtors as described herein.

### Services To Be Provided[3]

15.    As more fully described in the Engagement Agreement, the services being provided by Houlihan Lokey prior to and during these chapter 11 cases include the following:

(a)    assisting the Debtors in the development and distribution of selected information, documents and other materials, including, if appropriate, advising the Company in the preparation of offering memoranda;

(b)    assisting the Debtors in establishing and maintaining a data room (or similar process) and generally assisting potential lenders, equity investors, acquirers, creditors and/or strategic partners with their due diligence investigation of the Company

(c)    assisting the Debtors in evaluating indications of interest and proposals regarding any Transaction(s) from current and/or potential lenders, equity investors, acquirers, creditors and/or strategic partners;

(d)    assisting in the collection of confidentiality agreements between the Debtors and potential lenders, equity investors, acquirers, creditors and/or strategic partners;

(e)    assisting the Debtors with the negotiation of any Transaction(s), including participating in negotiations with lenders, investors, acquirers, strategic partners, creditors, landlords, and other parties involved in any Transaction(s);

(f)    providing expert advice and testimony regarding financial matters related to any Transaction(s), if necessary;

---

[3]    This summary is included for ease of reference only and shall not limit, modify, or amend the Engagement Agreement, which, in the event of any inconsistency, shall govern.

(g)     attending meetings of each Debtors' Board of Directors, creditor groups, official constituencies and other interested parties, as the Debtors and Houlihan Lokey mutually agree; and

(h)     providing such other financial advisory and investment banking services as may be required by additional issues and developments not anticipated on the Effective Date as may be agreed upon between the Debtors and Houlihan Lokey.

16.     It is necessary for the reorganization efforts of the Debtors that the Debtors employ Houlihan Lokey to render the foregoing professional services.  The Debtors believe that the services will not duplicate the services that other professionals will be providing the Debtors in these cases.  Specifically, Houlihan Lokey will carry out unique functions and will use reasonable efforts to coordinate with the Debtors and other professionals retained in these cases to avoid the unnecessary duplication of services.

## Professional Compensation

17.     Prior to the commencement of these chapter 11 cases and under the terms of the Engagement Agreement, the Debtors paid Houlihan Lokey fees of $2,065,242.71 for services rendered, and reasonable out-of-pocket expenses related thereto of $28,712.90. In addition, in relation to the May 2017 engagement letter, Houlihan Lokey was paid $1,000,000.00 in fees for services rendered and $55,025.66 in out-of-pocket expenses. As more fully described in the Engagement Agreement, in consideration of the services provided by Houlihan Lokey, the Debtors have agreed to pay Houlihan Lokey during these chapter 11 cases:

(a)     ***Monthly Fees.*** During the Term, in addition to the other fees provided for herein, upon the date of execution of this Agreement, and on every monthly anniversary of the Effective Date thereafter, up to the earlier of (i) the Company requests that Houlihan Lokey begin preparation for a Comprehensive Transaction or (ii) the Company formally begins pursuing a Comprehensive Transaction, the Company shall pay Houlihan Lokey, without required notice or invoice, a nonrefundable cash fee of $50,000 ("Monthly Work Fee"); provided that, the Monthly Work Fee shall only be payable if during the applicable preceding month Houlihan Lokey did any material work under this Agreement with respect to any Transaction. All of the Monthly Fees paid to Houlihan Lokey shall be credited against and reduce the next

Transaction Fee that is not a Pharmacy Transaction Fee related to a Pharmacy Transaction closed on or before February 14, 2019 (both as defined below) to which Houlihan Lokey becomes entitled hereunder (it being understood and agreed that no Monthly Fee shall be credited more than once), except that, in no event, shall such Transaction Fee be reduced below zero (provided that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Monthly Fee Credit"). From and after the first monthly anniversary of the Effective Date following the date that the Company requests that Houlihan Lokey begin  preparation for any Comprehensive Transaction, and on every monthly anniversary after such date, during the Term, the Company shall pay Houlihan Lokey, without required notice or invoice, a nonrefundable cash fee of $100,000 (each being a "Comprehensive Transaction Monthly Fee"); provided, however, that from and after the date that the Company actually formally begins pursuing a Comprehensive Transaction, such monthly fee shall be increased to $150,000 per month (each being a "Comprehensive Transaction Implementation Monthly Fee", and each Monthly Work Fee, Comprehensive Transaction Monthly Fee, and Comprehensive Transaction Implementation Monthly Fee being a "Monthly Fee"). Each Monthly Fee shall be earned upon Houlihan Lokey's receipt thereof in consideration of Houlihan Lokey accepting this engagement and performing services in accordance with the terms herein.

(b)    ***Transaction Fee(s).*** In addition to the other fees provided for herein, upon the consummation of each applicable Transaction (as defined in the Engagement Agreement) during the term of this Agreement (or in certain circumstances following the expiration or termination of this Agreement as provided herein), the Company shall pay Houlihan Lokey (subject to the terms of Sections 6 and 7 of the Engagement Agreement) in accordance with the following:

    i.    ***Majority Transaction Fee.*** Upon the consummation of a Majority Transaction (as defined below), the Company shall pay to Houlihan Lokey a cash fee ("Majority Transaction Fee") equal to the greater of (a) $5,000,000 and (b) the sum of (x) 0.95% of AGC (as defined below) of the relevant Transaction(s) that is not paid to or retained by equity holders of the Company, and (y) 5.00% of any portion of AGC of the relevant Transaction(s) that is paid to or retained by equity holders of the Company, each subject to, and reduced by, any applicable Fee Credit(s) (as defined below).

    For purposes hereof, a "Majority Transaction" shall mean (a) any Sale Transaction that, together with all other Sale Transactions involving a sale of assets, equity securities and/or operations of the Company and, after taking into account any strategic liquidations of a business line or a material group of stores in a single transaction or a series of related transactions, which have been completed or are in process at the time of the relevant Sale Transaction, constitute a majority of the assets, equity securities and/or operations of the Company, as determined in good faith by Houlihan Lokey and the Company and/or (b) a Financing Transaction or a Sale Transaction that, together with all other Sale Transactions and/or Financing

Transactions, after taking into account any strategic liquidations of a business line or a material group of stores in a single transaction or a series of related transactions, which have been completed or are in process at the time of the relevant Sale Transaction and/or Financing Transaction, results in any person or group of related persons (other than Sun Capital Partners, Inc. and/or any of its affiliates) in the aggregate acquiring, directly or indirectly, securities entitled to a majority of the equity value of the Company as of such time, securities convertible into securities entitled to a majority of the equity value of the Company as of such time, and/or sufficient power under normal circumstances to control the business and affairs of the Company whether by ownership by control of securities or by contract.

ii. ***Minority Sale Transaction Fee.*** Upon the consummation of a Sale Transaction that does not constitute a Majority Transaction or Pharmacy Transaction (any such Sale Transaction, "Minority Sale Transaction"), the Company shall pay Houlihan Lokey a cash fee ("Minority Sale Transaction Fee") equal to:

    *(a)* If AGC of the relevant Sale Transaction is less than $30,000,000: 0.95% of AGC of the relevant Sale Transaction;

    *(b)* If AGC of the relevant Sale Transaction is at least $30,000,000 but less than $50,000,000: $750,000;

    *(c)* If AGC of the relevant Sale Transaction is at least $50,000,000 but less than $100,000,000: $1,000,000;

    *(d)* If AGC of the relevant Sale Transaction is at least $100,000,000 but less than $200,000,000: $1,800,000; or

    *(e)* If AGC of the relevant Sale Transaction is at least $200,000,000 but less than $300,000,000: $3,000,000,

in each case, subject to, and reduced by, any applicable Fee Credit(s);

If one or more Minority Sale Transactions are consummated prior to the consummation of a Majority Transaction, then 90% of the aggregate amount of Minority Sale Transactions Fees paid to Houlihan Lokey shall be credited against and reduce any Majority Transaction Fee to which Houlihan Lokey becomes entitled hereunder (it being understood and agreed that any Minority Sale Transaction Fee may only be credited once ("Minority Sale Transaction Fee Credit").

iii. ***Financing Transaction Fee.*** Upon the closing of a Financing Transaction that does not constitute a Majority Transaction, (x) the Company shall pay Houlihan Lokey a reasonable and customary fee in light of the circumstances to be agreed upon in good faith by the Company and Houlihan Lokey ("Financing Transaction Fee") and (y) the Company and Houlihan Lokey shall agree upon the amount (if any) of such Financing

Transaction Fee which will be credited against and reduce any Majority Transaction Fee to which Houlihan Lokey becomes entitled hereunder thereafter (it being understood and agreed that such amount may only be credited once), except that, in no event, shall such Majority Transaction Fee be reduced below zero (provided that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Financing Transaction Fee Credit").  The Financing Transaction Fee(s) will be payable in respect of any Financing Transaction whether or not arranged by Houlihan Lokey, by another agent or directly by the Company (or such other issuer of the Securities in such Financing Transaction) or any of its affiliates, and shall be in addition to any other fees that the Company (or such other issuer of the Securities in the Financing Transaction) may be required to pay to any investor or other purchaser of Securities to secure its financing commitment. It is understood and agreed that if the proceeds from any such Financing Transaction are to be funded in more than one stage, Houlihan Lokey shall be entitled to its applicable compensation hereunder upon the closing date of each such stage.

iv.  ***Comprehensive Transaction Financing Fee.*** Notwithstanding Section 3(ii)(c) of the Engagement Agreement, upon the closing of a Comprehensive Transaction Financing (as defined below), Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such financing, as a cost of such financing, a cash fee ("Comprehensive Transaction Financing Fee") equal to the sum of either (I) $500,000 in the event that such financing is provided by the Company's then existing lenders and/or Spirit Realty Capital and/or their respective affiliates ("Spirit"), or (II) $1,000,000 in the event that such financing is provided by other third parties.

v.  ***Spirit Transaction Fee.*** Notwithstanding the foregoing, (x) in the event that the Company consummates a Spirit Transaction (as defined below) and such transaction on its own does not constitute a Majority Transaction or a Minority Sale Transaction, then the Company shall pay Houlihan Lokey a cash fee of $500,000 (the "Spirit Transaction Fee"), subject to any applicable Fee Credit(s).  If a Spirit Transaction Fee is paid prior to the consummation of a Majority Transaction, Minority Sale Transaction, or Comprehensive Transaction, then fifty percent (50%) of the aggregate amount of the Spirit Transaction Fee shall be credited against and reduce the applicable Majority Transaction Fee, Minority Sale Transaction Fee, or Comprehensive Transaction Fee to which Houlihan Lokey becomes entitled hereunder with respect thereto (it being understood and agreed that the Spirit Transaction Fee shall not be credited more than once), except that, in no event, shall such Majority Transaction Fee, Minority Sale Transaction Fee, or Comprehensive Transaction Fee be reduced below zero (provided that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Spirit Transaction Fee Credit").

11

*vi.* ***Pharmacy Transaction Fee.*** Upon the closing of each Pharmacy Transaction, except any Pharmacy Transaction involving the sale by the Company of any pharmacy assets to the Independent Pharmacy Cooperative and/or any of its members ("IPC"), the Company shall pay Houlihan Lokey a cash fee ("Pharmacy Transaction Fee") equal to:

*(a)* If AGC of the relevant Pharmacy Transaction is less than $260,000,000: 1.5% of the AGC of the relevant Sale Transaction; or

*(b)* If AGC of the relevant Pharmacy Transaction is at least $260,000,000: 1.5% of the AGC of the Relevant Pharmacy Transactions that is less than or equal to $260,000,000, plus 5% of the AGC that is in excess of $260,000,000.

in each case the applicable AGC shall be subject to normalized working capital adjustments, and in each case, subject to, and reduced by, any applicable Fee Credit(s).

*vii.* ***Comprehensive Transaction Fee.*** In a Comprehensive Transaction (as defined below), upon the earlier to occur of the substantial consummation or confirmation of such Comprehensive Transaction, Houlihan Lokey shall earn, and the Company shall promptly pay to Houlihan Lokey, a cash fee ("Comprehensive Transaction Fee") of $5,000,000. For the avoidance of doubt, in the event that a Comprehensive Transaction Fee is earned and paid, no Majority Transaction Fee, Minority Sale Transaction Fee, Spirit Transaction Fee, Financing Transaction Fee or Pharmacy Transaction Fee shall be thereafter earned or paid but all other applicable fees hereunder shall remain payable as provided in this Agreement.

Any Majority Transaction Fee, Minority Sale Transaction Fee, Financing Transaction Fee, Comprehensive Transaction Financing Fee, Spirit Transaction Fee, Pharmacy Transaction Fee, and/or Comprehensive Transaction Fee are each referred to herein as a "Transaction Fee" and are collectively referred to herein as "Transaction Fees". Any Monthly Work Fee Credit, Minority Sale Transaction Fee Credit, Financing Transaction Fee Credit and/or Spirit Fee Credit is each referred to herein as a "Fee Credit" and are collectively referred to herein as "Fee Credits."

For the avoidance of doubt, notwithstanding anything contained herein, (A) in no event shall Houlihan Lokey be entitled to more than one Majority Transaction Fee and (B) the total Transaction Fees payable to Houlihan Lokey hereunder (other than any fees calculated and payable in accordance with clause (y) of Section 3(ii)(a) of the Engagement Agreement, Section 3(ii)(d), and/or Section 3(ii)(f) of the Engagement Agreement which shall not be limited by this clause (B)) shall not exceed $8,000,000 in the aggregate. All payments received by Houlihan Lokey pursuant to this Agreement at any time shall become the property of Houlihan Lokey without restriction. No payments received by Houlihan

Lokey pursuant to this Agreement will be voluntarily put by the Company into a trust or other segregated account.

18.     In addition to all of the other fees and expenses described in the Engagement Agreement, and regardless of whether any Transaction is consummated, the Company shall, upon Houlihan Lokey's request, reimburse Houlihan Lokey for its reasonable out-of-pocket expenses incurred from time to time in connection with its services under the Engagement Agreement. Houlihan Lokey bills its clients for its reasonable out-of-pocket expenses including, travel-related and certain other expenses, without regard to volume-based or similar credits or rebates Houlihan Lokey may receive from, or fixed-fee arrangements made with, travel agents, airlines or other vendors.  Houlihan Lokey shall, in addition, be reimbursed by the Company for the fees and expenses of Houlihan Lokey's legal counsel incurred in connection with the negotiation and performance of the Engagement Agreement and the matters contemplated hereby.

19.     The Debtors believe that the compensation structure described above is (a) comparable to compensation generally charged by investment banking firms of similar stature to Houlihan Lokey for comparable engagements, both in and out of bankruptcy proceedings, and (b) reflects a typical fee structure for Houlihan Lokey and other leading investment banking firms which do not bill their clients on an hourly basis, but are generally compensated on a transactional basis.

20.     The hours worked, the results achieved and the ultimate benefit to the Debtors of the work performed by Houlihan Lokey in connection with this engagement may vary and the Debtors have taken this into account in setting the above fees.

21.     Houlihan Lokey's restructuring expertise, as well as its capital markets knowledge, financing skills, knowledge and experience within the Debtors' industry and mergers and acquisitions capabilities, some or all of which may be required by the Debtors during the term of

13

Houlihan Lokey's engagement hereunder, were important factors to the Debtors in determining the amount of Houlihan Lokey's fees, and the Debtors believe that the ultimate benefit to the Debtors of Houlihan Lokey's services hereunder cannot be measured merely by reference to the number of hours to be expended by Houlihan Lokey's professionals in the performance of such services.

22.     The Debtors propose that all compensation and expenses will be sought in accordance with 328(a) of the Bankruptcy Code and will not be subject to the standard of review in section 330 of the Bankruptcy Code.

**Modification Of Compliance With Requirements Regarding Time Entry Detail**

23.     Consistent with its ordinary practice and the practice of investment bankers and financial advisors in other chapter 11 cases whose fee arrangements are typically not hours-based, Houlihan Lokey does not ordinarily maintain contemporaneous time records (similar to those customarily kept by attorneys and required by the *General Order in the Matter of Procedures for Complex Chapter 11 Cases* (the "Uniform Complex Rules")) or provide or conform to a schedule of hourly rates for its professionals.  Accordingly, Houlihan Lokey requests that it be excused from such timekeeping and information requirements.  In cases in other jurisdictions, Houlihan Lokey has been exempt from such timekeeping requirements.  Courts in other large chapter 11 cases, including in the 8th Circuit, have excused flat-fee professionals from time-keeping requirements under similar circumstances.  *See e.g., In re Heritage Home Group, LLC*, No. 18-11736 (KG) (Bankr. D. Del. Aug. 24, 2018) (authorizing an investment banker's request to modify certain time keeping requirements); *In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (same); *In re SandRidge Energy, Inc.,* No. 16-32488 (DRJ) (Bankr. S.D. Tex. Jul. 1, 2016) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. May 6, 2016) (same);

14

*In re Peabody Energy Corp.*, Case No. 16-42529-399 (Bankr. E.D. Mo. May 18, 2016) (waiving the time-keeping requirements for an investment banker).  Houlihan Lokey will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in this case.

### Houlihan Lokey's Disinterestedness

24.     To the best of the Debtors' knowledge, (a) Houlihan Lokey is a "disinterested person," as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and, as required by section 327(a) and referenced by section 328(c) of the Bankruptcy Code, neither holds nor represents any interest adverse to the Debtors and their estates and (b) except as disclosed in the Burian Declaration, has no connection to the Debtors or to their significant creditors or certain other potential parties-in-interest ("Parties-In-Interest") whose names were supplied to Houlihan Lokey by the Debtors.[4]

25.     Also, to the best of the Debtors' knowledge, information and belief, and based entirely and in reliance upon the Burian Declaration: (a) to the best of Mr. Burian's knowledge, information and belief, none of Houlihan Lokey's past or current engagements would or does appear to create an interest materially adverse to the interests of the Debtors, creditors, or equity security holders in these cases and, as such the Debtors believe that Houlihan Lokey is disinterested and holds no materially adverse interest as to the matters upon which they are to be retained; and (b) to the extent Houlihan Lokey discovers any facts bearing on the matters described herein during

---

[4]     The list of Parties-In-Interest supplied to Houlihan Lokey by the Debtors is attached as **Annex 2** to the Burian Declaration.  To the extent that Houlihan Lokey's research of relationships with these Parties-In-Interest indicated that Houlihan Lokey has provided in the recent past or is currently providing services to any of these entities in matters unrelated to these chapter 11 cases, Houlihan Lokey has so indicated in **Annex 3** to the Burian Declaration.

the period of Houlihan Lokey's retention, they will supplement the information contained in the Burian Declaration.

26.    As described in more detail in the Burian Declaration, Houlihan Lokey, among other things, searched its client databases to determine whether it represents, or has represented, certain of the Debtors' creditors or other Parties-In-Interest in these proceedings, and/or matters wholly unrelated to those proceedings.  Due to the size of Houlihan Lokey and the number of creditors and other parties in interest involved in these cases, however, Houlihan Lokey may have represented certain of the Debtors' creditors or other Parties-In-Interest in matters wholly unrelated to the chapter 11 cases. Except as may be described in the Burian Declaration, Houlihan Lokey does not, to its knowledge, represent any party with an interest materially adverse to the Debtors or their estates.

27.    Also, in accordance with section 504 of the Bankruptcy Code, Houlihan Lokey has informed the Debtors that there is no agreement or understanding between Houlihan Lokey and any other entity, other than an employee of Houlihan Lokey, for the sharing of compensation received or to be received for services rendered in connection with these chapter 11 cases

## Indemnification of Houlihan Lokey

28.    Pursuant to the Engagement Agreement, the Debtors have agreed (a) to indemnify and hold harmless Houlihan Lokey and its affiliates and their respective past, present, and future directors, officers, partners, members, employees, agents, representatives, advisors, subcontractors, and controlling persons (collectively, the "Indemnified Parties") to the fullest extent lawful, from and against any and all losses, claims, damages, or liabilities (or actions in respect thereof), joint or several, arising out of or related to Houlihan Lokey's engagement under, or any matter referred to in, the Engagement Agreement and (b) to reimburse each Indemnified Party for all expenses (including, without limitation, the fees and expenses of counsel) as they are

incurred in connection with investigating, preparing, pursuing, defending, settling, compromising

or otherwise becoming involved in any action, suit, dispute, inquiry, investigation, or proceeding,

pending or threatened, brought by or against any person or entity (including, without limitation,

any shareholder or derivative action), arising out of or related to such engagement or matter.

29.    However, notwithstanding anything to the contrary in the Engagement Agreement

or any agreements incorporated by reference in the Engagement Agreement, the Debtors further

agree to the following:

a.    Subject to the provisions of subparagraphs (b) and (c) below, the Debtors are authorized to indemnify, and shall indemnify, Houlihan Lokey and the other Indemnified Parties for any claims arising out of or related to Houlihan Lokey's engagement under, or any matter referred to in, the Engagement Agreement and/or the services to be provided by Houlihan Lokey as specified in this Application, but not for any claim arising from, related to, or in connection with Houlihan Lokey's post-petition performance of any other services other than those in connection with the engagement, unless such post-petition services and indemnification therefor are approved by this Court;

b.    the Debtors shall have no obligation to indemnify Houlihan Lokey for any claim or expense that is either (i) judicially determined (the determination having become final) to have resulted primarily from Houlihan Lokey's actual fraud, gross negligence, bad faith, breach of fiduciary duty (if any), self dealing, or willful misconduct, or (ii) settled prior to a judicial determination as to Houlihan Lokey's actual fraud, gross negligence, bad faith, breach of fiduciary duty (if any), self dealing, or willful misconduct, but determined by this Court, after notice and a hearing pursuant to subparagraph (c) infra, to be a claim or expense for which Houlihan Lokey is not entitled to receive indemnity under the terms of this Application; and

c.    if, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these chapter 11 cases, Houlihan Lokey believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, reimbursement, and contribution obligations under the Engagement Agreement or this application, including, without limitation, the advancement of defense costs, Houlihan Lokey must file an application in this Court, and the Debtors may not pay any such amounts to Houlihan Lokey before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which the Court shall have

jurisdiction over any request for fees and expenses by Houlihan Lokey for indemnification, and not as a provision limiting the duration of the Debtors' obligation to indemnify or provide contribution or reimbursement to Houlihan Lokey.

30.     The Debtors and Houlihan Lokey believe that these provisions of the Engagement Agreement, are customary and reasonable for financial advisory and investment banking engagements, both in- and out-of-court, and reflect the qualifications and limitations on indemnification provisions that are customary in this district and other jurisdictions.   Similar indemnification arrangements have been approved and implemented in other large chapter 11 cases by courts in this District and other jurisdictions.  *See, e.g.*, *In re Gordmans Stores, Inc.*, No. 17-80304 (TLS) (Bankr. D. Neb. Mar., 13, 2017) (approving similar indeminifcation agreements); *In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (same); *In re Arch Coal, Inc.*, No. 16-40120 (Bankr. E.D. Mo. Mar. 23, 2016) (same); *In re Noranda Aluminum, Inc.*, No. 16-10083 (Bankr. E.D. Mo. Mar. 18, 2016) (same); *In re Southcross Holdings, LP*, No. 16-20111 (Bankr. S.D. Tex. May 6, 2016) (same).

## No Duplication of Services

31.     The Debtors believe that the services provided by Houlihan Lokey will not duplicate the services that other professionals will be providing to the Debtors in these chapter 11 cases.  The Debtors will coordinate with Houlihan Lokey and the Debtors' other professionals to minimize unnecessary duplication of efforts among the Debtors' professionals.

## Retention Pursuant To Bankruptcy Code Section 328(a)

32.     The Debtors are seeking to retain Houlihan Lokey pursuant to section 328(a) of the Bankruptcy Code.   Section 328(a) provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis,

on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Thus, section 328(a) of the Bankruptcy Code permits this Court to approve the terms of Houlihan Lokey's engagement as set forth in the Engagement Agreement.

33.     The Debtors submit that the fee structure, expense reimbursements, and indemnification provisions are reasonable terms and conditions of employment under Bankruptcy Code section 328(a) in light of the following:  (a) the nature and scope of services to be provided by Houlihan Lokey; (b) industry practice with respect to the fee structures and indemnification provisions typically utilized by leading investment banks and investment bankers that do not bill their clients on an hourly basis; (c) market rates charged for comparable services both in and out of the chapter 11 context; (d) Houlihan Lokey's substantial experience with respect to financial restructuring and investment banking; and (e) the extensive nature and scope of work already performed by Houlihan Lokey prior to the Petition Date.

34.     The terms of the Engagement Agreement were negotiated in good faith and at arm's-length between the Debtors and Houlihan Lokey and reflect the Debtors' evaluation of the extensive work that has been and will be performed by Houlihan Lokey and its financial advisory expertise.  The Debtors acknowledge and agree that the fee structure was agreed upon by the parties in anticipation of a substantial professional commitment of time and effort by Houlihan Lokey and its professional staff under the Engagement Agreement, and in light of the fact that such commitment may foreclose other opportunities for Houlihan Lokey and its professional staff and that the actual time and commitment required of Houlihan Lokey and its professional staff to perform the services under the Engagement Agreement may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

35.      Furthermore, the fee structure is consistent with and typical of compensation arrangements entered into by Houlihan Lokey and other comparable firms in connection with the rendering of similar services under similar circumstances.  Houlihan Lokey's dedicated Financial Restructuring retail industry group, strategic and financial expertise as well as its capital markets knowledge, financing skills, restructuring capabilities, and mergers and acquisitions expertise, some or all of which may be required by the Debtors during the term of Houlihan Lokey's engagement, were all important factors in determining the fee structure.  The Debtors believe that the ultimate benefit of Houlihan Lokey's services cannot be measured by reference to the number of hours to be expended by Houlihan Lokey's professionals in the performance of such services. Accordingly, the Debtors submit that the fee structure is both fair and reasonable under the standards set forth in Bankruptcy Code section 328(a).

36.      The Debtors propose that, notwithstanding Houlihan Lokey's retention under section 328(a), the United States Trustee will retain the right to object to the compensation to be paid to Houlihan Lokey pursuant to the Engagement Agreement based on the reasonableness standard provided for in Bankruptcy Code section 330, *provided* that reasonableness for this purpose shall include, among other things, an evaluation by comparing the fees payable in this case to the fees paid to other investment banking firms for comparable services in other chapter 11 cases and outside of chapter 11 cases, and shall not be evaluated primarily on the basis of time committed or the length of these cases.

37.      As set forth above, notwithstanding approval of the Engagement Agreement under Bankruptcy Code section 328(a), Houlihan Lokey intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these cases, subject to the Court's approval and in compliance with applicable provisions of the

Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable procedures and orders of the Court and consistent with the fee structure set forth in the Engagement Agreement.

**Retention Pursuant toBankruptcy Code Section 327(a) and Bankruptcy Rule 2014**

38.     Section 327(a) of the Bankruptcy Code provides that a debtor, subject to court approval:

> May employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor]'s duties under this title.

39.     Bankruptcy Rule 2014 requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

40.     For the reasons stated previously, the Debtors submit that Houlihan Lokey's employment is necessary and in the best interests of the Debtors and their estates.  Additionally, as described in the Burian Declaration, Houlihan Lokey is disinterested.  Accordingly, the Debtors submit that Court approval of Houlihan Lokey as the financial advisor and investment banker in these chapter 11 cases pursuant to section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014.

**_Nunc Pro Tunc_ Relief is Appropriate**

41.     Pursuant to the Debtors' request, Houlihan Lokey has acted as the Debtors' financial advisor and investment banker since the Petition Date.  Moreover, Houlihan Lokey

performed prepetition services with assurances that the Debtors would seek approval of its employment and retention effective *nunc pro tunc* to the Petition Date so that Houlihan Lokey may be compensated for its pre-application financial advisory and investment banking services. The Debtors believe that no party in interest will be prejudiced by granting Houlihan Lokey's *nunc pro tunc* employment, because Houlihan Lokey has provided, and continues to provide, valuable services to the Debtors' estates.

42.    Courts in this district and other jurisdications have routinely approved *nunc pro tunc* employment similar to that requested herein. *See, e.g.*, *In re Gordmans Stores, Inc.*, No. 17-80304 (TLS) (Bankr. D. Neb. Mar., 13, 2017) (approving retention of Duff & Phelps Securities, LLC, as financial advisor and investment banker *nunc pro tunc* to the petition date); *see also In re Payless Holdings, LLC*, No. 17-42267 (KSS) (Bankr. E.D. Mo. May 9, 2017) (approving retention of Guggeneim Partners, as financial advisor and investment banker *nunc pro tunc* to the petition date); *In re Arch Coal, Inc.*, No. 16-40120 (Bankr. E.D. Mo. Feb. 24, 2016) (approving retention of FTI Consulting, Inc., as financial advisor *nunc pro tunc* to the petition date); *In re Noranda Aluminum, Inc.*, No. 16-10083 (Bankr. E.D. Mo. Feb. 8, 2016) (approving retention of Prime Clerk, LLC, as notice and claims agent *nunc pro tunc* to the petition date); *In re Appleseed's Intermediate Holdings, LLC*, No. 11-10160 (KG) (Bankr. D. Del. Feb. 18, 2011) (approving retention of Alvarez & Marsal North America, LLC as restructuring consultant *nunc pro tunc* to the Petition Date).

43.    Based on the foregoing, the Debtors submit that the requirements of the Bankruptcy Code and the Bankruptcy Rules have been satisfied. Accordingly, the Debtors respectfully request entry of an order pursuant to section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014

approving the Debtors' application to retain and employ Houlihan Lokey to act as the Financial Advisor and investment banker, effective *nunc pro tunc* to the Petition Date.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

44.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

45.     The Debtors have provided notice of this Motion to the following parties or their respective counsel: (a) the office of the U.S. Trustee for the District of Nebraska; (b) counsel to the Committee; (c) the agents under the Debtors' prepetition asset based facility; (d) the agents under the proposed DIP Facility; (e) the agents under the Debtors' prepetition term loan facility; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the District of Nebraska; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

46.     No prior request for the relief sought in this Application has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: January 21, 2019

Russell L. Steinhorst
Chief Executive Officer
Specialty Retail Shops Holding Corp.

## **Exhibit A**

**Engagement Agreement**



# HOULIHAN LOKEY

*__Personal and Confidential__*

As of December 19, 2018

Specialty Retail Shops Holding Corp.
700 Pilgrim Way
Green Bay, WI 54304
Attn: Mr. Russell Steinhorst, Chief Executive Officer

Dear Mr. Steinhorst:

This amended letter agreement (this "Amended Agreement") confirms the terms under which Specialty Retail Shops Holding Corp. (collectively with its direct and indirect subsidiaries, the "Company") has engaged Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), effective as of the date indicated above (the "Effective Date"), as its financial advisor to provide financial advisory and investment banking services in connection with one or more potential merger and/or acquisition or other transactions involving the Company, one or more potential financing transactions for the Company, and/or with respect to such other financial matters as to which the Company and Houlihan Lokey may agree in writing during the term of this Amended Agreement. This Amended Agreement replaces and supersedes in all respects the original Agreement executed August 1, 2018.

1.    **Services**. In connection with each potential Transaction (as defined below), Houlihan Lokey will assist and advise the Company with the analysis, evaluation, pursuit and effectuation of any such Transaction. Houlihan Lokey's services will consist of, if applicable and if requested by the Company, (i) assisting the Company in the development and distribution of selected information, documents and other materials, including, if appropriate, assisting the Company in the preparation of offering memoranda, management presentations, and other customary marketing materials describing the Company (it being expressly understood that the Company will remain solely responsible for the content of such documents); (ii) assisting the Company in establishing and maintaining a data room (or similar process) and generally assisting potential lenders, equity investors, acquirers, creditors and/or strategic partners with their due diligence investigation of the Company, (iii) assisting the Company in evaluating indications of interest and proposals regarding any Transaction(s) from current and/or potential lenders, equity investors, acquirers, creditors and/or strategic partners; (iv) assisting in the collection of confidentiality agreements between the Company and potential lenders, equity investors, acquirers, creditors and/or strategic partners; (v) assisting the Company with the negotiation of any Transaction(s), including participating in negotiations with lenders, investors, acquirers, strategic partners, creditors, landlords, and other parties involved in any Transaction(s); (vi) providing expert advice and testimony regarding financial matters related to any Transaction(s), if necessary; (vii) attending meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as the Company and Houlihan Lokey mutually agree; and/or (viii) providing such other financial advisory and investment banking services as may be required by additional issues and developments not anticipated on the Effective Date as may be agreed upon between the parties hereto.

Specialty Retail Shops Holding Corp.
Page 2

2.    **Exclusive Agency**. In the event the Company receives any inquiry from any party regarding a
Transaction during the term of this Agreement, the Company shall promptly inform Houlihan Lokey of
such inquiry so that Houlihan Lokey can assist the Company in evaluating such party and its interest in a
Transaction and in any resulting negotiations.

3.    **Fees.** In consideration of Houlihan Lokey's acceptance of this engagement, the Company shall
pay the following:

    (i) *Monthly Fees*: During the Term, in addition to the other fees provided for herein, upon the date
of execution of this Agreement, and on every monthly anniversary of the Effective Date
thereafter, up to the earlier of (i) the Company requests that Houlihan Lokey begin preparation
for a Comprehensive Transaction or (ii) the Company formally begins pursuing a
Comprehensive Transaction, the Company shall pay Houlihan Lokey, without required notice
or invoice, a nonrefundable cash fee of $50,000 ("Monthly Work Fee"); provided that, the
Monthly Work Fee shall only be payable if during the applicable preceding month Houlihan
Lokey did any material work under this Agreement with respect to any Transaction. All of the
Monthly Fees paid to Houlihan Lokey shall be credited against and reduce the next Transaction
Fee that is not a Pharmacy Transaction Fee related to a Pharmacy Transaction closed on or
before February 14, 2019 (both as defined below) to which Houlihan Lokey becomes entitled
hereunder (it being understood and agreed that no Monthly Fee shall be credited more than
once), except that, in no event, shall such Transaction Fee be reduced below zero (provided
that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Monthly
Fee Credit"). From and after the first monthly anniversary of the Effective Date following the
date that the Company requests that Houlihan Lokey begin preparation for any Comprehensive
Transaction, and on every monthly anniversary after such date, during the Term, the Company
shall pay Houlihan Lokey, without required notice or invoice, a nonrefundable cash fee of
$100,000 (each being a "Comprehensive Transaction Monthly Fee"); provided, however, that
from and after the date that the Company actually formally begins pursuing a Comprehensive
Transaction, such monthly fee shall be increased to $150,000 per month (each being a
"Comprehensive Transaction Implementation Monthly Fee", and each Monthly Work Fee,
Comprehensive Transaction Monthly Fee, and Comprehensive Transaction Implementation
Monthly Fee being a "Monthly Fee"). Each Monthly Fee shall be earned upon Houlihan
Lokey's receipt thereof in consideration of Houlihan Lokey accepting this engagement and
performing services in accordance with the terms herein.

    (ii) *Transaction Fee(s)*: In addition to the other fees provided for herein, upon the consummation
of each applicable Transaction (as defined below) during the term of this Agreement (or in
certain circumstances following the expiration or termination of this Agreement as provided
herein), the Company shall pay Houlihan Lokey (subject to the terms of Sections 6 and 7
hereof) in accordance with the following:

        a.    *Majority Transaction Fee.* Upon the consummation of a Majority Transaction (as defined
below), the Company shall pay to Houlihan Lokey a cash fee ("Majority Transaction Fee")
equal to the greater of (a) $5,000,000 and (b) the sum of (x) 0.95% of AGC (as defined
below) of the relevant Transaction(s) that is not paid to or retained by equity holders of the
Company, and (y) 5.00% of any portion of AGC of the relevant Transaction(s) that is paid
to or retained by equity holders of the Company, each subject to, and reduced by, any
applicable Fee Credit(s) (as defined below).

        For purposes hereof, a "Majority Transaction" shall mean (a) any Sale Transaction that,
together with all other Sale Transactions involving a sale of assets, equity securities and/or
operations of the Company and, after taking into account any strategic liquidations of a

Specialty Retail Shops Holding Corp.
Page 3

business line or a material group of stores in a single transaction or a series of related transactions, which have been completed or are in process at the time of the relevant Sale Transaction, constitute a majority of the assets, equity securities and/or operations of the Company, as determined in good faith by Houlihan Lokey and the Company and/or (b) a Financing Transaction or a Sale Transaction that, together with all other Sale Transactions and/or Financing Transactions, after taking into account any strategic liquidations of a business line or a material group of stores in a single transaction or a series of related transactions, which have been completed or are in process at the time of the relevant Sale Transaction and/or Financing Transaction, results in any person or group of related persons (other than Sun Capital Partners, Inc. and/or any of its affiliates) in the aggregate acquiring, directly or indirectly, securities entitled to a majority of the equity value of the Company as of such time, securities convertible into securities entitled to a majority of the equity value of the Company as of such time, and/or sufficient power under normal circumstances to control the business and affairs of the Company whether by ownership by control of securities or by contract.

b.   *Minority Sale Transaction Fee.* Upon the consummation of a Sale Transaction that does not constitute a Majority Transaction or Pharmacy Transaction (any such Sale Transaction, "Minority Sale Transaction"), the Company shall pay Houlihan Lokey a cash fee ("Minority Sale Transaction Fee") equal to:

   i.   If AGC of the relevant Sale Transaction is less than $30,000,000: 0.95% of AGC of the relevant Sale Transaction;

   ii.  If AGC of the relevant Sale Transaction is at least $30,000,000 but less than $50,000,000: $750,000;

   iii. If AGC of the relevant Sale Transaction is at least $50,000,000 but less than $100,000,000: $1,000,000;

   iv.  If AGC of the relevant Sale Transaction is at least $100,000,000 but less than $200,000,000: $1,800,000; or

   v.   If AGC of the relevant Sale Transaction is at least $200,000,000 but less than $300,000,000: $3,000,000,

in each case, subject to, and reduced by, any applicable Fee Credit(s);

If one or more Minority Sale Transactions are consummated prior to the consummation of a Majority Transaction, then 90% of the aggregate amount of Minority Sale Transactions Fees paid to Houlihan Lokey shall be credited against and reduce any Majority Transaction Fee to which Houlihan Lokey becomes entitled hereunder (it being understood and agreed that any Minority Sale Transaction Fee may only be credited once ("Minority Sale Transaction Fee Credit").

c.   *Financing Transaction Fee.* Upon the closing of a Financing Transaction that does not constitute a Majority Transaction, (x) the Company shall pay Houlihan Lokey a reasonable and customary fee in light of the circumstances to be agreed upon in good faith by the Company and Houlihan Lokey ("Financing Transaction Fee") and (y) the Company and Houlihan Lokey shall agree upon the amount (if any) of such Financing Transaction Fee which will be credited against and reduce any Majority Transaction Fee to which Houlihan Lokey becomes entitled hereunder thereafter (it being understood and agreed that such

Specialty Retail Shops Holding Corp.
Page 4

amount may only be credited once), except that, in no event, shall such Majority Transaction Fee be reduced below zero (provided that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Financing Transaction Fee Credit"). The Financing Transaction Fee(s) will be payable in respect of any Financing Transaction whether or not arranged by Houlihan Lokey, by another agent or directly by the Company (or such other issuer of the Securities in such Financing Transaction) or any of its affiliates, and shall be in addition to any other fees that the Company (or such other issuer of the Securities in the Financing Transaction) may be required to pay to any investor or other purchaser of Securities to secure its financing commitment. It is understood and agreed that if the proceeds from any such Financing Transaction are to be funded in more than one stage, Houlihan Lokey shall be entitled to its applicable compensation hereunder upon the closing date of each such stage.

d. *Comprehensive Transaction Financing Fee.* Notwithstanding the foregoing Section 3(ii)c, upon the closing of a Comprehensive Transaction Financing (as defined below), Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such financing, as a cost of such financing, a cash fee ("Comprehensive Transaction Financing Fee") equal to the sum of either (I) $500,000 in the event that such financing is provided by the Company's then existing lenders and/or Spirit Realty Capital and/or their respective affiliates ("Spirit"), or (II) $1,000,000 in the event that such financing is provided by other third parties.

e. *Spirit Transaction Fee.* Notwithstanding the foregoing, (x) in the event that the Company consummates a Spirit Transaction (as defined below) and such transaction on its own does not constitute a Majority Transaction or a Minority Sale Transaction, then the Company shall pay Houlihan Lokey a cash fee of $500,000 (the "Spirit Transaction Fee"), subject to any applicable Fee Credit(s). If a Spirit Transaction Fee is paid prior to the consummation of a Majority Transaction, Minority Sale Transaction, or Comprehensive Transaction, then fifty percent (50%) of the aggregate amount of the Spirit Transaction Fee shall be credited against and reduce the applicable Majority Transaction Fee, Minority Sale Transaction Fee, or Comprehensive Transaction Fee to which Houlihan Lokey becomes entitled hereunder with respect thereto (it being understood and agreed that the Spirit Transaction Fee shall not be credited more than once), except that, in no event, shall such Majority Transaction Fee, Minority Sale Transaction Fee, or Comprehensive Transaction Fee be reduced below zero (provided that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Spirit Transaction Fee Credit").

f. *Pharmacy Transaction Fee.* Upon the closing of each Pharmacy Transaction, except any Pharmacy Transaction involving the sale by the Company of any pharmacy assets to the Independent Pharmacy Cooperative and/or any of its members ("IPC"), the Company shall pay Houlihan Lokey a cash fee ("Pharmacy Transaction Fee") equal to:

   i. If AGC of the relevant Pharmacy Transaction is less than $260,000,000: 1.5% of the AGC of the relevant Sale Transaction; or

   ii. If AGC of the relevant Pharmacy Transaction is at least $260,000,000: 1.5% of the AGC of the Relevant Pharmacy Transactions that is less than or equal to $260,000,000, plus 5% of the AGC that is in excess of $260,000,000.

   in each case the applicable AGC shall be subject to normalized working capital adjustments, and in each case, subject to, and reduced by, any applicable Fee Credit(s).

Specialty Retail Shops Holding Corp.
Page 5

> g. *Comprehensive Transaction Fee.* In a Comprehensive Transaction (as defined below), upon the earlier to occur of the substantial consummation or confirmation of such Comprehensive Transaction, Houlihan Lokey shall earn, and the Company shall promptly pay to Houlihan Lokey, a cash fee ("Comprehensive Transaction Fee") of $5,000,000. For the avoidance of doubt, in the event that a Comprehensive Transaction Fee is earned and paid, no Majority Transaction Fee, Minority Sale Transaction Fee, Spirit Transaction Fee, Financing Transaction Fee or Pharmacy Transaction Fee shall be thereafter earned or paid but all other applicable fees hereunder shall remain payable as provided in this Agreement.

Any Majority Transaction Fee, Minority Sale Transaction Fee, Financing Transaction Fee, Comprehensive Transaction Financing Fee, Spirit Transaction Fee, Pharmacy Transaction Fee, and/or Comprehensive Transaction Fee are each referred to herein as a "Transaction Fee" and are collectively referred to herein as "Transaction Fees". Any Monthly Work Fee Credit, Minority Sale Transaction Fee Credit, Financing Transaction Fee Credit and/or Spirit Fee Credit is each referred to herein as a "Fee Credit" and are collectively referred to herein as "Fee Credits."

For the avoidance of doubt, notwithstanding anything contained herein, (A) in no event shall Houlihan Lokey be entitled to more than one Majority Transaction Fee and (B) the total Transaction Fees payable to Houlihan Lokey hereunder (other than any fees calculated and payable in accordance with clause (y) of Section 3(ii)a hereof, Section 3(ii)d hereof, and/or Section 3(ii)f hereof which shall not be limited by this clause (B)) shall not exceed $8,000,000 in the aggregate. All payments received by Houlihan Lokey pursuant to this Agreement at any time shall become the property of Houlihan Lokey without restriction. No payments received by Houlihan Lokey pursuant to this Agreement will be voluntarily put by the Company into a trust or other segregated account.

4. **Term and Termination.** This Agreement shall have an initial term of six (6) months, and thereafter shall be automatically extended on a month-to-month basis until either party terminates this Agreement by providing five days' prior written notice of termination (including via e-mail) to the other party. The expiration or termination of this Agreement shall not affect (i) any provision of this Agreement other than Sections 1 through 3, the first four sentences of Section 11, the first sentence of Section 13 and Section 15, or (ii) Houlihan Lokey's right to receive, and the Company's obligation to pay, any and all fees, expenses and other amounts due and payable in accordance with this Agreement, whether or not any Transaction shall be consummated prior to or subsequent to the Effective Date of expiration or termination, as more fully set forth in this Agreement.

In addition, if this Agreement expires or is terminated by the Company for any reason and the Company consummates or enters into an agreement to engage in (and which subsequently closes at any time), any Transaction prior to the date that is twelve (12) months after such expiration or termination date, with any party which (i) Houlihan Lokey identified in writing to the Company, contacted or with whom Houlihan Lokey or the Company had discussions regarding a potential Transaction during the term of this Agreement, or (ii) reviewed the information memorandum or any other written materials prepared by Houlihan Lokey or by the Company with the assistance of Houlihan Lokey concerning the Company and/or any proposed Transaction, Houlihan Lokey shall be entitled to receive the applicable Transaction Fee, if any, upon the consummation of such Transaction in accordance with the terms hereof as if no such expiration or termination had occurred (the "Tail Fee"), and, for the avoidance of doubt, subject to any applicable Fee Credit. Notwithstanding the foregoing, Houlihan Lokey will not be entitled to the Tail Fee in the event that (a) during the term of this Agreement and prior to the time the Company enters into an agreement to engage in a Transaction (which subsequently closes at any time without any material modification to the terms of such agreement), Houlihan Lokey has engaged in gross negligence or willful misconduct with respect to the engagement hereunder and, as a result, there is a material failure of Houlihan Lokey to perform the services set forth in Section 1 of this Assignment, (b) within 20 days after being made aware of the foregoing, the Company gives Houlihan Lokey at least thirty (30) day's written notice of the

Specialty Retail Shops Holding Corp.
Page 6

Company's intention to terminate this Agreement as a result thereof (a "Pre-Termination Notice"), which Pre-Termination Notice shall specify in reasonable detail the act or failure to act constituting Houlihan Lokey's gross negligence or willful misconduct, (c) Houlihan Lokey fails to cure such specified act or failure to act, or fails to take reasonable steps to ensure that no such act or failure to act shall occur again, within thirty (30) days after receipt of such Pre-Termination Notice, (d) promptly following Houlihan Lokey's failure to cure or ameliorate such effects within such time period, the Company terminates this Agreement by delivering to Houlihan Lokey a Termination Notice which specifies the reasons for the Company's termination of this Agreement, and (e) Houlihan Lokey is finally judicially determined by a court of competent jurisdiction to have engaged in such gross negligence or willful misconduct. This paragraph only concerns the payment of a Tail Fee to Houlihan Lokey, and nothing contained herein shall modify the terms of Section 19 or any other part of this Agreement in any respect.

5.    **Transaction.**    As used in this Agreement, the term "Transaction" shall mean any of the following:

(i) *Sale Transaction.*  Any transaction or series of related transactions outside the Company's ordinary course of business that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity, including the Company's unaffiliated creditors, but excluding any of the Company's existing owners or shareholders and/or their respective affiliates) (a) all or any material portion of the outstanding equity securities of any entity comprising the Company and/or (b) all or any material portion of the assets (including the assignment of any executory contracts) or operations of any entity comprising the Company or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options or assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity (each a "Sale Transaction"); provided, that notwithstanding the foregoing, none of the following shall constitute a Sale Transaction: (i) a nonconsensual foreclosure sale by any creditor of its collateral over the objection of the relevant Companies, a Pharmacy Transaction (as defined below), and/or (ii) any liquidations and/or going out of business sales.

(ii) *Financing Transaction.*  The placement, raising or issuance of any form of equity, equity-linked or debt securities (including, without limitation, any convertible securities, preferred stock, unsecured, non-senior or subordinated debt securities, and/or senior notes or bank debt) or any loan or other financing, any or all of which being "Securities", from any source including, without limitation, the Company's unaffiliated creditors, but excluding any financing provided exclusively by the Company's existing owners or shareholders and/or their respective affiliates (each a "Financing Transaction").

(iii) *Comprehensive Transaction Financing.*  The placement, raising or issuance of a financing in connection with any Comprehensive Transaction concerning the Company (a "Comprehensive Transaction Financing").

(iv) *Spirit Transaction.*  A transaction in which the Company materially restructures or otherwise materially modifies: (a) the Amended and Restated Master Lease between Spirit SPE Portfolio 2006-1, LLC and Spirit SPE Portfolio 2006-2, LLC and Shopko Stores Operating Co., LLC, dated December 15, 2015 (as amended), (b) the Amended and Restated Master Lease between Spirit SPE Portfolio 2006-3, LLC and Pamida Stores Operating Co., LLC, dated June 1, 2016 (as amended) (collectively, the "Spirit Leases"), and/or the B-1 Term Loan entered into in January 2018 (the "Spirit B-1 Term Loan") (any such transaction, a "Spirit Transaction").

Specialty Retail Shops Holding Corp.
Page 7

(v) *Pharmacy Transaction.* Any transaction or series of related transactions that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity, including the Company's unaffiliated creditors, but excluding IPC and any of the Company's existing owners or shareholders and/or their respective affiliates) of prescription or pharmacy files or scripts and related pharmacy inventory, other than ordinary course sales of prescription or pharmacy files or scripts and related pharmacy inventory in transactions that are separate from a broader effort to exit from the pharmacy business generally and that are not consummated in connection with, or in anticipation of, other such sales or dispositions and that are in transactions that yield less than $2,000,000, on an individual pharmacy location basis and less than $15,000,000 on an annual aggregated basis.

(vi) *Comprehensive Transaction.* The consummation of any plan of reorganization, or sale of any material portion of the assets or operations of the Company (including any going concern sale) or any transaction or series of transactions that constitute a repayment, recapitalization, or restructuring of the equity and/or debt securities and/or other indebtedness, obligations or liabilities of any entity comprising the Company, including accrued and/or accreted interest thereon, which are outstanding as of the Effective Date, which repayment, recapitalization, or restructuring is effected pursuant to an exchange transaction, tender offer, a reorganization, a solicitation of consents, waivers, acceptances or authorizations, and/or a modification or amendment to the terms, conditions, or covenants (including, without limitation, the principal balance, accrued or accreted interest, payment term, other debt service requirement and/or financial or operating covenant) of any agreements or instruments governing any of the equity and/or debt securities and/or other indebtedness of any entity comprising the Company (such modification or amendment shall include, without limitation, any forbearance for at least twelve (12) months with respect to any payment obligation) or any combination of the foregoing transactions (each a "Comprehensive Transaction").

6.    **Aggregate Gross Consideration ("AGC").** For the purpose of calculating a Transaction Fee, the applicable "AGC" shall be the gross proceeds paid to, or received by, or to be paid to or received by, any entity comprising the Company, or any of its equity or debt holders, including, without limitation, holders of warrants and convertible securities, and holders of options or stock appreciation rights (in respect thereof) (collectively, including the Company, "Constituents"), in connection with the relevant Transaction, (i) including, without limitation and without duplication, (a) amounts in escrow and any hold-backs, (b) cash, notes, securities, and other property, (c) non-contingent payments made in installments, (d) Contingent Payments (as defined below), (e) the face value of any liabilities of any entity comprising the Company that are assumed, satisfied, or otherwise paid off by the acquiror in conjunction with a Transaction, and/or (f) the fair market value of any non-cash assets of any entity comprising the Company that are sold or otherwise transferred outside of the Company's ordinary course of business to another party prior to and directly in connection with the closing of a Transaction (including, without limitation, any non-cash dividends or distributions paid to security holders or to repurchase any securities, but excluding dispositions of obsolete or unused equipment contemplated by the Company); provided, that if any such proceeds are escrowed, held-back, deferred, contingent on future events (including Contingent Payments) or received in the form of a note payable or similar instrument (an "Additional Payment Amount"), the Transaction Fee to be paid at the closing of the applicable Transaction will be determined without taking into account such Additional Payment Amount in the calculation of AGC, and thereafter upon receipt of such Additional Payment Amount by the applicable Constituent(s), Houlihan Lokey shall be paid the difference between (x) the Transaction Fee calculated as if AGC included all Additional Payment Amounts received as of that later date and (y) the Transaction Fee(s) previously received by Houlihan Lokey with respect to the applicable Transaction, and (ii) excluding (a) consideration paid in respect of the Company's cash as of immediately prior to the closing of the Transaction in excess normalized minimum working capital cash balances, (b) consideration paid in respect of working capital adjustments and (c) any employment-related

Specialty Retail Shops Holding Corp.
Page 8

reasonable and customary compensation or reasonable and customary equity incentives provided to the Company's management team by the acquiror or any of its subsidiaries or affiliates. If, in the Transaction, no consideration is being paid in respect of the existing equity, AGC of the retained equity shall be determined by the good faith agreement of the parties as to the value of such retained equity implied by the Transaction. For the avoidance of doubt, the AGC of any Transaction will be determined without duplication to amounts accounted for in the AGC of any other Transaction. "Contingent Payments" shall be defined as the consideration received or receivable by any of the Constituents in the form of deferred performance-based payments, "earn-outs", or other contingent payments based upon the future performance of any entity comprising the Company, or any of its businesses or assets, and shall exclude any retained equity.

7.    **Value of Consideration.** For the purpose of calculating the AGC of any Transaction, any securities, other than a promissory note, will be valued at the time of the announcement of the Transaction, without regard to any restrictions on transferability, as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the announcement of the Transaction; (ii) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten trading day period ending two days prior to the announcement of the Transaction; and (iii) if such securities have not been traded prior to the announcement of the Transaction, Houlihan Lokey and the Company shall negotiate in good faith to agree on a fair valuation thereof, without regard to any restrictions on transferability, for the purposes of calculating the AGC. For any lease payments and other consideration that is not freely tradable or has no established public market, if the consideration utilized consists of property other than securities (including notes or other debt securities) or cash, then the value of such property shall be the fair market value thereof as determined in good faith by Houlihan Lokey and the Company. If any consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is received. The value of any purchase money or other promissory notes shall be deemed to be the face amount thereof.

8.    **Reasonableness of Fees.** The parties acknowledge that this engagement will require a substantial professional commitment of time and effort by Houlihan Lokey. Moreover, the amount of time and effort may vary substantially during different periods of the engagement. As a result, in order to ensure the availability of all necessary professional resources, whenever required, Houlihan Lokey may be foreclosed from pursuing other alternative engagement opportunities. In light of the foregoing, and given: (i) the numerous issues which can currently be anticipated in engagements such as this, (ii) Houlihan Lokey's commitment to the variable level of time and effort necessary to address such issues, (iii) the expertise and capabilities of Houlihan Lokey that will be required in this engagement, and (iv) the market rate for Houlihan Lokey's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Houlihan Lokey, and provides the requisite certainty to the Company.

9.    **Expenses.** In addition to all of the other fees and expenses described in this Agreement, and regardless of whether any Transaction is consummated, the Company shall, upon Houlihan Lokey's request (which shall include invoices with reasonable backup, provided the expenses in clause (ii) below will not have backup), reimburse Houlihan Lokey for its reasonable out-of-pocket expenses incurred from time to time in connection with its services hereunder (for the avoidance of doubt, prior to the termination or expiration of this Agreement), but in no event greater than $75,000 without the Company's prior written approval, which approval shall not be unreasonably withheld (provided that such limitation shall not affect the Company's obligations to otherwise pay any such expenses under this Agreement pursuant to Sections 16 and/or 19). Houlihan Lokey bills its clients for its reasonable out-of-pocket expenses including, but not limited to (i) travel-related and certain other expenses, without regard to volume-based or similar credits or rebates Houlihan Lokey may receive from, or fixed-fee arrangements made with, travel agents, airlines or

Specialty Retail Shops Holding Corp.
Page 9

other vendors, and (ii) research, database and similar information charges paid to third party vendors, and reprographics expenses, to perform client-related services that are not capable of being identified with, or charged to, a particular client or engagement in a reasonably practicable manner, based upon a uniformly applied monthly assessment. The expenses set forth in clause (ii) of the immediately preceding sentence shall in no event be greater than $25,000 in the aggregate without the Company's prior written consent (which consent shall not be unreasonably withheld), which amount shall be billed to the Company at a rate of no more than $2,000 per month, with any outstanding balance to be included in Houlihan Lokey's final invoice.

Houlihan Lokey shall, in addition, be reimbursed by the Company for the fees and expenses of Houlihan Lokey's outside legal counsel incurred in connection with the performance of this Agreement and the matters contemplated hereby, but in no event greater than $25,000 without the Company's prior approval, which approval shall not be unreasonably withheld (provided that such limitation shall not affect the Company's obligations to otherwise pay any such legal fees and other expenses under this Agreement pursuant to Sections 16 and/or 19).

10.    **Invoicing and Payment.**  All amounts payable to Houlihan Lokey shall be made in lawful money of the United States in accordance with the payment instructions as set forth on the invoice provided with this Agreement, or to such accounts as Houlihan Lokey shall provide to the Company in writing.  All amounts charged by Houlihan Lokey will be invoiced in arrears together with applicable sales tax where appropriate.

11.    **Information.**  The Company will provide Houlihan Lokey with access to management and other representatives of the Company, as reasonably requested by Houlihan Lokey. The Company will furnish Houlihan Lokey with such information as Houlihan Lokey may reasonably request for the purpose of carrying out its engagement hereunder, all of which will be, to the Company's knowledge, accurate and complete at the time furnished. Any financial projections delivered to Houlihan Lokey will be prepared in good faith by the Company based on reasonable assumptions at the time furnished and in light of the circumstances under which they are made. The Company will promptly notify Houlihan Lokey in writing (which shall include e-mail) to the extent it becomes aware of any material inaccuracy or misstatement in, or material omission from, any information previously delivered to, or discussed with, Houlihan Lokey, or any material provided to any interested party, in each case by or on behalf of the Company. Houlihan Lokey shall be entitled to rely, without independent verification, on the accuracy and completeness of all information that is publicly available and of all information furnished by or on behalf of the Company or any other potential party to any Transaction or otherwise reviewed by, or discussed with, Houlihan Lokey. The Company understands and agrees that Houlihan Lokey will not be responsible for the accuracy or completeness of such information, and shall not be liable for any inaccuracies or omissions therein. The Company acknowledges that Houlihan Lokey has no obligation to conduct any appraisal of any assets or liabilities of the Company or any other party or to evaluate the solvency of any party under any applicable laws relating to bankruptcy, insolvency or similar matters. Houlihan Lokey's role in reviewing any information is limited solely to performing such a review as it shall deem necessary to support its own advice and analysis and shall not be on behalf of any other party. Any advice (whether written or oral) rendered by Houlihan Lokey pursuant to this Agreement is intended solely for the use of the Company in evaluating a Transaction, and such advice may not be relied upon by any other person or entity or used for any other purpose. Any advice rendered by, or other materials prepared by, or any communication from, Houlihan Lokey may not be disclosed, in whole or in part, to any third party, or summarized, quoted from, or otherwise referred to in any manner without the prior written consent of Houlihan Lokey. In addition, the terms of this Agreement may otherwise be referred to without our prior written consent. Notwithstanding the two immediately preceding sentences, the Company may furnish Houlihan Lokey's advice and materials relating to a Transaction in response to any subpoena, court order, or similar legal demand received by it, or any of its directors or officers, provided that prompt prior written notice thereof (to the extent legally permissible) shall be given to Houlihan Lokey so that Houlihan Lokey may seek a

Specialty Retail Shops Holding Corp.
Page 10

protective order or other appropriate remedy, and, if Houlihan Lokey fails to obtain such remedy, the Company may disclose only that information which its counsel advises it is legally compelled to disclose.

12.    **Confidential Information.**  Houlihan Lokey acknowledges that, in connection with the services to be provided pursuant to this Agreement, certain confidential, non-public and proprietary information concerning the Company and the Transaction, including, for the avoidance of doubt, the existence and contents of this Agreement ("Confidential Information") has been or may be disclosed by the Company to Houlihan Lokey or its employees, affiliates, attorneys, subcontractors and advisors (collectively, "Representatives"). Houlihan Lokey agrees that, without the Company's prior written consent, no Confidential Information will be disclosed, in whole or in part, to any other party (other than to any potential party to a Transaction under appropriate assurances of confidentiality, to those Representatives who need access to any Confidential Information for purposes of performing the services to be provided hereunder (provided that Houlihan Lokey shall be responsible for any breach by any such Representatives of the confidentiality obligations of this Section 12), or as may be required by law or regulatory authority). The term "Confidential Information" does not include any information: (a) that was already in the possession of Houlihan Lokey or any of its Representatives, or that was available to Houlihan Lokey or any of its Representatives on a non-confidential basis, prior to the time of disclosure to Houlihan Lokey or such Representatives; (b) obtained by Houlihan Lokey or any of its Representatives from a third party which, insofar as is known to Houlihan Lokey or such Representatives, is not subject to any prohibition against disclosure; (c) which was or is independently developed by Houlihan Lokey or any of its Representatives without use of, or reference to, any Confidential Information; or (d) which was or becomes generally available to the public through no fault of Houlihan Lokey or any of its Representatives. If Houlihan Lokey becomes required by legal process or requested by regulatory authority to disclose any Confidential Information, prompt notice thereof (to the extent legally permissible) shall be given to the Company (provided that no notification shall be required in respect of any disclosure to regulatory authorities having jurisdiction over Houlihan Lokey), and Houlihan Lokey may disclose only that information which its counsel advises it is compelled to disclose. The obligations set forth in this paragraph shall remain in effect for a period of eighteen (18) months from the date of termination of this Agreement.

13.    **Additional Provisions Regarding Financing Transaction.**  The Company authorizes Houlihan Lokey to provide an information memorandum (or similar document) approved by the Company (as such document may be amended or supplemented and including any information incorporated therein by reference, the "Information Memorandum") and other pertinent information to prospective investors and other purchasers which are approved by the Company and subject to execution by each such prospective investor or other purchaser of a confidentiality agreement acceptable to the Company, and agrees not to transmit the Information Memorandum to prospective investors or other purchasers without Houlihan Lokey's prior approval. The Company will be solely responsible for the contents of the Information Memorandum and any and all other written or oral communications provided by or on behalf of the Company to any actual or prospective investor or other purchaser. The Company represents and warrants that the Information Memorandum and such other communications will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. If the Company becomes aware of an event, a result of which the Information Memorandum (as then supplemented or amended) would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, the Company, upon obtaining actual knowledge of the foregoing, will promptly notify Houlihan Lokey of such event and Houlihan Lokey will suspend solicitations of prospective investors and other purchasers until such time as the Company prepares (and the Company agrees that, if the solicitation of prospective investors and other purchasers has been so suspended after the Company has accepted orders from prospective investors or other purchasers, the Company will promptly prepare) a supplement or amendment to the Information Memorandum which corrects such statement(s) or omission(s) or the Company otherwise takes such reasonable action as required to address the statement(s)

Specialty Retail Shops Holding Corp.
Page 11

or omission(s). The Company will (i) make available to each bona fide offeree of the Securities such information (in addition to that contained in the Information Memorandum) concerning the offering of the Securities, the Company and any other relevant matters, and (ii) provide each bona fide offeree the opportunity to ask questions of, and receive answers from, the officers and certain employees of the Company, as approved by the Company, concerning the terms and conditions of the offering of the Securities.

The Company acknowledges that closing of a Financing Transaction is subject, among other factors, to acceptable documentation, market conditions, and satisfaction of the conditions set forth in one or more agreements to be entered into with any financier, lender, investor or other purchaser of Securities. It is expressly understood that this engagement does not constitute any commitment, express or implied, on the part of Houlihan Lokey to acquire, and does not ensure the successful placement of, any portion of the Securities. The Company further acknowledges and agrees that Houlihan Lokey is not acting as an underwriter of the Securities and shall have no responsibility or obligation to underwrite the Securities.

In connection with all offers and sales of the Securities, the Company will cause to be delivered to Houlihan Lokey copies of any opinions of counsel that have been provided to investors or other purchasers of the Securities. The Company also will cause to be furnished to Houlihan Lokey at or after each closing of a sale of Securities copies of such agreements, opinions, certificates and other documents (including, without limitation, accountant's letters) comprising the definitive documentation relating to the sale of such Securities as Houlihan Lokey may reasonably request. The Company hereby acknowledges that Houlihan Lokey may rely upon the representations and warranties made (whether pursuant to a subscription agreement or in any other format) to investors or other purchasers of Securities.

It is understood that the parties hereto intend that the offer and sale of the Securities in a Financing Transaction will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Act"), pursuant to Section 4(a)(2) thereof. The Company has not taken, and will not take, any action, directly or indirectly, so as to cause the transactions contemplated by this Agreement to fail to be entitled to exemption under Section 4(a)(2) of the Act. The Company will promptly from time to time take such reasonable action as necessary to qualify the Securities to be issued in connection with any Financing Transaction as a private placement under the securities laws of such States and foreign jurisdictions as any prospective investor or other purchaser may reasonably request and will comply with applicable laws. The Company shall cause the issuer of the Securities to be issued in connection with any Financing Transaction to offer and sell such Securities only to investors and other purchasers of that they reasonably believe to be "accredited investors", as defined in Rule 501 of Regulation D under the Act. To the extent the issuer of the Securities to be issued in connection with any Financing Transaction is required to file any notices or other filings with the Securities and Exchange Commission or other securities regulatory authorities with respect to such Securities, the Company will cause the issuer to make such filings in a timely manner and to furnish to Houlihan Lokey a copy of each such notice or filing promptly after its submission.

14.    **Limitations on Services as Advisor.** Houlihan Lokey's services are limited to those specifically provided in this Agreement, or subsequently agreed upon in writing, by the parties hereto. Houlihan Lokey shall have no obligation or responsibility for any other services including, without limitation, any crisis management or business consulting services related to, among other things, the implementation of any operational, organizational, administrative, cash management, or similar activities. The parties understand that Houlihan Lokey is being engaged hereunder as an independent contractor to provide the services hereunder solely to the Company, and that Houlihan Lokey is not acting as an agent or fiduciary of the Company, its security holders or creditors or any other person or entity in connection with this engagement, and the Company agrees that it shall not make, and hereby waives, any claim based on an assertion of such an agency or fiduciary relationship. In performing its services pursuant to this Agreement, Houlihan Lokey is not assuming any responsibility for the Company's decision on whether to pursue, endorse or support any business strategy, or to effect, or not to effect, any Transaction(s), which decision shall be made by the

Specialty Retail Shops Holding Corp.
Page 12

Company in its sole discretion. Any duties of Houlihan Lokey arising by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder will be owed solely to the Company.

15.    **Additional Services.**  To the extent Houlihan Lokey is requested by the Company to perform any financial advisory or investment banking services which are not within the scope of this engagement, the Company shall pay Houlihan Lokey such fees as shall be mutually agreed upon by the parties hereto in writing, in advance, depending on the level and type of services required, and shall be in addition to the fees and expenses described hereinabove.

16.    **Required Services.**  If Houlihan Lokey is required to render services not described herein, but which relate directly or indirectly to the subject matter of this Agreement (including, but not limited to, producing documents, answering interrogatories, attending depositions, giving expert or other testimony, whether by subpoena, court process or order, or otherwise), the Company shall pay Houlihan Lokey additional fees to be mutually agreed upon for such services, plus reasonable related out-of-pocket costs and expenses, including, among other things, the reasonable legal fees and expenses of Houlihan Lokey's counsel in connection therewith.

17.    **Credit.**  After the announcement or closing of any Transaction, Houlihan Lokey may, at its own expense and with the Company's prior written consent (not to be unreasonably withheld, conditioned or delayed), place announcements on its corporate website and in financial and other newspapers and periodicals (such as a customary "tombstone" advertisement, including the Company's logo or other identifying marks but shall not refer to the purchase price or other material economic terms of such Transaction) describing its services in connection therewith.

18.    **Choice of Law; Jury Trial Waiver; Jurisdiction.**  THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN NEW YORK. THIS AGREEMENT AND ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. EACH OF HOULIHAN LOKEY AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS EQUITY HOLDERS) IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF HOULIHAN LOKEY PURSUANT TO, OR THE PERFORMANCE BY HOULIHAN LOKEY OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE BROUGHT AND MAINTAINED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS, AND AGREES TO VENUE IN SUCH COURTS. EACH PARTY FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE EXCLUSIVELY TO SUCH JURISDICTION AND VENUE IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURTS, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. THE COMPANY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR CLAIM BROUGHT IN ANY OF THE COURTS REFERRED TO ABOVE SHALL BE CONCLUSIVE AND BINDING

Specialty Retail Shops Holding Corp.
Page 13

**UPON IT AND MAY BE ENFORCED IN ANY OTHER COURTS HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT. THE COMPANY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE COMPANY AT 700 PILGRIM WAY, GREEN BAY, WI 54304.**

19.    **Indemnification and Standard of Care.** As a material part of the consideration for the agreement of Houlihan Lokey to furnish its services under this Agreement, the Company agrees (i) to indemnify and hold harmless Houlihan Lokey and its affiliates, and their respective past, present and future directors, officers, partners, members, employees, agents, representatives, advisors, subcontractors and controlling persons (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to Houlihan Lokey's engagement under this Agreement, and (ii) to reimburse each Indemnified Party for all reasonable and reasonably documented out-of-pocket expenses (including, without limitation, the reasonable fees and reasonable out-of-pocket expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising or otherwise becoming involved in any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (including, without limitation, any shareholder or derivative action), arising out of or related to such engagement or matter. However, the Company shall not be liable under the foregoing indemnification provision to the extent that any loss, claim, damage or liability is finally judicially determined by a court of competent jurisdiction to have resulted from the willful misconduct, bad faith, actual fraud or gross negligence of such Indemnified Party, and in such case, the Company shall be entitled to recover from the applicable Indemnified Party any expenses advanced by the Company to such Indemnified Party pursuant to the reimbursement obligation set forth in this paragraph to the extent attributable to such loss, claim, damage or liability, subject to such Indemnified Party's rights of contribution.

With respect to any litigation brought by Houlihan Lokey against the Company for a breach of the Agreement that is not in any way related to a claim by a third party, the indemnity provision in the immediately preceding paragraph shall not apply, and the prevailing party in such proceeding shall be entitled to recover, in addition to any other appropriate amounts, its reasonable document out-of-pocket expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and expenses and court costs, except that this provision shall not apply to any claims (a) brought by any Indemnified Party to enforce such Indemnified Party's indemnification, contribution and reimbursement rights under this Schedule A, or (b) brought by any person or entity asserting claims on behalf of or in right of the Company, including, without limitation, a claim made derivatively, or by a shareholder, receiver or person serving in a similar capacity, which claims shall be covered by the indemnity and reimbursement provisions set forth in the immediately preceding paragraph.

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient fully to indemnify any Indemnified Party or to hold it harmless pursuant to the foregoing provisions of this Section 19, then the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of the losses, claims, damages, liabilities or expenses referred to in subsections (i) or (ii) of such indemnification or reimbursement provisions in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by such Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company (and its affiliates, and their respective directors, employees, agents and other advisors), on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by Houlihan Lokey from

Specialty Retail Shops Holding Corp.
Page 14

the Company pursuant to this Agreement. Relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Company, and its security holders, creditors, and other affiliates, as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by Houlihan Lokey under this Agreement. The Company shall not settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding arising out of or related to Houlihan Lokey's engagement under this Agreement (whether or not an Indemnified Party is an actual or potential party thereto), or participate in or otherwise facilitate any such settlement, compromise, consent or termination by any of the Company's controlled affiliates, directors, or officers, unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey. The Company shall not be required to indemnify any Indemnified Party for any amount paid or payable by such party in the settlement or compromise of any action or proceeding for which indemnification is sought hereunder, unless such settlement or compromise is consented to in writing by the Company, which consent shall not be unreasonably withheld, conditioned or delayed; provided that the Company shall be required to indemnify such Indemnified Party for such amount, even if such settlement or compromise is not consented to by the Company, if the Indemnified Party that is considering such settlement or compromise submits the terms of such settlement or compromise to the Company in writing and the Company has not, within thirty (30) days thereafter, engaged in good faith discussions with such Indemnified Party regarding the Company's obligation to indemnify it for the amount payable thereunder.

The Company further agrees that neither Houlihan Lokey nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company or any person or entity asserting claims on behalf of or in right of the Company arising out of or related to Houlihan Lokey's engagement under this Agreement, except to the extent, if any, losses, claims, damages or liabilities incurred by the Company are finally judicially determined by a court of competent jurisdiction to have resulted from the willful misconduct, bad faith, actual fraud or gross negligence of such Indemnified Party.

The Company shall cause any new company that may be formed by the Company, for any purpose, to agree to all of the obligations in this Section 19 to Houlihan Lokey in accordance with the foregoing provisions. Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Houlihan Lokey in writing thereof (if not previously so notified) and, if requested by Houlihan Lokey, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions satisfactory to Houlihan Lokey. The Company agrees that Houlihan Lokey would be irreparably injured by any breach of this Agreement (including, without limitation, the agreement set forth in the immediately preceding sentence), that money damages alone would not be an adequate remedy for any such breach and that, in the event of any such breach, Houlihan Lokey shall be entitled, in addition to any other remedies, to pursue injunctive relief and specific performance.

The indemnity, reimbursement, and other obligations and agreements of the Company set forth herein (i) shall apply to any services provided by Houlihan Lokey in connection with this engagement prior to the Effective Date and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Company may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Company or any

Specialty Retail Shops Holding Corp.
Page 15

Indemnified Party or any person controlling any of them, and (iv) shall survive the completion of the services described in, and any expiration or termination of the relationship established by, this Agreement.

20.    **Miscellaneous.**  This Agreement shall be binding upon the parties hereto and their respective successors, heirs and assigns and any successor, heir or assign of any substantial portion of such parties' respective businesses and/or assets, including any trustee appointed on behalf of the Company.

Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Parties and each of their respective successors, heirs and assigns any rights or remedies (directly or indirectly as a third party beneficiary or otherwise) under or by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder.

This Agreement, is the complete and exclusive statement of the entire understanding of the parties regarding the subject matter hereof, and supersedes all previous agreements or understandings regarding the same, whether written or oral, including, without limitation, that certain Letter Agreement, dated as of May 17, 2017 by and between the Company and Houlihan Lokey (the "Original Agreement"). For the avoidance of doubt, the parties hereto acknowledge and agree that this Agreement replaces the Original Agreement in its entirety. This Agreement may not be amended, and no portion hereof may be waived, except in a writing duly executed by the parties hereto.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business as a condition to doing business with that person. Accordingly, the Company will provide Houlihan Lokey upon request certain identifying information necessary to verify the Company's identity, such as a government-issued identification number (e.g., a U.S. taxpayer identification number), certified articles of incorporation, a government-issued business license, partnership agreement or trust instrument.

This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

The Company has all requisite power and authority to enter into this Agreement. This Agreement has been duly and validly authorized by all necessary action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms. This Agreement has been reviewed by the signatories hereto and their counsel. There shall be no construction of any provision against either party hereto because this Agreement was drafted by such party, and the parties waive any statute or rule of law to such effect.

The Company agrees that it will be solely responsible for ensuring that any Transaction complies with applicable law. The Company understands that Houlihan Lokey is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice.

To the extent that the Company hereunder is comprised of more than one entity or company, the obligations of the Company under this Agreement are joint and several, and any consent, direction,

Specialty Retail Shops Holding Corp.
Page 16

approval, demand, notice or the like given by any one of such entities or companies shall be deemed given by all of them and, as such, shall be binding on the Company.

The Company understands and acknowledges that Houlihan Lokey and its affiliates (collectively, the "Houlihan Lokey Group") engage in providing investment banking, securities trading, financing, financial advisory, and consulting services and other commercial and investment banking products and services to a wide range of institutions and individuals. In the ordinary course of business, the Houlihan Lokey Group and certain of its employees, as well as investment funds in which they may have financial interests or with which they may co-invest, may acquire, hold or sell, long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and financial instruments (including bank loans and other obligations) of, or investments in, the Company or any other party that may be involved in the matters contemplated by this Agreement or have other relationships with such parties. With respect to any such securities, financial instruments and/or investments, all rights in respect of such securities, financial instruments and investments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, the Houlihan Lokey Group may in the past have had, and may currently or in the future have, financial advisory or other investment banking or consulting relationships with parties involved in the matters contemplated by this Agreement, including parties that may have interests with respect to the Company, a Transaction or other parties involved in a Transaction, from which conflicting interests or duties may arise. Although the Houlihan Lokey Group in the course of such other activities and relationships may acquire information about the Company, a Transaction or such other parties, or that otherwise may be of interest to the Company, the Houlihan Lokey Group shall have no obligation to, and may not be contractually permitted to, disclose such information, or the fact that the Houlihan Lokey Group is in possession of such information, to the Company or to use such information on the Company's behalf. Houlihan Lokey agrees that until the earlier of (a) the expiration or termination of this Agreement or (b) the consummation of a Majority Transaction, Houlihan Lokey shall not become engaged to provide buy-side mergers and acquisitions investment banking services to a potential acquiror of the Company, which services relate to a potential Transaction, without the prior consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed; provided that such restriction shall not restrict Houlihan Lokey or its affiliates from providing valuation, tax and financial reporting, fairness or solvency opinion, transaction advisory (i.e., due diligence), dispute resolution, or consulting services, subject to the implementation of appropriate information barriers (including clean teams) between the Houlihan Lokey financial staff providing such services and the Houlihan Lokey financial staff providing such services hereunder.

In order to enable Houlihan Lokey to bring relevant resources to bear on its engagement hereunder from among its global affiliates, the Company agrees, subject to the confidentiality obligations set forth in Section 12, that Houlihan Lokey may share information obtained from the Company and other parties hereunder with other members of the Houlihan Lokey Group, and may perform the services contemplated hereby in conjunction with such other members.

Specialty Retail Shops Holding Corp.
Page 17

      If the foregoing correctly sets forth our agreement, please sign and return to us a copy of this Agreement along with a check (or wire transfer confirmation) for $50,000 on account of the first Monthly Fee.

      All of us at Houlihan Lokey thank you for choosing us to advise the Company, and look forward to working with you on this engagement.

Very truly yours,

HOULIHAN LOKEY CAPITAL, INC.

By:

Saul Burian
Managing Director

Specialty Retail Shops Holding Corp.
Page 18


Accepted and agreed to as of the Effective Date:

**SHOPKO STORES OPERATING CO., LLC**, on its own behalf, and on behalf of its direct and indirect subsidiaries

By: 

~~Russell Steinhorst~~

~~Executive Vice President~~ and Chief Executive Officer

President



## HOULIHAN LOKEY

*Personal and Confidential*

As of May 17, 2017

Specialty Retail Shops Holding Corp.
700 Pilgrim Way
Green Bay, WI 54304
Attn: Mr. Russell Steinhorst, Executive Vice President and Chief Financial Officer

Dear Mr. Steinhorst:

This letter agreement (this "Agreement") confirms the terms under which Specialty Retail Shops Holding Corp. (collectively with its direct and indirect subsidiaries, the "Company") has engaged Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), effective as of the date indicated above (the "Effective Date"), as its financial advisor to provide financial advisory and investment banking services in connection with one or more potential merger and/or acquisition transactions involving the Company, one or more potential financing transactions for the Company, and/or with respect to such other financial matters as to which the Company and Houlihan Lokey may agree in writing during the term of this Agreement.

1.    **Services**. In connection with each potential Transaction (as defined below), Houlihan Lokey will assist and advise the Company with the analysis, evaluation, pursuit and effectuation of any such Transaction. Houlihan Lokey's services will consist of, if applicable and if requested by the Company, (i) assisting the Company in the development and distribution of selected information, documents and other materials, including, if appropriate, assisting the Company in the preparation of offering memoranda, management presentations, and other customary marketing materials describing the Company (it being expressly understood that the Company will remain solely responsible for the content of such documents); (ii) assisting the Company in establishing and maintaining a data room (or similar process) and generally assisting potential lenders, equity investors, acquirers, creditors and/or strategic partners with their due diligence investigation of the Company, (iii) assisting the Company in evaluating indications of interest and proposals regarding any Transaction(s) from current and/or potential lenders, equity investors, acquirers, creditors and/or strategic partners; (iv) assisting in the collection of confidentiality agreements between the Company and potential lenders, equity investors, acquirers, creditors and/or strategic partners; (v) assisting the Company with the negotiation of any Transaction(s), including participating in negotiations with lenders, investors, acquirers, strategic partners, creditors, landlords, and other parties involved in any Transaction(s); (vi) providing expert advice and testimony regarding financial matters related to any Transaction(s), if necessary; (vii) attending meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as the Company and Houlihan Lokey mutually agree; and/or (viii) providing such other financial advisory and investment banking services as may be required by additional issues and developments not anticipated on the Effective Date as may be agreed upon between the parties hereto.

Specialty Retail Shops Holding Corp.
Page 2

2.    **Exclusive Agency**.  In the event the Company receives any inquiry from any party regarding a Transaction during the term of this Agreement, the Company shall promptly inform Houlihan Lokey of such inquiry so that Houlihan Lokey can assist the Company in evaluating such party and its interest in a Transaction and in any resulting negotiations.

3.    **Fees**.  In consideration of Houlihan Lokey's acceptance of this engagement, the Company shall pay the following:

(i) *Monthly Fees*:  In addition to the other fees provided for herein, upon the date of the execution of this Agreement, and on every monthly anniversary of the Effective Date up to (and including such date if such date is one of the first five monthly anniversaries of the Effective Date) the earlier of (a) the date of a Majority Transaction (as defined below), if any, and (b) the date which is the fifth monthly anniversary of the Effective Date, the Company shall pay Houlihan Lokey, without required notice or invoice, a nonrefundable cash fee of $50,000 ("Monthly Fee").  Each Monthly Fee shall be earned upon Houlihan Lokey's receipt thereof in consideration of Houlihan Lokey accepting this engagement and performing services in accordance with the terms herein.  All of the Monthly Fees paid to Houlihan Lokey shall be credited against and reduce the next Transaction Fee (as defined below) to which Houlihan Lokey becomes entitled hereunder (it being understood and agreed that no Monthly Fee shall be credited more than once), except that, in no event, shall such Transaction Fee be reduced below zero (provided that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Monthly Fee Credit").

If this Agreement is terminated prior to the earlier of (x) the payment of any Transaction Fee and (y) the date which is the fifth monthly anniversary of the Effective Date, then the Company hereby agrees to pay to Houlihan Lokey, on the effective date of such termination, any excess of (x) $300,000, less (y) the Monthly Fees actually paid to Houlihan Lokey hereunder prior to such termination.

(ii) *Transaction Fee(s)*:  In addition to the other fees provided for herein, upon the consummation of each applicable Transaction (as defined below) during the term of this Agreement (or in certain circumstances following the expiration or termination of this Agreement as provided herein), the Company shall pay Houlihan Lokey (subject to the terms of Sections 6 and 7 hereof) in accordance with the following:

a. *Majority Transaction Fee.*  Upon the consummation of a Majority Transaction (as defined below), the Company shall pay to Houlihan Lokey a cash fee ("Majority Transaction Fee") equal to the greater of (a) $5,000,000 and (b) the sum of (x) 0.90% of AGC (as defined below) of the relevant Transaction(s) that is not paid to or retained by equity holders of the Company, and (y) 5.00% of any portion of AGC of the relevant Transaction(s) that is paid to or retained by equity holders of the Company, each subject to, and reduced by, any applicable Fee Credit(s) (as defined below).

For purposes hereof, a "Majority Transaction" shall mean (a) any Sale Transaction that, together with all other Sale Transactions involving a sale of assets, equity securities and/or operations of the Company and, after taking into account any strategic liquidations of a business line or a material group of stores in a single transaction or a series of related transactions, which have been completed or are in process at the time of the relevant Sale Transaction, constitute a majority of the assets, equity securities and/or operations of the Company, as determined in good faith by Houlihan Lokey and the Company and/or (b) a Financing Transaction or a Sale Transaction that, together with all other Sale Transactions and/or Financing Transactions, after taking into account any strategic liquidations of a business line or a material group of stores in a single transaction or a

Specialty Retail Shops Holding Corp.
Page 3

series of related transactions, which have been completed or are in process at the time of the relevant Sale Transaction and/or Financing Transaction, results in any person or group of related persons (other than Sun Capital Partners, Inc. and/or any of its affiliates) in the aggregate acquiring, directly or indirectly, securities entitled to a majority of the equity value of the Company as of such time, securities convertible into securities entitled to a majority of the equity value of the Company as of such time, and/or sufficient power under normal circumstances to control the business and affairs of the Company whether by ownership by control of securities or by contract.

b. *Minority Sale Transaction Fee.* Upon the consummation of a Sale Transaction that does not constitute a Majority Transaction (any such Sale Transaction, "Minority Sale Transaction"), the Company shall pay Houlihan Lokey a cash fee ("Minority Sale Transaction Fee") equal to:

  i. If AGC of the relevant Sale Transaction is less than $30,000,000: 0.90% of AGC of the relevant Sale Transaction;

  ii. If AGC of the relevant Sale Transaction is at least $30,000,000 but less than $50,000,000: $750,000;

  iii. If AGC of the relevant Sale Transaction is at least $50,000,000 but less than $100,000,000: $1,000,000;

  iv. If AGC of the relevant Sale Transaction is at least $100,000,000 but less than $200,000,000: $1,800,000; or

  v. If AGC of the relevant Sale Transaction is at least $200,000,000 but less than $300,000,000: $3,000,000,

in each case, subject to, and reduced by, any applicable Fee Credit(s).

If one or more Minority Sale Transactions are consummated prior to the consummation of a Majority Transaction, then 0.90% of the aggregate amount of the AGC of all such previously consummated Minority Sale Transactions shall be credited against and reduce any Majority Transaction Fee to which Houlihan Lokey becomes entitled hereunder (it being understood and agreed that the AGC of any Minority Sale Transaction Fee may only be credited once), except that, in no event, shall such Majority Transaction Fee be reduced below zero (provided that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Minority Sale Transaction Fee Credit").

c. *Financing Transaction Fee.* Upon the closing of a Financing Transaction that does not constitute a Majority Transaction, (x) the Company shall pay Houlihan Lokey a reasonable and customary fee in light of the circumstances to be agreed upon in good faith by the Company and Houlihan Lokey ("Financing Transaction Fee") and (y) the Company and Houlihan Lokey shall agree upon the amount (if any) of such Financing Transaction Fee which will be credited against and reduce any Majority Transaction Fee to which Houlihan Lokey becomes entitled hereunder thereafter (it being understood and agreed that such amount may only be credited once), except that, in no event, shall such Majority Transaction Fee be reduced below zero (provided that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Financing Transaction Fee Credit"). The Financing Transaction Fee(s) will be payable in respect of any Financing Transaction whether or not arranged by Houlihan Lokey, by another agent or directly by the Company (or such other issuer of the Securities in such Financing Transaction) or any of

Specialty Retail Shops Holding Corp.
Page 4

its affiliates, and shall be in addition to any other fees that the Company (or such other issuer of the Securities in the Financing Transaction) may be required to pay to any investor or other purchaser of Securities to secure its financing commitment.

    d. *Spirit Transaction Fee.*  Notwithstanding the foregoing, (x) in the event that the Company consummates a Spirit Transaction (as defined below) and such transaction, on its own does not constitute a Majority Transaction or a Minority Sale Transaction, then the Company shall pay Houlihan Lokey a cash fee of $1,000,000 (the "Spirit Transaction Fee"), subject to any applicable Fee Credit(s); and (y) in the event that, prior to the date which is sixty (60) days following the Effective Date, the Company enters into a definitive agreement to consummate either (A) a Spirit Transaction in conjunction with a Majority Transaction or a Minority Sale Transaction and/or (B) a Majority Transaction or a Minority Sale Transaction in which Spirit Realty Capital ("Spirit") is an acquiror or investor or otherwise materially participates (beyond in a capacity relating to the restructuring of their master leases), then the applicable Majority Transaction Fee or Minority Sale Transaction Fee that would otherwise be payable by the Company to Houlihan Lokey shall be reduced by fifty percent (50%) and be subject to any applicable Fee Credit(s).  If a Spirit Transaction Fee is paid prior to the consummation of a Majority Transaction or Minority Sale Transaction, then fifty percent (50%) of the aggregate amount of the Spirit Transaction Fee shall be credited against and reduce the applicable Majority Transaction Fee or Minority Sale Transaction Fee to which Houlihan Lokey becomes entitled hereunder with respect thereto (it being understood and agreed that the Spirit Transaction Fee shall not be credited more than once), except that, in no event, shall such Majority Transaction Fee or Minority Sale Transaction Fee be reduced below zero (provided that any unused portion shall be applied to a subsequent Transaction Fee, if any) ("Spirit Transaction Fee Credit").

Any Majority Transaction Fee, Minority Sale Transaction Fee, Financing Transaction Fee and/or Spirit Transaction Fee are each referred to herein as a "Transaction Fee" and are collectively referred to herein as "Transaction Fees".  Any Monthly Fee Credit, Minority Sale Transaction Fee Credit, Financing Transaction Fee Credit and/or Spirit Fee Credit is each referred to herein as a "Fee Credit" and are collectively referred to herein as "Fee Credits."

For the avoidance of doubt, notwithstanding anything contained herein, (A) in no event shall Houlihan Lokey be entitled to more than one Majority Transaction Fee and (B) the total fees payable to Houlihan Lokey hereunder (other than any fees calculated and payable in accordance with clause (y) of Section 3(ii)a hereof which shall not be limited by this clause (B)) shall not exceed $7,250,000 in the aggregate.  All payments received by Houlihan Lokey pursuant to this Agreement at any time shall become the property of Houlihan Lokey without restriction.  No payments received by Houlihan Lokey pursuant to this Agreement will be voluntarily put by the Company into a trust or other segregated account.

4.    **Term and Termination.**  This Agreement shall have an initial term of six (6) months, and thereafter shall be automatically extended on a month-to-month basis until either party terminates this Agreement by providing five days' prior written notice of termination (including via e-mail) to the other party. The expiration or termination of this Agreement shall not affect (i) any provision of this Agreement other than Sections 1 through 3, the first four sentences of Section 11, the first sentence of Section 13 and Section 15, or (ii) Houlihan Lokey's right to receive, and the Company's obligation to pay, any and all fees, expenses and other amounts due and payable in accordance with this Agreement, whether or not any Transaction shall be consummated prior to or subsequent to the effective date of expiration or termination, as more fully set forth in this Agreement.

Specialty Retail Shops Holding Corp.
Page 5

In addition, if this Agreement expires or is terminated by the Company for any reason and the Company consummates or enters into an agreement to engage in (and which subsequently closes at any time), any Transaction prior to the date that is twelve (12) months after such expiration or termination date, with any party which (i) Houlihan Lokey identified in writing to the Company, contacted or with whom Houlihan Lokey or the Company had discussions regarding a potential Transaction during the term of this Agreement, or (ii) reviewed the information memorandum or any other written materials prepared by Houlihan Lokey or by the Company with the assistance of Houlihan Lokey concerning the Company and/or any proposed Transaction, Houlihan Lokey shall be entitled to receive the applicable Transaction Fee, if any, upon the consummation of such Transaction in accordance with the terms hereof as if no such expiration or termination had occurred (the "Tail Fee"), and, for the avoidance of doubt, subject to any applicable Fee Credit. Notwithstanding the foregoing, Houlihan Lokey will not be entitled to the Tail Fee in the event that (a) during the term of this Agreement and prior to the time the Company enters into an agreement to engage in a Transaction (which subsequently closes at any time without any material modification to the terms of such agreement), Houlihan Lokey has engaged in gross negligence or willful misconduct with respect to the engagement hereunder, and, as a result, there is a material failure of Houlihan Lokey to perform the services set forth in Section 1 of this Assignment, (b) within 20 days after being made aware of the foregoing, the Company gives Houlihan Lokey at least thirty (30) day's written notice of the Company's intention to terminate this Agreement as a result thereof (a "Pre-Termination Notice"), which Pre-Termination Notice shall specify in reasonable detail the act or failure to act constituting Houlihan Lokey's gross negligence or willful misconduct, (c) Houlihan Lokey fails to cure such specified act or failure to act, or fails to take reasonable steps to ensure that no such act or failure to act shall occur again, within thirty (30) days after receipt of such Pre-Termination Notice, (d) promptly following Houlihan Lokey's failure to cure or ameliorate such effects within such time period, the Company terminates this Agreement by delivering to Houlihan Lokey a Termination Notice which specifies the reasons for the Company's termination of this Agreement, and (e) Houlihan Lokey is finally judicially determined by a court of competent jurisdiction to have engaged in such gross negligence or willful misconduct. This paragraph only concerns the payment of a Tail Fee to Houlihan Lokey, and nothing contained herein shall modify the terms of Section 19 or any other part of this Agreement in any respect.

5.    **Transaction.**    As used in this Agreement, the term "Transaction" shall mean any of the following:

(i) *Sale Transaction.* Any transaction or series of related transactions outside the Company's ordinary course of business that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity, including the Company's unaffiliated creditors, but excluding any of the Company's existing owners or shareholders and/or their respective affiliates) (a) all or any material portion of the outstanding equity securities of any entity comprising the Company and/or (b) all or any material portion of the assets (including the assignment of any executory contracts) or operations of any entity comprising the Company or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options or assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity (each a "Sale Transaction"); provided, that notwithstanding the foregoing, none of the following shall constitute a Sale Transaction: (w) a nonconsensual foreclosure sale by any creditor of its collateral over the objection of the relevant debtor Companies shall not constitute a Sale Transaction, and/or (x) the disposition of all or a portion of the Company's pharmacy assets to CVS Pharmacy and/or any of its subsidiaries or affiliates in a transaction consummated pursuant to definitive agreements entered into prior to the date which is sixty (60) days following the Effective Date and which yields AGC of less than $40,000,000 (excluding the value of any prescription drug inventory included in such sale), (y) the disposition of prescription and/or pharmacy files in a

Specialty Retail Shops Holding Corp.
Page 6

transaction which yields less than $2,000,000, individually, and transactions that yield less than $15,000,000, in the aggregate (in each case, excluding the value of any prescription drug inventory included in such sale) and/or (z) any liquidations and/or going out of business sales.

(ii) *Financing Transaction.* The placement, raising or issuance of any form of equity, equity-linked or debt securities (including, without limitation, any convertible securities, preferred stock, unsecured, non-senior or subordinated debt securities, and/or senior notes or bank debt) or any loan or other financing, any or all of which being "Securities", from any source including, without limitation, the Company's unaffiliated creditors, but excluding any financing provided exclusively by the Company's existing owners or shareholders and/or their respective affiliates (each a "Financing Transaction").

(iii) *Spirit Transaction.* A transaction in which the Company materially restructures or otherwise materially modifies: (a) the Amended and Restated Master Lease between Spirit SPE Portfolio 2006-1, LLC and Spirit SPE Portfolio 2006-2, LLC and Shopko Stores Operating Co., LLC, dated December 15, 2015 (as amended) and (b) the Amended and Restated Master Lease between Spirit SPE Portfolio 2006-3, LLC and Pamida Stores Operating Co., LLC, dated June 1, 2016 (as amended) (collectively, the "Spirit Leases") (any such transaction, a "Spirit Transaction").

6.    **Aggregate Gross Consideration ("AGC").**  For the purpose of calculating a Transaction Fee, the applicable "AGC" shall be the gross proceeds paid to, or received by, or to be paid to or received by, any entity comprising the Company, or any of its equity or debt holders, including, without limitation, holders of warrants and convertible securities, and holders of options or stock appreciation rights (in respect thereof) (collectively, including the Company, "Constituents"), in connection with the relevant Transaction, (i) including, without limitation and without duplication, (a) amounts in escrow and any hold-backs, (b) cash, notes, securities, and other property, (c) non-contingent payments made in installments, (d) Contingent Payments (as defined below), (e) the face value of any liabilities of any entity comprising the Company that are assumed, satisfied, or otherwise paid off by the acquiror in conjunction with a Transaction, and/or (f) the fair market value of any non-cash assets of any entity comprising the Company that are sold or otherwise transferred outside of the Company's ordinary course of business to another party prior to and directly in connection with the closing of a Transaction (including, without limitation, any non-cash dividends or distributions paid to security holders or to repurchase any securities, but excluding dispositions of obsolete or unused equipment contemplated by the Company); provided, that if any such proceeds are escrowed, held-back, deferred, contingent on future events (including Contingent Payments) or received in the form of a note payable or similar instrument (an "Additional Payment Amount"), the Transaction Fee to be paid at the closing of the applicable Transaction will be determined without taking into account such Additional Payment Amount in the calculation of AGC, and thereafter upon receipt of such Additional Payment Amount by the applicable Constituent(s), Houlihan Lokey shall be paid the difference between (x) the Transaction Fee calculated as if AGC included all Additional Payment Amounts received as of that later date and (y) the Transaction Fee(s) previously received by Houlihan Lokey with respect to the applicable Transaction, and (ii) excluding (a) consideration paid in respect of the Company's cash as of immediately prior to the closing of the Transaction in excess normalized minimum working capital cash balances, (b) consideration paid in respect of working capital adjustments and (c) any employment-related reasonable and customary compensation or reasonable and customary equity incentives provided to the Company's management team by the acquiror or any of its subsidiaries or affiliates.  If, in the Transaction, no consideration is being paid in respect of the existing equity, AGC of the retained equity shall be determined by the good faith agreement of the parties as to the value of such retained equity implied by the Transaction.  For the avoidance of doubt, the AGC of any Transaction will be determined without duplication to amounts accounted for in the AGC of any other Transaction.  "Contingent Payments" shall be defined as the consideration received or receivable by any of the Constituents in the form of deferred performance-based

Specialty Retail Shops Holding Corp.
Page 7

payments, "earn-outs", or other contingent payments based upon the future performance of any entity comprising the Company, or any of its businesses or assets, and shall exclude any retained equity.

7.    **Value of Consideration.**  For the purpose of calculating the AGC of any Transaction, any securities, other than a promissory note, will be valued at the time of the announcement of the Transaction, without regard to any restrictions on transferability, as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the announcement of the Transaction; (ii) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten trading day period ending two days prior to the announcement of the Transaction; and (iii) if such securities have not been traded prior to the announcement of the Transaction, Houlihan Lokey and the Company shall negotiate in good faith to agree on a fair valuation thereof, without regard to any restrictions on transferability, for the purposes of calculating the AGC.  For any lease payments and other consideration that is not freely tradable or has no established public market, if the consideration utilized consists of property other than securities (including notes or other debt securities) or cash, then the value of such property shall be the fair market value thereof as determined in good faith by Houlihan Lokey and the Company.  If any consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is received.  The value of any purchase money or other promissory notes shall be deemed to be the face amount thereof.

8.    **Reasonableness of Fees.**  The parties acknowledge that this engagement will require a substantial professional commitment of time and effort by Houlihan Lokey.  Moreover, the amount of time and effort may vary substantially during different periods of the engagement.  As a result, in order to ensure the availability of all necessary professional resources, whenever required, Houlihan Lokey may be foreclosed from pursuing other alternative engagement opportunities.  In light of the foregoing, and given: (i) the numerous issues which can currently be anticipated in engagements such as this, (ii) Houlihan Lokey's commitment to the variable level of time and effort necessary to address such issues, (iii) the expertise and capabilities of Houlihan Lokey that will be required in this engagement, and (iv) the market rate for Houlihan Lokey's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Houlihan Lokey, and provides the requisite certainty to the Company.

9.    **Expenses.**  In addition to all of the other fees and expenses described in this Agreement, and regardless of whether any Transaction is consummated, the Company shall, upon Houlihan Lokey's request (which shall include invoices with reasonable backup, provided the expenses in clause (ii) below will not have backup), reimburse Houlihan Lokey for its reasonable out-of-pocket expenses incurred from time to time in connection with its services hereunder (for the avoidance of doubt, prior to the termination or expiration of this Agreement), but in no event greater than $75,000 without the Company's prior written approval, which approval shall not be unreasonably withheld (provided that such limitation shall not affect the Company's obligations to otherwise pay any such expenses under this Agreement pursuant to Sections 16 and/or 19). Houlihan Lokey bills its clients for its reasonable out-of-pocket expenses including, but not limited to (i) travel-related and certain other expenses, without regard to volume-based or similar credits or rebates Houlihan Lokey may receive from, or fixed-fee arrangements made with, travel agents, airlines or other vendors, and (ii) research, database and similar information charges paid to third party vendors, and reprographics expenses, to perform client-related services that are not capable of being identified with, or charged to, a particular client or engagement in a reasonably practicable manner, based upon a uniformly applied monthly assessment.  The expenses set forth in clause (ii) of the immediately preceding sentence shall in no event be greater than $25,000 in the aggregate without the Company's prior written consent (which consent shall not be unreasonably withheld), which amount shall be billed to the Company at a rate of no more than $2,000 per month, with any outstanding balance to be included in Houlihan Lokey's final invoice.

Specialty Retail Shops Holding Corp.
Page 8

Houlihan Lokey shall, in addition, be reimbursed by the Company for the fees and expenses of Houlihan Lokey's outside legal counsel incurred in connection with the performance of this Agreement and the matters contemplated hereby, but in no event greater than $25,000 without the Company's prior approval, which approval shall not be unreasonably withheld (provided that such limitation shall not affect the Company's obligations to otherwise pay any such legal fees and other expenses under this Agreement pursuant to Sections 16 and/or 19).

10.   **Invoicing and Payment.** All amounts payable to Houlihan Lokey shall be made in lawful money of the United States in accordance with the payment instructions as set forth on the invoice provided with this Agreement, or to such accounts as Houlihan Lokey shall provide to the Company in writing. All amounts charged by Houlihan Lokey will be invoiced together with applicable sales tax where appropriate.

11.   **Information.** The Company will provide Houlihan Lokey with access to management and other representatives of the Company, as reasonably requested by Houlihan Lokey. The Company will furnish Houlihan Lokey with such information as Houlihan Lokey may reasonably request for the purpose of carrying out its engagement hereunder, all of which will be, to the Company's knowledge, accurate and complete at the time furnished. Any financial projections delivered to Houlihan Lokey will be prepared in good faith by the Company based on reasonable assumptions at the time furnished and in light of the circumstances under which they are made. The Company will promptly notify Houlihan Lokey in writing (which shall include e-mail) to the extent it becomes aware of any material inaccuracy or misstatement in, or material omission from, any information previously delivered to, or discussed with, Houlihan Lokey, or any material provided to any interested party, in each case by or on behalf of the Company. Houlihan Lokey shall be entitled to rely, without independent verification, on the accuracy and completeness of all information that is publicly available and of all information furnished by or on behalf of the Company or any other potential party to any Transaction or otherwise reviewed by, or discussed with, Houlihan Lokey. The Company understands and agrees that Houlihan Lokey will not be responsible for the accuracy or completeness of such information, and shall not be liable for any inaccuracies or omissions therein. The Company acknowledges that Houlihan Lokey has no obligation to conduct any appraisal of any assets or liabilities of the Company or any other party or to evaluate the solvency of any party under any applicable laws relating to bankruptcy, insolvency or similar matters. Houlihan Lokey's role in reviewing any information is limited solely to performing such a review as it shall deem necessary to support its own advice and analysis and shall not be on behalf of any other party. Any advice (whether written or oral) rendered by Houlihan Lokey pursuant to this Agreement is intended solely for the use of the Company in evaluating a Transaction, and such advice may not be relied upon by any other person or entity or used for any other purpose. Any advice rendered by, or other materials prepared by, or any communication from, Houlihan Lokey may not be disclosed, in whole or in part, to any third party, or summarized, quoted from, or otherwise referred to in any manner without the prior written consent of Houlihan Lokey. In addition, the terms of this Agreement may otherwise be referred to without our prior written consent. Notwithstanding the two immediately preceding sentences, the Company may furnish Houlihan Lokey's advice and materials relating to a Transaction in response to any subpoena, court order, or similar legal demand received by it, or any of its directors or officers, provided that prompt prior written notice thereof (to the extent legally permissible) shall be given to Houlihan Lokey so that Houlihan Lokey may seek a protective order or other appropriate remedy, and, if Houlihan Lokey fails to obtain such remedy, the Company may disclose only that information which its counsel advises it is legally compelled to disclose.

12.   **Confidential Information.** Houlihan Lokey acknowledges that, in connection with the services to be provided pursuant to this Agreement, certain confidential, non-public and proprietary information concerning the Company and the Transaction ("Confidential Information") has been or may be disclosed by the Company to Houlihan Lokey or its employees, affiliates, attorneys, subcontractors and advisors (collectively, "Representatives"). Houlihan Lokey agrees that, without the Company's prior written consent, no Confidential Information will be disclosed, in whole or in part, to any other party (other than

Specialty Retail Shops Holding Corp.
Page 9

to any potential party to a Transaction under appropriate assurances of confidentiality, to those Representatives who need access to any Confidential Information for purposes of performing the services to be provided hereunder (provided that Houlihan Lokey shall be responsible for any breach by any such Representatives of the confidentiality obligations of this Section 12), or as may be required by law or regulatory authority). The term "Confidential Information" does not include any information: (a) that was already in the possession of Houlihan Lokey or any of its Representatives, or that was available to Houlihan Lokey or any of its Representatives on a non-confidential basis, prior to the time of disclosure to Houlihan Lokey or such Representatives; (b) obtained by Houlihan Lokey or any of its Representatives from a third party which, insofar as is known to Houlihan Lokey or such Representatives, is not subject to any prohibition against disclosure; (c) which was or is independently developed by Houlihan Lokey or any of its Representatives without use of, or reference to, any Confidential Information; or (d) which was or becomes generally available to the public through no fault of Houlihan Lokey or any of its Representatives. If Houlihan Lokey becomes required by legal process or requested by regulatory authority to disclose any Confidential Information, prompt notice thereof (to the extent legally permissible) shall be given to the Company (provided that no notification shall be required in respect of any disclosure to regulatory authorities having jurisdiction over Houlihan Lokey), and Houlihan Lokey may disclose only that information which its counsel advises it is compelled to disclose. The obligations set forth in this paragraph shall remain in effect for a period of eighteen (18) months from the date of termination of this Agreement.

13.    **Additional Provisions Regarding Financing Transaction.**  The Company authorizes Houlihan Lokey to provide an information memorandum (or similar document) approved by the Company (as such document may be amended or supplemented and including any information incorporated therein by reference, the "Information Memorandum") and other pertinent information to prospective investors and other purchasers which are approved by the Company and subject to execution by each such prospective investor or other purchaser of a confidentiality agreement acceptable to the Company, and agrees not to transmit the Information Memorandum to prospective investors or other purchasers without Houlihan Lokey's prior approval. The Company will be solely responsible for the contents of the Information Memorandum and any and all other written or oral communications provided by or on behalf of the Company to any actual or prospective investor or other purchaser. The Company represents and warrants that the Information Memorandum and such other communications will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. If the Company becomes aware of an event, a result of which the Information Memorandum (as then supplemented or amended) would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, the Company, upon obtaining actual knowledge of the foregoing, will promptly notify Houlihan Lokey of such event and Houlihan Lokey will suspend solicitations of prospective investors and other purchasers until such time as the Company prepares (and the Company agrees that, if the solicitation of prospective investors and other purchasers has been so suspended after the Company has accepted orders from prospective investors or other purchasers, the Company will promptly prepare) a supplement or amendment to the Information Memorandum which corrects such statement(s) or omission(s) or the Company otherwise takes such reasonable action as required to address the statement(s) or omission(s). The Company will (i) make available to each bona fide offeree of the Securities such information (in addition to that contained in the Information Memorandum) concerning the offering of the Securities, the Company and any other relevant matters, and (ii) provide each bona fide offeree the opportunity to ask questions of, and receive answers from, the officers and certain employees of the Company, as approved by the Company, concerning the terms and conditions of the offering of the Securities.

The Company acknowledges that closing of a Financing Transaction is subject, among other factors, to acceptable documentation, market conditions, and satisfaction of the conditions set forth in one or more agreements to be entered into with any financier, lender, investor or other purchaser of Securities.

Specialty Retail Shops Holding Corp.
Page 10

It is expressly understood that this engagement does not constitute any commitment, express or implied, on the part of Houlihan Lokey to acquire, and does not ensure the successful placement of, any portion of the Securities. The Company further acknowledges and agrees that Houlihan Lokey is not acting as an underwriter of the Securities and shall have no responsibility or obligation to underwrite the Securities.

In connection with all offers and sales of the Securities, the Company will cause to be delivered to Houlihan Lokey copies of any opinions of counsel that have been provided to investors or other purchasers of the Securities. The Company also will cause to be furnished to Houlihan Lokey at or after each closing of a sale of Securities copies of such agreements, opinions, certificates and other documents (including, without limitation, accountant's letters) comprising the definitive documentation relating to the sale of such Securities as Houlihan Lokey may reasonably request. The Company hereby acknowledges that Houlihan Lokey may rely upon the representations and warranties made (whether pursuant to a subscription agreement or in any other format) to investors or other purchasers of Securities.

It is understood that the parties hereto intend that the offer and sale of the Securities in a Financing Transaction will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Act"), pursuant to Section 4(a)(2) thereof. The Company has not taken, and will not take, any action, directly or indirectly, so as to cause the transactions contemplated by this Agreement to fail to be entitled to exemption under Section 4(a)(2) of the Act. The Company will promptly from time to time take such reasonable action as necessary to qualify the Securities to be issued in connection with any Financing Transaction as a private placement under the securities laws of such States and foreign jurisdictions as any prospective investor or other purchaser may reasonably request and will comply with applicable laws. The Company shall cause the issuer of the Securities to be issued in connection with any Financing Transaction to offer and sell such Securities only to investors and other purchasers of that they reasonably believe to be "accredited investors", as defined in Rule 501 of Regulation D under the Act. To the extent the issuer of the Securities to be issued in connection with any Financing Transaction is required to file any notices or other filings with the Securities and Exchange Commission or other securities regulatory authorities with respect to such Securities, the Company will cause the issuer to make such filings in a timely manner and to furnish to Houlihan Lokey a copy of each such notice or filing promptly after its submission.

14.    **Limitations on Services as Advisor.**  Houlihan Lokey's services are limited to those specifically provided in this Agreement, or subsequently agreed upon in writing, by the parties hereto. Houlihan Lokey shall have no obligation or responsibility for any other services including, without limitation, any crisis management or business consulting services related to, among other things, the implementation of any operational, organizational, administrative, cash management, or similar activities. The parties understand that Houlihan Lokey is being engaged hereunder as an independent contractor to provide the services hereunder solely to the Company, and that Houlihan Lokey is not acting as an agent or fiduciary of the Company, its security holders or creditors or any other person or entity in connection with this engagement, and the Company agrees that it shall not make, and hereby waives, any claim based on an assertion of such an agency or fiduciary relationship. In performing its services pursuant to this Agreement, Houlihan Lokey is not assuming any responsibility for the Company's decision on whether to pursue, endorse or support any business strategy, or to effect, or not to effect, any Transaction(s), which decision shall be made by the Company in its sole discretion. Any duties of Houlihan Lokey arising by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder will be owed solely to the Company.

15.    **Additional Services.**  To the extent Houlihan Lokey is requested by the Company to perform any financial advisory or investment banking services which are not within the scope of this engagement, the Company shall pay Houlihan Lokey such fees as shall be mutually agreed upon by the parties hereto in writing, in advance, depending on the level and type of services required, and shall be in addition to the fees and expenses described hereinabove.

Specialty Retail Shops Holding Corp.
Page 11

16.     **Required Services.**  If Houlihan Lokey is required to render services not described herein, but
which relate directly or indirectly to the subject matter of this Agreement (including, but not limited to,
producing documents, answering interrogatories, attending depositions, giving expert or other testimony,
whether by subpoena, court process or order, or otherwise), the Company shall pay Houlihan Lokey
additional fees to be mutually agreed upon for such services, plus reasonable related out-of-pocket costs
and expenses, including, among other things, the reasonable legal fees and expenses of Houlihan Lokey's
counsel in connection therewith.

17.     **Credit.**  After the announcement or closing of any Transaction, Houlihan Lokey may, at its own
expense and with the Company's prior written consent (not to be unreasonably withheld, conditioned or
delayed), place announcements on its corporate website and in financial and other newspapers and
periodicals (such as a customary "tombstone" advertisement, including the Company's logo or other
identifying marks but shall not refer to the purchase price or other material economic terms of such
Transaction) describing its services in connection therewith.

18.     **Choice of Law; Jury Trial Waiver; Jurisdiction.**   THIS AGREEMENT SHALL BE
DEEMED TO BE MADE IN NEW YORK.   THIS AGREEMENT AND ALL DISPUTES
ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON
CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED IN
ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD
TO PRINCIPLES OF CONFLICTS OF LAWS.   EACH OF HOULIHAN LOKEY AND THE
COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE
LAW, ON BEHALF OF ITS EQUITY HOLDERS) IRREVOCABLY WAIVES ANY RIGHT TO
TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER
BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF
THE ENGAGEMENT OF HOULIHAN LOKEY PURSUANT TO, OR THE PERFORMANCE BY
HOULIHAN LOKEY OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.
REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF
BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY
CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE
PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER
BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE BROUGHT AND
MAINTAINED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION
SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK OR IN THE
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK,
WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION
OF SUCH MATTERS, AND AGREES TO VENUE IN SUCH COURTS.   EACH PARTY
FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE EXCLUSIVELY TO
SUCH JURISDICTION AND VENUE IN ANY ACTION OR SUIT COMMENCED IN ANY
SUCH COURTS, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION
WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER
VENUE OR FORUM NON CONVENIENS.   THE COMPANY AGREES THAT A FINAL
JUDGMENT IN ANY SUCH ACTION, SUIT OR CLAIM BROUGHT IN ANY OF THE
COURTS REFERRED TO ABOVE SHALL BE CONCLUSIVE AND BINDING UPON IT AND
MAY BE ENFORCED IN ANY OTHER COURTS HAVING JURISDICTION OVER IT BY SUIT
UPON SUCH JUDGMENT.  THE COMPANY IRREVOCABLY CONSENTS TO SERVICE OF
PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO
THE COMPANY AT 700 PILGRIM WAY, GREEN BAY, WI 54304.

19.     **Indemnification and Standard of Care.**  As a material part of the consideration for the
agreement of Houlihan Lokey to furnish its services under this Agreement, the Company agrees (i) to
indemnify and hold harmless Houlihan Lokey and its affiliates, and their respective past, present and
future directors, officers, partners, members, employees, agents, representatives, advisors, subcontractors

Specialty Retail Shops Holding Corp.
Page 12

and controlling persons (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to Houlihan Lokey's engagement under this Agreement, and (ii) to reimburse each Indemnified Party for all reasonable and reasonably documented out-of-pocket expenses (including, without limitation, the reasonable fees and reasonable out-of-pocket expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising or otherwise becoming involved in any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (including, without limitation, any shareholder or derivative action), arising out of or related to such engagement or matter.  However, the Company shall not be liable under the foregoing indemnification provision to the extent that any loss, claim, damage or liability is finally judicially determined by a court of competent jurisdiction to have resulted from the willful misconduct, bad faith, actual fraud or gross negligence of such Indemnified Party, and in such case, the Company shall be entitled to recover from the applicable Indemnified Party any expenses advanced by the Company to such Indemnified Party pursuant to the reimbursement obligation set forth in this paragraph to the extent attributable to such loss, claim, damage or liability, subject to such Indemnified Party's rights of contribution.

With respect to any litigation brought by Houlihan Lokey against the Company for a breach of the Agreement that is not in any way related to a claim by a third party, the indemnity provision in the immediately preceding paragraph shall not apply, and the prevailing party in such proceeding shall be entitled to recover, in addition to any other appropriate amounts, its reasonable document out-of-pocket expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and expenses and court costs, except that this provision shall not apply to any claims (a) brought by any Indemnified Party to enforce such Indemnified Party's indemnification, contribution and reimbursement rights under this Schedule A, or (b) brought by any person or entity asserting claims on behalf of or in right of the Company, including, without limitation, a claim made derivatively, or by a shareholder, receiver or person serving in a similar capacity, which claims shall be covered by the indemnity and reimbursement provisions set forth in the immediately preceding paragraph.

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient to fully to indemnify any Indemnified Party or to hold it harmless pursuant to the foregoing provisions of this Section 19, then the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of the losses, claims, damages, liabilities or expenses referred to in subsections (i) or (ii) of such indemnification or reimbursement provisions in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by such Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company (and its affiliates, and their respective directors, employees, agents and other advisors), on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations.  Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by Houlihan Lokey from the Company pursuant to this Agreement.  Relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Company, and its security holders, creditors, and other affiliates, as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by Houlihan Lokey under this Agreement. The Company shall not settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding arising out of or related to Houlihan Lokey's engagement under this Agreement (whether or not an Indemnified Party is an actual or potential party thereto), or participate in

Specialty Retail Shops Holding Corp.
Page 13

or otherwise facilitate any such settlement, compromise, consent or termination by any of the Company's controlled affiliates, directors, or officers, unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey. The Company shall not be required to indemnify any Indemnified Party for any amount paid or payable by such party in the settlement or compromise of any action or proceeding for which indemnification is sought hereunder, unless such settlement or compromise is consented to in writing by the Company, which consent shall not be unreasonably withheld, conditioned or delayed; provided that the Company shall be required to indemnify such Indemnified Party for such amount, even if such settlement or compromise is not consented to by the Company, if the Indemnified Party that is considering such settlement or compromise submits the terms of such settlement or compromise to the Company in writing and the Company has not, within thirty (30) days thereafter, engaged in good faith discussions with such Indemnified Party regarding the Company's obligation to indemnify it for the amount payable thereunder.

The Company further agrees that neither Houlihan Lokey nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company or any person or entity asserting claims on behalf of or in right of the Company arising out of or related to Houlihan Lokey's engagement under this Agreement, except to the extent, if any, losses, claims, damages or liabilities incurred by the Company are finally judicially determined by a court of competent jurisdiction to have resulted from the willful misconduct, bad faith, actual fraud or gross negligence of such Indemnified Party.

The Company shall cause any new company that may be formed by the Company, for any purpose, to agree to all of the obligations in this Section 19 to Houlihan Lokey in accordance with the foregoing provisions. Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Houlihan Lokey in writing thereof (if not previously so notified) and, if requested by Houlihan Lokey, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions satisfactory to Houlihan Lokey. The Company agrees that Houlihan Lokey would be irreparably injured by any breach of this Agreement (including, without limitation, the agreement set forth in the immediately preceding sentence), that money damages alone would not be an adequate remedy for any such breach and that, in the event of any such breach, Houlihan Lokey shall be entitled, in addition to any other remedies, to pursue injunctive relief and specific performance.

The indemnity, reimbursement, and other obligations and agreements of the Company set forth herein (i) shall apply to any services provided by Houlihan Lokey in connection with this engagement prior to the Effective Date and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Company may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party or any person controlling any of them, and (iv) shall survive the completion of the services described in, and any expiration or termination of the relationship established by, this Agreement.

20.    **Miscellaneous.** This Agreement shall be binding upon the parties hereto and their respective successors, heirs and assigns and any successor, heir or assign of any substantial portion of such parties' respective businesses and/or assets, including any trustee appointed on behalf of the Company.

Specialty Retail Shops Holding Corp.
Page 14

Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Parties and each of their respective successors, heirs and assigns, any rights or remedies (directly or indirectly as a third party beneficiary or otherwise) under or by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder.

This Agreement, , is the complete and exclusive statement of the entire understanding of the parties regarding the subject matter hereof, and supersedes all previous agreements or understandings regarding the same, whether written or oral.  This Agreement may not be amended, and no portion hereof may be waived, except in a writing duly executed by the parties hereto.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business as a condition to doing business with that person.  Accordingly, the Company will provide Houlihan Lokey upon request certain identifying information necessary to verify the Company's identity, such as a government-issued identification number (e.g., a U.S. taxpayer identification number), certified articles of incorporation, a government-issued business license, partnership agreement or trust instrument.

This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument.  Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

The Company has all requisite power and authority to enter into this Agreement.  This Agreement has been duly and validly authorized by all necessary action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms.  This Agreement has been reviewed by the signatories hereto and their counsel.  There shall be no construction of any provision against either party hereto because this Agreement was drafted by such party, and the parties waive any statute or rule of law to such effect.

The Company agrees that it will be solely responsible for ensuring that any Transaction complies with applicable law.  The Company understands that Houlihan Lokey is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice.

To the extent that the Company hereunder is comprised of more than one entity or company, the obligations of the Company under this Agreement are joint and several, and any consent, direction, approval, demand, notice or the like given by any one of such entities or companies shall be deemed given by all of them and, as such, shall be binding on the Company.

The Company understands and acknowledges that Houlihan Lokey and its affiliates (collectively, the "Houlihan Lokey Group") engage in providing investment banking, securities trading, financing, financial advisory, and consulting services and other commercial and investment banking products and services to a wide range of institutions and individuals.  In the ordinary course of business, the Houlihan Lokey Group and certain of its employees, as well as investment funds in which they may have financial interests or with which they may co-invest, may acquire, hold or sell, long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and financial instruments (including

Specialty Retail Shops Holding Corp.
Page 15

bank loans and other obligations) of, or investments in, the Company or any other party that may be involved in the matters contemplated by this Agreement or have other relationships with such parties. With respect to any such securities, financial instruments and/or investments, all rights in respect of such securities, financial instruments and investments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, the Houlihan Lokey Group may in the past have had, and may currently or in the future have, financial advisory or other investment banking or consulting relationships with parties involved in the matters contemplated by this Agreement, including parties that may have interests with respect to the Company, a Transaction or other parties involved in a Transaction, from which conflicting interests or duties may arise. Although the Houlihan Lokey Group in the course of such other activities and relationships may acquire information about the Company, a Transaction or such other parties, or that otherwise may be of interest to the Company, the Houlihan Lokey Group shall have no obligation to, and may not be contractually permitted to, disclose such information, or the fact that the Houlihan Lokey Group is in possession of such information, to the Company or to use such information on the Company's behalf. Houlihan Lokey agrees that until the earlier of (a) the expiration or termination of this Agreement or (b) the consummation of a Majority Transaction, Houlihan Lokey shall not become engaged to provide buy-side mergers and acquisitions investment banking services to a potential acquiror of the Company, which services relate to a potential Transaction, without the prior consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed; provided that such restriction shall not restrict Houlihan Lokey or its affiliates from providing valuation, tax and financial reporting, fairness or solvency opinion, transaction advisory (i.e., due diligence), dispute resolution, or consulting services, subject to the implementation of appropriate information barriers (including clean teams) between the Houlihan Lokey financial staff providing such services and the Houlihan Lokey financial staff providing such services hereunder.

In order to enable Houlihan Lokey to bring relevant resources to bear on its engagement hereunder from among its global affiliates, the Company agrees, subject to the confidentiality obligations set forth in Section 12, that Houlihan Lokey may share information obtained from the Company and other parties hereunder with other members of the Houlihan Lokey Group, and may perform the services contemplated hereby in conjunction with such other members.

Specialty Retail Shops Holding Corp.
Page 16

     If the foregoing correctly sets forth our agreement, please sign and return to us a copy of this Agreement along with a check (or wire transfer confirmation) for $50,000 on account of the first Monthly Fee.

     All of us at Houlihan Lokey thank you for choosing us to advise the Company, and look forward to working with you on this engagement.

Very truly yours,

HOULIHAN LOKEY CAPITAL, INC.

By: _____
    Saul Burian
    Managing Director

Accepted and agreed to as of the Effective Date:

Specialty Retail Shops Holding Corp.
Page 17


Accepted and agreed to as of the Effective Date:

**SPECIALTY RETAIL SHOPS HOLDING CORP.,** on its own behalf, and on behalf of its direct and indirect subsidiaries

By: _____

Russell Steinhorst
Executive Vice President and Chief Financial Officer



# HOULIHAN LOKEY

**<u>Personal and Confidential</u>**

May 17, 2017

Shopko Stores Operating Co., LLC
700 Pilgrim Way
Green Bay, WI 54304
Attn: Mr. Russell Steinhorst, Executive Vice President and Chief Financial Officer

First Monthly Fee                                                                                                          <u>$50,000.00</u>

PAYMENT DUE UPON RECEIPT
**Please Send Checks To:**
Houlihan Lokey Capital, Inc.
Accounts Receivable Department
10250 Constellation Blvd., 5th Floor
Los Angeles, California 90067

**Wire Transfer Instructions:**
Bank of America
Wire Transfer ABA #026009593
ACH ABA #121000358
fbo Houlihan Lokey Capital, Inc.
Account #1453120593
Swift Code (International Wires Only): BOFAUS3N