## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) Case No.: 19-80064-TLS |
| | ) (Jointly Administered) |
| Debtors. | ) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED JOINT CHAPTER 11 PLAN, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

       1.      The Official Committee of Unsecured Creditors (the "Committee") of Specialty Retail Shops Holding Corp., *et al.*, the above-captioned debtors and debtors in possession (the "Debtors") hereby objects (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 53] (the "DS Motion") and the *Disclosure Statement for the Joint Chapter 11 Plan of Specialty Retail Shops Holding Corporation and Its Debtor Affiliates* [Docket No. 54] (the "Disclosure Statement"). In support of the Objection, the Committee respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592). The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

## I.    **PRELIMINARY STATEMENT**

2.    The Disclosure Statement and the Plan it purports to describe, lack the most basic information necessary for creditors to determine whether to accept or reject the Plan. This is unsurprising given the current posture of these cases, where the bar date for filing claims has not passed, the deadline for equity sponsor and asset purchase bids is weeks away, investigations concerning certain claims and Causes of Action are not completed and the Debtors have not yet filed their schedules and statement of financial affairs.  However, the Debtors have filed and are pushing forward for approval of a woefully inadequate Disclosure Statement that cannot be approved for the many reasons described below.

3.    Key details are missing from the Disclosure Statement, including estimated amounts of creditor claims in various classes, projected percentage recoveries for claim holders and anticipated dilution of equity proposed to be provided to general unsecured creditors in satisfaction of their claims.  The documents contain blanks instead of claim amounts and projections of creditor recoveries that render it at best a placeholder until the relevant information can be ascertained. Key exhibits to the Disclosure Statement have not been provided – i.e., financial projections, valuations and liquidation analyses - information essential for assessing Plan feasibility and whether the Plan's treatment of creditor claims meets the requirements of section 1129 of the Bankruptcy Code.  Moreover, substantially all of the exhibits to the DS Motion, including the form of Ballot which the Court is asked to approve, are not filed. The Debtors have not provided the most fundamental information relevant to creditors being solicited to vote on the plan – namely, what will their distributions be thereunder.  Based on these and other flaws as described below, the Disclosure Statement does not contain "adequate information."

2

4.      More meaningful information is missing from the Disclosure Statement

than is included: For example:

- The Disclosure Statement contains a chart summarizing classes of claims and interests <u>that is completely blank for both the estimated allowed amount of claims and estimated recovery</u> with respect to each and every class of claims, including general unsecured claims.

- The treatment of holders of general unsecured claims is subject to election by the Debtors, <u>but the criteria for making such election is not clearly stated</u>.

- <u>All key exhibits to the Disclosure Statement are missing</u>, namely the Financial Projections, the Valuation Analysis and the Liquidation Analysis.

- <u>Fifteen of the seventeen Schedules to the DS Motion</u>, which the Court is asked to approve in form and content, <u>are missing</u>.

- The Disclosure Statement has <u>no breakdown of assets and liabilities of the separate Debtors</u> that would allow for any understanding by creditors of the relative solvency or insolvency of each entity or the amounts of distributions projected to be made to creditors as a result.

- The Disclosure Statement provides <u>no description of each of the Debtor entities</u>, their purpose, the corporate structure, intercompany claims (which are being extinguished) and how the Debtors propose to transfer funds by and among the entities to fund obligations under the Plan.

- There is <u>no discussion in the Disclosure Statement concerning the potentially valuable estate claims that are to be released</u>, the value of those claims and the consideration provided for the releases.

- In fact, <u>the Debtors are only now investigating claims against the Released Parties</u> and are incapable of showing that adequate consideration is being given for their release.

5.      The first question any holder of a general unsecured claim would be

expected to ask before voting on the Plan is "how much are the Debtors proposing to pay on my

claim?"  Yet, the Disclosure Statement fails to provide any estimate of potential financial

recoveries to the holders of such claims.  Without an answer to that question, and many others,

informed voting by holders of general unsecured claims is not possible.

6.      In contrast to the rest of the Disclosure Statement which is completely lacking in details and information to enable creditors to evaluate what they are receiving under the plan, the Disclosure Statement goes to great lengths to describe the expansive, virtually unlimited releases that the Debtors seek approval of for no consideration.  While the scope of the release is clearly delineated (basically, anything having to do with the Debtors), there is no description of the potential claims against insiders that are being released or the identity of any consideration being provided to the estates in exchange for such release.  Instead, Debtors assert they will be prepared to meet their burden to establish the basis for the releases as part of Plan confirmation, <u>after</u> the deadlines for (a) submitting ballots voting to accept or reject the plan, and (b) filing an objection to the Plan, which is a requirement for creditors rejecting the Plan to opt-out of the Plan releases.  Creditors are denied essential information until after it is too late.

7.      Absent detailed financial information, there is no way to measure whether the Plan is feasible, meets the "best interests of creditors" test, or unfairly discriminates against unsecured creditors.

8.      Debtors had advised the Committee that they would be filing additional information prior to the deadline for responses to the Disclosure Statement.  However, as of one-day before the objection deadline, no such information has been either filed or provided to the Committee.  And, the Debtors have refused to consent to an extension of time for the Committee to file its response to the Disclosure Statement.

9.      Absent an order of the Court, creditors are entitled to 28 days' notice to object to a disclosure statement under the Bankruptcy Code and Bankruptcy Rules.  As of the Disclosure Statement objection deadline, and assuming the missing information is provided prior to the scheduled hearing, creditors will be given insufficient time to assess the adequacy of the

final proposed form of Disclosure Statement and the feasibility of the Plan it purports to describe. The hearing on the Disclosure Statement should be continued for no less than 28 days after all of the missing information, exhibits and schedules to the Disclosure Statement and the DS Motion have been filed.

10.     Based on the foregoing and as set forth more fully below, the Court should deny approval of the Disclosure Statement and direct the Debtors to notice a new disclosure statement hearing only after the actual document they are seeking to have approved is on file.

## II.     **BACKGROUND**

### A.     **General**

1.     On January 16, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

2.     On January 18, 2019, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code. The Committee consists of: (a) HanesBrands, Inc.; (b) Rederlink Distribution Services; (c) Home Products International N.A.; (d) McKesson Corp.; (e) Notations, Inc.; (f) LCN SKO Omaha (Multi) LLC; and (g) Realty Income Corporation.

### B.     **The Proposed Plan and Disclosure Statement**

11.     On January 16, 2019, the Debtors filed their *Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 55] (the "Plan"), the

Disclosure Statement and the DS Motion.  The hearing to consider approval of the DS Motion

will be held on February 22, 2019 at 11:00 a.m. (the "Disclosure Statement Hearing").

12.     The Debtors do not reveal whether they will be filing forms of the

Financial Projections, Valuation Analysis and the Liquidation Analysis that are to be attached to

the Disclosure Statement as Exhibits D, E and F, respectively, prior to the Disclosure Statement

Hearing.  A review of these documents will be essential to assessing the adequacy of the

Disclosure Statement as well as evaluating Plan feasibility and compliance with Section 1129 of

the Bankruptcy Code.  In addition, Debtors have not filed fifteen of the seventeen Schedules to

the DS Motion (including, *inter alia*, their proposed forms of Ballots, Notices, Solicitation and

Voting Procedures and Cover Letter) that they are requesting the Court to approve at the

Disclosure Statement Hearing.

13.     Debtors will not be filing a Plan Supplement until 14 days before the

Effective Date of the Plan, or such later date as may approved by the Court.[2]  Apparently the

Debtors do not contemplate any vetting by parties in interest or a hearing before the Court with

respect to the compilation of documents and forms of documents, schedules, and exhibits to

implement the Plan to be included in the Plan Supplement.

a.     Releases

14.     Article X of the Plan contains both direct and third-party blanket releases

to "Released Parties" (which include the Debtors, the Reorganized Debtors and their current and

former officers and directors)[3], of all claims and causes of action of whatever kind (including

---

[2]  DS Motion at para 31.

[3]  Plan at Article I A. "Released Party" means each of the following in their capacity as such: (a) the Debtors and
Reorganized Debtors; (b) the Debtors' current and former officers, directors, and managers; and (c) each of the
foregoing Entities' respective predecessors, successors and assigns, and current and former stockholders,

derivative claims that such party would have been legally entitled to assert (whether individually

or collectively)) based on or relating to, or in any manner arising from in whole or in part (a) the

Debtors . . . ".[4]

15.    The Debtors only attempt to justify the releases appears in Section IV.L.

of the Disclosure Statement, in the "Q and A" section in response to the question "*Will there be*

*releases and exculpation granted to parties in interest as part of the Plan*?"  There the Debtors

state:

> Yes, Article X of the Plan proposes to release the Released Parties
> and to exculpate the Exculpated Parties. The Debtors' releases,
> third-party releases, and exculpation provisions included in the
> Plan are an integral part of the Debtors' overall restructuring
> efforts and were an essential element of the negotiations between
> the Debtors and their creditors in obtaining their support for the
> Plan and reorganization.
>
> All of the Released Parties and the Exculpated Parties have made
> substantial and valuable contributions to the Debtors' restructuring
> through efforts to negotiate and implement the Plan, which will
> maximize and preserve the going-concern value of the Debtors for
> the benefit of all parties in interest. Accordingly, each of the
> Released Parties and the Exculpated Parties warrants the benefit of
> the release and exculpation provisions.
>
> All Holders of Claims that (i) vote to accept or are deemed to
> accept the Plan or (ii) are in voting Classes who abstain from
> voting on the Plan and do not opt out of the release provisions
> contained in Article X of the Plan will be deemed to have
> expressly, unconditionally, generally, individually, and collectively
> released and discharged all Claims and Causes of Action against
> the Debtors and the Released Parties. The releases represent an
> integral element of the Plan.

---

members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals,
partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees,
professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and
consultants, in each case solely in their capacity as such.

[4] Disclosure Statement at IV.L.

> Based on the foregoing, the Debtors believe that the releases and
> exculpations in the Plan are necessary and appropriate and meet
> the requisite legal standard promulgated by the United States Court
> of Appeals for the Eighth Circuit. Moreover, the Debtors will
> present evidence at the Confirmation Hearing to demonstrate the
> basis for and propriety of the release and exculpation provisions. [5]

16.    Other than these conclusory statements, the Disclosure Statement presents

no grounds to support Debtors' grant of releases to the Released Parties.  There is no showing

that the releases constitute an exchange of bargained-for consideration between the Debtors and

the Released Parties and there is virtually no explanation of what is being compromised and

settled.  The Debtors disclose that a Special Committee of the Board of Directors has

"commenced an investigation, among other things, into certain dividend payments to the

Debtors' direct or indirect equity owners to determine whether the Debtors' estates may have

claims related to such transactions."[6]  The Special Committee has retained independent counsel

and an independent financial advisor to assist in their review.  Yet, the Released Parties include

current and former stockholders and equity holders who are a subject of the Special Committee's

investigation, and there is no disclosure whatsoever as to the amounts under investigation.

17.    There is no explanation whatsoever of what contributions to the

restructuring efforts could have been provided as consideration by former and current

stockholders and equity holders, who are under investigation by the Special Committee and

being released by the Plan.  Furthermore, it is difficult to imagine what contributions to the

Debtors' restructuring could have been made by the Debtors' *former* officers and directors who

---

[5] Disclosure Statement, Section IV.L.

[6]  Disclosure Statement at XIII. C.

are included in the Released Parties.  There is no discussion of how, if at all, the Plan would be impacted if the gratuitous releases were removed and the claims retained or transferred to the Plan Administrator.

18.    In fact, the Debtors acknowledge that they are only in the process of investigating claims against the Released Parties.  The Disclosure Statement states "The Special Committee, with the assistance of counsel and advisors, is currently undertaking an investigation into Estate claims and Causes of Action.  The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, and the Debtors reserve all rights and claims with respect thereto."[7]

19.    Yet the Debtors allege they will be prepared to establish the basis for the releases as part of Plan confirmation; apparently Debtors believe that the Special Committee's investigation will be concluded by that time. As entry of the Confirmation Order will constitute an order of the Court approving the releases and making findings pursuant to Bankruptcy Rule 9019, the Debtors must provide substantially more information concerning the releases or modify the Plan to exclude them.[8]

20.    Clearly the Plan releases are not consensual.  Any party that votes for the Plan or whose claim is unimpaired by the Plan is "deemed" to grant the Plan's third-party releases and cannot opt-out.  Only parties that reject or are deemed to reject the Plan may opt-out by filing an objection to the Plan releases.[9]  Based upon the absence of any information that

---

[7]  Disclosure Statement at footnotes 3 and 6.

[8]  Plan at Article X, Section E.

[9]  Disclosure Statement at III.C.

would support the releases of claims and Causes of Action that have not yet been identified by the Special Committee, creditors should be entitled to reject the Plan release provisions without having to forego any Plan distribution by voting against the Plan.

21.     Non-consensual third-party plan releases should be allowed only in limited circumstances where the facts of the case warrant them.  None of the relevant factors for approving third-party releases exist here, as more fully discussed below.  However, to the extent the releases remain "an integral part" of the Debtors' Plan, the ability to opt-out should be readily available for all creditors without the unnecessary burden of filing a separate Plan objection.  The Ballot should include an opt-out provision that allows creditors to make a release decision election as part of the voting process.  In all events, the requirements for opting out of the Plan releases must be stated clearly on the Ballot and solicitation materials, none of which have been filed with the Court.

a.     Treatment of Claims and Interests

22.     The Plan contemplates a restructuring through either (a) a sponsor-led "Equitization Restructuring" or, (b) if elected by the Debtors, an orderly liquidation under an "Asset Sale Restructuring".  Under the Plan's default option, the Equitization Restructuring, an unspecified Plan Sponsor will invest an indefinite sum in exchange for a to-be-determined equity stake in "New Shopko".

23.     Under either Plan alternative, Holders of Class 1 claims– Other Secured Claims – will receive, at Debtors' election, either (a) payment in full in Cash, (b) delivery of the collateral securing such claim and payment of interest required under Section 506(b) of the

Bankruptcy Code, (c) reinstatement of such claim, or (d) other treatment rendering such claim unimpaired.

24.    Under either Plan alternative, Holders of Class 2 Claims - Other Priority Claims – will receive a Pro Rata share of the Priority Claims Reserve. [10]  Unclassified Administrative Claims and Priority Tax Claims also receive a Pro Rata share of the Priority Claims Reserve.  The Disclosure Statement notes that the <u>failure by holders of Other Priority Claims, Administrative Claims and Priority Tax Claims to object to Plan confirmation is "deemed" to be each such Holder's consent</u> to receive treatment that is different from that set forth in Section 1129(a)(9) of the Bankruptcy Code.[11]  The Bankruptcy Code does not authorize a Plan to <u>impose</u> agreement on creditors on negative notice.[12]  These provisions likely render the Plan not confirmable, and the Committee will raise this (among other objections) at Plan confirmation.  For purposes of disclosure, the Disclosure Statement must be amended to clearly disclose that creditors are required to "opt-out" of their "deemed agreement" to accept disparate treatment of their claims than that mandated by the Bankruptcy Code.  As these are very unusual provisions, the disclosures must be printed in **LARGE BOLD** typeface in each section describing the treatment of Other Priority Claims, Administrative Claims and Tax Claims.

---

[10] "Priority Claims Reserve" means (i) under the Equitization Restructuring, the lesser of (a) the Debtors' Cash on hand in excess of the Minimum Liquidity Threshold on the Effective Date accounting for all other distributions under the Plan and (b) an amount equal to the total amount of Allowed Administrative Claims and Priority Claims; or (ii) under the Asset Sale Restructuring, the account to be established and maintained by the Plan Administrator and funded with the Priority Claims Reserve Amount pursuant to Article VIII. C hereof.  Plan at Article I. A.

[11] The Priority Claims Reserve may be insufficient to satisfy all Administrative, Priority Tax Claims and Other Priority Claims, contrary to the provisions of Section 1129(a)(9).

[12] While Section 1129(a)(9) allows holders of a claim to agree to a different treatment of their claims, the Debtors' Plan imposes such "agreement" by default, undermining the purpose of the consent requirement.

25.    The Equitization Restructuring provides for payment in full of holders of

claims in Class 3 (Revolving Loan A Claims), Class 4 (Revolving Loan A-1 Claims) and Class 5

(Term Loan B Claims), unless such holder agrees to receive its Pro Rata share of the "Exit

Facility".  Class 6 (Holders of Allowed Term Loan B-1 Claims) will receive their Pro Rata share

of 19.9% of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and

the Management Incentive Plan (collectively, the "Plan Sponsor and Management Shares").

26.    Under the Equitization Restructuring, Class 7 (general unsecured claims)

receive either (a) 80.1% of the New Shopko Interests, subject to dilution by the Plan Sponsor and

Management Shares, or (b) a Pro Rata share of the GUC Equitization Distribution in one or more

distributions.  A review of the definition of GUC Equitization Distribution shows that the Class 7

alternative (b) equates to no Plan distribution, because substantial amounts will be deducted from

the fund before any distributions are to be made to GUCs.[13]  At the "Q and A" section of the

Disclosure Statement under the question *Will the final amount of Allowed General Unsecured*

*Claims affect my recovery under the Plan*?", the Debtors disclose that if Class 7 votes to reject

the Plan, then no distributions will be made on account of GUCs.[14]  The consequence of Plan

rejection by Class 7 on GUC recoveries should be plainly stated in the charts and other

descriptions of Class 7 Claims in the Disclosure Statement and the Plan.

---

[13]  "*GUC Equitization Distribution*" means $100,000 in Cash, less any professional fees incurred by the Creditors' Committee, to be funded on the Effective Date into the GUC Equitization Reserve and distributed in accordance with the Plan; *provided* that the GUC Equitization Distribution shall first fund the Administrative Claims Distribution Pool to the extent the Debtors' Cash on hand in excess of the Minimum Liquidity Threshold on the Effective Date accounting for all other distributions under the Plan is less than an amount equal to the total amount of Allowed Administrative Claims and Priority Claims.  Plan at Article I.

[14]  Disclosure Statement at IV.K.

27.     If the Asset Sale Restructuring is selected by the Debtors, substantially all of their assets will be disposed of through a series of sales.  Under this sale restructuring alternative, all Distribution Proceeds[15] available for distribution from time to time will be paid to creditors pursuant to the priority waterfall described in Article VIII, G, of the Plan.  Namely, after payment in full of DIP Claims, payments will be made to Holders of Revolving Loan A Claims, Revolving Loan A-1 Claims, Term Loan B Claims and Term Loan B-1 Claims on a periodic basis pursuant to the priorities set forth in the Credit Agreement and as set forth in the applicable loan documents.  After payment in full of the foregoing claims, all remaining distributions will be made (i) first on account of Allowed Priority Claims and Allowed Administrative Claims, and (ii) second, on account of allowed GUC claims.

28.     Under both Plan alternatives, Intercompany Claims (Class 8) will be reinstated or cancelled, at the Debtors' sole option, and will receive no distribution. Intercompany Interests (Class 9) receive the same treatment.  Interests in Shopko (Class 10) will be canceled, released and extinguished and will receive no distribution.  Class 11, Section 510(b) Claims, will be canceled, released and extinguished and will receive no distribution.  Debtors are not aware of any valid 510(b) claims and believe that no such claims exist.

---

[15] "*Distribution Proceeds*" means all Cash of the Debtors available on the Effective Date after the funding of the Priority Claims Reserve, the Other Secured Claims Reserve, the Professional Fee Escrow Account, and the Wind-Down Reserve, available for distribution under Article VIII.G hereof.

## III.   DISCLOSURE OBJECTIONS

**C.   The Disclosure Statement Should Not Be Approved Because It Does Not Contain Adequate Information as Required by Section 1125 of the Bankruptcy Code**

29.   Under Section 1125(b) of the Bankruptcy Code, a debtor may not solicit the votes of creditors under a plan of reorganization unless the Court has approved a written disclosure statement. A disclosure statement cannot be approved unless it contains "adequate information."[16] The primary function of a disclosure statement is to provide creditors with information necessary to determine whether to accept or reject a debtor's plan of reorganization. *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985); *In re Dakota Rail, Inc.*, 104 B.R. 138, 142 (Bankr. D. Minn. 1989).

30.   The obligation to provide adequate information is pivotal.  *See Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993) (disclosure is the "pivotal" concept in chapter 11 cases).  In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take."  *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991).  Significantly, even if more thorough disclosure would not have

---

[16] 'Adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan ....11 U.S.C. § 1125(a)(1).

affected an objecting creditor's vote, that creditor still has standing to object because inadequate disclosure may have induced other creditors to approve the plan. *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1217 (9th Cir. 1994). For a creditor to fairly evaluate the results of a proposed plan, the court must ensure that a disclosure statement sets forth "all those factors presently known to the plan proponent to bear upon the success or failure of the proposals contained in the plan." *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986; *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (holding that a proper disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting their [sic] distribution.").

31.     Whether a disclosure statement contains "adequate information" should be assessed from the perspective of the claims or interest holders with the ability to vote. *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987)); *see also* 11 Collier on Bankruptcy, 1125.03[1] (courts should "consider the needs of the claims or interest of the class as a whole and not the needs of the most sophisticated or least sophisticated members of a particular class").

32.     The Disclosure Statement fails to satisfy section 1125 of the Bankruptcy Code in numerous material respects. The Disclosure Statement omits basic information about matters of primary concern to creditors. Absent such disclosures, creditors simply have not been provided with "adequate information" to make an informed decision as to whether to accept or reject the Plan.

D.     **The Disclosure Statement Contains Inadequate Information Regarding the Treatment of Claims and Impacts on Creditor Recoveries**

33.     The Disclosure Statement provides no information with respect to what general unsecured creditors will receive.  As one court aptly stated, "a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferrett*i, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

34.     "The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan." *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985).  A disclosure statement <u>must</u> include a liquidation analysis and financial projections in order to provide adequate information and allow creditors to make an informed vote on a plan.  In order to cast an informed vote, creditors must have adequate information concerning the downside risk of a chapter 7 and the assumptions underlying a debtor's projected future performance following a confirmation.  A disclosure statement must therefore contain a liquidation analysis reflecting what creditors would receive in a hypothetical chapter 7 case and the financial projections of the debtor under the plan.  *E.g., In re Divine Ripe, L.L.C.*, 554 B.R. 395, 407 (Bankr. S.D. Tex. 2016) (financial projections necessary); *In re Radco Properties, Inc.*, 402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) (assumptions underlying projections are necessary); *In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) (financial projections and underlying assumptions are necessary); *In re Diversified Inv'rs Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) (liquidation analysis is necessary). Without a liquidation analysis or financial projections, a creditor cannot evaluate a debtor's plan and the very reason for requiring a disclosure statement is defeated.

35.    The Disclosure Statement has no financial data whatsoever and creditors have no basis upon which to make a determination whether to vote for or against the Plan.  To say that the Disclosure Statement is inadequate would be a vast understatement.

36.    There is no way to determine whether the Equitization Restructuring is feasible, as there are no plan projections.  There are no asset valuations, making it impossible to discern the basis for the Plan's treatment of claims in Class 6 (Term Loan B-1 Claims) and claims in Class 7 (general unsecured creditors) under the two restructuring alternatives.  Under the Asset Sale Restructuring, general unsecured creditors receive their Pro Rata share of the Distribution Proceeds, after payment in full of, *inter alia*, Class 6 claims.  Under the Equitization Restructuring, holders of Class 7 claims (ostensibly if they vote in favor of the Plan), receive 80.1% of the New Shopko shares and holders of Class 6 claims receive 19.9% of the new Shopko shares, each subject to further dilution by the Plan Sponsor and Management Shares. What is the basis for the Plan's proposed allocation of interests under the Equitization Restructuring alternative, which appears to be *pari passu* as to Classes 6 and 7 based upon some unstated formulation?  How does this treatment comport with the requirement that Class 6 claims are paid in full before payment of any amount to Class 7 under the Asset Sale Restructuring? Under an Asset Sale Restructuring valuation, does a larger percentage of Class 6 become Credit Agreement Deficiency Claims and treated as general unsecured claims in the sale restructuring alternative?  Absent valuations of assets under both Plan restructuring alternatives, Debtors cannot show that the Plan does not discriminate unfairly and is fair and equitable as required under Bankruptcy Code Section 1129(b)(1).

37.    Debtors will also have the burden of establishing that the Plan meets the "best interests of creditors" test.[17]  The Disclosure Statement is missing any liquidation valuation.  There is no way to determine whether a chapter 7 liquidation would provide more favorable treatment under either of the Plan's restructuring alternatives, particularly considering there will be no third-party releases under a chapter 7 liquidation.

38.    The Plan proposes that intercompany claims and interests will be canceled or reinstated at the Debtors' discretion.  The Disclosure Statement does not contain sufficient information as to the relationship between the Debtor entities, the description of intercompany claims and interests, or the impact of reinstatement or cancellation of intercompany claims on general unsecured creditor recoveries.  The Debtors must disclose the foregoing information so that general unsecured creditors are adequately informed with respect to what they are going to receive under the Plan.

39.    The Plan turns the requirements of Section 1129(a)(9) of the Bankruptcy Code upside down as it purports to impose "agreement" by holders of Administrative Claims, Priority Tax Claims and Other Priority Claims to receive treatment of their claims different from that required under this Bankruptcy Code provision.  This tacit agreement is imposed by default unless each such claimant files an objection to the Plan.  This is a very unusual provision and will be included among the Committee's objections to Plan confirmation.  In all events, the Disclosure Statement must be revised and language, capitalized and highlighted, added that clearly explains to creditors that they <u>must</u> file an objection to the Plan to essentially withdraw

---

[17] Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests of creditors test".  Section 1129(a)(7) requires that, with respect to each impaired class of claims or interests, (A) each holder of a claim or interest in such class (i) has accepted the plan, or (ii) will receive or retain under the plan property of a value that is not less than the amount that holder would receive or retain if the debtor liquidated under chapter 7.  The best interests test is based on a hypothetical liquidation.  7 Collier on Bankruptcy ¶ 1129.03[7][b] (15th rev. ed. 2009) ("This means that, absent consent, a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution….").

their "deemed" acceptance to disparate treatment under the Plan than required by Section

1129(a)(9) of the Bankruptcy Code.

40.     Bankruptcy Rule 2002 provides that parties must be given 28 days' notice

of the time to object to a disclosure statement.  The relatively lengthier period underscores the

nature of the disclosure statement process, which is intended to provide sufficient time for parties

in interest and the Court to vet a disclosure statement in advance of its transmission to creditors

to determine whether it contains adequate information to justify mailing it out to creditors to vote

on a plan. The Debtors have ignored this rule and have failed to provide parties the opportunity

to weigh in on or object to the information to be contained in the final form of the Disclosure

Statement Supplement or the Plan solicitation process.

**E.      The Description of the Basis, if any, for the Proposed Releases Is Inadequate**

41.     The Committee opposes the direct and third party releases proposed in the

Plan and reserves its rights to object to them at confirmation.  At this stage unsecured creditors

cannot cast an informed vote on the Plan and determine whether to opt out of the releases by

voting against and objecting to the Plan (and receiving no Plan distribution) based on the current

lack of disclosures regarding such direct and third party releases.

42.      The Disclosure Statement does not identify the nature or amount of the

releases in the Plan.  Debtors fail to disclose the existence or scope of insurance coverage for

such claims, who would prosecute such claims if not released by the Debtors, how such

prosecution would be funded, which creditors would be beneficiaries of the recovery on account

of such claims, and how a hypothetical recovery on account of those claims would impact the

distributions to creditors and the liquidation analysis.

43.     The Disclosure Statement fails to identify what consideration is being

provided in exchange for the releases.  Current and former stockholders and equity holders, who

are among the subject of investigation by the Special Committee, are being released. There is no discussion of the claims released, their value and the consideration for such releases. There is no discussion of consideration for the release of the other Released Parties, except perhaps some ephemeral notion that current officers and directors are contributing to the plan process. There is also no discussion of any consideration being provided by former officers and directors. Absent full disclosure of the claims to be released and the consideration for such releases, the Disclosure Statement should not be approved.

44.     Apparently the Debtors never analyzed claims and Causes of Action against the Released Parties before agreeing to grant extremely broad and unarticulated releases under the Plan.[18] Debtors admit that their independent board is currently undertaking its investigation which, given the Debtors' proposed Plan timeline, will be rendered moot by Plan confirmation.

45.     Third party releases should be granted only under limited circumstances.[19] While the Eighth Circuit has not squarely addressed the issue of whether third-party, or non-debtor, injunctions and releases are permissible as a matter of law, several courts in the Eighth Circuit have applied a number of factors in determining whether third-party releases can be approved. In *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994), the court cited to several Second Circuit courts that followed a permissive view of third-party releases and developed a multi-factor test for consideration of such releases. The "Master

---

[18] The releases relate to any claims relating to or arising from the Debtors. Specifically, the Plan releases the Released Parties from "any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part: (a) the Debtors . . . ".

[19] Courts have noted that releases under a plan of reorganization "is proper only in rare cases" when the release is "necessary to the plan" and only upon "the finding of circumstances that may be characterized as unique." *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141, 143 (2d Cir. 2005) ("*Metromedia*"); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992).

Mortgage Factors" look at whether: (1) there is an identity of interest between the debtor and the

third party, usually an indemnity relationship, such that a suit against the non-debtor is, in

essence, a suit against the debtor or will deplete assets of the estate; (2) the non-debtor has

contributed substantial assets to the reorganization; (3) the injunction is essential to

reorganization; without it, there is little likelihood of success; (4) a substantial majority of the

creditors agree to such injunction, specifically, the impacted class, or classes, has

"overwhelmingly" voted to accept the proposed plan treatment; (5) the plan provides a

mechanism for the payment of all, or substantially all, of the claims of the class or classes

affected by the injunction. *See also In re U.S. Fidelis, Inc.*, 481 B.R. 503, 519 (Bankr. E.D. Mo.

2012); *In re Peabody Energy Corp.*, Case No. 16-42529 (E.D. Mo. March 14, 2017); *In re*

*Archdiocese of Saint Paul and Minnesota*, No. BKY 15-30125, 2017 BL 465425 (Bankr. D.

Minn. Dec. 28, 2017) (disallowing non-consensual third-party releases where class of sexual

abuse victims in question had overwhelmingly rejected the debtor's plan, failing to satisfy the

fourth factor).  There is nothing in the Disclosure Statement that demonstrates the Debtors could

satisfy the Master Mortgage Factors.

      46.    In addition, while section 1123(b)(3)(A) permits a plan to provide for "the

settlement or adjustment of any claim or interest belonging to the debtor or to the estate,"

including a release of estate claims against non-debtors, any such release must satisfy the

requirement of a valid settlement of claims under the Bankruptcy Code. *See In re Bigler LP*, 442

B. R. 537, 543 (Bankr. S.D. Tex. 2010). Specifically, "[i]t would require, inter alia, consent and

consideration by each participant in the agreement to be valid." *Id.* at 543-44.  In *Bigler*, the

court approved a release of estate claims against non-debtors where the release was part of the

consideration given to a non-debtor (Amegy Bank), which was providing all of the funding to

effectuate the terms of the plan – including payments to unsecured creditors.  *See id.* at 544.

Thus, the court concluded, it was a settlement of claims "for consideration, pursuant to arms-

length negotiations" in satisfaction of section 1123(b)(3)(A).  *Id.*

47.     While the propriety of the releases is a confirmation issue, to the extent

that the Debtors have any factual information purportedly justifying such releases and explaining

what claims are to be released and the value of such claims, they must include it in the

Disclosure Statement.  The Debtors must also disclose the impact on creditor recoveries of the

release of estate claims against non-debtors and, in the alternative, the pursuit of such claims if

the releases are not approved at confirmation.

48.     The releases proposed under the Plan are not consensual because for

creditors that accept the Plan, there is no ability to opt-out.  The Plan binds any party that votes

for the Plan or is conclusively presumed to have accepted the Plan to the releases.  While

creditors may be willing to accept their treatment under the Plan, doing so should not mean they

are forced to surrender their rights against third parties.  As one Court has noted, compelling

allegedly "unimpaired" creditors to release third-parties necessarily results in an impairment of

the creditors' claims. *See In re Chassix Holdings, Inc.,* 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015)

("If a creditor must release a claim against a third party under a plan (as a condition to whatever

payment or other treatment the plan provides for the creditor's claim against the debtor), it is

difficult to understand how such a creditor could properly be considered to be 'unimpaired' by

the Plan in the first place.")

49.     Any party that (a) does not vote on the Plan, (b) votes to reject the Plan,

(c) is deemed to reject the Plan, or (d) is in a Class that abstains from voting on the Plan, is still

"deemed" to have granted the releases <u>unless</u> they "opt-out" by timely filing an objection to the

Plan's third-party release provisions.  Opt-out should be available for all such creditors without imposing the burden of retaining counsel to file a separate objection to the Plan releases. Between the Plan's "deathtrap" provision, denying any recovery to general unsecured creditors who vote against the Plan, and the additional burden of requiring the filing of a separate Plan objection to "opt-out" of the release provisions, the Plan unfairly coerces creditors to release any claims they or the Debtors hold against the Released Parties for no consideration.

## IV.    SOLICITATION PROCEDURES OBJECTIONS

50.    The Committee will object to the solicitation procedures proposed in the DS Motion if they improperly disenfranchise creditors.  Unless and until creditors have a reasonable opportunity to review the fifteen schedules that are missing from the DS Motion, the DS Motion cannot be approved.

**F.    The Proposed Voting Record Date Occurs Before the Proposed Bar Date**

51.    The Debtors have filed the *Debtors' Amended Motion For An Order (I) Setting A Bar Date For Filing Proofs Of Claim, Including Claims Arising Under Section 503(B)(9) Of The Bankruptcy Code, (II) Setting A Bar Date For The Filing Of Proofs Of Claim By Governmental Units, (III) Setting A Bar Date For The Filing Of Requests For Allowance Of Administrative Expense Claims, (IV) Setting An Amended Schedules Bar Date, (V) Setting A Rejection Damages Bar Date, (VI) Setting A Premise Liability Claims Bar Date, (VII) Approving The Form Of And Manner For Filing Proofs Of Claim, (VIII) Approving Notice Of The Bar Dates, And (IX) Granting Related Relief* [Docket No. 112].

52.    The Debtors' proposed bar date conflicts with its proposed solicitation/confirmation schedule.  The proposed Voting Record Date in the DS Motion is February 22, 2019 while the proposed Bar Date for filing claims is March 18, 2019.  The proposed Plan voting deadline and Plan objection deadline is March 25, 2019.  Since the Voting

Record Date determines who will receive ballots and who will be entitled to vote, many creditors could impermissibly be deprived of their fundamental right to vote on the Plan. The Committee proposes that the Debtors modify the solicitation procedures: (i) to permit parties to vote who file proofs of claim between the Voting Record Date and the Bar Date for claims that, as of the Voting Record Date, either are not scheduled claims or are scheduled as contingent, unliquidated or disputed; (ii) to provide that the Debtors will mail solicitation packages (including ballots) to such parties one business day after the Bar Date; and (iii) to extend the voting and Plan objection deadline for such parties, if necessary.

**G.**   **None of the forms of Notice, Solicitation Packages, Solicitation and Voting Procedures and Ballots requested for Approved by the DS Motion Have Been Filed.**

53.   The DS Motion requests that the Court approve (a) procedures for soliciting and voting on the Plan, (b) forms of Ballots, (c) solicitation packages, (d) cover letter, (e) confirmation hearing notice, (f) a plan supplement notice, (g) non-voting status notices, and (h) assumption and rejection notices. Yet, none of those have been filed with the Court. Creditors need an opportunity to review each of the proposed forms of documents that will govern who may vote on the Plan, how votes will be accepted or rejected and voting procedures with respect to claims that are the subject of an objection, among other things that may be included in the various solicitation forms. The Committee also seeks to ensure that the proposed forms of notices provide clear and accurate information for creditors. The forms of Ballots must contain clear and unambiguous information advising creditors of (a) the consequences of voting for or against the Plan (both in terms of Plan releases and Plan treatment), and (b) the procedures for "opting-out" of the Plan.

**H.**     **The Ballots Should Contain Release Opt-out Election**

54.     Non-consensual, non-debtor releases should be approved only in limited circumstances; they are not warranted by the facts of these cases.  The ballots itself should provide for an election by all creditors to opt-out of the Plan releases as part of the voting process.

**I.**     **The Solicitation Package Should Include the Committee Solicitation Letter**

55.     Given all of the issues with the Plan and Disclosure Statement discussed above, solicitation of the Plan should not be allowed to proceed.  However, in the event that the Court is inclined to approve the Disclosure Statement and permit solicitation to go forward, it is entirely appropriate for the Debtors to be required to include a letter from the Committee (the "Committee Letter") as part of the solicitation packages.  *See In re Boomerang Tube, LLC*, Case No. 15-11247 (Bankr. D. Del. 2015), Tr. of Proceedings held August 11, 2015 at 5:17-20 (allowing inclusion of Committee letter by agreement among parties); *In re Motor Coach Indus., Inc.*, Case No. 08-12136 (Bankr. D. Del. 2008), Tr. of Proceedings held Dec. 17, 2008 at 44:7-46:21 (allowing creditors' committee to include in solicitation package a letter outlining the committee's issues with the proposed plan); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 215 n.1 (Bankr. W.D. Mich. 1986) (permitting a creditors' committee objecting to a disclosure statement to include in the ballot package a letter recommending that creditors vote against acceptance of the plan); *In re Federated Dep't Stores, Inc.*, 1992 Bankr. LEXIS 392, at *21 (Bankr. S.D. Ohio Jan. 10, 1992) (solicitation packages included a letter from the appropriate creditors' committee recommending a vote in favor of the plan); *In re JHT Holdings, Inc., et al.*, Case No. 08-11267 (BLS) [Docket No. 302] (disclosure statement included bold, all capital letters recommendation by creditors' committee summarizing concerns and urging creditors to reject the plan).  The Committee will prepare a form of letter after the Debtors have filed its

proposed form of Cover Letter (Schedule 12 to the DS Motion) and the Committee has had a reasonable opportunity to review it.

## V.     RESERVATION OF RIGHTS

56.     The Committee reserves its right to supplement this Objection at or prior to the hearing on the DS Motion and approval of the Disclosure Statement.

## VI.     CONCLUSION

Based on the foregoing, the Committee respectfully requests that this Court deny approval of the DS Motion and the Disclosure Statement absent the significant changes and supplements thereto as set forth in this Objection and grant such other and further relief as this Court deems appropriate.

Dated:   February 12, 2019

PACHULSKI STANG ZIEHL & JONES LLP

Robert J. Feinstein, Esq.
Bradford J. Sandler, Esq.
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
E-mail:   rfeinstein@pszjlaw.com
              bsandler@pszjlaw.com
-and-
Jeffrey N. Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
E-mail:   jpomerantz@pszjlaw.com

GOOSMAN LAW FIRM, PLC

*/s/ Elizabeth M. Lally*
Elizabeth M. Lally, Esq.
Jeana L. Goosman, Esq.
Joel Carney, Esq.
The Advent Building
17838 Burke Street, Suite 250
Omaha, NE 68118
Telephone:  (402) 280-7648
Facsimile:  (402) 505-3967
E-mail:   lallye@goosmanlaw.com
              goosmanj@goosmanlaw.com
              carneyj@goosmanlaw.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*