## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No.: 19-80064-TLS |
| SPECIALTY RETAIL SHOPS HOLDING | ) |
| CORP., *et al.*,[1] | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE
ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE
SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO
CONFIRMATION OF THE DEBTORS' PROPOSED JOINT CHAPTER 11 PLAN, (III)
APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION
THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO,
AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Specialty Retail

Shops Holding Corp., *et al.*, the above-captioned debtors and debtors in possession (the

"Debtors") hereby objects (the "Objection") to the *Debtors' Motion for Entry of an Order (I)*

*Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice*

*Procedures with Respect to Confirmation of the Debtors' Proposed Joint Chapter 11 Plan, (III)*

*Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain*

*Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 412] (the "Amended

DS Motion") and the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of*

*Specialty Retail Shops Holding Corporation and Its Debtor Affiliates* [Docket No. 392] (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592). The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

"Amended Disclosure Statement"). [2]  In support of the Objection, the Committee respectfully

states as follows:

## I.    **INTRODUCTION**

1.      The Debtors' approach throughout these cases has been to withhold and

misrepresent information, disregard proper notice procedures, bypass due process requirements

and flaunt the requirements of the Bankruptcy Code.  Nowhere is this more evident than in

Debtors' efforts to obtain expedited approval of their disclosure statement which, even as

amended, is inadequate, inaccurate and describes a plan that is not confirmable on its face.

2.      As a threshold matter, the Amended Disclosure Statement falsely claims

that "The Plan is supported by the Debtors and a large number of Debtors' creditors and

stakeholders." [3]  In truth, creditors do not support the Debtors' plan.  As of this writing, there is

no restructuring agreement between the Debtors and their secured lenders or any other writing

evidencing significant creditor support for the plan.

3.      In addition to being misleading, the Amended Disclosure Statement fails

to disclose significant facts concerning these cases.  Nowhere is it disclosed that the Debtors

have, without prior notice or court approval, entered into numerous post-petition leases to set-up

a new line of business, standalone optical stores, even though they have no sponsor or business

plan.  A number of these new leases span five years or more and contain no exit clause, exposing

the estates to millions of dollars in uncapped administrative damage claims in the event the

---

[2] Capitalized Terms not otherwise defined herein shall have the meanings ascribed to them in the Amended
    Disclosure Statement and Amended Plan.

[3]" *See* Amended Disclosure Statement at Article IV. W.

newly-leased premises are vacated in a liquidation.  These claims, as well as administrative

liability claims for stub-rent and self-insured employee medical retention claims, are not

included in the Liquidation Analysis appended to the Amended Disclosure Statement, presenting

an incomplete picture of the estates' liabilities.

4.     Perhaps the most egregious instance of nondisclosure of material facts is

with respect to the expansive, virtually unlimited direct and third party releases of claims and

causes of action against the "Released Parties" who include, among others, the Debtors' current

and former officers and directors and their majority equity owner, an affiliate of private equity

firm Sun Capital.  Specifically, the Amended Disclosure Statement makes no mention of the fact

that the Debtors transferred very substantial amounts of money to the Debtors' direct and indirect

equity owners, at a time when the Debtors were insolvent.[4]  Remarkably, the Amended

Disclosure Statement contains only **one** sentence describing an investigation of transfers and

then in the most general way, *i.e.*, it states that a Special Committee of two directors appointed

after Debtors' bankruptcy counsel was hired "commenced an investigation, among other things,

into certain dividend payments to the Debtors' direct and indirect equity owners to determine

whether the Debtors' estates may have any claims related to such transactions." (Amended

Disclosure Statement at p. 29).  That's all.  The Amended Plan proposes to release these claims

unless, at some unspecified time in the future, the Special Committee decides on a different

course of action and the Liquidation Analysis ascribes no value to these potentially enormous

---

[4] The Debtors have taken the position that the transfers are confidential; the Committee disagrees.  However,
because the Debtors' documentation disclosing the transfers were stamped "confidential", the Committee cannot
disclose more specific information concerning them or their dollar amounts at this time.

3

avoidance claims.  In the interim, creditors are unfairly asked to vote on the Amended Plan that includes a release for the foreseeable future or perhaps permanently, without ever knowing the result of any investigation, let alone an independent one (as surely the Debtors' investigation of its own shareholder is not).

5.      The Amended Disclosure Statement articulates no basis for the granting of releases to Sun Capital's affiliate, other equity owners and the Debtors' past and present officers and directors.  It states in a conclusory, and false, manner (at page 21) that the blanket releases of the Released Parties are "in consideration for the distributions and other benefits provided pursuant to the Plan." Yet, there is no disclosure of the distributions and benefits to which the Debtors are referring.  Perhaps that's because there are none.  Under the Amended Plan, general unsecured creditors receive essentially nothing, administrative and priority claims are not being paid in full (contrary to the requirements of the Bankruptcy Code) and Term Loan B-1 Claims are effectively being subordinated to all administrative and priority claims without their consent. Equally conclusory and untrue is the statement that "[a]ll of the Released Parties … have made substantial and valuable contributions to the Debtors' restructuring efforts" (Amended Disclosure Statement at p. 13).  It is hard to imagine how former directors and officers could have made any such contribution.  It is also falsely stated (at page 7) that the releases "have the support of the vast majority of the Holders of the Debtors' DIP Claims, and the Term Loan Secured Claims." It is readily apparent that at this juncture no creditor constituency supports the Plan.[5]  For the same reason, it is factually inaccurate to claim, as the Debtors repeatedly do, that

---

[5] Similarly, the Amended Disclosure Statement falsely states on page 19 that "[t]he Plan is supported by the Debtors and a large number of the Debtors' creditors and stakeholders."

the releases are part of some global settlement between the Debtors and other constituencies (see

Amended Disclosure Statement at pp. 14-15).  There is no indication of what is being settled, the

consideration for such settlement or even who the parties to the settlement are, just vague and

conclusory verbiage.

6.     The Amended Disclosure Statement does not advise creditors of the

trajectory of this case – plan with a sponsor, the Equitization Option, the Asset Sale Option – as

the bid deadline has not passed.  Nor has the bar date passed and the "independent directors'

investigation" of claims against, *inter alia*, an affiliate of private equity firm Sun Capital is not

concluded.  Employing a "toggle" does not give creditors any better impression of what the

Debtors' actual plan will be, reorganization or sale, and relentlessly pushing forward without

these basic facts established now and disclosed to creditors effectively deprives creditors of the

ability to determine what it is they are accepting or rejecting and being asked to release.  The

Debtors have not and cannot provide adequate information and their insistence on pushing

forward with solicitation nonetheless should be resisted as it only compounds creditor

disenfranchisement, confusion and expense.[6]

7.     The Amended Disclosure Statement also should not be approved because

it describes a plan that is patently unconfirmable on several grounds, including that the Debtors

are administratively insolvent and are attempting, through "negative notice," to bind

---

[6] It is the Committee's belief that the Debtors' headlong rush to expedite the plan process even before the results of
its sale efforts are known, or the bar date has passed, is to push through a plan that releases Sun Capital's affiliate
and the other Released Parties before a meaningful, independent investigation of claims can be conducted.  The
Committee is undertaking its own investigation in order to preserve these claims, which should not be
gratuitously released under the plan but should be preserved and retained by the estates or put into a creditor trust
under a plan.

administrative and priority creditors to "deemed" agreements to accept less than payment in full

of their claims as proscribed by Section 1129 of the Bankruptcy Code. Debtors also cannot

confirm the Amended Plan without violating the provisions of the Bankruptcy Code, insofar as

they apparently seek to subordinate secured claims to administrative and priority claims without

their consent, as discussed below.

8.    The only apparent purpose of the Amended Plan is to shield Debtors'

present and former directors, officers and equity holder by granting them and the other Released

Parties improper and gratuitous third-party releases at the expense of creditors of these estates.

The Committee respectfully submits that in a few short weeks, this case will be more developed

and the Debtors will be able to provide fundamentally important information missing from the

Debtors' disclosure statement due to the posture of these cases. The bar date for filing claims is

several weeks away, the deadline for equity sponsor and asset purchase bids has not occurred and

the investigation of claims and causes of action against Released Parties is not completed;

therefore, very basic information concerning the direction of the cases and the nature of the plan

cannot be disclosed.[7] Allowing additional time for these cases to progress would eliminate

substantial plan ambiguity, allow the investigation of claims to proceed and crystalize

confirmation issues.

## II.    OVERVIEW OF COMMITTEE OBJECTION

9.    The Amended DS Motion cannot be approved because, among other

reasons described herein, the Amended Disclosure Statement does not contain adequate

---

[7] In fact, the Stalking Horse bid deadline is the afternoon of the disclosure statement hearing.

information, it describes a plan that is not confirmable and that plan is not proposed in good faith.

10. The Amended Disclosure Statement lacks the information necessary for general unsecured creditors to evaluate the plan, the plan releases or determine whether the First Amended Plan is "fair and equitable", meets the "best interests of creditors" test or otherwise meets the myriad requirements of Section 1129 of the Bankruptcy Code. Among the information missing from the Amended Disclosure Statement is the following:

- The treatment of holders of general unsecured claims and holders of Term Loan Claims are both subject to an election by the Debtors, <u>but the criteria for making such election is not stated</u>.

- <u>The Liquidation Analysis is incomplete</u> – self-insured medical retention claims, termination claims for optical store leases entered into post-petition and stub rent claims are excluded from liabilities; the value of claims, causes of action and previously undisclosed properties owned by the Debtors are excluded from liquidation value of Debtors' assets.

- The Plan does not substantively consolidate the Debtors but the <u>Liquidation Analysis is presented on a consolidated basis</u>.

- <u>There is no breakdown of assets and liabilities of the separate Debtors</u> that would allow for any understanding by creditors of the relative solvency or insolvency of each entity or the amounts of distributions projected to be made to creditors as a result.

- The Disclosure Statement provides <u>no description of each of the Debtor entities</u>, their purpose, the corporate structure, intercompany claims (which are being extinguished) and how the Debtors propose to transfer funds by and among the entities to fund obligations under the Plan.

- There is no disclosure in the Amended Disclosure Statement that the <u>Debtors made transfers of substantial amounts of money to their direct and indirect equity owners when the Debtors were insolvent</u>.

- There is <u>inadequate discussion in the Amended Disclosure Statement concerning the potentially valuable estate claims that are to be released</u>, the value of those claims and the consideration provided for the releases.

- The Debtors' investigation of claims against the Released Parties is still in process and Debtors are therefore incapable of showing that adequate consideration is being given for their release.

- Debtors fail to disclose that their key creditor constituents do not, at this juncture, support the plan.

11.    The Amended Disclosure Statement does not sufficiently disclose how the plan treats general unsecured creditors ("GUCs") under an Equitization Restructuring. It provides two alternative treatments, either 100 percent of the new Shopko Interests (but subject to over 100% dilution) or a Pro Rata share of the GUC Equitization Reserve, which amounts to no recovery. The prior plan made clear the second option would be imposed if creditors voted against the plan. Now there is no disclosure of any criteria upon which the Debtors will make their treatment election. Similarly, the Amended Plan provides for alternate treatment of Term Loan Secured Claims in an Equitization Restructuring, but provides no explanation of how Debtors will determine the treatment of those claims.

12.    The Amended Plan provides for extremely broad releases of claims and causes of action held by the Debtors and by third parties against the "Released Parties". There is no disclosure of any consideration being given for the releases and there is also no disclosure as to what is being released. While disclosing that there is an investigation underway, the Amended Disclosure Statement fails to state which transactions are being investigated, when those transactions took place, the nature of claims being analyzed, the amounts at issue and the identity of the parties against whom claims are being analyzed. Specifically, the Debtors do not disclose that they transferred very substantial amounts of money to their direct and indirect equity owners at a time when the Debtors were insolvent. While reserving all rights relating to the releases,

Debtors assert they will be prepared to meet their burden to establish the basis for the releases as part of Plan confirmation[8], <u>after</u> the deadlines for (a) submitting ballots voting to accept or reject the plan, and (b) filing an objection to the Plan's third party release provisions, which is a requirement for creditors rejecting the Plan to opt-out of the Plan releases.  Creditors are denied essential information until after it is too late.  The disclosures relating to the releases are inadequate and must be expanded to include the missing information.

13.    The Amended Disclosure Statement also misstates the nature of the plan, purporting to describe two possible "restructuring transactions" – an Equitization Restructuring and an Asset Sale Restructuring.  The asset sale restructuring is no more than a liquidation of the Debtors' assets which Debtors allegedly believe, without any rationale or factual support, "will provide for a going concern transaction".[9]  Debtors should properly characterize the alternative plan transaction as an "Asset Sale Liquidation."  They should also disclose the foundation, if any, for their stated belief that an Asset Sale Restructuring will lead to a going concern transaction.[10]

14.    The Amended Disclosure Statement also fails to provide a description of each of the Debtor entities, their purpose, the basis for the corporate structure, the nature of intercompany claims (which are being extinguished) and how the Debtors propose to transfer

---

[8] Amended Disclosure Statement at IV. L.

[9] Amended Disclosure Statement at Article IV. S.

[10] Debtors should also disclose how the Plan Administrator will administer the estates' assets after the stock of the Debtors has been dissolved.  (Although the Plan Supplement in an Asset Sale Restructuring purports to include "New Organizational Documents", that term is used in the Plan to refer to documents that will be issued under an Equitization Restructuring.)[10]  The Disclosure Statement needs to describe what oversight or accountability the Plan Administrator will have.

funds by and among the entities to fund obligations under the Plan.  Although the Amended Plan does not substantively consolidate the Debtor entities[11], the Liquidation Analysis appended to the Amended Disclosure Statement is presented on a consolidated basis.  Absent detailed financial information regarding the assets and liabilities of each Debtor, creditors cannot understand the relative solvency or insolvency of each entity or whether the amounts of distributions projected to be made to creditors meets the "best interests of creditors" test, or unfairly discriminates against creditors.

15.     The Liquidation Analysis fails to include any specificity as to what is included in the asset and claim categories. It does not include stub-rent claims, self-insured medical retention claims or administrative claims that may easily result from Debtors' entry into post-petition leases that lack exit clauses.  The Amended Disclosure Statement represents that proceeds of causes of action are to be used to fund plan distributions[12], but there is no description of such causes of action or value ascribed to causes of action in the Liquidation Analysis.  The Debtors disclose that they may have a claim against McKesson[13] but there is no such claim or value listed in the Liquidation Analysis.  The Debtors also fail to disclose the existence of 77 Debtor-owned properties or their estimated fair market value.  There is no value ascribed to potential claims against the Released Parties under a chapter 7 liquidation.  As these funds may be unencumbered and available for general unsecured creditors, the failure to include any potential value renders the Liquidation Analysis meaningless to general unsecured creditors.

---

[11] Amended Plan at I. G.

[12] Amended Disclosure Statement at III. C. 1.

[13] Amended Disclosure Statement at VII. B.

The Debtors also fail to provide support for the Plan Projections and lack disclosures that might enable creditors to evaluate their underlying assumptions.

16.    The timeline and solicitation procedures proposed in the Amended DS Motion are also objectionable, insofar as – due to the Debtors' intent on speed at all costs – they have the effect of disenfranchising creditors whose claims were omitted from the Debtors' schedules but who timely filed proofs of claim.  The Voting Record Date is February 28, 2019 while the claims bar date is March 18, 2019, and the voting and plan objection deadline is March 29, 2019.  Creditors not included in Debtors' schedules would have less than 11 days to cast a vote on and/or object to the Amended Plan – **if** there were some procedures for supplying them with ballots but there is not.  These creditors are effectively being denied their statutory right to vote to accept or reject the plan.  Moreover, even for known creditors, Debtors anticipate distributing solicitation materials on March 4, 2019 but seek a plan objection deadline of March 29, 2019, less than the requisite 28 days' notice required by the Bankruptcy Rules.  And as noted herein, the Amended Disclosure Statement's toggles and lack of description of anything other than a myriad of possibilities tells them nothing anyway.

17.    Based on these and the other flaws described herein, the Amended Disclosure Statement does not contain "adequate information" as required by Section 1125(a) of the Bankruptcy Code and the Amended DS Motion cannot be approved.

## III.   BACKGROUND

### A.   General

18.     On January 16, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

19.     On January 18, 2019, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of: (a) HanesBrands, Inc.; (b) Rederlink Distribution Services; (c) Home Products International N.A.; (d) McKesson Corp.; (e) Notations, Inc.; (f) LCN SKO Omaha (Multi) LLC; and (g) Realty Income Corporation.

### B.   The Proposed Plan and Disclosure Statement

20.     On January 16, 2019, the Debtors filed (i) the *Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 55] ("Initial Plan"), (ii) the *Disclosure Statement for the Joint Chapter 11 Plan of Specialty Retail Shops Holding Corporation and Its Debtor Affiliates* [Docket No. 54] ("Initial Disclosure Statement") and (iii) *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting*

*Related Relief* [Docket No. 53] (the "Initial DS Motion")  The hearing to consider approval of

the Initial DS Motion was scheduled for February 22, 2019 at 11:00 a.m., with an objection

deadline of February 13, 2019.

21.     The Initial Disclosure Statement lacked the most basic information

necessary for creditors to make an informed vote on the Debtors' proposed plan, such as the

amount of creditor claims and the proposed distributions to creditors under the plan.  There was

no financial information whatsoever – no projections, valuations or liquidation analyses –

nothing that would allow creditors to determine whether Debtors' proposed plan met the

requirements of Section 1129 of the Bankruptcy Code.  Debtors' Initial DS Motion was also

patently deficient in that the Debtors referenced but failed to include any of the proposed

solicitation materials for which they sought Court approval.

22.     The Committee filed the *Objection of the Official Committee of Unsecured*

*Creditors to Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the*

*Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to*

*Confirmation of the Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of*

*Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect*

*Thereto, and (V) Granting Related Relief* [Docket No. 390] (the "Initial DS Objection") on

February 12, 2019.

23.     Late on February 12, 2019, Debtors filed their Amended Disclosure

Statement, the *First Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp.*

*and its Debtor Affiliates* [Dkt. No. 393] ("Amended Plan") and the Amended DS Motion.  The

Amended Disclosure Statement, for the first time, includes claims estimates, a set of projections

and a liquidation analysis (but none of the other items the Committee noted was missing in its

Initial DS Objection).

24.     The following day, on February 13, 2019, Debtors filed the *Debtors'*

*Request For (I) An Expedited Hearing, Shortened Notice, And An Expedited Ruling With Respect*

*To Debtors' Amended Disclosure Statement And Amended Motion For Approval Of Debtors'*

*Disclosure Statement, And (II) Establishing Dates And Deadlines Concerning Confirmation*

*Process* [Dkt. No. 413] ("Motion to Expedite") requesting that the Amended DS Motion be

heard on February 28, 2019, with objections due on February 22, 2019. [14]   The Court granted the

Motion to Expedite and set the hearing on the Amended DS Motion for February 28, 2019 at

10:00 a.m. (the "Disclosure Statement Hearing"), with objections due February 26, 2019.[15]   The

Initial Disclosure Statement, Initial DS Motion and the Committee's Initial DS Objection were

rendered moot by Debtors' filing of the Amended Plan and Amended Disclosure Statement.[16]

25.     Essentially, the Debtors added only claim estimates, a Liquidation

Analysis (that suffers from multiple flaws) and a set of business projections for a going concern

reorganization as to which the Debtors presently have no sponsor, but nothing else needed to

adequately inform creditors asked to vote on the plan.  As set forth herein, critical relevant

information is missing, and there is still substantial additional documentation concerning the

Plan that has not been provided and will not be until the Debtors file their Plan Supplement,

---

[14]  Motion to Expedite at para 1.

[15]  Docket No. 420.

[16]  Docket No. 401 (mooting initial disclosure statement and any objections thereto)

which will not be filed until 14 days before the Effective Date of the Plan, or such later date as

may be approved by the Court.[17]  Clearly the Debtors do not contemplate any vetting by parties

in interest or a hearing before the Court with respect to the compilation of documents and forms

of documents, schedules, and exhibits to implement the Plan to be included in the Plan

Supplement.  Debtors do not even commit to disclose the names of new directors and officers of

the reorganized debtors as required by the Bankruptcy Code, but will do so only if such

disclosure is "reasonably practicable."[18]

## C.  The Claims to be Released and the Consideration, if any, Therefor are Inadequately Described

26.   Article X of the Plan contains both direct and third-party blanket releases

to "Released Parties" (which include the Debtors, the Reorganized Debtors and their current and

former officers and directors),[19] of all claims and causes of action of whatever kind (including

derivative claims that such party would have been legally entitled to assert (whether individually

---

[17]  Amended DS Motion at para 31.

[18] Amended Disclosure Statement Article IV. T. Why would timely disclosure to creditors who may be New Shopko equity holders be impracticable, particularly when those disclosures are required by section 1129(a)(5) of the Bankruptcy Code?  The Debtors appear to treat the provisions of the Bankruptcy Code as mere suggestions and not requirements.  All provisions of Section 1129(a) and (b) of the Bankruptcy Code must be satisfied as a condition to confirmation of Debtors' plan.

[19] Plan at Article I A. "Released Party" means each of the following in their capacity as such: (a) the Debtors and Reorganized Debtors; (b) the Debtors' current and former officers, directors, and managers; and (c) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case solely in their capacity as such.

or collectively)) based on or relating to, or in any manner arising from in whole or in part (a) the

Debtors . . . ".[20]

27.     The Debtors only attempt to justify the releases appears in Section IV. L.

of the Disclosure Statement, in the "Q and A" section in response to the question "*Will there be*

*releases and exculpation granted to parties in interest as part of the Plan*?"  There the Debtors

make the following unsupported statements:

> Yes, Article X of the Plan proposes to release the Released Parties
> and to exculpate the Exculpated Parties. The Debtors' releases,
> third-party releases, and exculpation provisions included in the
> Plan are an integral part of the Debtors' overall restructuring
> efforts and were an essential element of the negotiations between
> the Debtors and their creditors in obtaining their support for the
> Plan and reorganization.
>
> All of the Released Parties and the Exculpated Parties have made
> substantial and valuable contributions to the Debtors' restructuring
> through efforts to negotiate and implement the Plan, which will
> maximize and preserve the going-concern value of the Debtors for
> the benefit of all parties in interest. Accordingly, each of the
> Released Parties and the Exculpated Parties warrants the benefit of
> the release and exculpation provisions.
>
> All Holders of Claims that (i) vote to accept or are deemed to
> accept the Plan or (ii) are in voting Classes who abstain from
> voting on the Plan and do not opt out of the release provisions
> contained in Article X of the Plan will be deemed to have
> expressly, unconditionally, generally, individually, and collectively
> released and discharged all Claims and Causes of Action against
> the Debtors and the Released Parties. The releases represent an
> integral element of the Plan.
>
> Based on the foregoing, the Debtors believe that the releases and
> exculpations in the Plan are necessary and appropriate and meet
> the requisite legal standard promulgated by the United States Court
> of Appeals for the Eighth Circuit. Moreover, the Debtors will
> present evidence at the Confirmation Hearing to demonstrate the

---

[20] Amended Disclosure Statement at IV.L. 2 and 3.

basis for and propriety of the release and exculpation provisions.
(emphasis added) [21]

None of these conclusory statements are supported by the facts of these cases or by disclosures

contained in the Amended Disclosure Statement.

28.    There is no real information in the Amended Disclosure Statement

concerning the claims being released aside from the one sentence that mentioned unspecified

dividends being under investigation.  There is no discussion regarding the merits of any claims,

the identity of potential targets or how the releases constitute an exchange of bargained-for

consideration between the Debtors and the Released Parties.    Indeed, it is difficult to imagine

what possible contributions to the Debtors' restructuring could have been made by the Debtors'

*former* officers and directors or its equity owners, all of whom are included in the broad

definition of Released Parties.  There is no discussion of how, if at all, the Amended Plan would

be impacted if the gratuitous releases were removed and the claims retained by the Plan

Administrator or transferred to a liquidating trust.  The Disclosure Statement fails to identify

what substantial and valuable contributions were made by former equity owners, whose dividend

withdrawals involving very substantial sums of money are under continuing investigation.  Why

are the releases an integral part of a plan that gives no value to the estate, and fails to satisfy even

administrative and priority claims?  The Disclosure Statement also asserts that the releases are an

essential element of gaining creditor support for the plan and yet the creditors do not support the

plan.[22]

---

[21] Amended Disclosure Statement, Section IV.L.

[22] Debtors also submit that the releases provide "closure".  Closure as to what?  *See* Amended Disclosure Statement
at Section III. D.

29.    There is <u>virtually no explanation of what is being compromised and</u>

<u>settled</u>.  The Debtors' disclosures concerning potential claims are vague, at best.  The Initial

Disclosure Statement stated that a Special Committee of the Board of Directors has "commenced

an investigation, among other things, into certain dividend payments to the Debtors' direct or

indirect equity owners to determine whether the Debtors' estates may have claims related to such

transactions", that the Special Committee retained Willkie Farr & Gallagher LLP and Ducera

Partners LLP as independent counsel and financial advisor to assist in their review, and that the

investigation is progressing. [23]   The Amended Disclosure Statement includes additional verbiage

about the investigation, but still gives no real information.  It states:

> Prior to the Petition Date, the Special Committee commenced a
> detailed review of the transactions between the Debtors and their
> equity owners to determine whether there is a legal and factual
> basis for claims against the Debtors' equity owners.  The
> investigation has included diligence requests to the Debtors and
> their indirect equity owners. Willkie Farr and Ducera reviewed
> over 35,000 documents.  The Special Committee has been briefed
> extensively by Willkie Farr and Ducera, both before and since the
> Petition Date, regarding the investigation and analysis of all the
> potential claims. . . . The investigation remains on-going and no
> conclusions have been reached at this time. [24]

30.    The Amended Disclosure Statement still lacks any disclosure concerning

the transactions being reviewed, the timing of the transactions, the dollar amount(s) involved,

what potential claims are being analyzed and who are potential targets of those claims.  While

the Special Committee's investigation has not yet concluded, their professionals have already

reviewed 35,000 documents and are well aware of the transactions, causes of action and equity

---

[23]  Amended Disclosure Statement at XIII. C.

[24]  Amended Disclosure Statement at XIII. C.

holders involved.  Based on the limited documentation provided to the Committee, it is clear that

the Debtors transferred very substantial amounts of money to their majority equity holder, an

affiliate of private equity firm Sun Capital, and other equity owners at a time when the Debtors

were insolvent.  At a minimum, the Debtors must add the foregoing underlined language to

Section VIII. C. of the Amended Disclosure Statement.

31.     Debtors have reserved all rights to modify the Amended Plan, including

the release provisions of the Plan."[25]   Assuming they do not revise the plan, Debtors allege they

will be prepared to establish the basis for the releases as part of Plan confirmation. Apparently

Debtors believe that the Special Committee's investigation will be concluded by that time.  As

entry of the Confirmation Order will constitute an order of the Court approving the releases and

making findings pursuant to Bankruptcy Rule 9019, the Debtors must provide substantially more

information concerning the releases before creditors are asked to vote or modify the Amended

Plan to exclude them.[26]

32.     The Amended Plan releases are not consensual.  Any party that votes for

the plan or whose claim is unimpaired by the plan is "deemed" to grant the third-party releases

and cannot opt-out. [27]   Only parties that reject or are deemed to reject the Amended Plan may

opt-out by filing an objection to the Amended Plan releases.[28]  Based upon the absence of any

---

[25]  Amended Disclosure Statement at footnotes 3 and 6.

[26]  Amended Plan at Article X, Section E.

[27]  As one Court has noted, compelling allegedly "unimpaired" creditors to release third-parties necessarily results
    in an impairment of the creditors' claims. *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y.
    2015) ("If a creditor must release a claim against a third party under a plan (as a condition to whatever payment
    or other treatment the plan provides for the creditor's claim against the debtor), it is difficult to understand how
    such a creditor could properly be considered to be 'unimpaired' by the Plan in the first place.")

[28]  Amended Disclosure Statement at III.B.

information that would support the releases of claims and causes of action that have not yet been

identified by the Special Committee, creditors should be entitled to reject the plan release

provisions without having to file a stand-alone objection to the Amended Plan.

33.     Non-consensual third-party plan releases should be allowed only in

limited circumstances where the facts of the case warrant them.  None of the relevant factors for

approving third-party releases exist here, as more fully discussed below. Creditors should be

given an opportunity to "opt-out" of the plan releases without the unnecessary burden of filing a

separate plan objection.  The Ballot should include an opt-out provision that allows creditors to

make a release decision election as part of the voting process.  In all events, the requirements for

opting out of the plan releases must be stated clearly on the Ballot and solicitation materials, as

discussed below.

**D.**     **The Proposed Treatment of Claims and Interests is Inadequately Described**

34.     To address the fact that the Debtors do not know yet how they plan to use

the chapter 11 process, the Plan contemplates in the alternative either (a) a sponsor-led

"Equitization Restructuring" or, (b) if elected by the Debtors, an orderly liquidation under an

"Asset Sale Restructuring."  Under the Equitization Restructuring, an unspecified Plan Sponsor

will invest an indefinite sum in exchange for a to-be-determined equity stake [up to 100%] in

"New Shopko," subject to dilution by the Management Incentive Plan.  Interests in Shopko are

cancelled and extinguished.  Since there is no sponsor, creditors are left to guess what their

distribution might be.

35.    The Debtors assert that in an Equitization Restructuring, they will enter into an Exit Facility pursuant to which either (i) the Prepetition ABL Lenders, DIP ABL Lenders and Term B Lenders will convert their Claims into commitments under the Exit Facility, or (ii) the Reorganized Debtors will enter into a new credit facility sufficient to repay the Claims of the Prepetition ABL Lenders, DIP ABL Lenders and Term B Lenders.  The terms are not disclosed as admittedly the Debtors have no agreement with any lenders currently in the capital structure or third parties for exit financing, so the reference to an Exit Facility appears to be a placeholder, with no information supplied on terms and conditions.

36.    If the Asset Sale Restructuring is selected by the Debtors, substantially all of their assets will be disposed of through a series of sales after the Effective Date of the plan by a Plan Administrator selected by the Debtors and apparently beholden to no one, as the Debtors shares are being canceled and there is no provision for any further creditor or judicial oversight of the actual liquidation.  Under the Asset Sale Restructuring, which is not a restructuring at all, the existing board of directors or managers of the Debtors, as applicable, are dissolved and henceforth the Plan Administrator shall act as the sole officer, director and manager of the Debtors.  The Plan Administrator will take such actions as are necessary to wind down the Debtors' affairs, and Distribution Proceeds[29] will be distributed, from time to time, to creditors in the following priority: After payment in full of all DIP Claims, payments will be made to (i) Holders of Term Loan B Secured Claims up to their full amount, then to (ii)  holders of Allowed

---

[29] "*Distribution Proceeds*" means all Cash of the Debtors available on the Effective Date after the funding of the Priority Claims Reserve, the Other Secured Claims Reserve, the Professional Fee Escrow Account, and the Wind-Down Reserve, available for distribution under Article VIII.G hereof.

Priority Claims and Allowed Administrative Claims, (ii) third, to pay the remaining Term Loan

Secured Claims, i.e., the Term B-1 Loan, which is being involuntarily subordinated, and (iv)

fourth to holders of Allowed General Unsecured Claims.   The Disclosure Statement does not

disclose that none of the secured lenders in any tranche of debt has consented to or supports this

plan treatment.

37.   Under either Plan alternative, the plan proposes treatment of

administrative and priority claims in a highly unusual manner, as to which substantially more

prominent disclosure is required in the Disclosure Statement.  Under the Plan, Unclassified

Administrative Claims and Priority Tax Claims are not getting paid in full.  Rather, the Plan

provides that unless they object, they are to receive a Pro Rata share of the Priority Claims

Reserve. [30]   The Disclosure Statement notes that the <u>failure by holders of Other Priority Claims,</u>

<u>Administrative Claims and Priority Tax Claims to object to Plan confirmation is "deemed" to be</u>

---

[30] "Priority Claims Reserve" means the amount to be established by the Reorganized Debtors with the Priority Claim
Reserve Amount to fund distributions to Holders of Allowed Administrative Claims (excluding Professional Fee
Claims and DIP Claims) and Allowed Priority Claims. Plan at Article I. A. (101)

"Priority Claim Reserve Amount means  (i) under the Equitization Restructuring, the lesser of (a) an amount equal
to the total amount of Allowed Administrative Claims (excluding Professional Fee Claims and DIP Claims) and
Allowed Priority Claims and (b) any remaining cash on hand as of the Effective Date less (x) the Minimum
Liquidity Threshold and (Y) Cash necessary to make distributions to (i) Holders of all other Allowed Claims
pursuant to Article II hereof and (ii) Holders of Allowed Other Secured Claims and Holders of Allowed Term
Loan Secured Claims (pursuant to the priority set forth in the Credit Agreement, up to the amount of the
Allowed Term Loan B Claims) pursuant to Article III hereof; and (ii) under the Asset Sale Restructuring, the
lesser of (a) and amount equal to the total amount of Allowed Administrative Claims (excluding Professional
Fee Claims and DIP Claims) and Allowed Priority Claims and (b) the sum of (x) and amount agreed to by the
Debtors and the Credit Agreement Primary Agent, (y) the Allowed Surcharge, and (z) the Distribution Proceeds,
to the extend known on the Effective Date, to be allocated and paid to the Holders of Allowed Administrative
Claims (excluding Professional Fee Claims and DIP Claims) and Allowed Priority Claims according to the
priorities set forth in Article VIII.G. Plan at Article I. A. (101)

<u>each such Holder's consent</u> to receive treatment that is different from that set forth in Section 1129(a)(9) of the Bankruptcy Code.[31]

38.    The Bankruptcy Code does not authorize a Plan to <u>impose</u> consent upon administrative and priority creditors on negative notice.[32]  These provisions likely render the Plan not confirmable, and the Committee will raise this (among other objections) at Plan confirmation.  For purposes of disclosure, the Disclosure Statement must be amended to clearly disclose that creditors are required to "opt-out" of their "deemed agreement" to accept disparate treatment of their claims than that mandated by the Bankruptcy Code.  As these are very unusual provisions, the disclosures must be printed in **LARGE BOLD** typeface in each section describing the treatment of Other Priority Claims, Administrative Claims and Tax Claims.

39.    The Plan's unusual proposed treatment of the Term Loan Secured Claims requires greater explanation.  Under the Amended Plan, "Term Loan Secured Claims" are classified in Class 3.  "Term Loan Secured Claims" are defined as any Secured "Term Loan Claim" (consisting of both Term Loan B and Term Loan B-1 Claims), which shall equal no more than the amount of the Term Loan Claims less the sum of the "Allowed Surcharge"[33] and the

---

[31] The Priority Claims Reserve may be insufficient to satisfy all Administrative, Priority Tax Claims and Other Priority Claims, contrary to the provisions of Section 11129(a)(9).

[32] While Section 1129(a)(9) allows holders of a claim to agree to a different treatment of their claims, the Debtors' Plan imposes such "agreement" by default, undermining the purpose of the consent requirement.

[33] "Allowed Surcharge" means a Permitted Surcharge (as defined in the final DIP and Cash Collateral Order) in an amount not less than $11 million (a) to be authorized by the Bankruptcy Court or (b) as may be agreed by the Debtors and the Credit Agreement Primary Agent.

Recharacterized Principal[34].  By definition, the Class 3 Term Loan Claims are reduced and an amount of their claims subordinated to payment of administrative and priority claims.

40.     If the Equitization Restructuring occurs, holders of Class 3 claims will receive either (a) Cash equal to the outstanding amount of the Term Loan B Claims; (b) any remaining Cash on hand as of the Effective Date less (x) the Minimum Liquidity Threshold and (v) Cash necessary to make distributions to Holders of all Allowed Claims pursuant to Article II of the plan, Holders of Allowed Other Secured Claims and Holders of Allowed Other Priority Claims pursuant to Article III of the plan; or (c) as agreed by such Holder of an Allowed Term Loan Secured Claim and the Debtors, its Pro Rata share of the Exit Facility.  In an Asset Sale Restructuring, each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution to Holders of Allowed Term Loan Secured Claims from time to time as provided in Article VIII.G of the Plan, until such Allowed Term Loan Secured Claims are paid in full.

41.     Which of the three alternative treatments will be applied to the Term Loan Secured Claims is not specified in the summary of the Plan provisions laid out on page 9 of the Amended Disclosure Statement.  However, in their overview of an Equitization Restructuring on page 3 of the Amended Disclosure Statement, Debtors disclose that holders of Term Loan B Claims will be treated under alternative (a), which is full payment, or alternative (c), which is a pro rata share of the Exit Financing.  It is only the holders of Term Loan B-1 Claims that will

---

[34] "Recharacterized Principal" means the amount of any interests and fees paid to the Holders of Term Loan Claims as adequate protection under the DIP and Cash Collateral Orders.

apparently receive the treatment under alternative (b), which is subordination to administrative and priority claims.

42.     The Term Loan Lenders have not agreed to the subordination and treatment of their claims under the Amended Plan, a fact which should be prominently disclosed in the Disclosure Statement.

43.     The description of the treatment of General Unsecured Claims is confusing insofar as there is so little available information and so much optionality reserved for the Debtors.  The Amended Plan provides that under the Equitization Restructuring, Class 4 receives either (a) 100 % of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and the Management Incentive Plan (collectively, the "Plan Sponsor and Management Shares"), or (b) a Pro Rata share of the GUC Equitization Reserve in one or more distributions.  If the Asset Sale Restructuring occurs, each Holder of a GUC will receive its Pro Rata share of the Distribution Proceeds as provided in Article VIII. G of the Amended Plan. After describing all of those mechanics for calculating and distributing shares of the reorganized debtors to Class 4 - General Unsecured Creditors - the Disclosure Statement states without any further explanation that holders of Class 4 claims will receive a 0% recovery.  This is confusing to say the least and requires some kind of explanation.

# IV.    DISCLOSURE OBJECTIONS

**E.    The Disclosure Statement Should Not Be Approved Because It Does Not Contain Adequate Information as Required by Section 1125 of the Bankruptcy Code**

44.    Under Section 1125(b) of the Bankruptcy Code, a debtor may not solicit the votes of creditors under a plan of reorganization unless the Court has approved a written disclosure statement. A disclosure statement cannot be approved unless it contains "adequate information."[35]  The primary function of a disclosure statement is to provide creditors with information necessary to determine whether to accept or reject a debtor's plan of reorganization. *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985); *In re Dakota Rail, Inc.*, 104 B.R. 138, 142 (Bankr. D. Minn. 1989).

45.    The obligation to provide adequate information is pivotal.  *See Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993) (disclosure is the "pivotal" concept in chapter 11 cases).  In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the standard is not whether the failure to disclose information would harm creditors but whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take."  *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991).  Significantly, even if more thorough disclosure would not have

---

[35] 'Adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan ….11 U.S.C. § 1125(a)(1).

affected an objecting creditor's vote, that creditor still has standing to object because inadequate

disclosure may have induced other creditors to approve the plan. *Everett v. Perez (In re Perez)*,

30 F.3d 1209, 1217 (9th Cir. 1994).  For a creditor to fairly evaluate the results of a proposed

plan, the court must ensure that a disclosure statement sets forth "all those factors presently

known to the plan proponent to bear upon the success or failure of the proposals contained in the

plan." *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986; *In re Ferretti*, 128 B.R. 16, 19

(Bankr. D.N.H. 1991) (holding that a proper disclosure statement must "clearly and succinctly

inform the average unsecured creditor what it is going to get, when it is going to get it, and what

contingencies there are to getting their [sic] distribution.").

      46.    Whether a disclosure statement contains "adequate information" should be

assessed from the perspective of the claims or interest holders with the ability to vote.[36]  The

Amended Disclosure Statement fails to satisfy section 1125 of the Bankruptcy Code in numerous

material respects.  It omits basic information about matters of primary concern to creditors.

Absent such disclosures, creditors simply have not been provided "adequate information" to

make an informed decision as to whether to accept or reject the Plan.

      47.    The Amended Disclosure fails to disclose a litany of matters, including

that the Debtors' creditors do not, as claimed, support the Amended Plan; that the Plan entails the

involuntary subordination of the Term B-1 Loan subjecting it to significant legal challenge; that

Debtors are administratively insolvent, as evidenced by, among other things, the Amended

Plan's "deemed consent" by administrative and priority claims to accept less than full payment,

---

[36] *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987)); *see also* 11 Collier on Bankruptcy, 1125.03[1] (courts should "consider the needs of the claims or interest of the class as a whole and not the needs of the most sophisticated or least sophisticated members of a particular class").

subjecting the Amended Plan once again to significant legal challenge; and that the Debtors have

exacerbated their administrative insolvency by entering into postpetition long term leases,

without notice or Court approval, which could create uncapped administrative liability if they are

terminated and the premises vacated in a liquidation.

48.     The Amended Disclosure Statement also fails to provide material

information regarding the various Debtor entities, the purpose and basis for the corporate

structure, intercompany claims and how funds will be transferred by and among the Debtor

entities to fund the Amended Plan.

49.     The Liquidation Analysis also does not disclose what is included in the

asset and claim categories and omits stub-rent claims, self-insured medical retention claims and

the administrative claims that may arise from the post-petition leases which lack exit clauses.

The Liquidation Analysis fails to disclose causes of action or ascribe value to causes of action

including the value of a claim against McKesson and the Released Parties.  Debtors also fail to

disclose the existence of 77 Debtor-owned properties or their estimated fair market value.

50.     The Amended Disclosure Statement fails to provide adequate information

concerning the plan releases and falsely represents that creditors support them. As a result of the

inaccurate and missing information presented in the Amended Disclosure Statement, creditors

are misled about the terms of the plan and cannot evaluate whether their treatment under the

Amended Plan comports with the requirements of the Bankruptcy Code.

**F.**     **The Amended Disclosure Statement Contains Inadequate Information To
Determine Whether the Amended Plan Meets the Requirements of Section 1129 of
the Bankruptcy Code.**

51.     Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best

interests of creditors test".  Section 1129(a)(7) requires that, with respect to each impaired class

of claims or interests, (A) each holder of a claim or interest in such class (i) has accepted the

plan, or (ii) will receive or retain under the plan property of a value that is not less than the

amount that holder would receive or retain if the debtor liquidated under chapter 7.  The best

interests test is based on a hypothetical liquidation.  7 Collier on Bankruptcy ¶ 1129.03[7][b]

(15th rev. ed. 2009) ("This means that, absent consent, a creditor or interest holder must receive

property that has a present value equal to that participant's hypothetical chapter 7 distribution").

Debtors have the burden of establishing that the best interest of creditors test is satisfied.[37]  In

order to carry their burden, the Debtors must produce sufficient financial information about

themselves, their assets and liabilities and their prospects to permit the bankruptcy court to judge

whether the best interest test for confirmation has been satisfied.  *See Global Ocean Carriers*,

251 B.R. at 46.  The Amended Disclosure Statement fails to do so.

52.    Creditors cannot determine whether they are receiving as much as they

would in a chapter 7 liquidation because of Debtors' failure to include adequate information.

The Amended Disclosure Statement must include a liquidation analysis for each Debtor entity

that includes a comprehensive schedule of assets and liabilities including the value of claims

against the Released Parties that would be available in chapter 7.

53.    The Plan cancels or reinstates intercompany claims and interests, at

Debtors' discretion.  There is no information concerning the relationship between the Debtor

---

[37] *See, e.g., In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000); *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 479 (Bankr. E.D. Mich. 1995); *In re Zaleha*, 162 B.R. 309, 316 (Bankr. D. Idaho 1993); *In re Future Energy Corp.*, 83 B.R. 470, 489 (Bankr. S.D. Ohio 1998).

entities, no description of intercompany claims and interests, and no disclosure of the impact of reinstatement or cancellation of intercompany claims on creditor recoveries.

54.    Section 1129(a)(11) of the Bankruptcy Code requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  The Court must find that the plan is feasible by independently evaluating the plan to determine whether it offers a reasonable probability of success.  In re Leslie Fay Cos., 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997) ("The court must find that the plan is workable and has a reasonable likelihood of success.").

55.    The Amended Disclosure Statement does not provide sufficient information to determine plan feasibility.  The financial projections appended to the Disclosure Statement relating to an Equitization Restructuring contemplate 120 stores and 61 standalone optical locations.[38]  There is no disclosure regarding the basis for the go-forward business.  The burden is on the plan proponent to show not just the possibility of success, but the reasonable likelihood of success[39].  They fail to do so, particularly as it is undisputed that at present the Debtors have no plan sponsor.

---

[38] Amended Disclosure Statement Article IX. D.

[39] . *See In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986) (plan proponent is required to present "ample evidence to demonstrate that the Plan has a reasonable probability of success."); *In re Geijsel*, 480 B.R. 238, 256 (Bankr. N.D. Tex. 2012) (finding must be "by a preponderance of the evidence"). To demonstrate that a plan is feasible, it is not necessary that success be guaranteed; only a reasonable assurance of success is required.  *See, e.g., Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988)*; *In re Patrician St. Joseph Partners L.P.*, 169 B.R. 669, 647 (Bankr. D. Ariz. 1994); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995).

56.     Section 1129(b)(1) of the Bankruptcy Code permits confirmation of a plan notwithstanding its rejection by an impaired class, also known as a cramdown, only if, *inter alia*, "the plan does not discriminate unfairly and is fair and equitable: 11 U.S.C. § 1129(b)(1) (emphasis added).  "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.  Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes."  *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.* 843 F.2d 636 (2d Cir. 1988) (*citing In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982)).  The burden is on a proponent to prove that the plan does not discriminate unfairly.[40]

57.     The Amended Plan provides disparate treatment for holders of Secured Term Loan B and Term Loan B-1 Claims, although they are of equal priority and classified together under Class 3.  Class B-1 Claims are subordinated to administrative and priority claims while Term Loan B claims are either paid in full or receive a pro rata share of the Exit Financing. The Amended Disclosure Statement fails to include any disclosures regarding the basis for this disparate treatment or show that the Amended Plan does not discriminate unfairly against holders of Class B-1 Claims.  In this regard, Debtors must also disclose that the Term Loan B-1 Claims have not consented to subordination.

---

[40] *See In re Armstrong World Industries, Inc.*, 348 B.R. 111, 122 (D. Del. 2006); *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 853 (Bankr. S.D. Tex. 2001).

58.    The Amended Disclosure Statement does not disclose that the Amended

Plan does not comply with Section 1129(a)(9) of the Bankruptcy Code, and it does not

adequately disclose that creditors who fail to object to their treatment under the plan are

accepting payment on their claims less than required by statute.

59.    Bankruptcy Rule 2002 provides that parties must be given 28 days' notice

of the time to object to a disclosure statement and to object to a chapter 11 plan. The Debtors

ignored this rule in the consideration of the Amended Disclosure Statement and intend to do so

with respect to plan voting and confirmation in their proposed solicitation procedures.

## G.    There are no Disclosures that Would Support the Imposition of Direct and Third-Party Releases in These Cases

60.    The Amended Disclosure Statement fails to disclose sufficient information

about the direct and third-party plan releases to allow creditors to evaluate them and cast an

informed vote on the Amended Plan, as discussed in detail above.[41]  Moreover, the Disclosure

Statement fails to include any information that would support the Court's approval of the

proposed plan releases under the circumstances of these cases.

61.    Third party releases should be granted only under limited circumstances.[42]

While the Eighth Circuit has not squarely addressed the issue of whether third-party, or non-

debtor, injunctions and releases are permissible as a matter of law, several courts in the Eighth

Circuit have applied a number of factors in determining whether third-party releases can be

---

[41] The Committee will oppose the direct and third party releases proposed in the Plan in connection with plan confirmation.

[42] Courts have noted that releases under a plan of reorganization "is proper only in rare cases" when the release is "necessary to the plan" and only upon "the finding of circumstances that may be characterized as unique." *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141, 143 (2d Cir. 2005) ("*Metromedia*"); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992).

approved.  In *In re Master Mortgage Inv. Fund, Inc*., 168 B.R. 930, 935 (Bankr. W.D. Mo.

1994), the court cited to several Second Circuit courts that followed a permissive view of third-

party releases and developed a multi-factor test for consideration of such releases.  The "Master

Mortgage Factors" look at whether: (1) there is an identity of interest between the debtor and the

third party, usually an indemnity relationship, such that a suit against the non-debtor is, in

essence, a suit against the debtor or will deplete assets of the estate; (2) the non-debtor has

contributed substantial assets to the reorganization; (3) the injunction is essential to

reorganization; without it, there is little likelihood of success; (4) a substantial majority of the

creditors agree to such injunction, specifically, the impacted class, or classes, has

"overwhelmingly" voted to accept the proposed plan treatment; (5) the plan provides a

mechanism for the payment of all, or substantially all, of the claims of the class or classes

affected by the injunction.  [43]There is nothing in the Amended Disclosure Statement that

demonstrates that the Debtors could satisfy the Master Mortgage Factors.

62.    In addition, while section 1123(b)(3)(A) permits a plan to provide for "the

settlement or adjustment of any claim or interest belonging to the debtor or to the estate,"

including a release of estate claims against non-debtors, any such release must satisfy the

requirement of a valid settlement of claims under the Bankruptcy Code.  *See In re Bigler LP*, 442

B. R. 537, 543 (Bankr. S.D. Tex. 2010).  Specifically, "[i]t would require, inter alia, consent and

consideration by each participant in the agreement to be valid."  *Id.* at 543-44.  In *Bigler*, the

court approved a release of estate claims against non-debtors where the release was part of the

consideration given to a non-debtor (Amegy Bank), which was providing all of the funding to

---

[43] *See also In re U.S. Fidelis, Inc.*, 481 B.R. 503, 519 (Bankr. E.D. Mo. 2012); *In re Peabody Energy Corp.*, Case
No. 16-42529 (E.D. Mo. March 14, 2017); *In re Archdiocese of Saint Paul and Minnesota*, No. BKY 15-30125,
2017 BL 465425 (Bankr. D. Minn. Dec. 28, 2017) (disallowing non-consensual third-party releases where class
of sexual abuse victims in question had overwhelmingly rejected the debtor's plan, failing to satisfy the fourth
factor).

effectuate the terms of the plan – including payments to unsecured creditors.  *See id.* at 544.

Thus, the court concluded, it was a settlement of claims "for consideration, pursuant to arms-length negotiations" in satisfaction of section 1123(b)(3)(A).[44]  There is nothing in the Amended

Disclosure Statement that supports the requirements of a valid settlement under the Bankruptcy

Code.

**H.    The Amended Disclosure Statement Contains Other Misstatements and Errors**

63.    Although Debtors claim they have no duty to update the Amended

Disclosure Statement,[45] it must be revised to ensure it is accurate when sent out to creditors.  The

following sections of the Amended Disclosure Statement are outdated and inaccurate:

i)    Article VII.C.2.  – Plan Sponsor Marketing Process.  This section is outdated and
Debtors have more information concerning their efforts and results to date in
marketing to prospective Plan sponsors.  These disclosures go to Plan feasibility.

ii)    Article VII.C.4. – The DIP Financing no longer includes a Term B Loan.

iii)    Article IX.C. – The Committee's local counsel, Goosman Law Firm, PLC, should be
added.

iv)    Article IX.E. – The final order approving the DIP Financing included numerous
changes to the terms of the Interim DIP Financing Order.  Each of those changes
should be listed here.

v)    Article IX.H. – Schedules and Statements.  This section should be updated to state
that the Debtors' schedules and statements have been filed.

vi)    Article V.A.6. – Recovery to Holders of General Unsecured Claims.  This section
should be made clearer.  The language indicates that GUCs will receive a distribution

---

[44] *Id.*

[45] Amended Disclosure Statement at Article V.B.

but, as shown on the Liquidation Analysis, the Amended Plan provides no recovery

for holders of GUCs

## V.      SOLICITATION PROCEDURES OBJECTIONS

64.      The Committee objects to the solicitation procedures proposed in the

Amended DS Motion, as described below.   Some improperly disenfranchise creditors in

violation of the Bankruptcy Rules and fail to provide adequate or sufficient notice concerning

solicitation procedures for the Amended Plan. The Committee also requests that the Court

approve the additional provisions as set forth below.

## I.      The Proposed Voting Record Date Occurs Before the Proposed Bar Date

65.      The Debtors' proposed bar date/solicitation/confirmation schedule is as

follows:

| | |
|---|---|
| 2/28/19 | Voting Record Date |
| 3/4/19 | Solicitation Mailing |
| 3/18/19 | Bar Date |
| 3/20/18 | Plan Supplement |
| 3/29/19 | Voting Deadline/Confirmation Objection Deadline |
| 4/3/19 | Confirmation Hearing |

Based on the foregoing schedule, the Voting Record Date will occur before the Bar Date.  The

Voting Record Date determines who will receive ballots.  The Debtors have no provision for

distributing solicitation packages to creditors who file a proof of claim between the Voting

Record Date and the Bar Date.  The solicitation procedures, as drafted, impermissibly deprive

creditors of their fundamental right to vote on the Amended Plan.

66.      The Committee proposes that the Debtors modify the solicitation

procedures: (i) to permit parties to vote who file proofs of claim between the Voting Record Date

and the Bar Date for claims that, as of the Voting Record Date, either are not scheduled claims or

are scheduled as contingent, unliquidated or disputed; (ii) to provide that the Debtors will mail

solicitation packages (including ballots) to such parties one business day after the Bar Date; and

(iii) to extend the Voting Deadline for such parties, if necessary.

**J.** **Creditors Whose Claims are the Subject of an Objection Should Be Provided With Sufficient Time to Obtain a Resolution Event**

67. The Amended DS Motion proposes the following procedures regarding

voting rights with respect to claimants whose claims are the subject of objections:

- if the Debtors file a "reduce and allow" claim objection at any time, the claimant is entitled to vote the claim in the reduced amount absent further order of the court;

- if the Debtors object to a claim on or before March 22, 2019  (other than a "reduce and allow" objection), the claimant will receive a Disputed Notice and is not entitled to vote absent a Resolution Event occurring by March 22, 2018; and

- if Debtors object to a claim after March 22, 2019  (other than a "reduce and allow" objection), claim shall be deemed temporarily allowed for voting purposes without further action by claimant.

Amended DS Motion, Schedule 2 (Form of Solicitation and Voting Procedures), at ¶3.

68. A "Resolution Event" means that one of the following occurs by March

27, 2019:

- Court order allowing claim under section 502(b);

- Court order temporarily allowing claim for voting purposes under Bankruptcy Rule 3018(a);

- executed stipulation resolving claim objection and allowing claim in agreed amount; or

- withdrawal of objection.

*See id.*

69. There is insufficient time to have a Resolution Event (most of which

involve obtaining a Court order) by March 27, 2018 if a claim objection is filed on March 22,

2019.   The Resolution Event should be the Confirmation Hearing on April 3, 2019, to give

claimants adequate time to seek to have their claims temporarily allowed for voting purposes.

70.    In addition, the Debtors should be required to file all objections to claims

(including a "reduce and allow" objection) that affect claimants' voting rights on or before

March 22, 2019.   If the Debtors object to a claim after March 22, 2019 (including a "reduce and

allow" objection), the claim should be deemed temporarily allowed for voting purposes without

further action by claimant.

**K.     The Ballots and Notices Should Contain Opt-out Elections**

71.    Non-consensual, non-debtor releases should be approved only in limited

circumstances; they are not warranted by the facts of these cases.   The ballots for Class 2, Class 3

and Class 4 creditors should include an election to opt-out of the Plan releases as part of the

voting process.   Further, the forms of ballots for Class 2, Class 3 and Class 4 creditors should be

revised to more clearly explain the plan release and opt-out provisions; language should be in

**BOLD HIGHLIGHTED** print advising of the necessity to file an objection to the release

provisions of the plan as a condition to opting-out.   Non-voting creditors who are deemed to

accept or reject the plan should also be sent a separate form of ballot with an election to opt-out

of the plan release provisions.

72.    The Amended Plan provides that holders of Administrative and Priority

Claims are deemed to consent to treatment different than that provided under Section 1129(a)(9)

of the Bankruptcy Code.   As this is a most unusual plan provision, Debtors should include a clear

notice to such parties, in **BOLD HIGHLIGHTED** print setting forth the requirement that

claimants must <u>object</u> to the Amended Plan in order to withdraw their "deemed" consent to the

plan's treatment of their claims.

**L.**     **The Solicitation Package Should Include the Committee Solicitation Letter**

73.     Given all of the issues with the Amended Plan and Amended Disclosure

Statement discussed above, solicitation of the Amended Plan should not be allowed to proceed.

However, in the event that the Court is inclined to approve the Amended Disclosure Statement

and permit solicitation to go forward, it is entirely appropriate for the Debtors to be required to

include a letter from the Committee as part of the solicitation packages.[46]  The proposed form of

the Committee's letter is appended as Exhibit "A" to the Objection.

**M.**     **All Votes in Favor of the Amended Plan Made by Landlords as a Requirement to Receiving Payment of Stub Rent Should be Designated.**

74.     Debtors required that landlords in these cases, as a condition to the

payment of stub rent, vote in favor of their plan.  As part of its confirmation objection, the

Committee will request that those votes be designated under Section 1126(e) of the Bankruptcy

as having been "bought" and not procured in good faith.

## VI.     RESERVATION OF RIGHTS

75.     The Committee reserves its right to supplement this Objection at or prior

to the hearing on the Amended DS Motion and approval of the Amended Disclosure Statement.

---

[46] *See In re Boomerang Tube, LLC*, Case No. 15-11247 (Bankr. D. Del. 2015), Tr. of Proceedings held August 11, 2015 at 5:17-20 (allowing inclusion of Committee letter by agreement among parties); *In re Motor Coach Indus., Inc.*, Case No. 08-12136 (Bankr. D. Del. 2008), Tr. of Proceedings held Dec. 17, 2008 at 44:7-46:21 (allowing creditors' committee to include in solicitation package a letter outlining the committee's issues with the proposed plan); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 215 n.1 (Bankr. W.D. Mich. 1986) (permitting a creditors' committee objecting to a disclosure statement to include in the ballot package a letter recommending that creditors vote against acceptance of the plan); *In re Federated Dep't Stores, Inc.*, 1992 Bankr. LEXIS 392, at *21 (Bankr. S.D. Ohio Jan. 10, 1992) (solicitation packages included a letter from the appropriate creditors' committee recommending a vote in favor of the plan); *In re JHT Holdings, Inc., et al.*, Case No. 08-11267 (BLS) [Docket No. 302] (disclosure statement included bold, all capital letters recommendation by creditors' committee summarizing concerns and urging creditors to reject the plan).

# VII.   CONCLUSION

Based on the foregoing, the Committee respectfully requests that this Court deny approval of the Amended DS Motion and the Amended Disclosure Statement absent the significant changes and supplements thereto as set forth in this Objection and grant such other and further relief as this Court deems appropriate.

Dated:   February 26, 2019

PACHULSKI STANG ZIEHL & JONES LLP

Robert J. Feinstein, Esq.
Bradford J. Sandler, Esq.
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
E-mail:   rfeinstein@pszjlaw.com
            bsandler@pszjlaw.com
-and-
Jeffrey N. Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
E-mail:   jpomerantz@pszjlaw.com

GOOSMAN LAW FIRM, PLC

*/s/ Elizabeth M. Lally*
Elizabeth M. Lally, Esq.
Jeana L. Goosman, Esq.
Joel Carney, Esq.
The Advent Building
17838 Burke Street, Suite 250
Omaha, NE 68118
Telephone:  (402) 280-7648
Facsimile:  (402) 505-3967
E-mail:   lallye@goosmanlaw.com
            goosmanj@goosmanlaw.com
            carneyj@goosmanlaw.com

*Counsel for the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

I certify that on February 26, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record registered with the CM/ECF system.

I further certify that on February 26, 2019, I served the following parties by first class, U.S. Mail, postage prepaid:

Jeanmarie Baer on behalf of
Creditor Baylor County
Perdue,Brandon,Fielder,Collins&Mott
PO Box 8188
Wichita Falls, TX 76307

Ducera Partners, LLC
499 Park Avenue
16th Floor
New York, NY 60022

Matthew A. Feldman
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, NY 10019

Greenfield Community Development
Corporation
215 S. First Street
Greenfield, IA 50849

Hilco Real Estate, LLC
5 Revere Drive
Suite #206
Northbrook, IL 60062

Holly Plaza LLC
2055 Driscoll Dr.
Reno, NV 89509

IBM Credit LLC
Andrew Gravina - Special Handling Group
7100 Highlands Pkwy
Smyrna, GA 30082-4859

Dennis Lutgen
Westwind Plaza
1108 North Independence
Box 504
Beloit, KS 67420

Jennifer L. Marines on behalf of Creditor
United Parcel Service, Inc.
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019-9601

Patrick J. Nash, Jr. on behalf of Debtor
Specialty Retail Shops Holding Corp.
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

Northwest Natural Gas Company
Attn: Ashlee Minty, CCRA, CBA
220 NW 2nd Avenue
Portland, OR 97209

PRA Receivables Management, LLC
PO Box 41021
Norfolk, VA 23541

Trevor R. Pincock on behalf of Creditor
Terence M. Tombari
Lukins & Annis, P.S.
717 West Sprague Ave., Ste. 1600
Spokane, WA 99201

Prime Clerk LLC
830 3rd Avenue
3rd Floor
New York, NY 10022

Wisconsin Rapids Water Works and
Lighting Commission
Attn: Jeff Kuhn, CPA
221 16th St.
PO Box 399
Wisconsin Rapids, WI 54495

Zhangusa Investments, LLC dba ZiMart
Kermit LLC, a Texas series limited liab. Co.
3420 Pine Ave.
Waco, TX 76708

*/s/ Celia M. Baker*
Celia M. Baker