*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) | Case No. 19-80064 (TLS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR
## THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF
## SPECIALTY RETAIL SHOPS HOLDING CORP AND ITS DEBTOR AFFILIATES

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

- and -

Steven Serajeddini (admitted *pro hac vice*)
Daniel Rudewicz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

James J. Niemeier (NE Bar No. 18838)
Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**McGRATH NORTH MULLIN & KRATZ, PC LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: February 28, 2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE SECOND AMENDED JOINT PLAN OF REORGANIZATION OF SPECIALTY RETAIL SHOPS HOLDING CORP. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN CREDITORS OF THE DEBTORS, INCLUDING THE DEBTORS' LARGEST UNSECURED CREDITOR, COLUMN FINANCIAL, INC. (SUBJECT TO APPROVAL OF A 9019 SETTLEMENT [DOCKET NO. 433]) AND CERTAIN OF THE LANDLORDS UNDER THE DEBTORS' LEASES.  ADDITIONALLY, THE DEBTORS ANTICIPATE THAT THEY WILL BE ABLE TO SECURE THE SUPPORT OF THE CREDIT AGREEMENT PRIMARY AGENT PRIOR TO THE CONFIRMATION HEARING. ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE SECURITIES THAT MAY BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL HAVE NOT BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW ("BLUE SKY LAWS").  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS ARE RELYING ON THE EXEMPTION FROM THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND EQUIVALENT STATE LAW REGISTRATION REQUIREMENTS PROVIDED BY SECTION 1145(A)(1) OF THE BANKRUPTCY CODE, TO EXEMPT THE OFFERING AND ISSUANCE OF NEW SECURITIES PURSUANT TO THE PLAN FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO

REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  YOU ARE CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

<u>MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS THEREFORE HIGHLY SPECULATIVE.</u>  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ....................................................................................................................1

II.     PRELIMINARY STATEMENT ............................................................................................1

III.    OVERVIEW OF THE PLAN..................................................................................................2

      A.    Purpose and Effect of the Plan ....................................................................................2
      B.    Equitization Restructuring ...........................................................................................3
      C.    The Asset Sale Restructuring .......................................................................................5
      D.    Releases. ......................................................................................................................8

IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
       PLAN......................................................................................................................................9

      A.    What is chapter 11?......................................................................................................9
      B.    Why are the Debtors sending me this Disclosure Statement? .....................................9
      C.    Am I entitled to vote on the Plan?................................................................................9
      D.    What will I receive from the Debtors if the Plan is consummated? ..............................9
      E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
           Claim, or a Priority Tax Claim? .................................................................................12
      F.    Are any regulatory approvals required to consummate the Plan?...............................13
      G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ...............13
      H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
           Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
           "Consummation?"......................................................................................................13
      I.    What are the sources of Cash and other consideration required to fund the Plan?.........................13
      J.    Are there risks to owning the New Shopko Interests upon emergence from chapter 11?..............14
      K.    Will the final amount of Allowed General Unsecured Claims affect my recovery under
           the Plan?.....................................................................................................................14
      L.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............14
      M.    What impact does the Claims Bar Date have on my Claim? .........................................17
      N.    What is the deadline to vote on the Plan? ...................................................................18
      O.    How do I vote for or against the Plan?........................................................................18
      P.    Why is the Bankruptcy Court holding a Confirmation Hearing?.................................18
      Q.    When is the Confirmation Hearing set to occur? ........................................................18
      R.    What is the purpose of the Confirmation Hearing?.....................................................18
      S.    What is the effect of the Plan on the Debtors' ongoing business? ...............................18
      T.    Will any party have significant influence over the corporate governance and operations of
           the Reorganized Debtors? ..........................................................................................19
      U.    Who do I contact if I have additional questions with respect to this Disclosure Statement
           or the Plan? ................................................................................................................20
      V.    Do the Debtors recommend voting in favor of the Plan?............................................20
      W.    Who Supports the Plan?.............................................................................................20

V.      THE DEBTORS' PLAN .......................................................................................................20

      A.    The Plan ....................................................................................................................20
      A.    Miscellaneous Provisions...........................................................................................23
      B.    Additional Important Information ...............................................................................24

VI.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW...........26

      A.    The Debtors................................................................................................................26
      B.    Prepetition Capital Structure .....................................................................................26

**VII.     EVENTS LEADING TO THE CHAPTER 11 FILINGS** ...................................................... **27**

    A.     Challenging Operating Environment and Operational Right Sizing ............................. 27
    B.     Supply Chain Challenges and McKesson Actions ...................................................... 27
    C.     Exploration of Strategic Alternatives ......................................................................... 28

**VIII.    PRIOR TRANSACTIONS** ...................................................................................................... **30**

    A.     SUPERVALU Transaction and Pamida Acquisition .................................................. 30
    B.     Sun Capital Transaction .............................................................................................. 30
    C.     Special Committee ....................................................................................................... 30

**IX.      EVENTS OF THE CHAPTER 11 CASES** ........................................................................... **32**

    A.     Expected Timetable of the Chapter 11 Cases .............................................................. 32
    B.     First and Second Day Relief ........................................................................................ 32
    C.     Creditors' Committee .................................................................................................. 33
    D.     Postpetition Marketing Process ................................................................................... 33
    E.     Approval of the DIP Facility ....................................................................................... 34
    F.     McKesson Stipulation .................................................................................................. 34
    G.     Executory Contracts and Unexpired Leases ................................................................ 34
    H.     Lease Renegotiation and Store Closing Process .......................................................... 36
    I.     Schedules and Statements ............................................................................................ 37
    J.     Litigation Matters ........................................................................................................ 37
    K.     Miscellaneous Matters ................................................................................................ 37
    L.     Insert Summarizing Shopko Note Holding, LLC's Objection to the Disclosure Statement .......... 38

**X.       PROJECTED FINANCIAL INFORMATION** ................................................................... **38**

**XI.      RISK FACTORS** ..................................................................................................................... **39**

    A.     Bankruptcy Law Considerations .................................................................................. 39
    B.     Risks Related to Recoveries under the Plan ................................................................ 41
    C.     Risks Related to the Debtors' and the Reorganized Debtors' Businesses .................... 43

**XII.     SOLICITATION AND VOTING PROCEDURES** ............................................................ **45**

    A.     Holders of Claims Entitled to Vote on the Plan .......................................................... 45
    B.     Voting Record Date ..................................................................................................... 45
    C.     Voting on the Plan ....................................................................................................... 45
    D.     Ballots Not Counted .................................................................................................... 46

**XIII.    CONFIRMATION OF THE PLAN** ...................................................................................... **46**

    A.     Requirements for Confirmation of the Plan ................................................................ 46
    B.     Best Interests of Creditors/Liquidation Analysis ....................................................... 46
    C.     Feasibility .................................................................................................................... 47
    D.     Acceptance by Impaired Classes ................................................................................. 47
    E.     Confirmation Without Acceptance by All Impaired Classes ....................................... 47
    F.     Valuation of the Debtors ............................................................................................. 48

**XIV.     CERTAIN SECURITIES LAW MATTERS** ..................................................................... **48**

    A.     Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers ............. 48

**XV.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
    PLAN** ........................................................................................................................................ **50**

    A.     Introduction ................................................................................................................. 50

B.   Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors ................................................................................................................................ 51

C.   Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims Entitled to Vote .......................................................................................................... 54

D.   Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims ............. 58

XVI.   **RECOMMENDATION** ...................................................................................................................... **62**

**EXHIBITS**

EXHIBIT A       Plan of Reorganization

EXHIBIT B       Corporate Structure Chart

EXHIBIT C       Disclosure Statement Order

EXHIBIT D       Financial Projections

EXHIBIT E       Liquidation Analysis

## I.    INTRODUCTION

Specialty Retail Shops Holding Corp. ("Shopko") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the ***Second Amended Joint Chapter 11 Plan of*** *Specialty Retail Shops* ***Holding Corp. and Its Debtor Affiliates*** (the "Plan"), dated February 28, 2019.[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for Shopko and each of its affiliated Debtors.

Each of the Debtors' boards of managers or directors has approved the Plan and believes the Plan is in the best interests of the Debtors' Estates.  As such, the Debtors recommend that all Holders of Claims entitled to vote accept the Plan by returning their ballots (each, a "Ballot") so as to be **actually received** by the Solicitation Agent (as defined herein) no later than **March 25, 2019, at 5:00 p.m. (prevailing Central Time)**.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## II.    PRELIMINARY STATEMENT

Shopko, founded in 1962 and headquartered in Green Bay, Wisconsin, is a leading operator of over 300 general merchandise stores throughout the Midwestern, Northwestern, and Southwestern regions of the United States. The Debtors employ over 15,000 individuals, and offer a broad assortment of name brand and private brand merchandise including clothing and accessories, electronics, and home furnishings, as well as Debtor-operated pharmacy and optical services departments.  In many instances, the Debtors' stores are an integral part of the fabric of the communities in which they operate.

Unfortunately, the Debtors, like many other retail companies, have recently fallen victim to adverse macro-trends, including the general shift away from brick and mortar stores to online retail channels.  More specifically, retail companies like Shopko, with a substantial physical footprint, bear higher expenses than web-based retailers and are heavily dependent on store traffic, which has decreased significantly as consumers increasingly shop online rather than in malls or shopping centers.  In addition to competing against online retailers, the Debtors have struggled against other established brick and-mortar retailers, such as Walmart and Target, who have less leveraged capital structures and greater economies of scale.  These factors allow the Debtors' competitors to offer lower prices than the Debtors and still bear the high operating expenses associated with brick-and-mortar retail.  Further, consolidation in the pharmacy industry has led to a lack of pricing power for retail pharmacies of Shopko's size.

These market developments, compounded with an underdeveloped online presence and wholesale platform and certain above-market lease obligations, have adversely impacted the Debtors' sales and operations, with EBITDA declining by 21% over the last year, from approximately $45.2 million in 2017 to approximately $35.6 million in 2018.  These declines have directly—and negatively—impacted liquidity and left the Debtors overleveraged. Moreover, the Debtors' pharmacy business has not performed as well as the Debtors anticipated, due in part to high inventory costs from the Debtors' primary pharmaceutical provider, McKesson Corporation ("McKesson").

To protect the inherent value in their businesses and to address the existing macro-economic challenges, the Debtors retained advisors to assist management and the board of directors regarding potential strategic alternatives to enhance the Debtors' leverage and liquidity and address their capital structure.  With the assistance of their advisors, the Debtors began a series of steps in late 2017 to address their balance sheet.  These steps include processes to market the Debtors' assets, efforts to right-size their debt and lease obligations, and pursuing deleveraging and financing opportunities.  Among other successes, Debtors obtained additional financing from Spirit Realty L.P. ("Spirit")—their primary landlord—in January 2018.

Over the past year and a half, the Debtors began implementing real-estate rationalization measures and other operational efficiency initiatives and developing their wholesale business and online sales presence.  After an initial

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

marketing process for the Debtors' business in 2017 led by Houlihan Lokey, the Debtors, through receipt of feedback from the buyers and as a result of their own analysis, learned that they would have greater value if they exited the pharmacy business.  Using this analysis, the Debtors commenced another comprehensive marketing process in mid-2018 for both a sale of their entire business as well as a separate process for the sale of their pharmacy assets.  As a result of these efforts, the Debtors were able to close approximately $95 million in transactions in the months leading up to the Petition Date.   As described in more detail below, the Debtors finished these marketing efforts postpetition in an expedited auction and sale process.  The Debtors also began the process of closing their unprofitable locations in late 2018, and intend to complete that process at some point during these cases.

With debtor-in-possession financing and key creditor support in place, the Debtors intend to move expeditiously through these cases and emerge as a stronger, better-capitalized business positioned to thrive for years to come.

As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $403 million, consisting primarily of approximately (a) $289 million under the ABL Revolving Loans A, (b) $30.0 million outstanding under the Revolving Loans A-1, (c) $49.1 million outstanding under the Term Loan B, and (d) $34.4 million under the Term Loan B-1.

## III.    OVERVIEW OF THE PLAN

The Plan contemplates a restructuring of the Debtors through either (a) a sponsor-led Equitization Restructuring or (b) an orderly liquidation under the Asset Sale Restructuring.

The key terms of the Plan are as follows:

### A.    Purpose and Effect of the Plan

The Debtors propose to reorganize under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders.  The consummation of a chapter 11 plan of reorganization is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan does not contemplate the substantive consolidation of the Debtors' estates.  Instead, the Plan, although proposed jointly, constitutes a separate plan for each of the Debtors in these Chapter 11 Cases.  Holders of Allowed Claims or Interests against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class.

The Debtors contemplate two different possible paths forward under their Plan, the Equitization Restructuring and the Asset Sale Restructuring.

2

The Plan includes a "toggle" feature which will determine whether the Debtors complete the Equitization Restructuring or the Asset Sale Restructuring. The Plan thus provides the Debtors with the necessary latitude to negotiate the precise terms of their ultimate emergence from chapter 11.

The Plan contemplates the following transactions under the Equitization Restructuring:

- The issuance of the New Shopko Interests;

- The Debtors Prepetition ABL Obligations being rolled up into the DIP Facility;

- The entrance by the Reorganized Debtors into the Exit Facility, if any, pursuant to which either: (i) the Prepetition ABL Lenders, DIP ABL Lenders, and Term B Lenders will convert their Claims into commitments under such an Exit Facility; or (ii) the Reorganized Debtors will enter into a new credit facility sufficient to both repay the Claims of the Prepetition ABL Lenders, DIP ABL Lenders, and Term B Lenders and to provide incremental liquidity;

- The investment by the Plan Sponsor in exchange for New Shopko Interests; and

- Interests in Shopko being canceled and extinguished.

Under the Asset Sale Restructuring, the Debtors will conduct one or more Asset Sales to sell substantially all of the Debtors' assets. The Asset Sale Restructuring contemplates the following transactions:

- Selection by the Debtors of the Plan Administrator who will act in the fiduciary capacity as a board of managers or directors. As of the Effective Date, the Plan Administrator would become the sole manager, director, and officer of Reorganized Shopko and act to wind down the business affairs of the Debtors and Reorganized Shopko;

- The Debtors paying all outstanding Claims in accordance with the Bankruptcy Code's priority waterfall;

- The Plan Administrator will establish each of the Distribution Reserve Accounts in accordance with Article VIII of the Plan and administer the distribution thereof to Holders of Allowed Claims;

- Vesting of all assets of the Debtors in Reorganized Shopko for the purpose of liquidating the Estates; and

-  Interests in Shopko being canceled and extinguished.

The projected recoveries included in this Disclosure Statement and the liquidation analysis attached hereto as **Exhibit E** provide the baseline recovery for creditors under the Asset Sale Restructuring.  The Debtors may determine to pursue an alternative Asset Sale Restructuring or Equitization Restructuring, but will only do so to the extent such alternative produces higher recoveries than this baseline recovery.  The feasibility of the Plan is premised upon, among other things, the Debtors' ability to achieve the goals of its long-range business plan, make the distributions contemplated under the Plan, and pay certain continuing obligations in the ordinary course of the Reorganized Debtors' business.  The Reorganized Debtors' financial projections are set forth on **Exhibit D**. Although the Debtors' believe the projections are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty.  Actual results may differ from the projections, and the differences may be material.

### B.    Equitization Restructuring

Unless otherwise determined by the Debtors before the Confirmation Hearing, the Debtors shall effectuate the Equitization Restructuring.

The Equitization Restructuring shall be governed by the following provisions.

1.    Sources of Consideration for Plan of Reorganization Distributions

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, and the New Shopko Interests.

2.       Issuance and Distribution of New Shopko Interests

On the Effective Date, the Reorganized Debtors shall issue the New Shopko Interests to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan.  The issuance of New Shopko Interests under the Plan, as well as options, or other equity awards, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims.

On the Effective Date, Holders of New Shopko Interests shall be parties to the New Stockholders' Agreement, in substantially the form included in the Plan Supplement.  On the Effective Date, Reorganized Shopko shall enter into and deliver the New Stockholders' Agreement to each Entity that is intended to be a party thereto, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Shopko Interests shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Shopko.

3.       Exit Facility

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility.  Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facility.

4.       Plan Sponsor Investment

On the Effective Date, the Plan Sponsor shall consummate the Plan Sponsor Investment, if any, in exchange for up to 100% of the New Shopko Interests, subject to dilution by Management Incentive Plan. The Cash received from the Plan Sponsor Investment shall be contributed to the Reorganized Debtors on the Effective Date.

5.       Management Incentive Plan

As of the Effective Date, the Reorganized Shopko Board will be authorized to implement the Management Incentive Plan.  The Management Incentive Plan shall provide for the issuance of options and/or equity based compensation to certain members of management of Reorganized Shopko.  New Shopko Interests representing up to 10% of the New Shopko Interests outstanding as of the Effective Date on a fully-diluted basis shall be reserved for issuance in connection with the Management Incentive Plan.

6.       Reporting Upon Emergence

On the Effective Date, none of the New Shopko Interests will be registered under the Securities Act or the Securities Exchange Act or listed on a national securities exchange, Reorganized Shopko will not be a reporting company under the Securities Exchange Act, Reorganized Shopko shall not be required to and will not file Securities Exchange Act reports with the Securities and Exchange Commission or any other entity or party, and Reorganized Shopko shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date. In order to prevent Reorganized Shopko from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, a separate agreement or Reorganized Shopko's organizational documents may impose certain trading restrictions, and the New Shopko Interests may be subject to certain transfer and other restrictions designed to maintain Reorganized Shopko as a private, non-reporting company.

Notwithstanding the foregoing in this Section 3, from and after the Effective Date, Reorganized Shopko shall be required to provide (via separate agreement or in its organizational documents) to its shareholders audited annual

and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP (for the avoidance of doubt, no SAS 100 review, compliance with any other requirement of Regulation S-X under the Securities Act or narrative disclosure required to be provided by reporting companies under the Securities Exchange Act in periodic or other reports (including, without limitation, a Management's Discussion and Analysis of Financial Condition and Results of Operations) is required in connection with the delivery of the required financial statements). The Reorganized Debtors may also be required to provide certain financial information to other parties pursuant to contracts that are in effect on or after the Effective Date.

### C.    The Asset Sale Restructuring

Under the Asset Sale Restructuring, the Debtors will conduct one or more Asset Sales to sell substantially all of the Debtors' assets.

If the Asset Sale Restructuring occurs, the following provisions shall govern.

1.    Sources of Consideration for Plan Distributions

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreements, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Reorganized Debtors and shall be subject to administration by the Plan Administrator in consultation with the Credit Agreement Primary Agent.

2.    Asset Sales

On the Effective Date, the Debtors shall consummate the Asset Sales and, among other things, the acquired assets, as set forth in the Asset Purchase Agreement, shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Asset Purchase Agreement and Confirmation Order.  The Purchaser shall be deemed not to be a successor of the Debtors.  On the Effective Date, the Purchaser shall pay to the Debtors the proceeds from the Asset Sales, as and to the extent provided for in the Asset Purchase Agreements.  The Confirmation Order shall:  (a) approve the Asset Purchase Agreement; and (b) authorize the Debtors or Reorganized Debtors, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

3.    Reorganized Debtor

On and after the Effective Date, the Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) establishing and funding the Distribution Reserve Accounts, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Purchase Agreements, if any, and (h) administering the Plan in an efficacious manner.  The Reorganized Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

4.    Plan Administrator

The Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).

On the Effective Date, the powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and the Reorganized Debtors, including:  (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Reorganized Debtor in accordance with the Wind-Down Milestones and Wind-Down Budget; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Distribution Reserve Accounts in accordance with the Wind-Down Budget; (3) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Reorganized Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Reorganized Debtors; (7) administering and paying taxes of the Reorganized Debtors, including filing tax returns; (8) representing the interests of the Reorganized Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, in each case of the forgoing clauses (1-9) strictly in accordance with the Wind-Down Milestones and Wind-Down Budget.  The Plan Administrator shall provide the Credit Agreement Primary Agent with all non-privileged budgets, records, projections, financial information, reports and other information that the Credit Agreement Primary Agent (or its consultants and advisors) may reasonably request.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator (which shall be acceptable to the Credit Agreement Primary Agent).  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Reorganized Debtors shall be terminated.

5.    Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Milestones and Wind-Down Budget, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the assets of the Reorganized Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

6.    Wind-Down Budget

The Debtors shall include in the Plan Supplement, in form and substance satisfactory to Credit Agreement Primary Agent, a 13-week statement of cash receipts and disbursements (which shall include the funding of the Distribution Reserve Accounts and the Professional Fee Escrow) and amount of Term Loan Claims outstanding for the consecutive 13 weeks immediately following the Effective Date, setting forth on a weekly basis, the anticipated uses of the Distribution Proceeds (the "**Wind-Down Budget**", as may be updated, amended or modified from time to time with the written consent of the Credit Agreement Primary Agent). The Wind Down Budget shall be filed with the Plan Supplement, and shall describe the rights and remedies of the Credit Agreement Primary Agent if the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, fail to comply with the Wind Down Budget in any material aspect.

7.    Wind-Down

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Wind-Down Milestones and Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates in accordance with the Wind-Down Milestones and Wind-Down Budget.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (1) cause the Debtors and the Reorganized Debtors, as applicable, to comply with, and abide by, the terms of the Asset Purchase Agreement and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent

document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions in accordance with the Wind-Down Milestones and Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor. From and after the Effective Date, except with respect to the Reorganized Debtors as set forth herein, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

Notwithstanding anything to the contrary set forth in this Plan, the Plan Supplement, the Disclosure Statement or otherwise, at all times on and after the Effective Date through the date on which the Term Loan Claims are paid in full in Cash or otherwise satisfied with the consent of the Holder of such Claim, (i) the Debtors, the Reorganized Debtors, and the Plan Administrator shall maintain the cash management system of the Debtors (including all deposit accounts, as in effect immediately prior to the Effective Date, in all respects unless otherwise agreed in writing by the Credit Agreement Primary Agent); and (ii) assume, ratify, and reaffirm all agreements (including all deposit account control agreements) related to the deposit accounts of the Debtors, Reorganized Debtors, and Plan Administrator.

8.      Dissolution and Board of the Debtors

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to its affairs. Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of Shopko under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of Shopko or any of its affiliates.

9.      Release of Liens

Except otherwise expressly provided herein, on the Effective Date, all Liens on any property of any Debtors or the Reorganized Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Reorganized Debtors shall be automatically discharged and released; provided that notwithstanding anything to the contrary set forth in this Plan, subject to the funding of the Professional Fee Escrow Account, (a) all Liens of the Credit Agreement Primary Agent and Lenders (as defined in the DIP

Agreement) on any property of any Debtors or the Reorganized Debtors shall remain valid, binding, and in full effect on and after the Effective Date, (b) all property of the Debtors and Reorganized Debtors shall remain subject to the Liens and claims of the Credit Agreement Primary Agent and Lenders and shall continue to secure all Obligations (as defined in the DIP Agreement) owing to the Credit Agreement Primary Agent and Lenders, and (c) all guarantees of any Debtors or the Reorganized Debtors in favor of the Credit Agreement Primary Agent or Lenders shall be reaffirmed and remain in full force and effect.

### D.    Releases.[3]

The Plan contains certain releases (as described more fully in Article IV.L hereof), including mutual releases between: (a) the Debtors; (b) the Credit Agreement Primary Agent; (c) the Term Loan B-1 Agent; (d) each Holder of a Claim or Interest entitled to vote to accept or reject the Plan that (i) votes to accept the Plan or (ii) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; (e) each Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan; (f) each Holder of a Claim or Interest that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; and (g) with respect each of the Debtors, the Reorganized Debtors and the foregoing entities described in clauses (a) through (g), such entities' current and former affiliates, and such entities' and such affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, officers, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns

Holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in Voting Classes who abstain from voting on the Plan and do not object to the releases will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things: (a) the releases, exculpations, and injunctions are specific; (b) the releases provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (c) the releases are a condition to the global settlement and a necessary part of the Plan; and (d) each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring. Further, the Debtors anticipate that they will be able to secure the support of the vast majority of the Holders of the Debtors' DIP Claims, and Term Loan Secured Claims prior to the Confirmation Hearing for the releases, exculpations, and injunctions. The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Debtors to propose the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.[4]

---

[3]    The Special Committee, with the assistance of its counsel and advisors, is currently undertaking an investigation into Estate claims and Causes of Action. The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, and the Debtors reserve all rights and claims with respect thereto. For more information on the Estate claims and Causes of Action being investigated by the Special Committee, see Section VIII.C. Special Committee.

[4]    The foregoing paragraph is subject to Article X.E of the Plan.

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Impaired | Entitled to Vote |
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote |
| 7 | Interests in Shopko | Impaired | Deemed to Reject |
| 8 | Section 510(b) Claims | Impaired | Deemed to Reject |

### D.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Based on the Liquidation Analysis, the Debtors estimate Holders of Administrative Claims may recover between 45.7-100 percent on account of such claims.  Certain creditors have asserted that absent payment of Administrative Claims in full on the Effective Date (or consent by Holders of Administrative to such treatment) the Plan is not confirmable.

**THE FAILURE TO OBJECT TO CONFIRMATION BY A HOLDER OF AN ALLOWED ADMINISTRATIVE CLAIM OR PRIORITY CLAIM SHALL BE DEEMED TO BE SUCH HOLDER'S CONSENT TO RECEIVE TREATMENT FOR SUCH CLAIM AS PROVIDED IN ARTICLE II AND ARTICLE III OF THE PLAN.**

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[5]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim will receive, at the Debtors' election: (a) payment in full in Cash, which may come from the Other Secured Claims Reserve; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired. | $15,631,000 | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim will receive its Pro Rata share of the Priority Claims Reserve. The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code. | $1,781,000 | 45.7% - 100% |

---

[5]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions. "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

| 3 | Term Loan Secured Claims | If the Equitization Restructuring occurs, each Holder of an Allowed Term Loan Secured Claim will receive its share of, in accordance with section 6.4 of the Credit Agreement:  (a)(i)  Cash  equal  to  the outstanding amount of the Term Loan B Claim; plus (ii) Cash in an amount equal to (x) the amount of Cash on hand as of the Effective Date, less (x) the Minimum Liquidity Threshold and (y) the amount of Cash necessary to make distributions to Holders of all Allowed Claims pursuant to Article II hereof (including the funding of the Professional Fee Escrow Account) and Holders of Allowed Other Secured Claims and Holders of Allowed Other Priority Claims pursuant to Article III hereof, provided that the amount set forth in clause (ii) shall not exceed the amount of the Term Loan B-1 Claim; or (b) as agreed by such Holder of an Allowed Term Loan Secured Claim and the Debtors, its Pro Rata share of the Exit Facility.<br><br>If the Asset Sale Restructuring occurs, each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution to Holders of Allowed Term Loan Secured Claims from time to time as provided in Article VIII.G of the Plan, until such Allowed Term Loan Secured Claims are paid in full. | $82,078,000 | 58.6% - 95.5% |
| 4 | General Unsecured Claims | If the Equitization Restructuring occurs, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of, at the election of the Debtors, either (a) 100% of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and the Management Incentive Plan or (b) its Pro Rata share of the GUC Equitization Reserve in one or more distributions.<br><br>If the Asset Sale Restructuring occurs, each Holder of a General Unsecured Claim will receive its Pro Rata share of the Distribution Proceeds as provided in Article VIII.G of the Plan. | $536,800,000 | 0% |
| 5 | Intercompany Claims | Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; provided, that no distributions shall be made on account of any such Intercompany Claims. | N/A | 0% |
| 6 | Intercompany Interests | Each Allowed Intercompany Interest shall be Reinstated for administrative convenience or cancelled and released without any distribution on account of such interests at the option of the Debtors. | N/A | 0% |

| 7 | Interests in Shopko | Each Allowed Interest in Shopko shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Shopko shall be entitled to any recovery or distribution under the Plan on account of such Interests | N/A | 0% |
| 8 | Section 510(b) Claims | Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.  The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist. | N/A | 0% |

**E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**(i)    Administrative Claims and Priority Tax Claims**

Administrative Claims and Priority Tax Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein.

Except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. §503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim or Priority Tax Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim or Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Priority Claims Reserve.

THE FAILURE TO OBJECT TO CONFIRMATION BY A HOLDER OF AN ALLOWED ADMINISTRATIVE CLAIM OR PRIORITY TAX CLAIM SHALL BE DEEMED TO BE SUCH HOLDER'S CONSENT TO RECEIVE TREATMENT FOR SUCH CLAIM THAT IS DIFFERENT FROM THAT SET FORTH IN SECTION 1129(A)(9) OF THE BANKRUPTCY CODE; PROVIDED, THAT THE HOLDERS OF SUCH CLAIMS SHALL BE DEEMED TO CONSENT TO THE TREATMENT ON ACCOUNT OF SUCH CLAIMS AS PROVIDED HEREIN.

Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

If the Asset Sale Restructuring occurs, any amounts remaining in the Priority Claims Reserve after payment of all Allowed Administrative Claims and all Allowed Priority Claims shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.G of the Plan without any further action or order of the Court.

### (ii)    DIP Claims

DIP Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein.  As of the Effective Date, the DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Agreement and Financing Orders, including principal, interest, fees, and expenses.

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction of the Allowed DIP Claims, each Holder of an Allowed DIP Claim: (i) if the Equitization Restructuring occurs, will either be:  (a) indefeasibly repaid in full in Cash on the Effective Date; or (b) with the consent of such Holder, receive its Pro Rata share of the Exit Facility; or (ii) if the Asset Sale Restructuring occurs, paid *all Distribution Proceeds* available for distribution under V.III.G. of the Plan *until such Allowed DIP Claims are Repaid in Full.*  As used in this paragraph, "Repaid in Full" shall mean, in each case to the extent authorized by the Financing Orders: the indefeasible payment in full in Cash of all liquidated DIP Claims; the cancelation, backing, or cash collateralization of letters of credit under the Credit Agreements in accordance with the terms of the Financing Agreements (as defined in the DIP Agreement); or in the case of any contingent Obligations (as defined in the DIP Agreement), including any payments that have been provisionally credited to the Obligations and any continuing obligations (contingent or otherwise) that the Reorganized Debtors shall have furnished the Credit Agreement Primary Agent  with cash collateral or an indemnification from a Person, and pursuant to terms and conditions, in each case which are satisfactory to the Credit Agreement Primary Agent; Reorganized Debtors shall have furnished the Credit Agreement Primary Agent with cash collateral in an amount satisfactory to the Credit Agreement Primary Agent in its discretion to secure payment of liabilities in respect of matters or circumstances known to Credit Agreement Primary Agent at the time which are reasonably expected to result in any actual loss, cost, damage or expense (including attorneys' fees and legal expenses) to the Credit Agreement Primary Agent or any DIP Lender; and the termination of the Agent's and DIP Lenders' obligation to extend credit under the Financing Agreements (as defined in the DIP Agreement).

### F.    Are any regulatory approvals required to consummate the Plan?

There are no known regulatory approvals that are required to consummate the Plan.  However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### G.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative transaction may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* "*Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis*," which begins on page 42 of this Disclosure Statement.

### H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims or Interests will only be made on the date the Plan becomes effective— the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* "*Confirmation of the Plan*," which begins on page 42 of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

### I.    What are the sources of Cash and other consideration required to fund the Plan?

If the Equitization Restructuring occurs, the Plan and distributions thereunder will be funded by the following sources of Cash and consideration: (a) Cash on hand, (b) the revenues and proceeds of all assets of the Debtors,

including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, and (c) the issuance of the New Shopko Interests.

If the Asset Sale Restructuring occurs, the Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined or exculpated under the Plan or otherwise on or prior to the Effective Date.

**J.      Are there risks to owning the New Shopko Interests upon emergence from chapter 11?**

Yes.  *See* "Risk Factors," which begins on page 35 of this Disclosure Statement.

**K.      Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that Allowed General Unsecured Claims total approximately $536.8 million.  If the Equitization Restructuring occurs, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of, at the election of the Debtors, either (a) 100 percent of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and the Management Incentive Plan, or (b) its Pro Rata share of the GUC Equitization Reserve in one or more distributions.

If the Asset Sale Restructuring occurs, each Holder of a General Unsecured Claim will receive its Pro Rata share of the Distribution Proceeds as provided in the Plan.  Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

Moreover, the Debtors may in the future reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages claims not accounted for in this estimate.  Further, the Debtors may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the total amount of Allowed General Unsecured Claims could change as well.

The Management Incentive Plan shall provide for the issuance of options and/or equity based compensation to certain members of management of Reorganized Shopko. The issuance of options and/or equity based compensation under the Management Incentive Plan will dilute the New Shopko Interests being distributed to certain Holders of Allowed Claims under the Plan.

**L.      Will there be releases and exculpation granted to parties in interest as part of the Plan?[6]**

Yes, Article X of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.

All Holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who vote to reject the Plan or who do not vote to accept or reject the Plan <u>and</u> do not affirmatively opt out of the

---

[6]    The Special Committee, with the assistance of its counsel and advisors, is currently undertaking an investigation into Estate claims and Causes of Action. The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, and the Debtors reserve all rights and claims with respect thereto.  For more information on the Estate claims and Causes of Action being investigated by the Special Committee, see Section VIII.C. Special Committee.

release provisions contained in Article X of the Plan by timely objecting to the Plan's third-party release provisions, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Eighth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### 1. Release of Liens

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.  If an Equitization Restructuring occurs pursuant to the Plan, then the Credit Agreement Primary Agent and the Term Loan B-1 Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtors that are subject to the Equitization Restructuring; *provided* that if an Asset Sale Restructuring occurs, then, subject to the funding of the Professional Fee Escrow Account, all Liens securing the Prepetition ABL Claims, DIP Claims, Term Loan Claims, or any other Obligations (as defined in the DIP Agreement) shall continue in full force and effect on and after the Effective Date and nothing in this Plan shall or shall be construed to release, discharge, relieve, limit or impair in any way the rights of any Holder of a Prepetition ABL Claims, DIP Claims, or Term Loan B Claim or any Lien securing any such Claim.**

### 2. Debtor Release

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, Plan Administrator and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, Plan Administrator, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

(a)     **the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the other Restructuring Documents;**

(b)     **any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, or the Plan;**

(c)     **the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the DIP Facilities, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the New Shopko Interests) pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or**

(d)     the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 3.     Release by Holders of Claims or Interests

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, as applicable, and other Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a)     the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the other Restructuring Documents;

(b)     any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, or the Plan;

(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the DIP Facilities, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 4.     Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the DIP Facilities, the Exit Facility Credit Agreement, the Exit Facility Documents, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have

constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 5.    Injunction

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or Reorganized Debtors, or the other Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

### M.    What impact does the Claims Bar Date have on my Claim?

The Bankruptcy Court has established March 18, 2019, at 11:59 p.m., prevailing Central Time, as the Claims bar date (the "Bar Date") in the Chapter 11 Cases.  The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, must file Proofs of Claim on or before the Bar Date:  (1) any entity whose Claim against a Debtor is not listed in the applicable Debtor's schedules of assets and liabilities ("Schedules") or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (2) any entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim Allowed in a different classification or amount from that identified in the Schedules; (3) any entity that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim Allowed against a Debtor other than that identified in the Schedules; and (4) any entity that believes its Claim against a Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), for any Person or Entity that is required, but fails, to file a Proof of Claim on or before the Bar Date: (1) such Person or Entity will be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a Proof of Claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such Person or Entity will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such Person or Entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which Proofs of Claim are filed on or before the Bar Date.

17

**N.      What is the deadline to vote on the Plan?**

The Voting Deadline is March 25, 2019, at 5:00 p.m. (prevailing Eastern Time).

**O.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by March 25, 2019, at 5:00 p.m. (prevailing Eastern Time) at the following address: Shopko Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022 (or returned in accordance with the instructions otherwise set forth on your ballot).  *See* Article XII of this Disclosure Statement, which begins on page 41 of this Disclosure Statement.

If a creditor whose Claim was not listed in the Debtors schedules of assets and liabilities timely files a proof claim, the Debtors shall promptly provide a Ballot to such creditor; however, if the Holder of such Claim wants to have its Ballot counted, it is required to file a motion with the Bankruptcy Court seeking to have its vote counted.

If a Class of Claims is eligible to vote and no Holder of Claims in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**P.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for April 3, 2019, at 11:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than March 25, 2019, at 5:00 (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national editions of the *Omaha World-Herald* and *USA Today* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**R.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are seeking to reorganize under chapter 11 of the Bankruptcy Code.  If the Equitization Restructuring occurs, Confirmation means that the Debtors will not be liquidated or forced to go out of business.  If the Asset Sale Restructuring occurs, the Debtors will consummate one or more series of Asset Sales which they believe may provide for a going concern transaction.  Following Confirmation, the Plan will be consummated on the Effective

Date, which is a date selected by the Debtors that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A of the Plan have been satisfied or waived (in accordance with Article XI.B of the Plan); and (c) the Plan is declared effective. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate or wind-down their businesses, as applicable, and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**T.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

*Equitization Restructuring*

If an Equitization Restructuring occurs, then as of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  Provisions regarding the removal, appointment, and replacement of members of the subsequent Reorganized Shopko Board shall be determined by Reorganized Shopko.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Reorganized Shopko Board, as well as those Persons that will serve as an officer of the Reorganized Debtors.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the Reorganized Shopko Board will be disclosed in the New Organizational Documents.

As of the Effective Date, the New Shopko Interests shall be subject to a stockholders' agreement, substantially in the form included in the Plan Supplement, containing terms and conditions that are commercially reasonable, and each holder of the New Shopko Interests will be bound thereby without the need for execution by any party thereto other than Reorganized Shopko.

*Asset Sale Restructuring*

If an Asset Sale Restructuring occurs, then as of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to its affairs.  Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall:  (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of Shopko under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

**U.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Notice and Claims Agent, Prime Clerk LLC:

> *By regular mail at:*
> **Shopko Ballot Processing**
> **c/o Prime Clerk LLC**
> **830 Third Avenue, 3rd Floor**
> **New York, NY 10022**
>
> *By hand delivery or overnight mail at:*
> **Shopko Ballot Processing**
> **c/o Prime Clerk LLC**
> **830 Third Avenue, 3rd Floor**
> **New York, NY 10022**
>
> *By electronic mail at:*
> **shopkoeballots@primeclerk.com**
>
> *By telephone at:*
> **(844)-205-7495 (Domestic)**
> **(347)-576-1550 (International)**

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' notice, claims, and solicitation agent at the address above or for a fee via PACER at:  https://www.neb.uscourts.gov/.

**V.    Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significantly reduced physical footprint and the Plan Sponsor Investment under the Equitization Restructuring, is in the best interest of all Holders of Claims and Interests, and that other alternatives fail to realize or recognize the value inherent under the Plan.

**W.    Who Supports the Plan?**

The Plan is supported by the Debtors and certain creditors of the Debtors, including the Debtors' largest unsecured creditor, Column Financial, Inc. (subject to approval of a 9019 settlement [Docket No. 433]), and certain of the landlords under the Debtors' leases.  Additionally, the Debtors anticipate that they will be able to secure the support of the Credit Agreement Primary Agent prior to the Confirmation Hearing.

**V.    THE DEBTORS' PLAN**

**A.    The Plan**

As discussed in Article III herein, the Plan contemplates two different paths forward, each effectuated through a chapter 11 plan under the following applicable key terms:

**1.    *Issuance and Distribution of New Shopko Interests***

If an Equitization Restructuring occurs, on the Effective Date, the Reorganized Debtors shall issue the New Shopko Interests to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan. The issuance of New Shopko Interests under the Plan, as well as options, or other equity awards, if any, reserved under

the Management Incentive Plan, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims.

If an Equitization Restructuring occurs, on the Effective Date, Holders of New Shopko Interests shall be parties to the New Stockholders' Agreement, in substantially the form included in the Plan Supplement. On the Effective Date, Reorganized Shopko shall enter into and deliver the New Stockholders' Agreement to each Entity that is intended to be a party thereto, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Shopko Interests shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Shopko.

### 2. *Exit Facility*

If an Equitization Restructuring occurs, on the Effective Date, the Reorganized Debtors shall enter into the Exit Facility. Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facility.

On the later of (i) the Effective Date and (ii) the satisfaction of the DIP Claims in accordance with Article II.D of the Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3. *Plan Sponsor Investment*

If an Equitization Restructuring occurs, on the Effective Date, the Plan Sponsor shall consummate the Plan Sponsor Investment, if any, in exchange for up to 100% of the New Shopko Interests, subject to dilution by the Management Incentive Plan. The Cash received from the Plan Sponsor Investment shall be contributed to the Reorganized Debtors on the Effective Date.

### 4. *Plan Administrator*

If the Asset Sale Restructuring occurs, the Plan Administrator shall act for the Debtors and Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, sale director of the Reorganized Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Debtors, and shall succeed to the powers of Reorganized Shopko's managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, Reorganized Debtors as further described in Article VII of the Plan.

5. ***Plan Supplement***

The Plan Supplement shall be filed by the Debtors no later than 14 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement. If a Equitization Restructuring occurs, the Plan Supplement shall include the following:  (a) New Organizational Documents; (b) Exit Facility Credit Agreements, if any; (c) Schedule of Assumed Executory Contracts and Unexpired Leases; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) New Stockholders' Agreement, if any; (g) Plan Sponsor Agreement, if any; (h) a document listing the members of the New Boards and the officers of the Reorganized Debtors, if any; (i) the *Management Incentive Plan; (j)* Asset Purchase Agreement, if any; and (k) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. If an Asset Sale Restructuring occurs, the Plan Supplement shall include the following:  (a) New Organizational Documents; (b)  Exit Facility Credit Agreements, if any; (c) Schedule of Assumed Executory Contracts and Unexpired Leases; (d)  a list of retained Causes of Action; (e) Asset Purchase Agreement, if any; (f) the identity of the Plan Administrator and the compensation of the Plan Administrator, if any; (g) the Wind-Down Budget, (h) the Wind-Down Milestones; and (i) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article XII of the Plan; *provided* that the Debtors shall not amend the Schedule of Assumed Executory Contracts and Unexpired Leases or Schedule of Rejected Executory Contracts and Unexpired Leases after seven days prior to the Confirmation Hearing.

6. ***Surcharge***

The Plan provides for the Allowed Surcharge in an amount no less than $11 million or as may be otherwise agreed to by the Debtors and the Credit Agreement Primary Agent, as may be authorized by the Bankruptcy Court. The Debtors or Reorganized Debtors shall file a separate motion for an order of the Bankruptcy Court approving, pursuant to section 506(c) of the Bankruptcy Code, the Allowed Surcharge.

7. ***Recovery to Holders of Term Loan Secured Claims***

If an Equitization Restructuring occurs, in full and final satisfaction of each Allowed Term Loan Secured Claim, Holders of Allowed Term Loan Secured Claims will receive either:  (a) Cash equal to the outstanding amount of the Term Loan B Claims; (b) any remaining Cash on hand as of the Effective Date less (x) the Minimum Liquidity Threshold and (y) Cash necessary to make distributions to Holders of all Allowed Claims pursuant to Article II of the Plan and Holders of Allowed Other Secured Claims and Holders of Allowed Other Priority Claims pursuant to Article III of the Plan; or (c) as agreed by such Holder of an Allowed Term Loan Secured Claim and the Debtors, its Pro Rata share of the Exit Facility.

If the Asset Sale Restructuring occurs, each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution to Holders of Allowed Term Loan Secured Claims from time to time as provided in Article VIII.G of the Plan, until such Allowed Term Loan Secured Claims are paid in full.

8. ***Recovery to Holders of General Unsecured Claims***

If an Equitization Restructuring occurs, in full and final satisfaction of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of, at the election of the Debtors, either (a) 100% of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and the Management Incentive Plan or (b) its Pro Rata share of the GUC Equitization Reserve in one or more distributions.

If the Asset Sale Restructuring occurs, each Holder of a General Unsecured Claim will receive its Pro Rata share of the Distribution Proceeds as provided in Article VIII.G of the Plan.

As disclosed in Article IV.D. above, the Debtors currently estimate projected recovery values for Holders of General Unsecured Claims to be 0%.

22

### 9.    *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The Plan shall  be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### A.    Miscellaneous Provisions

1.    Immediate Binding Effect

Subject to the terms of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order, shall be immediately effective and enforceable and deemed binding upon the Debtors or Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

2.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.    Dissolution of Committee

On the Effective Date, the Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.

4.    Reservation of Rights

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

5.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to, the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

6.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors, Reorganized Shopko, or Plan Administrator, as applicable, will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

7.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

8.    Waiver or Estoppel

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

**B.    Additional Important Information**

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "*Risk Factors*," and the Plan before submitting your ballot to vote on the Plan.

***The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the New Shopko Interests as contemplated by the Plan are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Shopko Interests are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof, subject to compliance with the New Organizational Documents and the New Stockholders' Agreement, that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

There is not and there may not be a public market for the New Shopko Interests, and Shopko does not intend to seek any listing of the New Shopko Interests on any stock exchange or other trading market of any type whatsoever. Accordingly, there can be no assurance that an active trading market for the New Shopko Interests will ever develop or, if such a market does develop, that it will be maintained.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtors':

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- general economic and business conditions;

- counterparty credit risk;

- the outcome of pending and future litigation;

- uncertainty regarding the Debtors' future operating results; and

- plan, objections, and expectations.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include the following: the Debtors' ability to confirm and consummate the Plan; the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer and vendor responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business, and market conditions; exposure to litigation; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; and adverse tax changes.

## VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    The Debtors

Shopko, along with its affiliated Debtors, are engaged in the sale of general merchandise including clothing, accessories, electronics, and home furnishings, as well as company-operated optical services departments.  The Debtors are headquartered in Green Bay, Wisconsin, and operate over 300 stores in 25 states throughout the United States, as well as e-commerce operations.  Debtors also maintain optical care centers and operate an optical lab in DePere, Wisconsin.  The Debtors generated approximately $2.6 billion in revenue in fiscal year 2017 and currently employ approximately 14,000 people throughout the United States.  Additionally, the Debtors' optical business has continued to generate significant revenue and the Debtors have continued to expand the optical business both pre- and postpetition, including by entering into new leases to support this business.  A corporate organization chart is attached to the Disclosure Statement as **Exhibit B**.

### B.    Prepetition Capital Structure

As of the Petition Date,[7] the Debtors reported approximately $403 million in total funded debt.  As described in greater detail below, the Debtors' significant funded-debt obligations include: (a) approximately $289 million in principal amount of obligations under the Debtors' Revolving Loans A; (b) approximately $30 million in principal amount of obligations under the Debtors' Revolving Loans A-1; (c) approximately $49 million in principal amount of obligations under the Debtors' Term Loan B; and (d) approximately $34.4 million in principal obligations under the Debtors' Term Loan B-1.

#### 1.    Prepetition Credit Agreement

Specialty Retail Shops Holding Corp. and its debtor affiliates, as borrowers and guarantors; the revolving loan lenders party thereto (the "Prepetition ABL Lenders"); the term loan lenders party thereto (the "Prepetition Term Loan Lenders," and together with Prepetition ABL Lenders, the "Prepetition Lenders"), Wells Fargo Bank, N.A., as administrative agent and collateral agent for the Revolving Loans A, Revolving Loans A-1, and Term Loan B, Spirit, as the administrative agent and collateral agent for the Term Loan B-1 (Wells Fargo Bank, N.A. and Spirit collectively, in such capacities, the "Credit Agreement Agents" and together with the Prepetition Lenders, the "Prepetition Secured Parties"), are parties to that certain Third Amended and Restated Credit Agreement, dated as of February 7, 2012 (as further amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement").

The Prepetition Credit Agreement provides for a senior secured revolving credit facility: (i) Revolving Loans A, with a maximum availability of $700 million, and (ii) a senior secured term loan, Revolving Loans A-1, with a maximum availability of $30 million (the Revolving Loans A and Revolving Loans A-1, together, the "Prepetition ABL Loans" and such obligations owing thereunder the "Prepetition ABL Obligations").  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Loans was not less than $357 million.  Each of the Debtors or either borrowers or have guaranteed the Prepetition ABL Obligations.  The Prepetition ABL Obligations are secured by a lien on substantially all of the Debtors' assets, including accounts receivable, inventory, cash and cash equivalents, the Debtors' capital stock and other personal property, including the Debtors' intellectual property and investment contracts.  Upon entry of the interim DIP and Cash Collateral Order, as the Prepetition ABL Obligations began to be paid down, such Prepetition ABL Obligations began converting into DIP ABL Obligations.  Upon entry of the Final Order, the Prepetition ABL Obligations were fully converted into DIP ABL Obligations.

The Prepetition Credit Agreement also provides for term loans: (a) Term Loan B, with a maximum availability of $72.5 million; and (b) Term Loan B-1, with a maximum availability of $35 million (the Term Loan B and Term Loan B-1, together, the "Prepetition Term Loans" and such obligations owing thereunder, the "Prepetition Term Loan Obligations").  The Prepetition Term Loans mature in June 2020.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loans was approximately $83.4 million.  Each of the Debtors

---

[7]    These financial figures reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

are either borrowers of or have guaranteed the Prepetition Term Loan Obligations. The Prepetition Term Loan Obligations are secured by a lien on substantially all of the Debtors' assets, including accounts receivable, inventory, cash and cash equivalents, the Debtors' capital stock and other personal property, including the Debtors' intellectual property and investment contracts.

## VII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases. These factors include the general downturn in the retail industry, which led to a decrease in sales and increased operating losses, and the marked shift away from brick-and-mortar retail to online channels. These factors have made it increasingly difficult for Debtors to maintain their cost structure as sales have remained slightly depressed, and impaired the Debtors' liquidity.

### A.    Challenging Operating Environment and Operational Right Sizing

The Debtors, like many other apparel and retail companies, have faced a challenging commercial environment as of late brought on by a shift away from traditional shopping at brick-and-mortar stores. Given the Debtors' substantial brick-and-mortar presence and associated expenses, the Debtors' businesses have been heavily dependent on in-store traffic and resulting sales conversions to meet sales and profitability targets. In addition, the increased traffic to larger retailers such as Walmart, Target, and Kohl's have further contributed to the Debtors' negative or declining same store sales trends since 2016, with accelerating declines to date. The significant 2018 fiscal year performance decline was the result of a combination of factors, including: (i) merchandising, pricing, and inventory planning operational challenges; (ii) increased pharmacy business cost and reimbursement pressures; and (iii) the opening of new stores in 2015 and 2016 at a pace and quantity in excess of historical precedents for growth.

Additionally, as a result of consolidation trends in the pharmacy industry, direct and indirect remuneration fees imposed on pharmacies, sometimes weeks or months after a medication is dispensed, has decreased pharmacy profit on a prescription transaction, sometimes leading to a loss on the prescription. Although Shopko has been able to reduce operating costs in its pharmacies, continually reducing costs in the face of declining margins has reached its limit. Shopko lacks purchasing scale to purchase drugs at costs similar to large national pharmacy chains, and saw cost increases in excess of industry trends from its primary pharmaceutical supplier, McKesson. As a result of this, the Debtors pursued the pharmacy sale process (as more fully described below) which will soon result in a complete exit from the pharmacy business

### B.    Supply Chain Challenges and McKesson Actions

In the months leading up to the Petition Date, the Debtors began to experience significant pressure from McKesson Corporation ("McKesson")—the Debtors' primary pharmaceutical provider. In December 2018, McKesson sent the Debtors a letter notifying them that it intended to reduce trade terms from 45 days to one day under that certain Restated Supply Agreement, dated February 1, 2017 (as amended, supplement, restated or otherwise modified from time to time, the "Supply Agreement"), and thereby accelerate approximately $70 million of accounts payable. While the Debtors disputed McKesson's ability to suddenly reduce trade terms, the Debtors had no alternative pharmaceutical supplier available on such short notice, and were forced into a negotiated reduction in trade terms from 45 days to 21 days.

Moreover, the Debtors believe they may have a claim against McKesson under the Supply Agreement, and former iterations of the Supply Agreement, for overcharging the Debtors in violation of the agreements and representations. The Debtors have attempted to work with McKesson to investigate and resolve these claims since well before the commencement of these proceedings, but McKesson has consistently refused to cooperate in any meaningful way. The Debtors and their advisors intend to continue to investigate these claims during these chapter 11 proceedings for the benefit of the estates.

After careful deliberation, on December 27, 2018, Shopko ceased payments to McKesson in light of its bona fide dispute with McKesson regarding the Debtors' overcharging claims, and to preserve liquidity and manage the Debtors' overall inventory position. In response, McKesson stopped shipping inventory to Shopko. In the following days, Shopko attempted to negotiate a resolution with McKesson, as Shopko wanted to work with McKesson to

27

preserve the value of the prescription files, and offered to pay cash-on-delivery for new inventory. McKesson was not receptive and instead took a series of actions that caused additional harm to Shopko.

On December 30, 2018, McKesson sent Shopko a letter asserting reclamation rights against all inventory it sent Shopko in the preceding 45 days. Debtors denied the allegations in the letter, and denied McKesson's purported right to reclamation. While the parties were still discussing McKesson's reclamation request, McKesson filed a motion in the Circuit Court of Brown County, Wisconsin, on Saturday January 5, 2019, seeking a temporary restraining order (the "TRO") to effectuate McKesson's reclamation demand.

McKesson's TRO motion sought an immediate court order to physically remove tens of millions of dollars of prescription drugs from the shelves of approximately 150 of the Debtors' pharmacies. The effect would have been to shut down every single Shopko pharmacy—if not every Shopko store—and deny prescriptions to customers. During the TRO Hearing, on January 7, 2019, the court denied McKesson's motion. The court articulated that McKesson's TRO request would likely have caused harm to the Debtors' customers—who would lose access to medication necessary for their health and well-being. Moreover, the court explained that it was not clear that McKesson had such reclamation rights because another party had a senior security interest in the inventory.

During the January 7, 2019 TRO hearing, McKesson engaged in further harmful conduct that the Debtors believe may give rise to additional claims. McKesson is obligated under its supply contracts with Shopko, and a non-disclosure agreement ("NDA") executed between the parties in August 2018 while the parties were considering certain business ventures. McKesson agreed to keep certain information—including Shopko's strategic business plans and contingency planning—confidential. McKesson's counsel made statements that appear to be violations of the supply agreements and NDA, including that Shopko was planning to exit the pharmacy business entirely. Such contingency planning was not public knowledge. After the court ruled against McKesson, McKesson's counsel stated that it believed Shopko would file for bankruptcy on January 15. Unsurprisingly, McKesson's comments appeared in multiple newspapers following the hearing. These public statements had a detrimental effect on Shopko.

During these chapter 11 cases, Shopko and its advisors intend to investigate these issues and claims for the benefit of the estates. Indeed, on February [●], 2019, Shopko filed a Motion Pursuant to Bankruptcy Rule 2004 to obtain discovery from McKesson about these claims.

### C.     Exploration of Strategic Alternatives

The Debtors have diligently worked with their financial advisors since 2017 to develop and explore strategic alternatives to maximize value for the Debtors and their assets. In May 2017, the Debtors engaged Houlihan Lokey, Inc. ("Houlihan Lokey") to act as their financial advisor and to explore alternatives. The Debtors and their advisors engaged in a significant marketing process to solicit bids for an equity investment or the purchase of the Debtors' assets in order to obtain the greatest proceeds to maximize the value for the Debtors' stakeholders. Despite significant interest, this process failed ultimately to yield a mutually acceptable transaction. The Debtors intend to build off this process in connection with the Chapter 11 Cases. To that end, subsequent to the final hearing on February 7, 2019, the Debtors gained the Bankruptcy Court's approval of certain plan sponsor bidding procedures for the process to obtain a Plan Sponsor Investment or enter into one or more Asset Sales.

Recognizing the need to explore restructuring alternatives, in December 2017, the Debtors retained Kirkland & Ellis LLP, as legal advisor. As a result of the Debtors' initial efforts, the Debtors obtained an additional $35 million in financing from Spirit in January 2018. The Debtors used this incremental liquidity to right-size its store footprint and pursue potential sale transactions.

In August 2018, the Debtors and their advisors commenced another process to market the Debtors assuming an exit from the pharmacy business (which was separately marketed and yielded numerous successful transactions). While this process yielded some interest, it became clear that the Debtors would be more attractive if marketed as part of a comprehensive restructuring.

In November 2018, the Debtors also retained Berkeley Research Group, LLC ("BRG"). Together, the Debtors and their advisors analyzed the Debtors' capital structure, potential sources of liquidity, and runway to facilitate the operational changes necessary to reduce the burdensome operational costs associated with their brick-and-mortar footprint, including various restructuring and recapitalization options. These efforts are more fully set

forth below.

### 1.  *Pharmacy Sale Process*

Because the Debtors have not been able to profitably operate their pharmacy business, the Debtors diligently worked with Houlihan Lokey and the Debtors' other advisors to develop and explore several strategic alternatives to maximize value for the Debtors' prescription pharmaceutical inventory, prescription files and records, and pharmacy customer lists and patient profiles (the "Pharmacy Assets").  As a result of this analysis, in August 2018, the Debtors and their advisors engaged in a thorough marketing process to solicit bids for the Debtors' Pharmacy Assets to maximize value for the Debtors' stakeholders.

The Debtors and their advisors contacted a total of 19 strategic buyers, including national pharmacies, pharmacy cooperatives, pharmacy wholesalers, and regional pharmacies.  Of these, 12 parties executed non-disclosure agreements with the Debtors and began conducting due diligence.

By mid-September 2018, the deadline for interested parties to submit bids, the Debtors received eight bids for varying subsets of the Debtors' Pharmacy Assets.  Houlihan Lokey and the Debtors conducted multiple rounds of negotiations with these bidders and provided detailed analyses of the value of the Pharmacy Assets at each location.

Having begun the process with approximately 234 pharmacy locations, the Debtors and Houlihan Lokey identified 134 locations with then actionable bids from six parties for the purchase of such respective Pharmacy Assets. Of the 134 locations with attractive bids, the Debtors were able to execute and close agreements for 82 of the locations prior to the Petition Date.  The closing of the sales for the Pharmacy Assets at these 82 locations resulted in approximately $95 million in proceeds.

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Orders (I) Establishing Bidding Procedures for the Pharmacy Assets, (II) Approving the Transactions, and (III) Granting Related Relief* [Docket No. 27].  On January 17, 2019 the Court entered an *Order (I) Establishing Bidding Procedures for the Pharmacy Assets and (II) Granting Related Relief* [Docket No. 77] (the "Pharmacy Sale Bidding Procedures Order").

Pursuant to the Pharmacy Sale Bidding Procedures Order, the Debtors conducted an auction on January 23, 2019 of certain remaining Pharmacy Assets.  The Debtors sold Pharmacy Assets at 31 locations as part of the auction, generating over $21 million of proceeds. The Debtors generated total proceeds from the Pharmacy Assets sales of approximately $51 million at current inventory levels.

### 2.  *Plan Sponsor Marketing Process*

In addition to the marketing and sale of the Pharmacy Assets, the Debtors and their advisors spent considerable efforts seeking out parties who would be willing to invest new capital in the Debtors' business.  As part of this process, Houlihan Lokey contacted 14 potential sponsors in late November 2018.  Five of these parties attended in-person meetings with the Debtors' management and advisors in New York on December 6, 2018.  Following the December 6, 2018 meeting, those five parties and one party that did not attend the meetings carried out extensive due diligence of the Debtors' business.

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Orders (I) Establishing Bidding Procedures for Plan Sponsors and (II) Granting Related Relief* [Docket No. 38].  Subsequent to the final hearing on February 7, 2019, the Court entered an *Order (I) Establishing Bidding Procedures for the Plan Sponsors and (II) Granting Related Relief* (the "Plan Sponsor Bidding Procedures Order").  The procedures approved in the Plan Sponsor Bidding Procedures Order provide the Debtors with a cost-effective and flexible mechanism to realize value for their business, including through the sale of the Debtors' assets or the issuance, and purchase by a Plan Sponsor, of new common equity interests in the Reorganized Debtors. Pursuant to the Plan Sponsor Bidding Procedures Order, the Debtors will select a stalking horse bidder by March 5, 2019 at 4:00 p.m. prevailing Central Time, hold an auction on March 19, 2019 at 9:00 a.m. prevailing Eastern Time, and seek to approve the transaction pursuant to the Plan.

Houlihan Lokey is in discussions with a select group of potential bidders and is conducting more extensive outreach to both previously contacted parties as well as select new parties.

### 3. *Real Estate Rationalization*

The Debtors hired Houlihan Lokey and BRG, in part, to help address the disparity between productive and non-productive stores and rationalize the Debtors' store footprint. With the assistance of their advisors, the Debtors identified approximately 70 unprofitable stores that are in the process of closing. On February 6, 2019, the Debtors filed a notice to close additional stores to further reduce their footprint by an additional 137 stores, freeing up net-working capital and allow for more efficient operations and inventory management. The Debtors continue to analyze whether they can improve their operations by closing additional unproductive locations.

### 4. *Discussions with Creditors and DIP Financing*

Beginning in December 2018, the Debtors commenced comprehensive restructuring negotiations with certain prepetition lenders, including certain of their advisors (the "Prepetition Lenders' Advisors"). The Debtors have facilitated the diligence of such advisors for the last several months.

Since, December 2018, the Debtors and their advisors engaged in a number of substantive meetings and telephone conferences with the Prepetition Lenders' Advisors regarding comprehensive restructuring alternatives that would strengthen the Debtors' balance sheet and provide necessary liquidity.

To fund the administration of these chapter 11 cases, the Prepetition ABL Lenders and certain Prepetition Term Loan Lenders have agreed to provide debtor-in-possession financing. The Prepetition ABL Lenders have agreed to continue to lend money on terms similar to those under the Debtors' existing asset-based lending facility, providing the up to $480 million DIP Facility, pursuant to which the revolving loans commitments under the Debtors' existing asset-based credit facility will convert into the DIP Facility.

Pursuant to the Financing Orders, the Prepetition ABL Lenders' loans were rolled up into the DIP ABL Lenders' loans, the Debtors obtained the consensual use of cash collateral, and the Debtors provided adequate protection to the Prepetition Term Loan Lenders.

## VIII.    PRIOR TRANSACTIONS

### A.    SUPERVALU Transaction and Pamida Acquisition

Shopko has grown significantly since its founding in 1962 through a combination of new store openings, acquisitions, and mergers. In 1971, Shopko merged with SUPERVALU Inc., a Minneapolis-based grocery wholesale company. Following opening its 100th store, in 1991, Shopko was spun-off by SUPERVALU and became an independent, publicly owned company. In 1997, Shopko acquired Penn-Daniels Inc., a retailer operating 18 Jacks Discount Stores. The Debtors' largest acquisition came in 1999, with Shopko acquiring Pamida Holding Co., a retailer operating 148 discount stores in small rural markets.

### B.    Sun Capital Transaction

December 2005, Sun Capital Partners, Inc. ("Sun Capital") acquired Shopko. The acquisition was effectuated through a merger with an affiliate of Sun Capital on December 15, 2005. Subsequently, on May 31, 2006, Spirit purchased nearly all of the Debtors' real estate assets through a financing provided through Spirit SPE SK Acquisition, LLC.

### C.    Special Committee

In December 2017, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the board of directors or Shopko (the "Board of Directors") appointed Steve Winograd and Mohsin Meghji to the Board of Directors as disinterested directors (the "Independent Directors"). Each of the Independent Directors has extensive experience serving on boards of managers and boards of directors in distressed situations. On November 26, 2018, the Board of Directors authorized the formation of a special committee comprised of the Independent Directors (the "Special Committee") to, among other things, review matters regarding transactions or negotiations which the Special Committee determines in whole or in part may result in conflicts of interest. The

Independent Directors subsequently retained Willkie Farr & Gallagher LLP ("Willkie Farr") and Ducera Partners LLP ("Ducera") as independent counsel and independent financial advisor, respectively, to assist the Independent Directors in their review. As part of this mandate, the Special Committee commenced an investigation, among other things, into certain dividend payments to the Debtors' direct or indirect equity owners to determine whether the Debtors' estates may have any claims related to such transactions.  In the course of its investigation, the Special Committee is considering, among other things, whether the Estates should pursue causes of action on account of fraudulent transfers, breach of fiduciary duty, breach of contract, unjust enrichment, tortious interference with contract, and illegal dividends under state law.

Prior to the Petition Date, the Special Committee commenced a detailed review of the transactions involving the Debtors to determine whether there is a legal and factual basis for claims against the Debtors' equity owners.  The Investigation has included diligence requests to the Debtors and Sun Capital, Shopko's largest beneficial equity holder. The Special Committee is continuing to seek additional diligence items from the Debtors, Sun Capital and others.

The Advisors have received several rounds of diligence materials from Shopko in response to its requests. Diligence materials have included email correspondence from a number of custodians, including senior management of the company.  Willkie Farr is conducting a review of this correspondence and other documents.  Ducera is also conducting a solvency analysis of Shopko to determine whether it was solvent on certain dates relevant to the Investigation. Willkie Farr and Ducera have reviewed over 40,000 documents as of the filing of this statement. Willkie Farr and Ducera will plan to shortly commence interviews with a number of Shopko's current and former senior management team.

Willkie Farr and Ducera sent diligence requests to counsel to Sun Capital on January 11, 2019.  After finalizing a non-disclosure agreement with Sun Capital, the Willkie Farr and Ducera have recently received voluntary productions of documents in response to these requests.  Diligence materials have included email correspondence from a number of custodians who were substantively involved with Sun Capital's position in Shopko.  Willkie Farr is conducting a review of Sun Capital's email correspondence and documents and other diligence gathering is ongoing, and the Willkie Farr and Ducera hope to schedule interviews with Sun Capital.

Among other things, the Special Committee is currently investigating several dividend payments Shopko made to its direct or indirect equity owners since its acquisition by a group of equity holders in 2005.  A summary the circumstances of these payments is below:

- **May 14, 2007**, Shopko Holding Company, LLC, formerly Shopko Holding Company, Inc., ("Shopko Holding") paid a dividend in the amount of $55 million to its parent company, Specialty Retail Shops Holding Corp. ("Specialty Retail").  SKO Group Holding, LLC ("SKO Group") similarly distributed a dividend in the amount of $55 million to its various owners, including Sun Capital. The dividend was financed with additional borrowings under an existing credit facility.  In connection with this dividend, the board of directors of Shopko Holding reviewed the audited financial statements of Specialty Retail and a solvency opinion provided by Valuation Research Corp. on the financial condition of Shopko Holding.

- **September 24, 2010**, Shopko Holding paid a dividend in the amount $20 million to its parent company, Specialty Retail, which paid a dividend in the same amount to its parent, SKO Group.  SKO Group used the proceeds to pay its various owners, including Sun Capital.  The funds for the dividend were borrowed under the company's revolving credit facility, which was governed by the Second Amended and Restated Loan and Security Agreement, dated January 28, 2010 (the "Second RCF").

- **December 3, 2010**, Shopko Holding paid a dividend in the amount of $10 million to its parent, Specialty Retail, which paid a dividend in the same amount to its parent, SKO Group.  SKO Group used the proceeds to pay a dividend to its various owners, including Sun Capital.  The funds for the dividend were borrowed from Shopko's Second RCF.

- **August 29, 2013**, Specialty Retail paid a dividend in the amount of $44,531,900 to SKO Group, which used the proceeds to pay a dividend to its various owners, including Sun Capital.  The dividend was financed through borrowing from Shopko's revolving credit facility, which was governed by the Third Amended and Restated Loan and Security Agreement, dated February 7, 2012 (the "Third RCF").  Specialty Retail engaged

31

Duff & Phelps to perform a "solvency analysis" on Specialty Retail to determine whether it was solvent at the time of the dividend payments. Duff & Phelps provided a solvency opinion dated August 29, 2013.

- **June 19, 2015**: Shopko Holding paid a dividend in the amount of $50 million to its parent Specialty Retail, which paid a dividend in the same amount to its parent, SKO Group. SKO Group used the proceeds to pay a dividend in the same amount to its various owners, including Sun Capital. The dividend was financed through borrowing from Shopko's Third RCF. SKO Group, Specialty Retail, Shopko Holding, and Shopko Stores Operating Co., LLC engaged Duff & Phelps to perform an analysis of the solvency of those four entities. Duff & Phelps provided a solvency opinion dated June 19, 2015.

The Special Committee has also focused its investigation on the consulting services arrangements between the Debtors and its equity sponsors. Prior to February 7, 2012, Shopko was party to a long-term management services agreement, under which Sun Capital Partners Management IV, LLC ("SCM") provided Specialty Retail with financial and management consulting services. SCM also provided consulting services to Pamida Holding Company, Inc. ("Pamida") and its affiliates, under a similar agreement. On February 7, 2012, in conjunction with the merger between Specialty Retail and Pamida, Specialty Retail entered into a new consulting agreement with SCM. The Consulting Agreement has a 10 year term. SCM is to render consulting services regarding the business of Specialty Retail and its subsidiaries, including, but not limited to, advice regarding improvements to financial reporting, accounting and management information systems services.

In exchange for its consulting services, SCM is entitled to an annual fee of $4 million, and reimbursement for all reasonable out-of-pocket fees and expenses incurred in the performance of the consulting services. Shopko and Pamida affiliates and entities are guarantors of all payments owed pursuant to the agreement. The fee is paid in quarterly installments in advance, each installment equal to $1 million. The Special Committee understands that, in 2017, the Debtors and Sun Capital agreed to reduce the Consulting Fee to approximately $301,000 per quarter, and that no additional Consulting Fees have been paid since December 2017.

SCM also is entitled to an additional fee in connection with certain transactions or events ("Consulting Events"), equal to approximately 1% of the value of the transaction. At this time, the Special Committee understands that since 2012, approximately six Consulting Events have occurred that have generated such a fee, including a $445,319.00 fee related to the 2013 dividend and a $500,000.00 fee related to the 2015 dividend.

## IX.    EVENTS OF THE CHAPTER 11 CASES

### A.    Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within approximately 90 days of the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### B.    First and Second Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") requesting various types of relief which were approved by the Bankruptcy Court. The relief granted enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things: (a) an order authorizing the Debtors to obtain postpetition financing and use cash collateral during the Chapter 11 Cases, and granting certain adequate protection to certain secured parties; (b) an order authorizing the Debtors to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions; (c) an order authorizing the Debtors to pay certain prepetition taxes and fees; (d) an order authorizing the Debtors to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business; (e) an order granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs; (f) an order

authorizing the Debtors to make payment on account of prepetition Claims of certain shippers, lienholders, and 503(b)(9) claimants; and (g) an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Russell L. Steinhorst, Chief Executive Officer of Specialty Retail Shops Holding Corp., in Support of Chapter 11 Petitions and First Day Motions*, filed on the Petition Date.

The First Day Motions, and all entered orders for relief in the Chapter 11 Cases, can be viewed for a fee via PACER at:  https://www.neb.uscourts.gov/.

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed motions requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors:  (a) Prime Clerk, as Notice and Solicitation Agent to the Debtors; (b) Kirkland & Ellis LLP as counsel to the Debtors; (c) McGrath North Mullin & Kratz PC LLO as co-counsel to the Debtors; (d) Houlihan Lokey, Inc. as investment banker to the Debtors; and (e) Berkeley Research Group, LLC. as restructuring advisor to the Debtors. The Bankruptcy Court entered orders approving the aforementioned retentions on January 25, 2019.  Further, the Debtors filed motions seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.

## C.    Creditors' Committee

On January 18, 2019, the U.S. Trustee filed the *Appointment of Committee of Unsecured Creditors* [Docket No. 95] notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members: Hanesbrands, Inc.; ReaderLink Distribution Services, LLC; Home Products International N.A.; McKesson Corp.; Notations, Inc.; LCN SKO Omaha (Multi) LLC; and Realty Income Corporation. The Committee has retained Pachulski Stang, Ziehl & Jones LLP and Goosman Law Firm, PLC, as its legal counsel and FTI Consulting, Inc., as its financial advisor.

## D.    Postpetition Marketing Process

As described above, the Debtors are conducting a marketing process for substantially all of their assets.  The Debtors began a multi-phase postpetition marketing process on the Petition Date, which they anticipated would last for approximately nine weeks following the Petition Date.  The Debtors, working with their legal and financial advisors in consultation with certain creditors, determined that this additional marketing period would ensure the transaction that is ultimately consummated represents the highest and best offer.

During the first phase of the Debtors' marketing process, the Debtors reached out to potential interested parties (including strategics and financial sponsors, the majority of which did not indicate further interest), executed confidentiality agreements, shared information on the Debtors, and solicited non-binding offers for the Pharmacy Assets.  This phase culminated in an auction sale during which the Debtors sold certain Pharmacy Assets.

During the second phase of the Debtors' marketing process, the Debtors plan to work with various parties to determine whether additional asset sales, including sales of non-pharmacy assets, would be viable and beneficial. This second phase contemplates a go-forward business plan that includes 120 store locations and 61 standalone optical centers. The Debtors have continued to expand the optical business both pre- and postpetition, including by entering into new leases to support this business.  The Debtors estimate the total potential administrative claims related to rejection of new optical leases is approximately $3.1 million.

Consistent with their fiduciary duty to maximize value for the benefit of all stakeholders, the Debtors reserve all rights to amend the Plan, as necessary, to incorporate the terms of any transaction proposed in connection with the marketing process, and, to the extent permitted by law, seek confirmation of any such amended Plan without resoliciting votes on such amended Plan.

E.        **Approval of the DIP Facility**

Based on the Debtors' need for debtor-in-possession financing and their conclusion that the DIP Facility represents the best terms available, on the Petition Date, the Debtors filed a motion on the Petition Date seeking authorization to enter into the DIP Facility on an interim and final basis (the "DIP Motion").  On the Petition Date the Bankruptcy Court approved the DIP Motion on an interim basis.  On February 7, 2019 the Bankruptcy Court approved the DIP Motion on a final basis.  The final order approving the DIP motion included changes from the interim order approving the DIP Motion.  At no time during these chapter 11 cases have the Debtors defaulted under the DIP Agreement.

F.        **McKesson Stipulation**

On January 16, 2019, McKesson filed a limited objection to the DIP Motion asserting certain reclamation claims and marshaling rights.  On January 29, 2019, the Debtors filed a motion approving a settlement with McKesson pursuant to Bankruptcy Rule 9019 [Docket No. 225].  The settlement resolves all matters regarding the reclamation and marshaling rights asserted by McKesson, and remains subject to Bankruptcy Court approval.

G.        **Executory Contracts and Unexpired Leases**

### 1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtors are party to a large number of unexpired non-residential real property leases and executory contracts.  In connection with their restructuring efforts, the Debtors are attempting to enhance the competitiveness of their operations, which, among other things, involves a careful and comprehensive evaluation of all aspects of the Debtors' leases, contracts, and supply chain.  The Debtors intend to utilize the tools afforded a chapter 11 debtor to achieve the necessary cost savings and operational effectiveness envisioned in their revised strategic business plan, including modifying or, in some cases eliminating, burdensome or underutilized agreements and leases.

As such, the Debtors have, and intend to continue to, engage in extensive discussions with contract and lease counterparties regarding the contributions such parties are making to the restructuring process and can make to the post-emergence businesses.  Pursuant to the final order approving the DIP Motion, the Debtors have authority to enter into agreements regarding, and make payments on account of, stub rent for the landlords under the Debtors' Unexpired Leases.

The Debtors intend to file the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases no later than fourteen days before the Confirmation Hearing, as part of the Plan Supplement.

If the Equitization Restructuring occurs, on the Confirmation Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such

rejection is after the Effective Date.  Except as otherwise provided in the Plan, the Debtors shall assume, assume and assign, or reject, as the case may be, Executory Contracts and Unexpired Leases set forth in the applicable Schedules in the Plan Supplement. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order.  Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

If the Asset Sale Restructuring occurs, on the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Certain landlords have objected to the Debtors' *Motion for Approval to Extend the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 240] and are contesting the Debtors' ability to make any decisions regarding the assumption or rejection of a lease post-confirmation.  The Bankruptcy Court's order on such motion, if any, shall determine the outcome of this dispute.

### 2.  *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the latest to occur of: (1) 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) 30 days after the Debtors provide notice of surrender of possession to a landlord of a rejected lease where surrender occurs after entry of an order approving such rejection; and (3) 30 days after notice of any rejection that occurs after the Effective Date.  **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, Reorganized Debtors, or the property for any of the foregoing without the need for any objection by the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

If the Equitization Restructuring occurs, counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Bankruptcy Court pursuant to

the Bankruptcy Court order approving the Disclosure Statement as soon as reasonably practicable following entry of the Bankruptcy Court order approving the Disclosure Statement.

### 3. Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors, the Purchaser, or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment. Notwithstanding the foregoing, nothing herein shall prevent the Reorganized Debtors from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court or in the Asset Purchase Agreement, at least seven days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim.  To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 4. Adequate Assurance of Future Performance Under Assumed Executory Contracts and Unexpired Leases

The Debtors have provided Financial Projections attached hereto as **Exhibit D** and are prepared to demonstrate the feasibility of the Plan at the Confirmation Hearing in satisfaction of any obligation to provide adequate assurance of future performance under Executory Contracts and Unexpired Leases that are assumed under the Plan.

### H.    Lease Renegotiation and Store Closing Process

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [Docket No. 16] (the "Store Closing Motion") seeking to implement a key component of their restructuring strategy and right-size their operations by closing underperforming or geographically undesirable stores.  These efforts, which are ongoing, are part of the Debtors' attempt to rationalize their store fleet. On the Petition Date, the Bankruptcy Court approved the Store Closing Motion on an interim basis.

On February 6, 2019, pursuant to the interim order approving the Store Closing Motion, the Debtors filed notice to close 137 additional stores to reduce their physical footprint to 120 stores. On February 7, 2019, the Bankruptcy Court approved the Store Closing Motion on a final basis. The decision to close the additional 137 stores reflects the business reality and the results of the Pharmacy Assets sales and feedback from parties and bidders on the Debtors' remaining business and assets. The 120-store footprint provides the highest go forward value proposition.

### I.    Schedules and Statements

On the Petition Date, the Debtors filed their *Motion For Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditure, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and (II) Granting Related Relief* (the "SOFA Extension Motion").

On January 29, 2019, the Bankruptcy Court approved the SOFA Extension Motion on a final basis. As a result, the Debtors will file their Schedules of Assets and Liabilities, Schedules of Current Income and Expenditure, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs on or before February 22, 2019.

On February 22, 2019, the Debtors filed their Schedules of Assets and Liabilities, Schedules of Current Income and Expenditure, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs.

### J.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### K.    Miscellaneous Matters

RPT Realty, L.P. ("RPT") filed a *Limited Objection and Reservation of Rights with respect to the Debtors' Amended Disclosure Statement* [Doc. No. 500] (the "Limited Objection"). The Limited Objection primarily addresses issues relating to Section (IX)(G) of this Disclosure Statement. By way of resolution, the Debtors and RPT have agreed to deem the Limited Objection to be an objection to confirmation of the Plan. The Debtors and RPT will work in good faith to resolve the issues broached in the Limited Objection. If not resolved before-hand, the Limited Objection will be addressed at the hearing on confirmation of the Plan.

The Chubb Companies ("Chubb") have objections to the Disclosure Statement and Plan, which the Debtors assert are confirmation rather than disclosure statement objections. Chubb has provided the Debtors suggested changes to the Plan to address its objection, and the Debtors are considering the changes. If no agreement is reached, Chubb reserves the right to object to confirmation of the Plan.

No later than five (5) business days prior to the earlier of (i) the Plan Objection Deadline, and (ii) the Voting Deadline, Debtors shall provide Cigna Health and Life Insurance Company with written notice of its decision as to whether or not the Debtors propose to assume or reject the ASO Agreement under the Plan. Such decision shall be revocable only with the consent of Cigna Health and Life Insurance Company, provided such consent cannot be unreasonably withheld.

If the Debtors propose to reject the ASO Agreement, such notice shall include the Debtors' decision as to whether: (i) the payment of Run-Out Claims prior to the effective date of rejection of the ASO Agreement will

continue to be funded by the Debtors or a successor thereto during the twelve (12) month period following such rejection, and the source of such funding; or (ii) the payment of Run-Out Claims will not be funded, in which case such notice shall include the name and contact information of a representative of the Debtors or their successor to whom Cigna Health and Life Insurance Company can direct inquiries from former employees whose healthcare claims will not be paid. Such decision shall be revocable only with the consent of Cigna Health and Life Insurance Company, provided such consent cannot be unreasonably withheld.

Pursuant to the *Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 98] and corresponding motion [Docket No. 23], the Debtors are authorized to pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs (as defined in such motion) in the ordinary course of business and continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto. Such Employee Compensation and Benefits Programs included health insurance programs and medical plans such as the ASO Agreement. Thus, until the Effective Date the Debtors have the authority to pay such Run-Out Claims. To the extent there are Run-Out-Claims that were incurred before the Petition Date but have not yet been paid, such claimants may submit a Proof of Claim. To the extent a Run-Out Claim was incurred from the Petition Date to the Effective Date but has not yet been paid, claimants may submit a request for payment of an Administrative Claim.

### L.    Insert Summarizing Shopko Note Holding, LLC's Objection to the Disclosure Statement

Shopko Note Holding, LLC ("SNH"), as holder of the Term Loan B-1 secured claim, believes the Plan is not confirmable as a matter of law for the following three (3) reasons:

(1)    the Plan violates section 506(c) of the Bankruptcy Code by surcharging SNH's collateral to pay unsecured administrative creditors in full before paying SNH, and if the payment priority were to be revised to fix this infirmity, the Plan would violate section 1129(a)(9) of the Bankruptcy Code by not paying all administrative creditors in full in cash;

(2)    the Plan fails the best interest of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code because SNH will perform better in chapter 7 than chapter 11 based on the low, mid and high cases in the Liquidation Analysis and after adjusting recoveries in a chapter 7 to match those in chapter 11; and

(3)    the Plan violates section 1123(a)(4) because it classifies SNH's Term Loan B-1 secured claim and the Term Loan B secured claim in Class 3 while providing disparate treatment with respect to each claim within Class 3.

SNH also submits this insert to the Disclosure Statement to correct what it believes are certain error and misstatements as set forth below:

(1)    SNH, the holder of over 40% of the Term Loan Secured Claims, does not support the Plan releases. In addition, Article III(D) (Releases) states that each of the Released Parties "has afforded value to the Debtors and aided in the reorganization process." SNH believes the Disclosure Statement should be revised to disclose with specificity the value provided by the Debtors' private equity sponsor, Sun Capital Partners, Inc., in exchange for their release.

## X.    PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit D** is a set of pro forma financial projections of the Reorganized Debtors (collectively, the "Financial Projections") for fiscal years 2019 through 2023. The Financial Projections are based on an assumed Effective Date in April 2019. To the extent that the Effective Date occurs before or after April 2019, the Financial Projections could be impacted.

Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## XI.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article XI of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

#### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

#### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. *Continued Risk upon Confirmation*

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. *The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8.    *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.    *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10.    *Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11.    *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

### B.    **Risks Related to Recoveries under the Plan**

### 1.    *The Debtors May Not Be Able to Achieve Their Projected Financial Results*

With respect to Holders of Interests in the Reorganized Debtors, the Reorganized Debtors may not be able to achieve their projected financial results.  The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the particular industry segments in which the Debtors operate in particular, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Court may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the ability of the Debtors to make payments with respect to indebtedness following the Effective Date.  Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur.  Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement.  Such events may have a material impact on the information contained in the Disclosure Statement.  The Debtors do not intend to update the projections and, therefore, the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections. If the Debtors do not achieve their projected financial results, (a) the value of the New Shopko Interests may be negatively affected, (b) the Debtors may lack

sufficient liquidity to continue operating as planned after the Effective Date, and (c) the Debtors may be unable to service their debt obligations as they come due.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2.    The Plan Exchanges Senior Securities for Junior Securities

If the Plan is confirmed and consummated, certain Holders of Claims will receive New Shopko Interests. Thus, in agreeing to the Plan, certain of such Holders will be consenting to the exchange of their interests in senior debt for junior securities that will be subordinate to all future creditor claims.

### 3.    A Liquid Trading Market for the New Shopko Interests

The Debtors make no assurance that a liquid trading market for the New Shopko Interests will develop. The liquidity of any market for the New Shopko Interests will depend, among other things, upon the number of holders of the New Shopko Interests, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.  The New Shopko Interests may also be subject to trading restrictions by the New Organizational Documents and the New Stockholders' Agreement.

On the Effective Date, none of the New Shopko Interests will be registered under the Securities Act or the Securities Exchange Act or listed on a national securities exchange, Reorganized Shopko will not be a reporting company under the Securities Exchange Act, Reorganized Shopko shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and Reorganized Shopko shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date.  In order to prevent Reorganized Shopko from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, a separate agreement or the New Organizational Documents may impose certain trading restrictions, and the New Shopko Interests may be subject to certain transfer and other restrictions designed to maintain Reorganized Shopko as a private, non-reporting company.

Notwithstanding the foregoing in this risk factor, from and after the Effective Date, Reorganized Shopko will be required to provide (via separate agreement or in the New Organization Documents) to its shareholders audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP (for the avoidance of doubt, no SAS 100 review, compliance with any other requirement of Regulation S-X under the Securities Act or narrative disclosure required to be provided by reporting companies under the Securities Exchange Act in periodic or other reports (including, without limitation, a Management's Discussion and Analysis of Financial Condition and Results of Operations) is required in connection with the delivery of the required financial statements).

### 4.    The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes

Under federal income tax law, a corporation is generally permitted to deduct from taxable income NOLs carried forward from prior years. The Debtors have federal NOL carryforwards of approximately $241.2 million as of January 31, 2018.  The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes, and are also currently generating additional taxable income and gains from the sale of pharmacy assets, which will ultimately decrease the Debtors' NOLs and other tax attributes.

The Debtors' ability to utilize their NOL carryforwards and other tax attributes to offset future taxable income and to reduce federal income tax liability is subject to certain requirements and restrictions. In general, such NOLs and other tax attributes could be reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the Internal Revenue Code of 1986, as amended (the "Tax Code") or to offset any taxable gains recognized by the Debtors attributable to the restructuring transactions.  In addition, if the Debtors experience an "ownership change," as defined in section 382 of the Tax Code, then their ability to use the NOL carryforwards may be substantially limited, which could have a negative impact on the Debtors' financial position and results of operations.  Generally, there is an "ownership change" if one or more stockholders owning 5 percent or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage

points over the prior three-year period.  Following the implementation of a plan of reorganization, it is possible that an "ownership change" may be deemed to occur.  Under section 382 of the Tax Code, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs that may be utilized to offset future taxable income generally is subject to an annual limitation.  The Debtors currently expect that their net operating loss carryforwards and other tax attributes may be significantly reduced, eliminated, or limited in connection with the restructuring transactions, through a combination of one or more of the above factors.

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "*Certain United States Federal Income Tax Consequences of the Plan*," which begins on page 46 herein.

### C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 5.    *The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness*

The Debtors' ability to make scheduled payments on, or refinance their debt obligations depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control (including the factors discussed in Article XI., which begins on page 38, herein).  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including the notes.

#### 6.    *The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases*

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, vendors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 7.    *Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses*

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings

related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships. So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 8. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 9. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors. In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 10. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 11. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of

reorganization could be asserted against the reorganized Entities and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## XII.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.***

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims and interests against a debtor are entitled to vote on a chapter 11 plan. The table in Article IV.C of this Disclosure Statement, which begins on page 7 hereof, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 2, 3, and 4 (the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims and Interests in Classes 1, 5, 6, 7, and 8. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan. The solicitation and voting procedures provide for the resolution of disputed claims for voting purposes, including by creditors who obtain entry of an order temporarily allowing their claims for voting purposes pursuant to Bankruptcy Rule 3018(a).

### B.    Voting Record Date

**The Voting Record Date is February 22, 2019**. The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.    Voting on the Plan

**The Voting Deadline is March 25, 2019, at 5:00 p.m.** prevailing Eastern Time; *provided*, that the Voting Deadline with respect to an Executory Contract or Unexpired Lease that is included on a Schedule of Assumed Executory Contracts and Unexpired Leases filed in advance of March 25, 2019, but is added to the Schedule of Rejected Executory Contracts and Unexpired Leases after March 25, 2019, shall be April 1, 2019. In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' voting and claims agent (the "Voting and Claims Agent") on or before the Voting Deadline.

D.      **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE (844) 205-7495. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## XIII.   CONFIRMATION OF THE PLAN

### A.      Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B.      Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of BRG, the Debtors' financial advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed.

Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Shopko Interests to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following their emergence from chapter 11 and that the Plan will meet the feasibility requirements of the Bankruptcy Code. The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[8]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

---

[8]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### 1.    *No Unfair Discrimination*

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.    Valuation of the Debtors

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative, and the value will be based upon the Debtors' continued marketing process.  Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Debtors' creditors, including holders of Claims in the Voting Classes.

Houlihan Lokey believes the value determined by the successful consummation of the plan sponsor sale process will be a reasonable measure of the Debtors' value in light of, among other things, (1) the robust and exhaustive nature of the marketing process, both prepetition and postpetition, and (2) the active bidding that took place during the marketing process.

## XIV.    CERTAIN SECURITIES LAW MATTERS

The issuance of, and the distribution under, the Plan of the New Shopko Interests will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

### A.    <u>Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers</u>

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied:  (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.  In reliance upon this exemption, the Debtors believe that the offer and sale, under the Plan, of the New Shopko Interests will be exempt from registration under the Securities Act and state securities laws with respect to any Holder of Allowed Claims who is not deemed to be an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code.

In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.  Accordingly, subject to compliance with the New Organizational Documents and the New Stockholders'

Agreement, such securities generally may be resold:  (a) without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code; and (b) without registration under state securities or Blue Sky laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "**underwriter**" as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"*Control*," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "**controlling person**" and, therefore, an underwriter.

To the extent that persons deemed to be "underwriters" receive New Shopko Interests pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Such persons would not be permitted to resell such Plan Securities, unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act.

The issuer of the New Shopko Interests will not be required to file periodic reports under the Securities Exchange Act or seek to list the New Shopko Interests for trading on a national securities exchange.  Consequently, there may not be "current public information" (as such term is defined in Rule 144) regarding the issuer of the New Shopko Interests.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Shopko Interests to be issued pursuant to the Plan, or an "affiliate" of the issuer of the New Shopko Interests would depend upon various facts and circumstances applicable to that person.  Accordingly, we express no view as to whether any such person would be such an "underwriter" or "affiliate."

PERSONS WHO RECEIVE NEW SHOPKO INTERESTS UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW SHOPKO INTERESTS OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE

NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW SHOPKO INTERESTS

## XV.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims and New Shopko Interests.  This summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims or who will hold the New Shopko Interests as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "non-U.S. Holder" is any holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner)

and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.    Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions include a taxable sale of the Debtors' assets and/or stock.

If the transaction undertaken pursuant to the Plan is structured as a taxable sale of the assets and/or stock of any Debtor (a "<u>Taxable Transaction</u>"), such Debtor would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets sold and the Debtor's tax basis in such assets.  The Debtors have not yet determined whether or not they intend to structure the Restructuring Transactions as a Taxable Transaction, whether in whole or in part.  Such decision will depend on, among other things, whether assets being sold pursuant to a Taxable Transaction have a fair market value in excess of tax basis (i.e., a "built-in gain") or a fair market value less than tax basis (*i.e.*, a "built-in loss"), in the case of assets with built-in gains, whether sufficient tax attributes are available to offset any such built-in gain, and how the fair market value of such assets compares to the expected tax bases of such assets after their tax basis is reduced for COD Income.

If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock.  However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, subject to reduction due to COD Income, as described below.

For the period ending January 31, 2018, the Debtors had approximately $241.2 million of federal NOLs.  The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes, and are also currently generating additional taxable income and gains from the sale of pharmacy assets, which will ultimately decrease the Debtors' NOLs and other tax attributes.  Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising in tax years beginning before January 1, 2018 and indefinitely for NOLs arising in taxable years starting in 2018 (including the Debtors' tax year starting January 31, 2018), thereby reducing the Debtors' future aggregate tax obligations.  Subject to the limitations discussed below, NOLs arising before 2018 may offset 100% of future taxable income and NOLs arising in taxable years starting with 2018 may be used to offset 80% of taxable income in a given year.

**1.    *Cancellation of Debt and Reduction of Tax Attributes***

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("<u>COD Income</u>") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor), in each case, given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (including, as described above, the amount of gain or loss recognized by the debtor with respect to the sale of all or a portion of their assets in a taxable transaction).  In general, tax attributes will be reduced in the

51

following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income. The amount of the tax attributes required to be reduced will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction. The exact amount of any COD Income that will be realized by the Debtors, and accordingly, the amount of tax attributes required to be reduced (if any), will depend in part on the fair market value of the New Shopko Interests and may depend on the "issue price" of the loans under the Exit Facility (as described below) and will not be determinable until the consummation of the Plan. Regardless of the implemented structure, the Debtors expect, however, that the amount of such COD Income likely will be sufficient to materially reduce or eliminate all of their NOLs and tax credits allocable to periods prior to the Effective Date pursuant to section 108 of the Tax Code. In addition, depending on the structure of the transactions undertaken pursuant to the Plan, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

As discussed above, the Debtors' NOLs will likely be materially reduced or eliminated after computing the Debtors' taxes for the year in which the Plan is implemented. To the extent that any remain, they will be subject to limitation as described below, subject to the exceptions described below.

## 2.    *Limitation of NOL Carryforwards and Other Tax Attributes*

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, to the extent the Reorganized Debtors succeed to the Debtors' tax attributes (i.e., if the Restructuring Transactions are not structured as a Taxable Transaction pursuant to which the Debtors' assets, and not stock of corporate entities, are being transferred to the Reorganized Debtors for U.S. federal income tax purposes), the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Code.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Shopko pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

### (a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 2.51 percent for February 2019). The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year

period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

**(b)        Special Bankruptcy Exceptions**

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

As discussed above, the Debtors expect that all of the Debtors' NOLs allocable to periods prior to the Effective Date likely will be materially reduced or eliminated and hence will not be subject to the section 382 limitation following the year in which the Effective Date occurs. The availability to the Debtors of either the 382(l)(5) Exception or the 382(l)(6) Exception will depend on the structure of the transactions undertaken pursuant to the Plan.

**3.    *Excess Loss Accounts***

Generally, when corporations are members of an affiliated group filing a consolidated return, a parent corporation's basis in the stock of a subsidiary in such a group is (a) increased by the sum of (i) income of such subsidiary and (ii) contributions to such subsidiary, and (b) reduced by the sum of (i) losses or deductions of such subsidiary that are used by the affiliated group and (ii) distributions from such subsidiary. In the case that the amount described in clause (b) above exceeds the amount described in clause (a) above, and such excess is greater than the parent corporation's basis in the subsidiary stock before the adjustments specified in clauses (a)-(b) are made, the amount by which such excess is greater than the parent corporation's basis in the subsidiary stock is called an "excess loss account" and is treated as negative basis for U.S. federal income tax purposes. The affiliated group must recognize income equal to the excess loss account in the subsidiary's stock in certain events, including (x) to the extent the subsidiary recognizes COD Income that is excluded from gross income pursuant to section 108 of the Code (as discussed above), and the affiliated group does not reduce its tax attributes by such excluded COD Income, and (y) if the stock of the subsidiary is treated as disposed of for no consideration. It is possible that a Debtor will exclude COD Income in excess of available tax attributes and that there could be an excess loss account in the stock of that Debtor. In that case, the Debtors will recognize taxable income in the amount of such excess COD Income, but not to exceed the amount of the excess loss account.

    **C.**    **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims Entitled to Vote**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

*1.*    *U.S. Federal Income Tax Consequences to Holders of Allowed Class 2 Claims*

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Class 2 Claims, each Holder thereof will receive Cash. The receipt of Cash by a U.S. Holder of an Allowed Class 2 Claim should be treated as a taxable exchange pursuant to Section 1001 of the Code.  Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the Cash received, and (b) the Holder's adjusted tax basis in its Claim.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Claim were held for more than one year.  To the extent that a portion of the Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income.  See "Accrued Interest" below.

*2.*    *U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims*

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Class 3 Claims, each Holder thereof will receive either Cash or its Pro Rata share of the Exit Facility.

The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed Class 3 Claims who receive their Pro Rata share of the Exit Facility will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute a Taxable Transaction or a transaction that qualifies in whole or in part as an exchange of stock or securities in a tax-free reorganization under the reorganization provisions of the Tax Code (a "<u>Reorganization</u>").  The determination of whether the transactions undertaken pursuant to the Plan constitute a Reorganization will depend on whether the Claims surrendered and the loans under the Exit Facility both constitute "securities" for U.S. federal income tax purposes.

*a.*    *Treatment of a Debt Instrument as a "Security"*

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  The Allowed Term Loan Secured Claims (i.e., the Allowed Class 3 Claims) each had a term to maturity of approximately five years when issued.  The terms of the loans under the Exit Facility, including the term to maturity thereof, have not yet been finalized.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Allowed Term Loan Secured Claims and the loans under the Exit Facility as "securities" for U.S. federal income tax purposes.

*a.*    *Taxable Transaction*

To the extent that the transactions undertaken pursuant to the Plan constitute a Taxable Transaction (including where the debt instrument underlying the Allowed Claim and/or the loan under the Exit Facility is not a security for U.S. federal income tax purposes), a U.S. Holder of an Allowed Class 3 Claim would be treated as exchanging its Claims for its Pro Rata Share of the Exit Facility or Cash in a fully taxable exchange under section 1001 of the Tax Code.

A U.S. Holder of an Allowed Class 3 Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) the sum of the Cash received, if any, plus the "issue price" of the loans under the Exit Facility received, if any (in each case to the extent such consideration is not allocable to accrued but untaxed interest on the obligations underlying such Claim), and (b) the U.S. Holder's adjusted tax basis, if any, in the obligation constituting such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the consideration received in exchange for its Allowed Class 3 Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. *See* "Accrued Interest" and "Market Discount" below. A U.S. Holder's tax basis in the loans under the Exit Facility should be equal to the issue price of such loan as of the date such loan is issued to the U.S. Holder. The determination of the "issue price" of the loans under the Exit Facility for purposes of this analysis will depend, in part, on whether the loans under either the Allowed Class 3 Claims or the loans under the Exit Facility are traded on an "established securities market" for U.S. federal income tax purposes. The issue price of a debt instrument that is traded on an established market is the fair market value of such debt instrument. The issue price of a debt instrument that is not so traded is its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). Although not free from doubt, the Debtors believe that either loans underlying the Exit Facility or the debt instruments underlying the Class 3 Claims that are tendered for loans under the Exit Facility may be treated as traded on an established securities market for U.S. federal income tax purposes, in which case the issue price of the loans under the Exit Facility would be equal to its fair market value, but no assurances can be given in this regard. The rules regarding the determination of issue price are complex and highly detailed and you should consult your tax advisor regarding the determination of the issue price of the loans under the Exit Facility. A U.S. Holder's holding period for loans received under the Exit Facility should begin on the day following the Effective Date.

### 3. Reorganization

If a U.S. Holder receives loans under the Exit Facility in exchange for its Claim, and both the loans under the Exit Facility and the debt instruments underlying such Claim are "securities" for U.S. federal income tax purposes, the exchange of a U.S. Holder's Allowed Class 3 Claim should be treated as a Reorganization under the Tax Code. If the exchange is treated as a Reorganization, a U.S. Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of accrued interest below). To the extent that a portion of the loans under the Exit Facility is allocable to accrued but untaxed interest, however, the U.S. Holder may recognize ordinary income (as discussed in greater detail in "Accrued Interest" below). A U.S. Holder who is subject to this treatment will take an aggregate tax basis in its interest in the loans under the Exit Facility received (apart from amounts allocable to accrued but untaxed interest) equal to the U.S. Holder's tax basis in the surrendered Allowed Claim. A U.S. Holder's holding period for its interest in the loans under the Exit Facility received (except to the extent attributable to accrued but untaxed interest) should generally include the holding period for the obligation underlying the surrendered Allowed Claim exchanged for such loans.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 4. U.S. Federal Income Tax Consequences to Holders of Allowed Class 4 Claims

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Class 4 Claims, each Holder thereof will receive either Cash or its Pro Rata share of the New Shopko Interests.

The receipt of Cash by a U.S. Holder of an Allowed Class 4 Claim should be treated as a taxable exchange under section 1001 of the Code. The U.S. Holder should recognize capital gain or loss equal to the difference between (1) the Cash received (to the extent such Cash is not allocable to accrued but untaxed interest that is received in exchange for the Claim) and (2) the U.S. Holder's adjusted tax basis in the obligation constituting its Claim. The

character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  See the discussions of accrued interest and market discount below.

The receipt of New Shopko Interests by a U.S. Holder of an Allowed Class 4 Claim depends on whether the Allowed Class 4 Claim constitutes a "security" for U.S. federal income tax purposes.  See the discussion of whether a debt instrument constitutes a "security" for U.S. federal income tax purposes above.  Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding whether any Allowed Class 4 Claims may constitute a "security" for U.S. federal income tax purposes.

If the debt or obligation underlying the Allowed Class 4 Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of the Allowed Class 4 Claim for New Shopko Interests should constitute a "recapitalization" for U.S. federal income tax purposes.  The U.S. federal income tax consequences to such U.S. Holder will be substantially similar to the consequences described above in Section C.1(c) of this Article XVI (substituting "New Shopko Interests" for "loans under the Exit Facility") that a U.S. Holder of Allowed Class 3 Claims would experience if the debt or obligation underlying the Claims and the consideration received in exchange therefore are both treated as "securities" for U.S. federal income tax purposes.

If the New Shopko Interests and the debt or obligations underlying the Allowed Class 4 Claim are not both treated as "securities" for U.S. federal income tax purposes, the exchange of the Allowed Class 4 Claim for New Shopko Interests should be treated by such U.S. Holder as a fully taxable exchange under section 1001 of the IRC.  Accordingly, each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the New Shopko Interests and (2) such U.S. Holder's adjusted tax basis, if any, in the obligation constituting such Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  See the discussions of accrued interest and market discount below.  A U.S. Holder's tax basis in any New Shopko Interests received should equal the fair market value of such stock or issue price of such loan as of the date such stock is distributed to the U.S. Holder.  A U.S. Holder's holding period for the New Shopko Interests received should begin on the day following the Effective Date.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 5.    *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a surrendered Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder).  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury

Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 6. *Medicare Tax*

Certain U.S. Holders that are individual, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 7. *Market Discount*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 8. *Dividends on New Shopko Interests*

Any distributions made on account of New Shopko Interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

### 9. Sale, Redemption, or Repurchase of New Shopko Interests

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Shopko Interests. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Shopko Interests for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Shopko Interests as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for New Shopko Interests.

### 10. Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### D. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holders and the ownership and disposition of the New Shopko Interests.

### 1. Gain Recognition

Any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). To claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.    *Accrued Interest*

Payments to a non-U.S. Holder that are attributable to accrued interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the Reorganized Debtor's stock entitled to vote;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Reorganized Debtor (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

### 3.    *Dividends on New Shopko Interests*

Any distributions made with respect to New Shopko Interests will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtor's current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below, dividends paid with respect to New Shopko Interests held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Shopko Interests held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

4.    *Sale, Redemption, or Repurchase of New Shopko Interests*

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Shopko Interests unless:

(i)    such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

(ii)    such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

(iii)    the Reorganized Debtors are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Shopko Interests. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). The Debtors consider it unlikely, based on their current business plans and operations, that any of the Reorganized Debtors will become a "U.S. real property holding corporation" in the future.

5.    *FATCA*

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Shopko Interests), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Shopko Interests). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules currently apply to U.S.-source payments of fixed or determinable, annual or periodic income. The Internal Revenue Service has issued proposed regulations that, when finalized, will provide for the repeal of the 30% withholding tax that existing regulations released in January 2013 and subsequent guidance by the Service would have applied to all payments of gross proceeds from the sale, exchange or other disposition of property of a type which can produce U.S. source interest or dividends occurring after December 31, 2018. In the preamble to the proposed regulations, the Service provided that taxpayers may rely upon this repeal until the issuance of final regulations.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder's ownership of New Shopko Interests.

E.    **Information Reporting and Back-Up Withholding**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a

properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

## XVI.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  February 28, 2019

Respectfully submitted,

Specialty Retail Shops Holding Corp.,
on behalf of itself and each of the other Debtors

By:   /s/ Russell L. Steinhorst
Name: Russell L. Steinhorst
Title:   Chief Executive Officer

Dated:   February 28, 2019                        /s/
Omaha, Nebraska                                  James J. Niemeier (NE Bar No. 18838)
Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Telephone:   (402) 341-3070
Facsimile:   (402) 341-0216
Email:       jniemeier@mcgrathnorth.com
             meversden@mcgrathnorth.com
             lgoodman@mcgrathnorth.com
- and -
James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       james.sprayregen@kirkland.com
             patrick.nash@kirkland.com
             travis.bayer@kirkland.com
- and -
Steven Serajeddini (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:       steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Plan of Reorganization**

*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) Case No. 19-80064 (TLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF
## SPECIALTY RETAIL SHOPS HOLDING CORP. AND ITS DEBTOR AFFILIATES

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Travis Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

-and-

Steven Serajeddini (admitted *pro hac vice*)
Daniel Rudewicz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

James J. Niemeier (NE Bar No. 18838)
Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**McGRATH NORTH MULLIN & KRATZ, PC LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Telephone:      (402) 341-3070

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  February 28, 2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); Shopko Holding Company, LLC (0171); Shopko Institutional Care Services Co., LLC (7112); Shopko Optical Manufacturing, LLC (6346); Shopko Properties, LLC (0865); Shopko Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ........................................................................................................1
  A.    Defined Terms ..................................................................................................................1
  B.    Rules of Interpretation ..................................................................................................13
  C.    Computation of Time .....................................................................................................13
  D.    Governing Law ...............................................................................................................13
  E.    Reference to Monetary Figures ....................................................................................14
  F.    Controlling Document ...................................................................................................14
  G.    Nonconsolidated Plan ....................................................................................................14

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ........................14
  A.    Administrative Claims and Priority Tax Claims ........................................................14
  B.    Professional Compensation ...........................................................................................15
  C.    DIP Claims ......................................................................................................................16
  D.    Statutory Fees .................................................................................................................16

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............16
  A.    Summary of Classification ............................................................................................16
  B.    Treatment of Claims and Interests ..............................................................................17
  C.    Special Provision Governing Unimpaired Claims ......................................................19
  D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ..............20
  E.    Elimination of Vacant Classes ......................................................................................20
  F.    Voting Classes; Presumed Acceptance by Non-Voting Classes .................................20
  G.    Subordinated Claims and Interests ..............................................................................20

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .................................20
  A.    General Settlement of Claims .......................................................................................20
  B.    Restructuring Transactions ..........................................................................................21
  C.    Cancelation of Notes, Instruments, Certificates, and Other Documents .................21
  D.    Exemption from Certain Taxes and Fees ....................................................................21
  E.    Surcharge ........................................................................................................................21
  F.    Asset Sales ......................................................................................................................21
  G.    The Equitization Restructuring ...................................................................................22
  H.    The Asset Sale Restructuring .......................................................................................25

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......29
  A.    Assumption and Rejection of Executory Contracts and Unexpired Leases .............29
  B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ...............29
  C.    Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases ....................30
  D.    Indemnification Obligations .........................................................................................30
  E.    Director and Officer Liability Insurance ....................................................................31
  F.    Run-Out Claims .............................................................................................................31
  G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ........32
  H.    Reservation of Rights .....................................................................................................32
  I.    Nonoccurrence of Effective Date .................................................................................32

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ......................................32
  A.    Timing and Calculation of Amounts to Be Distributed .............................................32
  B.    Disbursing Agent ...........................................................................................................32
  C.    Rights and Powers of Disbursing Agent ......................................................................33
  D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ..............33
  E.    Manner of Payment ........................................................................................................34
  F.    Registration or Private Placement Exemption ...........................................................34

G.     Tax Issues and Compliance with Tax Requirements ................................................. 34
H.     Allocations ............................................................................................................... 35
I.     No Postpetition Interest on Claims........................................................................... 35
J.     Setoffs and Recoupment ........................................................................................... 35
K.     Claims Paid or Payable by Third Parties .................................................................. 35

**ARTICLE VII. THE PLAN ADMINISTRATOR ................................................................. 36**
A.     The Plan Administrator ............................................................................................. 36
B.     Wind Down ................................................................................................................ 38
C.     Exculpation, Indemnification, Insurance and Liability Limitation ........................... 38
D.     Tax Returns ................................................................................................................ 38
E.     Dissolution of the Reorganized Debtors ................................................................... 39

**ARTICLE VIII. RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR ..................... 39**
A.     Establishment of Reserve Accounts .......................................................................... 39
B.     Undeliverable Distribution Reserve .......................................................................... 39
C.     Priority Claims Reserve ............................................................................................ 40
D.     Wind-Down Reserve ................................................................................................. 40
E.     Other Secured Claims Reserve.................................................................................. 40
F.     GUC Asset Sale Reserve........................................................................................... 41
G.     Distribution Proceeds/Priority Waterfall .................................................................. 41
H.     The General Account and Distribution Reserve Account Adjustments ..................... 41

**ARTICLE IX. PROCEDURES FOR RESOLVING CONTINGENT,   UNLIQUIDATED, AND
DISPUTED CLAIMS.................................................................................................. 42**
A.     Allowance of Claims ................................................................................................. 42
B.     Claims Administration Responsibilities..................................................................... 42
C.     Estimation of Claims ................................................................................................. 42
D.     Claims Reserve .......................................................................................................... 43
E.     Adjustment to Claims Without Objection .................................................................. 43
F.     Time to File Objections to Claims ............................................................................. 43
G.     Disallowance of Claims ............................................................................................. 43
H.     Amendments to Claims.............................................................................................. 44
I.     No Distributions Pending Allowance......................................................................... 44
J.     Distributions After Allowance ................................................................................... 44

**ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS....................... 44**
A.     Compromise and Settlement of Claims, Interests, and Controversies ........................ 44
B.     Discharge of Claims and Termination of Interests..................................................... 44
C.     Term of Injunctions or Stays..................................................................................... 45
D.     **Release of Liens** ...................................................................................................... 45
E.     **Debtor Release** ........................................................................................................ 45
F.     **Release by Holders of Claims or Interests** ............................................................. 46
G.     **Exculpation** ............................................................................................................. 47
H.     **Injunction** ................................................................................................................ 47
I.     Protection Against Discriminatory Treatment ........................................................... 48
J.     Recoupment ............................................................................................................... 48
K.     Subordination Rights.................................................................................................. 48

**ARTICLE XI. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ........................................................................................................... 48**
A.     Conditions Precedent to the Effective Date ............................................................... 48
B.     Waiver of Conditions ................................................................................................. 49
C.     Substantial Consummation ........................................................................................ 49
D.     Effect of Nonoccurrence of Conditions to the Effective Date..................................... 49

**ARTICLE XII. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**..............................**49**
    A.    Modification and Amendments...................................................................................49
    B.    Effect of Confirmation on Modifications................................................................49
    C.    Revocation or Withdrawal of the Plan ...................................................................49

**ARTICLE XIII. RETENTION OF JURISDICTION** .............................................................................**50**

**ARTICLE XIV. MISCELLANEOUS PROVISIONS** ..............................................................................**51**
    A.    Immediate Binding Effect.......................................................................................51
    B.    Additional Documents .............................................................................................52
    C.    Dissolution of the Creditors' Committee ...............................................................52
    D.    Reservation of Rights..............................................................................................52
    E.    Successors and Assigns...........................................................................................52
    F.    Service of Documents..............................................................................................52
    G.    Entire Agreement ....................................................................................................53
    H.    Exhibits ...................................................................................................................53
    I.    Nonseverability of Plan Provisions ........................................................................53
    J.    Votes Solicited in Good Faith .................................................................................53
    K.    Waiver or Estoppel..................................................................................................54

**INTRODUCTION**

Capitalized terms used in this chapter 11 plan shall have the meanings set forth in Article I.A. The Debtors propose this Plan for the resolution of outstanding Claims against, and Interests in, the Debtors. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan for each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (d) all DIP Claims.

2.    "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, except as otherwise set forth in the Plan or a Final Order, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date; *provided* that Filing requests for payment of Administrative Claims is not required, where the Plan, Bankruptcy Code, or a Final Order does not require such Filing.

3.    "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

4.    "*ASO Agreement*" means the Administrative Services Only Agreement, effective January 1, 2017, including all cover agreements, amendments, disclosures, appendices, schedules, benefit booklets and rate information related thereto through which Cigna Health and Life Insurance Company processes healthcare claims of the Debtors' employees for the Debtors' self insured employee healthcare benefits plan.

5.    "*Asset Purchase Agreement*" means one or more asset purchase agreements pursuant to which the Asset Sales are consummated, in each case in form and substance reasonably acceptable to Credit Agreement Primary Agent.

6.    "*Asset Sales*" means the sale or sales of all, substantially all, or certain of the Debtors' assets under this Plan pursuant to an Asset Purchase Agreement or as otherwise authorized by order of the Bankruptcy Court or the Bankruptcy Code in each case with the consent of the Credit Agreement Primary Agent (such consent not to be unreasonably withheld).

7.    "*Asset Sale Restructuring*" means a restructuring under this Plan providing for the Asset Sales where the Equitization Restructuring does not occur.

8.        "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, (I) no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes and (II) the Revolving Loan A Lenders, Revolving Loan A-1 Lenders, Term Loan B Lenders, and Term Loan B-1 Lender(s) shall not be required to file a Proof of Claim. A Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

9.        "*Allowed Surcharge*" means a Permitted Surcharge (as defined in the final Financing Orders) in an amount no less than $11 million or as otherwise determined by the Debtors, as may be authorized by the Bankruptcy Court.

10.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the debtors in possession, the Estates, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

11.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time, as applicable to the Chapter 11 Cases.

12.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Nebraska having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the District of Nebraska.

13.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

14.      "*Bar Date*" means the dates established by the Bankruptcy Court by which Proofs of Claim must be Filed; *provided* that the Claims of the Revolving Loan A Lenders, Revolving Loan A-1 Lenders, Term Loan B Lenders, and Term Loan B-1 Lender(s) shall not be subject to the Bar Date

15.      "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

17.      "*Cash Consideration*" means any proceeds paid or payable in Cash by buyers to the Debtors in connection with the Asset Sales; *provided, however*, that Cash Consideration includes any Cash or Cash equivalents returned (whether before or after the Effective Date) to the Debtors or their Estates, including (a) the return of any deposits of Cash or Cash equivalents and (b) the release of Cash or Cash equivalents used to collateralize any of the Debtors' surety bonds, insurance policies, or utility contracts.

2

18.       "*Causes of Action*" means any claims, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

19.       "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

20.       "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, asserted against a Debtor.

21.       "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22.       "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent or the Bankruptcy Court.

23.       "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

24.       "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

25.       "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

26.       "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court, if any, to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

27.       "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

28.       "*Consummation*" means the occurrence of the Effective Date.

29.       "*Credit Agreement*" means that certain Third Amended and Restated Loan and Security Agreement, dated as of February 7, 2012 (as amended from time to time), by and among Shopko, as borrower, and certain of its subsidiaries as borrowers or guarantors, certain lenders party thereto, the Credit Agreement Primary Agent, and the Term Loan B-1 Agent, which governs the Revolving Loan A, Revolving Loan A-1, Term Loan B, and Term Loan B-1.

30.       "*Credit Agreement Deficiency Claims*" means, pursuant to the priority set forth in the Credit Agreement, the portion of the Term Loan Claims that constitute unsecured Claims under section 506(a) of the Bankruptcy Code.

31.       "*Credit Agreement Primary Agent*" means Wells Fargo Bank, N.A., in each of its capacities as Agent, Collateral Agent, and Term Loan B Agent (as each term is defined in the Credit Agreement), under the Credit Agreement.

3

32.      "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

33.      "*Cure Claim*" means a monetary Claim based upon a Debtor's defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

34.      "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include:  (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

35.      "*Cure/Assumption Objection Deadline*" means the date that is 14 days after filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, or an Executory Contract or Unexpired Lease proposed to be assumed by the Debtors or Reorganized Debtors is proposed to be assigned to a third party after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification and (b) the date of the scheduled Confirmation Hearing.

36.      "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

37.      "*Debtors*" means, collectively, each of the following (the debtors and debtors in possession in the Chapter 11 Cases):  (a) Specialty Retail Shops Holding Corp.; (b) Pamida Stores Operating Co., LLC; (c) Pamida Transportation LLC; (d) Penn-Daniels, LLC; (e) Place's Associates' Expansion, LLC; (f) Retained R/E SPE, LLC; (g) Shopko Finance, LLC; (h) Shopko Gift Card Co., LLC; (i) Shopko Holding Company, LLC; (j) Shopko Institutional Care Services Co., LLC; (k) Shopko Optical Manufacturing, LLC; (l) Shopko Properties, LLC; (m) Shopko Stores Operating Co., LLC; and (n) SVS Trucking, LLC.

38.      "*DIP Agreement*" means the Credit Agreement, as amended and modified by that certain Ratification and Amendment Agreement, dated as of January 16, 2019, by and among the Debtors and the DIP Lenders, as it may be amended, restated, supplemented, or otherwise modified from time to time.

39.      "*DIP Claim*" means any Claim in favor of any DIP Lender against any of the Debtors arising under the Financing Agreements or the Financing Orders on or after the Petition Date, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations as well as the adequate protection claims granted by any of the Financing Orders.

40.      "*DIP ABL Lenders*" means, collectively, the Revolving Loan A Lenders and Revolving Loan A-1 Lenders (as each is defined in the DIP Agreement) from time to time party to the DIP Agreement.

41.      "*DIP Lenders*" means, collectively, the lenders from time to time party to the DIP Agreement.

42.      "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order

of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

43.      "*Disbursing Agent*" means the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, or the Entity or Entities selected by the Debtors, the Reorganized Debtors, or the Plan Administrator to make or facilitate distributions contemplated under the Plan.

44.      "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

45.      "*Disputed*" means a Claim that is not yet Allowed.

46.      "*Distribution Proceeds*" means all Cash of the Debtors available on the Effective Date after the funding of the Priority Claims Reserve, the Other Secured Claims Reserve, the Professional Fee Escrow Account, and the Wind-Down Reserve, available for distribution under Article VIII.G hereof.

47.      "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions hereunder, which shall be (a) the Confirmation Date or (b) such other date as designated in a Final Order of the Bankruptcy Court.

48.      "*Distribution Reserve Accounts*" means the Priority Claims Reserve, the Undeliverable Distribution Reserve, the Wind-Down Reserve, the Other Secured Claims Reserve, and the GUC Asset Sale Reserve established pursuant to this Plan.

49.      "*DTC*" means the Depository Trust Company.

50.      "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article XI.A hereof have been satisfied or waived (in accordance with Article XI.B); and (c) the Plan is declared effective.

51.      "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

52.      "*Equitization Restructuring*" means the transactions and reorganization contemplated by, and pursuant to, this Plan under which the New Shopko Interests are distributed, among other things.

53.      "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54.      "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Credit Agreement Primary Agent; and (c) with respect to each of the foregoing Entities, such Entities' respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants.

55.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

56.      "*Exit Facility*" means either (a) a replacement credit facility, pursuant to which the Prepetition ABL Lenders, the DIP ABL Lenders, and the Term Loan B Lenders will convert all of their outstanding Claims and commitments into commitments under such Exit Facility, and/or (b) a new credit facility in an amount sufficient to repay in full in Cash on the Effective Date the Claims of the Prepetition ABL Lenders, the DIP ABL Lenders, and Term Loan B Lenders and to provide incremental liquidity, if any.

57.      "*Exit Facility Agent*" means the agent under the Exit Facility Credit Agreements.

58.     "*Exit Facility Credit Agreements*" means the credit agreements governing the Exit Facility, if any.

59.     "*Exit Facility Documents*" means the Exit Facility Credit Agreements and related documents governing the Exit Facility.

60.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

61.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

62.     "*Final Order*" means:  (a) an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction; or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Case (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

63.     "*Financing Orders*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to use cash collateral and enter into the DIP Agreement and incur postpetition obligations thereunder.

64.     "*General Account*" means a general account:  (a) into which shall be deposited revenues and proceeds of all assets of the Debtors, including proceeds of the Asset Sales, and Cash of the Debtors in an amount in excess of the amount required to adequately maintain the Distribution Reserve Accounts as described in Article VIII.H (*provided* that the General Account shall not include funds required to be deposited into the Distribution Reserve Accounts); (b) from which shall be made payments to any Distribution Reserve Account (other than GUC Asset Sale Reserve) in an amount sufficient to adequately maintain such Distribution Reserve Account as described in Article VIII.H; and (c) from which payments shall be made according to the priority set forth in Article VIII.G.

65.     "*General Unsecured Claim*" means any Claim other than:  (a) an Administrative Claim; (b) a Secured Tax Claim; (c) an Other Secured Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Term Loan Secured Claim; (g) an Intercompany Claim; (h) a DIP Claim; or (i) a Section 510(b) Claim; *provided* that General Unsecured Claims shall include Credit Agreement Deficiency Claims, if any.

66.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

67.     "*GUC Asset Sale Reserve*" means a separate, segregated account to be established and maintained by the Plan Administrator and funded with the Distribution Proceeds pursuant to Article VIII.F hereof.

68.     "*GUC Equitization Reserve*" means, if an Equitization Restructuring occurs, a separate reserve account for distribution to the Holders of Allowed General Unsecured Claims that will be funded with the lesser of (a) an amount equal to the total amount of Allowed General Unsecured Claims or (b) any remaining Cash on hand as of the Effective Date less (x) the Minimum Liquidity Threshold and (y) Cash necessary to make distributions to Holders of all other Allowed Claims pursuant to Article II (including the funding of the Professional Fee Escrow Account) and Article III hereof.

69.     "*Holder*" means an Entity holding a Claim or Interest, as applicable.

70.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

71.     "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate.

72.     "*Intercompany Interest*" means, other than an Interest in Shopko, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

73.     "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

74.     "*Interim Compensation Order*" means the order of the Bankruptcy Court establishing procedures for interim compensation and reimbursement of expenses for professionals.

75.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, as applicable to the Chapter 11 Cases.

76.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

77.     "*Management Incentive Plan*" means, if an Equitization Restructuring occurs, a post-Effective Date management incentive plan, the material terms of which shall be consistent with Article IV of the Plan.

78.     "*Minimum Liquidity Threshold*" means, subject to the consent of the Credit Agreement Primary Agent (not to be unreasonably withheld), $30 million, or such other amount determined by the Debtors with the consent of the Credit Agreement Primary Agent (not to be unreasonably withheld) on or before the Confirmation Hearing.

79.     "*New Boards*" means, if an Equitization Restructuring occurs, the initial board of directors, members, or managers, as applicable, of each Reorganized Debtor.

80.     "*New Organizational Documents*" means, if an Equitization Restructuring occurs, the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each of the Reorganized Debtors, which forms shall be included in the Plan Supplement.

81.     "*New Shopko Interests*" means, if an Equitization Restructuring occurs, interests in Reorganized Shopko.

82.     "*New Stockholders' Agreement*" means the agreement with respect to the New Shopko Interests, the form of which shall be included in the Plan Supplement.

83.     "*Notice and Claims Agent*" means Prime Clerk LLC.

84.     "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

85.     "*Other Secured Claim*" means any Secured Claim other than Claims arising under the Credit Agreement.

86.     "*Other Secured Claims Reserve*" means the account to be established and maintained by the Plan Administrator and funded with the Other Secured Claims Reserve Amount pursuant to Article VIII.E.

87.    "*Other Secured Claims Reserve Amount*" means Cash in an amount to be determined by the Debtors, which amount shall be funded by the Debtors and used by the Plan Administrator for the payment of Allowed Other Secured Claims to the extent that such Other Secured Claims have not been satisfied pursuant to Article III.B.2 on or before the Effective Date.

88.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

89.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

90.    "*Plan*" means this plan, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto.

91.    "*Plan Administrator*" means the person selected by the Debtors and acceptable to the Credit Agreement Primary Agent to administer the Plan Administrator Assets if the Asset Sale Restructuring has occurred. All costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Plan Administrator Assets, subject to and in accordance with the Wind-Down Budget.

92.    "*Plan Administrator Assets*" means, if the Asset Sale Restructuring has occurred, on the Effective Date, all assets of the Estates vested in the Reorganized Debtors to be administered by Plan Administrator, and, thereafter, all assets held from time to time by Reorganized Debtors to be administered by Plan Administrator.

93.    "*Plan Sponsor*" means, collectively, one or more sponsors or other financial institutions acceptable to the Credit Agreement Primary Agent and Exit Facility Agent, if any, providing the Plan Sponsor Investment.

94.    "*Plan Sponsor Agreement*" means that certain plan sponsor agreement, by and among each of the Debtors and the Plan Sponsor, in form and substance acceptable to the Credit Agreement Primary Agent.

95.    "*Plan Sponsor Investment*" means the investment, if any, by the Plan Sponsor under the Plan Sponsor Agreement.

96.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 14 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement.  If a Equitization Restructuring occurs, the Plan Supplement shall include the following:  (a) New Organizational Documents; (b) Exit Facility Credit Agreements, if any; (c) Schedule of Assumed Executory Contracts and Unexpired Leases; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) New Stockholders' Agreement, if any; (g) Plan Sponsor Agreement, if any; (h) a document listing the members of the New Boards and the officers of the Reorganized Debtors, if any; (i) the Management Incentive Plan; (j) Asset Purchase Agreement, if any; and (k) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.  If an Asset Sale Restructuring occurs, the Plan Supplement shall include the following:  (a) New Organizational Documents; (b) Exit Facility Credit Agreements, if any; (c) Schedule of Assumed Executory Contracts and Unexpired Leases; (d)  a list of retained Causes of Action; (e) Asset Purchase Agreement, if any; (f) the identity of the Plan Administrator and the compensation of the Plan Administrator, if any; (g) the Wind-Down Budget, (h) the Wind-Down Milestones; and (i) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article XII of the Plan; *provided* that the Debtors shall not amend the Schedule of Assumed Executory Contracts and Unexpired Leases or Schedule of Rejected Executory Contracts and Unexpired Leases after seven days prior to the Confirmation Hearing.

97.    "*Prepetition ABL Claim*" means any Claim derived from or based upon the Prepetition ABL Loans.

98.      "*Prepetition ABL Lenders*" means, collectively, the lenders providing loans and commitments under the Prepetition ABL Loans.

99.      "*Prepetition ABL Loans*" means, collectively, the Revolving Loan A and Revolving Loan A-1.

100.      "*Priority Claims*" means, collectively, Priority Tax Claims and Other Priority Claims.

101.      "*Priority Claims Reserve*" means the account to be established by the Reorganized Debtors with the Priority Claims Reserve Amount to fund distributions to Holders of Allowed Administrative Claims and Allowed Priority Claims (excluding Professional Fee Claims and DIP Claims).

102.      "*Priority Claims Reserve Amount*" means (i) under the Equitization Restructuring, the lesser of (a) an amount equal to the total amount of Allowed Administrative Claims (excluding Professional Fee Claims and DIP Claims) and Allowed Priority Claims and (b) any remaining Cash on hand as of the Effective Date less (x) the Minimum Liquidity Threshold and (y) Cash necessary to make distributions to (i) Holders of all other Allowed Claims pursuant to Article II hereof (including the funding of the Professional Fee Escrow Account) and (ii) Holders of Allowed Other Secured Claims and Holders of Allowed Term Loan Secured Claims (pursuant to the priority set forth in the Credit Agreement, up to the amount of the Allowed Term Loan B Claims) pursuant to Article III hereof; and (ii) under the Asset Sale Restructuring, the lesser of (a) an amount equal to the total amount of Allowed Administrative Claims (excluding Professional Fee Claims and DIP Claims) and Allowed Priority Claims and (b) the sum of (x) an amount agreed to by the Debtors and the Credit Agreement Primary Agent, (y) the Allowed Surcharge, and (z) the Distribution Proceeds, to the extent known on the Effective Date, to be allocated and paid to the Holders of Allowed Administrative Claims (excluding Professional Fee Claims and DIP Claims) and Allowed Priority Claims according to the priority set forth in Article VIII.G.

103.      "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

104.      "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

105.      "*Professional*" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

106.      "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been previously paid.

107.      "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the total Professional Fee Reserve Amount funded by the Reorganized Debtors on the Effective Date.

108.      "*Professional Fee Reserve Amount*" means the aggregate amount of Professional Fee Claims that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of this Plan.

109.      "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases.

110.      "*Purchaser*" means the purchaser under the Asset Purchase Agreement, together with its successors and permitted assigns (including any and all of its wholly-owned Affiliates to which it assigns any of its rights or obligations under the Asset Purchase Agreement).

111.    "*Recharacterized Principal*" means the amount of any interests and fees paid to the Holders of Term Loan B-1 Claims as adequate protection under the Financing Orders for the Term Loan B-1 Claims.

112.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

113.    "*Released Party*" means each of the following in their capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Debtors' current and former officers, directors, and managers; (c) the Credit Agreement Primary Agent; (d) the DIP Lenders; and (e) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case solely in their capacity as such; *provided* that any Holder of a Claim or Interest that elects to "opt out" of granting releases by timely objecting to the Plan's third-party release provisions shall not be a "Released Party."

114.    "*Releasing Party*" means, collectively, and in each case solely in its capacity as such:  (a) the Debtors and the Reorganized Debtors; (b) the Credit Agreement Primary Agent; (c) the DIP Lenders; (d) each Holder of a Claim or Interest entitled to vote to accept or reject the Plan that (i) votes to accept the Plan or (ii) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; (e) each Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan; (f) each Holder of a Claim or Interest that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; and (g) with respect each of the foregoing Entities described in clauses (a) through (f), such Entities' current and former affiliates, and such Entities' and such affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, officers, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns.

115.    "*Reorganized Debtors*" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including Reorganized Shopko.

116.    "*Reorganized Shopko*" means either:  (a) Shopko, or any successor thereto, as reorganized pursuant to and under the Plan; or (b) a new corporation or limited liability company designated by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Shopko Interests to be distributed or sold pursuant to the Plan, or any other successor to the foregoing, including the Purchaser.

117.    "*Reorganized Shopko Board*" means the New Board of Reorganized Shopko on and after the Effective Date.

118.    "*Restructuring*" means the restructuring of the Debtors on the terms of the Plan.

119.    "*Restructuring Documents*" means the Plan, the Disclosure Statement, the Plan Supplement, and the various agreements and other documents formalizing or implementing the Plan and the transactions contemplated thereunder.

120.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors reasonably determine to be necessary to implement the Restructuring, as described in more detail in Article IV.B herein.

121.    "*Retained Causes of Action List*" means a list of all retained Claims and Causes of Action of the Debtors, identified in the Plan Supplement.

122.    "*Revolving Loan A*" means the total Revolving Loan A Commitments made pursuant to (and as defined in) the Credit Agreement, made by or on behalf of certain lenders for the ratable accounts of such lenders, pursuant to the Credit Agreement.

123.    "*Revolving Loan A Lenders*" means, collectively, the lenders providing loans and commitments under the Revolving Loan A.

124.    "*Revolving Loan A-1*" means the total Revolving Loan A-1 Commitments made pursuant to (and as defined in) the Credit Agreement, made by or on behalf of certain lenders for the ratable accounts of such lenders, pursuant to the Credit Agreement.

125.    "*Revolving Loan A-1 Lenders*" means, collectively, the lenders providing loans and commitments under the Revolving Loan A-1.

126.    "*Run-Out Claims*" means the employee healthcare claims that were incurred, but not submitted, processed and paid under the ASO Agreement prior to the rejection date of the ASO Agreement, if any.

127.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtors or the Reorganized Debtors, as applicable, pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan, which shall be in form and substance acceptable to the Debtors.

128.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan, which shall be in form and substance acceptable to the Debtors.

129.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

130.    "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

131.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim, in each case subject to the consent of the Credit Agreement Primary Agent.

132.    "*Secured Tax Claim*" means any Secured Claim against any of the Debtors that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

133.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

134.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

135.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

11

136.    "*Shopko*" means Specialty Retail Shops Holding Corp.

137.    "*Special Committee*" means the special committee created by the board of directors of Shopko.

138.    "*Spirit*" means Spirit Realty L.P., Shopko Note Holding, LLC, and their affiliates.

139.    "*Store Closing GOB Sales Order*" means the order of the Bankruptcy Court approving the Debtors' going out of business sales in accordance with section 363 of the Bankruptcy Code, entered on February 8, 2019 [Docket No. 364].

140.    "*Term Loans*" means, collectively, the Term Loan B and the Term Loan B-1.

141.    "*Term Loan B*" means the total Term Loan B Commitments made pursuant to (and as defined in) the Credit Agreement, made by or on behalf of certain lenders for the ratable accounts of such lenders, pursuant to the Credit Agreement.

142.    "*Term Loan B Claim*" means any Claim derived from or based upon the Term Loan B.

143.    "*Term Loan B Lenders*" means, collectively, the lenders providing loans and commitments under the Term Loan B.

144.    "*Term Loan B-1*" means the total Term Loan B-1 Commitments made pursuant to (and as defined in) the Credit Agreement made by or on behalf of Spirit for the ratable account of Spirit, pursuant to the Credit Agreement.

145.    "*Term Loan B-1 Agent*" means Spirit, in its capacity as administrative and collateral agent of the Term Loan B-1, on behalf of itself as a lender pursuant to the terms of the Credit Agreement and any replacement or successor agent on behalf of Spirit as the Term Loan B-1 lenders.

146.    "*Term Loan B-1 Claim*" means any Claim derived from or based upon the Term Loan B-1.

147.    "*Term Loan B-1 Lenders*" means, collectively, the lenders providing loans and commitments under the Term Loan B-1.

148.    "*Term Loan Claim*" means any Claim derived from or based upon the Term Loans.

149.    "*Term Loan Secured Claim*" means any Secured Term Loan Claim, which shall equal no more than the amount of the Term Loan Claims less the sum of the Allowed Surcharge and the Recharacterized Principal; *provided* that the Term Loan Secured Claim shall not be less than the amount of the Term Loan B Claims.

150.    "*Undeliverable Distribution Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIII.B hereof.

151.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Nebraska.

152.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

153.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

154.    "*Voting Deadline*" means March 29, 2019 at 5:00 p.m. (prevailing Central Time).

155.    "*Wind Down*" means the wind down and dissolution of the Debtors' Estates following the Effective Date as set forth in Article VIII.D hereof.

156.    "*Wind-Down Amount*" means Cash in an amount to be determined by the Debtors, which amount shall be funded by the Debtors and used by the Plan Administrator to fund the Wind Down.

157.    "*Wind-Down Budget*" has the meaning set forth in Article VII.A.2.

158.    "*Wind-Down Milestones*" means the deadlines, set forth in the Plan Supplement and approved by the Credit Agreement Primary Agent, by which the Plan Administrator must complete certain aspects of the Wind Down.

159.    "*Wind-Down Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIII.D.

B.    *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Debtors, the Reorganized Debtors, or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to

the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.        *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.        *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

G.        *Nonconsolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.        *Administrative Claims and Priority Tax Claims*

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim or Priority Tax Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim or Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Priority Claims Reserve.

The failure to object to Confirmation by a Holder of an Allowed Administrative Claim or Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, that the Holders of such Claims shall be

deemed to consent to the treatment on account of such Claims as provided herein. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

If the Asset Sale Restructuring occurs, any amounts remaining in the Priority Claims Reserve after payment of all Allowed Administrative Claims and all Allowed Priority Claims shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.G without any further action or order of the Bankruptcy Court.

B.      *Professional Compensation*

1.      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 45 days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Reorganized Debtors or the Plan Administrator, as applicable, shall pay the full unpaid amount of such Allowed Administrative Claim in Cash in accordance with the Wind Down Budget.

2.      Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all Allowed amounts owing to the Professionals have been paid in full, any amount remaining in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims will be paid by the Reorganized Debtors.

3.      Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.       Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash to the extent of the Wind Down Budget the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

C.       *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Agreement and Financing Orders, including principal, interest, fees, and expenses.

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction of the Allowed DIP Claims, each Holder of an Allowed DIP Claim: (i) if the Equitization Restructuring occurs, will either be:  (a) indefeasibly repaid in full in Cash on the Effective Date; or (b) with the consent of such Holder, receive its Pro Rata share of the Exit Facility; or (ii) if the Asset Sale Restructuring occurs, paid all Distribution Proceeds available for distribution under Article VIII.G hereof until such Allowed DIP Claims are Repaid in Full.  As used in this paragraph, "Repaid in Full" shall mean, in each case to the extent authorized by the Financing Orders: the indefeasible payment in full in Cash of all liquidated DIP Claims; the cancelation, backing, or cash collateralization of letters of credit under the Credit Agreements in accordance with the terms of the Financing Agreements (as defined in the DIP Agreement); or in the case of any contingent Obligations (as defined in the DIP Agreement), including any payments that have been provisionally credited to the Obligations and any continuing obligations (contingent or otherwise) that the Reorganized Debtors shall have furnished the Credit Agreement Primary Agent with cash collateral or an indemnification from a Person, and pursuant to terms and conditions, in each case which are satisfactory to the Credit Agreement Primary Agent; Reorganized Debtors shall have furnished the Credit Agreement Primary Agent with cash collateral in an amount satisfactory to the Credit Agreement Primary Agent in its discretion to secure payment of liabilities in respect of matters or circumstances known to Credit Agreement Primary Agent at the time which are reasonably expected to result in any actual loss, cost, damage or expense (including attorneys' fees and legal expenses) to the Credit Agreement Primary Agent or any DIP Lender; and the termination of the Agent's and DIP Lenders' obligation to extend credit under the Financing Agreements (as defined in the DIP Agreement).

D.       *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors.  On and after the Effective Date, to the extent applicable, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.       *Summary of Classification*

Claims and Interests, except for DIP Claims, Administrative Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that

any portion of the Claim or Interest qualifies within the description of such other Classes. Except as otherwise provided in this Plan, a Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

1.      Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Impaired | Entitled to Vote |
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote |
| 7 | Interests in Shopko | Impaired | Deemed to Reject |
| 8 | Section 510(b) Claims | Impaired | Deemed to Reject |

B.      *Treatment of Claims and Interests*

Subject to Article VI hereof, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims

a.      *Classification*: Class 1 consists of Other Secured Claims against any Debtor.

b.      *Treatment*: Each Holder of an Allowed Other Secured Claim will receive, at the Debtors' election: (a) payment in full in Cash, which may come from the Other Secured Claims Reserve; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired.

c.      *Voting*: Class 1 is Unimpaired. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

a.      *Classification*: Class 2 consists of Other Priority Claims.

b.      *Treatment*: Each Holder of an Allowed Other Priority Claim will receive its Pro Rata share of the Priority Claims Reserve. The failure to object to Confirmation by a Holder

of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

    c.    *Voting*:  Class 2 is Impaired.  Holders of Other Priority Claims are entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Term Loan Secured Claims</u>

    a.    *Classification*:  Class 3 consists of all Term Loan Secured Claims.

    b.    *Treatment*:  If the Equitization Restructuring occurs, each Holder of an Allowed Term Loan Secured Claim will receive its share of, in accordance with section 6.4 of the Credit Agreement:  (a)(i) Cash equal to the outstanding amount of the Term Loan B Claim; *plus* (ii) Cash in an amount equal to (x) the amount of Cash on hand as of the Effective Date, less (x) the Minimum Liquidity Threshold and (y) the amount of Cash necessary to make distributions to Holders of all Allowed Claims pursuant to Article II hereof (including the funding of the Professional Fee Escrow Account) and Holders of Allowed Other Secured Claims and Holders of Allowed Other Priority Claims pursuant to Article III hereof, *provided* that the amount set forth in clause (ii) shall not exceed the amount of the Term Loan B-1 Claim; or (b) as agreed by such Holder of an Allowed Term Loan Secured Claim and the Debtors, its Pro Rata share of the Exit Facility.

If the Asset Sale Restructuring occurs, each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of the Distribution Proceeds available for distribution to Holders of Allowed Term Loan Secured Claims from time to time as provided in Article VIII.G hereof, until such Allowed Term Loan Secured Claims are paid in full.

    c.    *Voting*:  Class 3 is Impaired.  Holders of Allowed Term Loan Secured Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – General Unsecured Claims</u>

    a.    *Classification*:  Class 4 consists of all General Unsecured Claims.

    b.    *Treatment*:  If the Equitization Restructuring occurs, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of, at the election of the Debtors, either (a) 100 percent of the New Shopko Interests, subject to dilution by the Plan Sponsor Investment and the Management Incentive Plan, or (b) its Pro Rata share of the GUC Equitization Reserve in one or more distributions.

If the Asset Sale Restructuring occurs, each Holder of a General Unsecured Claim will receive its Pro Rata share of the Distribution Proceeds as provided in Article VIII.G hereof.

    c.    *Voting*:  Class 4 is Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – Intercompany Claims</u>

    a.    *Classification*:  Class 5 consists of all Intercompany Claims.

    b.    *Treatment*: Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors;

*provided* that no distributions shall be made on account of any such Intercompany Claims.

    c.    *Voting*: Class 5 is either Unimpaired, and the Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and the Holders of Allowed Intercompany Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Intercompany Interests</u>

    a.    *Classification*: Class 6 consists of all Intercompany Interests.

    b.    *Treatment*: Each Allowed Intercompany Interest shall be Reinstated for administrative convenience or canceled and released without any distribution on account of such interests at the option of the Debtors.

    *Voting*: Class 6 is either Unimpaired, and the Holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and the Holders of Allowed Intercompany Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7 – Interests in Shopko</u>

    a.    *Classification*: Class 7 consists of all Interests in Shopko.

    b.    *Treatment*: Each Allowed Interest in Shopko shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Shopko shall be entitled to any recovery or distribution under the Plan on account of such Interests.

    c.    *Voting*: Class 7 is Impaired. Holders of Interests in Shopko are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

8.    <u>Class 8 – Section 510(b) Claims</u>

    a.    *Classification*: Class 8 consists of all Section 510(b) Claims.

    b.    *Treatment*: Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist.

    c.    *Voting*: Class 8 is Impaired. Holders of Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims and Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XII hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

G.      *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN[2]

A.      *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

---

[2]     The Special Committee, with the assistance of its counsel and advisors, is currently undertaking an investigation into Estate claims and Causes of Action. The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, and the Debtors reserve all rights and claims with respect thereto.

B.      *Restructuring Transactions*

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including:  (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Restructuring Transactions; (e) all transactions necessary to provide for the purchase of substantially all of the assets of, or Interests in, any of the Debtors by one or more Entities to be wholly owned by Reorganized Shopko or any other Entity pursuant to the Asset Purchase Agreement, which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C.      *Cancelation of Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised.

D.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the Asset Sales, or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

E.      *Surcharge*

The Debtors or Reorganized Debtors shall file a separate motion for an order of the Bankruptcy Court approving, pursuant to section 506(c) of the Bankruptcy Code, the Allowed Surcharge.

F.      *Asset Sales*

On the Effective Date, the Debtors shall consummate the Asset Sales, if any, and, among other things, the acquired assets, as set forth in the Asset Purchase Agreement, shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Asset Purchase Agreement and Confirmation Order.  The Purchaser shall be deemed not to be a successor of the Debtors.  On the Effective Date, the Purchaser shall pay to the Debtors the proceeds from the Asset Sales, as and to the extent provided for in the Asset Purchase Agreements.  The Confirmation Order shall:  (a) approve the Asset Purchase

Agreement; and (b) authorize the Debtors or Reorganized Debtors, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

G.    *The Equitization Restructuring*

Unless otherwise determined by the Debtors before the Confirmation Hearing in consultation with the Credit Agreement Primary Agent, the Debtors shall effectuate the Equitization Restructuring. The following provisions shall govern the Equitization Restructuring.

1.    Sources of Consideration for Plan of Reorganization Distributions

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, and the New Shopko Interests.

2.    Issuance and Distribution of New Shopko Interests

On the Effective Date, the Reorganized Debtors shall issue the New Shopko Interests to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan. The issuance of New Shopko Interests under the Plan, as well as options, or other equity awards, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims.

On the Effective Date, Holders of New Shopko Interests shall be parties to the New Stockholders' Agreement, in substantially the form included in the Plan Supplement. On the Effective Date, Reorganized Shopko shall enter into and deliver the New Stockholders' Agreement to each Entity that is intended to be a party thereto, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Shopko Interests shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Shopko.

3.    Exit Facility

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, if any. Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facility.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (i) shall be deemed to be granted, (ii) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents, and (iv) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings

that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

4.      Plan Sponsor Investment

On the Effective Date, the Plan Sponsor shall consummate the Plan Sponsor Investment, if any, in exchange for up to 100 percent of the New Shopko Interests, subject to dilution by Management Incentive Plan. The Cash received from the Plan Sponsor Investment shall be contributed to the Reorganized Debtors on the Effective Date.

5.      Corporate Existence

Except as otherwise provided in the Plan, the New Organizational Documents, the New Stockholders' Agreement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

6.      Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Asset Purchase Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, in each case to the extent of the Credit Agreement Primary Agent's consent, on the Effective Date, all property in each Estate, and all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan or the Asset Purchase Agreement, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

7.      Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the entry into the Exit Facilities and the incurrence of credit thereunder; (4) the adoption of the Management Incentive Plan by the Reorganized Shopko Board; (5) the issuance and distribution of the New Shopko Interests; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facilities, the New Shopko Interests, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

8.      New Organizational Documents

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents.

9.      Directors and Officers of the Reorganized Debtors

As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire, and the New Boards and new officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor. The identities of the Reorganized Shopko Board shall be included in the Plan Supplement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Boards, as well as those Persons that will serve as officers of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the New Boards will be disclosed in the New Organizational Documents.

10.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the New Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Shopko Interests, and the Exit Facilities, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

11.     Preservation of Causes of Action

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in the Reorganized Debtors' sole discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the

exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

12.    Management Incentive Plan

The Reorganized Shopko Board will be authorized to implement the Management Incentive Plan.  The Management Incentive Plan shall provide for the issuance of options and/or equity based compensation to certain members of management of Reorganized Shopko.  New Shopko Interests representing up to 10 percent of the New Shopko Interests outstanding as of the Effective Date on a fully-diluted basis shall be reserved for issuance in connection with the Management Incentive Plan.

13.    Employee Obligations

On the Effective Date, the Debtors shall be deemed to have assumed each of the written contracts, agreements, policies, programs and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs, and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors (but excluding any severance agreements with any of Debtors' former employees).

14.    Reporting Upon Emergence

On the Effective Date, none of the New Shopko Interests will be registered under the Securities Act or the Securities Exchange Act or listed on a national securities exchange, Reorganized Shopko will not be a reporting company under the Securities Exchange Act, Reorganized Shopko shall not be required to and will not file Securities Exchange Act reports with the Securities and Exchange Commission or any other entity or party, and Reorganized Shopko shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date. In order to prevent Reorganized Shopko from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, a separate agreement or Reorganized Shopko's organizational documents may impose certain trading restrictions, and the New Shopko Interests may be subject to certain transfer and other restrictions designed to maintain Reorganized Shopko as a private, non-reporting company.

Notwithstanding the foregoing in this Section 11, from and after the Effective Date, Reorganized Shopko shall be required to provide (via separate agreement or in its organizational documents) to its shareholders audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP (no SAS 100 review, compliance with any other requirement of Regulation S-X under the Securities Act or narrative disclosure required to be provided by reporting companies under the Securities Exchange Act in periodic or other reports (including a Management's Discussion and Analysis of Financial Condition and Results of Operations) is required in connection with the delivery of the required financial statements).  Reorganized Debtors may also be required to provide certain financial information to other parties pursuant to contracts that are in effect on or after the Effective Date.

H.    *The Asset Sale Restructuring*

If the Asset Sale Restructuring occurs, the following provisions shall govern.

1.    Vesting of Assets

Except as otherwise provided in the Plan, the Asset Purchase Agreement, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the

Plan or the Plan Supplement, in each case to the extent of the Credit Agreement Primary Agent's consent, on the Effective Date, the assets of the Debtors shall vest in the Reorganized Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances; *provided* that, after funding the Professional Fee Escrow Account, the collateral, or proceeds of sales of such collateral, of the Reorganized Debtors securing the DIP Claims, Prepetition ABL Claims, and Term Loan Claims shall remain subject to the liens and claims of the Credit Agreement Primary Agent and Lenders (as defined in the DIP Agreement) to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets until such DIP Claims, Prepetition ABL Claims, and Term Loan Claims are Repaid in Full pursuant to Article II.C.  On and after the Effective Date, except as otherwise provided for in the Plan, the Financing Orders, or the Asset Purchase Agreement, the Debtors and the Reorganized Debtors may operate their business and use, acquire, or dispose of property in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action with the prior written consent of the Credit Agreement Primary Agent.

2.    Sources of Consideration for Plan Distributions

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreements, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Reorganized Debtors and shall be subject to administration by the Plan Administrator in consultation with the Credit Agreement Primary Agent.

3.    Reorganized Debtors

On and after the Effective Date, the Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget and Wind-Down Milestones, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) establishing and funding the Distribution Reserve Accounts in accordance with the Wind-Down Budget, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Asset Purchase Agreement, if any, and the Financing Orders (as applicable), and (h) administering the Plan in an efficacious manner.  The Reorganized Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, Financing Orders (as applicable) and (iii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

4.    Plan Administrator

The Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or sale director of the Reorganized Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Debtors, and shall succeed to the powers of the Reorganized Debtors' managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors. The foregoing shall not limit the authority of the Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtors and the Purchaser.

5.    Financing Orders

Subject to the funding of the Professional Fee Escrow Account, notwithstanding anything to the contrary set forth in the Plan, Plan Supplement, Confirmation Order or otherwise, the Liens, claims, and rights of the Credit Agreement Primary Agent and DIP Lenders set forth in the Financing Orders shall continue in full force and effect on and after the Effective Date until all DIP Claims and Term Loan Claims are paid in full in Cash or otherwise satisfied with the consent of the Holder of such Claim.

6.      Dissolution and Board of the Debtors

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to its affairs. Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall:  (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of Shopko under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of Shopko or any of its affiliates.

7.      Release of Liens

Except as otherwise expressly provided herein, on the Effective Date, all Liens on any property of any Debtors or the Reorganized Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Reorganized Debtors shall be automatically discharged and released; *provided* that notwithstanding anything to the contrary set forth in this Plan, subject to the funding of the Professional Fee Escrow Account, (a) all Liens of the Credit Agreement Primary Agent and Lenders (as defined in the DIP Agreement) on any property of any Debtors or the Reorganized Debtors shall remain valid, binding, and in full effect on and after the Effective Date, (b) all property of the Debtors and Reorganized Debtors shall remain subject to the Liens and claims of the Credit Agreement Primary Agent and Lenders and shall continue to secure all Obligations (as defined in the DIP Agreement) owing to the Credit Agreement Primary Agent and Lenders, and (c) all guarantees of any Debtors or the Reorganized Debtors in favor of the Credit Agreement Primary Agent or Lenders shall be reaffirmed and remain in full force and effect.

8.      Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (a) consummation of the Asset Sales; and (b) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan or corporate structure of the Debtors or Reorganized Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements,

27

documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

9.      Effectuating Documents; Further Transactions

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Reorganized Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

10.     Preservation of Causes of Action

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the Plan Administrator all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of the Plan. The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan; *provided* that the Debtors, in consultation with the Plan Administrator after the Effective Date, may prosecute any such Cause of Action against any party only in connection with their objection to and resolution of any Claim asserted by such party. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Plan Administrator reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

11.     Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Shopko, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Shopko.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Shopko in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

If the Equitization Restructuring occurs, on the Confirmation Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, not to be unreasonably withheld, and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.  Except as otherwise provided in the Plan, the Debtors shall assume, assume and assign, or reject, as the case may be, Executory Contracts and Unexpired Leases set forth in the applicable Schedules in the Plan Supplement.  Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order.  Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.

If the Asset Sale Restructuring occurs, on the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the latest to occur of: (1) 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) 30 days after the Debtors provide notice of surrender of possession to a landlord of a rejected lease where surrender occurs after entry of an order approving such rejection; and (3) 30 days after notice of any rejection that occurs after the Effective Date.  **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the**

**Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Reorganized Debtors, or the property for any of the foregoing without the need for any objection by the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**   Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

If an Equitization Restructuring occurs, counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Bankruptcy Court, pursuant to the Bankruptcy Court order approving the Disclosure Statement, as soon as reasonably practicable following entry of the Bankruptcy Court order approving the Disclosure Statement.

C.    *Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors, the Purchaser, or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment. Notwithstanding the foregoing, nothing herein shall prevent the Reorganized Debtors from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court or in the Asset Purchase Agreement, at least seven days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim.  To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of, the Bankruptcy Court.

D.    *Indemnification Obligations*

All indemnification obligations in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents,

board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose. All indemnification obligations of the Debtors arising under or pursuant to the Credit Agreement, DIP Agreement, or any other of the Financing Agreements in place as of the Effective Date shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

E.       *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

F.       *Run-Out Claims*

No later than five (5) business days prior to the earlier of (i) the Plan objection deadline, and (ii) the Voting Deadline, the Debtors shall provide Cigna Health and Life Insurance Company with written notice of its decision as to whether or not the Debtors propose to assume or reject the ASO Agreement under the Plan.  Such decision shall be revocable only with the consent of Cigna Health and Life Insurance Company, provided such consent cannot be unreasonably withheld.

 If the Debtors propose to reject the ASO Agreement, such notice shall include the Debtors' decision as to whether: (i) the payment of Run-Out Claims prior to the effective date of rejection of the ASO Agreement will continue to be funded by the Debtors or a successor thereto during the twelve (12) month period following such rejection, and the source of such funding; or (ii) the payment of Run-Out Claims will not be funded, in which case such notice shall include the name and contact information of a representative of the Debtors or their successor to whom Cigna Health and Life Insurance Company can direct inquiries from former employees whose healthcare claims will not be paid.  Such decision shall be revocable only with the consent of Cigna Health and Life Insurance Company, provided such consent cannot be unreasonably withheld.

Pursuant to the *Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 98] and corresponding motion [Docket No. 23], the Debtors are authorized to pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs (as defined in such motion) in the ordinary course of business and continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto.  Such Employee Compensation and Benefits Programs included health insurance programs and medical plans such as the ASO Agreement.  Thus, until the Effective Date the Debtors have the authority to pay such Run-Out Claims. To the extent there are Run-Out Claims that were incurred before the Petition Date but have not yet been paid, such claimants may submit a Proof of Claim. To the extent a Run-Out Claim was incurred from the Petition Date to the Effective Date but has not yet been paid, claimants may submit a request for payment of an Administrative Claim.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VI.
# PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (or such Holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent*

Distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent*

      1.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities subject to the Wind-Down Budget (as applicable); and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

      2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out of pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors to the extent such fees and expenses are set forth in the Wind-Down Budget.(as applicable).

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

      1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

      2.      Delivery of Distributions

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims, except as otherwise provided in this Article VI, or Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent:  (a) to the signatory set forth on any of the Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Disbursing Agent, the Reorganized Debtors, or the Plan Administrator, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

      3.      No Fractional Distributions

No fractional shares of New Shopko Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Shopko Interests that is not a whole number, the actual distribution of shares of New Shopko Interests shall be rounded as follows:  (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Shopko Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

4.        Minimum Distributions

Holders of Allowed Claims entitled to distributions of $100 (whether Cash or otherwise) or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claim against the Debtors, the Reorganized Debtors or the Plan Administrator, as applicable, or their property.

5.        Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtor, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

E.        *Manner of Payment.*

Unless otherwise set forth herein, all distributions of Cash and the New Shopko Interests, as applicable, to the Holders of Allowed Claims under the Plan shall be made by the Disbursing Agent.  At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.        *Registration or Private Placement Exemption*

If a Equitization Restructuring occurs, the New Shopko Interests are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

Pursuant to section 1145 of the Bankruptcy Code, the issuances of the New Shopko Interests as contemplated by the Plan are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The New Shopko Interests (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of Reorganized Shopko as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of Title 11 of the United States Code.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Shopko Interests through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Shopko Interests or under applicable securities laws.  DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Shopko Interests issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the New Shopko Interests issued under the Plan are exempt from registration and/or eligible for DTC book entry delivery, settlement, and depository services.

G.        *Tax Issues and Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental

Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Plan Administrator, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors or the Plan Administrator, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

I.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim; provided that interest may accrue on the Prepetition ABL Claim, the DIP Claim and Term Loan B Claim in accordance with the terms of the DIP Agreement and Financing Orders until paid in full in Cash or otherwise satisfied with the consent of the Holder of such Claim.

J.      *Setoffs and Recoupment*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or their successors of any such Claim it may have against the Holder of such Claim.

K.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor, such Claim shall be Disallowed without an objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized Debtors on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such

insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court.

        3.        Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything herein to the contrary, nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## THE PLAN ADMINISTRATOR

The following provisions shall apply only if an Asset Sale Restructuring occurs and a Plan Administrator is appointed.

A.     *The Plan Administrator*

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and the Reorganized Debtors, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Reorganized Debtor in accordance with the Wind-Down Milestones and Wind-Down Budget; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Distribution Reserve Accounts in accordance with the Wind-Down Budget; (3) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Reorganized Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Reorganized Debtors; (7) administering and paying taxes of the Reorganized Debtors, including filing tax returns; (8) representing the interests of the Reorganized Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, in each case of the forgoing clauses (1-9) strictly in accordance with the Wind-Down Milestones and Wind-Down Budget. The Plan Administrator shall provide the Credit Agreement Primary Agent with all non-privileged budgets, records, projections, financial information, reports and other information that the Credit Agreement Primary Agent (or its consultants and advisors) may reasonably request.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator (which shall be acceptable to the Credit Agreement Primary Agent). Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Reorganized Debtors shall be terminated.

        1.        Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Milestones and Wind-Down Budget, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Reorganized Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

        2.        Wind-Down Budget

The Debtors shall include in the Plan Supplement, in form and substance satisfactory to Credit Agreement Primary Agent, a 13-week statement of cash receipts and disbursements (which shall include the funding of the Distribution Reserve Accounts and the Professional Fee Escrow) and amount of Term Loan Claims outstanding for the consecutive 13 weeks immediately following the Effective Date, setting forth as a weekly basis, the anticipated uses of the Distribution Proceeds (the "**Wind-Down Budget**", as may be updated, amended or modified from time to time with the written consent of the Credit Agreement Primary Agent). The Wind-Down Budget shall be filed with the Plan Supplement, and shall describe the rights and remedies of the Credit Agreement Primary Agent if the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, fail to comply with the Wind-Down Budget in any material aspect.

3.      Retention of Professionals

a.      The Plan Administrator shall have the right, subject to the Wind-Down Budget, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Reorganized Debtors from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator to the extent set forth in the Wind-Down Budget.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

b.      Until all Term Loan Claims are paid or otherwise satisfied in full, the Credit Agreement Primary Agent shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Credit Agreement Primary Agent, are necessary or desirable to assist the Credit Agreement Primary Agent.  The fees and expenses of such professionals shall be paid by the Reorganized Debtors from the Distribution Proceeds within five business days of submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Credit Agreement Primary Agent's retained professionals shall be made in the ordinary course of business from the Distribution Proceeds and shall not be subject to the approval of the Bankruptcy Court.

4.      Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

5.      Plan Administrator Expenses

All costs, expenses, and obligations incurred by the Plan Administrator in administering this Plan, the Reorganized Debtors, or in any manner connected, incidental, or related thereto, in effecting distributions from the Reorganized Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget.  Such costs, expenses, and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

B.     *Wind Down*

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Wind-Down Milestones and Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates in accordance with the Wind-Down Milestones and Wind-Down Budget.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (1) cause the Debtors and the Reorganized Debtors, as applicable, to comply with, and abide by, the terms of the Asset Purchase Agreement and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions in accordance with the Wind-Down Milestones and Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to the Reorganized Debtors as set forth herein, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  Notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

Notwithstanding anything to the contrary set forth in this Plan, the Plan Supplement, the Disclosure Statement or otherwise, at all times on and after the Effective Date through the date on which the Term Loan Claims are paid in full in Cash or otherwise satisfied with the consent of the Holder of such Claim, (i) the Debtors, the Reorganized Debtors, and the Plan Administrator shall maintain the cash management system of the Debtors (including all deposit accounts, as in effect immediately prior to the Effective Date, in all respects unless otherwise agreed in writing by the Credit Agreement Primary Agent); and (ii) assume, ratify, and reaffirm all agreements (including all deposit account control agreements) related to the deposit accounts of the Debtors, Reorganized Debtors, and Plan Administrator.

C.     *Exculpation, Indemnification, Insurance and Liability Limitation*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Reorganized Debtors.  The Plan Administrator may obtain, at the expense of the Reorganized Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Reorganized Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

Notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

D.     *Tax Returns*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code,

may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

E.      *Dissolution of the Reorganized Debtors*

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Reorganized Debtors shall be deemed to be dissolved without any further action by the Reorganized Debtors, including the filing of any documents with the secretary of state for the state in which the Reorganized Debtors is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Reorganized Debtors in and withdraw the Reorganized Debtors from applicable state(s).

## ARTICLE VIII.
## RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR

The following provisions shall apply only if an Asset Sale Restructuring occurs and a Plan Administrator is appointed.

A.      *Establishment of Reserve Accounts*

The Plan Administrator shall establish each of the Distribution Reserve Accounts (which may be affected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator).

B.      *Undeliverable Distribution Reserve*

1.      Deposits

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VI.D.5 of the Plan.

2.      Forfeiture

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within three months after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Reorganized Debtors, or their respective properties or assets. In such cases, any Cash or other property held by the Reorganized Debtors in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary, and shall promptly be transferred to the General Account to be distributed according to the priority set forth in Article VIII.G without any further action or order of the Bankruptcy Court; *provided* that any undeliverable or unclaimed distribution on account of an Allowed General Unsecured Claim shall be transferred to the GUC Asset Sale Reserve.

3.      Disclaimer

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Claim Holder or (ii) obtain an executed Internal Revenue Service Form W-9 from any Claim Holder; *provided* that, in his or her sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

4.      Distribution from Reserve

Within 15 Business Days after the Holder of an Allowed Claim satisfies the requirements of the Plan, such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution (*provided* that satisfaction occurs within the time limits set forth in Article VI.D.5 of the Plan), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, to the General Account.

C.      *Priority Claims Reserve*

On the Effective Date, following payment in full of all Prepetition ABL Claims, DIP Claims, and Term Loan Claims (up to the amount of the Term Loan B Claims), the Plan Administrator shall establish the Priority Claims Reserve by depositing Cash in the amount of the Priority Claims Reserve Amount into the Priority Claims Reserve in accordance with the Wind-Down Budget. The Priority Claims Reserve Amount shall be used to pay Holders of all Allowed Priority Claims and Allowed Administrative Claims (excluding Professional Fee Claims and DIP Claims) their respective Pro Rata share of the Priority Claims Reserve, to the extent that such Priority Claims and Administrative Claims have not been paid in full on or before the Effective Date. If all or any portion of a Priority Claim or Administrative Claim shall become a Disallowed Claim, then the amount on deposit in the Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Priority Claims Reserve, shall remain in the Priority Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Priority Claims Reserve is sufficient to ensure that all Allowed Priority Claims and Allowed Administrative Claims will be paid in accordance with the Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court. Any amounts remaining in the Priority Claims Reserve after payment of all Allowed Priority Claims and Allowed Administrative Claims (excluding Professional Fee Claims and DIP Claims) shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.G without any further action or order of the Bankruptcy Court.

D.      *Wind-Down Reserve*

On the Effective Date, the Plan Administrator shall establish the Wind-Down Reserve by depositing Cash, in accordance with the Wind-Down Budget, in the amount of the Wind-Down Amount into the Wind-Down Reserve. The Wind-Down Reserve shall be used by the Plan Administrator solely to satisfy the expenses of the Reorganized Debtors and the Plan Administrator as set forth in the Plan and Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Reorganized Debtors and the storage of records and documents shall constitute expenses of the Reorganized Debtors and shall be paid from the Wind-Down Reserve to the extent set forth in the Wind-Down Budget. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes. Any amounts remaining in the Wind-Down Reserve after payment of all expenses of the Reorganized Debtors and the Plan Administrator shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.G without any further action or order of the Court.

E.      *Other Secured Claims Reserve*

On the Effective Date, following payment in full of all Prepetition ABL Claims, DIP Claims, and Term Loan Claims (up to the amount of the Term Loan B Claims), the Plan Administrator shall establish the Other Secured Claims Reserve by depositing Cash, to the extent set forth in the Wind-Down Budget, in the amount of the Other Secured Claims Reserve Amount into the Other Secured Claims Reserve. The Other Secured Claims Reserve Amount shall be used to pay Allowed Other Secured Claims in accordance with the Wind-Down Budget. If all or any portion of an Other Secured Claim shall become a Disallowed Claim, then the amount on deposit in the Other Secured Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Other Secured Claims Reserve, shall remain in the Other Secured Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Other Secured Claims Reserve is sufficient to ensure that all Allowed Other Secured Claims will be paid in

accordance with the Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Court.  Any amounts remaining in the Other Secured Claims Reserve after satisfaction of all Allowed Other Secured Claims shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.G without any further action or order of the Court.

F.      *GUC Asset Sale Reserve*

On the Effective Date, following payment in full of all Prepetition ABL Claims, DIP Claims, and Term Loan Claims (up to the amount of the Term Loan B Claims), the Plan Administrator shall establish and thereafter maintain the GUC Asset Sale Reserve in a separate, segregated account by depositing the Distribution Proceeds allocated to General Unsecured Claims, pursuant to the priority set forth in Article VIII.G, into the GUC Asset Sale Reserve.  The Distribution Proceeds shall be used to pay Allowed General Unsecured Claims on a Pro Rata basis.  If all or any portion of a General Unsecured Claim shall become a Disallowed Claim, then the amount on deposit in the GUC Asset Sale Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the GUC Asset Sale Reserve, shall remain in the GUC Asset Sale Reserve and be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan.

Notwithstanding anything to the contrary herein, neither the Plan Administrator, the Reorganized Debtors, nor any other party in interest shall be obligated to fund the GUC Asset Sale Reserve in an aggregate amount in excess of the Distribution Proceeds.

G.      *Distribution Proceeds/Priority Waterfall*

After the funding of the Professional Fee Escrow Account and the Wind-Down Reserve, the Plan Administrator shall deliver to the Credit Agreement Primary Agent, on a daily basis, all Distribution Proceeds available for distribution from time to time to the Holders of Allowed DIP Claims pursuant to Article II.A hereof.

After the DIP Claims have been paid in full, the Plan Administrator shall deliver to the Credit Agreement Primary Agent, on a daily basis, all Distribution Proceeds available for distribution from time to time to the Holders of Allowed Term Loan Secured Claims, pursuant to Article III.B.3 hereof to be paid on account of, and pursuant to the priority set forth in the Credit Agreement, up to the amount of the Allowed Term Loan B Claims.

After the Term Loan Secured Claims have been paid pursuant to the priority set forth in the Credit Agreement, up to the amount of the Allowed Term Loan B Claims, the Distribution Proceeds shall be allocated and paid to the applicable Holders of Claims until paid in full from time to time in the following priority (in each case on a Pro Rata basis):  (i) *first*, on account of all Allowed Priority Claims and Allowed Administrative Claims, up to the amount of the Priority Claims Reserve and the Other Secured Claims Reserve; (ii) *second,* on account of all remaining Allowed Term Loan Secured Claims, and (iii) *third*, on account of any Allowed General Unsecured Claims.

H.      *The General Account and Distribution Reserve Account Adjustments*

Beginning on the first anniversary of the Effective Date or at such other times as the Plan Administrator shall determine as appropriate, and thereafter, on each anniversary of the Effective Date, the Plan Administrator shall determine the amount of Cash required to adequately maintain each of the Distribution Reserve Accounts (other than the GUC Asset Sale Reserve).  Other than with respect to amounts held in the GUC Asset Sale Reserve, if after making and giving effect to any determination referred to in the immediately preceding sentence, the Plan Administrator determines that any Distribution Reserve Account (i) contains Cash in an amount in excess of the amount then required to adequately maintain such Distribution Reserve Account, then at any such time the Plan Administrator shall transfer such surplus Cash to the General Account to be used or distributed according to the priority set forth in this Article VIII.H, or (ii) does not contain Cash in an amount sufficient to adequately maintain such Distribution Reserve Account (other than the GUC Asset Sale Reserve), then at any such time the Plan Administrator, with the prior consent of the Credit Agreement Primary Agent, shall transfer Cash from the General Account, to the extent Cash is available in the General Account until the deficit in such Distribution Reserve

Account is eliminated.  Any funds in the General Account not needed to eliminate a Distribution Reserve Account deficit shall be allocated and paid in the following priority (in each case on a Pro Rata basis): (v) *first*, on account of the DIP Claims that have not yet been paid in full; (w) *second*, on account of the Allowed Term Loan Secured Claims, and pursuant to the priority set forth in the Credit Agreement, up to the amount of the Allowed Term Loan B Claims; (x) *third*, on account of all Allowed Priority Claims and Allowed Administrative Claims; (y) *fourth*, on account of any remaining Allowed Term Loan Secured Claims; and (z) *fifth*, on account of all Allowed General Unsecured Claims.

**ARTICLE IX.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors or the Plan Administrator, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to:  (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  On and after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise.

C.      *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.    *Claims Reserve*

If the Equitization Restructuring occurs and the Debtors have elected for the Holders of Allowed General Unsecured Claims to receive their Pro Rata share of the GUC Equitization Reserve in accordance with Article III, following payment in full of the DIP Claims, Prepetition ABL Claims, and Term Loan Claims (up to the amount of the Term Loan B Claims), on the Effective Date, the Reorganized Debtors shall establish the GUC Equitization Reserve to be administered by the Reorganized Debtors.  As soon as practicable after the Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases have been filed, the Reorganized Debtors shall make a Pro Rata distribution to all Allowed General Unsecured Claims from the GUC Equitization Reserve using the amount of the total amount of Allowed and Disputed General Unsecured Claims as the denominator in calculating such Pro Rata distribution.  The Reorganized Debtors shall make one or more additional distributions to General Unsecured Claims, in their discretion, until all General Unsecured Claims have been resolved.  The Reorganized Debtors shall hold Cash in the GUC Equitization Reserve in the same Pro Rata share in trust for the benefit of the Holders of Disputed General Unsecured Claims.  Once all General Unsecured Claims have been resolved, the Reorganized Debtors shall make a final distribution in order to distribute the remaining Cash in the GUC Equitization Reserve Pro Rata to all Allowed General Unsecured Claims using the total amount of Allowed General Unsecured Claims as the denominator.  The Reorganized Debtors shall distribute all such amounts (net of any expenses, including any taxes relating thereto but excluding any legal fees or time of employees of the Reorganized Debtors associated with the reconciliation of such claims), as provided herein, as such Claims or Interests are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the GUC Equitization Reserve.

E.    *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, without an objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court.

F.    *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

G.    *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors or the Plan Administrator, as applicable.  All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors or the Plan Administrator, as applicable, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

H.    *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Reorganized Debtors, or the Plan Administrator, as applicable, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court to the maximum extent provided by applicable law.

I.    *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors or the Plan Administrator, as applicable.

J.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

# ARTICLE X.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS[3]

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, may compromise and settle any Claims and Causes of Action against other Entities.

B.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any

---

[3]    The Special Committee, with the assistance of its counsel and advisors, is currently undertaking an investigation into Estate claims and Causes of Action. The Debtors reserve all rights to modify the Plan, including the release provisions of the Plan, and the Debtors reserve all rights and claims with respect thereto.

liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

D.      **Release of Liens**

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.  If an Equitization Restructuring occurs pursuant to the Plan, then the Credit Agreement Primary Agent and the Term Loan B-1 Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtors that are subject to the Equitization Restructuring; *provided* that if an Asset Sale Restructuring occurs, then, subject to the funding of the Professional Fee Escrow Account, all Liens securing the Prepetition ABL Claims, DIP Claims, Term Loan Claims, or any other Obligations (as defined in the DIP Agreement) shall continue in full force and effect on and after the Effective Date and nothing in this Plan shall or shall be construed to release, discharge, relieve, limit or impair in any way the rights of any Holder of a Prepetition ABL Claims, DIP Claims, or Term Loan B Claim or any Lien securing any such Claim.**

E.      **Debtor Release**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, Plan Administrator, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, Plan Administrator, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

> **(a)     the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Documents;**

> **(b)     any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the**

45

reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the New Shopko Interests) pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth above, which includes by reference each of the related provisions and definitions contained herein, *and further,* shall constitute the Bankruptcy Court's finding that the releases set forth above are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases set forth above; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases set forth above against any of the Released Parties.

F.     *Release by Holders of Claims or Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor or Reorganized Debtor, as applicable, and other Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a)     the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the other Restructuring Documents;

(b)     any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(c)     the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)     the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release set forth above, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the third-party release set forth above is:   (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the third-party release set forth above against any of the Released Parties.

G.     *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the Exit Facility Credit Agreement, the Exit Facility Documents, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H.     *Injunction*

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or Reorganized Debtors, or the other Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind

47

**against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

I.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

J.      *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup against such Claim any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has provided notice of such recoupment in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

**ARTICLE XI.
CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article XI.B hereof):

1.      if the Equitization Restructuring occurs, all conditions precedent to the effectiveness of the Exit Facilities shall have been satisfied or duly waived;

2.      all conditions precedent to the effectiveness of the Asset Purchase Agreement, if any, shall have been satisfied or duly waived;

3.      the Confirmation Order shall have been duly entered in form and substance acceptable to Credit Agreement Primary Agent and in full force and effect;

4.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring;

5.       all Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and

6.       the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Plan.

B.       *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article XI may be waived only by consent of the Debtors and the Credit Agreement Primary Agent without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.       *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.       *Effect of Nonoccurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:   (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE XII.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.       *Modification and Amendments*

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.       *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.       *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any

Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to:  (a) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article X hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K.1 hereof;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine all disputes involving the Exit Facilities;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order closing the Chapter 11 Cases; and

25.     enforce the injunction, release, and exculpation provisions provided in Article X hereof.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article XI.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order, shall be immediately effective and enforceable and deemed binding upon the Debtors or Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or

compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

D.      *Reservation of Rights*

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

E.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to, the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      *Service of Documents*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

the Debtors:    Specialty Retail Shops Holding Corp.
700 Pilgrim Way
Green Bay, Wisconsin 54304
Attn.: Russ Steinhorst

with copies to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn.:  Patrick J. Nash, Jr., P.C. and Travis Bayer

-and-

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn.:  Steven Serajeddini and Daniel Rudewicz

-and-

McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Attn.:  James J. Niemeier

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.      *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or for a fee via PACER at: https://www.neb.uscourts.gov.

I.      *Nonseverability of Plan Provisions*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors, Reorganized Shopko, or Plan Administrator, as applicable, will have any liability for the violation of any

applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

K.      *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

Respectfully submitted, as of the date first set forth above,

SPECIALTY RETAIL SHOPS HOLDING CORP. (on behalf of itself and all other Debtors)

By:     */s/ Russell Steinhorst*
Name:    Russell Steinhorst
Title:    Chief Executive Officer

**<u>Exhibit B</u>**

**Corporate Structure Chart**





## Exhibit C

**Disclosure Statement Order**

*[Intentionally Omitted]*

## **Exhibit D**

**Financial Projections**

## FINANCIAL PROJECTIONS

The Debtors, with the assistance of their advisors, developed a set of pro forma financial projections for the period of fiscal years 2019, 2020, 2021, 2022, and 2023 (such projections, the "Financial Projections" and, such period, the "Projection Period") for the purpose of demonstrating feasibility of the Plan.

The Financial Projections present, to the best of the Debtors' knowledge, the Reorganized Debtors' projected financial position, results of operations, and cash flows during the Projection Period. Although management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, the Debtors can provide no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.

The Financial Projections are based upon management's internal view of projected financial performance conducted before the filing of these Financial Projections and may differ methodologically from historical public reporting by the Debtors (*e.g.*, the Financial Projections herein break out costs associated with corporate buying and occupancy, while historical public reporting did not).

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, and that Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

Under Accounting Standards Codification "ASC" 852, "Reorganizations", the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon emergence. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the impact to the Financial Projections. When the Debtors fully implement fresh start accounting, differences are anticipated and such differences could be material.

## General Assumptions

1. **Plan Terms and Consummation.** The Financial Projections assume the reorganization will be consummated as of the Effective Date, which for modeling purposes is assumed to occur in April of 2019.

2. **Reorganized Footprint.** The Financial Projections assume a reorganized footprint of 120 stores and 61 standalone optical locations. Store closures are assumed to take place during the pendency of the Chapter 11 Cases and proceeds from store liquidations are reflected in pre-emergence assumptions.

3. **Macroeconomic Factors.** The Financial Projections assume that general economic conditions will not change significantly during the time period in question.

**Operating Assumptions**

4. **Sales.** The Debtors realize revenue through the following channels:

   a. **Retail Stores**:  Sales from the Reorganized Debtors' footprint of retails stores accounts for approximately 88.6% of annual revenues over the Projection Period.

   b. **Standalone Optical Stores**:  Sales from the Reorganized Debtors' standalone optical stores accounts for ~11.4% of annual revenues over the Projection Period.

   c. **Web**:  Ecommerce revenue for the sale and distribution of products are embedded in both retail store and standalone optical store revenues and account for less than 2% of annual revenues over the Projection Period.

5. **Growth Assumptions.** Same-store-sales growth rates for retail stores and standalone optical stores are projected based on historical performance and recent trends.

6. **Gross Margin.** Projected gross margin is based on historical performance, adjusted to reflect select performance improvement initiatives.

7. **Occupancy.** Projected occupancy is based on historical performance of the reorganized footprint and incorporates assumed cost-savings resulting from ongoing landlord negotiations.

8. **SG&A.** Incorporates store and corporate SG&A, marketing expenses, distribution expenses, buying and other corporate expenses. SG&A is forecasted based on historical needs and adjusted for the reorganized footprint and inflationary adjustments.

9. **EBITDA.** For purposes of the Financial Projections, EBITDA is defined as earnings before interest expense, income tax provision, depreciation and amortization.

10. **Interest.** Post-reorganization interest expense reflects cash interest payments on the post-emergence debt and debt-like obligations.

11. **Income Taxes.** The Financial Projections assume no cash income taxes as the Debtors believe that existing net operating losses from previous years are sufficient to cover the gains during the projection period.

*Financial Projections*

The Financial Projections prepared by the Debtors are summarized in the following table.

The Debtors do not publish projections of its anticipated financial position or results of operations.  Unless otherwise required by securities law, the Debtors will not:

- furnish updated projections, or

- make updated information concerning the Financial Projections publicly available.

The Debtors believe the Financial Projections represent the most probable range of operating results and financial position and that the estimates and assumptions underlying the projections are reasonable. The estimates and assumptions may not be realized, however and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond its control. The Debtors have not made any determinations with respect to any operational or strategic assumptions that differ by any material measure from the assumptions set forth in the Financial Projections, and do not expect to in advance of the Effective Date, but instead expect to continue to evaluate these areas in light of the evolving facts and circumstances of the Debtors' business through and after the Effective Date. As a result, no representations can be or are made as to whether the actual results will be within the range set forth in the Financial Projections. Some assumptions inevitably will not materialize, and events and circumstances occurring subsequent to the date on which the Financial Projections were prepared may be different from those assumed or may be unanticipated, and therefore may affect financial results in a material and possibly adverse manner. The Financial Projections, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur. Further, various operational or strategy inputs are subject to change at any time, including during the course of the Chapter 11 Cases. In addition, negotiations with landlords remain ongoing, therefore, the number of store closures may differ from the projections subject to those negotiations.

THE DEBTORS' BOARD OF DIRECTORS WAS NOT ASKED TO AND DID NOT APPROVE THE FINANCIAL PROJECTIONS OR EVALUATE OR ENDORSE THE PROJECTIONS OR THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS. MOREOVER, THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE DEBTORS' INDEPENDENT AUDITOR HAS NOT EXAMINED, COMPILED OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS CONTAINED IN THIS EXHIBIT AND, ACCORDINGLY, IT DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE ON SUCH INFORMATION OR ITS ACHIEVABILITY. THE DEBTORS' INDEPENDENT AUDITOR ASSUMES NO RESPONSIBILITY FOR, AND DENIES ANY ASSOCIATION WITH, THE PROSPECTIVE FINANCIAL INFORMATION.

The Debtors do not intend to and disclaim any obligation to: (1) furnish updated Financial Projections to holders of Claims or Interests before the Effective Date or to any other party after the Effective Date; (2) include any such updated information in any documents that may be required to be filed with the Securities and Exchange Commission; or (3) otherwise make such updated information publicly available.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any

obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

**Shopko**
**Disclosure Statement P&L**
**($ in 000s)**

| | Forecast Period | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 |
| 1) Sales | 798,830 | 791,426 | 791,609 | 798,789 | 809,388 |
| 2) Cost of Sales | 514,887 | 506,654 | 504,973 | 509,703 | 516,766 |
| 3) Gross Margin | 283,943 | 284,772 | 286,637 | 289,086 | 292,622 |
| 4) Misc. & Rental Income | 9,239 | 9,210 | 9,220 | 9,273 | 9,338 |
| 5) Store Expense Less Depreciation | 199,195 | 199,269 | 199,939 | 201,187 | 202,702 |
| 6) 4 - Wall Contribution | 93,986 | 94,713 | 95,918 | 97,173 | 99,258 |
| 7) G&A Expense | 50,640 | 51,069 | 51,518 | 51,986 | 52,473 |
| 8) **EBITDA** | **43,346** | **43,643** | **44,400** | **45,187** | **46,786** |
| 9) D&A | 17,667 | 17,667 | 17,667 | 17,667 | 17,667 |
| 10) Interest | 17,771 | 16,628 | 15,016 | 13,308 | 11,819 |
| 11) Taxes | - | - | - | - | - |
| 12) Net Income | 7,908 | 9,349 | 11,717 | 14,212 | 17,299 |

## **Exhibit E**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS[1]

## Introduction

Under the "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a chapter 11 plan unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests test, the Debtors, with the assistance of their restructuring advisors, Berkeley Research Group, LLC, have prepared this hypothetical liquidation analysis (this "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and accompanying notes to this Liquidation Analysis.

This Liquidation Analysis compares the estimated range of recovery values for each Class of Claims and Interests under the Asset Sale Restructuring and a hypothetical chapter 7 liquidation, each of which the Debtors believe would be lower than the corresponding recovery values under the Equitization Restructuring.  As illustrated by this Liquidation Analysis, no Holder of a Claim or Interest would receive or retain property under either restructuring option described in the the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code.

## Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  Furthermore, the restructuring options described in the Plan are subject to the conclusion of the marketing process described in the *Debtors' Motion for Entry of Orders (I) Establishing Bidding Procedures for the Pharmacy Assets, (II) Approving the Transactions, and (III) Granting Related Relief* [Docket No. 27] and *Debtors' Motion for Entry of an Order (I) Establishing the Bidding Procedures for Plan Sponsors and (II) Granting Related Relief* [Docket No. 38].  This Liquidation Analysis was prepared for the sole purpose of generating a reasonable and good faith estimate of the recoveries that would result if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code and is not intended and should not be used for any other purpose.  This Liquidation Analysis does not include estimates for: (i) the tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets or (ii) certain claims that may be entitled to priority under the Bankruptcy Code,

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement.

including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code. More specific assumptions are detailed in the notes below.  The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of claims against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the chapter 7 case.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN.  THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements to account for other known liabilities, as necessary.  In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind down costs and trustee fees.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.   NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THIS LIQUIDATION ANALYSIS.

### Basis of Presentation

This Liquidation Analysis assumes an effective date of the Plan on or about April 15, 2019 (the "Effective Date").  The chapter 7 liquidation portion of this Liquidation Analysis also assumes that the Debtors converted their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about April 15, 2019 (the "Liquidation Date").  This Liquidation Analysis assumes that on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates, during which time all of the assets of the Debtors (the "Liquidating Entities") would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law.

This Liquidation Analysis utilizes the book values of the Debtors' assets and liabilities as of December 31, 2018 as a starting point, or more recent values where available.  The Debtors' management team believes that the December 31, 2018 book value of assets and certain liabilities are a proxy for such book values as of the Liquidation Date.  The Debtors have also projected cash

3

balances, merchandise inventory, Revolver A, Revolver A-1, Term B Loan, Term B-1 Loan, letters of credit, and DIP Facility and certain administrative and unsecured claim balances forward to the Liquidation Date.  This Liquidation Analysis assumes operations of the Liquidating Entities will cease and the related individual assets will be sold in a rapid sale under a three-month store liquidation process (the "Liquidation Timeline") under the direction of the Trustee, utilizing the Debtors' resources and third-party advisors, to allow for the orderly wind down of the Debtors' estates.  There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously possible (generally at distressed prices), consistent with the best interests of parties-in-interest.  This Liquidation Analysis is also based on the assumptions that:  (i) the Debtors have continued access to cash collateral during the course of the Liquidation Timeline to fund Wind Down Expenses and (ii) store expenses, accounting, treasury, IT, and other management services needed to wind down the estates continue.  This Liquidation Analysis was analyzed on a legal entity basis but is presented on a consolidated basis for ease of presentation and because there is no material difference to the recoveries of any Class of Claims or Interests under either methodology.

## Conclusion

The proceeds from the hypothetical liquidation of all assets of each Debtor were estimated based on the assumptions discussed herein, and then applied to the estimated values of Claims against each such Debtor to determine liquidation recovery estimates for each Class of Claims and Interests under the Plan.  These liquidation recovery estimates were compared to the estimated recoveries under the Plan, including the Equitization Restructuring and the Asset Sale Restructuring.  As shown in the table below, for each Class of Claims or Interests, liquidation under chapter 7 of the Bankruptcy Code would yield recoveries that are no better—and, in many cases, worse—than the recoveries available pursuant to either restructuring option described in the Plan.

**Shopko**
**Liquidation Analysis**
**($ in 000s)**

| | Note | Class | Estimated Value 3/5/2019 | Chapter 11 Recovery % Low | Mid | High | Chapter 11 Recovery $ Low | Mid | High | Chapter 7 Recovery % Low | Mid | High | Chapter 7 Recovery $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Liquidation Value of Borrowing Base Assets** | | | | | | | | | | | | | | | |
| Inventory | 1 | | 323,220 | 84.2% | 89.2% | 94.2% | 272,176 | 288,337 | 304,498 | 75.8% | 80.3% | 84.8% | 244,959 | 259,504 | 274,048 |
| Store Receivables | 2 | | 7,012 | 90.0% | 95.0% | 100.0% | 6,311 | 6,661 | 7,012 | 90.0% | 95.0% | 100.0% | 6,311 | 6,661 | 7,012 |
| Net Property and Equipment | 3 | | 20,753 | 60.0% | 70.0% | 80.0% | 12,452 | 14,527 | 16,602 | 54.0% | 63.0% | 72.0% | 11,207 | 13,074 | 14,942 |
| Liquidation Value of Borrowing Base Assets | | | 350,984 | | | | 290,939 | 309,526 | 328,113 | | | | 262,476 | 279,239 | 296,003 |
| **Liquidation Value of All Other Assets** | | | | | | | | | | | | | | | |
| Cash & Cash Equivalents | 4 | | 1,836 | 100.0% | 100.0% | 100.0% | 1,836 | 1,836 | 1,836 | 100.0% | 100.0% | 100.0% | 1,836 | 1,836 | 1,836 |
| Other Current Assets | 5 | | 13,495 | 40.0% | 50.0% | 75.0% | 5,398 | 6,748 | 10,121 | 2.5% | 5.0% | 7.5% | 337 | 675 | 1,012 |
| All Other Assets | 6 | | 35,523 | 2.5% | 7.5% | 15.0% | 888 | 2,664 | 5,328 | 2.5% | 5.0% | 7.5% | 888 | 1,776 | 2,664 |
| Asset Collateral for Other Secured Claims | 7 | | 15,631 | 100.0% | 100.0% | 100.0% | N/A | N/A | N/A | 100.0% | 100.0% | 100.0% | N/A | N/A | N/A |
| Liquidation Value of Other Assets | | | 66,486 | | | | 8,123 | 11,248 | 17,286 | | | | 3,062 | 4,287 | 5,513 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | | | | 299,062 | 320,774 | 345,399 | | | | 265,538 | 283,527 | 301,515 |
| Chapter 7 Trustee Fees | 8 | | | N/A | N/A | N/A | N/A | N/A | N/A | 100.0% | 100.0% | 100.0% | 7,966 | 8,506 | 9,045 |
| Wind Down Costs | 9 | N/A | 17,500 | 100.0% | 100.0% | 100.0% | 19,250 | 17,500 | 13,125 | 100.0% | 100.0% | 100.0% | 19,250 | 17,500 | 13,125 |
| Employee Costs | 10 | N/A | 5,779 | 100.0% | 100.0% | 100.0% | 6,357 | 5,779 | 5,201 | 100.0% | 100.0% | 100.0% | 6,357 | 5,779 | 5,201 |
| Admin Rent Reserve | 11 | N/A | 6,629 | 100.0% | 100.0% | 100.0% | 6,629 | 6,629 | 6,629 | 100.0% | 100.0% | 100.0% | 6,629 | 6,629 | 6,629 |
| Accrued Sales Tax | 12 | N/A | 7,000 | 100.0% | 100.0% | 100.0% | 7,000 | 7,000 | 7,000 | 100.0% | 100.0% | 100.0% | 7,000 | 7,000 | 7,000 |
| Priority and Administrative Claims (1 of 2) | | | 36,908 | | | | 39,236 | 36,908 | 31,955 | | | | 47,202 | 45,414 | 41,000 |
| **Net Proceeds Available for Secured Claims** | | | | | | | 259,826 | 283,866 | 313,444 | | | | 218,336 | 238,113 | 260,515 |
| DIP Claims | 13 | N/A | 192,132 | 100.0% | 100.0% | 100.0% | 192,132 | 192,132 | 192,132 | 100.0% | 100.0% | 100.0% | 192,132 | 192,132 | 192,132 |
| Other Secured Claims | 14 | 1 | 15,631 | 100.0% | 100.0% | 100.0% | N/A | N/A | N/A | 100.0% | 100.0% | 100.0% | N/A | N/A | N/A |
| Term Loan Secured Claims | 13 | 3 | 82,078 | 58.6% | 59.5% | 95.5% | 48,063 | 48,815 | 78,393 | 31.9% | 56.0% | 83.3% | 26,204 | 45,980 | 68,382 |
| Secured Claims | | | 289,841 | | | | 240,195 | 240,948 | 270,525 | | | | 218,336 | 238,113 | 260,515 |
| **Net Proceeds Available after Secured Claims** | | | | | | | 19,631 | 42,919 | 42,919 | | | | - | - | - |
| Other Priority Claims | | 2 | 1,781 | 45.7% | 100.0% | 100.0% | 815 | 1,781 | 1,781 | 0.0% | 0.0% | 0.0% | - | - | - |
| 503(b)(9) Claims | 15 | N/A | 25,138 | 45.7% | 100.0% | 100.0% | 11,498 | 25,138 | 25,138 | 0.0% | 0.0% | 0.0% | - | - | - |
| Priority Tax Claims | 16 | N/A | 16,000 | 45.7% | 100.0% | 100.0% | 7,318 | 16,000 | 16,000 | 0.0% | 0.0% | 0.0% | - | - | - |
| Priority and Administrative Claims (2 of 2) | | | 42,919 | | | | 19,631 | 42,919 | 42,919 | | | | - | - | - |
| **Net Proceeds Available for All Other Claims** | | | | | | | - | - | - | | | | - | - | - |
| General Unsecured Claims | 17 | 4 | 536,800 | 0.0% | 0.0% | 0.0% | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intercompany Claims | | 5 | TBD | 0.0% | 0.0% | 0.0% | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Intercompany Interests | | 6 | TBD | 0.0% | 0.0% | 0.0% | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Interests in Shopko | | 7 | TBD | 0.0% | 0.0% | 0.0% | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Section 510(b) Claims | | 8 | TBD | 0.0% | 0.0% | 0.0% | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |

**Shopko**
**Liquidation Analysis Assumptions**
**($ in 000s)**

| | | Chapter 11 Liquidation | Chapter 7 Liquidation |
|---|---|---|---|
| 1.) | Inventory | Inventory is assumed to be sold "as is, where is" and recovery values are based on a third party inventory appraisal. The recovery shown reflects the net orderly liquidation value of the inventory, which accounts for costs related to selling through the inventory such as occupancy, payroll, liquidation fees, freight, and other expenses. | The recovery shown is an estimate for the forced liquidation value of inventory. The recovery percentages represent diminished value, which is estimated to be a discount of 10% to the orderly liquidation value. |
| 2.) | Store Receivables | Forecasted credit card receivables. | Forecasted credit card receivables. |
| 3.) | Net Property and Equipment | Consists of owned property, furniture's and fixtures, machinery and equipment, and computer hardware. Amounts are based on forecasted borrowing base collateral and recovery is based on current advance rates, which is the net orderly liquidation value of the assets. | Consists of owned property, furniture's and fixtures, machinery and equipment, and computer hardware. Amounts are based on forecasted borrowing base collateral and recovery is based on current advance rates, which is the net orderly liquidation value of the assets. |
| 4.) | Cash & Cash Equivalents | The Debtor's do not hold significant cash in their concentration accounts. Amount primarily reflect cash in stores. | The Debtor's do not hold significant cash in their concentration accounts. Amount primarily reflect cash in stores. |
| 5.) | Other Current Assets | Consist primarily of prepaid expenses and deposits. | Consist primarily of prepaid expenses and deposits. |
| 6.) | All Other Assets | Consists primarily of lease incentive receivables, insurance receivables, long term tax receivables, and intangible assets. The majority of intangible assets are pharmacy customer lists, which are assumed to have been sold as part of the pharmacy disposition process. | Consists primarily of lease incentive receivables, insurance receivables, long term tax receivables, and intangible assets. The majority of intangible assets are pharmacy customer lists, which are assumed to have been sold as part of the pharmacy disposition process. |
| 7.) | Asset Collateral for Other Secured Claims | Most recent balances for capital and developer leases payable, and IGF financing. Assumption is that equipment is returned to satisfy the claim. | Most recent balances for capital and developer leases payable, and IGF financing. Assumption is that equipment is returned to satisfy the claim. |
| 8.) | Chapter 7 Trustee Fees | n/a | Calculated as 3% of total proceeds collected |
| 9.) | Wind Down Costs | Based on analysis of wind down expenses in cases of similar size and complexity. | Based on analysis of wind down expenses in cases of similar size and complexity. |
| 10.) | Employee Costs | Consists of accrued payroll and severance expense. Accrued payroll is estimated as one payroll cycle. | Consists of accrued payroll and severance expense. Accrued payroll is estimated as one payroll cycle. |
| 11.) | Admin Rent Reserve | Carve-out for Credit Suisse rent reserve. | Carve-out for Credit Suisse rent reserve. |
| 12.) | Accrued Sales Tax | Accrued and paid in arrears, estimate represents one month accrual. | Accrued and paid in arrears, estimate represents one month accrual. |
| 13.) | DIP Claims | Estimated principal and interest on roll-up of A and A-1 debt tranches. | Estimated principal and interest on roll-up of A and A-1 debt tranches. |
| 14.) | Other Secured Claims | Offsetting claim for capital leases and other assets assumed to be returned in order to satisfy claim amount (note 7 above). | Offsetting claim for capital leases and other assets assumed to be returned in order to satisfy claim amount (note 7 above). |
| 14.) | Term Loan Secured Claims | Estimated balances of principal and accrued interest of B and B-1 debt tranches. | Estimated balances of principal and accrued interest of B and B-1 debt tranches. |
| 15.) | Other Priority Claims | Consists primarily of estimated accrued employee vacation as of petition date. | Consists primarily of estimated accrued employee vacation as of petition date. |
| 15.) | 503(b)(9) Claims | Estimate for net payable related to goods for which title of ownership transferred to the Company within the 20 day period prior to filing | Estimate for net payable related to goods for which title of ownership transferred to the Company within the 20 day period prior to filing |
| 16.) | Priority Tax Claims | Mainly accrued real estate tax, forecasted based on most recent balance sheet. | Mainly accrued real estate tax, forecasted based on most recent balance sheet. |
| 17.) | General Unsecured Claims | Consists of merchandise and expense payables, landlord 502(b)(6) claims, unsecured bonds and all other balance sheet liabilities. | Consists of merchandise and expense payables, landlord 502(b)(6) claims, unsecured bonds and all other balance sheet liabilities. |