# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re:<br><br>SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 19-80064-TLS<br><br>Jointly Administered<br><br>Chief Judge Thomas L. Saladino |

**APPLICATION AND REQUEST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS OF THOMPSON ASSOCIATES CORP. PURSUANT TO 11 U.S.C. §§ 365(d)(3) AND 503(b)(1) AGAINST DEBTOR SHOPKO STORES OPERATING CO., LLC, LESSEE (CASE NO. 19-80075) and NOTICE OF OBJECTION/RESISTANCE DEADLINE[1]**

Thompson Associates Corp. ("**Thompson**"), a Utah corporation files this Application and Request for Allowance and Payment of Thompson's administrative expense claims pursuant to 11 U.S.C. §§ 365(d)(3), 503(b)(1) and 507(a)(2) ("**Application**") against its Lessee, Shopko Stores Operating Co., LLC, in accordance with the Bar Date Order for requesting allowance and payment of administrative claims (Docket No. 421) seeking allowance of its administrative claims specified below (**"Administrative Claims"**) and for an Order of the Court compelling immediate payment of the Administrative Claims in full and in cash. Thompson seeks allowance and payment of the Administrative Claims in its Applications against both the jointly administered Debtors, Shopko Stores Operating Company, LLC (Case No. 19-80075) the

---

[1] This Application is similar to and based upon essentially the same grounds as the Application filed against the Specialty Retail Shops Holding Corp. case (Case No. 19-80064 (and also the lead case)) in an abundance of caution in order to assert the relief requested in both the case of Thompson's Lease guarantor (Specialty Retail) and Thompson's principal lessee under its Lease, Shopko Stores Operating Co. LLC (Case No. 18-80075).

1554255.1

principal lessee under the Lease (as defined below), and Specialty Retail Shops Holding Corp. (Case No. 18-80064), under the Guaranty of the Lease (as defined below) to the extent Shopko Stores Operating Co., LLC fails to pay the Administrative Claims as allowed and ordered.  ing . In support of its Application, Thompson states as follows:

## PARTIES

1. ShopKo Stores Operating Co., LLC (**"ShopKo Operating"**), is a Delaware limited liability based in Green Bay, Wisconsin.

2. Specialty Retail Shops Holding Corp. (**"ShopKo Holding"** and collectively with ShopKo Operating, **"ShopKo"**) is a Delaware corporation based in Green Bay, Wisconsin.

3. Shopko and certain other affiliates[2] filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C.A. §§ 101 *et seq.*, on January 16, 2019 (**"Petition Date"**).  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C §§ 1107 and 1108.

4. Thompson Associates, Corp. (**"Thompson"**) is a Utah Corporation, owning certain real property including a commercial building located at 955 N Main St, Spanish Fork, UT 84660 (the **"Property"**), which Property is currently leased to and occupied by ShopKo Stores Operating Co., LLC (**"ShopKo Operating"**) and used to operate Shopko Store #108.

---

[2] Specialty Retail Shops Holding Corp., Pamida Transportation, LLC, Pamida Stores Operating Co., LLC, Penn-Daniels, LLC, Place's Associates Expansion, LLC, Retained R/E SPE, LLC, Shopko Finance, LLC, Shopko Gift Card Co., LLC, Shopko Holding Company, LLC, Shopko Institutional Care Services Co., LLC, Shopko Optical Manufacturing, LLC, Shopko Properties, LLC, , SVS Trucking, LLC (collectively, with Shopko Stores Operating Co., LLC, the **"Debtors"**),

2

1554255.1

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this matter pursuant to Sections 157(a) and 1334 of Title 28 of the United States Code.

6.  Venue is proper in this Court pursuant to Section 1409(a) of Title 28 of the United States Code.

## BACKGROUND FACTS

**A. The Lease**

7.  On or about February 11, 2015, ShopKo Operating entered into a certain Lease (**"Lease"**) with Thompson's predecessor-in-interest. *See* Declaration of Troy Thompson (**"Thompson Declaration"**) ¶ 3. A true and correct copy of the Thompson Declaration is attached hereto as **Exhibit A**.

8.  In addition to making monthly rental payments, the Lease obliges ShopKo Operating to: (i) pay taxes on the Property (*see* Lease, § 3.01, Ex. A) (**"Tax Obligation"**); and (ii) maintain the Property "in good working order," including the Property's roof, mechanical, electrical, pipes, etc. (*see id.* at § 9.02) (**"Maintenance Obligation"**).

9.  As of the filing of this Administrative Claim, ShopKo Operating continues to occupy and make use of the Property. *See* Thompson Decl. ¶ 4. Indeed, since the beginning of February 2019, ShopKo Operating has been conducting a going-out-of-business sale (**"GOB Sale"**) at the Property. *Id.* ¶ 5. As of the date of this Application, the GOB Sale is still in progress. *Id.*

10. The Lease has not yet been rejected, assumed, or assumed and assigned.

### B. The Guaranty

11.     In conjunction with the Lease (and executed on the same day), ShopKo Holding entered into an Unconditional Guaranty of Payment and Performance (**"Guaranty"**), under which ShopKo Holding guaranteed "complete and performance" of all of ShopKo Operating's obligations under the Lease, including but not limited to the payment of rent, taxes, and maintenance and repair costs.  *See* Thompson Decl. ¶ 4.

### C. The Postpetition Agreement

12.     On February 12, 2019 (almost a month after the Petition Date), ShopKo Operating and Thompson entered into an Agreement Regarding Payment of Certain Postpetition Lease Obligations (**"Postpetition Agreement"**).[3]

13.     The Postpetition Agreement provides that Thompson (as ShopKo Operating's landlord) "shall have an administrative expense claim for Rent on a *per diem* basis . . . for the period from the end of the Stub Period through the date Debtor rejects such Lease."  Postpetition Agreement, § 2.  The Postpetition Agreement also provides that "all Rent following the Stub Period shall be timely paid by Debtors in accordance with the terms of the Lease."  *Id.* at § 3.

14.     The Postpetition Agreement defines "Rent" as "any rent, common area maintenance, taxes, or other monthly charges, cost, or expense chargeable to Debtor under any of the Lease."  *Id.* at § E.  The Postpetition Agreement defines "Stub Period" as "the Petition Date through the last date of the billing cycle in effect as of the Petition Date."  *Id.* at § D.

---

[3] Debtors designated the Postpetition Agreement as "Confidential Subject to FRE 408."  Accordingly, Thompson has not attached a copy of the agreement to this Application and makes only limited and necessary references to it.  Fed.R.Ev. 408(b) provides that the Court "may admit this evidence for another purpose" and is not required to exclude evidence otherwise discoverable merely because it is presented in the course of compromise or settlement negotiations.  *See, Bower v. Stein Eriksen Lodge Owners' Assn., Inc.,* 201 F. Supp. 2d 1134, 1139 (D. Utah 2002).

4

1554255.1

15. In the Postpetition Agreement, the parties acknowledged that Thompson had received the "Rent obligations" for the month of February "except the property tax proration for the month of February 2019 that came due under the Lease after the Petition Date." *Id.* at § G.

16. Moreover, as evidenced by Exhibit A to the Postpetition Agreement, ShopKo explicitly agreed to pay the following amounts as "Stub Rent": "$20,355.00 base rent plus $3470.00 tax proration." Postpetition Agreement, Ex. A.

17. On February 21, 2019, Thompson received a payment from ShopKo for $23,825.00 for the Stub Rent. This amount included the tax proration. Thompson also received payment for February, March and April, 2019—but only for base rent; the payments did *not* include the property tax proration for February, March or April. *See* Thompson Decl. ¶ 6. The unpaid post-petition tax proration to date is $19,627.00—$6,724.00 for each of February, March and April, 2019.[4] The anticipated rent and tax proration for May, 2019 is based on the same calculation: base rent of $39,438.78 plus $6,724.00 per month tax proration.

**D. The Lack of Maintenance of the Building's Roof**

18. During its occupation and use of the Property, ShopKo has failed to maintain the Property in good working order. This failure to maintain the Property is most apparent with the roof. For example:

    a. The gravel roof ballast has been cleared away and needs to be replaced;

    b. Several areas of the roof have been patched and not been reassembled;

---

[4] The Lease is listed on the Debtors' first postpetition notice of Store Closings with a date of April 15, 2019. *See* Docket No. 16. Ex. C. However, the Lease has not been rejected, assumed, or assumed and assigned.

      c.      The roof's membrane has bellowed from the walls and flashings, leaving it susceptible to tearing, breaking, or pedestrian damage; and

      d.      Some maintenance that has been performed on the roof has been done in a manner that does not meet manufacturer's specifications.

*See* Declaration of Mike Harwood ("**Harwood Declaration**") ¶ 4. A true and correct copy of the Harwood Declaration is attached hereto as **Exhibit B**.

19.    All of this damage to the Property's roof was caused by ShopKo's failure to properly maintain the roof. *Id.* ¶ 5.

20.    As a result of ShopKo's failure to perform the Maintenance Obligation under the Lease, Thompson has been damaged in the amount of $435,395.00. *Id.* ¶ 6. Thompson filed timely proofs of claim in each of the Shopko Holdings and Shopko Operating cases claiming administrative expense priority for the Maintenance Obligation. *See* Proofs of Claim Nos. 1777 and 1778.

### E. Tax Proration for April 2019

21.    The Lease requires ShopKo to pay base monthly rent on the first day of each month in the amount of $39,438.78.[5] *See* Lease at § 2.01.

22.    As of the date of this filing, ShopKo paid base rent due under the Lease for the month of April 2019 but no tax proration. *See* Thompson Decl. ¶ 7.

---

[5] The Lease is a triple net lease under the terms of which ShopKo pays directly all taxes, insurance, costs of maintenance, utilities, snow removal, maintenance and other expenses that would normally be included in CAM. This Administrative Claim assumes that such payments are current, pre-petition and postpetition. Such expenses are not included in the base rent figure provided here. To the extent such expenses are not timely paid, Thompson reserves the right to amend this Administrative Claim Application to include those unpaid amounts.

23.     Thompson therefore seeks allowance of the April tax proration in the amount of $6,724.00 as an administrative expense claim.  The Bar Date Order (Docket No. 421) requires that all administrative claims from the Petition Date to April 1, 2019 be asserted by the Bar Date.  Thompson has been paid the base rent for April, 2019.  As a result, Thompson requests the April 2019 tax proration.

## REQUESTED RELIEF

24.     Thompson requests that the following administrative claims be allowed and ordered paid as requested herein: (i) administrative expense claim for the Tax Obligation in the amount of $19,627.00 (representing February, March, and April, 2019 at $6,724.00 per month); (ii) an administrative expense claim for the Maintenance Obligation in the amount of $435,395.00; (iii);  an administrative claim for anticipated May, 2019 rent and tax proration to be paid when and if due in the sum of $46,162.78 (which is the sum of the monthly tax proration of $6,724.00 and base rent of $39,438.78) (**"May Rent"**)(the foregoing administrative claims are collectively referred to as the **"Administrative Claims"**), (v) an order compelling immediate payment, in full and in cash, of the Tax Obligation and the Maintenance Obligation and payment of the May Rent as due.

## BASES FOR REQUESTED RELIEF

**A. The Tax Obligation and the Maintenance Obligation Are Allowable Administrative Expense Claims under 11 U.S.C. § 365(d)(3)**

25.     Under 11 U.S.C. § 365(d)(3), a debtor in possession is required to timely perform all obligations of the debtor under an unexpired lease of nonresidential property until the lease is assumed or rejected.  According to the 8th Circuit BAP's decision in *In re Burival*, the debtor in

7

possession must perform the debtor's lease obligations "as they become due' under the terms of the lease. 406 B.R. 548, 553 (8th Cir. B.A.P. 2009). For lease claims that arise postpetition, pre-rejection, "Section 365(d)(3) provides administrative expense status." *Id.* at 555.

26. Here, the Lease obliges ShopKo Operating to pay property taxes and maintain the Property in good working order. *See* Lease, at §§ 3.01 & 9.02. And as ShopKo Operating's guarantor, ShopKo Holding is under these same obligations. *See* Guaranty, at § 1. Because ShopKo Operating and ShopKo Holding have failed to perform their obligations under the Lease, the Court should award Thompson an administrative expense claim in the amount of Thompson's postpetition, pre-rejection damages related to the Tax Obligation and the Maintenance Obligation.

*1. The Tax Obligation*

27. Under the Lease, ShopKo must pay taxes on the Property "in a timely manner." *Id.* at § 3.01. The Lease does not precisely define what "in a timely manner" means. While ShopKo must pay the property taxes "before the last day the [taxes] may be paid without fine, penalty, interest or additional cost," it may pay them "in installments." *Id.* In other words, under the Lease, although ShopKo *must* pay taxes before they can be considered late (which under Utah law would be November 30 each year), it *may* pay them throughout the year. However, Thompson and ShopKo modified ShopKo's obligations vis-à-vis paying property taxes when they executed the Postpetition Agreement.

28. The Postpetition Agreement does three key things with respect to ShopKo's postpetition obligations under the Lease: (1) it obliges ShopKo to pay the "Stub Rent" within

8

five days of the execution of the agreement[6]; (2) it gives Thompson an administrative expense claim for "Rent"; and (3) it requires ShopKo to pay "all Rent" in a timely manner "in accordance with the terms of the Lease." Postpetition Agreement, at §§ 1–2.

29. "Rent" and "Stub Rent" are defined terms under the Postpetition Agreement. "Rent" means "any rent, common area maintenance, *taxes*, or other monthly charges, cost, or expense chargeable to Debtor under . . . the Lease." *Id.* at Recital E (emphasis added). "Stub Rent" means all Rent "for the Stub Period," which the agreement defines as the period between the Petition Date and January 31, 2019. *Id.* at Recitals D & E. In other words, the Postpetition Agreement requires ShopKo to pay rent and property tax prorations for the Stub Period and thereafter until rejection. This is further evidenced by Exhibit A to the Postpetition Agreement, which shows that ShopKo explicitly agreed to pay the following amounts as "Stub Rent"— "$20,355.00 base rent plus $3470.00 tax proration." Postpetition Agreement, Ex. A.

30. The Postpetition Agreement also provides that "all Rent following the Stub Period shall be timely paid by [ShopKo] in accordance with the terms of the Lease." *Id.* at § 3. Under the Lease, base rent is due on the first day of each month. *See* Lease, at § 2.01. So, while the Postpetition Agreement required ShopKo to pay the Stub Rent within five days of the execution of the agreement, all remaining Rent (i.e., base monthly rent and property tax prorations) were to be paid on a monthly basis.

31. On February 14, 2019, the Court entered its order (the final DIP financing order) authorizing Debtors to "enter into, and perform under, agreements in the form attached [to the

---

[6] To be exact, the Postpetition Agreement requires ShopKo to "pay the Stub Rent five business days after the later of the execution of this Agreement or the Court granting authority to enter into this Agreement." Postpetition Agreement, at § 1. The Stub Rent and tax proration were timely paid as agreed.

9

1554255.1

order] as Exhibit 3 with the landlords under the Debtors' unexpired leases." *See* Docket No. 425, at § 5.15. The Postpetition Agreement, which was "effective as of February 12, 2019" (*see* Postpetition Agreement, para. 1), mirrors the form of Exhibit 3 to the Court's February 14 order although with some custom changes.

32. Again, the Postpetition Agreement required ShopKo to pay Thompson $23,825.00 for the Stub Rent, which included "$20,355.00 base rent plus $3470.00 tax proration." Postpetition Agreement, Ex. A. On February 21, 2019, Thompson received a payment from ShopKo for $23,825.00. Thus, ShopKo has performed its first obligation under the Postpetition Agreement—i.e., it paid both the base rent and the property tax proration for the Stub Period.

33. Subsequently, ShopKo also made payments related to its February and March 2019 obligations. *See* Thompson Decl. ¶ 6. However, although ShopKo paid the base rent for February and March, 2019, it did not pay the property tax prorations for those months. *Id.* Thus ShopKo has failed to fully perform its contractual obligations under the Lease, the Postpetition Agreement, and Section § 365(d)(3) of the Bankruptcy Code.

34. The unpaid post-petition tax proration is $16,265.00—$6,724.00 for each of February and March, plus $3,253.00 for April 1–15, 2019. Thompson requests that an administrative expense claim for Thompson in that amount be allowed and paid.

2. *The Maintenance Obligation*

35. As stated above, the Lease requires ShopKo to maintain the Property in good working order. *See* Lease, at § 9.02. This maintenance requirement includes the Property's roof. *See id.* ShopKo Operating has occupied the Property under this Lease since November of 2015 (and under prior leases). However, as a direct result of ShopKo's failure to properly maintain the

10

roof, a full roof replacement is necessary. *See* Harwood Decl. ¶ 6. Given ShopKo's failure to satisfy its obligations under the Lease, Thompson should be allowed and paid an administrative expense claim for the cost of the roof replacement.

36. While a contractual duty to *repair* damaged property arises when the damage occurred, a contractual duty to *maintain* property in good working order—like section 9.02 in the Lease—arises "on a daily basis." *See In re Hayes Lemmerz Intern., Inc.*, 340 B.R. 461, 477–78 (Bankr. D. Del. 2006).

37. In *In re Hayes*, the debtor leased various CNC machines pursuant to a lease. *Id.* at 466. The lease required the debtor to "maintain each unit of Equipment in good operating order, repair, condition and appearance." *Id.* at 476. The court found that this provision contained "[t]wo separate and distinct obligations"—(1) "a duty to repair" and (2) "a duty to maintain." *Id.* at 478. The lessor (i.e., owner of the equipment) argued that both the duty to repair and the duty to maintain "arose every day." The court held that, under the lease, the debtor was "obligated to repair a Machine when it was damaged." *Id.* at 479. Thus the duty to *repair* arose when the damage occurred, and only the cost of repairs resulting from damage that occurred postpetition was entitled to an administrative expense. However, the court held that "the *maintenance* obligation arose on a daily basis." *Id.* at 477–78 (emphasis added). Thus, "the 'first' breach of maintenance obligation occurred each day maintenance was not done." *Id.* at 478. So the lessor was "entitled to an administrative expense" under Section 365 of the Bankruptcy Code for the debtor's "breach of its maintenance obligation" under the lease. *Id.*

38. Here, the damage to the Property's roof resulted from ShopKo's failure to properly maintain the roof. *See* Harwood Decl. ¶¶ 4–6. Some of the issues resulting from

11

1554255.1

ShopKo's failure are somewhat minor. For example, the gravel roof ballast has been cleared away and needs to be replaced. *Id.* ¶ 4. But the more serious issues involve the roof's membrane. Several areas of the roof have been patched and open penetrations are present due to a failure to properly reassemble the membrane after patching. *Id.* The roof's membrane has bellowed from the walls and flashings leaving it susceptible to tearing, breaking, or pedestrian damage, which in turn leaves the Property susceptible to leakage and substantial water damage. *Id.* Indeed, the roof's membrane has been maintained so poorly that simply patching the membrane is sufficient—it must be replaced. *Id.* ¶¶ 6.

39.  Importantly, none of these issues with the Property's roof arise out of damage caused by isolated occurrences, accidents, or catastrophic weather. *See* Harwood Decl. ¶ 5. Instead, like the machines in *In re Hayes*, the cost to replace the roof is most fairly characterized as damages caused by ShopKo's failure to perform under the Lease by maintaining the roof in good working order. For that reason, Thompson should be allowed and paid an administrative expense claim for the Roof Obligation in the amount of $435,395.00.

### 3. Base Rent for April 2019

40.  The Lease requires ShopKo to pay base monthly rent on the first day of each month in the amount of $39,438.78.[7] *See* Lease at § 2.01.

41.  As of the date of this filing, ShopKo paid base rent for the month of April 2019 but no tax proration. *See* Thompson Decl. ¶ 7.

---

[7] The Lease is a triple net lease under the terms of which ShopKo pays directly all taxes, insurance, costs of maintenance and other expenses that would normally be included in CAM. This Administrative Claim assumes that such payments are current, pre-petition and postpetition. Such expenses are not included in the base rent figure provided here. To the extent such expenses are not timely paid, Thompson reserves the right to amend this Administrative Claim to include those unpaid amounts.

42.     Thompson therefore seeks allowance of the April tax proration, as part of the Tax Obligations quantified above, as well as all of the Tax Obligations as an administrative expense claim.

**B. The Court should grant Thompson administrative expenses for the Tax Obligation and the Maintenance Obligation under 11 U.S.C. § Section 503**

43.     Section 503(b)(1) of the Bankruptcy Code allows administrative expenses for the "actual, necessary costs and expenses of preserving the estate." Courts allow administrative claims "when the expense (1) arises post-petition; and (2) is beneficial to the Debtor's estate." *JN Med. Corp. v. Auro Vaccines, LLC*, No. 8:18CV154, 2019 WL 687887, at *14 (D. Neb. Jan. 11, 2019); *see also In re Burival*, 406 B.R. 548, 555 (B.A.P. 8th Cir. 2009) (holding Section 503(b)(1) "generally requires proof of a benefit to the bankruptcy estate"). Both the Tax Obligation and the Maintenance Obligation arose postpetition and have benefitted ShopKo's bankruptcy estates.

44.     Even if, for some reason, Thompson is not entitled to an administrative expense for the Tax Obligation or the Maintenance Obligation under Section 365(d)(3) of the Bankruptcy Code, it can still qualify under Section 503(b)(1). *See In re Goody's Family Clothing, Inc.*, 443 B.R. 5 (Bank. D. Del. 2010). In *In re Goody's*, a landlord sought administrative expense status for taxes on its property for 2008 and 2009. The lease provided that the debtor was required to pay the property taxes "when due." *Id.* at 8. Under Tennessee law, taxes were due "on the first Monday in October." *Id.* at 12. The court held that the taxes for 2008 were due "long before the January 13, 2009 petition date." *Id.* at 18. Therefore, the landlord was not entitled to an administrative expense claim under Section 365(d)(3) for the 2008 taxes.

13

45. The *Goody's* court then turned its attention to the 2009 taxes. The debtor argued that the court should not allow an administrative expense claim for the 2009 taxes because the debtor rejected the lease on the property months before the 2009 taxes became due. *Id.* at 20. The court analyzed the 2009 taxes under Section 503(b)(1). The court noted that, although the 2009 taxes were not due prior to rejection, the landlord was nevertheless entitled to administrative expense claims for the 2009 taxes because the debtor "used and occupied [the] premises" and "received the benefit of the 2009 Taxes." *Id.* at 20. The court reasoned that "[a]llowing [the debtor] to skip the payments for the January and February 2009 taxes, despite the fact that [the debtor] continued to occupy and use the premises during that time," and despite the fact that the debtor paid taxes for other months in 2009, "would be an inconsistent and inequitable result." *Id.*

46. Here, the Roof Obligation arose postpetition because, as a *maintenance* requirement, the obligation arose on a daily basis—including every day since the Petition Date. *See supra* Part A(2). And, as stated above, the Tax Obligation arose postpetition because ShopKo and Thompson entered into the Postpetition Agreement. Under the Postpetition Agreement, ShopKo agreed that Thompson was eligible for an administrative expense claim for the Tax Obligation and that ShopKo would pay the tax prorations on a monthly basis. *See supra* Part A(1).

47. But even if the Tax Obligation did not arise postpetition, and even if the taxes for 2019 were not due until November 30, 2019 and assuming no agreement to the contrary, the Court should still allow an administrative expense claim for the Tax Obligation because, like in *In re Goody's*, ShopKo has occupied and used the Property postpetition. Also, like in *In re*

14

*Goody's*, ShopKo has paid some of the 2019 taxes—it paid the Stub Rent, which included the tax proration for the Stub Period. Thus, as in *In re Goody's*, it would be "inconsistent and inequitable" to allow ShopKo to have used and occupied the Property—and thus enjoyed the benefit of the 2019 taxes—but allow it to avoid payment of the Tax Obligation.

48. Both the Tax Obligation and the Maintenance Obligation have benefitted the bankruptcy estates because they are part and parcel with ShopKo's use of the Property, which has undoubtedly benefitted the estate. On February 8, 2019, the Court entered its order authorizing Debtors to conduct GOB sales at various locations. *See* Docket No. 369. Since the beginning of February 2019, ShopKo has been conducting the GOB Sale on the Property. *See* Thompson Decl. ¶ 5. Although Thompson has no knowledge of how much revenue the GOB Sale has generated, Debtors have estimated that the gross proceeds from GOB sales generally "will be approximately $80 to $95 million." *See* Docket No. 16, at 5. Debtors have also told the Court that the purpose of the GOB sales is to "maximize value for the Debtors' estates." *Id.* at 6.

49. Thus, the GOB sales have and will benefit the Debtors' bankruptcy estates. Without the Property (and other store locations across the country), ShopKo would be unable to realize this benefit. Without payment of the taxes and maintenance of the Property, the Property would be unable to house the GOB sales. Thus, the Tax Obligation and the Maintenance Obligation have and will continue to benefit ShopKo's bankruptcy estates.

C. **Thompson is entitled to immediate payment of the Tax Obligation and the Maintenance Obligation.**

50. The February, March, and April tax proration payments were due on February 1, and March 1, and April 1, 2019 (respectively). ShopKo has failed to pay the tax prorations. *See* Thompson Decl. ¶ 6. Thompson therefore requests that the Court order ShopKo to pay

15

$16,265.00 to Thompson immediately.  In addition, because the Maintenance Obligation is a continuing obligation, ShopKo's duty to perform it arises every day.  ShopKo has nevertheless failed to perform the Maintenance Obligation.  Therefore ShopKo asks the Court to order ShopKo to pay $435,395.00 to Thompson immediately, in full and in cash.

51.     Thompson asks the Court to order Shopko to pay the May Rent when and if it comes due.

## RESERVATION OF RIGHTS

52.     This Application is filed without prejudice to the filing by Thompson of additional requests for allowance and payment of administrative expense claims with respect to any other liability or indebtedness of the Debtors or any of their parents, subsidiaries or affiliates.

53.     The filing of this Application is not: (a) a waiver or release of Thompson's right against any person, entity or property; (b) a consent by Thompson to the jurisdiction of this Court with respect to the subject matter of this claim, any objection hereto, or any other proceeding commenced in these cases against or otherwise involving Thompson; (c) a waiver of the right to move to withdraw the reference, or otherwise to challenge the jurisdiction of this Court, with respect to the subject matter of this claim, any objection thereto, or any other proceeding commenced in these cases against or otherwise involving Thompson, or to assert that the reference has already been withdrawn with respect to the subject matter of this claim, any objection thereto, or any other proceeding commenced in these cases against or otherwise involving Thompson; (d) an election of remedy, or (e) a waiver of any past, present or future defaults or events of default.

1554255.1

54. Thompson specifically preserves all of its procedural and substantive defenses and rights with respect to any claim (if any) that may be asserted against Thompson by the Debtors, any Debtor or non-debtor affiliate or other entity related thereto, any trustee for the Debtors' estates, any other party in interest in these bankruptcy cases, or any other person or entity whatsoever.

55. Thompson fully reserves all rights to pursue joint and several or separate liability for the obligations arising under the Lease against any one or more of the jointly administered Debtors in its discretion.

56. To the best of the Thompson's knowledge, the Administrative Claim is not subject to any setoff or counterclaim in favor of the Debtor.

57. While Thompson has made every effort to (i) identify all tenancies and services provided to Debtors prior to the Petition Date; (ii) identify the correct debtor entity with which it conducted business; (iii) provide accurate information in the supporting exhibits; and (iv) include all available or refer to all supporting documentation, Thompson reserves all rights to amend, modify, or supplement this Applications at any time. In addition, Thompson is investigating whether it has claims against any of the other jointly administered debtors on other bases not identified herein. Thompson reserves all rights to file such other additional applications.

58. To the extent that Thompson has valid rights to set-off pursuant to 11 U.S.C. § 553, rights of recoupment, or otherwise, such rights are expressly preserved and Thompson reserves all rights related to such setoff or recoupment. Further, Thompson specifically objects to any provision of a plan of reorganization that attempts to discharge or otherwise alter any of Thompson's setoff or recoupment rights.

17

WHEREFORE, Thompson requests allowance and immediate payment of its Administrative Claims in the amount of $455,022.78—$19,627.00 for the Tax Obligation, $435,395.00 for the Maintenance Obligation, and, in addition, the May Rent, if and when due, against both Shopko Operating as the primary responsible Debtor lessee and Shopko Holdings, as guarantor of the obligations of the Lease.

### 9013-1 NOTICE

TO:   ALL CREDITORS AND PARTIES IN INTEREST

YOU ARE HEREBY ADVISED that this Notice is being furnished to all parties in interest pursuant to Nebraska Rule of Bankruptcy Procedure 9013-1 and that any objection or resistance with respect to the foregoing Application and Request for Allowance of Payment of Administrative Claims of Thompson Associates Corp. must be filed with the Bankruptcy Court Clerk – Omaha, Roman L. Hruska Courthouse, 111 South 18th Plaza, Suite 1125, Omaha, NE 68102, and served on Jeffrey W. Shields and Paul R. Smith of Jones Waldo Holbrook & McDonough PC, 170 South Main Street, Suite 1500, Salt Lake City, Utah 84101, on or before **April 22, 2019**. If objections are filed on or before said date, a hearing shall be established by the Bankruptcy Court with Notice being limited to those parties filing objections or resistances.

IF NO OBJECTION OR RESISTANCE is filed on or before the date set forth above, the Bankruptcy Court will consider the approval of the foregoing Application without further notice or opportunity to be heard.

Dated this 1st day of April, 2019.

JONES WALDO HOLBROOK & McDONOUGH, PC

*/s/ Jeffrey W. Shields*
Jeffrey W. Shields (Admitted *Pro Hac Vice*)
Paul R. Smith (Admitted *Pro Hac Vice*)
JONES WALDO HOLBROOK & McDONOUGH, PC
170 S. Main Street, Suite 1500
Salt Lake City, UT  84101
Tel.:  (801) 521-3200
Fax:  (801) 328-0537
jshields@joneswaldo.com
psmith@joneswaldo.com
*Attorneys for Thompson Associates Corp.*

18