## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) Case No. 19-80064-TLS |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF THE DEBTORS' OPTICAL BUSINESS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (III) AUTHORIZING A SETTLEMENT OF CLAIMS AND CAUSES OF ACTION, (IV) GRANTING RELIEF RELATED TO THE WIND-DOWN OF THE DEBTORS' REMAINING OPERATIONS, AND (V) GRANTING RELATED RELIEF**

Specialty Retail Shops Holding Corp. ("Shopko") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), acting at the direction of the special committee of independent directors (the "Special Committee") with respect to conflict matters, respectfully state as follows in support of this motion (this "Motion").[2] In further support of this motion, the Debtors submit contemporaneously herewith the *Declaration of Saul Burian In Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Sale of the Debtors' Optical Business, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (III) Authorizing a Settlement of Claims and Causes*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Order or DIP Order.

*of Action (IV) Granting Relief Related to the Wind-Down of the Debtors' Remaining Operations,*

*and (V) Granting Related Relief* (the "Burian Declaration").

**Preliminary Statement**

1.      By this Motion, the Debtors seek entry of an Order approving the sale of the Debtors' optical business (the "Optical Business").  As the Court is aware, the Debtors have been spending the last several months conducting a thorough marketing process to secure a going-concern transaction to save the Debtors' businesses and jobs.  As the Debtors publicly announced on March 18, 2019, they were unable to negotiate an actionable proposal to preserve their retail business and commenced a liquidation process to wind down their retail business.

2.      The Debtors, however, have continued marketing efforts with respect to certain of their assets, including their Optical Business, and are in advanced negotiations with multiple potential bidders regarding a sale of the Optical Business.  Uunfortunately, as a result of the wind-down of their retail business, many of the key employees of the Optical Business have begun exploring alternative employment, and the Debtors' optical customers are increasingly transitioning their business to competitors.  As a result, time is of the essence:  to realize the full value of the Optical Business and preserve the going concern, the Debtors need to consummate a sale transaction quickly with a well-capitalized buyer and resume immediately their process of "building-out" a stand-alone optical business.  The Debtors believe that consummating a sale of the Optical Business could preserve as many as 700 jobs and keep as many as 80 store locations open, a tremendous achievement in light of these cases.  A sale of the Optical Business would also generate higher value than a liquidation of the related property, plant, equipment, and inventory.

3.      Due to the interest from multiple parties and the time constraints to realize the value of the Optical Business, the Debtors have determined that the value-maximizing path forward is

to conduct a true auction process for the sale of the Optical Business as soon as possible.  In advance of the hearing to approve the sale of the Optical Business, the Debtors intend to announce the winning bid.  Given that there is interest in the Optical Business from certain of the Debtors' stakeholders, the winning bid may include not only typical buyer protections, such as a free and clear finding by the Court, but also potential settlements of claims and disputes between the Debtors and the affected stakeholders. Importantly, the Special Committee has the sole and exclusive authority to settle claims against insiders and is particularly focused on these issues.

4.      Simultaneously with marketing and negotiating bids for the Optical Business, the Debtors have engaged in lengthy negotiations with their lenders regarding an appropriate revised budget for the duration of the Debtors' wind-down efforts, especially in light of the reduced need for professionals following the sale of the Optical Business.  In connection with agreeing to a revised wind-down budget, the Debtors and their lenders have also agreed to certain modifications to the Debtors' postpetition financing order and seek authority pursuant to this Motion to make clear that the lenders consent to only very limited costs with respect to their collateral going forward.  These changes are not only necessary to obtain the lenders' support for the Debtors' wind down and sale of the Optical Business, but also will facilitate the orderly wind-down of the Debtors' retail business and otherwise help maximize the value of the Debtors' estates.

## Relief Requested

5.      By this Motion, the Debtors respectfully seek entry of an order (the "<u>Order</u>"): (a) authorizing the sale of the Debtors' Optical Business (the "<u>Transaction</u>") free and clear of liens, claims, interests, and encumbrances (collectively, the "<u>Interests</u>") with any such Interests to attach to the proceeds thereof with the same validity and priority (under the Bankruptcy Code) as such Interests had immediately prior to the consummation of the Transaction; (b) authorizing the

assumption and assignment of certain executory contracts and unexpired leases to the winning bidder; (c) authorizing a settlement of claims and cause of action; (d) granting relief related to the wind-down of the Debtors' remaining operations; and (e) granting related relief.

## **Jurisdiction and Venue**

6.     The United States Bankruptcy Court for the District of Nebraska (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     The bases for the relief requested herein are sections 105(a), 363(b), and 365 of the Bankruptcy Code, Bankruptcy Rule 9019, and rule 9019-1 of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules").

## **Background**

### I.     **General Background.**

9.     The Debtors are engaged in the sale of general merchandise including clothing, accessories, electronics, and home furnishings, as well as the operation of pharmacy and optical services departments.  The Debtors are headquartered in Green Bay, Wisconsin, and as of January 16, 2019 (the "Petition Date"), operated approximately 367 stores in 25 states throughout the United States, as well as e-commerce operations.  The Debtors and their non-Debtor subsidiaries generated approximately $2.6 billion in revenue in fiscal year 2017 and, as of the Petition Date, employed approximately 14,000 people throughout the United States.

10.     On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 25].  No party has requested the appointment of a trustee or examiner in these chapter 11 cases.  On January 18, 2019, the United States Trustee for the District of Nebraska (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 95].

## II.     Going-Concern Marketing Process and Bidding Procedures.

11.     Since beginning a comprehensive marketing process in June 2017, the Debtors have diligently worked with their financial advisors to develop and explore several strategic alternatives to maximize value for the Debtors' assets in their entirety.  In May 2017, the Debtors engaged Houlihan Lokey, Inc. ("Houlihan Lokey") to act as their financial advisor and to explore alternatives as to maximize the proceeds from a sale of the Debtors' assets.  The Debtors and their advisors engaged in a wide ranging and thorough marketing process to solicit bids for the Debtors' assets to obtain the greatest proceeds to maximize the value for the Debtors' stakeholders.

12.     As part of that process, the Debtors and their advisors contacted 92 financial buyers, as well as 29 strategic buyers.  Of these buyers, the Debtors executed confidentiality agreements with 37 financial buyers and 10 strategic buyers.  By August 2017—the deadline for interested parties to submit bids during the initial stage of the marketing process—the Debtors received two indications of interest.  One of the indications was for selected pharmacy assets at a value significantly below appraisal value; as such, the Debtors did not pursue this transaction.  While

the second indication was for the business as a whole, the respective bidder withdrew from the process due to conflicts related to timing and bandwidth.

13.     In addition, as part of the marketing process, the Debtors and their advisors contacted 16 financial investors regarding an alternative investment in the Debtors. The Debtors executed confidentiality agreements with 13 of these parties, and received preliminary term sheets from two of these parties. Simultaneously with conducting their alternative-investment outreach, the Debtors and their advisors contacted three additional strategic buyers, none of which expressed interest or executed a confidentiality agreement.

14.     Despite these efforts, nothing materialized from the Debtors' marketing efforts in 2017, and the Debtors continued to work with Houlihan Lokey to develop and explore alternatives to maximize value. Beginning in August of 2018, the Debtors and their advisors reengaged in a significant marketing process to solicit bids for the Debtors' assets. The Debtors and their advisors contacted a total of approximately 53 potentially interested parties, which included five strategic and 48 financial parties. These parties included 28 of the same parties originally contacted starting in June 2017. Of these 53 parties, 28 parties entered into confidentiality agreements with the Debtors and began conducting due diligence. As of October 24, 2018—the deadline for interested parties to submit bids in the sale process—the Debtors received a proposal from one interested party.

15.     In late November 2018 and early December 2018 the Debtors and their advisors contacted 13 parties to solicit interest to serve as a potential chapter 11 plan sponsor. Ten of these parties had been contacted as part of earlier outreach efforts, and three of these parties were new. Five of these parties attended presentations with the Debtors' management and its advisors in December 2018. Five of these parties attended in-person meetings with the Debtors' management

and advisors in New York on December 6, 2018.  Following the December 6, 2018 meeting, those

five parties and one party that did not attend the meetings carried out extensive due diligence of

the Debtors' business.  The Debtors continued discussions with several of the potential sponsors

following their due diligence, but none emerged as a potential plan sponsor.

16.    On February 12, 2019, the Court entered the *Order (I) Establishing Bidding

*Procedures for the Plan Sponsors and (II) Granting Related Relief* [Docket No. 385] (the "Bidding

Procedures Order"), by which the Court approved the bidding procedures (the "Bidding

Procedures") for the sale of the Debtors' assets.  The Bidding Procedures represented the final

stage of a thorough and effective marketing process conducted, in stages, by the Debtors and their

advisors over the course of nearly 18 months.  The Debtors and their advisors re-marketed the

Debtors' business postpetition to 158 parties, including 140 financial sponsors and 18 strategic

parties.  Of these 158 parties, 137 parties had been previously contacted as part of either or both

the 2017 and 2018 marketing processes.  In addition, Houlihan Lokey reached out to 38 parties, of

which 31 were incremental to the 158 parties, in an effort to sell the Debtors' optical business as a

stand-alone entity.  In total, during the post-petition sale process, the Debtors contacted 189 parties,

and an incremental 12 parties entered into confidentiality agreements with the Debtors to perform

due diligence.

17.    On February 6, 2019, the Debtors filed the *Notice of Modified Proposed Bidding

*Procedures* [Docket No. 335], where the Debtors noted that, in consultation with their advisors,

they had developed a go-forward business plan which included 120 stores and 61 stand-alone

optical centers, and that the Debtors were actively soliciting interest from parties who would like

to explore a transaction in support of the new business plan.  Although the Debtors actively

negotiated with a party interested in pursuing a sale of the Debtors' assets under section 363 of the

Bankruptcy Code, they were ultimately unable to generate an actionable transaction. While the Debtors made the difficult decision to file on March 18, 2019 the *Notice of Additional Store Closings* [Docket No. 689] to close their remaining 120 retail locations, the Debtors continued to receive inquiries from parties interested in purchasing the Debtors' Optical Business.

18.     At present, multiple bidders have expressed interest in purchasing the Optical Business, and the Debtors hope that other parties may also participate in the final stages of this sale process. Pursuant to the Bidding Procedures Order, the Debtors reserved the right to modify the Bidding Procedures as necessary to ensure a value-maximizing transaction. Given the continued interest in the Optical Business and the need to adjust the Bidding Procedures to implement the sale process for such asset, the Debtors have modified the Bidding Procedures to provide for the new dates described below:

| Action | Deadline |
|---|---|
| Bid Deadline | April 12, 2019 at 4:00 p.m. (prevailing Central Time) as the deadline by which bids for the Optical Business (as well as an Optical Business purchase agreement (the "Optical Sale Agreement") and all other documentation required under the Bidding Procedures) must be actually received (the "Bid Deadline"). |
| Auction | April 15, 2019 at 9:00 a.m. (prevailing Central Time) at the Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or such later date and time or location as selected by the Debtors. |
| Transaction Objection Deadline | April 16, 2019 at 11:59 p.m. (prevailing Central Time) as the deadline to object to the Transaction. |
| Reply Deadline | April 18, 2019 at 10:00 a.m. (prevailing Central Time) as the deadline to reply to the Transaction Objections, either in writing or in open court at the hearing to consider the Transaction (such hearing, the "Transaction Hearing"). |

| Action | Deadline |
|---|---|
| Transaction Hearing | April 18, 2019 at 10:00 a.m. (prevailing Central Time), or as soon as the Court's schedule permits. |

19.     Following the auction, the Debtors will finalize definitive documentation to implement the terms of the winning bid, and, as applicable, file a notice of such winning bidder with the Court no later than April 16, 2019 at 10:00 a.m. (prevailing Central Time).  The proposed sale of the Optical Business will be the result of the extensive and lengthy marketing process detailed above, and represents an opportunity to achieve a value-maximizing going-concern transaction.    The Debtors reserve the right to file and serve any supplemental pleading or declaration that the Debtors deem appropriate or necessary in support of their request for entry of the Order before the Transaction Hearing.

### III.   Form and Manner of Notice.

20.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Order constitutes good and adequate notice of the sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further notice shall be required.  Accordingly, the Debtors request that the Court approve the form and manner of the notice.

### IV.   Objection Deadline.

21.     As proposed, any and all objections, if any, to the Transaction (a "Transaction Objection") must be filed and served so that such Transaction Objection is actually received by the following parties by April 16, 2019 at 11:59 p.m. (prevailing Central Time) (the "Transaction Objection Deadline"):  (a) the Debtors, Specialty Retail Shops Holding Corp., 700 Pilgrim Way, Green Bay, Wisconsin 54304, Attn:  Russell Steinhorst, Chief Executive Officer; (b)  counsel to

the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Travis

Bayer; Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven

Serajeddini and Daniel Rudewicz; (c) co-counsel to the Debtors, McGrath North Mullin & Kratz,

P.C. LLO, 1601 Dodge St., Omaha, Nebraska 68102, Attn: James Niemeier; (d) counsel to the

Special Committee, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York

10019, Attn: Brian Lennon; (e) the Office of the United States Trustee for the District of Nebraska,

111 South 18th Plaza, #1125, Omaha, Nebraska 68102, Attn: Jerry Jensen; (f) counsel to Wells

Fargo Bank, N.A., Otterbourg P.C., 230 Park Avenue, New York, New York 10169, Attn: Chad

Simon; (g) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th

Floor, New York, New York 10017, Attn: Robert J. Feinstein and Bradford J. Sandler; Pachulski

Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067,

Attn: Jeffrey N. Pomerantz; and (h) co-counsel to the Committee, Goosmann Law Firm, PLC, The

Advent Building, Suite 250, Omaha, NE 68118, Attn: Elizabeth M. Lally, Jeana Goosmann, and

Joel Carney.  Any party failing to timely file a Transaction Objection will be forever barred from

objecting and will be deemed to have consented to the Transaction, including the transfer of the

Debtors' right, title and interest in, to, any of the assets sold pursuant to the Optical Sale Agreement

free and clear of any and all liens, claims, interests, and encumbrances.

**V.**      **Modification of DIP Order to Reflect Sale of Optical Business and the Debtors' Wind-Down.**

22.      The Debtors submit that the final order authorizing the Debtors to use cash

collateral and incur postpetition obligations [Docket No. 425] (the "DIP Order") should be

modified to reflect an agreement reached between the Debtors and Wells Fargo, N.A., as agent to

the Credit Agreement (the "DIP Agent"), reflecting the reduced need for professionals going

forward in these cases.  Pursuant to section 1.3(c) of the DIP Order, the Debtors, subject to certain

exceptions, "may amend, modify, supplement or waive any provision of the Financing Agreements."

23.     Here, the Debtors, while continuing to discuss the specific terms with the lenders and the DIP Agent, seek to (a) amend the DIP Order to make clear that on and after the date the Order is entered, the Debtors may only use the Collateral and proceeds thereof to compensate Committee Professional Persons in accordance with the Sale Budget, which includes a limit of $250,000 for the Committee's Professional Persons' fees and expenses, (b) amend the DIP Order to make clear that it shall be an Event of Default if, on and after the date the Order is entered, the Debtors use the Collateral and proceeds thereof to compensate Debtor Professional Persons, including Willkie Farr & Gallagher LLP and Ducera Partners LLC (retained by the special committee of the Debtors' board of directors), in excess of the sum (x) $2,500,000 as provided in the Sale Budget and (y) any and all fees and expenses incurred in connection with generating proceeds through this Sale Motion or through the prosecution or settlement of any avoidance actions not settled pursuant to this Sale Motion or in connection with a Sale, including, without limitation, services rendered in connection with the pursuit, analysis, negotiation, documentation, prosecution and defense of any such transaction or settlement, and (c) amend section 2.3(a)(iv) of the DIP Order by replacing it in its entirety with the following: "(iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed the greater of (x) $1,490,000 less any Allowed Professional Fees incurred pursuant to the Sale Budget on and after the date an order is entered on the *Debtors' Motion for Entry of an Order (I)  Authorizing the Sale of the Debtors' Optical Business, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (III) Authorizing a Settlement of Claims and Causes of Action (IV) Granting Relief Related to the Wind-Down of the Debtors' Remaining Operations, and (V)*

*Granting Related Relief* and (y) $1,000,000, incurred after the first business day following delivery

by the Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim

order, procedural order, or otherwise (the amounts set forth in this clause)."

24.     The Debtors believe that the modified DIP Order is appropriate as the Debtors wind

down their affairs.  Indeed, consummating the Transaction will resolve many of the key contested

issues in this case, and allow the Debtors, the Committee, and their professionals to streamline

their efforts going forward.

## Basis for Relief

## I.      The Transaction Should Be Approved as an Exercise of Sound Business Judgment.

25.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to

section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed

transaction.  *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the

debtor in possession can sell property of the estate . . . if he has an 'articulated business

justification.'"); *see also In re Bridge Info. Sys., Inc.*, 293 B.R. 479, 486 (Bankr. E.D. Mo. 2003)

(same).

26.     Courts have made clear that a debtor's business judgment is entitled to substantial

deference with respect to disposing of an estate's assets. *See, e.g.*, *In re Trilogy Dev. Co., LLC*,

2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. 2010) (holding that section 363 of the

Bankruptcy Code permits the debtor to sell their assets if a sound business purpose exists); *In re*

*Channel One Commc'ns, Inc.*, 117 BR 493 (Bankr. E.D. Mo. 1990) (same); *In re Schipper*, 933

F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of

the estate . . . if he has an 'articulated business justification.") (internal citations omitted); *see also*

*In re Farmland Indus., Inc.*, 294 B.R 855, 881 (Bankr. W.D. Mo. 2003) (holding that courts in this district are reluctant to interfere with corporate decisions unless "it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code").

27.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'"  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *see also In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988) (holding that section 363(b) of the Bankruptcy Code is satisfied when using "sound business justifications" and, "absent a showing of bad faith, the debtors entered into the disposition of substantially all of their assets"); *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate . . . ") (citations omitted); *In re Integrated Res., Inc.*, 147 B.R. at 656 (explaining that the business judgment rule's presumption that corporate directors "acted on informed basis, in good faith and in the honest belief that action taken was in the best interests of the company"); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions.").

## A.    A Sound Business Purpose Exists for the Transaction.

28.    The Debtors have a sound business justification for the sale of the Optical Business. The Debtors have concluded that the Transaction is in the best interest of their chapter 11 estates, and is supported by a number of sound business reasons.  ***First***, the Debtors believe that, as a result

of the marketing efforts that have been undertaken, the highest or otherwise best offer will be obtained and will provide maximum value to the Debtors under the current circumstances. **Second**, the sale of the Optical Business was, and continues to be, subject to a competitive process, enhancing the Debtors' ability to receive the highest or otherwise best value for the Optical Business. Consequently, the winning bidder's offer will be subject to a "market check" in the form of the sale process, which is the best means for establishing whether a fair and reasonable price is being paid.

29.    Thus, the Debtors submit that the final Optical Sale Agreement will constitute the highest or otherwise best offer for the Optical Business, on balance of the current facts and circumstances, and will allow the Debtors the greatest chance of obtaining the highest value for their estates. As such, the Debtors' determination to enter into the Optical Sale Agreement to sell the Optical Business will be a valid and sound exercise of the Debtors' business judgment. Therefore, the Debtors request that the Court make a finding that the Transaction is a proper exercise of the Debtors' business judgment and is rightly authorized.

### B.    The Transaction and Purchase Prices Reflect a Fair Value Transaction.

30.    It is well settled that the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) (explaining that the "best way to determine value is exposure to a market"); *see also In re Wintz Cos.*, 219 F.3d 807, 813 (8th Cir. 2000) (holding that an auction procedure for the disposition of the debtor's property can be structured to "maximize the value of estate property"). This is especially true here, where the Optical Business has been actively marketed among interested buyers during the extensive marketing process described herein.

14

### C.    The Transaction Is Proposed in Good Faith and Without Collusion, and the Winning Bidder Will Be a "Good-Faith Purchaser."

31.    The Debtors request that the Court find that the winning bidder be entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Transaction.

32.    Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

33.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased assets in "good faith."   In the absence of a definition of "good faith" in the Bankruptcy Code and the Bankruptcy Rules, courts determining whether a buyer was a "good faith purchaser" have "turned to traditional equitable principles, holding that the phrase encompasses one who purchases in 'good faith' and for 'value'" and have looked to the "integrity of his conduct in the course of the sale proceedings."  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Trism, Inc.,* 328 F.3d 1003, 1006 (8th Cir. 2003); *In re Paulson,* 276 F.3d 389, 392 (8th Cir. 2002).

34.     The Debtors submit that the winning bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the Optical Sale Agreement will be a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code. *First*, as set forth in more detail above, the Debtors will only consummate the Transaction if the consideration to be received by the Debtors pursuant to the Optical Sale Agreement is substantial, fair, and reasonable. *Second*, any sale agreement with the winning bidder will be the culmination of a competitive marketing process in which the parties will be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis. *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Transaction to be avoided under section 363(n) of the Bankruptcy Code. *Fourth*, the winning bidder's offer will have been evaluated and approved by the Debtors in consultation with their advisors.

35.     Accordingly, the Debtors believe that the winning bidder and the Optical Sale Agreement will be entitled to the full protections of section 363(m) of the Bankruptcy Code.

**D.     The Transaction Should Be Approved "Free and Clear" Under Section 363(f).**

36.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

37.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any one of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Optical Business

16

free and clear of all interests (i.e., all liens, claims, interests, or encumbrances).  *See In re Heine,* 141 B.R. 185, 189 (Bankr. D. S.D. 1992) ("[O]nly one of the five conditions must be met for authority to sell property free and clear of liens.").

38.    The Debtors submit that any Transaction satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Transaction will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.  Additionally, Wells Fargo, N.A., as agent under the Debtors' prepetition and postpetition financing facility, has confirmed its consent to selling the Optical Business.

39.    Accordingly, the Debtors request authority to convey the Optical Business free and clear of all interests including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Transaction.

## II.    The Assumption and Assignment of Contracts and Leases Are Appropriate and Should Be Approved.

40.    To facilitate and effectuate the sale of the Optical Business and enhance the value to the Debtors' estate, the Debtors are requesting authority to assign or transfer the contracts and leases (the "Assumed Contracts"), upon the closing of the Transaction as contemplated under the Optical Sale Agreement and payment of the cure costs (the "Cure Costs").  The Cure Costs are the amounts, if any, that the Debtors believe are owed to each counterparty (each a "Contract Counterparty," and collectively, the "Contract Counterparties") to an Assumed Contract in order to cure any defaults that exist under such contract or lease.

**A.  The Assumption of the Assumed Contracts Reflects Business Judgement.**

41.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign the debtor's executory contracts and unexpired leases, subject to court approval, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor's decision to assume and/or assign an executory contract or unexpired lease, courts have consistently applied a "business judgment" test when reviewing such a decision unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Grp. of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.,* 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Matter of GP Exp. Airlines, Inc.,* 200 B.R. 222, 230 (Bankr. D. Neb. 1996) ("Absent a showing of bad faith or abuse of debtor's discretion, however, debtor's exercise of business judgment in deciding whether to assume a lease will generally not be disturbed."); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Spirit Holding Co., Inc.,* 166 B.R. 371, 378 (Bankr. E.D. Mo. 1994) (providing that the standard for approving the assumption of an executory contract is to determine if the debtor "exercise[d] wise business judgment").

42.     Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the sale as a sound exercise of the Debtors' business judgment.  ***First***, the Assumed Contracts are necessary to run the Optical Business.  As such, they are essential to inducing the best offer for the Optical Business.  ***Second***, it is unlikely that any purchaser would

want to acquire the Optical Business on a going-concern basis unless a significant number of the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction.  ***Third***, the Debtors expect that the Optical Sale Agreement will provide that the assumption and assignment of Assumed Contracts is integral to, and inextricably integrated in, the Transaction.  ***Finally***, the Assumed Contracts will be assumed and assigned though the process approved by the Court, and thus will be reviewed by key constituents.

43.     Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts should be approved as an exercise of their business judgment.

**B.     Defaults Under the Assumed Contracts Will Be Cured Through the Transaction.**

44.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code:  (a) that a debtor cure, or provide adequate assurance of prompt cure of, prepetition defaults in the executory contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

45.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will promptly be satisfied because either the Debtors or the winning bidder will cure all defaults associated with, or required to properly assume, the Assumed Contracts. Moreover, the Contract Counterparties will be provided notice of the proposed Cure Costs, and will have an opportunity to file an objection to the proposed Cure Costs.  To the extent no objection

is timely filed with regard to a particular cure amount, such cure amount shall be binding on the applicable contract or lease counterparty.  The payment of the Cure Costs will be in full and final satisfaction of all obligations to cure defaults and compensate the Contract Counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular contract is not truly executory, and does not need to be cured to transfer the assets of the Optical Business to the winning bidder.

### C.    Non-Debtor Parties Will be Adequately Assured of Future Performance.

46.    Similarly, the Debtors submit that the third requirement of section 365(b)(1)(C) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  The phrase "adequate assurance of future performance," adopted from section 2-609 of the Uniform Commercial Code, "[is] to be given a practical, pragmatic construction" based upon the facts and circumstances of each case.  *Matter of U.L. Radio Corp.,* 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982); *see In re Alipat, Inc.,* 36 B.R. 274, 277 (Bankr. E.D. Mo. 1984).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.,* 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

47.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of the winning bidder

(e.g., financial credibility, willingness, and ability of the interested party to perform under the Assumed Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assumed Contracts assigned to the winning bidder.  Therefore, the Debtors submit that the winning bidder will satisfy the statutory requirements of section 365(f)(2)(B) of the Bankruptcy Code.

## III.   Modification of the DIP Order Is an Exercise of the Debtors' Reasonable Business Judgment.

48.     Section 363 of the Bankruptcy Code provides, in relevant part, that the debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Approval of a debtor's actions under section 363(b)(1) of the Bankruptcy Code requires the debtor to show that its decision was based on its business judgment.  *See In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (noting that in reviewing a debtor's decision to use estate property pursuant to section 363(b) "the business judgment of the Debtor is the standard applied"); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval under section 363 of the Bankruptcy Code requires a showing that the proposed action is fair and equitable, in good faith and supported by a good business reason).

49.     To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202, 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, Inc., 340 B.R. 222, 239 (Bankr.

D. Del. 2006)).   Once a debtor articulates a valid business justification, it is presumed that "in

making a business decision the directors of a corporation acted on an informed basis, in good faith

and in the honest belief that the action was in the best interests of the company." *In re Integrated*

*Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d

858, 872 (Del. 1985)).   The business judgment rule therefore shields a debtor's management

from judicial second-guessing, and mandates that a court approve a debtor's business decision

unless that decision is a product of bad faith or gross abuse of discretion.   *See id.*; *see also Lubrizol*

*Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*,

475 U.S. 1057 (1986).

50.   The modifications to the DIP Order are a sound exercise of the Debtors' business

judgment.   The Debtors' lenders required these modifications before they would support the

Debtors' wind-down budget and the sale of the Optical Business.   An orderly wind-down of the

Debtors' retail business and a going-concern sale of the Optical Business will maximize the value

of the Debtors' estates for all stakeholders.   Moreover, the DIP Order modifications are appropriate

as they reflect the reduced need for professionals following the sale of the Optical Business.

Accordingly, the Debtors believe that the modifications to the DIP Order are a sound exercise of

their business judgment and respectfully request that the Count authorize such modifications.

## IV.   This Court's Equitable Powers Allow it to Authorize the Modifications to the DIP Order.

51.   Section 105 of the Bankruptcy Code provides that the Court "may issue any order

. . . that is necessary or appropriate to  carry out the provisions of [the Bankruptcy Code]."  11

U.S.C. § 105(a).

52.   The modifications to the DIP Order are necessary to the Debtors' wind-down.

Absent the modifications to the DIP Order, the Debtors' ability to conduct an orderly wind-down

of their retail business or secure a value-maximizing Optical Business sale will be put in jeopardy, materially decreasing recoveries for the Debtors' stakeholders.  Accordingly, the Debtors believe the Court should use its equitable powers to authorize the DIP Order modifications.

## V.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

53.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).  The Debtors request that the Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

54.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, the leading treatise on bankruptcy suggests that the 14-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  10 Collier on Bankr. ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

55.    To maximize the value received for the Optical Business, the Debtors seek to close the Transaction as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

**VI.    Entry Into the Optical Sale Agreement, Including Any Settlement of Claims and Causes of Action, Is in the Best Interests of the Debtors' Estates.**

56.    Certain of the potential bidders for the Optical Business are stakeholders in the chapter 11 cases, and may likely require as part of their Optical Sale Agreement, a settlement of claims against the Debtors or causes of action held by the Debtors.   To the extent the Optical Sale Agreement contains within such terms, Bankruptcy Rule 9019 may apply.  Bankruptcy Rule 9019 provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

57.    In describing the standard for evaluating a settlement under Bankruptcy Rule 9019, the United States Court of Appeals for the Eighth Circuit has stated that a settlement need not be "the best result obtainable," rather the evaluating court should approve the settlement where "the settlement is fair and equitable and in the best interests of the estate."  *Tri-State Fin., LLC v. Lovald*, 525 F.3d 649, 654 (8th Cir. 2008).  The evaluating court only needs to determine that settlement does not fall below the lowest point in the range of reasonableness.  *Id.*; *see also In re Martin*, 212 B.R. 316, 319 (Bankr. App. 8th Cir. 1997) ("The court does not substitute its judgment for that of the trustee, but reviews the issues to see if the settlement falls below the lowest point of reasonableness.").

58.    In determining the range of reasonableness, the court does not need to decide the numerous issues of law and fact raised by the settlement. *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). In other words, the court does not need to conduct a "mini-trial" of the underlying facts and merits; it needs only to evaluate those facts that are necessary to allow it to assess the settlement and to make an independent judgment about the settlement. *In re Hancock-Nelson Mercantile Co., Inc.*, 95 B.R. 982, 995–96 (Bankr. D. Minn. 1989) ("However, *TMT Trailer Ferry* does not impose upon this Court the obligation to compel the full trial record, or the burden of reviewing that record—or even the duty to conduct a 'mini-trial.'"); *see also In re Martin*, 212 B.R. 316, 319 (Bankr. App. 8th Cir. 1997) ("[I]t is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement."); 10 Collier on Bankruptcy ¶ 9019.02 (16th 2018) ("The *TMT* rule does not require the bankruptcy judge to hold a full evidentiary hearing or even a 'mini-trial' before a compromise can be approved. Otherwise, there would be no point in compromising; the parties might as well go ahead and try the case."). Ultimately, "the decision to approve a settlement under [Bankruptcy] Rule 9019 is within the discretion of the bankruptcy judge." *In re Racing Servs., Inc.*, 332 B.R. 581, 586 (B.A.P. 8th Cir. 2005).  As stated above, the Special Committee of the Debtors' board of directors has the sole and exclusive authority to settle claims against insiders.  And here, the Optical Sale Agreement will benefit the Debtors and all parties in interest by providing substantial value to the Debtors' estates and allowing the Debtors to achieve a going-concern transaction, and any settlement of claims or causes of action contained within the Optical Sale Agreement will be reasonable, fair and

equitable, in the best interests of the estate, and exceed the lowest point in the range of reasonableness.

### Waiver of Bankruptcy Rule 6004(a)

59.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the requirements under Local Rule 6004-1.

### Conclusion

60.    For the foregoing reasons, the Debtors respectfully submit that the Optical Sale Agreement satisfies the standards for approval under applicable law and that the Court should therefore approve the Transaction pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rule 9019.

### Notice

61.    The Debtors have provided notice of this Motion to the following parties or their respective counsel: (a) the office of the U.S. Trustee for the District of Nebraska; (b) counsel to the official committee of unsecured creditors; (c) the agents under the Debtors' prepetition asset-based facility; (d) the agents under the proposed DIP Facility; (e) the agents under the Debtors' prepetition term loan facility; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the District of Nebraska; (j) any parties known or reasonably believed to have expressed interest in the Optical Business; (k) all known holders of liens, encumbrances, and other claims secured by the Optical Business; (l) Contract Counterparties to Assumed Contracts; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

62.     No prior request for the relief sought in this Motion has been made to this or any

other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated:  April 10, 2019<br>Omaha, Nebraska | /s/ Michael T. Eversden |

Brian S. Lennon (admitted *pro hac vice*)
Todd G. Cosenza (admitted *pro hac vice*)
Matthew A. Feldman
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
Email:       blennon@willkie.com
              tcozenza@willkie.com
              mfeldman@willkie.com

*Counsel to the Special Committee of Independent Directors of the Debtors*

- and -

James J. Niemeier (NE Bar No. 18838)
Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Telephone:       (402) 341-3070
Facsimile:       (402) 341-0216
Email:           jniemeier@mcgrathnorth.com
                 meversden@mcgrathnorth.com
                 lgoodman@mcgrathnorth.com

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000

Facsimile:    (312) 862-2200
Email:       james.sprayregen@kirkland.com
              patrick.nash@kirkland.com
              travis.bayer@kirkland.com

- and -

Steven Serajeddini (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:       steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors*