# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) | Case No. 19-80064 (TLS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF THE VISA/MASTERCARD CLAIM AND (II) GRANTING RELATED RELIEF

Specialty Retail Shops Holding Corp. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), respectfully state as follows in support of this motion (this "Motion") and submit the *Declaration of Rudy Morando in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Sale of the Visa/MasterCard Claim and (II) Granting Related Relief*, filed contemporaneously herewith.[2]

### Preliminary Statement

1.    This Motion relates to the sale of the Debtors' rights to settlement proceeds as a class member in the Visa/MasterCard Case. The Purchase Price for the Visa/MasterCard Claim is $2.216 million, or less than 1% of the estimated the total proceeds from a liquidation of the Debtors' assets.[3]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592). The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and Its Debtor Affiliates* [Docket No. 570] (the "Plan") or the Claim Agreement, as applicable.

[3]    Based on the midpoint of the liquidation analysis provided in Exhibit E of the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and Its Debtor Affiliates* [Docket No.

## Relief Requested

2.      The Debtors respectfully seek entry of an order (the "Sale Order"): (a) authorizing the sale (the "Claim Sale") of the claim (the "Visa/MasterCard Claim") the Debtors hold in the case captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (MKB) (JO) (the "Visa/MasterCard Case") pursuant to the claim purchase agreement entered into by and between the Debtors and Halcyon Loan Trading Fund LLC (the "Purchaser"), a copy of such agreement is attached hereto as **Exhibit A** (such agreement, the "Claim Agreement"), free and clear of liens, claims, interests, and encumbrances (collectively, the "Interests") with any such Interests to attach to the proceeds thereof with the same validity and priority under the Bankruptcy Code as such Interests had immediately prior to the consummation of the Claim Sale; and (b) granting related relief.

3.      Additionally, the Debtors respectfully request leave to submit a proposed order for the Court's consideration to grant the relief requested herein.

## Jurisdiction and Venue

4.      The United States Bankruptcy Court for the District of Nebraska (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

571] (the "Disclosure Statement"), that estimated the total proceeds from a liquidation of the Debtors' assets of $283.5 million.

5.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.       The bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code ("the <u>Bankruptcy Code</u>"), Bankruptcy Rules 2002, 6004, 6006, and Rule 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Nebraska (the "<u>Local Rules</u>").

**<u>Background</u>**

**I.       General Background.**

7.       The Debtors are engaged in the sale of general merchandise including clothing, accessories, electronics, and home furnishings, as well as the operation of pharmacy and optical services departments.  The Debtors are headquartered in Green Bay, Wisconsin, and as of January 16, 2019 (the "<u>Petition Date</u>"), operated approximately 367 stores in 25 states throughout the United States, as well as e-commerce operations.  The Debtors and their non-Debtor subsidiaries generated approximately $2.6 billion in revenue in fiscal year 2017 and, as of the Petition Date, employed approximately 14,000 people throughout the United States.

8.       On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 25].  No party has requested the appointment of a trustee or examiner in these chapter 11 cases.  On January 18, 2019, the United States Trustee for the District of Nebraska (the "<u>U.S. Trustee</u>") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "<u>Committee</u>") [Docket No. 95].

9.    On February 12, 2019, the Court entered the *Order (I) Establishing Bidding Procedures for the Plan Sponsors and (II) Granting Related Relief* [Docket No. 385] (the "<u>Bidding Procedures Order</u>"), by which the Court approved the bidding procedures (the "<u>Bidding Procedures</u>") for the sale of the Debtors' assets.  On February 6, 2019, the Debtors filed the *Notice of Modified Proposed Bidding Procedures* [Docket No. 335], in which the Debtors noted that, in consultation with their advisors, they had developed a go-forward business plan that included 120 stores and 61 standalone optical centers and were actively soliciting interest from parties who would like to explore a transaction in support of the new business plan.  On March 18, 2019, having failed to consummate an agreement with an acceptable buyer or receive sufficient interest, the Debtors cancelled the auction that was to be held as part of the Bidding Procedures and filed the *Notice of Additional Store Closings* [Docket No. 689].

## II.    The Visa/MasterCard Settlement.

10.    Throughout the case, the Debtors have been exploring strategic alternatives to maximize value for the Debtors' remaining assets, including the sale of their non-operational assets, such as the Visa/MasterCard Claim.  On September 12, 2013, the United States District Court of the Eastern District of New York held a final approval hearing concerning the Visa/MasterCard Case, the related Visa/MasterCard Claim settlement agreement, and entered an order (the "<u>Proposed Class Settlement Order</u>") on January 14, 2014.  The Proposed Class Settlement Order was rejected by the United States Court of Appeals for the Second Circuit for conflict of interest issues; however the settlement was approved (the "<u>Class Settlement Order</u>") on January 28, 2019.  Pursuant to the court-authorized settlement website, "[t]he Court has preliminarily approved a proposed settlement of a maximum of approximately $6.24 billion and a minimum of at least $5.54 billion in a class action lawsuit."  *See* Payment Card Interchange Fee

Settlement,          Official          Court-Authorized          Settlement          Website,

https://www.paymentcardsettlement.com (last visited Apr. 11, 2019).  The Debtors were a member

of such class pursuant to the litigation where plaintiffs asserted that interchange fees paid by

merchants on purchases were inflated.  The Debtors, in the exercise of their business judgment,

believe that the sale of the Visa/MasterCard Claim free and clear of all liens is in the best interests

of the Debtors' estates and their creditors.

11.    The Debtors' have received inquiries from various parties interested in purchasing

the Visa/MasterCard Claim.  Based on these inquiries, the Debtors obtained interchange data from

Bank of America Merchant Services for the period from January 1, 2004 to December 31, 2018

showing credit card interchange fees of approximately $166 million.  The Debtors and their

advisors shared this information with multiple potential buyers and asked the potential buyers to

submit offers for the purchase of the Visa/MasterCard Claim.   The Debtors did not have, and did

not provide, information on the credit card interchange fees for the period of January 1, 2019

through the January 25, 2019; any debit card interchange fees; or any post transaction adjustments,

such as refunds, chargebacks, and network fees.

12.    After evaluation of all initial bids received, the Debtors selected the highest or

otherwise best bid for the Visa/MasterCard Claim at the time.  As additional inquiries from various

parties interested in purchasing the Visa/MasterCard Claim were received, the Debtors broadened

the number of parties to which interchange data from Bank of America Merchant Services was

provided.   In total, over 37 parties received the interchange data and were given an opportunity to

bid on the Visa/MasterCard Claim.

13.    On April 13, 2019, the Debtors executed the Claim Agreement with the Purchaser

and have filed this Motion seeking the Court's entry of the Sale Order.  The Claim Sale represents

a cost-effective method to realize value for the Visa/MasterCard Claim.

14.    The following summarizes the principal terms of the Claim Agreement: [4]

| Agreement Provision | Summary Description |
|---|---|
| **Parties** | <u>Sellers</u>: Specialty Retail Shops Holding Corp. and certain of its subsidiaries<br><u>Purchaser</u>: Halcyon Loan Trading Fund LLC |
| **Purchase Price** | On the terms and subject to the conditions and other provisions set forth in the Claim Agreement, Purchaser agrees to purchase all right, title and interest in the Claim from Seller, and Seller agrees to sell, transfer and assign all right, title and interest in the Claim to Purchaser for the sum of $2,216,000 (the "<u>Purchase Price</u>"), which is subject to higher or otherwise better offers that may be obtained by the Seller prior to the Bankruptcy Court's entry of the Sale Order. |
| **Closing** | The Seller and Purchaser will use reasonable efforts to close no later than May 14, 2019. |
| **Cooperation of Seller** | Seller understands and acknowledges that in order for Purchaser to verify and/or collect the Claim, Purchaser may require Seller's assistance, and Seller agrees to provide such assistance to Purchaser, during the period of 120 days immediately following the Closing Date unless otherwise extended in writing by the parties, as may be necessary for the collection of the Claim, including but not limited to the verification of data within Seller's reasonable possession and/or control or that may be obtained with the assistance/authorization of Seller.  In addition, Seller agrees to authorize and direct its credit/debit card merchant bank, Bank of America, to fully cooperate with Purchaser in connection with the foregoing. |
| **Termination Fee and Expense Reimbursement** | In the event the Seller consummates an alternative transaction (an "<u>Alternative Transaction</u>") with another party (not affiliated with Purchaser) for the Claim, the Purchaser shall be entitled to a termination fee equal to 1.5% of the Purchase Price (the "<u>Termination Fee</u>") and to be reimbursed for all reasonable professional fees and expenses incurred (including all reasonable legal fees and expenses) in an amount not to exceed $20,000.00 (the "<u>Expense Reimbursement</u>").  The Termination Fee and Expense Reimbursement shall be payable from the proceeds of the purchase price in such Alternative Transaction and will be deemed an administrative expense of the Seller. The termination fee will be paid to the Purchaser within five (5) business days after the closing of an Alternative Transaction for the sale of the Claim.  Seller agrees to incorporate this provision into any agreements related to the Alternative Transaction or motions seeking approval of this transaction or such Alternative Transaction. |
| **No Assumption of Obligations or Liabilities** | Purchaser shall not assume or in any way become liable for any obligation or liability relating to the Claim or Seller unless explicitly provided for in the Claim Agreement. |
| **No Fiduciary or Confidential Relationship** | Seller and Purchaser acknowledge that Seller and Purchaser are not in a fiduciary, confidential, agency or otherwise special relationship, including one of trust, |

---

[4]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Claim Agreement, the latter governs in all respects.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Claim Agreement.

| Agreement Provision | Summary Description |
|---|---|
| | confidence or privity, and that Seller and Purchaser are each acting for their own self-interest. |
| Waiver of Claims | To the maximum extent permitted by law, Seller will not assert and hereby waives any and all claims against Purchaser or any of its members, officers, directors, employees, agents or affiliates with respect to the Claim Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby based on: (i) any claim that Purchaser had superior or additional information material to a decision to sell or buy the Claim; (ii) Purchaser made warranties or representations, expressed or implied, not contained in the Claim Agreement; or (iii) the Claim's value and scope exceeds the Purchase Price. For the avoidance of doubt, the foregoing shall not be deemed to be a waiver of any representation or warranty expressly set forth herein. |
| Covenant Not To Sue | Seller will not commence or maintain any suit thereon against Purchaser or any of its shareholders, officers, directors, employees, agents or affiliates with respect to the Claim Agreement, or the transactions contemplated hereby, whether at law or in equity, based on: (i) any claim that Purchaser had superior or additional information material to a decision to sell or buy the Claim; (ii) Purchaser made warranties or representations, expressed or implied, not contained in the Claim Agreement; or (iii) the Claim's value and scope exceeds the Purchase Price. For the avoidance of doubt, the foregoing shall not be deemed to be a waiver of any representation or warranty expressly set forth in the Claim Agreement. |
| Governing Law; Forum | The Claim Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of law rules, principles or provisions of such state or of any other state. The Parties hereby agree that any action or claim arising out of any dispute in connection with the Claim Agreement, any rights, remedies, obligations, or duties hereunder, or the performance or enforcement hereof or thereof shall be subject to the exclusive jurisdiction of the Bankruptcy Court. |

15.     The bid provided by the Purchaser, and the related Claim Agreement, provides the Debtors with a viable path to sell an asset and provide liquidity to the Debtors' estates. The bid is the byproduct of arms'-length, good-faith negotiations between the Debtors and the Purchaser.

16.     The Debtors submit that the Claim Agreement represents the best available offer for the Debtors' rights under the Visa/MasterCard Claim. To be sure, the Debtors explored and negotiated potential transactions with other interested parties prior to entering into the Claim Agreement. If a higher or otherwise better alternative materializes—which at a minimum would be a bid greater than the sum of the Purchase Price plus the Expense Reimbursement (as defined below) plus the Termination Fee (as defined below)—the Debtors will, subject to the terms of the

Claims Agreement, pursue and potentially implement such alternative as value-accretive to their estates.

17.     For all of these reasons, the Debtors respectfully request that the Court grant the relief requested herein.

**III.     Form and Manner of Notice.**

18.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Sale Order constitutes good and adequate notice of the Claim Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further notice shall be required. Accordingly, the Debtors request that the Court approve the form and manner of the notice.

**IV.     Objection Deadline.**

19.     Any and all objections, if any, to the Claim Sale (a "Claim Sale Objection") must be filed and served so that such Claim Sale Objection is actually received by the following parties by May 6, 2019 at 4:00 p.m. (prevailing Central Time) (the "Claim Sale Objection Deadline"): (a) the Debtors, Specialty Retail Shops Holding Corp., 700 Pilgrim Way, Green Bay, Wisconsin 54304, Attn:  Russell Steinhorst, Chief Executive Officer; (b)  counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  Travis Bayer; Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Steven Serajeddini and Daniel Rudewicz; (c) co-counsel to the Debtors, McGrath North Mullin & Kratz, P.C. LLO, 1601 Dodge St., Omaha, Nebraska 68102, Attn:  James Niemeier; (d) the Office of the United States Trustee for the District of Nebraska, 111 South 18th Plaza, #1125, Omaha, Nebraska 68102, Attn:  Jerry Jensen; (e) counsel to Wells Fargo Bank, N.A., Otterbourg P.C., 230 Park Avenue, New York, New York 10169, Attn: Chad Simon; (f) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017, Attn: Robert J. Feinstein and

Bradford J. Sandler; Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor,

Los Angeles, California 90067, Attn: Jeffrey N. Pomerantz; and (g) co-counsel to the Committee,

Goosmann Law Firm, PLC, The Advent Building, Suite 250, Omaha, NE 68118, Attn: Elizabeth

M. Lally, Jeana Goosmann, and Joel Carney.   Any party failing to timely file a Claim Sale

Objection will be forever barred from objecting and will be deemed to have consented to the Claim

Sale, including the transfer of the Debtors' right, title and interest in, to, and under the

Visa/MasterCard Claim free and clear of any and all liens, claims, interests, and encumbrances in

accordance with the relative definitive agreements for the Claim Sale.

### **Basis for Relief**

## I.    **The Claim Sale Should Be Approved as an Exercise of Sound Business Judgment.**

20.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to

section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed

transaction.  *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the

debtor in possession can sell property of the estate . . . if he has an 'articulated business

justification.'"); *see also In re Bridge Info. Sys., Inc.*, 293 B.R. 479, 486 (Bankr. E.D. Mo. 2003)

(same).

21.    Courts have made clear that a debtor's business judgment is entitled to substantial

deference with respect to disposing of an estate's assets. *See, e.g., In re Trilogy Dev. Co., LLC*,

2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. 2010) (holding that section 363 of the

Bankruptcy Code permits the debtor to sell their assets if a sound business purpose exists); *In re

Channel One Commc'ns, Inc.,* 117 BR 493 (Bankr. E.D. Mo. 1990) (same); *In re Schipper,* 933

F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of

the estate . . . if he has an 'articulated business justification.") (internal citations omitted); *see also In re Farmland Indus., Inc.,* 294 B.R 855, 881 (Bankr. W.D. Mo. 2003) (holding that courts in this district are reluctant to interfere with corporate decisions unless "it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code").

22.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *see also In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988) (holding that section 363(b) of the Bankruptcy Code is satisfied when using "sound business justifications" and, "absent a showing of bad faith, the debtors entered into the disposition of substantially all of their assets"); *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate . . . ") (citations omitted); *In re Integrated Res., Inc.*, 147 B.R. at 656 (explaining that the business judgment rule's presumption that corporate directors "acted on informed basis, in good faith and in the honest belief that action taken was in the best interests of the company"); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions.").

## A.     A Sound Business Purpose Exists for the Sale.

23.     The Debtors have a sound business justification for entering into the disposition of the Visa/MasterCard Claim.  The Debtors have concluded that the Claim Sale is in the best interest of their chapter 11 estates, and is supported by a number of sound business reasons.  *First*, the Debtors believe that, as a result of the marketing efforts that have been undertaken, the highest or otherwise best offer has been obtained and will provide maximum value to the Debtors under the current circumstances.   *Second*, the sale of the Visa/MasterCard Claim has been subject to a competitive process, enhancing the Debtors' ability to receive the highest or otherwise best value for the Visa/MasterCard Claim.  Consequently, the Purchaser has been subject to a "market check" in the form of the sale process and will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Visa/MasterCard Claim, and was the best means for establishing whether a fair and reasonable price is being paid.

24.     Thus, the Debtors submit that the Claim Agreement constitutes the highest or otherwise best offer for the Visa/MasterCard Claim, on balance of the current facts and circumstances, and will allow the Debtors the greatest chance of obtaining the highest value for their estates.  As such, the Debtors' determination to enter into the Claim Agreement to sell the Visa/MasterCard Claim is a valid and sound exercise of the Debtors' business judgment. Therefore, the Debtors request that the Court make a finding that the sale of the Visa/MasterCard Claim to the Purchaser is a proper exercise of the Debtors' business judgment and is rightly authorized.  Courts have previously authorized sales of debtor claims in the Visa/MasterCard Case. *See In re City Sports, Inc.*, No. 15-12054 (KG) (Bankr. D. Del. Mar. 4, 2016); *In re Cach*é*, Inc.*, No. 15-10172 (MFW) (Bankr. D. Del. Oct. 5, 2015); *In re ALCO Stores, Inc.*, No. 14-34941 (SGJ)

(Bankr. N.D. Tex. May 21, 2015); *In re dELiA\*s, Inc.*, No. 14-23678 (RDD) (Bankr. S.D.N.Y.

Mar. 20, 2015).

**B.    The Claim Sale and Purchase Prices Reflect a Fair Value Transaction.**

25.     It is well settled that the best way to determine value is exposure to the market.  *See*

*Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999)

(explaining that the "best way to determine value is exposure to a market").  This is especially true

here, where the Visa/MasterCard Claim has marketed among interested buyers. Moreover, even

as the Debtors move forward with the Claim Sale, the Debtors will continue to evaluate other

offers for the Visa/MasterCard Claim subject to the Claim Agreement.  *In re Payless Cashways,*

*Inc.*, 281 B.R. 648, 652 (Bankr. App. 8th Cir. 2002) ("Up to the point where the court actually

enters an order confirming the sale, the Eighth Circuit recognized that a bankruptcy court has broad

discretion to accept or reject bids and to conduct sales or auctions in the manner deemed most

appropriate by the court." (citing *In re Food Barn Stores, Inc.*, 107 F.3d 558, 565–67 (8th Cir.

1997))); *In re The Great A. & P. Tea Co., Inc.*, 544 B.R. 43, 49–50 (Bankr. S.D.N.Y. 2016) (noting

that private sales of assets do not require an auction and that "because of the requirement of Court

review coupled with debtors' duty to maximize the value of their estates, any motion for approval

of . . . the sale of an asset, has inherent within it the possibility for an auction: all it takes to turn

the hearing on such a motion into an auction is the public submission of an arguably higher or

better firm offer") (internal citations omitted); *see also Food Barn* at 564 (8th Cir. 1997) (holding

that bankruptcy court did not abuse its discretion by entertaining higher offers even after

bankruptcy court had preliminarily approved the sale).  In this way, the number of bidders that are

eligible to participate in a competitive process will be maximized and the Claim Agreement

Purchase Price will, conclusively, be fair value.

**C.    The Claim Sale Is Proposed in Good Faith and Without Collusion, and the Purchaser Is a "Good-Faith Purchaser."**

26.    The Debtors request that the Court find that the Purchaser be entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Claim Sale.

27.    Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

28.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the Visa/MasterCard Claim in "good faith."  In the absence of a definition of "good faith" in the Bankruptcy Code and the Bankruptcy Rules, courts determining whether a buyer was a "good faith purchaser" have "turned to traditional equitable principles, holding that the phrase encompasses one who purchases in 'good faith' and for 'value'" and have looked to the "integrity of his conduct in the course of the sale proceedings."  *See, e.g., In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Trism, Inc.,* 328 F.3d 1003, 1006 (8th Cir. 2003); *In re Paulson,* 276 F.3d 389, 392 (8th Cir. 2002).

29. The Debtors submit that the Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the Claim Agreement is a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code. *First*, as set forth in more detail above, the consideration received by the Debtors pursuant to the Claim Agreement is substantial, fair, and reasonable. *Second*, the Claim Agreement with the Purchaser is the culmination of a competitive process in which the Debtors were represented by counsel and all negotiations were conducted on an arm's-length, good-faith basis. *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Claim Sale or Claim Agreement to be avoided under section 363(n) of the Bankruptcy Code. *Fourth*, the Purchaser's offer has been evaluated and approved by the Debtors in consultation with their advisors.

30. Accordingly, the Debtors believe that the Purchaser and Claim Agreement should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

**D.    The Claim Sale Should Be Approved "Free and Clear" Under Section 363(f).**

31. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

32. Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any one of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Visa/MasterCard

Claim free and clear of all interests (i.e., all liens, claims, interests, or encumbrances).  *See In re Heine,* 141 B.R. 185, 189 (Bankr. D. S.D. 1992) ("[O]nly one of the five conditions must be met for authority to sell property free and clear of liens.").

33.    The Debtors submit that the Claim Sale satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any interests will be adequately protected by having it attach to the net proceeds of the Claim Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Additionally, Wells Fargo, as agent under the Credit Agreement, has confirmed its consent to the Debtors' sale of the Visa/MasterCard Claim.

34.    Accordingly, the Debtors request authority to convey the Visa/MasterCard Claim free and clear of all Interests including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Claim Sale.

## II.    The Expense Reimbursement and Termination Fee Have a Sound Business Purpose and Should Be Approved.

35.    The Debtors provided the Purchaser with a right of first refusal, which does not normally require court approval under Eighth Circuit precedent.  *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 567–68 (8th Cir. 1997) ("Some amount of bid protection is, of course, permissible under the Code, and the trustee is not normally required to seek court approval before in good faith entering into an agreement which includes a right of first refusal."); *see also In re Table Talk, Inc.*, 53 B.R. 937, 942 (Bankr. D. Mass. 1985) ("[T]he policy of encouraging potential buyers to enter negotiations with trustees would not be served by requiring the trustee to gain Court approval of a right of first refusal, if, as in this proceeding, it was granted in good faith. A contrary position might discourage potential buyers from negotiating with trustees, thereby forcing down the market

value of the bankruptcy estate property in general. Therefore, the Court finds that the right of first refusal is not ineffective simply because the Trustee did not obtain Court approval for it.").

36.    The Debtors are seeking authority, in the event the Debtors elect to sell the Visa/MasterCard Claim to another buyer (an "Alternative Transaction"), to pay the Purchaser for all reasonable professional fees and expenses incurred in an aggregate amount not to exceed $20,000 (the "Expense Reimbursement") and a termination fee equal to 1.5% of the Purchase Price (the "Termination Fee").  Payment of expense reimbursements in a bidding process for sales is appropriate under section 363(b) of the Bankruptcy Code so long as such payment is a valid exercise of the Debtors' business judgment.  Under section 363(b), the Debtors may use, sell, or lease estate property outside of the ordinary course of business so long as they articulate a sound business reason for doing so.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983).

37.    The Debtors believe that granting authority to pay the Expense Reimbursement is in the best interests of their estates.  The Purchaser has expended time and resources negotiating, drafting, and performing due diligence activities despite the fact that the Purchaser's bid has been and will be subject not only to Court approval, but to overbidding by third parties.  Without the Expense Reimbursement, the Purchaser would have withdrawn from the bid process to the detriment of the Debtors' estates.  In that instance, the value created for the Debtors' estates would have likely outweighed the cost of any Expense Reimbursement.

38.    The Debtors further seek authority to pay the Termination Fee in an amount of 1.5% of the proposed Purchase Price, only in the event that the Debtors elect to enter into an Alternative Transaction with another bidder.  Bidders subject to higher or better bids often require breakup

16

fees and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."  *Off. Comm. of Unsecured Creditors v. Interforum Holding LLC*, 11-CV-219, 2011 WL 2671254, at *1 (E.D. Wis. July 7, 2011) (internal citations omitted).  "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." *In re Integrated Res., Inc.*, 147 B.R. 650, 659–60 (S.D.N.Y. 1992) (emphasis added).  Specifically, bid protections may be necessary to convince a bidder to enter the bidding by providing some form of compensation for the risks that it is undertaking.  *E.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").  Thus, the use of bid protections has become an established practice in chapter 11 cases.

39.     As a result, courts routinely approve bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See, e.g.*, *In re Wintz Cos.*, 230 B.R. 840, 847 (B.A.P. 8th Cir. 1999) (holding that bid protections benefitted the estate rather than chilled bidding); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).  The Debtors believe that the allowance of the bid protections is in the best interests of the Debtors' estates and their creditors.

40.     Accordingly, for the reasons set forth above, the Court should grant the Debtors the authority to incur and pay the Expense Reimbursement and Termination Fee obligations as a valid exercise of the Debtors' business judgment and otherwise within the controlling legal standards in this district.

**III.    Relief Under Bankruptcy Rules 6004(h) Is Appropriate.**

41.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  The Debtors request that the Sale Order be effective immediately upon its entry by providing that the 14-day stays under Bankruptcy Rule 6004(h) is waived.

42.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, the leading treatise on bankruptcy suggests that the 14-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankr. ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

43.     To maximize the value received for the Visa/MasterCard Claim, the Debtors seek to close the Claim Sale as soon as possible after the Claim Sale Objection Deadline or, if necessary, the hearing to consider the Claim Sale.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h).

### Waiver of Bankruptcy Rule 6004(a) and Local Rule 6004-1

44.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the requirements under Local Rule 6004-1.

### Reservation of Rights

45.    Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

### Notice

46.    The Debtors have provided notice of this Motion to the following parties or their respective counsel:  (a) the office of the U.S. Trustee for the District of Nebraska; (b) counsel to the Committee; (c) the agents under the Debtors' prepetition asset-based facility; (d) the agents under the proposed DIP Facility; (e) the agents under the Debtors' prepetition term loan facility; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the United States Attorney's Office for the District of Nebraska; (j) all known holders of liens, encumbrances, and other claims secured by the Visa/MasterCard Claim; and (k) any party that has requested

notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

47.    No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Sale Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated: April 13, 2019<br>Omaha, Nebraska | /s/ *Lauren R. Goodman* |

James J. Niemeier (NE Bar No. 18838)
Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Telephone:    (402) 341-3070
Facsimile:    (402) 341-0216
Email:        jniemeier@mcgrathnorth.com
              meversden@mcgrathnorth.com
              lgoodman@mcgrathnorth.com

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              patrick.nash@kirkland.com
              travis.bayer@kirkland.com

- and -

Steven Serajeddini (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        steven.serajeddini@kirkland.com

*Co-Counsel to the Debtors*

## Exhibit A

**Claim Agreement**

# ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into this 13th day of April, 2019 by and between the undersigned funds managed by Halcyon Loan Trading Fund LLC or its designee (collectively, the "Purchaser"), and Specialty Retail Shops Holding Corp., et. al.[1] , (collectively, the "Seller") as debtors and debtors in possession. Purchaser and Seller are sometimes collectively referred to in this Agreement as "Parties" or individually as "Party."

# RECITALS

A.  Seller may be a Class Member and potential beneficiary of the putative consolidated class action entitled *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* (Case No. 1:05 md-1720-MKB-JO) ("Litigation") pending in the United States District Court for the Eastern District of New York ("District Court"). If the plaintiffs in the Litigation prevail in the Litigation, such Litigation results in a final settlement, or the Litigation is otherwise resolved in any way or by any forum in favor of class members ("Settlement Event"), the Seller may be entitled to a monetary recovery.

B.  Seller may have a right, now or in the future, to benefits arising from and/or relating to the Litigation and the injuries alleged therein. These rights to benefits are called the "Claim". The Claim encompasses all rights, title, and ownership interest of any kind, now existing or arising hereafter, to which Seller or its affiliates may be entitled, arising in any way or form, from the Litigation, or the operative facts alleged in the Litigation, including but not limited to the right to monetary benefits, or benefits that may be monetized, from settlements, judgments, or any other form of resolution of the Litigation or the operative facts alleged therein. Whether such recovery will occur is unknown by Seller and Purchaser at the time of this Agreement.

C.  Seller is Specialty Retail Shops Holding Corp. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), in connection with the Debtors' jointly administered chapter 11 cases in the United States Bankruptcy Court for the District of Nebraska (the "Bankruptcy Court"), lead case number 19-80064 (TLS) (the "Bankruptcy Case").

D.  Purchaser desires to purchase the Claim from Seller, and Seller desires to sell the Claim to Purchaser as provided for in this Agreement. The Parties intend to transfer from Seller to Purchaser any and all of the Seller's right, title and interest in and or associated with, or connected in any manner to, the Claim.

---

[1]  The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).

E.    All terms used herein and not defined herein shall have the meanings given such terms in the Litigation filings.

**NOW, THEREFORE**, in consideration of the mutual covenants, agreements, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1.  RECITALS INCORPORATED IN AGREEMENT

1.1    The above recitals are hereby incorporated herein by reference.

## SECTION 2.  TERMS OF PURCHASE AND SALE

2.1    <u>Sale and Purchase of Claim</u>. On the terms and subject to the conditions and other provisions set forth in this Agreement, Purchaser agrees to purchase all right, title and interest in the Claim from Seller, and Seller agrees to sell, transfer and assign all right, title and interest in the Claim to Purchaser for the sum of $2,216,000.00 (the "<u>Purchase Price</u>"), which is subject to higher or otherwise better offers that may be obtained by the Seller prior to the Bankruptcy Court's entry of the Sale Order (as defined below).

2.2    <u>Termination Fee</u>.  In the event the Seller consummates an alternative transaction (an "<u>Alternative Transaction</u>") with another party (not affiliated with Purchaser) for the Claim, the Purchaser shall be entitled to a termination fee equal to 1.5% of the Purchase Price (the "<u>Termination Fee</u>") and to be reimbursed for all reasonable professional fees and expenses incurred (including all reasonable legal fees and expenses) in an amount not to exceed $20,000.00 (the "<u>Expense Reimbursement</u>").  The Termination Fee and Expense Reimbursement shall be payable from the proceeds of the purchase price in such Alternative Transaction and will be deemed an administrative expense of the Seller. The termination fee will be paid to the Purchaser within five (5) business days after the closing of an Alternative Transaction for the sale of the Claim.  Seller agrees to incorporate this provision into any agreements related to the Alternative Transaction or motions seeking approval of this transaction or such Alternative Transaction.

2.3    <u>Bankruptcy Court Approval</u>. It shall be a condition precedent to the performance of the obligations of both Seller and Purchaser under this Agreement that the Bankruptcy Court shall have entered an order reasonably satisfactory to each of Seller and Purchaser approving the sale of the Claim pursuant to this Agreement, which order shall be in full force and effect and shall not have been modified, stayed, or reversed as of the Closing Date (the "<u>Sale Order</u>").

2.4    <u>Closing</u>. The transactions contemplated by this Agreement will be consummated at a closing as follows:

(a)    The Seller and Purchaser will use reasonable commercial efforts to close (the "<u>Closing</u>") no later than May 14, 2019. The date and time the Closing actually

2

occurs are referred to herein as the "Closing Date". The Closing will be effective as of 12:01 a.m., Eastern Daylight Savings Time, on the Closing Date.

(b)    No later than the Closing Date, Seller shall execute and deliver to Purchaser the Notice of Assignment, in the form attached hereto as Exhibit A ("Assignment") and the Authorization to Obtain Transactional Data, in the form attached hereto as Exhibit B ("Data Authorization", with Assignment, the "Ancillary Agreements").

(c)    Provided that Seller has fully performed its obligations under Section 2.4(b), including delivering to Purchaser the completed schedules associated with the Ancillary Agreements and the Sale Order has been entered approving the sale of the Claim to Purchaser, Purchaser shall pay to Seller at the Closing an amount equal to the Purchase Price in immediately available funds by confirmed wire transfer to a bank account to be designated by Seller no later than the Closing Date.

2.5    Cooperation of Seller. Seller understands and acknowledges that in order for Purchaser to verify and/or collect the Claim, Purchaser may require Seller's assistance, and Seller agrees to provide such assistance to Purchaser, during the period of 120 days immediately following the Closing Date unless otherwise extended in writing by the parties, as may be necessary for the collection of the Claim, including but not limited to the verification of data within Seller's reasonable possession and/or control or that may be obtained with the assistance/authorization of Seller.  In addition, Seller agrees to authorize and direct its credit/debit card merchant bank, Bank of America, to fully cooperate with Purchaser in connection with the foregoing.

2.6    No Assumption of Obligations or Liabilities. Purchaser shall not assume or in any way become liable for any obligation or liability relating to the Claim or Seller unless explicitly provided for in this Agreement.

## SECTION 3.  REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

3.1    Organization. Specialty Retail Shops Holding Corp. and each of its Debtor affiliates (a) is an entity duly incorporated or organized and validly existing under the laws of its jurisdiction of incorporation or organization, as applicable, (b) has all requisite corporate or limited liability company power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) under the laws of its jurisdiction of incorporation or organization, as applicable, and in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify.

3.2    Authority. The execution and delivery of this Agreement by Seller and, subject to the entry of the Sale Order, the consummation by Seller of the transaction contemplated by this Agreement are within Seller's authority as granted by the Bankruptcy Court in the Bankruptcy Case.

1038160.v.3 463/01567

3.3     <u>Due Execution; Validly Binding Agreement</u>. This Agreement has been duly authorized, executed and delivered and constitutes a legal, valid and binding obligation of the Seller upon entry of the Sale Order, enforceable against it in accordance with its terms.

3.4     <u>No Litigation</u>. There is no known suit, action, litigation or other proceeding or governmental or administrative investigation or inquiry, pending or threatened against the Seller or concerning the Claim that could prevent or prohibit Seller from selling the Claim or from otherwise complying in full with the provisions of this Agreement. Transfer of the Claim pursuant to this Agreement will not breach, violate or otherwise contravene any applicable law, statute, regulation or contractual term.

3.5     <u>Title to Claim; No Liens</u>. Seller has good, valid and marketable title to the Claim and, upon entry of the Sale Order, may sell the Claim free and clear of any mortgage, pledge, lien, security interest, claim or encumbrance. Seller has not heretofore transferred the Claim or any interest therein, other than security interests that will no longer attach to the Claim once sold in accordance with the Sale Order.

3.6     <u>Independent Investigation</u>. Seller acknowledges that it has conducted its own independent evaluation of the transactions contemplated under this Agreement. Seller further acknowledges that it has had an opportunity to conduct its own independent investigation regarding the Claim and the Litigation. Seller has had an opportunity to review the documents and information available through publicly available sources of information.

3.7     <u>Information Provided to Purchaser</u>. To the best of Seller's knowledge, all information provided to Purchaser by Seller in connection with the sale of the Claim, including, but not limited to, information on dates on which the Seller began accepting Visa and/or MasterCard credit card and/or debit transactions, financial information about the Seller's business (including total United States sales) and any other representations actually or potentially concerning the asset is true, correct and complete in all material respects. Seller has made the following representations or warranties to Purchaser:

     i.     Seller has not had any communications with the District Court, lead counsel for the parties in the Litigation ("<u>Lead Counsel</u>"), any defendants in the Litigation or any other entity affiliated with the Litigation regarding the Litigation.

     ii.     Should a Settlement Event occur, if asked by the District Court, Lead Counsel, the claims administrator appointed in the Litigation ("<u>CA</u>") or any other entity affiliated with such settlement, Seller hereby warrants that

          1.     Seller never intended to opt-out of the Litigation;

          2.     Seller never gave any entity any indication of an intent to opt-out of the Litigation; and

          3.     Seller never authorized any entity to opt-out of the Litigation on Seller's behalf.

4

    iii.    Seller warrants that if requested by Purchaser and if a Settlement Event should occur, it will provide an affidavit stating that (1) Seller never intended to opt-out of the Settlement Event; (2) Seller never gave any entity any indication of an intent to opt-out of the Settlement Event; and (3) Seller never authorized any entity to opt-out of the Settlement Event on Seller's behalf.

    iv.    Seller warrants that it will never take any position inconsistent with the representations and warranties contained in this Section 3.7.

3.8    <u>No Reliance</u>. Seller has conducted an independent evaluation of the reasonableness of the Purchase Price and has decided to enter into this Agreement and undertake the transactions contemplated hereunder solely in reliance on its own evaluation of the Purchase Price. With the exception of any representations and warranties set forth in Section 4 of this Agreement, Seller is not relying on (i) any information provided to Seller or written or oral representations, whether express or implied, by Purchaser or its respective members, shareholders, officers, directors, employees, agents or affiliates or (ii) any information provided to Seller by Purchaser or its respective shareholders, officers, directors, employees, agents or affiliates in assessing the reasonableness of the Purchase Price. Aside from representations or warranties contained herein, Seller acknowledges that Purchaser expressly disclaims and has not made any warranties, guarantees, promises, or representations of any kind whatsoever regarding the value of the Claim and the anticipated recovery and/or timing of recovery on the Claim.

3.9    <u>Information</u>. Seller acknowledges that because a Settlement Event had not taken place prior to the payment of the Purchase Price, the value of the Claim and the final recovery on the Claim may not be determined with certainty by Seller or Purchaser as of the time of execution of this Agreement. Seller further acknowledges that Purchaser may possess material information not known to Seller, and Seller agrees that Purchaser shall have no liability with respect to the non-disclosure of any such information.

3.10    <u>Expectation of Return</u>. Seller acknowledges that Purchaser's sole intention and expectation in entering into this Agreement is to earn a positive financial return on the Claim. As such, Seller understands that Purchaser's recovery on the Claim may exceed the Purchase Price.

3.11    <u>No Fiduciary or Confidential Relationship</u>. Seller acknowledges that Seller and Purchaser are not in a fiduciary, confidential, agency or otherwise special relationship, including one of trust, confidence or privity, and that Seller and Purchaser are each acting for their own self-interest.

3.12    <u>Interchange Fees</u>. Based on information delivered to Seller by its credit/debit card merchant bank, Bank of America, the amount of interchange fees attributable to Seller's MasterCard and Visa payment card transactions from January 1, 2004 to January 25, 2019 hereof are not less than $165,560,434.00, which figure excludes any interchanges fee paid by Seller in connection with its own branded credit or debit cards. To the best of Seller's knowledge, such figure is not incorrect.

5

3.13    <u>Brokers and Finders</u>. Except for the retention of Berkeley Research Group, LLC ("<u>Broker</u>"), Seller has not employed any investment banker, broker or finder or incurred any liability for any investment banking fees, brokerage fees, commissions or finders' fees in connection with this transaction, and Purchaser shall not have any liability or obligation with respect to any fees, commissions or other amounts payable to Broker in connection with such retention.

3.14    <u>Entirety of Claims</u>. The Claim is the only antitrust claim that Seller or any of its affiliates hold against Visa, MasterCard and the other defendants named in the Litigation and their respective affiliates, with regards to alleged antitrust violations in relation to certain practices with respect to merchant processing fees and merchant processing agreements attributable to merchants that accepted Visa or MasterCard credit or debit cards.

3.15    <u>No Distributions</u>. No payment or other distribution has been received by Seller, or by any third party on behalf of Seller, in full or partial satisfaction of, or in connection with, the Claim;

3.16    <u>No Bad Acts</u>. Seller has not engaged in any acts, conduct or omissions that might result in Purchaser receiving in respect of the Claim proportionately less payments or distributions or less favorable treatment (including the timing of distributions) than other similarly situated interchange fee claimants;

3.17    <u>No Objections</u>. Except for defenses asserted in public court filing in the Litigation, no objection to the Claim has been filed or threatened.

**SECTION 4.  REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Seller as follows:

4.1    <u>Organization</u>. Purchaser is a limited liability company, validly existing and in good standing under the laws of Delaware.

4.2    <u>Authorization</u>. Purchaser has the requisite power and authority to purchase the Claim from Seller, execute and deliver this Agreement, and to perform the transactions contemplated hereby or thereby.

4.3    <u>Due Execution; Validly Binding</u>. This Agreement has been duly authorized, executed and delivered and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights in general and subject to general principles of equity.

4.4    <u>No Litigation</u>. There is no suit, action, litigation or other proceeding or governmental or administrative investigation or inquiry, pending or threatened, against Purchaser that could prevent or prohibit Purchaser from purchasing the Claim or from otherwise complying in full with the provisions of this Agreement.

1038160v.3 463/01567

4.5    <u>No Affiliation</u>. Purchaser is not affiliated with any counsel involved in the Litigation or the District Court relating to the Litigation.

4.6    <u>Purchaser Solvent</u>. That Purchaser is solvent and has the funds available to pay the Purchase Price.

4.7    <u>Disclaimers: No Representations or Warranties</u>. Purchaser expressly disclaims and does not make any warranties, guarantees, promises, or representations of any kind whatsoever regarding the Claim, including, but not limited to: (i) the value of the Claim; and (ii) the anticipated recovery or timing of recovery on the Claim. Purchaser has advised Seller that it should consult with an attorney and/or other relevant professional advisors prior to the execution of this Agreement.

4.8    <u>Independent Investigation</u>. Purchaser acknowledges that it has conducted its own independent evaluation of the transactions contemplated under this Agreement. Purchaser further acknowledges that it has had an opportunity to conduct its own independent investigation regarding the Litigation, the possibility of a Settlement Event taking place, and the Claim. Purchaser has had an opportunity to review the documents and information available through publicly available sources of information.

4.9    <u>No Reliance</u>. Purchaser has decided to enter into this Agreement and undertake the transactions contemplated hereunder solely in reliance on its own evaluation, based on such information as it has deemed appropriate under the circumstances. With the exception of any representations and warranties set forth in Section 3 of this Agreement, Purchaser is not relying on (i) any information provided to Purchaser or written or oral representations, whether express or implied, by Seller or its agents or affiliates, or (ii) any information provided to Purchaser by Seller or its agents or affiliates. Aside from representations or warranties contained herein, Purchaser acknowledges that Seller expressly disclaims and has not made any warranties, guarantees, promises, or representations of any kind whatsoever regarding the Claim, including, but not limited to: (i) the value of the Claim, and (ii) the anticipated recovery and/or timing of recovery on the Claim.

4.10    <u>Information</u>. Purchaser acknowledges that, because a Settlement Event had not taken place prior to the payment of the Purchase Price, the value of the Claim and the final recovery on the Claim may not be determined with certainty by Seller or Purchaser as of the time of execution of this Agreement. Purchaser further acknowledges that Seller may possess material information not known to it. Aside from representations or warranties contained herein, Purchaser agrees that Seller shall have no liability with respect to the non-disclosure of any such information.

4.11    <u>Expectation of Return</u>. Purchaser is in the business of purchasing claims from entities entitled to recover funds from both existing class action lawsuit settlements and from pending class action litigation that may or may not result in a Settlement Event. Purchaser understands that Purchaser's recovery on the Claim may not exceed the Purchase Price.

1038160v.3 463/01567

4.12    No Fiduciary or Confidential Relationship. Purchaser acknowledges that Seller and Purchaser are not in a fiduciary, confidential, agency or otherwise special relationship, including one of trust, confidence or privity, and that Seller and Purchaser are each acting for their own self-interest.

## SECTION 5.  COVENANTS OF SELLER

Seller covenants to Purchaser as follows:

5.1    Further Assurances.  Following the Closing Date unless otherwise extended in writing by the Parties, Seller will use commercially reasonable efforts to provide, duly execute or deliver, or cause to be provided, duly executed or delivered, to Purchaser such further information and instruments reasonably available to it or under its possession, custody or control and do and cause to be done such further acts as may be reasonably necessary or proper to respond to any audit or inquiry by the CA, Lead Counsel or the District Court regarding the Claim. To the extent any decision needs to be made or vote taken among the Plaintiffs relating to the Claim and any party does not recognize the Purchaser as the rightful owner of the Claim for any reason, then the Seller agrees to consult with and follow the direction of the Purchaser.

5.2    Waiver of Claims. To the maximum extent permitted by law, Seller will not assert and hereby waives any and all claims against Purchaser or any of its members, officers, directors, employees, agents or affiliates with respect to this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby based on: (i) any claim that Purchaser had superior or additional information material to a decision to sell or buy the Claim; (ii) Purchaser made warranties or representations, expressed or implied, not contained in this Agreement; or (iii) the Claim's value and scope exceeds the Purchase Price. For the avoidance of doubt, the foregoing shall not be deemed to be a waiver of any representation or warranty expressly set forth herein.

5.3    Covenant Not To Sue. Seller will not commence or maintain any suit thereon against Purchaser or any of its shareholders, officers, directors, employees, agents or affiliates with respect to this Agreement, or the transactions contemplated hereby, whether at law or in equity, based on: (i) any claim that Purchaser had superior or additional information material to a decision to sell or buy the Claim; (ii) Purchaser made warranties or representations, expressed or implied, not contained in this Agreement; or (iii) the Claim's value and scope exceeds the Purchase Price. For the avoidance of doubt, the foregoing shall not be deemed to be a waiver of any representation or warranty expressly set forth herein.

5.4    Payment Delivery. If a CA or any other entity mistakenly sends total or partial payment or other distribution directly to Seller, Seller will be deemed to hold such amounts in trust for the benefit of the Purchaser, such payment or distribution shall not constitute property of any Debtor's estate and shall immediately endorse such payment to Purchaser and deliver the payment to Purchaser by personal delivery or by first-class mail, certified, return receipt requested, postage prepaid and addressed to:

8

Halcyon Loan Trading Fund LLC
477 Madison Avenue, 8th Floor
New York, New York 10022
Attn: Anthony Savella
BackOffice@bardinhill.com

## SECTION 6.  COVENANTS OF PURCHASER

6.1  <u>Waiver of Claims</u>. To the maximum extent permitted by law, Purchaser will not assert and hereby waives any and all claims against Seller or any of its members, officers, directors, employees, agents or affiliates with respect to this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby based on: (i) any claim that Seller had superior or additional information material to a decision to sell or buy the Claim; (ii) Seller made warranties or representations, expressed or implied, not contained in this Agreement; or (iii) the Claim's value and scope exceeds the Purchase Price. For the avoidance of doubt, the foregoing shall not be deemed to be a waiver of any representations or warranties expressly contained herein.

6.2  <u>Covenant Not To Sue</u>. Purchaser will not commence or maintain any suit thereon against Seller or any of its shareholders, officers, directors, employees, agents or affiliates with respect to this Agreement, or the transactions contemplated hereby, whether at law or in equity, based on: (i) any claim that Seller had superior or additional information material to a decision to sell or buy the Claim; (ii) Seller made warranties or representations, expressed or implied, not contained in this Agreement; or (iii) the Claim's value and scope exceeds the Purchase Price. For the avoidance of doubt, the foregoing shall not be deemed to be a waiver of any representation or warranty expressly set forth herein.

## SECTION 7.  GENERAL

7.1  <u>Severability</u>. In the event that any provision herein becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision.

7.2  <u>Costs</u>. The Parties shall each pay their own costs and expenses (including attorney's fees and accountants' fees) incurred or to be incurred in negotiating, preparing and executing this Agreement.

7.3  <u>Entire Agreement</u>. This Agreement represents the entire agreement and understanding between the Parties regarding the sale and purchase of the Claim and supersedes any and all prior representations, warranties agreements and understandings, whether written or oral, concerning the sale and/or purchase of the Claim.

7.4  <u>No Oral Modification</u>. This Agreement may only be amended in writing signed by both Parties.

7.5  <u>Assignability of Claim</u>. Notwithstanding anything contained in this Agreement, Purchaser may assign its right, title and interest in and to this Agreement to a third party without the further consent of Seller.

1038160v.3 463/01567

7.6   Jury Trial Waiver. The Parties hereby irrevocably and knowingly waive to the fullest extent permitted by law any right to a trial by jury in any action or proceeding arising out of this Agreement. The Parties agree that any such action or proceeding shall be tried before a court and not a jury. In the event the Parties' waiver of a trial by jury is deemed invalid, the Parties hereby agree that any action or claim arising out of any dispute in connection with this agreement, any rights, remedies, obligations, or duties hereunder, or the performance or enforcement hereof or thereof shall be determined by judicial reference.

7.7   Governing Law; Forum. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of law rules, principles or provisions of such state or of any other state. The Parties hereby agree that any action or claim arising out of any dispute in connection with this Agreement, any rights, remedies, obligations, or duties hereunder, or the performance or enforcement hereof or thereof shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

7.8   Headings. Section headings are for convenient reference only and will not affect the meaning or have any bearing on the interpretation of any provision of this Agreement.

7.9   Counterparts. This Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as an original and shall constitute an effective, binding agreement. If so signed, the Agreement becomes effective when both signature pages are attached.

7.10   Voluntary Execution of Agreement. This Agreement is executed voluntarily and without any duress or undue influence on the part or on behalf of the Parties hereto.

7.11   Notices. All notices, requests, demands or any other communication made under, pursuant to, or in accordance with this Agreement, except for normal day-to-day business communications, which may be made orally or in a writing, shall be in writing and shall either be delivered personally or deposited in the United States mail and sent by first-class mail, certified, return receipt requested, postage prepaid and addressed properly as follows:

| If to Purchaser: | If to Seller: |
|---|---|
| Halcyon Loan Trading Fund LLC<br>477 Madison Avenue, 8th Floor<br>New York, New York 10022<br>Attn: Anthony Savella<br>BackOffice@bardinhill.com | Specialty Retail Shops Holding Corp.<br>700 Pilgrim Way,<br>Green Bay, Wisconsin 54304<br>Attn: Russell Steinhorst, Chief Executive Officer |
| With a copy (which shall not constitute effective notice) to: | With a copy (which shall not constitute effective notice) to: |
| Richards Kibbe & Orbe LLP<br>200 Liberty Street | Kirkland & Ellis LLP<br>601 Lexington Avenue |

| New York, New York 10281<br>Attn: Paul B. Haskel | New York, New York 10022<br>Attn:  Steven Serajeddini |
| --- | --- |

or to such other address(es) as a Party hereto may indicate to the other Party in the manner provided for herein. Notices given by mail shall be deemed effective and complete forty-eight (48) hours following the time of posting and mailing, and notices delivered personally shall be deemed effective and complete at the time of delivery and the obtaining of a signed receipt.

7.12    <u>Limited Liability.</u> Notwithstanding anything contained in this Agreement to the contrary, the parties agree that all obligations and liabilities of Purchaser under this Agreement are enforceable solely against Purchaser and Purchaser's assets and not against any partner or member of Purchaser nor against any assets of any partner or member of Purchaser.

7.13    <u>Litigation Financing.</u> Following the Closing Date, should Seller determine, in its sole discretion, that (i) it wishes to pursue civil litigation against any third-parties for damages caused by the prepetition misconduct of such third-parties and (ii) it wishes to finance the costs of pursuing such litigations, Purchaser and Seller agree to engage in good faith negotiations to reach an agreement whereby Purchaser would provide Seller with financing for such litigation on mutually agreeable terms.

*[Signature page follows]*

1038160v.3 463/01567

IN WITNESS WHEREOF, the Agreement has been executed by the Parties as of the date and year provided above.

Specialty Retail Shops Holding Corp., on its behalf and on behalf of its affiliated Debtors

By: _____

Name: Russell Steinhorst
Title: Chief Executive Officer

HALCYON LOAN TRADING FUND LLC

By: Bardin Hill Credit Management LP,
    its manager


By: _____

Name:
Title:

1038160v.3 463/01567

IN WITNESS WHEREOF, the Agreement has been executed by the Parties as of the date and year provided above.

Specialty Retail Shops Holding Corp., on its behalf and on behalf of its affiliated Debtors

By: _____
    Name:
    Title:

HALCYON LOAN TRADING FUND LLC

By: Bardin Hill Credit Management LP,
    its manager

By: _____
    Name:
    Title:    Suzanne McDermott
            Authorized Signatory

John Freese Authorized Signato

## **Exhibit A to Claim Purchase and Sale Agreement**

Form of Notice of Assignment

To:   Claims Administrator of Any Settlement Arising from **IN RE: PAYMENT CARD INTERCHANGE FEE AND MERCHANT-DISCOUNT ANTITRUST LITIGATION** (Case No. 1:05-md-01720-JG-JO)(E.D.N.Y.)

We hereby give notice that pursuant to that certain Asset Purchase and Sale Agreement dated [●], 2019 (the "Sale Agreement"), between Specialty Retail Shops Holding Corp., and certain of its affiliates (collectively, the "Seller") and [●]("Purchaser"), and the order of the United States Bankruptcy Court for the District of Nebraska in case number 19-80064 (TLS), dated May [●], 2019 (attached as Exhibit A) approving the Sale Agreement, Seller has absolutely and unconditionally transferred and assigned to Purchaser all of Seller's right, title and interest in and to or associated with, or connected in any manner to, any claim against and settlement arising from the class action litigation of *In Re: Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation* (Case No 1:05-md-01720-JG-JO) pending in the United States District Court for the Eastern District of New York (the "Settlement"), for the following entities:

| Entity Name | United States Bankruptcy Court for the District of Nebraska Case Number |
|---|---|
| Specialty Retail Shops Holding Corp. | 19-80064 |
| Pamida Stores Operating Co., LLC | 19-80065 |
| Pamida Transportation, LLC | 19-80063 |
| Penn-Daniels, LLC | 19-80066 |
| Place's Associates Expansion, LLC | 19-80067 |
| Retained R/E SPE, LLC | 19-80068 |
| ShopKo Finance, LLC | 19-80069 |
| ShopKo Gift Card Co., LLC | 19-80070 |
| ShopKo Holding Company, LLC | 19-80071 |
| ShopKo Institutional Care Services Co., LLC | 19-80072 |
| ShopKo Optical Manufacturing, LLC | 19-80073 |
| ShopKo Properties, LLC | 19-80074 |
| ShopKo Stores Operating Co., LLC | 19-80075 |
| SVS Trucking, LLC | 19-80076 |

The rights assigned to Purchaser include, but are not limited to, Seller's right to file a claim in the Settlement proceedings and to challenge any and all estimates for payment of that claim. Seller has provided Purchaser with merchant identification information listed on and attached hereto as Schedule A.

Purchaser is now the legal and equitable owner of all rights associated with the Settlement. You should deal directly with Purchaser or its duly appointed agents on all matters pertaining to the Seller's rights in the Settlement. Further, in accordance with the Sale Agreement, any and all payments relating to the Settlement should be made payable to Purchaser and sent to the following address:

[●]

Moreover, any and all correspondence, documents or any other communications pertaining to the Settlement should be directed to Purchaser at the above address.

Dated this ___ day of May 2019.

**SELLER:**

Specialty Retail Shops Holding Corp., on its behalf and on behalf of its affiliated debtors


By: _____
     Russell Steinhorst, Chief Executive Officer

1038160v.3 463/01567

**Schedule A**

| Debtor | Address | Tax ID |
|---|---|---|
| Specialty Retail Shops Holding Corp. | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3940029 |
| Pamida Stores Operating Co., LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3606157 |
| Pamida Transportation, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 47-0714219 |
| Penn-Daniels, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 37-1110040 |
| Place's Associates Expansion, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 43-1827526 |
| Retained R/E SPE, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-4936679 |
| ShopKo Finance, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 80-0781152 |
| ShopKo Gift Card Co., LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 82-4422161 |
| ShopKo Holding Company, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3940171 |
| ShopKo Institutional Care Services Co., LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 27-1717112 |
| ShopKo Optical Manufacturing, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3616346 |
| ShopKo Properties, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 41-1740865 |
| ShopKo Stores Operating Co., LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3606109 |
| SVS Trucking, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 41-1400592 |

**Exhibit B to Claim Purchase and Sale Agreement**

Form of Authorization to Obtain Transaction Data

## AUTHORIZATION TO OBTAIN TRANSACTIONAL DATA

This Authorization to Obtain Transactional Data ( this "<u>Authorization</u>") is made on May [●], 2019 between Specialty Retail Shops Holding Corp., and certain of its affiliates as debtors and debtors in possession (collectively, the "<u>Seller</u>") and [●] ("<u>Purchaser</u>").

Seller has absolutely and unconditionally transferred and assigned to Purchaser all of Seller's right, title and interest in and to or associated with, or connected in any manner to, any claim against and settlement arising from the class action litigation of *In Re: Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation* (Case No 1:05-md-01720-JG-JO) pending in the United States District Court for the Eastern District of New York.

As used in this Authorization, (a) the term "Transactional Data" means data from or related to credit card or debit card transactions in which Seller received payment for goods sold or services provided, and (b) the term "Processors" means Seller's acquiring banks, credit card processors, any other entity involved in processing or recording credit card or debit card transactions, and any third party holding or possessing any or all of Seller's Transactional Data.

Seller hereby directs and authorizes all Processors to release and provide to Purchaser any and all Transactional Data. Seller hereby authorizes Purchaser to request, demand, obtain and receive from any source all of Seller's Transactional Data, including, but not limited to, the merchant identification information listed on and attached hereto as Schedule A.

The undersigned has executed this Authorization as of the date set forth above.

**Specialty Retail Shops Holding Corp., on its behalf and on behalf of its affiliated debtors**

By: _____
    Russell Steinhorst, Chief Executive Officer

Purchaser acknowledges receipt of this Authorization.

[●]


By: _____
       [●]

Schedule A

| Debtor | Address | Tax ID |
|---|---|---|
| Specialty Retail Shops Holding Corp. | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3940029 |
| Pamida Stores Operating Co., LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3606157 |
| Pamida Transportation, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 47-0714219 |
| Penn-Daniels, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 37-1110040 |
| Place's Associates Expansion, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 43-1827526 |
| Retained R/E SPE, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-4936679 |
| ShopKo Finance, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 80-0781152 |
| ShopKo Gift Card Co., LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 82-4422161 |
| ShopKo Holding Company, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3940171 |
| ShopKo Institutional Care Services Co., LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 27-1717112 |
| ShopKo Optical Manufacturing, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3616346 |
| ShopKo Properties, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 41-1740865 |
| ShopKo Stores Operating Co., LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 20-3606109 |
| SVS Trucking, LLC | 700 Pilgrim Way, Green Bay, Wisconsin, 54304 | 41-1400592 |