## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) | Case No. 19-80064-TLS |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (I) AUTHORIZING THE DEBTORS TO ENTER INTO A SETTLEMENT AGREEMENT WITH SUN CAPITAL PARTNERS AND (II) GRANTING RELATED RELIEF

Specialty Retail Shops Holding Corp. ("Shopko" or the "Company") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), acting at the direction of the Special Committee of independent and disinterested directors (the "Special Committee"), hereby seek authority to enter into the settlement agreement attached hereto as **Exhibit A** (the "Settlement Agreement," and the terms and conditioned contained therein, the "Settlement") and respectfully state as follows in support of the motion (this "Motion"):[2]

### Preliminary Statement

1.      Prior to the filing of these cases, the Debtors delegated to the Special Committee authority to investigate all potential causes of action against insiders.   After five months of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2]    In support of this Motion, the Debtors submit the *Declaration of Adam W. Verost in Support of the Debtors' Motion for an Order (I) Authorizing the Debtors to Enter into a Settlement Agreement with Sun Capital Partners and (II) Granting Related Relief* (the "Verost Declaration"), attached hereto as **Exhibit B**.

extensive investigation and due diligence, the Special Committee has determined in its business judgment to enter into the Settlement Agreement with Sun Capital Partners, Inc. and certain of its affiliates ("Sun Capital"), which is the Debtors' primary equity sponsor.  Pursuant to the Settlement Agreement, the Debtors seek to settle any and all potential claims and causes of action that the Debtors may have against the Debtors' equity sponsors, as well as claims and causes of action that the Debtors may have against current and former directors and officers in exchange for an immediate cash payment of $15 million from Sun Capital.[3]  The Settlement represents the culmination of extensive diligence, analysis, and negotiations with all of the Debtors' key stakeholders.

2.        For the past five months, the Special Committee, advised by and working with its advisors, has gone to massive lengths to investigate, negotiate, and ultimately settle the claims within their mandate.  The Special Committee began its investigation in late 2018 by focusing on dividend and related payments in excess of $100 million made to the Debtors' equity sponsors in 2013 and 2015.  In furtherance of its diligence, the Special Committee's professionals manually reviewed tens of thousands of pages of documents, including e-mails produced by the Company and Sun Capital, extensively analyzed the financial condition of the Company at the time of the subject payments, and interviewed four representatives of the Company.  Relying on the information received during its investigation, the Special Committee spent weeks engaged in negotiations with Sun Capital working to extract as much value as possible, wherever possible, for the estates at a time when the Debtors were in significant need of additional liquidity.

---

[3]    This amount will be deposited into a segregated account in accordance with the terms of the Debtors' postpetition lending facility.  *See Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* (the "DIP Order"), ¶1.6.

3.      In late March 2019, these negotiations intensified when Sun Capital approached the Special Committee and expressed an interest in acquiring the Debtors' optical business (the "Optical Business") and made clear that any such transaction would need to be done in conjunction with a settlement of the potential estate causes of actions that the Special Committee has been investigating since the outset of these chapter 11 cases.  Based on its extensive due diligence, the possibility of statutes of limitations defenses for claims prior to 2015, and the strong likelihood that Shopko was solvent in both 2013 and 2015, the Special Committee concluded that it was appropriate to discuss the potential to maximize the value of these potential causes of action through a settlement, rather than through time-consuming litigation, and engaged in discussions regarding a potential transaction and settlement with Sun Capital.

4.      As the Court is aware, the Special Committee did not reach agreement with Sun Capital on the terms of a combined Optical Business transaction and settlement.  In the course of those negotiations, Sun Capital made it clear to the Special Committee that it would not engage on the terms of an optical sale transaction separate and apart from the release.  The Special Committee and the Debtors ultimately approved the sale of the Optical Business to Shoptikal LLC, which is an affiliate of Monarch Alternative Capital, L.P. ("Monarch"), in a transaction that the Special Committee believes maximizes the value of the Optical Business while preserving the value of the insiders claims for the estates.

5.      With the optical sale transaction on track to close, the Special Committee re-focused its effort to maximize the value of the potential estate causes of action and engaged the Debtors' secured lenders, the Official Committee of Unsecured Creditors (the "UCC"), and Sun Capital in settlement discussions in advance of the Special Committee's objection deadline to the UCC's motion seeking standing (the "Standing Motion")[4] to prosecute causes of action related to

---

[4]    *Motion for Entry of an Order Authorizing the Committee to Prosecute Certain Claims on Behalf of the Bankruptcy*

the 2015 dividend payments against the Debtors' equity sponsors.  Between April 25, 2019 and

May 1, 2019, the Special Committee's negotiations with Sun Capital intensified.  On May 1, 2019,

after multiple rounds of arms-length negotiations, the Special Committee and Sun Capital finally

reached agreement in principle on the $15 million Settlement.  In exchange for this significant

payment, Sun Capital made it clear that the Settlement would be contingent upon the support of

the Debtors' secured lenders and Monarch.  Sun Capital also expressed a desire to gain UCC

support for the Settlement.  Finally, Sun Capital required that the Settlement bring complete

closure to the possibility of any litigation related to the equity sponsors' investment in the Debtors,

including general releases from the Debtors to Sun Capital, including current and former

representative agents of the Debtors.  Accordingly, the Settlement Agreement includes releases in

favor of the Debtors' current and former officers for any claims related to the dividend and related

payment and the filing and prosecution of the chapter 11 cases.

      6.     Throughout this process, the Special Committee consulted with the Debtors'

secured lenders and the UCC on a regular basis.  In particular, the Special Committee's advisors

met with the advisors to the UCC a multitude of times telephonically, and in person on at least

three different occasions, including (a) on March 11, 2019, to review the work product of the

UCC's solvency expert, (b) on April 2, 2019, to discuss the status of the investigation and potential

settlement terms in light of the Debtors' GOB sales process, and (c) on April 26, 2019, to discuss

the conclusions reached by Ducera Partners LLC ("Ducera") regarding the Debtors' solvency in

2015 and the benefits of settling any potential claims.  As the Court is aware, in the midst of this

process, the UCC filed the Standing Motion to pursue approximately $67.5 million in claims

---

*Estates* [Docket No. 641].

against Sun Capital on account of the 2015 payments and hired its own expert to analyze the issues related thereto.[5]

7.      The road to this Settlement has been long and bumpy.  At times throughout these cases, certain parties in interest have expressed skepticism as to the independence of the Special Committee and have alleged that the sole purpose of the existence of the Special Committee is to manufacture a release in favor of the Debtors' equity sponsors.  The Special Committee vigorously disputes these baseless accusations and submits that the record in these cases demonstrates the integrity and independence with which the Special Committee has approached its investigation and the Settlement negotiations.  The reality is that the $15 million Settlement creates extraordinary value for the estates, especially in light of the defenses that would be raised if the issues were litigated.  Importantly, the defendants in any such litigation would argue that the Debtors were solvent at the time of the 2015 dividend payment.  And as set forth in the Verost Declaration, an unbiased analysis of the Debtors' financial condition at the time of the 2015 dividend payment does indeed lead to the conclusion that the Debtors were most likely solvent at the time of the 2015 dividend transaction.

8.      The UCC has concluded that the Company was insolvent in 2015, and to support that conclusion appears (a) to have determined that the Debtors were insolvent based upon one or more discounted cash flow analyses that are premised on the Debtors' downside "sensitivity case" as further modified by Shaked without consultation with the Debtors' management and (b) to have chosen not to use a comparable public company analysis on the basis that there are no sufficiently comparable companies. But the Special Committee has not identified any evidence to conclusively

---

[5]   The Special Committee and the UCC are in general agreement that any claims related to the 2013 payments are likely to be barred by statute of limitations defenses.

suggest that a better set of projections existed at the time of the 2015 dividend payment, and contemporaneous evidence supports the conclusion that the Debtors were solvent.

9.        Against this backdrop, a settlement that generates $15 million in cash is a remarkable achievement, and if the issues were litigated to completion, the estates likely would receive much less, if any, value on account of the claims.  In its deliberations, the Special Committee also considered the extensive amount of fees that the parties would incur litigating.  If the case were litigated on a contingency fee basis, which the UCC's counsel repeatedly has volunteered it would be willing to do, there is simply too much risk that these fees would cannibalize any recovery for the benefit of the estates and its creditors.[6]

10.        The Special Committee has taken its role in these cases and its duty to maximize value seriously.  To that end, the Special Committee vigorously sought, pursued, and attained a third party purchaser for the Optical Business.  The Special Committee negotiated hard with Sun Capital to settle the claims, which have no guarantee of success if pursued, for $15 million in cash. The $15 million the estates will receive immediately as a result of the Settlement is by far the better choice than the unknown amount creditors *might* receive at a later date, discounted by some undisclosed contingency fee.  To put it simply, the Special Committee respectfully submits the estates will be better off by accepting the bird in hand recovery rather than leaving it to an unknown estate representative to litigate tenuous claims over a timeframe that could last years.

11.        For these reasons, and the reasons set forth below, the Special Committee respectfully submits that the Settlement is fair, equitable, and in the best interest of these estates and respectfully requests the Court to approve the Settlement.

---

[6]    The Special Committee has requested the UCC's counsel to provide its proposed contingency fee, but the UCC's counsel has not done so to date.

**Relief Requested**

12.     By this Motion, the Debtors respectfully seek entry of an order (the "Order"): (a) approving the Settlement Agreement and authorizing the parties to take any and all actions necessary to effectuate the Settlement Agreement without the need of further order by this Court; and (b) granting related relief.

**Jurisdiction and Venue**

13.     The United States Bankruptcy Court for the District of Nebraska (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

14.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     The bases for the relief requested herein are sections 105(a), 363(b), and 365 of the Bankruptcy Code, Bankruptcy Rule 9019, and Rule 9019-1 of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules").

**Background**

**I.      The Special Committee's Investigation and Negotiations.**

16.     On October 18, 2005, Shopko entered into a merger agreement (the "SKO Group Merger Agreement") with SKO Group Holding Corp. ("SKO Group"), an affiliate of Sun Capital. The SKO Group Merger Agreement provided for SKO Group's acquisition of Shopko for $29.07 per share, with approximately 30.3 million shares of common stock outstanding, plus an increase in the per share price of 6 percent per annum each day beginning on December 15, 2005.  Shopko's

7

shareholders overwhelmingly approved the SKO Group Merger Agreement on December 23, 2005, and the merger was completed on December 28, 2005.

17.      In December 2017, to ensure a thorough and fair process with respect to the Debtors' review of their strategic alternatives, the board of directors of Shopko (the "Board of Directors") appointed Steve Winograd and Mohsin Y. Meghji to the Board of Directors as disinterested directors (the "Disinterested Directors"). Each of the Disinterested Directors has extensive experience serving on boards of managers and boards of directors in distressed situations. On November 26, 2018, the Board of Directors authorized the formation of the Special Committee comprising the Disinterested Directors to, among other things, review matters regarding transactions or negotiations that the Special Committee determines in whole or in part may result in conflicts of interest. The Special Committee subsequently retained Willkie Farr & Gallagher LLP ("Willkie Farr") as independent counsel and Ducera as independent financial advisor (collectively, the "Advisors"), to assist the Disinterested Directors in their review. As part of this mandate, the Special Committee commenced an investigation (the "Investigation") into, among other things, certain dividend payments made to the Debtors' direct or indirect equity owners. In the course of its Investigation, the Special Committee has considered, among other things, whether the Debtors' estates should pursue causes of action on account of actual fraudulent transfer, constructive fraudulent transfer, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, unjust enrichment, tortious interference with contract, and illegal dividends under state law (the "Potential Claims"). As part of the Investigation, Ducera presented a report to the Special Committee, which is annexed to the Verost Declaration.

18.      The Investigation has included multiple diligence requests to the Debtors, Sun Capital, and Duff & Phelps. The Advisors also conducted interviews of current and former Shopko

personnel who the Special Committee determined may have relevant knowledge related to the Potential Claims.

19.    The Advisors received several rounds of diligence materials from Shopko in response to their requests, including thousands of documents, and e-mail correspondence from the Debtors' senior management.  The Advisors conducted four interviews with senior management, namely Russell Steinhorst (Shopko's current CEO and former CFO), Mary Meixelsperger (Shopko's former CFO), Gary Gibson (Shopko's current VP and Treasurer), and Kelly Weerts (Shopko's current VP and Controller).   The interviews of Russell Steinhorst and Mary Meixelsperger were considered especially important to the Investigation as these witnesses signed management representation letters in connection with the solvency opinions that were done for the 2013 and 2015 dividends, respectively.  Willkie Farr conducted a review of this correspondence and other documents.  Ducera also conducted a solvency analysis of Shopko to determine whether it was solvent, primarily focusing on issues relating to the 2015 dividend transaction.

20.    Additionally, the Advisors sent discovery requests to counsel to Sun Capital beginning January 11, 2019.  After finalizing a non-disclosure agreement with Sun Capital, the Advisors received several rounds of voluntary productions of documents in response to the Advisors' requests.  Materials produced by Sun Capital included over 6,000 documents (including over 42,000 Bates numbered pages), including e-mail correspondence from a number of custodians who were substantively involved with Sun Capital's position in Shopko, as well as Sun Capital's own internal valuation analysis and outside valuations that were requested by Sun Capital.

21.    The Special Committee focused its Investigation on several dividend payments Shopko made to its direct or indirect equity owners since its acquisition by a group of equity holders in 2005.  A summary of the circumstances of these payments since 2013 is below:[7]

---

[7]    The Debtors also made dividend payments on May 14, 2007, September 24, 2010, and December 3, 2010 (for

- **August 29, 2013**, Shopko paid a dividend in the amount of $44,531,900 to SKO Group, which used the proceeds to make a distribution to its various owners, including Sun Capital. The dividend was financed through borrowing from Shopko's revolving credit facility, which was governed by the Third Amended and Restated Loan and Security Agreement, dated February 7, 2012 (the "Third RCF"). Shopko engaged Duff & Phelps to perform a "solvency analysis" on Shopko and to determine whether it was solvent at the time of the dividend payments. Duff & Phelps provided a solvency opinion dated August 29, 2013.

- **June 19, 2015**: each of Shopko Stores Operating Co., LLC ("Shopko Operating"), Shopko Holding, Shopko Holding Company, LLC, formerly Shopko Holding Company, Inc., ("Shopko Holding"), and Shopko paid a dividend in the amount of $50 million to its respective parent. SKO Group used the proceeds received from Shopko to make a distribution in the same amount to its various owners, including Sun Capital. The dividend was financed through borrowing from Shopko's Third RCF. SKO Group, Shopko, Shopko Holding, and Shopko Operating engaged Duff & Phelps to perform an analysis of the solvency of those four entities. Duff & Phelps provided a solvency opinion dated June 19, 2015.

22. Upon its retention by the Special Committee, Ducera began analyzing the Debtors' financial condition at the time of the 2015 dividend transaction. As it conducted its analysis, Ducera had telephonic meetings with the Special Committee and Willkie Farr and kept them apprised as to Ducera's preliminary solvency views. On March 22, 2019, during a meeting of the Special Committee, Ducera delivered an oral report and conclusions concerning its investigation of the Debtors' solvency focusing on the 2015 dividend payments that was subsequently finalized and reduced to writing. The Special Committee was therefore guided by Ducera's report and advised by both Ducera and Willkie Farr at the time it began its negotiations with Sun Capital to extract value for the benefit of the estates. In the meantime, the Special Committee resolved to leave the investigation open while it pursued and responded to proposals involving Sun Capital.

---

$55 million, $20 million, and $10 million, respectively), which the Special Committee determined did not present viable Potential Claims.

23.    The Special Committee also focused its Investigation on the consulting services arrangements between the Debtors and its equity sponsors.  Prior to February 7, 2012, Shopko was party to a long-term management services agreement, under which Sun Capital Partners Management IV, LLC ("SCM") provided Shopko with financial and management consulting services.  SCM also provided consulting services to Pamida Holding Company, Inc. ("Pamida") and its affiliates, under a similar agreement.  On February 7, 2012, in conjunction with the merger between Shopko and Pamida, Shopko entered into a new consulting agreement with SCM (the "Consulting Agreement").  The Consulting Agreement has a 10-year term pursuant to which SCM is to render consulting services regarding the business of Shopko and its subsidiaries, including, but not limited to, advice regarding improvements to financial reporting, accounting, and management information systems services.

24.    In exchange for its consulting services, SCM was entitled to an annual fee of $4 million (the "Consulting Fee") and reimbursement for all reasonable out-of-pocket fees and expenses incurred in the performance of the consulting services.  The Debtors are guarantors of all payments owed pursuant to the Consulting Agreement.  The Consulting Fee was paid in quarterly installments in advance, each installment equal to $1 million.  The Special Committee understands that, in 2017, the Debtors and Sun Capital agreed to reduce the Consulting Fee to approximately $301,000 per quarter, and that no Consulting Fees have been paid since December 2017.

25.    SCM also was entitled to an additional fee in connection with certain transactions or events ("Consulting Events"), equal to approximately 1 percent of the value of the transaction. At this time, the Special Committee understands that since 2012, approximately six Consulting Events have occurred that have generated such a fee, including a $445,319.00 fee related to the 2013 dividend and a $500,000.00 fee related to the 2015 dividend.

26.     As described above, Sun Capital approached the Debtors to express their interest in acquiring the assets related to the Debtors' Optical Business.  Given Sun Capital's status as an insider, the Special Committee assumed responsibility for negotiating the terms of a potential transaction related to the Optical Business with Sun Capital.  At the outset, Sun Capital conditioned any purchase of the Optical Business on a settlement of the Potential Claims investigated by the Special Committee.  While the Special Committee engaged in vigorous negotiations with Sun Capital's advisors on a transaction, Sun Capital subsequently informed the Special Committee that they were withdrawing from the sale process because it could not consummate a transaction without the support of affiliates of Monarch, the Debtors' largest landlord for the Optical Business, who itself had entered the process as a competing bidder and preferred its own transaction. Ultimately, after weeks of negotiation, the Special Committee successfully negotiated a transaction for the Optical Business with Monarch that was subsequently approved by the Court.

27.     In considering its negotiating strategy, the Special Committee engaged with Sun Capital and the UCC, as well as other stakeholders, to determine the best path forward for the estates, including  whether to settle the Potential Claims now in exchange for significant value that would alleviate the Debtors' acute need for near-term cash to fund and provide distributions in the chapter 11 cases, or to formally pursue litigation to obtain recoveries on the Potential Claims.

28.     Recognizing that the Potential Claims are subject to formidable defenses that would have been raised by Sun Capital, and to have a complete understanding of its best settlement outcome, the Special Committee focused on extracting as much value as possible on account of the claims in advance of the objection deadline to the UCC's Standing Motion. The Special Committee also requested the UCC to actively participate in settlement negotiations in the hopes of maximizing value and reaching a consensus with all parties.  After months of investigation and hard-fought negotiations during which the parties came to and left the table on numerous

12

occasions, on May 6, 2019, the Debtors and Sun Capital reached mutually agreeable settlement

terms for all of the Potential Claims, embodied in the Settlement Agreement.

## II.    The Special Committee's Findings.

29.    As part of its mandate to investigate potential claims or causes of action on behalf

of the estates, the Special Committee and its Advisors conducted numerous interviews and

reviewed tens of thousands of documents produced by both the Debtors and Sun Capital.  The

Special Committee considered not only the Potential Claims and causes of action, including actual

and fraudulent transfers, breaches of fiduciary duty, and illegal payment of dividends under state

law, but also potential defenses Sun Capital might have to the claims and the risk, time, and

expense of litigation.  The Special Committee understands that solvency would be a focus of any

litigation against Sun Capital relating to the above categories of claims, and would likely involve

complicated factual issues and expert testimony and analysis.  As such, the Special Committee

relied on the report of Ducera, its independent financial advisor, and the results of its Investigation

when evaluating the Debtors' solvency at the time of the 2015 dividend transactions.

### A.    Contemporaneous Evidence of the Debtors' Solvency.

30.    The Special Committee and its Advisors found that multiple sophisticated parties

came to conclusions prior to, and soon after, the close of the 2015 dividend transactions that were

consistent with a belief that the Debtors were solvent. For example, Duff & Phelps prepared a

solvency opinion in connection with the 2013 and 2015 dividend transactions, concluding that the

Debtors were solvent.  Additionally, the Debtors received presentations from various investment

banks in connection with a potential IPO.  As part of their diligence, at least 3 investment banks

relied on the Debtors' forecasts at or around the time of the 2015 dividend transactions.  At the

time, these banks viewed a potential sale transaction or IPO as feasible as early as 2016, and

prepared analyses showing significant equity value in the Debtors (i.e. solvency).  Furthermore,

the fact that the Debtors' lenders at the time agreed to fund the dividends through additional borrowings suggests that the Debtors' lenders also believed that the Debtors were solvent.

**B.      The Debtors Were Most Likely Solvent at the Time of the 2015 Dividend Transactions.**

31.      As part of the Special Committee's Investigation, Ducera independently investigated the solvency of the Debtors at various points critical to determining the viability of pursuing Potential Claims.  Ducera undertook a thorough, multi-step analysis before reaching its conclusions, which are based on the information Ducera reviewed and developed, and Ducera's expertise in securities and business valuations and general financial market financial conditions. In the course of its investigation, Ducera performed the following tasks:

   a.      reviewed and analyzed audited financial statements of the Debtors;

   b.      reviewed and analyzed the Debtors' monthly management reports;

   c.      reviewed and analyzed valuation grids prepared by Sun Capital;

   d.      reviewed and analyzed solvency opinions prepared by Duff & Phelps in June 2015 and August 2013;

   e.      reviewed and analyzed financing documents and amendments from the time of the 2015 and 2013 dividend transactions;

   f.      reviewed e-mail correspondence by the Debtors and Sun Capital employees;

   g.      participated in meetings with advisors of the UCC and Sun Capital;

   h.      participated with counsel in interviews with the Debtors' employees, including Russell Steinhorst, Mary Meixelsperger, Gary Gibson, and Kelly Weerts; and

   i.      reviewed and analyzed historical actual performance relative to forecasts for periods prior to the dividend transactions.

32.      Based on its analysis, Ducera concluded that the financial forecast (the "Shopko Forecast") utilized by Duff & Phelps at the time of the 2015 dividend transactions was the most appropriate forecast available at the time to use for an assessment of value and solvency.  In

14

reaching this conclusion, Ducera took into account that the Debtors' management provided letters to Duff & Phelps that validated the reliability of Duff & Phelps' assumptions, and that such assumptions represented managements' best estimates for future operating performance and financial performance of the Debtors.  Additionally, during interviews conducted in the course of the Investigation in March 2019, the Debtors' employees represented that the assumptions were accurate, and, while acknowledging certain risks, were the best available assumptions at that time of the 2015 dividend transactions.  Specifically, Ducera discussed the historical financial performance of the Company with Shopko's current CEO and other members of management and no one suggested a more reliable forecast or that the Shopko Forecast was unreliable.

33.     Furthermore, in the course of its investigation, Ducera identified no contemporaneous forecasts developed by management or Sun Capital that materially differed from the Shopko Forecast.  Ducera is not aware of any efforts by Sun Capital or other parties to pressure Shopko management to put forth projections that the Debtors' management found to be unreasonable.  Ducera identified no evidence suggesting Sun Capital believed at the time of the 2015 dividend transaction that the Shopko Forecast was unreasonable or unlikely to be achieved.

34.     Using the Shopko Forecast, Ducera performed valuation and comparative analyses using generally accepted valuation and analytical techniques, including discounted cash flow analysis and comparable public companies analysis.  Based on its review of the Debtors' financial data, Ducera found that the Debtors were most likely solvent at the time of the 2015 dividend transaction.   (Verost Decl., Annex A.)   Ducera determined that the financial projections incorporated in the Duff & Phelps 2015 solvency opinion reflected the most appropriate basis for Ducera's evaluation of the Debtors.  Ducera also reviewed other contemporaneous financial forecasts utilized by third parties.

35.    Ducera understands that the Debtors funded the 2015 dividend payment through incremental debt incurrence of approximately $54 million.  Upon incurrence of the incremental debt and payment of the 2015 dividend payment, the Debtors had approximately $560 million of debt outstanding, reflecting leverage of 5.5x LTM EBITDA, and the Debtors' enterprise value was reasonably estimated in the range of $650 million to $750 million.  Ducera also found that at the time of the 2015 dividend payment, the Debtors' equity value was reasonably estimated in the range of $123 million to $223 million.

36.    Ducera reviewed and analyzed, as of the date of the 2015 dividend transactions, the Debtors' ability to pay its debts as they came due.  Ducera concluded that Shopko was reasonably expected to be able to pay its debts as they came due, considering both the Shopko Forecast and the downside "sensitivity case" to the Shopko Forecast.  Based on the above valuation and analysis of Shopko's ability to pay its debts as they came due, Ducera concluded that Shopko was likely solvent at the time of the 2015 dividend payment.  However, Ducera also acknowledged that a trier of fact in a litigation may conclude that forecasts with less growth and lower profitability are more appropriate.  A trier of fact in a litigation could also conclude that the 2015 Duff & Phelps solvency opinion is not reliable for a determination of value or assessment of solvency.

37.    The Special Committee also considered the views of other professionals on solvency issues, including professionals retained by the UCC and Sun Capital.  The UCC filed the report of the UCC's expert, the Michel-Shaked Group ("Shaked"), with the Court on March 12, 2019, only one month after the Michel-Shaked Group was retained, and one day prior to the UCC's first requests for production.  [Docket No. 641-2].  Shaked appears to have concluded that the Debtors were insolvent based upon one or more discounted cash flow analyses that are premised on the Debtors' downside "sensitivity case" as further modified by Shaked without consultation with the Debtors' management.  Furthermore, Shaked appears to choose not to use a comparable

16

public company analysis on the basis that there are no sufficiently comparable companies. The UCC concluded that the Debtors' were insolvent beginning in 2013, even though the UCC was in possession of relatively little information. Similarly, as negotiations progressed, Sun Capital retained Protiviti, Inc. as its financial advisor, who informed the Special Committee that it disagreed with Shaked's analysis, including (a) certain assumptions and calculations used in the Shaked cash flow analysis and (b) the fact that Shaked ignored all comparable companies data that was inconsistent with its conclusions of value. The Special Committee's advisors questioned both of those professionals as part of the Special Committee's analysis, and used these views (to the limited extent they were helpful) in putting together the good faith and fact-driven solvency analysis relied upon by the Special Committee.

## III.   The Settlement Agreement.

38.     The Debtors entered into the Settlement Agreement to avoid the burden, expense, and uncertainty of litigating the disputes regarding the Potential Claims. In substance, the Settlement Agreement provides that the Debtors will receive $15 million, in exchange for mutual releases between the Debtors, Sun Capital, and related parties for all claims and causes of action relating to all dividends and consulting fees paid to Sun Capital and the filing and prosecution of the chapter 11 cases. Specifically, the release provisions of the Settlement Agreement provide:

    a.    <u>Release by the Debtors.</u> For good and valuable consideration, the sufficiency of which is hereby acknowledged, the Debtors, on behalf of themselves and their respective estates, including, without limitation, any successor, trustee, or estate representative, and its and their insurers, predecessors, successors, assigns, and current and former officers, directors, equity holders, shareholders, stockholders, partners, members, managers, employees, attorneys and agents (the "<u>Debtor Releasors</u>"), as of the Effective Date (as defined in the Settlement Agreement), release, remise and forever discharge (a) the Sun Parties and each of their respective current and former affiliates, parents, equity holders, shareholders, stockholders, subsidiaries and co-investors (collectively the "<u>Primary Sun Releasees</u>"), and each of the Primary Sun Releasees respective current and former successors, assigns, equity holders, shareholders, stockholders, officers, directors, members, managers, principals, employees, agents, advisory board members, financial advisors,

partners, attorneys, accountants, investment bankers, consultants, representatives, insurers and other professionals, each in their capacity as such (together with the Primary Sun Releasees the "Sun Capital Releasees"); and (b) the Debtors' current and former officers, directors, members, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (together with the Sun Capital Releasees the "Debtor Releasees") of and from any and all debts, demands, actions, causes of action, suits, damages, claims and liabilities whatsoever of every name and nature, whether known or unknown, that the Debtor Releasors now have, ever had, or in the future may have against the Debtor Releasees; provided, however, that nothing herein shall be construed to release any of the Debtor Releasees from any liability, duty or obligation expressly arising under the Settlement Agreement. The Debtor Releasors hereby consciously accept the risk that the scope of this release may include future damages, injuries, claims, obligations and liabilities that are presently unknown, unforeseen or not yet in existence and consciously intend to release same.

b.   Release of the Debtors by Sun Capital. For good and valuable consideration, the sufficiency of which is hereby acknowledged, the Sun Parties and, to the extent they may legally do so, the Sun Parties on behalf of each of their respective current and former affiliates, parents, equity holders, shareholders, stockholders, subsidiaries and co-investors (collectively the "Primary Sun Releasors"), and each of the Primary Sun Releasors' respective current and former equity holders, shareholders, stockholders, partners, members, managers, officers, directors, employees, attorneys, agents, representatives, insurers, successors and assigns (together with the Primary Sun Releasors the "Sun Capital Releasors"), as of the Effective Date, release, remise and forever discharge the Debtors, their estates, current and former affiliates, parents, subsidiaries, equity holders, shareholders, stockholders, partners, members, managers, officers, directors, employees, attorneys, financial advisors, agents, representatives, insurers, successors and assigns, of and from any and all debts, demands, actions, causes of action, suits, damages, claims and liabilities whatsoever of every name and nature, whether known or unknown, that the Sun Capital Releasors now have, ever had or in the future may have against the Debtor Releasors; provided, however, that nothing in the Settlement shall be construed to release any of the Debtor Releasors from any liability, duty or obligation expressly arising under the Settlement Agreement. The Sun Capital Releasors hereby consciously accept the risk that the scope of this release may include future damages, injuries, claims, obligations and liabilities which are presently unknown, unforeseen or not yet in existence and consciously intend to release same.

39.   Additionally, the Settlement Agreement provides a representation by Sun Capital

that they have attempted in good faith to provide all documents that the Special Committee and its

Advisors have requested from them.  The Debtors are not aware of any other potential claims,

other than as discussed herein, that are being released pursuant to the Settlement Agreement.

### Basis for Relief

**I.    Entry Into Release Provisions of the Settlement Agreement Is in the Best Interests of the Debtors' Estates.**

40.    Bankruptcy Rule 9019 provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

41.    In describing the standard for evaluating a settlement under Bankruptcy Rule 9019,

the United States Court of Appeals for the Eighth Circuit has stated that a settlement need not be

"the best result obtainable," but rather, the evaluating court should approve the settlement where

"the settlement is fair and equitable and in the best interests of the estate."  *Tri-State Fin., LLC v.*

*Lovald*, 525 F.3d 649, 654 (8th Cir. 2008).  The evaluating court only needs to determine that

settlement does not fall below the lowest point in the range of reasonableness.  *Id.; see also In re*

*Martin*, 212 B.R. 316, 319 (Bankr. App. 8th Cir. 1997) ("The court does not substitute its judgment

for that of the trustee, but reviews the issues to see if the settlement falls below the lowest point of

reasonableness.").

42.    In determining the range of reasonableness, the Court does not need to decide the

numerous issues of law and fact raised by the settlement.  *See Cosoff v. Rodman (In re W.T. Grant*

*Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

In other words, the court does not need to conduct a "mini-trial" of the underlying facts and merits;

it needs only to evaluate those facts that are necessary to allow it to assess the settlement and to

make an independent judgment about the settlement.  *In re Hancock-Nelson Mercantile Co., Inc.*,

95 B.R. 982, 995–96 (Bankr. D. Minn. 1989) ("However, *TMT Trailer Ferry* does not impose upon this Court the obligation to compel the full trial record, or the burden of reviewing that record—or even the duty to conduct a 'mini-trial.'"); *see also In re Martin*, 212 B.R. 316, 319 (Bankr. App. 8th Cir. 1997) ("[I]t is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement."); 10 Collier on Bankruptcy ¶ 9019.02 (16th 2018) ("The *TMT* rule does not require the bankruptcy judge to hold a full evidentiary hearing or even a "mini-trial" before a compromise can be approved. Otherwise, there would be no point in compromising; the parties might as well go ahead and try the case."). Ultimately, "the decision to approve a settlement under [Bankruptcy] Rule 9019 is within the discretion of the bankruptcy judge." *In re Racing Servs., Inc.*, 332 B.R. 581, 586 (B.A.P. 8th Cir. 2005).

43.    To arrive at the range of reasonableness, the evaluating court should consider the factors laid out in *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  As discussed by the Eighth Circuit in *Tri-State Fin., LLC v. Lovald*, there are four factors described in *TMT* by which courts determine the reasonableness of a settlement: "[(i)] the probability of success in the litigation; [(ii)] the difficulties, if any to be encountered in the matter of collection; [(iii)] the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and the paramount interest of the creditors and a proper deference to their reasonable views in the premises." 525 F.3d 649, 654 (8th Cir. 2008) (internal quotation marks and citations omitted); *see also In re Brodkey Bros., Inc.*, No. 13-80203 (TLS), 2013 WL 5636484, at *7 (Bankr. D. Neb. Oct. 15, 2013) (considering same factors).

A.    **The Balance of Possible Litigation Success and the Settlement's Future Benefits Weighs In Favor of the Release Provisions of the Settlement Agreement.**

44.    The first *TMT* factor—the balance between the litigation's possibility of success and the settlement's future benefits—plainly favors approval of the Settlement Agreement.  When evaluating this factor, courts will consider the merit of the claims, the defenses to such claims, and any counterclaims. *See, e.g.*, *In re WBE Co., Inc.*, 2010 WL 2867426, at *5 (Bankr. D. Neb. July 20, 2010) (considering a settling party's defenses to the claims, attacks on evidentiary foundations, and counterclaims for offsets against any damages awarded).

45.    The Debtors will receive $15 million in consideration from Sun Capital in exchange for the release of all claims and causes of action against the Debtor Releasees.  The resolution of these matters will represent a critical building block for the Debtors to proceed with an efficient and cost effective emergence from chapter 11. These benefits support the approval of the Settlement Agreement when viewed in light of the possibility of success of the Potential Claims and causes of action being resolved.

46.    In fact, courts have found the uncertainty of settlement recovery to be a compelling factor favoring approval of a settlement.  As the court stated in *In re Adelphia Commc'ns Corp.*, "there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 159 (Bankr. S.D.N.Y. 2007); *see also O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 71 (Bankr. E.D.N.Y. 2009) ("[T]he outcome of litigation is nearly always uncertain and may be distant. It is also costly. And the enforcement of any resulting judgment may be far from sure. A settlement, by contrast, eliminates uncertainty and delay, reduces costs, and brings finality to the parties' dispute.").

47.    In this case, the benefits to be obtained under the Settlement Agreement more than justify the Debtors' decision to settle the Potential Claims and causes of action against the Released Parties.  The Settlement Agreement provides substantial benefits to the Debtors' estates, including cash contributions of $15 million, and waivers of claims against the Debtors' estates.  By contrast, pursuing the Potential Claims and causes of action against the Released Parties would result in the Debtors spending millions of dollars and potentially years in litigation—with no assurance of success—while the estates would continue to be hamstrung in their liquidity and ability to make immediate distributions to secured and administrative creditors.

**B.      The Uncertainty Regarding Difficulties of Collection Weigh in Favor of Approving the Release Provisions of the Settlement Agreement.**

48.    With respect to the second *TMT* factor—the difficulties, if any, to be encountered in the matter of collection—the appeals process may hinder any collection.  In addition to considering whether the parties to the settlement have the ability to pay a judgment, courts evaluating this factor have also looked at whether the party opposing a judgment has the ability and desire to engage in litigation through the appellate process.  *See In re Boddie*, 569 B.R. 297, 308 (Bankr. S.D. Ohio 2017) ("[T]he Court would be remiss if it did not acknowledge that PNC has the financial resources to sustain litigation over an extended period of time and may appeal any judgment obtained by Trustee.  Thus, although there is little doubt that any judgment would ultimately be collectible, collection of the judgment could be delayed, if PNC elected to pursue its appellate rights."); *see also In re Key3Media Group, Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005), *aff'd,* 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006) (finding the second *TMT* factor favored settlement because, among other reasons, if a judgment was pursued, "[t]he collection of a judgment could be further delayed by the potential for appeal").

49.    While it is unclear what SKO Group and Sun Capital would do in this situation, entities affiliated with Sun Capital have shown that they will engage in litigation at the appellate

level, even up to the Supreme Court. *See, e.g.*, *Sun Capital Partners III, LP v. New Eng. Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 137 (1st Cir. 2013); *Czyzewski v. Jevic Holding Corp.* (*Jevic*), 137 S. Ct. 973, 976 (2017). While the Debtors believe Sun Capital would honor any required collections, the pressures and complexity of these chapter 11 cases mean that any potential future collection would not directly benefit the Debtors now, when it is most needed in their reorganization efforts. For example, in *Jevic*, while an affiliate of Sun Capital was a respondent, the appeals process left issues unresolved until 2017 for a bankruptcy filed in 2008. *Jevic*, 137 S. Ct. at 976.

50.    The Debtors have an immediate need for the proceeds of the Settlement, as they will be critical in helping the Debtors resolve the remaining issues in these contested chapter 11 cases. Denying the Settlement would not only force the Debtors to bear the risk of the possible difficulties of future collection of a to-be-determined future judgment, but it would deprive the Debtors of funds they need now.

### C.    The Likelihood of Complex and Protracted Litigation Is a Near Certainty and Weigh in Favor of Approving the Release Provisions of the Settlement Agreement.

51.    The third *TMT* factor—the likelihood of complex and protracted litigation, with its attendant expense and inconvenience—strongly favors settlement. Where litigation would result in substantial expense, inconvenience, and delay, courts have found that this factor favors settlement. *Ritchie Capital Mgt., L.L.C. v. Kelley*, 785 F.3d 273, 281 (8th Cir. 2015) (affirming lower court's decision to approve a settlement where bankruptcy court found "the case involve[d] 'complex issues, unsettled law, and massively complicated factual disputes,'" and where "the resolution of the claims 'would entail a much larger infrastructure, much more procedure and much more costs for the resolution of disputes' and would 'grind [the] process down to a much lower speed, make it much more expensive and potentially drag this on for longer than it will drag on'");

*see also In re Michael*, 183 B.R. 230, 239 (Bankr. D. Mont. 1995) ("The third factor is the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it. This litigation is near its end, and little complexity remains. The facts are simple and stipulated. The law has been to a large part researched, except for the final briefs. While there may be further delay upon appeal, this Court finds that the third factor weighs against settlement.").

52.     This factor clearly favors settlement. ***First**,* no litigation has even been commenced. Only *potential* claims have been considered. No complaint has been filed. ***Second**,* the matters in dispute here are complex. These matters include potential claims against the released parties for actual fraudulent transfer, constructive fraudulent transfer, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, tortious interference with contract, unjust enrichment, and illegal dividends. The litigation of these matters would otherwise cost the estates substantial time, money, and resources. By entering into the Settlement Agreement, the Debtors are able to mitigate litigation risk and avoid the cost, time, and delay of litigation. Complicated factual and legal questions would likely be raised on motions to dismiss and for summary judgment, adding significant expense and uncertainty before even getting to trial (assuming any claims survived motion practice). Extensive expert work would also be required for most claims, ensuring that discovery would be protracted, complex, and costly. *In re Worldcom, Inc.*, 2003 WL 23861928, at *43 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving settlement and explaining that " the avoidance of long and complicated litigation is one of the principal rationales for debtors entering into settlements with creditors"). And even after trial, there is a likelihood that the losing party or parties would appeal and cause further delay, expense and uncertainty. *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 242-43 (Bankr. S.D.N.Y. 2007). ***Third**,* with respect to expense, the cost of pursuing such a claim is likely to be significant. The Debtors would incur substantial, indirect costs from litigation. Most concretely, litigation would require document requests and

other discovery from the Debtors and their personnel, which would be a major distraction and could materially interfere with efforts to successfully resolve these chapter 11 cases. *See In re Key3Media Group, Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005) ("[T]he self-serving offer of the [creditors'] counsel to prosecute this matter on a contingency fee basis may arguably mitigate the costs of litigation, but does not necessarily eliminate the costs involved, either monetarily, or in terms of the delay involved."), *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006). If any case were taken on a contingency fee, that may allow the estates to defray the costs of litigation on the front-end, however, any recovery would need to be discounted based on the amount of the contingency fee. The Special Committee has requested the UCC to provide the proposed amount of this fee, but the UCC has not answered. Based on experience with similar cases, this fee could be as high as 40 percent. In sum, this factor favors settlement.

> **D.**     **The Paramount Interests of Creditors Weigh in Favor of Approving the Release Provisions of the Settlement Agreement.**

53.     With respect to the fourth *TMT* factor—the paramount interests of creditors—the Settlement Agreement provides certainty to creditors, and also provides substantial value that will help the Debtors' emergence from bankruptcy. With the complexity of the Debtors' chapter 11 cases and the immediate need for liquidity to fund recoveries to the Debtors' secured and administrative claimants, the Settlement Agreement is clearly in the best interests of the creditors. Although some stakeholders may object to settling any claims, the fact that only some creditors do not support the settlement, while other creditors do support the settlement, only serves to neutralize the factor. *In re Auge*, 559 B.R. 223, 233 (Bankr. D.N.M. 2016) (noting that where the creditors are divided, "[t]his factor is neutral"). The Settlement requires the support of the certain of the Debtors' key stakeholders to be effective. The Debtors are confident that this condition will be satisfied and that the Settlement Agreement will have the support of these key stakeholders. Besides avoiding potentially expensive and protracted litigation, the Debtors will have an

immediate, substantial cash infusion from the Settlement, which will directly benefit the Debtors' creditors.

54.     The benefits of the Settlement Agreement are immediate and obvious.  The $15 million payment is undeniably substantial.  Moreover, the avoidance of costly and unpredictable litigation allows the Debtors to move forward with its reorganization efforts.  By securing the substantial guaranteed benefits of the Settlement Agreement, the Debtors avoid taking unnecessary litigation risks.

## II.     The Releases Contained in the Settlement Agreement Are Appropriate.

55.     The proposed releases given to the Released Parties under the Settlement Agreement are appropriate, reasonable, and an integral part of the Settlement Agreement and permissible under Rule 9019 of the Bankruptcy Rules.  Claims and causes of action held by a debtor become property of the estate upon the filing of a chapter 11 petition, and the debtor in possession is "vested with the power to settle the estate's claims." *Police & Fire Retirement Sys. v. Ambac Fin. Grp. (In re Ambac Fin. Grp., Inc.)*, No. 10-B-15973 (SCC), 2011 WL 6844533, at *2 (S.D.N.Y. Dec 29, 2011) (quoting *Smart World Techs., LLC v. Juno Online Servs., Inc.*, 423 F.3d 166, 175 (2d Cir. 2005)); *see also In re Adelphia*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own."); *In re Oneida Ltd.*, 351 B.R. 79, 94 n.21 (Bankr. S.D.N.Y. 2006) (noting that a debtor is permitted to release claims that it owns).  A debtor in possession maintains authority to settle claims if it deems "that choice to be the proper course of action."  *In re Ambac Fin. Grp., Inc.*, 2011 WL 6844533 at *2.  A debtor in possession may seek approval to settle claims in the context of a plan of reorganization, under section 1123(b)(3)(A) of the Bankruptcy Code, or outside of the context of a plan of reorganization, under Rule 9019 of the Bankruptcy Rules.

26

56.     As explained above, under the Eighth Circuit's four-factor test for approving settlements under Rule 9019, the Settlement Agreement and the releases provided therein are permissible, reasonable, and appropriate.

57.     Without the releases, Sun Capital would not have agreed to the terms of the Settlement Agreement or to provide the Debtors and their estates with the substantial value that is being provided therein.  While the Debtors are releasing all claims against Sun Capital and its affiliates, other than the 2015 dividend payments, the Debtors are not aware of any other potential claims that are being released.  And with respect to the 2015 dividend payment, the strongest Potential Claims, as discussed in greater detail above, litigating the claims addressed by the Settlement Agreement through trial and all appeals would require the expenditure of substantial estate funds, and the Debtors' success in such litigation is uncertain.  The releases reasonably and justifiably take into account the uncertainty and costs of any actual litigation of claims.  Further, the substantial consideration being provided to the Debtors' estates and their creditors as part of the Settlement Agreement reflects a favorable resolution of the claims.  Given the uncertain prospects of recovery, along with the inevitable costs, delay, and risk of loss inherent in pursuing litigation, providing releases of claims owned by the Debtors in exchange for the substantial consideration provided under the Settlement Agreement is entirely reasonable, a sound exercise of business judgment, and is fair and equitable and in the best interests of the Debtors' estates.

**Waiver of Bankruptcy Rule 6004(a)**

58.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), and the requirements under Local Rule 6004-1.

**Notice**

59.      The Debtors have provided notice of this Motion to the following parties or their

respective counsel: (a) the office of the U.S. Trustee for the District of Nebraska; (b) counsel to

the UCC; (c) the agents under the Debtors' prepetition asset-based facility; (d) the agents under

the proposed DIP Facility; (e) the agents under the Debtors' prepetition term loan facility; (f) the

Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the

office of the attorneys general for the states in which the Debtors operate; (i) the United States

Attorney's Office for the District of Nebraska; (j) counsel to Sun Capital; (k) counsel to Monarch;

and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit

that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

60.      No prior request for the relief sought in this Motion has been made to this or any

other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: May 6, 2019
  Omaha, Nebraska

/s/ *Michael T. Eversden*

James J. Niemeier (NE Bar No. 18838)
Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**MCGRATH NORTH MULLIN & KRATZ, P.C. LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Telephone:    (402) 341-3070
Facsimile:    (402) 341-0216
Email:       jniemeier@mcgrathnorth.com
           meversden@mcgrathnorth.com
           lgoodman@mcgrathnorth.com

*Co-Counsel to the Debtors*

- and -

Brian S. Lennon (admitted *pro hac vice*)
Todd G. Cosenza (admitted *pro hac vice*)
Matthew A. Feldman
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
Email:      blennon@willkie.com
           tcozenza@willkie.com
           mfeldman@willkie.com

*Counsel to the Special Committee of Independent Directors of the Debtors*

## Exhibit A

**Settlement Agreement**

*EXECUTION VERSION*

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT (the "Agreement") is entered into and effective as of this 6th day of May, 2019, by and among Specialty Retail Holding Corp., a Wisconsin corporation having its principal office at 700 Pilgrim Way, Green Bay, Wisconsin 543044 ("Shopko" or the "Company"), and its debtor affiliates in In re Specialty Retail Shops Holding Corp. (Case No. 19-80064, Bankr. Neb.) (collectively with Shopko, the "Debtors"), Sun Capital Partners, Inc., a Florida corporation, having its principal office at 5200 Town Circle Center, 4th Floor, Boca Raton, Florida 33486 ("Sun Capital"), and Sun Capital affiliates SKO Group Holding, LLC, a Delaware limited liability company ("SKO Group"); Sun SKO, LLC, a Delaware limited liability company ("Sun SKO"); and Sun Capital Partners Management IV, LLC, a Delaware limited liability company, and Sun Capital Partners IV, LP, a Delaware limited partnership ("IV LP") ("SCM" and collectively with Sun Capital, SKO Group, Sun SKO, and IV LP, the "Sun Parties").

## RECITALS

WHEREAS, Shopko entered into a merger agreement with SKO Group Holding Corp. ("SKO Group"), an affiliate of Sun Capital, on October 18, 2005;

WHEREAS, the Debtors paid certain dividends from Shopko to SKO Group on the following dates: (a) May 14, 2007 ($55 million); (b) September 24, 2010 ($20 million); (c) December 3, 2010 ($10 million); (d) August 29, 2013 ($44,531,900); and (e) June 19, 2015 ($50 million) (the "Dividend Transactions"). Additionally, prior to its bankruptcy filing (y) the Debtors made payments to the Sun Parties or their affiliates under certain management consulting agreements and (z) the Debtors engaged in certain other transactions with the Sun Parties or their affiliates that were reported in their consolidated financial statements as related party transactions (together with the Dividend Transactions, the "Sponsor Transactions").

WHEREAS, on November 26, 2018, the board of directors of Shopko authorized the formation of a special committee of disinterested directors (the "Special Committee") to, among other things, review matters regarding transactions or negotiations which the Special Committee determines in whole or in part may involve conflicts of interest;

WHEREAS, on January 16, 2019, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in United States Bankruptcy Court for the District of Nebraska (the "Bankruptcy Court");

WHEREAS, on January 18, 2019, the United States Trustee appointed the official committee of unsecured creditors (the "UCC");

WHEREAS, in connection with the filing of the chapter 11 cases, the Special Committee has been investigating claims that the Debtors' estates may be able to assert against the Sun Parties and other insiders arising out of the parties' respective business dealings and dividend payments;

WHEREAS, on March 12, 2019, the UCC filed the *Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Authorizing The Committee To Prosecute Certain*

29261780.19

*Claims On Behalf Of The Bankruptcy Estates* seeking authority to pursue alleged claims for avoidance of certain of transactions related to the Sun Parties, breaches of fiduciary duty by the Sun Parties and others, and equitable subordination;

WHEREAS, the Sun Parties believe that such claims are without merit and deny any liability to Shopko, but have expressed a desire to address those, and any other potential claims the Debtors and their estates may have against the Sun Parties, in a comprehensive manner that resolves any claims against the Sun Parties and entities or persons related to the Sun Parties and resolves claims that might be asserted against directors, officers and other parties relating to the Debtors;

WHEREAS, after conducting extensive diligence and analysis regarding the potential estate claims, including meeting with the UCC's advisors on multiple occasions and reviewing documents produced by the Company and the Sun Parties, the Special Committee has determined that a settlement of estate claims as set forth in this Agreement is in the best interests of these estates;

WHEREAS, after extensive, arms-length negotiation, the parties desire to fully resolve and their disputes without the risk or expense of litigation; and

WHEREAS, the parties have negotiated and reached this Agreement in good faith, each represented by counsel.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises and limited releases set forth herein, the parties hereby agree as follows:

1.      **RECITALS.**  The recitals set forth above are an integral part of this Agreement and are incorporated herein by reference.

2.      **PAYMENT.**  On the Effective Date, the Sun Parties shall remit to Shopko the sum of $15,000,000.00 (the "Settlement Amount") in immediately available funds, pursuant to wire instructions to be provided by Shopko.  The Settlement Amount shall be applied by the Debtors as required by paragraph 1.6 of the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief,* by being placed in a segregated account maintained by the Debtors and not used for any payment or distribution of any kind except in accordance with the terms thereof.

3.      **RELEASE BY THE DEBTORS.**  For good and valuable consideration, the sufficiency of which is hereby acknowledged, the Debtors, on behalf of themselves and their respective estates, including, without limitation, any successor, trustee, or estate representative,

29261780.19

and its and their insurers, predecessors, successors, assigns, and current and former officers, directors, equity holders, shareholders, stockholders, partners, members, managers, employees, attorneys and agents (the "Debtor Releasors"), as of the Effective Date (as defined below), release, remise and forever discharge (a) the Sun Parties and each of their respective current and former affiliates, parents, equity holders, shareholders, stockholders, subsidiaries and co-investors (collectively the "Primary Sun Releasees"), and each of the Primary Sun Releasees respective current and former successors, assigns, equity holders, shareholders, stockholders, officers, directors, members, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, insurers and other professionals, each in their capacity as such (together with the Primary Sun Releasees the "Sun Capital Releasees"); and (b) the Debtors' current and former officers, directors, members, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (together with the Sun Capital Releasees the "Debtor Releasees") of and from any and all debts, demands, actions, causes of action, suits, damages, claims and liabilities whatsoever of every name and nature, whether known or unknown, that the Debtor Releasors now have, ever had, or in the future may have against the Debtor Releasees; provided, however, that nothing herein shall be construed to release any of the Debtor Releasees from any liability, duty or obligation expressly arising under this Agreement. The Debtor Releasors hereby consciously accept the risk that the scope of this release may include future damages, injuries, claims, obligations and liabilities that are presently unknown, unforeseen or not yet in existence and consciously intend to release same.

4.      **RELEASE OF THE DEBTORS BY THE SUN PARTIES.**  For good and valuable consideration, the sufficiency of which is hereby acknowledged, the Sun Parties and, to the extent they may legally do so, the Sun Parties on behalf of each of their respective current and former affiliates, parents, equity holders, shareholders, stockholders, subsidiaries and co-investors (collectively the "Primary Sun Releasors"), and each of the Primary Sun Releasors' respective current and former equity holders, shareholders, stockholders, partners, members, managers, officers, directors, employees, attorneys, agents, representatives, insurers, successors and assigns (together with the Primary Sun Releasors the "Sun Capital Releasors"), as of the Effective Date, release, remise and forever discharge the Debtors, their estates, current and former affiliates, parents, subsidiaries, equity holders, shareholders, stockholders, partners, members, managers, officers, directors, employees, attorneys, financial advisors, agents, representatives, insurers, successors and assigns, of and from any and all debts, demands, actions, causes of action, suits, damages, claims and liabilities whatsoever of every name and nature, whether known or unknown, that the Sun Capital Releasors now have, ever had or in the future may have against the Debtor Releasors; provided, however, that nothing herein shall be construed to release any of the Debtor Releasors from any liability, duty or obligation expressly arising under this Agreement. The Sun Capital Releasors hereby consciously accept the risk that the scope of this release may include future damages, injuries, claims, obligations and liabilities which are presently unknown, unforeseen or not yet in existence and consciously intend to release same.

5.      **EFFECTIVE DATE.**  This Agreement shall become effective upon the date on which all of the conditions set forth in paragraph 6 herein are satisfied (the "Effective Date").

29261780.19

6.      **CONDITIONS TO EFFECTIVE DATE.**  It shall be a condition to the Effective Date of this Agreement that each of the following conditions shall have been satisfied unless waived by the Sun Parties:

> (a)  prior to the Bankruptcy Court hearing to approve the Agreement, the Special Committee and Sun Capital shall receive written confirmation (email being sufficient) that each of Wells Fargo Bank National Association, Shopko Note Holding, LLC, and Monarch Alternative Capital, LP shall support the approval and consummation of the Agreement;

> (b)  by not later than June 14, 2019, the Bankruptcy Court shall have entered an order approving this Agreement in a form reasonably acceptable to the Special Committee and the Sun Parties (the "Bankruptcy Court Order");

> (c)  by not later than, June 28, 2019, the Bankruptcy Court Order shall become a Final Order[1]; and

> (d)  prior to the Bankruptcy Court Order becoming a Final Order, the Bankruptcy Court shall have not granted the *Motion of Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Claims on Behalf of the Bankruptcy Estates* (Bankruptcy Court Docket No. 641).

If any of the foregoing four conditions to the Effective Date have not been satisfied by their respective deadlines set forth in this Section 6 and have not been waived by the Sun Parties, this Agreement shall terminate and shall be null and void.

7.      **REPRESENTATION BY AND CONSULTATION WITH COUNSEL.**  The parties represent and warrant that: (a) each has read and understands the terms of this Agreement and is duly authorized to enter into this Agreement, (b) each has been represented by counsel with respect to the negotiation and execution of this Agreement and all matters covered by and relating to it, and (c) each has entered into this Agreement of its own free will and for reasons of its own and not based upon representations of any other party hereto.

8.      **DEBTORS' COVENANTS.**  The Debtors do hereby covenant and agree as follows:  (a) they will use commercially reasonable efforts to obtain releases in any confirmed plan of reorganization that are similar in all material respects to, and no less favorable to the Sun Parties than, the releases contained in the *Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and Its Debtor Affiliates* and this Agreement; and (b) the Debtors will use

---

[1]"Final Order" shall mean (i) the Bankruptcy Court Order has not been reversed, modified or amended, and is not stayed; (ii) the time to appeal from or to seek review or rehearing or petition for certiorari with respect to such Bankruptcy Court Order has expired; and (iii) the Bankruptcy Court Order is no longer subject to review, reversal, modification or amendment; provided, however, that the mere possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule, may be filed relating to such order or judgment shall not cause such order not to be a "Final Order."

29261780.19

commercially reasonable efforts to cooperate with any efforts by the Sun Parties to defend against claims asserted against the Sun Parties that have been released pursuant to this Agreement.

9.     **REPRESENTATION REGARDING DOCUMENT PRODUCTIONS.**  The Sun Parties represent that as of the Effective Date they, or their attorneys, including their outside counsel, have (a) conducted a search for documents based upon search terms, date ranges and custodians agreed upon between the Special Committee and the Sun Parties, (b) engaged in a good faith effort to identify all documents requested by the Special Committee that were located in connection with such search, and (c) provided to the Special Committee all non-privileged documents requested by the Special Committee or its attorneys and advisors that were located in this manner.

10.     **NO ASSIGNMENT OF CLAIMS.**  The Sun Parties and the Debtors, on behalf of themselves and the Sun Capital Releasors and the Debtor Releasors, respectively, each represent and warrant that neither it nor any of its agents, representatives, officers, employees or attorneys has assigned, transferred, pledged, or hypothecated, or purported to assign, transfer, pledge or hypothecate, any actual or alleged claims, obligations or liabilities that are the subject of this Agreement and/or that are released in either Paragraphs 3 or 4 of this Agreement.

11.     **MUTUAL COOPERATION.**  The parties agree to cooperate, and to execute such additional documents as may reasonably be necessary, in order to effectuate and finalize this Agreement and the settlement described herein.

12.     **INTEGRATION AND MERGER CLAUSE.**  This Agreement embodies the entire agreement between the parties hereto with respect to the subject matter hereof and there have been and are no agreements, representations, or warranties, whether express or implied, written or oral, other than those set forth or provided for herein.  Other than as stated herein, each party hereto warrants that no representation, promise, or inducement has been offered or made to induce such party to enter into this Agreement.

13.     **AMENDMENT OF AGREEMENT.**  The terms of this Agreement may only be amended or modified by a writing that has been executed by each of the parties hereto.

14.     **CONSTRUCTION.**  This Agreement was drafted with the assistance of counsel for all parties and shall not be construed in favor of or against any party.

15.     **EXECUTION.**  This Agreement may be executed in two or more counterparts each of which shall be deemed an original but all of which together shall constitute but one and the same instrument.  Executed signature pages may be removed from partially executed counterparts and attached to one or more other counterparts in order to produce fully executed counterparts of this agreement.  This agreement may be executed by facsimile copy, and each signature thereto shall be and constitute an original signature, again as if all parties had executed a single original document.  This Agreement shall be originally executed as many times as required to provide a fully executed duplicate original of such document to each party hereto.

29261780.19

16.    **NO ADMISSION OF LIABILITY.**    The parties agree that the settlement embodied in this Agreement represents the compromise of disputed claims and agree that nothing in this Agreement shall be construed as an admission of any fault or liability with respect to any claim, obligation or liability released.  All communications (whether oral or in writing) between and/or among the parties, their counsel and/or their respective representatives relating to, concerning or in connection with this Agreement, or the matters covered hereby and thereby, shall be governed and protected in accordance with the Federal Rule of Evidence 408.

17.    **THIRD PARTY BENEFICIARIES.**  This Agreement shall not confer any rights or remedies upon any person other than the parties hereto, each Debtor Releasor, each Debtor Releasee, each Sun Capital Releasor. and each of their respective successors and permitted assigns.

18.    **FIDUCIARY OBLIGATIONS.**  Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require the Debtors' or any of their directors or officers, or other similar governing body or fiduciary, to take any action, or to refrain from taking any action, to the extent such person or body determines that taking such action, or refraining from taking such action, may be inconsistent with applicable law or its or their fiduciary obligations under applicable law.

19.    **CHOICE OF LAW.**  This Agreement shall be construed and interpreted in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

20.    **HEADINGS.**  The parties agree that the captions and headings in this Agreement are inserted for convenience of reference only and are not part of, and shall not affect the interpretation of, this Agreement.

21.    **NOTICE.**  All notices to be made pursuant to or in connection with this Agreement may be made by mail, overnight delivery or facsimile and shall be deemed effective when sent if made as follows:

To the Sun Parties:

Sun Capital Partners, Inc.
5200 Town Center Circle, 4th Floor
Boca Raton, FL 33486
Attention:      C. Deryl Couch
Email:           dcouch@suncappart.com

With a copy to:

Morgan, Lewis & Bockius LLP
101 Park Ave.
New York, New York 10178
Attention:      Craig A. Wolfe
Email:           craig.wolfe@morganlewis.com

DB1/ 103843359.11                              6

29261780.19

To the Debtors:

        Specialty Retail Shops Holding Corp.
        700 Pilgrim Way
        Green Bay, Wisconsin 54304
        Attention:    Russell Steinhorst, CEO
                    Susan Buckna, General Counsel
        Email:    russ.steinhorst@shopko.com
                    susan.buckna@shopko.com

with a copy to:

        Willkie Farr & Gallagher LLP
        787 Seventh Avenue
        New York, New York 10019
        Attention:    Brian Lennon
                    Todd Cosenza
        Email:    BLennon@willkie.com
                    TCosenza @willkie.com

      22.    **WAIVER OF JURY TRIAL.  THE PARTIES EXPRESSLY AND IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY FOR ANY CLAIM, COUNTERCLAIM, ACTION OR OTHER PROCEEDINGS ARISING UNDER OR RELATING TO THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER, THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS OR THE RELATIONSHIP BETWEEN THE PARTIES, IN EACH CASE WHETHER SUCH CLAIM, COUNTERCLAIM, ACTION OR OTHER PROCEEDING IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the dates set forth below.

SUN CAPITAL PARTNERS, INC.

Dated: _____ May 6 _____, 2019.

_____

By: _____
    Michael McConvery

Its: _____
     Vice President - Finance & Asst Secretary

SUN SKO, LLC

Dated: _____ May 6 _____, 2019.

_____

By: _____
    Michael McConvery

Its: _____
     Vice president & Asst. Secretary

SUN CAPITAL PARTNERS IV, LP

Dated: _____ May 6 _____, 2019.

By: <u>Sun Capital Advisors IV, LP, its general partner</u>

By: <u>Sun Capital Partners IV, LLC, its general partner</u>

By: _____

Name: Michael McConvery

Title: Vice president - Finance & Asst. Secretary

SKO GROUP HOLDING, LLC

Dated: _____May 6_____, 2019.          _____

                                       By: _____
                                            Michael McConvery
                                       Its: _____
                                            Vice President & Asst. Secretary

SUN CAPITAL PARTNERS MANAGEMENT IV, LLC

Dated: _____May 6_____, 2019.          _____

                                       By: _____
                                            Michael McConvery
                                       Its: _____
                                            Vice President & Asst Secretary

SPECIALTY RETAIL HOLDINGS CORP., on behalf of
itself and its debtor affiliates

Dated: _____, 2019.          _____

                                       By: _____

                                       Its: _____

SPECIALTY RETAIL SHOPS HOLDING CORP., on
behalf of itself and its debtor affiliates

Dated:  May 6        , 2019.

By:  Steven Winograd

Its:  Independent Director

SPECIALTY RETAIL SHOPS HOLDING CORP., on
behalf of itself and its debtor affiliates

Dated:              , 2019.

By:  Mohsin Meghji

Its:  Independent Director

SPECIALTY RETAIL SHOPS HOLDING CORP., on behalf of itself and its debtor affiliates

Dated: _____, 2019.        _____

By:  Steven Winograd

Its:  Independent Director

SPECIALTY RETAIL SHOPS HOLDING CORP., on behalf of itself and its debtor affiliates

Dated: __May 6____, 2019.        _____

By:  Mohsin Meghji

Its:  Independent Director

**<u>Exhibit B</u>**

**Verost Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) | Case No. 19-80064 (TLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF ADAM W. VEROST**
**IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)**
**AUTHORIZING THE DEBTORS TO ENTER INTO A SETTLEMENT AGREEMENT**
**WITH SUN CAPITAL PARTNERS AND (II) GRANTING RELATED RELIEF**

I, Adam W. Verost, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.     I am a Partner in Ducera Partners LLC ("Ducera"), independent financial advisor to the Special Committee of independent and disinterested directors (the "Special Committee") of Specialty Retail Shops Holding Corp. ("Shopko" or the "Company"). Ducera is a financial advisory services firm with its principal office located at 499 Park Avenue, 16th Floor, New York, New York 10022. I am the Ducera Partner with principal responsibility for advising the Special Committee.

2.     I have been a Partner in Ducera since June 2015 and am currently co-Chairman of Ducera's Fairness Committee. Before joining Ducera, I was employed for more than eight years by Perella Weinberg Partners L.P., most recently as a Managing Director. I have also

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); ShopKo Gift Card Co., LLC (2161); ShopKo Holding Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing, LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592). The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin, 54304.

held positions at Kramer Capital Partners, LLC, Greenhill & Co., and Houlihan Lokey, Inc.  I received a Bachelor of Science degree from Indiana University in Finance, Accounting and International Business.

3.       Ducera specializes in, among other things, providing capital structure and restructuring advice in workout and bankruptcy situations.  Ducera's debtor-advisory services include a wide range of activities including providing advice on maximizing value of the estate through the chapter 11 process, evaluating the needs for DIP financing and potential sources of such financing, assisting in developing, negotiating, and validating capital structure alternatives, conducting diligence on underlying business plans and liquidity projections, evaluating contracts and operating agreements to assess business risk from vendors, evaluating potential contract rejections, and analyzing tax, regulatory, and labor considerations. In addition, Ducera's professionals have experience in investigating and analyzing potential claims of debtors and their estates.

4.       I submit this Declaration to support the relief requested in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter into a Settlement Agreement with Sun Capital Partners and (II) Granting Related Relief* (the "<u>Motion</u>").[2]

5.       I have reviewed the Motion, including the exhibits attached to it.  I am familiar with the facts and circumstances of the chapter 11 cases.

6.       This Declaration is based on my personal knowledge, information gathered from Ducera's review of relevant documents, and information supplied to Ducera by current and former members of the Debtors' management and the Debtors' advisors.

---

[2]       Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

7.    In December 2018, the Special Committee retained Ducera as independent financial advisor to provide assistance and financial advisory services in connection with these chapter 11 cases.  Ducera's responsibilities have included providing advice in connection with an investigation of certain transactions between the Debtors and their equity sponsors (the "<u>Investigation</u>"), among which was Sun Capital Partners, Inc. and certain of its affiliates ("<u>Sun Capital</u>").  Among others, Ducera's roles in the Investigation included an examination of the Debtors' solvency at various points critical to determining the viability of pursuing Potential Claims, a review of the solvency opinions prepared by Duff & Phelps in August 2013 and June 2015, and a report documenting Ducera's analysis and conclusions.

8.    Ducera undertook a thorough, multi-step analysis before reaching its conclusions, which are based on the information Ducera reviewed and developed, and Ducera's experience in securities and business valuations, and general financial market conditions.  In the course of the Investigation, Ducera performed the following tasks primarily focusing on issues relating to the 2015 dividend transaction:

a.    reviewed and analyzed audited financial statements of the Debtors;

b.    reviewed and analyzed the Debtors' monthly management reports;

c.    reviewed and analyzed valuation grids prepared by Sun Capital;

d.    reviewed and analyzed solvency reports prepared by Duff & Phelps in June 2015 and August 2013;

e.    reviewed and analyzed financing documents and amendments from the time of the 2015 and 2013 dividend transactions;

f.    reviewed e-mail correspondence by the Debtors and Sun Capital employees;

g.    participated in meetings with advisors of the official committee of unsecured creditors and Sun Capital;

h.    participated with counsel in interviews with the Debtors'

employees, including Russell Steinhorst, Mary Meixelsperger, Gary Gibson, and Kelly Weerts; and

i.      reviewed and analyzed historical actual performance relative to forecasts for periods prior to the dividend transactions.

9.      Ducera performed valuation and comparative analyses using generally accepted valuation and analytical techniques, including discounted cash flows analysis and comparable public companies analysis.

10.     Ducera reviewed the report of the Michel-Shaked Group ("Shaked"), filed with the Court on March 12, 2019.  Shaked appears to have concluded that the Debtors were insolvent based upon one or more discounted cash flow analyses that are premised on the Debtor's downside "sensitivity case" as further modified by Shaked without consultation with Company management.  Furthermore, Shaked appears to choose not to use a comparable public company analysis on the basis that there are no sufficiently comparable companies.

11.     On March 22, 2019, during a meeting of the Special Committee, I orally delivered Ducera's report and conclusions concerning Ducera's investigation of the Debtors' solvency as of June 19, 2015, the date of the dividend transactions in 2015.  Ducera's report was subsequently finalized and reduced to writing.  A true and correct copy of Ducera's investigation report is attached to this declaration as **Annex A** and incorporated hereto.

12.     Ducera concluded that the Debtors were most likely solvent at the time of the 2015 dividend transaction.  Further, Ducera determined that the financial forecast (the "Shopko Forecast") utilized by Duff & Phelps at the time of the 2015 dividend transactions was the most appropriate forecast available at the time to use for an assessment of value and solvency. In reaching this conclusion, Ducera took into account that the Debtors' management provided letters to Duff & Phelps that validated the reliability of Duff & Phelps' assumptions, and that such assumptions represented managements' best estimates for future operating performance and

4

financial performance of the Company. Additionally, during interviews conducted in the course of the investigation in March 2019, the Debtors' employees represented that the assumptions were accurate, and while acknowledging certain risks, that they were the best available assumptions at that time of the 2015 dividend transactions. Specifically, Ducera discussed the historical financial performance of the Company with Shopko's current CEO and other members of management and none suggested a more reliable forecast or that the Shopko Forecast was unreliable.

13.    Ducera reviewed and analyzed, as of the date of the 2015 dividend transactions, the Debtors' ability to pay its debts as they came due. Ducera concluded that Shopko was reasonably expected to be able to pay its debts as they came due, considering both the Shopko Forecast and the downside "sensitivity case" to the Shopko Forecasts.

14.    Furthermore, in the course of its investigation, Ducera identified no contemporaneous forecasts developed by management or Sun Capital that materially differed from the Shopko Forecast. Ducera is not aware of any efforts by Sun Capital or other parties to pressure Shopko management to put forth projections that Shopko management found to be unreasonable. Ducera identified no evidence suggesting Sun Capital believed at the time of the 2015 dividend transaction that the Shopko Forecast was unreasonable or unlikely to be achieved.

15.    Ducera understands that the Debtors funded the 2015 dividend payment through incremental debt incurrence of approximately $54 million. Upon incurrence of the incremental debt and payment of the 2015 dividend payment, Shopko had approximately $560 million of debt outstanding, reflecting leverage of 5.5x LTM EBITDA, and Shopko's enterprise value was reasonably estimated in the range of $650 million to $750 million. Ducera also found that at the time of the 2015 dividend payment, Shopko's equity value was reasonably estimated in the range of $123 million to $223 million.

16.     Based on the above valuation and analysis of the Debtors' ability to pay its debts as they came due, Ducera concluded that Shopko was most likely solvent at the time of the 2015 dividend payment.  However, Ducera also acknowledged that a trier of fact in a litigation may conclude that forecasts with less growth and lower profitability are more appropriate. Additionally, a trier of fact in a litigation could conclude that the 2015 Duff & Phelps solvency opinion is not reliable for a determination of value or assessment of solvency.

Dated: May 6, 2019
New York, New York                           By:     _/s/_____Adam W. Verost_____

## **Annex A**

**Ducera Report**

# Specialty Retail Shops Holding Corp.

## Report to the Special Committee



© 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

## Table of Contents

1.  Discussion
2.  Exhibits

© 2019, Ducera Partners LLC / CONFIDENTIAL



# Discussion





© 2019, Ducera Partners LLC / CONFIDENTIAL

# Discussion

- The committee of disinterested directors (the "Special Committee") of Specialty Retail Shops Holding Corp. (collectively with its subsidiaries, "Shopko") engaged Ducera Partners LLC ("Ducera") to prepare a report (the "Report") concerning certain historical transactions of Shopko, if requested by the Special Committee

- At the request of the Special Committee, this Report provides a review of the financial condition of Shopko at the time of Shopko's June 19, 2015 dividend to its shareholders in the amount of approximately $50 million (the "2015 Distribution")

- In connection with the Report, Ducera has made such reviews, analyses and inquiries regarding Shopko and the 2015 Distribution as it has deemed necessary and appropriate to prepare the Report

- Ducera also took into account general economic, market and financial conditions, as well as its experience in securities and business valuation

- Ducera's procedures, investigations, and financial analysis with respect to the preparation of the Report included, but were not limited to, the items summarized below
  - Ducera reviewed the following documents, among others:
    - Shopko's audited financial statements for the fiscal years ended 2012, 2013, 2014, 2015, and 2016
    - Shopko's monthly management reports ("Management Reports") for the fiscal periods ending 1Q12 through 4Q16, including the financial projections and historical results included therein
    - Valuation grids, schedules, and analysis prepared by Shopko for Sun Capital Partners, Inc. ("Sun Capital") ("Sun Valuation Grids") for the periods ending 1Q12 through 4Q16
    - Credit agreements, amendments, and other documentation related to Shopko's credit facility and its lender (Wells Fargo) at the time of each transaction
    - The Duff & Phelps Solvency and Capital Surplus Analysis dated August 29, 2013 ("Duff & Phelps 2013 Analysis")
    - The Duff & Phelps Solvency and Capital Surplus Analysis dated June 18, 2015 ("Duff & Phelps 2015 Analysis")
    - Email correspondence among various Shopko and Sun Capital employees
    - Materials prepared by The Michel-Shaked Group ("MSG") including an expert report filed with the United States Bankruptcy Court for the District of Nebraska on March 12, 2019 (Doc 641) under sealed motion ("The MSG Expert Report")

    © 2019, Ducera Partners LLC / CONFIDENTIAL



# Discussion (Continued)

– Interviewed the following individuals regarding the information above, the background and other elements of Shopko's August 29, 2013 dividend to its shareholders in the amount of approximately $45 million (the "2013 Distribution") and 2015 Distribution, and Shopko management's plans and intentions with respect to the management and operation of the business at the time of the 2013 Distribution and 2015 Distribution:

- Russ Steinhorst, current CEO of Shopko and former CFO

- Gary Gibson, Treasurer of Shopko

- Kelly Weerts, Controller of Shopko

- Mary Meixelsperger, former CFO of Shopko

– Reviewed Shopko's historical, actual performance relative to forecasts for periods prior to the 2013 Distribution and 2015 Distribution

– Performed certain valuation and comparative analyses using generally accepted valuation and analytical techniques including a discounted cash flow analysis and an analysis of selected public companies that Ducera deemed relevant

– Performed certain cash flow analyses on the financial projections prepared by management and a downside "sensitivity case" represented by management to be reasonable at the time of the 2015 Distribution

– Conducted other analyses and considered such other factors as Ducera deemed appropriate

- Ducera requested but did not receive the following items:

– Interviews with employees of Sun Capital and Duff & Phelps LLC ("Duff & Phelps") who have relevant knowledge of the 2013 Distribution and 2015 Distribution

– Document production from Duff & Phelps regarding its Solvency and Capital Surplus Analyses dated August 29, 2013 and June 18, 2015

© 2019, Ducera Partners LLC / CONFIDENTIAL



# Discussion (Continued)

▪ To complete certain analyses requested by the Special Committee, Ducera needed to utilize projections for the financial performance of Shopko as of the June 19, 2015 Distribution

▪ Based on the information currently available to Ducera, Ducera determined that the financial projections incorporated in the Duff & Phelps 2015 Analysis ("June 2015 Management Projections") reflect the most appropriate basis for Ducera's evaluation of Shopko including valuation and other analyses as of June 19, 2015

   – On June 19, 2015, Shopko management provided a letter to Duff & Phelps representing, among other things, that "the assumptions provided and utilized in the projected revenue and expense calculations for the Company represent management's best estimates as to the future operating performance and financial results of the Company. The assumptions supporting such projections are both reasonable and achievable as of June 19, 2015 and have been subject to management and board (or managers, as applicable) review and approval"

   – Shopko management represented, with respect to the Duff & Phelps Solvency and Capital Surplus Analyses (which includes financial projections),"Based upon my review to date of your analysis and materials that you have provided, nothing has come to our attention that would cause me to believe that the assumptions underlying your analyses are unreasonable or unachievable given the prevailing facts and circumstances surrounding the Company and the Proposed Transaction"

   – During interviews in March 2019, Shopko's current CEO (who was Shopko's CFO in June 2015) confirmed that the representations in the June 2015 letter were accurate. Shopko's CEO acknowledged that risks to the forecast existed at the time of the representations, but stated the forecasts were nonetheless the best estimate at the time and believed to be achievable. Shopko's CEO also confirmed that the representations refer to all years of the forecast utilized by Duff & Phelps in both the base and sensitivity cases

   – Ducera reviewed and considered the historical financial performance of Shopko and the revisions to its forecasts included in the management reports prepared monthly

   – Ducera discussed the historical financial performance of the business, including negative variances to the forecast, and the expectations for store, revenue, and margin growth with Shopko's CEO and other members of management. During the interviews, none of the Shopko employees suggested a more reliable financial forecast existed as of June 19, 2015 or that the forecasts utilized by Duff & Phelps were unreliable

   – Ducera reviewed other contemporaneous financial forecasts utilized by third parties, including investment banks proposing strategic alternatives for Shopko. Ducera observed that these were materially consistent with or more favorable than the forecasts utilized by Duff & Phelps

© 2019, Ducera Partners LLC / CONFIDENTIAL



# Discussion (Continued)

- Ducera reviewed communications with Shopko's credit facility lender (Wells Fargo) and the lenders' agreement to amend Shopko's credit agreement, thereby allowing Shopko to borrow funds that would not have otherwise been available for the 2015 Distribution

- Notwithstanding the foregoing, Ducera believes there is risk that a trier of fact in a litigation may conclude that the June 2015 Management Projections are not reliable for determination of value, assessment of solvency, or other analyses

- For various reasons, including but not limited to the following, the trier of fact may conclude that forecasts with less growth and lower profitability are more appropriate

  - Following an acquisition of Pamida in January 2012, Shopko struggled to integrate Pamida's stores as successfully as projected, calling into question the ability of Shopko to successfully add large numbers of stores as assumed in the management projections

    - Unfamiliar geographies, changes to shopping patterns during conversion periods, and other operating challenges resulted in declining profits in 2013

    - FY2013 actual EBITDA was $74.5 million compared to a budget of $132.0 million

  - Management had previously forecast the addition of approximately 30 Hometown stores per year, but had fallen behind its projections

    - At the time of its 2013 Distribution, Shopko's projections had assumed store growth from approximately 330 at the time of the 2013 Distribution to 353, 383, and 413 in the years 2014 through 2016

    - The June 2015 Management Projections assume store growth from approximately 330 at the time of the 2015 Distribution to 357, 387, and 417 in the years 2015 through 2017, approximately one year delayed

    © 2019, Ducera Partners LLC / CONFIDENTIAL



# Discussion (Continued)

– Roll-out of the Hometown store format was effectively discontinued between the 2015 Distribution and the end of FY2015, calling into question if, at the time of the 2015 Distribution, Shopko knew its projected growth was unlikely to be achieved

- The revenue and earnings growth reflected and represented in the management projections is dependent upon the addition of new Hometown stores

- The final Hometown store was opened in 2016; however, Ducera understands approval of Hometown store openings had been significantly reduced following the 2015 Distribution (11 stores in August, 14 stores in September, 1 store in November, and 1 store in February 2016) reflecting a reduction in the number of Hometown stores that were projected to be opened after the 2015 Distribution

  ➢ Only 27 Hometown stores were approved following the 2015 Distribution, relative to the projected 60 stores assumed to be opened after the 2015 Distribution

– Shopko demonstrated a trend of failing to achieve its forecast revenue and EBITDA projections

- In the years 2012 through 2014, Shopko's actual Revenue and EBITDA had fallen short of budget;

- For the years 2013 and 2015, Shopko's financial budgets and financial results reflected a quarterly trend and pattern of reducing full-year EBITDA projections, reflecting Shopko's inability to meet initial projections; and

- Shopko's historical projections included store growth projections year over year that were not realized, but were assumed to be realized in the following year, suggesting Shopko's inability to grow its store count and meet projections

© 2019, Ducera Partners LLC / CONFIDENTIAL



## Discussion (Continued)

– In Shopko employee interviews during March 2019, Shopko management reiterated a belief that the management projections were Shopko's best estimate as of June 19, 2015, however, several comments from the management team highlighted risks and potential concerns, including but not limited to:

- Shopko had a limited track record in its ability to successfully grow its store count; and

- Shopko has not historically demonstrated a track record in being able to meet its forecasts and budgets

– In addition, Ducera has reviewed certain emails from the time leading up to the 2015 Distribution that highlighted risks and potential concerns of management, including but not limited to:

- Management indicated potential concerns around the sizing of the 2015 Distribution;

- Management indicated potential concerns with approaching its credit facility lenders and potential reactions to a dividend transaction; and

- Management indicated potential concerns around Shopko's ability to accurately project financial performance with the FP&A resources available at the time

▪ Based upon the information available today, it is Ducera's view that Shopko was most likely solvent at the time of the 2015 Distribution. Notwithstanding the foregoing, given the concerns discussed above, Ducera does not recommend agreeing to a release absent a significant settlement contribution by Sun Capital

© 2019, Ducera Partners LLC / CONFIDENTIAL



# Exhibits





© 2019, Ducera Partners LLC / CONFIDENTIAL

# Financial Forecast Summary: Overview

- Ducera reviewed various forecasts for Shopko's financial performance that were prepared at or around the time of the dividend distributions, including those identified below, among others

| Financial Forecasts | Description | Purpose | Frequency | Projection Period |
|---|---|---|---|---|
| Shopko Management Reports | Forecasts reflect projections provided by Shopko as part of its monthly management reporting process | Monthly management reporting on recent results and future outlook | Provided monthly | Forecasts typically extended 2-4 years in the future |
| Sun Capital Reports | Forecasts reflect internal Sun Capital investment valuation analysis | Quarterly portfolio investment update for mark-to-market fund valuation | Provided quarterly, with assistance from Shopko and Duff & Phelps | These forecasts typically extended 4-5 years in the future, however, there is varying consistency in availability of projections |
| Duff & Phelps Solvency Opinion | Forecasts reflect projections utilized in the Duff & Phelps Solvency and Capital Surplus Analysis for 2013 and 2015 | Board of Directors solvency opinion for 2013 and 2015 Distributions | As needed | These forecasts typically extended 10 years in the future<br>Duff & Phelps utilized management's near-term 2-3 year projections and extrapolated the remaining periods |
| Other 3rd Parties | Reflect projections utilized by 3rd parties (investment banks, consultants, etc.) | Specific transactions (i.e., refinancing, IPOs, etc.) | As needed | These forecasts typically extended 2-3 years in the future |
| Shopko – Other | Reflects other ad hoc projections prepared by Shopko | Varies (lender updates, Duff & Phelps diligence, bank budget, etc.) | As needed | These forecasts typically extended 1-2 years in the future |
| Sun Capital – Other | Reflects other ad hoc projections prepared by Sun Capital | Varies (exit consideration analysis, high level valuation, etc.) | As needed | These forecasts typically extended 1-2 years in the future |

© 2019, Ducera Partners LLC / CONFIDENTIAL



# Overview of 2015 Distribution Transaction: Sources & Uses

▪ The following table highlights the sources and uses of the 2015 Distribution transaction at closing

  – Analysis assumes Shopko raises ~$54 million of new financing

    ▪ $24 million is funded via incremental draws on the Revolving Loan A credit facility

    ▪ $30 million is funded via incremental draws on the Term Loan B credit facility

  – Proceeds from the financings are utilized to (i) fund the dividend distribution to Shopko's ultimate equity holders and (ii) fund transaction expenses and fees

*The 2015 Distribution was funded through incremental debt of ~$54 million*

| Illustrative Transaction Sources & Uses | | | |
|---|---|---|---|
| *($ in millions)* | | | |
| **Sources** | | **Uses** | |
| Revolving Loan A Funding | $24 | 2015 Distribution | $50 |
| Term Loan B Funding | 30 | Transaction Expenses | 4 |
| **Total Sources** | **$54** | **Total Uses** | **$54** |

**Notes:**
Source: Management

© 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

# Overview of 2015 Distribution Transaction: Capital Structure

▪ The following table reflects the pro forma capital structure of Shopko following the 2015 Distribution

($ in millions)

| Facility | Principal Outstanding | | Interest | Maturity | Txn. | Pro Forma | |
|---|---|---|---|---|---|---|---|
| | Amount | xEBITDA | Interest | Maturity | Adjustments | Amount | xEBITDA |
| Revolving Loan A | $366 | | L+1.75% | 05/2020 | $24 | $389 | |
| Revolving Loan A-1 | 30 | | L+3.00% | 05/2020 | - | 30 | |
| Term Loan B | 43 | | L+7.75% | 05/2020 | 30 | 73 | |
| Sale Leaseback Note Payable | 11 | | 9.29% | 05/2026 | - | 11 | |
| Bonds | 6 | | 9.25% | 03/2022 | - | 6 | |
| Capital Leases | 37 | | 12.65% | 05/2022 | - | 37 | |
| Balboa Capital Lease | 2 | | 7.00% | 05/2018 | - | 2 | |
| IGF Financing | 12 | | 7.00% | 06/2018 | - | 12 | |
| Note Payable | 0 | | 9.25% | 03/2018 | - | 0 | |
| **Total Debt** | **$506** | **5.0x** | | | **$54** | **$560** | **5.5x** |
| Cash and Short Term Investments | (25) | | | | - | (25) | |
| **Total Net Debt** | **$481** | **4.7x** | | | **$54** | **$535** | **5.3x** |
| **LTM Adjusted EBITDA** | **$102** | | | | | | |

*Pro forma for the 2015 Distribution, Shopko had ~$560 million of debt outstanding, reflecting leverage of 5.5x EBITDA*

| Key Capital Structure Metrics | | |
|---|---|---|
| | Current | Pro Forma |
| Total Debt Outstanding | $506 | $560 |
| Total Annualized Cash Interest | $19 | $22 |
| Effective Blended Cash Interest | 3.8% | 3.9% |
| Weighted Average Maturity | 5.1yrs | 5.1yrs |

Notes:
Source: Management

© 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

# Overview of Historical and Projected Financial Performance

- The table below summarizes historical performance and projected financial performance included in the June 2015 Management Projections

| Overview of Management Projections | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in millions) | 2011A | 2012A | 2013A | 2014A | LTM | 2015F | 2016F | 2017F | 2018F | 2019F | 2020F | 2021F | 2022F | 2023F | 2024F |
| Total Sales | $2,730.2 | $2,711.5 | $2,660.6 | $2,666.1 | $2,678.7 | $2,858.3 | $3,066.5 | $3,283.7 | $3,497.1 | $3,636.9 | $3,764.2 | $3,877.2 | $3,993.5 | $4,113.3 | $4,236.7 |
| Growth (%) | -- | (0.7%) | (1.9%) | 0.2% | -- | 7.2% | 7.3% | 7.1% | 6.5% | 4.0% | 3.5% | 3.0% | 3.0% | 3.0% | 3.0% |
| Cost of Goods Sold | (1,928.8) | (1,910.3) | (1,873.0) | (1,862.6) | (1,878.0) | (1,999.2) | (2,131.5) | (2,275.4) | -- | -- | -- | -- | -- | -- | -- |
| Gross Profit | $801.4 | $801.2 | $787.6 | $803.5 | $800.7 | $859.1 | $935.0 | $1,008.3 | -- | -- | -- | -- | -- | -- | -- |
| GP Margin (%) | 29.4% | 29.5% | 29.6% | 30.1% | 29.9% | 30.1% | 30.5% | 30.7% | -- | -- | -- | -- | -- | -- | -- |
| SG&A | (716.6) | (709.9) | (713.9) | (698.6) | (699.1) | (739.0) | (799.1) | (859.1) | -- | -- | -- | -- | -- | -- | -- |
| Adjusted EBITDA | $84.8 | $91.3 | $73.7 | $104.9 | $101.6 | $120.1 | $135.9 | $149.2 | $159.8 | $166.8 | $173.1 | $178.7 | $184.5 | $190.4 | $196.6 |
| Growth (%) | -- | 7.7% | (19.3%) | 42.3% | -- | 14.5% | 13.2% | 9.8% | 7.1% | 4.4% | 3.8% | 3.2% | 3.2% | 3.2% | 3.3% |
| Adj. EBITDA Margin (%) | 3.1% | 3.4% | 2.8% | 3.9% | 3.8% | 4.2% | 4.4% | 4.5% | 4.6% | 4.6% | 4.6% | 4.6% | 4.6% | 4.6% | 4.6% |
| Memo: Store Count | | | | | | | | | | | | | | | |
| Hometown | 10 | 176 | 181 | 167 | 188 | 217 | 247 | 277 | -- | -- | -- | -- | -- | -- | -- |
| Shopko | 134 | 134 | 134 | 131 | 131 | 131 | 131 | 131 | -- | -- | -- | -- | -- | -- | -- |
| Express | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | -- | -- | -- | -- | -- | -- | -- |
| Standalone Pharmacy | - | 17 | 6 | 4 | 4 | 4 | 4 | 4 | -- | -- | -- | -- | -- | -- | -- |
| Pamida | 193 | - | - | - | - | - | - | - | -- | -- | -- | -- | -- | -- | -- |
| Total | 342 | 332 | 326 | 307 | 328 | 357 | 387 | 417 | -- | -- | -- | -- | -- | -- | -- |
| Memo: Other Key Financials | | | | | | | | | | | | | | | |
| Capital Expenditures | $46.3 | $71.6 | $33.5 | $32.5 | $39.0 | $68.5 | $75.0 | $75.0 | $35.0 | $36.4 | $37.6 | $38.8 | $39.9 | $41.1 | $42.4 |
| % of Sales | 1.7% | 2.6% | 1.3% | 1.2% | 1.5% | 2.4% | 2.4% | 2.3% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Net Working Capital | 265.7 | 275.9 | 278.8 | 272.8 | 270.7 | 283.4 | 302.6 | 323.4 | -- | -- | -- | -- | -- | -- | -- |
| % of Sales | 9.7% | 10.2% | 10.5% | 10.2% | 10.1% | 9.9% | 9.9% | 9.8% | -- | -- | -- | -- | -- | -- | -- |
| Change in NWC | -- | 10.2 | 2.9 | (6.0) | (2.1) | 12.6 | 19.3 | 20.7 | 21.0 | 13.8 | 12.5 | 11.1 | 11.5 | 11.8 | 12.2 |

Source: Management and Duff & Phelps 2015 Analysis

© 2019, Ducera Partners LLC / CONFIDENTIAL

Ducera

# June 2015 Valuation Summary



**Total Enterprise Value (TEV)**

*($ in millions)*

| Case | TEV & EV/EBITDA Multiple |
|---|---|
| 2015 Public Companies Approach | TEV:$661-781 million<br><br>x15E EBITDA: 5.5x-6.5x |
| 2016 Public Companies Approach | TEV:$680-815 million<br><br>x16E EBITDA: 5.0x-6.0x |
| Discounted Cash Flow Approach | TEV:$639-757 million<br><br>x15E EBITDA: 5.3x-6.3x |

**TEV Range:** $650 to $750 million
**Mid-Point Value:** $700 million

$661 — $781
$680 — $815
$639 — $757

$500   $600   $700   $800   $900   $1,000

*Shopko's enterprise value is reasonably estimated in the range of $650 million to $750 million as of the June 2015 Distribution*

© 2019, Ducera Partners LLC / CONFIDENTIAL



# June 2015 Equity Value / Capital Surplus Analysis

| Illustrative TEV Waterfall | | | |
|---|---|---|---|
| ($ in millions) | Concluded Value | | |
| | **Low** | **Mid** | **High** |
| **Total Enterprise Value** | **$650** | **$700** | **$750** |
| Memo: 2015E EBITDA Multiple | *5.4x* | *5.8x* | *6.2x* |
| Memo: 2016E EBITDA Multiple | *4.8x* | *5.2x* | *5.5x* |
| **Assets:** | | | |
| Cash | 25 | 25 | 25 |
| Tax Assets [1] | 14 | 14 | 14 |
| **Total Assets** | **$689** | **$739** | **$789** |
| **Liabilities** | | | |
| Debt Outstanding | $560 | $560 | $560 |
| Tax Effected Store Lease Liability [2] | 6 | 6 | 6 |
| Contingent & Other Liabilities [2] | - | - | - |
| **Total Liabilities** | **$566** | **$566** | **$566** |
| **Implied Equity Value - OpCo** | **$123** | **$173** | **$223** |
| Net Assets / Liabilities - Intermediate Holdings | - | - | - |
| Net Assets / Liabilities - Parent | - | - | - |
| Net Assets / Liabilities - Ultimate Parent | - | - | - |
| **Implied Equity Value - Ultimate Parent [3]** | **$123** | **$173** | **$223** |

*Shopko's equity value is reasonably estimated in the range of $123 million to $223 million as of the June 2015 Distribution*

Notes:
(1)    Per management analysis of present value of net operating loss ("NOL") tax shield
(2)    Per management
(3)    Based on Ducera's understanding of Shopko's legal entity structure, Intermediate Holdings, Parent, and Ultimate Parent are simply holding entities and do not hold any assets or liabilities outside of their subsidiary equity ownership
Source: Shopko management projections

16                    © 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

# June 2015 Public Companies Analysis

| Public Companies Multiples Analysis | | | | | |
|---|---|---|---|---|---|

*($ in millions)*

| Case | Financial Metric Shopko EBITDA | Selected Range | | TEV Range | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| 2015 EBITDA | $120.1 | 5.5x | 6.5x | $660.6 | $780.7 |
| 2016 EBITDA | 135.9 | 5.0x | 6.0x | 679.5 | 815.4 |
| | | | | | |
| Concluded TEV | | | | $670.0 | $798.0 |

*Shopko's value is reasonably estimated in the range of $670 million to $798 million as of the June 2015 Distribution based upon a comparable public companies analysis*

© 2019, Ducera Partners LLC / CONFIDENTIAL



# June 2015 Public Companies Overview

| Illustrative Public Companies Information | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in millions) | TEV | Equity | EV / EBITDA | | | Revenue Growth | | | EBITDA Margin | | | EBITDA Growth Rate | | | Capex % Sales | |
| Illustrative Peer Group | 06/19/15 | 06/19/15 | FY15E | FY16E | FY17E | FY15E | FY16E | FY17E | FY15E | FY16E | FY17E | FY15E | FY16E | FY17E | FY16E | FY17E |
| **Illustrative Focused Regional / Local Retail Group** | | | | | | | | | | | | | | | | |
| Bon-Ton Stores, Inc. | $1,060 | $114 | 6.9x | 6.5x | N/A | 1.6% | 1.7% | -- | 5.4% | 5.6% | -- | 5.6% | 6.7% | -- | 2.5% | -- |
| Stage Stores, Inc. | $682 | $611 | 5.0x | 4.8x | N/A | 0.4% | 1.4% | -- | 8.3% | 8.5% | -- | 6.8% | 4.3% | -- | 4.3% | -- |
| Stein Mart, Inc. | $661 | $525 | 7.8x | 6.7x | N/A | 6.2% | 6.5% | -- | 6.0% | 6.7% | -- | 12.1% | 17.5% | -- | -- | -- |
| Citi Trends, Inc. | $313 | $420 | 7.4x | 6.5x | N/A | 4.7% | 5.8% | -- | 6.0% | 6.5% | -- | 27.3% | 15.0% | -- | 2.2% | -- |
| **Illustrative Dollar / Discount Store Retail Group** | | | | | | | | | | | | | | | | |
| Dollar General Corporation | $25,954 | $23,464 | 11.2x | 10.2x | 9.4x | 8.4% | 9.1% | 8.8% | 11.3% | 11.4% | 11.4% | 9.0% | 9.9% | 8.9% | 2.5% | 2.5% |
| Dollar Tree, Inc. | $16,244 | $16,539 | 11.6x | 10.5x | 9.7x | 27.6% | 21.1% | (4.8%) | 12.7% | 11.7% | 13.2% | 9.5% | 11.0% | 8.0% | 3.4% | 3.4% |
| Family Dollar Stores, Inc. | $9,334 | $9,102 | 12.4x | 11.4x | 10.0x | 3.2% | 4.5% | 6.5% | 7.0% | 7.2% | 7.8% | (4.0%) | 8.5% | 14.4% | 4.0% | 3.5% |
| **Illustrative Diversified / National Retail Group** | | | | | | | | | | | | | | | | |
| Walmart Inc. | $282,532 | $236,644 | 8.0x | 7.7x | 7.4x | 0.6% | 3.1% | 2.8% | 7.3% | 7.3% | 7.4% | (2.3%) | 3.2% | 4.2% | 2.5% | 2.5% |
| Target Corporation | $65,462 | $55,464 | 9.0x | 8.6x | 8.4x | 2.4% | 1.8% | 2.2% | 9.8% | 10.0% | 10.1% | 16.0% | 3.6% | 2.9% | 3.0% | 3.0% |
| **Illustrative General Retail Group** | | | | | | | | | | | | | | | | |
| TJX Companies Inc | $44,509 | $45,474 | 10.3x | 9.6x | 8.8x | 5.0% | 6.9% | 8.6% | 14.1% | 14.2% | 14.3% | 3.5% | 7.7% | 9.5% | 3.0% | 2.9% |
| Macy's Inc | $30,018 | $24,191 | 7.6x | 7.3x | 7.1x | 0.9% | 1.9% | 2.6% | 14.0% | 14.1% | 14.2% | 3.5% | 3.1% | 3.0% | 3.9% | 3.9% |
| Ross Stores, Inc. | $20,733 | $21,119 | 10.9x | 10.2x | 9.2x | 7.4% | 6.6% | 8.7% | 16.0% | 16.1% | 16.5% | 10.3% | 6.9% | 11.3% | 3.6% | 3.4% |
| Kohl's Corporation | $16,652 | $13,101 | 6.2x | 6.1x | 6.1x | 1.9% | 2.0% | 1.0% | 13.8% | 13.9% | 13.7% | 3.8% | 2.7% | (0.3%) | 3.8% | 3.6% |
| J. C. Penney Company, Inc. | $7,010 | $2,649 | 11.4x | 8.5x | 6.6x | 2.6% | 3.2% | 2.6% | 4.9% | 6.4% | 8.0% | 95.4% | 33.8% | 28.5% | 2.3% | 2.4% |
| Big Lots, Inc. | $2,503 | $2,530 | 6.8x | 6.3x | 5.8x | 0.5% | 1.2% | 1.0% | 7.0% | 7.5% | 8.2% | 5.4% | 8.4% | 9.3% | 2.2% | 1.9% |
| **Illustrative Drug Store / Pharmacy Group** | | | | | | | | | | | | | | | | |
| CVS Health Corporation | $132,084 | $120,951 | 11.4x | 10.2x | 9.4x | 8.0% | 7.9% | 9.1% | 7.7% | 7.9% | 7.9% | 8.2% | 10.6% | 9.8% | 1.3% | 1.2% |
| Walgreens Boots Alliance Inc | $108,885 | $96,805 | 15.3x | 12.3x | 11.1x | 37.8% | 17.2% | 4.8% | 6.8% | 7.2% | 7.6% | 39.7% | 24.3% | 10.7% | 1.5% | 1.6% |
| Rite Aid Corporation | $14,505 | $9,192 | 10.2x | 9.2x | 8.4x | 16.6% | 9.1% | 4.7% | 4.6% | 4.7% | 4.9% | 10.1% | 10.3% | 10.0% | 1.8% | 1.8% |
| Fred's, Inc. Class A | $806 | $732 | 10.1x | 8.4x | N/A | 13.0% | 6.8% | -- | 3.6% | 4.0% | -- | -- | 20.5% | -- | 1.6% | -- |
| **Shopko** | | | | | | 7.2% | 7.3% | 7.1% | 4.2% | 4.4% | 4.5% | 14.5% | 13.2% | 9.8% | 2.4% | 2.3% |
| 75th Percentile | $37,263 | $34,832 | 11.3x | 10.2x | 9.4x | 8.2% | 7.4% | 8.1% | 12.0% | 11.5% | 13.6% | 11.7% | 13.0% | 10.5% | 3.6% | 3.4% |
| Median | $16,244 | $13,101 | 10.1x | 8.5x | 8.6x | 4.7% | 5.8% | 3.8% | 7.3% | 7.5% | 9.1% | 9.5% | 8.6% | 9.4% | 2.5% | 2.7% |
| Average | $41,050 | $35,770 | 9.4x | 8.5x | 8.4x | 7.8% | 6.2% | 4.2% | 8.8% | 9.0% | 10.4% | 14.4% | 10.9% | 9.3% | 2.8% | 2.7% |
| 25th Percentile | $1,782 | $1,631 | 7.5x | 6.6x | 7.2x | 1.8% | 2.0% | 2.3% | 6.0% | 6.6% | 7.8% | 4.2% | 5.5% | 5.2% | 2.2% | 2.0% |

**Notes:**
Source: FactSet research as of 6/19/15 and public filings

 © 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

# June 2015 Public Companies Overview (Continued)

| Company | Description | End Markets | Products | | Stores | States | Total SF (000's) |
|---|---|---|---|---|---|---|---|
| Bon-Ton Stores, Inc. | The Bon-Ton Stores, Inc. owns and operates retail department stores. The Bon-Ton Stores was founded in 1898 and is headquartered in York, PA. | Brand-name fashion apparel and accessories for women, men and children | Women's Apparel<br>Home<br>Cosmetics | Men's Apparel<br>Accessories | 270 | 26 | Total: 25,000<br>Avg: 92.6 |
| Stage Stores, Inc. | Stage Stores, Inc. engages in the management of retail shops and department stores. Stage Stores was founded in 1988 and is headquartered in Houston, TX. | Specialty department stores primarily in small and mid-sized towns and communities | Apparel<br>Accessories<br>Cosmetics | Footwear<br>Home Goods | 854 | 40 | Total: 15,409<br>Avg: 18.0 |
| Stein Mart, Inc. | Stein Mart is a national retailer offering the fashion merchandise, service and presentation of a better department or specialty store. The company was founded by Sam Stein in 1908 and is headquartered in Jacksonville, FL. | 35-65 year old woman who is both style conscious and value seeking | Ladies' and Boutique Apparel<br>Ladies' Accessories<br>Men's | Home<br>Shoes<br>Other | 270 | 30 | Prototype: 32.0 |
| Citi Trends, Inc. | Citi Trends, Inc. engages in the retail of urban fashion apparel, shoes, accessories, and home decor. The company was founded in 1946 and is headquartered in Savannah, GA. | Urban fashion apparel and accessories for the entire family | Accessories<br>Children's<br>Ladies' | Men's<br>Home | 511 | 29 | Total: 5,500<br>Avg: 10.8 |
| Dollar General Corporation | Dollar General Corp. engages in retailing of merchandise, including consumables, seasonal, home products and apparel. The company was founded by J. L. Turner and Hurley Calister Turner Sr. in 1939 and is headquartered in Goodlettsville, TN. | Broad merchandise, including consumables, seasonal, home products and apparel | Consumables<br>Seasonal<br>Home Products | Apparel | 11,879 | 43 | Total: 87,904<br>Avg: 7.4 |
| Dollar Tree, Inc. | Dollar Tree, Inc. owns and operates discount variety stores offering merchandise at the fixed prices. Dollar Tree was founded by J. Douglas Perry and Macon F. Brock, Jr. in 1986 and is headquartered in Chesapeake, VA. | Value merchandise | Consumable<br>Variety Categories<br>Seasonal | | 5,367 | 48 | Total: 46,500<br>Avg: 8.6 |
| Family Dollar Stores, Inc. | Family Dollar Stores, Inc. operates general merchandise retail discount stores. The company was founded by Leon Levine in November 1959 and is headquartered in Matthews, NC. | Value merchandise | Consumables<br>Home Products<br>Apparel and Accessories | Seasonal<br>Electronics | 8,042 | 46 | Total: 58,100<br>Avg: 7.2 |
| Walmart Inc. | Walmart, Inc. engages in retail and wholesale business. The company was founded by Samuel Moore Walton and James Lawrence Walton on July 2, 1962 and is headquartered in Bentonville, AR. | Value and low price customers | Grocery<br>Health and Wellness<br>Entertainment | Hardlines<br>Apparel<br>Home | 11,767 | 50 | Total: 1,134,252<br>Avg: 96.4 |
| Target Corporation | Target Corp. engages in owning and operating of general merchandise stores. The company was founded by George Draper Dayton in 1902 and is headquartered in Minneapolis, MN. | Everyday essentials and fashionable, differentiated merchandise at discounted prices | Household Essentials<br>Hardlines<br>Apparel and Accessories | Food and Pet Supplies<br>Home Furnishing<br>Décor | 1,790 | 50 | Total: 239,963<br>Avg: 134.05 |
| TJX Companies Inc | The TJX Cos., Inc. engages in the retail of off-price apparel and home fashion products. The company was founded by Stanley Harris Feldberg and Sumner L. Feldberg in 1956 and is headquartered in Framingham, MA. | Off price retail | Family Apparel<br>Home Fashions<br>General Merchandise | | 3,215 | 51 | Total: 92,467<br>Avg: 28.7 |
| Macy's Inc | Macy's, Inc. engages in the retail of apparel, accessories, cosmetics, home furnishings, and other consumer goods. The company was founded by Rowland Hussey Macy Sr. on March 6, 1929 and is headquartered in Cincinnati, OH. | Focused on women's accessories and a wide range of merchandise | Feminine Accessories<br>Intimate Apparel<br>Shoes and Cosmetics | Feminine Apparel<br>Men's and Children's | 823 | 45 | Total: 147,400<br>Avg: 179.1 |
| Ross Stores, Inc. | Ross Stores, Inc. engages in the operation of off-price retail apparel and home accessories stores. The company was founded by Stuart G. Moldaw in 1957 and is headquartered in Dublin, CA. | Off price retail | Name brand and Designer Apparel<br>Accessories<br>Footwear | Home Fashions | 1,210 | 33 | Total: 30,400<br>Avg: 25.1 |

Notes:
Source: FactSet research as of 6/19/15 and public filings

19

© 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

# June 2015 Public Companies Overview (Continued)

| Company | Description | End Markets | Products | | Stores | States | Total SF (000's) |
|---------|-------------|-------------|----------|--|--------|--------|------------------|
| Kohl's Corporation | Kohl's Corp. owns and operates family-oriented department stores. It offers exclusive brand apparel, shoes, accessories and home & beauty products through its department stores. The company was founded in 1962 and is headquartered in Menomonee Falls, WI. | Moderately-priced private label, exclusive and national brand apparel, footwear, accessories, beauty and home products | Women's Men's Home | Children's | 1,162 | 49 | Total: 83,800 Avg: 72.1 |
| J. C. Penney Company, Inc. | J. C. Penney Co., Inc. is a holding company, which engages in the business of selling merchandise and services to consumers through its department stores and website. The company was founded by James Cash Penney in April 1902 and is headquartered in Plano, TX. | Fashion apparel, cosmetics and home furnishing | Women's Apparel Men's Apparel Home | Women's Accessories | 1,062 | 49 | Total: 107,900 Avg: 101.6 |
| Big Lots, Inc. | Big Lots, Inc. is a community oriented discount retailer. The company was founded by Sol A. Shenk in 1967 and is headquartered in Columbus, OH. | Discount retailing | Food Consumables Soft and Hard Home | Furniture & Home Décor Seasonal Electronics & Accessories | 1,460 | 48 | Total: 32,006 Avg: 21.9 |
| CVS Health Corporation | CVS Health Corp. engages in the provision of health care services. The company was founded by Stanley P. Goldstein and Ralph Hoagland in 1963 and is headquartered in Woonsocket, RI. | Retail pharmacies and general merchandise | Prescription Drugs OTC & Personal Care Beauty/Cosmetics | General Merchandising | 7,822 | 49 | Total: 76,700 Avg: 9.8 |
| Walgreens Boots Alliance Inc | Walgreens Boots Alliance, Inc. engages in the provision of drug store services. The company was founded in 1901 and is headquartered in Deerfield, IL. | Retail pharmacies and general merchandise | Pharmacy Retail | | 12,755 | 50 | Total: 111,000 Avg: 8.7 |
| Rite Aid Corporation | Rite Aid Corp. engages in owning and managing retail drug stores and pharmacy services for insurance companies. The company was founded by Alex Grass in September 1962 and is headquartered in Camp Hill, PA. | Retail pharmacies and general merchandise | Prescription Drugs OTC and Personal Care Health and Beauty Aids | General Merchandise | 4,570 | 31 | Total: 57,582 Avg: 12.6 |
| Fred's, Inc. Class A | Fred's, Inc. engages in the retail sale of general merchandise and pharmaceuticals. The company was founded in 1947 and is headquartered in Memphis, TN. | Pharmacy and general merchandise | Pharmacy Consumables Household Goods | Softlines | 641 | 15 | Total: 76,700 Avg: 14.7 |

Notes:
Source: FactSet research as of 6/19/15 and public filings

© 2019, Ducera Partners LLC / CONFIDENTIAL



# June 2015 Precedent Transactions Analysis

- Ducera has reviewed select precedent transactions leading up to the 2015 Distribution
  - The transactions reviewed are identified on the following page

- Ducera believes that none of the precedent transactions are sufficiently comparable and timely to form a basis for valuation

- As a result, Ducera has not included the precedent transaction analysis methodology when evaluating Shopko

*Ducera has determined that a precedent transaction approach is not appropriate for a valuation of Shopko as of the June 2015 Distribution*

© 2019, Ducera Partners LLC / CONFIDENTIAL



# June 2015 Precedent Transactions Overview

| Illustrative Select Historical Transactions Information through 2015 |
|---|

*($ in millions)*

| Date Announced | Target | Acquirer | Enterprise Value | xLTM EBITDA |
|---|---|---|---|---|
| 05/18/15 | ANN, Inc. | Ascena Retail Group, Inc. | $1,954 | 7.9x |
| 03/31/15 | The J. Jill Group, Inc. | TowerBrook Capital Partners LP | 400 | N.A. |
| 07/28/14 | Family Dollar Stores, Inc. | Dollar Tree, Inc. | 9,092 | 11.1x |
| 04/15/14 | totes ISOTONER Corp. | Freeman Spogli Management Co. LP; Sipco Ltd; Investcorp Bank BSC | 525 | N.A. |
| 09/09/13 | The Neiman Marcus Group, Inc. | Ares Management LLC; Canada Pension Plan Investment Board | 6,000 | 9.6x |
| 07/29/13 | Saks Incorporated | Hudson's Bay Company | 2,699 | 10.2x |
| 05/23/13 | rue21, Inc. | Apax Partners LLP | 932 | 9.2x |
| 05/10/13 | True Religion Apparel, Inc. | TowerBrook Capital Partners LP | 630 | 8.0x |
| 03/07/13 | Hot Topic Inc. | Sycamore Partners | 548 | 8.8x |
| 08/23/12 | David's Bridal, Inc. | Clayton Dubilier & Rice LLC | 1,050 | N.A. |
| 08/03/12 | The Talbots, Inc. | Sycamore Partners Management LLC | 369 | Neg. |
| 06/07/12 | Savers, Inc. | TPG Capital LLC; Leonard Green & Partners LP | 1,720 | N.A. |
| 05/09/12 | Cost Plus, Inc. | Bed Bath & Beyond, Inc. | 605 | 11.8x |
| 05/02/12 | Charming Shoppes Inc. | Ascena Retail Group Inc. | 829 | 10.2x |
| 05/01/12 | Collective Brands, Inc. (nka:Payless Inc.) | Blum Capital; Wolverine World Wide Inc.; Golden Gate Capital | 1,751 | 8.6x |
| 10/11/11 | 99 Cents only Stores LLC | Ares Management LLC; Canada Pension Plan Investment Board | 1,341 | 9.1x |
| 06/29/11 | BJ's Wholesale Club Inc. | CVC Capital Partners Limited; Leonard Green & Partners | 2,646 | 7.0x |
| 12/23/10 | Jo-Ann Stores LLC | Leonard Green & Partners LP | 1,603 | 7.6x |
| 10/11/10 | The Gymboree Corp. | Bain Capital LLC | 1,658 | 7.7x |
| **Min** | | | **$369** | **7.0x** |
| **Mean** | | | **$1,913** | **9.1x** |
| **Median** | | | **$1,341** | **9.0x** |
| **Max** | | | **$9,092** | **11.8x** |

**Notes:**
Source: FactSet research as of 6/19/15 and public filings

     © 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

# June 2015 Discounted Cash Flow Analysis

▪ Shopko's discounted cash flow analysis value is reasonably estimated in the range of $639 million to $757 million as of the June 2015 Distribution

## Illustrative Discounted Cash Flow Analysis

| ($ in millions) | | Overview | | | | | | | | | Terminal | CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fiscal Year** | 2015F | 2016F | 2017F | 2018F | 2019F | 2020F | 2021F | 2022F | 2023F | 2024F | Terminal | CAGR |
| **Calendar Year End** | Jan'16 | Jan'17 | Jan'18 | Jan'19 | Jan'20 | Jan'21 | Jan'22 | Jan'23 | Jan'24 | Jan'25 | Jul'25 | FY15-24 |
| Revenue | $2,858.3 | $3,066.5 | $3,283.7 | $3,497.1 | $3,636.9 | $3,764.2 | $3,877.2 | $3,993.5 | $4,113.3 | $4,236.7 | | 4.5% |
| *% Growth* | *--* | *7.3%* | *7.1%* | *6.5%* | *4.0%* | *3.5%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | | |
| **Adjusted EBITDA** | **$118.3** [1] | **$135.9** | **$149.2** | **$159.8** | **$166.8** | **$173.1** | **$178.7** | **$184.5** | **$190.4** | **$196.6** | **$196.6** | **5.8%** |
| Less: D&A | (33.5) | (42.0) | (45.0) | (51.1) | (47.8) | (45.5) | (43.9) | (42.8) | (42.2) | (41.1) | | |
| EBIT | 84.8 | 93.9 | 104.2 | 108.7 | 119.0 | 127.6 | 134.8 | 141.7 | 148.2 | 155.5 | | 7.0% |
| *% Margin* | *3.0%* | *3.1%* | *3.2%* | *3.1%* | *3.3%* | *3.4%* | *3.5%* | *3.5%* | *3.6%* | *3.7%* | | |
| Tax Rate | 39.7% | 39.7% | 39.7% | 39.7% | 39.7% | 39.7% | 39.7% | 39.7% | 39.7% | 39.7% | | |
| Less: Cash Taxes | (33.7) | (37.3) | (41.4) | (43.2) | (47.2) | (50.7) | (53.5) | (56.3) | (58.8) | (61.7) | | |
| Tax Effected EBIT | 51.1 | 56.6 | 62.8 | 65.5 | 71.8 | 76.9 | 81.3 | 85.4 | 89.4 | 93.8 | | 7.0% |
| Plus: D&A | 33.5 | 42.0 | 45.0 | 51.1 | 47.8 | 45.5 | 43.9 | 42.8 | 42.2 | 41.1 | | |
| Less: Capital Expenditures | (58.4) [2] | (75.0) | (75.0) | (35.0) | (36.4) | (37.6) | (38.8) | (39.9) | (41.1) | (42.4) | | |
| Plus/(Less): Change in Working Capital | (12.6) | (19.3) | (20.7) | (21.0) | (13.8) | (12.5) | (11.1) | (11.5) | (11.8) | (12.2) | | |
| Adj. Unlevered Free Cash Flow | 13.6 | 4.3 | 12.1 | 60.6 | 69.4 | 72.3 | 75.3 | 76.8 | 78.7 | 80.3 | | 21.8% |
| *% Growth* | *--* | *(68.3%)* | *180.7%* | *399.9%* | *14.4%* | *4.3%* | *4.1%* | *2.1%* | *2.4%* | *2.0%* | | |
| Terminal Multiple (Illustrated at 6.0x) | | | | | | | | | | | 6.0x | |
| Terminal Value | | | | | | | | | | | 1,179.6 | |
| **Total Undiscounted Cash Flow** | **$13.6** | **$4.3** | **$12.1** | **$60.6** | **$69.4** | **$72.3** | **$75.3** | **$76.8** | **$78.7** | **$80.3** | **$1,179.6** | |
| Discount Period | 0.38 | 1.25 | 2.25 | 3.25 | 4.25 | 5.25 | 6.25 | 7.25 | 8.25 | 9.25 | 9.75 | |
| Discount Rate (Illustrated at 11.5% WACC) | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | |
| Discount Factor | 96.0% | 87.3% | 78.3% | 70.2% | 63.0% | 56.5% | 50.6% | 45.4% | 40.7% | 36.5% | 34.6% | |
| **Present Value of Cash Flows** | **$13.1** | **$3.8** | **$9.5** | **$42.6** | **$43.7** | **$40.9** | **$38.1** | **$34.9** | **$32.0** | **$29.3** | **$408.1** | |

| **Ill. TEV (Assuming 6.0x EBITDA & 11.5% WACC)** | **$696.0** |
|---|---|

| Ill. TEV Multiples | Multiple | EBITDA |
|---|---|---|
| 2015E EBITDA | 5.8x | $120.1 |
| 2016E EBITDA | 5.1x | $135.9 |

### Illustrative Enterprise Value Sensitivity Analysis

| | | EBITDA Multiple | | | | |
|---|---|---|---|---|---|---|
| | | 5.50x | 5.75x | **6.00x** | 6.25x | 6.50x |
| **WACC** | 11.00% | $686.0 | $703.8 | $721.6 | $739.3 | $757.1 |
| | 11.25% | $673.9 | $691.2 | $708.6 | $726.0 | $743.4 |
| | **11.50%** | $662.0 | $679.0 | **$696.0** | $713.0 | $730.0 |
| | 11.75% | $650.3 | $667.0 | $683.6 | $700.3 | $716.9 |
| | 12.00% | $639.0 | $655.2 | $671.5 | $687.8 | $704.1 |

Notes:
(1)    Reflects management's forecasted EBITDA for stub period
(2)    Reflects management's forecasted capital expenditures for stub period
Source: Shopko management projections

© 2019, Ducera Partners LLC / CONFIDENTIAL



# June 2015 WACC

▪ The following table summarizes the guideline public companies referenced to calculate the weighted average cost of capital

## Illustrative Guideline Public Companies

($ in millions)

| Company | Debt | Equity | Total Capital | Debt to Capital | Equity to Capital | Debt to Equity | Tax Rate | Levered Equity Beta | Unlevered Equity Beta | Relevered Equity Beta |
|---|---|---|---|---|---|---|---|---|---|---|
| Bon-Ton Stores, Inc. | $955.3 | $113.8 | $1,069.2 | 89.4% | 10.6% | 8.4x | 35.0% | 1.17x | 0.18x | |
| Stage Stores, Inc. | 96.2 | 610.6 | 706.7 | 13.6% | 86.4% | 0.2x | 37.6% | 0.74x | 0.67x | |
| Stein Mart, Inc. | 152.4 | 525.5 | 677.9 | 22.5% | 77.5% | 0.3x | 39.5% | 0.77x | 0.65x | |
| Citi Trends, Inc. | - | 420.2 | 420.2 | - | 100.0% | - | 19.3% | 1.05x | 1.05x | |
| Dollar General Corporation | 2,715.3 | 23,463.9 | 26,179.3 | 10.4% | 89.6% | 0.1x | 36.6% | 0.75x | 0.70x | |
| Dollar Tree, Inc. | 7,819.7 | 16,538.8 | 24,358.5 | 32.1% | 67.9% | 0.5x | 37.2% | 0.82x | 0.63x | |
| Family Dollar Stores, Inc. | 484.3 | 9,102.0 | 9,586.4 | 5.1% | 94.9% | 0.1x | 32.7% | 0.11x | 0.11x | |
| Walmart Inc. | 50,231.0 | 236,644.4 | 286,875.4 | 17.5% | 82.5% | 0.2x | 32.2% | 0.68x | 0.59x | |
| Target Corporation | 12,766.0 | 55,463.9 | 68,229.9 | 18.7% | 81.3% | 0.2x | 33.0% | 0.72x | 0.63x | |
| TJX Companies Inc | 1,623.9 | 45,473.6 | 47,097.5 | 3.4% | 96.6% | 0.0x | 37.6% | 0.79x | 0.78x | |
| Macy's Inc | 7,336.0 | 24,190.7 | 31,526.7 | 23.3% | 76.7% | 0.3x | 36.2% | 0.81x | 0.68x | |
| Ross Stores, Inc. | 395.7 | 21,119.3 | 21,515.0 | 1.8% | 98.2% | 0.0x | 38.0% | 0.77x | 0.76x | |
| Kohl's Corporation | 4,746.0 | 13,101.2 | 17,847.2 | 26.6% | 73.4% | 0.4x | 35.7% | 0.64x | 0.52x | |
| J. C. Penney Company, Inc. | 5,405.0 | 2,648.6 | 8,053.6 | 67.1% | 32.9% | 2.0x | 35.0% | 0.97x | 0.42x | |
| Big Lots, Inc. | 40.5 | 2,529.7 | 2,570.2 | 1.6% | 98.4% | 0.0x | 38.4% | 0.88x | 0.88x | |
| CVS Health Corporation | 12,762.0 | 120,950.8 | 133,712.8 | 9.5% | 90.5% | 0.1x | 39.5% | 0.64x | 0.60x | |
| Walgreens Boots Alliance Inc | 16,247.0 | 96,804.6 | 113,051.6 | 14.4% | 85.6% | 0.2x | 35.7% | 0.84x | 0.76x | |
| Rite Aid Corporation | 7,234.9 | 9,192.4 | 16,427.3 | 44.0% | 56.0% | 0.8x | 35.0% | 1.17x | 0.77x | |
| Fred's, Inc. Class A | 81.0 | 732.1 | 813.1 | 10.0% | 90.0% | 0.1x | 40.9% | 0.90x | 0.85x | |
| Average | | | | 21.6% | 78.4% | | 35.5% | 0.80x | 0.64x | 0.74x |
| Median | | | | 14.4% | 85.6% | | 36.2% | 0.79x | 0.67x | 0.77x |
| Selected | | | | 20.0% | 80.0% | 0.3x | 39.7% | | | 0.75x |

**Notes:**
Source: FactSet research, Company filings, Barra Beta, and other public research

© 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

# June 2015 WACC (Continued)

- The following table summarizes the illustrative weighted average cost of capital for Shopko

## Illustrative Weighted Average Cost of Capital

*($ in millions)*

| Description | Amount | Notes |
|---|---|---|
| Risk-Free Rate | 2.6% | 20-year U.S. Treasury Yield. Source: U.S. Treasury |
| Equity Risk Premium | 7.0% | Expected Equity Risk Premium. Source: Duff & Phelps' 2014 Valuation Handbook |
| Relevered Equity Beta | 0.75x | Based on the selected guideline public company relevered equity beta |
| **Cost of Equity Capital** | **7.9%** | |
| Unsystematic Risk Factors: | | |
| Size Premium | 5.8% | Market capitalization size premium. Source: Duff & Phelps' Cost of Capital Navigator |
| **Cost of Equity Capital** | **13.6%** | |
| Tax Rate | 39.7% | Based on the effective federal and state tax rate |
| **Illustrative Pre-Tax Cost of Debt** | **4.5%** | Cost of debt illustratively reflects observed public companies interest effective interest rates |
| Debt to Capital Ratio | 20.0% | Based on the selected guideline public company Debt to Capital Ratio |
| Equity to Capital Ratio | 80.0% | Based on the selected guideline public company Equity to Capital Ratio |
| **Weighted Average Cost of Capital** | **11.4%** | |

*Shopko's weighted average cost of capital incorporates a 20 year risk free rate, expected market risk premiums, and a market capitalization size premium*

*The analysis illustratively assumes a capital structure of 20/80 debt to equity ratio*

**Notes:**
Source: U.S. treasury rates, FactSet research, Barra Beta, and other public research

© 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

# June 2015 Adequacy Analysis: Overview of Methodology & Analysis

| Assumptions |
| --- |

| | |
| --- | --- |
| **Overview** | ▪ The following pages include a capital adequacy analysis based upon the Company's near-term cash flow forecast and capital structure assumptions as of June 2015<br>▪ The analysis evaluates the Company's ability to (i) fund its operating cash usage, if applicable, (ii) service its ongoing debt obligations including cash interest, and (iii) reasonably refinance the Company's debt facilities at maturity<br>▪ The analysis evaluates the Company's forecast credit profile at the time of a maturity in order to assess the Company's ability to refinance its debt. Considerations include but are not limited to the following financial metrics:<br>  – Net Debt / TTM Adjusted EBITDA<br>  – Adjusted EBITDA / Cash Interest, Net<br>  – Fixed Charge Coverage Ratio |
| **Financial Projections** | ▪ The analysis is based upon the June 2015 Management Projections through the date of a required refinancing |
| **Capital Structure** | ▪ The analysis is based upon the capital structure pro forma for the 2015 Distribution (i.e., ~$560 million of total debt at the start of the forecast)<br>▪ The analysis assumes Shopko's debt is paid down over time as the Company generates cash in excess of its operating and financial cash flow requirements |
| **Sensitivity Analysis** | ▪ The analysis also includes a sensitivity case prepared at the time of the June 2015 Management Projections<br>▪ The sensitivity case represents a reasonable potential downside case relative to the June 2015 Management Projections for the Company's financial performance<br>▪ The sensitivity case assumes, among other items:<br>  – Reductions in revenue growth rates<br>  – Reduction in gross profit margin rates<br>  – Reduction in EBITDA margin rates |

*Ducera analyzed Shopko's anticipated ability to service and refinance its debt following the 2015 Distribution*

© 2019, Ducera Partners LLC / CONFIDENTIAL



# June 2015 Adequacy Analysis: Base Case Analysis Overview

| Illustrative Cash Flow Adequacy Analysis | | | | | | | |
|---|---|---|---|---|---|---|---|
| ($ in millions) | LTM | 2015F | 2016F | 2017F | 2018F | 2019F | 2020F |
| Revenue | $2,678.7 | $2,858.3 | $3,066.5 | $3,283.7 | $3,497.1 | $3,636.9 | $3,764.2 |
| % Growth | -- | 6.7% | 7.3% | 7.1% | 6.5% | 4.0% | 3.5% |
| **Adjusted EBITDA** | **$101.6** | **$108.4** | **$135.9** | **$149.2** | **$159.8** | **$166.8** | **$173.1** |
| Less: Taxes | | - | - | (11.4) | (31.6) | (36.3) | (40.5) |
| Less: Other Expense and Management Fees | | (3.8) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) |
| Less: Net Working Capital | | (12.6) | (19.3) | (20.7) | (21.0) | (13.8) | (12.5) |
| Less: Closed Store Lease Liability | | (3.4) | (4.5) | (1.2) | - | - | - |
| Less: Capital Expenditures | | (58.4) | (75.0) | (75.0) | (35.0) | (36.4) | (37.6) |
| **Adj. Unlevered Free Cash Flow** | | **$30.2** | **$33.1** | **$36.9** | **$68.2** | **$76.3** | **$78.5** |
| Interest Income | | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Cash Interest Expense | | (13.2) | (22.5) | (24.9) | (25.1) | (23.5) | (21.8) |
| Mandatory Amortization | | (8.7) | (8.7) | (4.8) | (4.8) | (4.8) | (4.8) |
| **Levered Cash Flow** | | **$8.4** | **$2.0** | **$7.3** | **$38.4** | **$48.1** | **$52.0** |
| Revolver Draw/(Repayment) | | (10.7) | (2.0) | (7.3) | (23.7) | (48.1) | (52.0) |
| Optional Debt Repayment | | - | - | - | - | - | - |
| Repayment of Debt at Maturity | | - | - | - | (14.7) | - | (311.3) |
| Debt Refinancing | | - | - | - | - | - | 311.3 |
| **Net Cash Flow** | | **($2.3)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| | Pro Forma | | | | | | |
| Total Debt | $560.0 | $540.6 | $529.9 | $517.8 | $474.6 | $421.7 | $364.9 |
| Total Cash | 25.4 | 23.1 | 23.1 | 23.1 | 23.1 | 23.1 | 23.1 |
| Net Debt / TTM Adj. EBITDA | 5.3x | 4.3x | 3.7x | 3.3x | 2.8x | 2.4x | 2.0x |
| Adj. EBITDA / Cash Interest, Net | 4.6x | 5.5x | 6.0x | 6.0x | 6.4x | 7.1x | 7.9x |
| Fixed Charge Coverage[1] | 2.0x | 2.0x | 2.0x | 2.1x | 3.1x | 3.3x | 3.6x |

*Illustrated herein is a forecast of Shopko's cash flow forecast through 2020 and the associated debt paydown and pro forma leverage levels*

Notes:
(1)      Fixed Charge Coverage ratio reflects (Adj. EBITDA - Taxes - CapEx) / (Cash Interest + Mandatory Amortization)
Source: Shopko management projections

© 2019, Ducera Partners LLC / CONFIDENTIAL

**Ducera**

# June 2015 Adequacy Analysis: Sensitivity Case Analysis Overview

| Illustrative Cash Flow Adequacy Analysis | | | | | | | |
|---|---|---|---|---|---|---|---|
| ($ in millions) | LTM | 2015F | 2016F | 2017F | 2018F | 2019F | 2020F |
| Revenue | $2,678.7 | $2,666.1 | $2,753.7 | $2,852.3 | $2,951.1 | $2,996.4 | $3,041.3 |
| % Growth | -- | (0.5%) | 3.3% | 3.6% | 3.5% | 1.5% | 1.5% |
| **Adjusted EBITDA** | **$101.6** | **$87.9** | **$108.7** | **$115.9** | **$120.3** | **$122.3** | **$124.3** |
| Less: Taxes | - | - | - | - | - | (10.1) | (21.4) |
| Less: Other Expense and Management Fees | (3.8) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) | (4.0) |
| Less: Net Working Capital | 5.1 | (7.5) | (9.2) | (9.9) | (4.4) | (4.4) | |
| Less: Closed Store Lease Liability | (3.4) | (4.5) | (1.2) | - | - | | |
| Less: Capital Expenditures | (54.9) | (65.0) | (65.0) | (29.5) | (30.0) | (30.4) | |
| **Adj. Unlevered Free Cash Flow** | **$30.9** | **$27.7** | **$36.5** | **$76.9** | **$73.8** | **$64.1** | |
| Interest Income | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | |
| Cash Interest Expense | (14.5) | (26.2) | (28.7) | (27.4) | (26.4) | (24.8) | |
| Mandatory Amortization | (8.7) | (8.7) | (4.8) | (4.8) | (4.8) | (4.8) | |
| **Levered Cash Flow** | **$7.8** | **($7.1)** | **$3.1** | **$44.8** | **$42.7** | **$34.6** | |
| Revolver Draw/(Repayment) | (10.1) | 7.1 | (3.1) | (30.1) | (42.7) | (34.6) | |
| Optional Debt Repayment | - | - | - | - | - | - | |
| Repayment of Debt at Maturity | - | - | - | (14.7) | - | (341.6) | |
| Debt Refinancing | - | - | - | - | - | 341.6 | |
| **Net Cash Flow** | | **($2.3)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| | | Pro Forma | | | | | |
| Total Debt | $560.0 | $541.2 | $539.6 | $531.7 | $482.1 | $434.6 | $395.2 |
| Total Cash | 25.4 | 23.1 | 23.1 | 23.1 | 23.1 | 23.1 | 23.1 |
| Net Debt / TTM Adj. EBITDA | 5.3x | 5.2x | 4.8x | 4.4x | 3.8x | 3.4x | 3.0x |
| Adj. EBITDA / Cash Interest, Net | 4.6x | 4.5x | 4.1x | 4.0x | 4.4x | 4.6x | 5.0x |
| Fixed Charge Coverage[1] | 2.0x | 1.5x | 1.3x | 1.5x | 2.8x | 2.6x | 2.4x |

*Illustrated herein is a forecast of Shopko's cash flow forecast through 2020 and the associated debt paydown and pro forma leverage levels*

Notes:
(1)    Fixed Charge Coverage ratio reflects (Adj. EBITDA - Taxes - CapEx) / (Cash Interest + Mandatory Amortization)
Source: Shopko management projections

 © 2019, Ducera Partners LLC / CONFIDENTIAL



# Disclaimer

These materials have been prepared by Ducera Partners LLC and its affiliates (collectively, "Ducera") for the Special Committee of Specialty Retail Shops Holding Corp. (the "Company") to whom such materials are directly addressed and delivered and may not be used or relied upon for any purpose other than as specifically contemplated. The information used in preparing these materials may have been obtained from or through the Company or the Company's representatives, other potential transaction participants, public sources or otherwise. Ducera assumes no responsibility for independent investigation or verification of such information and has relied on such information being complete and accurate in all material respects. To the extent such information includes estimates and forecasts of future financial performance prepared by or reviewed with the management of the Company or the Company's representatives, other potential transaction participants or obtained from public sources, Ducera has assumed that such estimates and forecasts have been reasonably prepared on bases reflecting the best currently available estimates and judgments of such management, such representatives or such potential transaction participants (or, with respect to estimates and forecasts obtained from public sources or otherwise, represent reasonable estimates). Ducera assumes no responsibility for and expresses no view as to such forecasts or the assumptions on which they are based. No representation or warranty, express or implied, is made as to the accuracy or completeness of such information and nothing contained herein is, or shall be relied upon as, a representation, whether as to the past, the present or the future. These materials were designed for use by specific persons familiar with the business and affairs of the Company. These materials are not intended to provide the sole basis for evaluating, and should not be considered a recommendation with respect to, any transaction or other matter. These materials have been developed by and are proprietary to Ducera and were prepared exclusively for the benefit and internal use of the Board of Directors of the Company.

These materials were compiled on a confidential basis for use by the Special Committee in evaluating the transaction described herein and not with a view to public disclosure or filing thereof under state or federal securities laws, and may not be reproduced, disseminated, quoted or referred to, in whole or in part, without the prior written consent of Ducera.

These materials do not constitute an offer or solicitation to sell or purchase any securities and are not a commitment by Ducera to provide or arrange any financing for any transaction or to purchase any security in connection therewith. Ducera has no obligation (express or implied) to update any or all of these materials or to advise the Company or the Special Committee of any changes; nor does Ducera make any express or implied warranties or representations as to the completeness or accuracy or accept responsibility for errors.

Ducera does not provide legal, accounting, regulatory or tax advice. Accordingly, any statements contained herein as to tax matters were neither written nor intended by Ducera to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on such taxpayer. Each person should seek legal, accounting and tax advice based on his, her or its particular circumstances from independent advisors regarding the impact of the transactions or matters described herein.

    © 2019, Ducera Partners LLC / CONFIDENTIAL

