IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. BK 19-80064-TLS |
| | ) | Chapter 11 |
| SPECIALTY RETAIL SHOPS HOLDING | ) | |
| CORP., *et al*[1] | ) | |
| | ) | |
| Debtors. | ) | |

## MCKESSON CORPORATION'S OBJECTION TO CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN

McKesson Corporation ("McKesson"), by and through its undersigned counsel, hereby submits this Objection to the Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and Debtor Affiliates [Dk. No. 1367] (the "Amended Plan"), proposed by Specialty Retail Holding Corp. and its debtor affiliates in the above captioned jointly administered cases (collectively, "Debtors").[2]

## I.    SUMMARY OF OBJECTION

1.    Debtors filed the Amended Plan on May 21, 2019, just four business days before the confirmation hearing, and, more critically, long after ballots were submitted and the plan objection deadline for most creditors passed.[3] Yet, the Amended Plan represents no mere minor tinkering to the previous versions. Instead, it is a wholesale re-vamping of the earlier plans. The sweeping breadth of the revisions are obvious upon even a cursory look at the cumulative redline Debtors filed along with the Amended Plan.[4] One revision is particularly egregious and

---

[1]    The Debtors in these chapter 11 cases are: Specialty Retail Shops Holding Corp.; Pamida Stores Operating Co., LLC; Pamida Transportation LLC; Penn-Daniels, LLC; Place's Associates' Expansion, LLC; Retained R/E SPE, LLC; Shopko Finance, LLC; Shopko Gift Card Co., LLC; Shopko Holding Company, LLC; Shopko Institutional Care Services Co., LLC; Shopko Optical Manufacturing, LLC; Shopko Properties, LLC; Shopko Stores Operating Co., LLC; SVS Trucking, LLC.

[2]    Inexplicably, the Debtors' label the Amended Plan as the Second Amended Joint Plan, notwithstanding that the previous version [Dk. No. 570] was also denominated as the Second Amended Joint Plan.

[3]    By agreement, the creditors' committee and its members, including McKesson, have until May 24 to file their plan objections.

[4]    See Exhibit 3 to Notice of Global Settlement of Plan Issues Among Debtors, Creditors' Committee, Sun Capital Partners and Lenders filed on May 21, 2019 [Dk. No. 1361]. Notwithstanding Debtors' filing of this notice of purported global settlement, McKesson, as the Chair of the creditors' committee, believes there was never a "meeting of the minds" with respect to the Amended Plan. Accordingly, at best, Debtors filing was premature.

constitutes a material modification to the plan that significantly and adversely affects creditors.
While the previous plan versions contained a mechanism whereby creditors could opt out of
releasing non-Debtor parties (specifically Debtors' insiders), the Amended Plan eliminates the
opt out provision.  As a result, notwithstanding that creditors voted and based their objections (or
lack thereof) on a plan containing an opt out provision, Debtors now seek to confirm, in a classic
bait and switch, a plan that requires creditors to release all claims they may have against
Debtors' insiders, among others.

   2.  Debtors' gambit is merely the latest (although perhaps the most egregious)
maneuver in their consistent approach to these cases – protecting their insiders at all costs.  A
brief review of how we got here is in order.  Upon its filing, Debtor's original plan was touted as
a "toggle" Plan that purportedly presented the potential for a true reorganization that could have
preserved jobs and provided future business to the Debtors' vendors.  Couched in that manner,
Debtors apparently hoped that the Plan's myriad infirmities would be counterbalanced by the
positive impact of a true reorganization.  Since then, much has gone wrong.

   3.  The sale of Debtor's pharmacy assets came up $20 to $30 million short of
expectations, and their much-touted equity sponsor never materialized.  Debtors are now nearing
the end of a full-chain liquidation and there no realistic possibility that non-priority unsecured
creditors will see a dime.  Worse, Debtors remain administratively insolvent, and the
professional fees and other administrative costs are mounting despite the lack of any
demonstrable benefit to Debtors' estates that will result from confirmation of the Amended Plan.
Why?  The answer can only be that Debtors and their insiders are singularly focused on the
improper releases and other exculpatory and insider protection provisions contained in the
Amended Plan.  Accordingly, the scheme and the Amended Plan reek of bad faith. [5]

---

[5]  At the hearing on the adequacy of the Disclosure Statement (defined below), the Court recognized the
problem of the releases:  "I can't help but think that if the Plan . . . simply said all recovery causes of action are
transferred to the committee or the Plan administrator, or whoever, on behalf of the committee, in lieu of the release
provisions, I think we'd have a whole bunch of people lining up behind the Plan . . . " Disclosure Statement hearing
transcript, p. 97, l2 -19.  Debtors did not take the Court's suggestion, and continue to press on with a Plan that
contains improper releases despite all that has gone wrong since that hearing.

4.     Debtors' apparent motivation pervades every aspect of their Amended Plan, leaving a list of infirmities that reduces confirmation to nothing more than a pipe dream.  To begin with, the Amended Plan does not comply with a number of the applicable provisions of the Bankruptcy Code as mandated by section 1129(a)(1). The following is a list of some of those provisions:

- Section 524(e), which prohibits third-party releases.  Notwithstanding the prohibition, the Amended Plan provides releases to third parties, including current and former officers, directors and managers of the Debtors, the Credit Agreement Primary Agent,[6] the DIP Lenders and a broadly defined set of successors and assigns and other parties related to the Debtors, regardless of when any claims arose.  Those parties are to be released of all manner of claims that include anything relating to the Debtors' pre-petition actions and conduct, the Debtors' out of court restructuring efforts, intercompany transactions, and anything related to Debtors' bankruptcy cases.  As mentioned above, the Amended Plan even eliminates the prior opt out provision regarding these releases.

- Section 1123(b)(3)(A) regarding releases of estate claims.  The Amended Plan provides for the release of the estates' valuable claims against Debtors' insiders without the estates receiving anything of value in exchange.  At the same time, the Amended Plan provides for broad exculpation of the Debtors and others despite the lack of good faith evidenced by the Amended Plan.

- Section 1141(d)(3), which prohibits a discharge in a liquidation of Debtor entities.  Notwithstanding that the Amended Plan is now a pure liquidating Amended Plan, it nonetheless provides the Debtors a discharge.

- Section 503(b), which requires, among other things, that all administrative claims be paid ratably.  Yet, while most administrative claims will not be paid in full, the Amended Plan provides that professional fees will be paid in full.

---

[6]     Terms defined in the Amended Plan are used here with the same meaning.

5.      In addition, the Amended Plan violates section 1129(a)(9) because it does not provide for full payment of allowed administrative claims on the effective date.  Debtors, of course, cannot meet this requirement because they are administratively insolvent, possibly in the tens of millions of dollars.  To skirt the problem, Debtors resort to a procedurally inappropriate sleight of hand – they ask the Court to deem a failure to object to the Amended Plan to constitute affirmative consent for acceptance of less than payment in full.  The Court (as have other courts) must reject this transparent artifice.[7]

6.      Moreover, the Amended Plan violates section 1129(a)(3) because it is not proposed in good faith.  Among other things, good faith requires a reasonable likelihood that the Amended Plan will achieve a result consistent with the standards prescribed under the Code.  For all of the reasons described herein, if confirmed, the Amended Plan would achieve precisely the opposite.

7.      Finally, the Amended Plan violates Bankruptcy Code section 1127 (c) and (d). The elimination of the opt out provisions and the resulting mandatory release by creditors of Debtors' insiders constitutes a material, adverse modification to the plan on which creditors voted.  The modification requires further disclosure pursuant to section 1127 (c) and re-solicitation of votes to accept or reject pursuant to section 1127(d).

## II.      FACTUAL BACKGROUND

### A.      The Bankruptcy Cases and Relevant Orders

8.      Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on January 16, 2019.  Debtors' bankruptcy cases were administratively consolidated pursuant to an order entered on January 16, 2019 [Dk. No. 25]. Debtors filed the Amended Plan, along with their Disclosure Statement for the Amended Plan [Dk. No. 571] (the "Disclosure Statement) on March 1, 2019.

9.      The Court entered its Order Approving the Adequacy of the Disclosure Statement

---

[7]      For avoidance of doubt, McKesson does not consent to the proposed treatment of its administrative claims (described below).  And, numerous other administrative creditors have filed similar objections to those contained in this Objection.

BN 36102264v6

[etc.] on March 1, 2019 [Dk. No. 572] (the "Disclosure Statement Order").  Among other things, the Disclosure Statement Order set March 29, 2019 as the deadline for objections to the Amended Plan.  A hearing on confirmation of the Amended Plan was set for April 2, 2019.  Those dates were later continued to April 5, and April 18, respectively by text order dated March 20, 2019 [Dk. No. 703].  On April 4, 2019, the Court entered its text order approving a further continuance of the confirmation hearing to May 8, and the objection deadline for certain parties (including the Committee and its members) to May 2, 2019 [Dk.No. 915].  Later, the entered its order further continuing the hearing on Confirmation of the plan to May 28, 2019.

B.     **McKesson's Claims**

10.     Prior to the commencement of its bankruptcy case, Shopko Stores Operating Co. LLC, one of the administratively consolidated Debtors ("Shopko Stores"), purchased the vast majority of its pharmaceuticals from McKesson (the "Pharmaceutical Goods").  As of the Petition Date, Shopko Stores owed McKesson $70,561,775.90 in connection with the Pharmaceutical Goods.

11.     More than half of the amount owed to McKesson is subject to McKesson's reclamation and/or marshalling rights.  Accordingly, McKesson and Debtors entered into a Stipulation and Settlement Agreement (the "Settlement Agreement"), pursuant to which, among other things, McKesson retained any rights it may have to assert a reclamation claim in connection with that portion of its claim well as any rights it may have to assert the doctrine of marshalling (the "Reclamation Claim").  In addition, subject to certain conditions, the Reclamation Claim is entitled to a superpriority administrative claim pursuant to Bankruptcy Code section 507(b) on account of its reclamation and marshalling rights.  The Court entered its text Order approving the Settlement Agreement on March 15, 2019 [Dk. No. 684].

12.     As a result of the Settlement Agreement, if the Conditions Precedent are met, the Reclamation Claim will be treated as a 507(b) administrative claim.  If the Conditions Precedent are not met, the Reclamation Claim will be treated as a general unsecured claim.  McKesson filed proofs of claim that delineated the various aspects of its claims against Debtors.  That proof

5

of claim was filed on March 15, 2019 (the "McKesson Claim"). The McKesson Claim, denominated as claim number 1753 on the Court's claim register, details an aggregate prepetition amount owing from Shopko Stores of $70,561,775.90. The McKesson Claim is comprised of three components:

- $1,973,887.80 on account of Pharmaceutical Goods delivered to Shopko Stores within twenty days of the Petition Date. This portion of the McKesson Claim is entitled to administrative priority pursuant to Bankruptcy code section 503(b)(9)[8];

- $36,190,535.08 on account of Pharmaceutical Goods sold to Shopko Stores within forty-five days of the Petition Date. This Reclamation Claim portion of the McKesson Claim will be treated either as a 507(b) administrative claim or a general unsecured claim pursuant to the terms of the McKesson Settlement[9]; and

- $32,397,353.17 on account of Pharmaceutical Goods sold to Shopko Stores outside of forty-five days before the Petition Date. This portion of the McKesson Claim is a general unsecured claim.

### C.    The Amended Plan and Debtors' Administrative Insolvency

13.    In the short lifespan of these cases, Debtors have suffered significant setbacks that bear on their administrative solvency. First, their sale of pharmacy assets yielded $20 to $30 million less than expected. The resulting default under their post-petition financing agreement was just the beginning of Debtors' misfortunes.

14.    Next, Debtors' hoped-for equity sponsor did not materialize. Debtors referred to their previous plans as a "toggle" plans that provided for Debtors' reorganization and continuance as going concerns if they were able to find an equity sponsor to invest in the companies. Alternatively, if Debtors were unable to find an equity sponsor, the Plan provided

---

[8]    Under the provisions of the Settlement Agreement, the administrative components of McKesson's claim will be reduced by pharmaceutical returns according to the provisions of the pre-petition Supply Agreement and the formula set forth in the Settlement Agreement.

[9]    Out of an abundance of caution, McKesson also filed its Request for Payment of Administrative Claim on March 29, 2019 in connection with the Reclamation Claim [Dk. No. 782].

BN 36102264v6

for the liquidation of Debtors assets.  The deadline for bids by potential equity sponsors was March 14, 2019 but no acceptable bid was received, and Debtors promptly announced their intention to liquidate.  Clearly, the Amended Plan is no longer a "toggle" Plan – it is now a full liquidation Plan, with no hope for the reorganization that was to have provided cover for the Amended Plan's infirmities.

15.     In the face of these setbacks, Debtors has had to address the implications of massive and mounting administrative claims.  As of the administrative claims bar date, approximately 103 administrative claims were filed in an aggregate amount of at least approximately $56 million.  That amount does not include the significant 503(b)(9) claims or unpaid professional fees and costs.  The amount will be likely be higher still because approximately 20 administrative claims did not include a fixed amount owed.  Added to these amount will be potential additional administrative claims arising from Debtors' highly-questionable decisions to assume insider indemnification agreements and insurance policies covering those same insiders.

16.     While Debtors may be making some progress toward closing the "administrative hole," the Amended Plan itself admits that these cases are administratively insolvent. Rather than providing for payment in full of administrative claims on the effective date of the Amended Plan, most administrative creditors will share *pro rata* in the Administrative Claims Reserve. Amended Plan, Art. II.A. There would, of course, be no need for a *pro rata* sharing if there were sufficient funds to pay all administrative claims in full.

17.     The Amended Plan contains a number of features, which, as demonstrated below, preclude its confirmation.  These include:

- Third Party Releases. The Amended Plan includes releases of third parties in contravention of § 524(e).  Amended Plan, Art. X.F.  Specifically, the parties to be released under the Amended Plan include current and former officers, directors and managers of the Debtors; the Credit Agreement Primary Agent, the DIP Lenders and a broadly defined set of successors and assigns and other parties

related to the Debtors.  Amended Plan, Art. I.A.99.  Those Released Parties are

deemed by the Amended Plan to have been released of all manner of Causes of

Action (as defined in Amended Plan, Art. I.A.19) including a long list of anything

relating to the Debtors' out of court restructuring efforts, intercompany

transactions, and anything related to Debtors' bankruptcy cases.  Amended Plan

Art. X.F.  Worse, while the above releases purport to contain an opt-out for

creditors (Amended Plan, Art. I. A. 100(e)), a new provision in the Amended Plan

nullifies the opt out provision and provides for full releases by creditors of

Debtors' insiders, among others, <u>without any ability of creditors to opt out</u>.

Amended Plan, Art. I.A.100(h).[10]

- Release of Estate Claims. In an apparent attempt to prevent the Creditors'

  Committee from pursuing an action on behalf of the Debtors' estates against

  insiders of the Debtors (See Motion of Official Committee of Unsecured

  Creditors For Entry of An Order Authorizing the Committee To Prosecute Certain

  Claims on Behalf of the Bankruptcy Estates, [Dk.No. 641] (filed under seal) the

  "Claim Prosecution Motion")), the Amended Plan includes the release and

  discharge of the Debtors and their estates, among others, from all claims,

  including any derivative claims asserted on behalf of the Debtors.   Amended

  Plan, Art. X.E.  The result is that if confirmed, the Amended Plan would release

  claims that the estates have against their insiders without receiving any value. At

  the same time, the Amended Plan provides broad exculpation provisions to

  protect (a) the Debtors and Reorganized Debtors; (B) the Credit Agreement

---

[10]        The proposed non opt out releases are no small thing.  For example, McKesson believes it has more than credible claims against certain of debtors' insiders under applicable Wisconsin law for intentional misrepresentation, civil theft, and negligent misrepresentation.  Moreover, under long-standing Wisconsin law, officers of a corporation are liable for intentional misrepresentations they make on behalf of the corporation ("An individual is personally responsible for his own tortious conduct. A corporate agent cannot shield himself from personal liability for a tort he personally commits or participates in by hiding behind the corporate entity; if he is shown to have been acting for the corporation, the corporation also may be liable, but the individual is not thereby relieve of his own responsibility.") See *Uni\*quality v. Infotronx*, 974 R.2d 91 8,923 (7th Cir. lgg2), generally, *Oxmans' Erwin Meat Co., v. Blacketer*, 36 Wis.2d 683,
692,273 N.W.2d 285 (1979).

8

Primary Agent; and (c) predecessors, successors, assigns and numerous related parties from any Cause of Action for any Claim related to Debtors cases. Amended Plan, Art. X.G.

- Discharge. The Amended Plan describes that Amended Plan Administrator shall be appointed and "[O]n and after the Effective date the Reorganized Debtor shall continue in existence for purposes of "winding down the Debtors' business and affairs as expeditiously as reasonably possible…"  Amended Plan, Art. IV.H.3-4. Notwithstanding that the Amended Plan provides that the Debtors will be promptly liquidated and will neither engage in business nor hold or manage assets long-term after consummation of the Amended Plan, the Amended Plan nonetheless provides that the Debtors receive a discharge. Amended Plan, Art. X.B.

- Preferential Treatment of Professional Claims.  Notwithstanding that the Amended Plan provides for less than full payment of most administrative claims, administrative claims of estate professionals appear to be paid in full.  Amended Plan, Art. II.B.  This provision violates section 503(b) and the requirement that all administrative claims be paid ratably.

- Less than Full Payment of Administrative Claims.  Bankruptcy Code section 1129(a)(9) mandates that an Amended Plan provide for payment in full of administrative claims on the effective date, except to the extent that a particular clamant agrees otherwise.  The Amended Plan provides for less than full payment of most administrative claims, and improperly asks this Court to imply consent if a creditor fails to object to confirmation of the Amended Plan.

- Lack of Good Faith. Because the Amended Plan blatantly attempts to achieve results inconsistent with the standards set forth in the Bankruptcy Code, it is not proposed in good faith.  Accordingly, the Amended Plan does not comply with Bankruptcy Code Section 1129(a)(3).

9

### D.   The Myriad Plan Objections

18.     Not surprisingly, the Amended Plan has drawn many objections, even before the

last minute elimination of the opt release provision.  As of this date, scores of objections have

been filed.  Most of the objections point to the Amended Plan's violation of Bankruptcy Code

section 1129(a)(9).  Indeed, most if not all, expressly object to the Debtors' proposed payment of

less than full payment of administrative claims on the Effective Date.  Many objections also take

issue with the proposed releases of Debtors' current and former insiders, even with the opt out

provision.

### E.   The Sun Settlement's Inclusion in the Amended Plan and Debtors'
### Continued Focus on Protecting its Insiders

19.     Sun Capital Partners, Inc. ("Sun") is the Debtors' primary equity sponsor.  Prior

to the Petition Date, Debtors' equity sponsors (again, primarily Sun) received over $100 million

in dividends and related payments (the "Sun Transfers").  On May 6, 2019 Debtors filed their

Motion seeking approval of a compromise with Sun (the "Sun Settlement") in connection with

the Sun Transfers [Dk. No. 1256] (the "Sun Settlement Motion").  In short, Debtors propose to

settle all claims they may have against Sun in exchange for a payment of $15 million from Sun.

Of course, in exchange for the payment, Debtors propose to release Sun from any claims they

may have against it.  But that is not all.  In an apparent end run around the prohibition against

third party releases in the Amended Plan, tucked into the agreement, without any apparent

consideration, the Debtors also propose to release their current and former officers, directors, and

related parties from any claims the Debtors may have against them.  Notwithstanding the broad

releases contained in the agreement, the motion contains no discussion of the claims Debtors

may have against their insiders, let alone any analysis of why it makes sense to release its own

insiders in connection with the Sun Settlement.

20.     The Sun Settlement is now incorporated into the Amended Plan.[11]  Amended

---

[11] While it is unclear whether Debtors intend to also separately go forward with the Sun Settlement Motion, this will also serve as McKesson's objection to the Sun Settlement Motion to the extent it seeks to release any party other than Sun.

Plan, Art.X.A.  A key feature of the Sun Settlement as incorporated in the Amended Plan,
however, goes much further than that described in the Sun Settlement Motion.  Rather than
merely deal with appropriate settlement issues between Debtors and Sun, <u>creditors are now
required to release all claims they may have against Debtors' insiders and others</u>.  Amended
Plan, Art. I.A. 100(h).  Not only is this improper and unsupported by law, but as demonstrated
below, it constitutes a material modification of the Amended Plan that requires re-solicitation of
votes.

21.     The Debtors' focus on protecting insiders does not stop with the Amended Plan
and the Sun Settlement.  McKesson is informed and believes that Debtors' representatives have
been approaching holders of 503(b)(9) claims and offering to settle and pay those claims in
exchange for the claim holder's release of claims against Debtors' current and former insiders.
While the Court previously authorized Debtors to pay 503(b)(9) claims,[12] nothing in that
authorization permits or even suggests that Debtors can use such payments as leverage to obtain
releases of their insiders.

22.     In addition, if the above were not enough to show Debtors' bad faith efforts to
protect their insiders, Debtors propose assumption of indemnification obligations to those same
insiders.  Amended Plan, Art.,V.D.   Assumption of such indemnity obligations in a liquidating
chapter 11 case is unprecedented.  As a companion to the proposed assumption of
indemnification obligations, Debtors recently filed a notice of executory contracts to be assumed
[Dk. No. 1320].  Included in the list of assumed contracts are eight insurance policies for the
benefit of Debtors' officers and directors (the "D&O Policies").  The question must be asked
what benefit can be achieved to the estate from by assumption of the D&O Policies, particularly
in light of the insider releases contained in the proposed Sun settlement?  Stated another way, if
all estate claims against the insiders are released, why would a liquidating debtor assume the
D&O Policies for those same insiders?  There can be no good faith reason for doing so.

---

[12]     See, Order (I) Authorizing the Debtors to Pay Prepetition Claims of Lien Claimants, Import Claimants, and
503(b)(9) Claimants [etc.] [Dk. No. 74].

BN 36102264v6

## III.    LEGAL DISCUSSION

### A.    Standards for Confirmation of the Amended Plan

23.    A Plan can only be confirmed if it satisfies all requirements for confirmation under Bankruptcy Code section 1129. *Heidelberg Print Finance Americas, Inc. v. Master Services, Inc.*, 188 Fed. Appx. 534 (8th Cir. 2006). The Plan proponent must prove that a Plan complies with each of the statutory requirements for confirmation under sections 1129(a) and (b). See, *In re Arnold and Baker Farms*, 177 B.R. 648, 654 (9th Cir. BAP 1994). Moreover, even absent objection to confirmation, a court has an independent duty to determine whether a Plan satisfies each element of section 1129. *In re Genesis Health Ventures, Inc*. 266 B.R. 591 (Bankr. D. DE. 2001) (citations omitted).

24.    As demonstrated below, the Amended Plan cannot be confirmed because it violates the requirements of Bankruptcy Code sections 1129(a)(1) (compliance with applicable provisions of the Bankruptcy Code) and 1129(a)(9) (payment in full of administrative claims). As a result, the Amended Plan also cannot comply with Bankruptcy Code section 1129(a)(3) (proposed in good faith and not by any mean forbidden by law).

### B.    The Amended Plan Cannot be Confirmed

#### 1.    The Amended Plan Violates Bankruptcy Code Section 1129(a)(1)

25.    The Amended Plan cannot comply with Bankruptcy Code section 1129(a)(1) because it does not comply with the applicable provisions of title 11. "The legislative history suggests that the applicable provisions are those governing the Amended Plan's internal structure and drafting." 7 *Collier on Bankruptcy*, ¶ 1129.02[1] R. Levin and H. Sommer eds., 16th ed. "Thus, courts have refused to confirm plans which omit the provisions made mandatory by section 1123(a), or which contain classification of claims not permitted by section 1122." *Id.* Similarly, section 1123(b) provides for discretionary provisions that a plan may contain. Any such discretionary provision, however, must be consistent with applicable provisions of the Code. For example**,** plans containing improper releases contrary to section 524(e) violate section 1129(a)(1)**.** See, *In re Riverbend Leasing LLC*, 458 B.R. 520 (Bankr. S.D. IA. 2011). Indeed,

12

section 1123(b)(6) allows for the inclusion of any appropriate provision "not inconsistent with the applicable provisions" of the Code.  As demonstrated below, the Amended Plan contains a myriad of inconsistent, prohibited provisions, and hence, violates section 1129(a)(1).

a.      **The Amended Plan Contains Improper Third Party Releases**

26.      The Amended Plan includes releases of third parties in contravention of section 524(e). The Releasing Parties include "each Holder of a Claim or Interest entitled to vote to accept or reject the Amended Plan that (i) votes to accept the Amended Plan or (ii) votes to reject the Amended Plan or does not vote to accept or reject the Amended Plan but does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Amended Plan's third-party release provisions." Amended Plan, Art. I.A.114.  Accordingly, the Ballot For Voting to Accept or Reject the Amended Plan does not contain any mechanism for opting out of the proposed releases, but includes a statement that those submitting a vote will be a Releasing Party unless a timely objection to Amended Plan Confirmation is filed.

27.      Bankruptcy Code Bankruptcy Code section 524(e) provides that, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  Releases of third parties should be the exception and only approved in rare circumstances. *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.),* 416 F.3d 136, 141 (2d Cir. 2005). Further, "a nondebtor release is a device that lends itself to abuse" because it shields non-debtors from liability to third parties and "in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code*." Id.* at 142.

28.      While the Eighth Circuit has not ruled on this issue, third party releases have been determined to be *per se* impermissible by several other circuit courts.  *Resorts Int'l, Inc. v. Lowenschuss,* 67 F.3d 1394 (9th Cir. 1995) (524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors); *Landsing Diversified Pro. V. First National Bk. And Trust Co. of Tulsa* (*In re Western Real Estate Fund*), 922 F.2d 592 (10th Cir. 1990) (third parties not entitled to releases because precluded by 524(e)).  Other circuit courts have allowed third

13

party releases in narrow circumstances, including those in which "the estate received substantial

consideration; the enjoined claims were 'channeled' to a settlement fund rather than

extinguished; the enjoined claims would indirectly impact the debtor's reorganization 'by way of

indemnity or contribution;' and the plan otherwise provided for the full payment of the enjoined

claims." *Id*. at 601 (citations omitted); *see also In re Chemtura Corp*., 439 B.R. 561, 611 (Bankr.

S.D.N.Y. 2010) (same), *In re Oneida Ltd*., 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (same).

29.     None of those requirements for approval of third party releases is satisfied here.

This is not a channeling case, nor is there any evidence of substantial indemnification claims that

would result in the reduction of payments to the claimants that are being enjoined as those

claimants are receiving nothing under the Amended Plan.  Similarly, the lack of any payment to

unsecured creditors under the Amended Plan renders the concept of consideration for those

releases a nullity.

30.     The lack of payment to the claimants being enjoined is also inconsistent with the

five part test that has been the benchmark for the approval of third party releases by other courts

within the Eighth Circuit.  That test, as enunciated by the Bankruptcy Court for the Western

District of Missouri in *In re Master Mortgage Invest. Fund, Inc*., 168 B.R. 930 (Bankr. W.D.

Mo. 1994) considered (1) whether there is an identity of interest between the debtor and third

party, such as an indemnity agreement, such that the suit against the debtor by a third party will

deplete the return to creditors; (2) whether the non-debtor has contributed substantially to the

reorganization; (3) whether the injunction is essential to the reorganization; (4) approval of the

injunction by a substantial majority of creditors to be restrained; and (5) payment of all or

substantially all of the claims to be enjoined. *Id*. at 935.  The failure of a single prong of that test

was sufficient to prevent confirmation in the channeling injunction case of *In re Archdiocese of

St. Paul & Minneapolis*, 578 B.R. 823 (Bankr. D. Minn. 2017) (the lack of approval by the class

of claims to be enjoined rendered the plan unconfirmable).

31.     Debtors' Amended Plan fails multiple factors of the *Master Mortgage* test.  The

existence of substantial indemnification claims that could deplete the return to creditors has not

14

been established[13] and cannot be satisfied given the administrative insolvency of Debtors' cases. There is also no proof of a substantial contribution towards reorganization by the recipients of the releases nor that the releases are essential to the reorganization as the Amended Plan is a liquidating Amended Plan that will not confer the benefits of reorganization upon Debtors' creditors. It also appears very unlikely that the Amended Plan will be supported by a substantial majority of the creditors to be restrained due to the lack of any discernable consideration to be provided to those creditors.

32.    Even if it was still effective given the modifications to the Amended Plan, the mechanism for "opting out" of the releases fails to satisfy the standards of nearly every court that has addressed the issue of third party releases. Some courts have held that a third party release may be tolerated if the affected creditors consent. *Metromedia*, 416 F.3d at 142. Courts in other circuits agree that absent "extraordinary circumstances," non-debtor releases are impermissible without the consent of the releasing party. *In re Tribune Co.*, 464 B.R. 126, 203 (Bankr. D. Del. 2011) (quoting *Gillman v. Continental Airlines* (*In re Continental Airlines*)), 203 F.3d 203, 212 (3d Cir. 2000)). Rather than a simple mechanism for voting creditors to opt out by checking a box on the ballot, the Amended Plan requires a formal objection to be filed by each non-consenting creditor, a burden that surely is not reasonable given the proximity of the court to most creditors and the difficulty of filing a formal objection without being represented by counsel admitted to practice in the Eighth Circuit.

33.    In any event, in the unlikely event that Debtors' Amended Plan can be confirmed given the multiple infirmities delineated in this Opposition, McKesson hereby formally opts out

---

[13] The Amended Plan seeks to assume "all indemnification obligations in place as of the Effective Date (whether in by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employee contracts or otherwise)…" Amended Plan, Art. V.D. Since the Amended Plan contains no mechanism to identify these obligations, determine any cure amounts nor any analysis of whether assumption of any of these agreements is in the best interests of Debtors' estates, this transparent attempt to buttress the argument for third party releases by establishing the existence of substantial indemnification claims must fail.

BN 36102264v6

of any releases contained in Debtors' Amended Plan.[14]

> **b.** **The Amended Plan Provides for Improper Releases of Estate Claims.**

34.     The Amended Plan provides for the release and discharge of "the Debtors, the Reorganized Debtors, Amended Plan Administrator, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors…"  Amended Plan, Art. X.E.  The Amended Plan also includes language that confirmation of the Amended Plan will constitute approval of the Debtor Releases pursuant to Bankruptcy Rule 9019, with explicit findings by this Court that the releases are "in exchange for good and valuable consideration provided by the Released Parties…a good faith settlement…in the best interests of Debtors, [and] fair, equitable and reasonable," *Id*., despite failing to include any specific basis for those findings.  If approved, the effect will be the release of estate claims against their insiders.

35.     While it is well settled that a debtor is authorized to settle or release its claims in a chapter 11 plan as provided in 1123(b)(3)(A), those releases must satisfy the standards of the "best interests of the estate" test and the requirements of Bankruptcy Rule 9019.  Under this standard, the "court should canvass the issues [to] determine whether the settlement falls below the lowest point in the range of reasonableness." *In re NHI Holdings, Inc*., 536 B.R. 61, 99 (Bankr. S.D.N.Y. 2015).  The Debtor releases contained in the Amended Plan fail to satisfy even those minimal requirements.

36.     The Creditors' Committee has articulated the value of the estates' claims against insiders in the Claim Prosecution Motion.  Debtors' have failed to demonstrate any consideration to the estate for the release of those claims through the Debtor Releases proposed by the Amended Plan.  The mere statement that the releases are "for good and valuable consideration" are "integral to the plan" or are "in the best interests of Debtors' estates" is not sufficient to

---

[14] The Amended Plan also seeks to prohibit the assertion of recoupment claims unless any Holder of such claim has provided notice of such recoupment in writing to the Debtors on or before the Confirmation.  While this provision is also unenforceable for myriad reasons, in the unlikely event the Amended Plan is confirmed, McKesson hereby provides notice of its intent to assert a recoupment claim wherever applicable.

BN 36102264v6

satisfy this standard.  *Chemturra*, 439 B.R. 609-613 (refusing to approve releases based upon mere recitations in the plan); *In re Adelphia Commc'ns Corp*., 368 B.R. 140, 268-269 (Bankr. S.D.N.Y. 2007) (insiders' election to make releases an integral part of their deal insufficient to warrant approval).  Here, Debtors must demonstrate why the releases satisfy the requirements for approval, a standard that cannot be satisfied in these circumstances.

37.     We now know that Debtors are to be liquidated, non-priority unsecured creditors are to receive nothing from the Amended Plan, and the case is administratively insolvent. Despite these facts and the lack of any apparent support for the proposition that the releases provide value to Debtors' estates, the Amended Plan includes a finding that the releases are "in exchange for good and valuable consideration provided by the Released Parties…a good faith settlement…in the best interests of Debtors, [and] fair, equitable and reasonable." The proposed receipt of releases of valuable claims in exchange for no consideration is but another example of the lack of good faith inherent in the Amended Plan.

38.     The Amended Plan also provides broad exculpation provisions to protect (a) the Debtors and Reorganized Debtors; (B) the Credit Agreement Primary Agent; and (c) predecessors, successors, assigns and numerous related parties from any Cause of Action for any Claim related to Debtors cases.  Amended Plan, Art. X.G.  The basis for these exculpation provisions is ostensibly on account of the Exculpated Parties' having acted in "good faith" in connection with the "distribution of consideration pursuant to the Amended Plan."  *Id*.

39.     As described in this Objection, there is significant question whether the parties to be exculpated have in fact acted in good faith.  There also is little, if any, evidence of that there will be a distribution of consideration of any value to Debtors' creditors.  Since these factors are the primary basis for approval of exculpation provisions, the exculpation provisions of the Amended Plan should not be approved.  See, *In re Bally Total Fitness of Greater N.Y., Inc*., 2007 Bankr. Lexis 4729 (Bankr. S.D.N.Y. Sept. 17, 2007).

BN 36102264v6

### c.    The Amended Plan Provides for an Improper Discharge of Debtors

40.    The discharge provided by the Amended Plan is another vestige of the "toggle" aspect of the Amended Plan that has been mooted by the inability to find a purchaser.  While a discharge may well have been appropriate if Debtors' business was to continue as a going concern post-confirmation, that is not the case in the context of a liquidation.

41.    The Bankruptcy Code prohibits discharge of a debtor through plan confirmation if "(A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title." 11 U.S.C. § 1141(d)(3). The three subparts of section 1141(d)(3) are conjunctive; thus a chapter 11 debtor that is not an individual will be denied a discharge if the confirmed plan is a liquidating plan and the debtor does not engage in business after the plan has been consummated. See, *Kunica v. St. Jean Financial, Inc*., 233 B.R. 46, 55 (S.D.N.Y. 1999).

42.    Courts have found that a liquidating plan is one that involves "the cessation of debtor's operations, the sale of debtor's assets and the distribution of the proceeds amongst creditors." *In re Repurchase Corp*., 332 B.R. 336, 341 (Bankr. N.D. Ill. 2005). Similarly, the legislative history instructs that a plan is a liquidating Amended Plan "if all or substantially all of the distribution under the plan is of all or substantially all of the property of the estate." H.R. Rep. No. 95–595, at 418.

43.    Moreover, the requirement that a debtor must "engage in business after consummation of the plan" in order to obtain a discharge has been interpreted to require the continuation of a debtor's prepetition business.  *Spokane Rock I, LLC v. Um* (*In re Um*), 2016 U.S. Dist. LEXIS 182336 (W.D. Wash. Aug. 18, 2016).  Legislative history also supports this conclusion.  H.R. Rep. No. 95–595, at 418.

44.    Here, the Debtors are not individuals, the Amended Plan is a liquidating Amended Plan, and the Debtors will not engage in business after consummation of the Amended Plan. The

Amended Plan is a liquidating Amended Plan because it provides for the liquidation and

distribution of substantially all of the Debtors' assets. The Debtors will not engage in business

under the Amended Plan as the Amended Plan Administrator shall be appointed and "[O]n and

after the Effective date the Reorganized Debtor shall continue in existence for purposes of

"winding down the Debtors' business and affairs as expeditiously as reasonably possible…"

Amended Plan, Art. IV.H.3-4.

45.     Nor does this case constitute the kind of supervised divestiture process that has

sometimes been cited as justifying the grant of a discharge. The wind down process here is not

complicated and the Amended Plan Administrator is not managing assets post-emergence for a

prolonged, indeterminate period of time. Rather, the assets are to be promptly liquidated.  As

such, the Debtors are not managing assets for any meaningful period of time after consummation

of the Amended Plan, they are conducting a liquidation and not a supervised divestiture process,

and as a result are not entitled to a discharge.

### d.     The Amended Plan Violates Bankruptcy Code Section 503(b)

46.     Bankruptcy Code Section 503(b) provides for the allowance of administrative

claims.  Section 503(b) does not contain a ranking of priority for payment of administrative

claims.  Accordingly, all administrative claims are entitled to the same priority, and must be paid

ratably. See, e.g. *Collier* at ¶ 503.03[3][b] (required parity of all administrative claims); *In re*

*Alloy Metal Wire Works, Inc*., 60 B.R. 21 (Bankr. E.D. PA. 1986) (all administrative claims

entitled to *pro rata* treatment).

47.     Based on the parity principle, courts have recognized that interim fees paid to

estate professionals must be subject to disgorgement to the extent necessary to insure ratable

payment of administrative claims.  The notion of paying estate professionals on a monthly basis

in certain cases was originated in *In re Knudsen Corp*., 84 B.R. 668 (9th Cir. BAP 1988).  In

*Knudsen*, the panel stated that such a procedure was permitted in certain "rare" cases, and under

certain conditions. *Id*. at 672.  Among the conditions was that the court must be satisfied that

counsel can respond to any reassessment.  *Id*.  This condition was in response to the trustee's

BN 36102264v6

concern that the proposed fee procedure would discriminate in favor of professionals. The panel noted that "so long as the court is certain that fees paid out can, if necessary, be recovered there is no reason why discrimination would occur." *Id.*

48.     Similarly, in *In re Dandy Lion Inns*, 120 B.R. 1015 (D. Neb 1990), a Nebraska district court, following *Knudsen*, understood that monthly fees paid to professionals must be subject to recovery upon reassessment. *Id.* at 1017. In *In re Lockwood*, 46 Bankr. Ct. Dec. 132 (Bankr. D. Neb. 2006), Chief Judge Mahoney noted that "the case law is clear that pro rata distribution among administrative claimants is mandated by § 726(b) and may require disgorgement from interim payments to professionals in order to equalize the distribution." *Id.* at *1 (citing, among others, *Specker Motor Sales Co. v. Eisen*, 393 F.3d 659 (6th Cir. 2014)). See also *In re Kaiser Steel Corp.*, 74 B.R. 885, 891 (Bankr. D. Colo. 1987) ("Certainly, it is clear that if some administrative expenses are paid on an interim basis and it is ultimately determined that there will be insufficient funds to similarly pay all other administrative claims, those who have received interim payments may be required to disgorge funds so that all administrative claims share pro rata.").

49.     The principle that interim payment of professional fees cannot prejudice the rights of other administrative claimants was also discussed in a slightly different (but equally applicable) context in *Stumpf v. Creel & Atwood, P.C.* (*In re Lockwood Corp.*), 126 B.R. 628 (Bankr. D. Neb. 1997). In *Stumpf*, the Chapter 7 trustee sought disgorgement of Chapter 11 fees after conversion of the case to Chapter 7. In ordering disgorgement, the court noted that "the clear majority of courts that have addressed this issue have uniformly held a cause of action for disgorgement does exist if the Chapter 7 estate is administratively insolvent." *Id.* at 635.

50.     Despite the required parity among all administrative claims, the Amended Plan does just the opposite. Most administrative creditors are not paid in full, but instead share *pro rata* in the Priority Claims Reserve. Amended Plan, Art.II.A. Yet, the Amended Plan appears to pay the administrative claims of estate professionals in full. Amended Plan, Art.II.B. To justify this result, Debtors will no doubt point to a purported professional fee carve out in connection

20

with their post-petition financing. On February 14, 2019 the court entered the Final Order . . .

Authorizing Debtors and Debtors in possession to Obtain Postpetition Financing [etc.] [Dk. No.

425] (the "DIP Order"). Section 2.3 of the DIP Order contains a purported professional fee

carve-out. Section 2.3(d)(v) provides that ". . . the Carve Out shall be senior to all liens and

claims securing the Loan Agreement, the Adequate Protection Liens, and the Diminution in

Value Claims and any and all other forms of adequate protection, liens or claims securing the

Post-Petition Obligations or the Pre-Petition Obligations."

51.     Yet, there are provisions of the DIP Order that prove the interim professional fee

payments were not "carve outs," but rather payments out of cash collateral, without any

corresponding reduction of the obligations owed to the secured lenders. For example, the

apparently mis-numbered second section 2.3(d) of the DIP Order provides that:

> The Agent and the Lenders shall not be responsible for the
> payment or reimbursement of any fees or disbursements of any
> Professional Person incurred in connection with the Cases or any
> Successor Case under any chapter of the Bankruptcy Code.
> Nothing in this Final Financing Order shall be construed to
> obligate the Agent or the Lenders . . . in any way, to pay
> compensation to, or to reimburse expenses of, any Professional
> Person or to guarantee that the Debtors have sufficient funds to pay
> such compensation or reimbursement.

52.     In addition, section 2.4 of the DIP Order provides that:

> Payment of the Carve-Out, whether by or on behalf of the Agent or
> any Lender, shall not and shall not be deemed to reduce the Post-
> Petition Obligations, and shall not and shall not be deemed to
> subordinate any of any of (sic) Agent's or Lender's liens and
> security interests in the Pre-Petition Collateral, any other
> Collateral, the Pre-Petition Adequate Protection Super Priority

Claim . . . or the Post-Petition Superpriority Claim to any junior

pre- or post-petition lien, interest or claim in favor of any other

party.

53.      If the Lenders are not responsible for the payment of professional fees, if payment

of the Carve Out does not reduce the obligations owed to the Lenders, and if payment of the

Carve-Out does not subordinate the Lenders' liens to the rights of professionals (in apparent

contradiction to section 2.3(d)(v) quoted above), then notwithstanding the words used, this is not

an actual "carve-out."  As aptly described by several other courts, "carve out" is defined as "to

set aside, cut into pieces or reserve something, which typically belongs to someone else, for a

specific purpose; typically to pay professionals or the U.S. Trustee."  *In re Blackwood*

*Associates, L.P.*, 187 B.R. 856, 860 (Bankr. E.D.N.Y. 1995) (citing *In re FYM Clinical*

*Laboratory, Inc*., No. 90 B 10954, 1993 WL 288541, at 5 n. 4 (Bankr.S.D.N.Y. June 17, 1993)).

In this case, notwithstanding the words used in several financing documents, there is not an

actual "carve out."  Rather, the lenders have permitted estate assets to pay professional fees and

expenses, without any corresponding reduction in the amount of the Debtors' obligations to its

secured creditors.  Accordingly, the Amended Plan does not comply with section 503(b), and

therefore violates section 1129(a)(1).

### 2.      The Amended Plan Violates Bankruptcy Code Section 1129(a)(9)

54.      Bankruptcy Code section 1129(a)(9)(a) requires that a plan provide for payment

in full of administrative claims on the effective date of the plan unless the holder of a particular

claim agrees to different treatment.  Here, the Amended Plan does not provide for payment in

full of administrative claims.  Instead, most administrative claims merely share *pro rata* in the

Administrative Claims Reserve.  Rather than seek the consent of each particular holder of such

claims as required, Debtors resort to an artifice – they ask the Court to deem a claimant to have

consented unless it affirmatively objects to the Amended Plan.

55.      Courts have roundly rejected such tactics.  In *In re Digital Impact*, 223 B.R. 1

(Bankr. N.D. OK. 1998), the debtor's plan provided for payment of only 50% of certain

administrative claims.  The court noted that "Section 1129(a)(9) provides one loophole to the

strict mandate for full payment: the 'holder of a particular' claim may agree to different

treatment of its claim."  *Id*. at 7.  The debtor argued that because it had classified administrative

claims, and because the class as a whole accepted the plan, the consent requirement was met.

The court disagreed:

> The language of Section 1129(a)(9) specifically requires *each*
>
> *holder* of each "particular claim" to enter into an agreement with
>
> the plan proponent to waive the right to payment of administrative
>
> expenses in full.  The court concludes that in order to waive the
>
> protection of Section 1129(a)(9), a claimant must individually and
>
> affirmatively agree to such treatment.

*Digital Impact,* at 7 (emphasis in original).

56.    Similarly, in *In re Jankins*, 184 B.R. 488 (Bankr. E.D. VA. 1995), the debtor

sought to bind the Internal Revenue Service to treatment less favorable than required by

Bankruptcy Code section 1129(a)(9)(C).  That section also permits divergent treatment if the

affected creditor agrees.  Rather than obtain an affirmative consent to the treatment, the debtor

argued that the IRS's failure to object was sufficient evidence of consent.  The court disagreed:

> The debtor suggests that Section 1129(a)(9)(C) has not necessarily
>
> been contravened since the statute allows non-conforming
>
> treatment where the creditor otherwise agrees, and he suggests that
>
> the [IRS], by failing to object, effectively consented to the
>
> treatment is received under the plan.  This court, however,
>
> construes the term "has agreed" in Section 1129(a)(9) as requiring
>
> the affected creditor's affirmative concurrence and not mere failure
>
> to object . . . .

*Jankins*, at 482, n. 8.  See also, *In re St. Louis Freight lines, Inc*., 45 B.R. 546, 552, n.13 (Bankr.

E.D MI. 1984) (IRS affirmatively agreed to non-conforming treatment by expressly, and in

writing, approving confirmation of a plan.  If that approval was read as something less than

agreement to different treatment, the plan could not be confirmed); *In re Real Wilson*

*Enterprises*, 2013 Bankr. LEXIS 3997 (E.D. CA. 2013) (Section 1129(a)(9) requires some form

of affirmative agreement to non-conforming treatment).

57.    McKesson is aware of only one decision, easily distinguishable from these cases,

that endorsed something less than express agreement to treatment different from that mandated

by section 1129(a)(9).  In *In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y 2002), an

administratively insolvent debtor proposed to pay only a portion of administrative claims,

contrary to section 1129(a)(9).  To deal with the consent requirement, the Amended Plan

solicitation package contained a form for administrative creditors to give their express written

consent.  The creditors were told that the failure to return the form would be construed as

consent.  As described by the court:

> The debtors provided a quick, easy and inexpensive way for each
> administrative creditor to make his election.  He had only to check
> a box on the consent form, and mail it in a pre-addressed, stamped
> envelope, fax it to a toll free number, or email the information to
> the address provided by the debtors.  If the administrative creditor
> failed to respond for any reason, he received two telephonic
> contacts by the debtors reminding him to return the consent form.
> He did not have to hire an attorney or file a formal objection, and
> in light of the procedures established by the debtors, there was no
> danger that he would be lulled into silence.

*Teligent*, at 772.

58.    To begin with, *Teligent* is an outlier in permitting anything other than express

affirmative consent to treatment different from that mandated by section 1129(a)(9).  As noted

by the court in *Real Wilson* with respect to *Teligent*, ". . . those courts requiring affirmative

consent have the better interpretation of 'agreed').  Even if this Court agrees with *Teligent's*

24

notion that something less than affirmative consent can be sufficient, Debtors' procedures are woefully inadequate.  Unlike in *Telegent*, here there was no disclosure of the amount of administrative insolvency, no consent form sent to administrative creditors, no box to check, no pre-addressed, stamped envelope, toll free fax number or email address, and certainly no follow up telephone calls.

59.     Where the *Telegent* debtors made it easy and inexpensive for administrative creditors, Debtors made it hard and expensive.  To begin with, a creditor must read and understand the highly complex 62 page Disclosure Statement and/or the equally complex 54 page Amended Plan, with no discernable information about the extent of administrative insolvency, to have a chance to learn that failure to object equals consent.[15]  Even if creditors are able to locate the appropriate provisions (at page 10 and 12 of the Disclosure Statement and page 14 of the Amended Plan), most would need an attorney to understand their rights and what the provisions mean.  On top of that, a creditor must file an objection to the Amended Plan in order to protect its rights.  Again, that requires and attorney and no shortage of expense.  Whether intended or not, unlike in *Telegent*, there is every danger that creditors will be lulled into silence. Accordingly, the Amended Plan cannot be confirmed because it violates Bankruptcy Code section 1129(a)(9).

### 3.     The Amended Plan Violates Bankruptcy Code Section 1129(a)(3)

60.     The Amended Plan also fails to comply with Bankruptcy Code section 1129(a)(3) because it is not proposed in good faith.  While "good faith" is not defined in the Bankruptcy Code, courts have generally determined that "a plan is considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Hanson v. First Bank of S.D., N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987) (overruled in part on other grounds, citation omitted).

61.     The Amended Plan's violation of sections 1129(a)(1) and (9) strongly indicates

---

[15]     McKesson acknowledges that many creditors have filed objections.  Countless others, however, may not have understood the need to object in order to protect their rights.

BN 36102264v6

that it was not proposed in good faith. *In Village Green I, GP v. Fannie Mae* (*In re Village Green I, GP*), 811 F.3d 816 (6th Cir. 2016), a debtor artificially impaired a class of unsecured claims in order to obtain a consenting impaired class as required by Bankruptcy Code section 1129(a)(10). The panel agreed with the debtor that sections 1124(1) (defining impaired claims) and 1129(a)(10) do not distinguish between "real" and "artificially" impaired claims. Accordingly, the debtor's motives in creating such a class is irrelevant to a determination of whether the requirement of section 1129(a)(1) is met. Rather, the panel noted that "the debtor's motives instead are expressly the business of section 1129(a)(3), which requires that the plan has been proposed in good faith and not by any means forbidden by law." *Village Green* at 819. The panel ruled that the artificial impairment "was transparently an artifice to circumvent the purposes of section 1129(a)(10)", and for that reason, the plan was not proposed in good faith. *Id.*

62.     As should be obvious, the Amended Plan embodies little, if any, regard for the mandates of the Bankruptcy Code. As a result, its confirmation will not achieve a result consistent with the Code. Quite to the contrary, like in *Village Green*, the Amended Plan is a transparent artifice to circumvent all of the sections discussed above.

63.     In addition, a breach of fiduciary duty by a plan proponent may also preclude a finding that a plan is proposed in good faith. For example, in *In re WBE Co.*, 2007 Bankr. LEXIS 4250 (D. Neb. 2007), the debtor's principals directed work that could have been performed by the debtor to other entities. Accordingly, former Chief Judge Mahoney ruled that because of the breach of fiduciary duty, the debtor could not meet its burden to prove that the plan was proposed in good faith. See also *In re Unichem Corp.*, 72 B.R. 95 (Bankr. N.D. Ill. 1987) (Debtor principal's breach of fiduciary duty to estate precluded good faith finding).

64.     The fiduciary duty of a debtor in possession is spelled out in Bankruptcy Code section 1107(a). That section provides that a debtor in possession has all of the rights, powers and duties of a trustee. One of those duties is the duty to perform as a fiduciary. *In re Four Score Broadcasting, Inc.*, 77 B.R. 404, 407 (Bankr. W.D.N.Y. 1987) ("Among the fiduciary

responsibilities of [a] debtor [is] preserving the assets of the estate for the benefit of creditors."). See also *In re Frankel*, 77 B.R. 401 (Bankr. W.D.N.Y. 1987) (The most important obligation of a debtor is that of loyalty to its creditors).

65.     Debtors have consistently breached their duty of loyalty to their creditors.  Time and again, Debtors have focused on protecting their current and former insiders to the detriment of their creditors.  This is evidenced not only by the terms of the Amended Plan itself, but also by the proposed Sun settlement that gratuitously includes a release of claims against insiders, Debtors' offers to pay 503(b)(9) claims in exchanges for insider releases, and Debtors assumption of the D&O Policies and insider indemnity agreements.  For all of these reasons, the result is an Amended Plan that is not proposed in good faith, and one that cannot meet the requirement of section 1129(a)(3).

C.     **The Amended Plan Contains Material Modifications Requiring Re-Solicitation of Votes**

66.     Bankruptcy Code section 1127(a) permits a debtor to modify a proposed plan at any time prior to confirmation.  The right to modify, however, comes with certain caveats.  For example, the proponent of a modification must comply with Bankruptcy Code section 1125 regarding post-petition disclosure and plan solicitation in connection with the plan as modified. 11 U.S.C. § 1127(c).  In addition, "any holder of a claim or interest that has accepted or rejected the plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection." 11 U.S.C. § 1127(d).  Bankruptcy Rule 3019(a) also addresses the issue:

> In a . . . chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice . . .that the proposed modification does not adversely change the treatment of the claim of any creditor . . . who has not accepted in writing the modification, it shall be deemed accepted by all creditors . . .who have previously accepted the plan.

27

*Id.*

67.     The upshot of the above is that if a plan modification ". . . adversely affects the interests of a creditor who has previously accepted the plan in more than a purely ministerial *de minimus* manner, that creditor should have the opportunity to reconsider and change his or her vote." *U.S. v. Frontier Airlines, Inc.*, 93 B.R. 1014 (Bankr. D. CO 1988).  See also *In re Young Broadcasting,* 430 B.R. 99 (Bankr. S.D.N.Y. 2010 (material modification to corporate governance required re-solicitation); *Collier*, ¶ 1127.03[2][a] ("If the modification adversely affects a creditor in more than a purely *de minimus* manner, that creditor must have the opportunity to change its vote.").

68.     Here, there can be no doubt that the inclusion of a blanket release by creditors of Debtors' insiders, without the opt out provision in the earlier iterations of the plan, is a material modification.  Accordingly, re-solicitation is required and creditors must have the opportunity to change their votes. In addition, creditors must be afforded an additional period to object to confirmation of the Amended Plan.

## IV.    <u>CONCLUSION</u>

69.     The Amended Plan provides minimal benefit to creditors, yet seeks the release of insiders to insulate those parties from causes of action that may constitute the only source of recovery for creditors.  As demonstrated by this Objection, the Amended Plan's attempt to obtain those releases by blatantly disregarding nearly every confirmation standard demonstrates that it was not proposed in good faith and cannot be confirmed.

BN 36102264v6

Dated: May 24, 2019

CLINE WILLIAMS WRIGHT JOHNSON &
OLDFATHER, L.L.P.

*/s/ Michael J. Whaley*_____
Richard P. Garden, Jr., #17685
Michael J. Whaley, #19390
Cline Williams Wright Johnson
Oldfather, L.L.P.
Sterling Ridge
12910 Pierce Street, Suite 200
Omaha, NE  68144
Telephone: (402) 397-1700
rgarden@clinewilliams.com
mwhaley@clinewilliams.com

and

BUCHALTER
A Professional Corporation

/s/ *Jeffrey K. Garfinkle*_____
Jeffrey K. Garfinkle (admitted *pro hac vice*)
Bernard D. Bollinger (admitted *pro hac vice)*
Paul S. Arrow (admitted *pro hac vice*)
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612
Tel: (949) 760-1121
jgarfinkle@buchalter.com
parrow@buchalter.com

BN 36102264v6

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of May, 2019, I caused the above document to be filed in the Bankruptcy Court's CM/ECF system which gave electronic notification electronically upon all parties who filed an appearance or requested notice by electronic filing in this case.

*/s/ Michael J. Whaley*_____

4829-4697-3079, v. 1

BN 36102264v6