IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN RE:<br><br>SPECIALTY RETAIL SHOPS HOLDING CORP., *et al*[1]<br><br>    Debtors. | CASE NO. BK 19-80064-TLS<br>Chapter 11 |

**MCKESSON CORPORATION'S LIMITED OBJECTION, STATEMENT AND RESERVATION OF RIGHTS RE DEBTORS' THIRD AMENDED PLAN OF REORGANIZATION**

McKesson Corporation ("McKesson"), by and through its undersigned counsel, hereby submits this Limited Objection, Statement and Reservation of Rights re the Third Amended Joint Plan of Reorganization [Dk. No. 1495] (the "Third Amended Plan") filed in the above captioned jointly administered cases of Specialty Retail Shops Holding Corp. and its affiliated debtors (collectively, "Debtors").

**I. INTRODUCTION**

1. Much has changed since last week when the Court denied confirmation of Debtors' Second Amended Joint Plan of Reorganization (the "Second Amended Plan"). Despite Debtors' insistence that the non-consensual third party releases and other insider protections were vital to the Second Amended Plan and to the Sun settlement, the Debtors appeared to be bluffing. Within approximately 48 hours after the Court denied confirmation of the Second Amended Plan, Debtors filed the Third Amended Plan, which removes the offending provisions: no more non-consensual third party releases, exculpation for prepetition actions, or assumption

---

[1] The Debtors in these Chapter 11 cases are: Specialty Retail Shops Holding Corp.; Pamida Stores Operating Co., LLC; Pamida Transportation LLC; Penn-Daniels, LLC; Place's Associates' Expansion, LLC; Retained R/E SPE, LLC; Shopko Finance, LLC; Shopko Gift Card Co., LLC; Shopko Holding Company, LLC; Shopko Institutional Care Services Co., LLC; Shopko Optical Manufacturing, LLC; Shopko Properties, LLC; Shopko Stores Operating Co., LLC; SVS Trucking, LLC.

1

of insider indemnity obligations.  The Debtors' quick turnaround with these changes evidences their own belief that such releases were neither necessary nor proper.

2. The Debtors now rush to have the Third Amended Plan confirmed a week after the Court denied confirmation of the Second Amended Plan.  The key reason for this rush is transparent.  On June 28, 2019, evidentiary hearings and trials are scheduled to be held on the more than 100 administrative claims which the Debtors challenged in the "First Omnibus Response and Objection to Requests for Allowance of Administrative Expenses" [Docket No. 1386] (the "Administrative Claim Objection")  McKesson believes that the outcome of these evidentiary hearings and trials will prove that the liquidation analysis submitted by Robert Duffy, Managing Director at Berkeley Research Group, LLC., in support of plan confirmation grossly and materially understated the Chapter 11 administrative insolvency of these cases.

3. McKesson still maintains that the Plan cannot be statutorily confirmed because (1) administrative claims will not be paid in full on the Plan's effective date, 11 U.S.C. § 1129(a)(9)(A); and (2) there is unlawful disparate treatment between general administrative creditors on the one hand (such as McKesson and other reclamation claimants, numerous landlords, § 503(b)(9) claimants) and the Chapter 11 professionals on the other hand.  Accordingly, as it must, McKesson still opposes confirmation of the Plan.

4. To the extent the Court is still inclined to confirm the Plan notwithstanding the legal impediments, McKesson sets forth three key reservations of its rights, which reservations McKesson asserts must be granted in order to confirm the Third Amended Plan.  These reservations are:

- The right to object to the extent Debtors seek to re-insert assumption of insider indemnity obligations into the Third Amended Plan.

- The right to seek *pari passu* treatment of its administrative claim with the claims of Debtors' professionals.

- The right to review and consent to the form of any order confirming the Third Amended Plan. In that regard, McKesson has worked with Debtors' counsel and has agreed on language in the order with respect to McKesson and the third party releases.

II.   **FACTUAL BACKGROUND**

5.   Debtors filed the first iteration of their joint plan of reorganization on the date they commenced these cases, January 16, 2019 [Dk. No. 55] (the "First Plan"). Among other provisions, the First Plan contained consensual third party releases of Debtors' insiders. Creditors were afforded the opportunity to opt out of the releases. Debtors filed their amended plan on March 1, 2019 [Dk. No. 570] (the "Amended Plan"). Again, the Amended Plan provided creditors an opt out of the third party insider releases. On May 21, 2019, just four days before the confirmation hearing on the Amended Plan, Debtors' filed the Second Amended Plan [Dk. No. 1367]. Despite its close proximity to the confirmation hearing, the Second Amended Plan contained a significant change – it removed the opt out provisions in the earlier iterations of the plan, and made the third party insider releases mandatory. The Second Amended Plan also included a purported global settlement in which Sun Capital would contribute $15.5 million to Debtors in exchange not only for third party releases of Sun, but according to Debtors, also for third party releases of Debtors' insiders. McKesson filed its Objection to confirmation of the Second Amended Plan on May 24, 2019 [Dk. No. 1431] (the "McKesson Objection").

6.   At the confirmation hearing on the Second Amended Plan, Debtors argued that the non-consensual releases, along with the other insider protections such as the pre-petition exculpation and the assumption of insider indemnity obligations, were critical components to the plan. Moreover, the Debtors argued that without the insider protections, the entire global settlement, including the Sun contribution, would collapse. It turns out that was all a ruse.

3

Despite all Debtors' bluster about the necessity of the insider protections, within approximately 48 hours after the Court denied confirmation of the Second Amended Plan, Debtors filed the Third Amended Plan, which removes the offending provisions, mostly as they relate to McKesson.

### III.  RESERVATIONS OF RIGHT

#### A.  Assumption of Insider Indemnity Agreements

7. As mentioned above, the Third Amended Plan no longer contains assumption of insider indemnity agreements. Yet, in its Motion for entry of order modifying and confirming the Third Amended Plan [Dk. No 1494] (the "Confirmation Motion"), Debtors note while they removed the indemnification obligations, they ". . . continue to negotiate these provisions with their key constituents." Confirmation Motion, ¶ 18. McKesson reserves its right to object if Debtors seek to re-incorporate any form of insider indemnity obligations and assumption of those obligations into the Third Amended Plan, or into any order confirming that Plan.

8. Such indemnity obligations are no small thing. For example, McKesson believes it has credible claims against certain of Debtors' insiders under applicable Wisconsin law (the "McKesson Claims"). The McKesson Claims are considerable.

9. As stated in the McKesson Objection, assumption of indemnity obligations in a liquidating case is unprecedented and simply improper. McKesson Objection, ¶ 22. The Third Amended Plan cannot include assumption of insider indemnity obligations because such claims are statutorily disallowed under Bankruptcy Code § 502(e)(l)(B). That section provides that:

> the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution . . .

4

11 U.S.C. § 502(e)(l )(B); see also *Touch Am. Holdings, Inc.*, 381 B.R. 95 (Bankr. D. Del. 2008) ("*Touch Am. I*"); *In re Touch Am. Holdings, Inc.*, 409 B.R. 712 (Bankr. D. Del. 2009) ("*Touch Am. II*").

10. As McKesson noted during last week's plan confirmation trial, none of the Debtors' insiders had filed indemnity claims. Nevertheless, had such claims been asserted, they would be denied. Bankruptcy courts must disallow claims by directors and officers for indemnity, contribution and reimbursement, including claims potential defense costs, under section 502(e)(1)(B). See *Touch Am. I and Touch Am. II,* 409 B.R. at 715-16 (citing *In re RNI Wind Down Corp.*, 369 B.R. 174, 181 (Bankr. D. Del. 2007) and *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 55 (Bankr. D. Del. 2001)).

11. Here, any indemnity claims Debtors' insiders may otherwise have in connection with the McKesson Claims (and likely any other claims) satisfy the required elements for disallowance under section 502(e)(1)(B). It is improper for a debtor to attempt to bypass Section 502(e)(1)(B) and the claim disallowance provisions, by having those disallowed claims (again, held by insiders) accepted in the plan, under the guise of assumption of the underlying indemnification agreements or obligations. See 11 U.S.C. § 1129(a)(1) ("The plan complies with other provisions of the Code). It goes without saying that a plan with grants an insider creditor an allowed claim, when other provisions of the Code disallow that same claim does not "comply with the other provisions of the Code."

  **B.** **<u>Preferential Treatment of Professional Claims.</u>**

12. Notwithstanding that the Third Amended Plan provides for less than full payment of most administrative claims, administrative claims of estate professionals are paid in full. Third Amended Plan, Art. II.B. This provision violates Bankruptcy Code section 503(b) and the requirement that all administrative claims be paid ratably. To the extent the Court is willing to confirm the Third Amended Plan notwithstanding the serious doubt that administrative and priority claims will be paid in full, McKesson reserves its right to object to payment of

5

professional claims, to the extent they are not treated on a *pari passu* basis with all other allowed administrative claims.[2]

13. As McKesson argued in the McKesson Objection, Bankruptcy Code Section 503(b) provides for the allowance of administrative claims. Section 503(b) does not contain a ranking of priority for payment of administrative claims. Accordingly, all administrative claims are entitled to the same priority, and must be paid ratably. See, e.g. *Collier* at 503.03[3][b] (required parity of all administrative claims); *In re Alloy Metal Wire Works, Inc.*, 60 B.R. 21 (Bankr. E.D. Penn. 1986) (all administrative claims must receive pro rata treatment).

14. Based on the parity principle, courts have recognized that interim fees paid to estate professionals are subject to disgorgement to the extent necessary to insure ratable payment of administrative claims. The notion of paying estate professionals on a monthly basis in certain cases was originated in *In re Knudsen Corp.*, 84 B.R. 668 (9th Cir. BAP 1988). In *Knudsen*, the panel stated that such a procedure was permitted in certain "rare" cases, and under certain conditions. *Id*. at 672. Among the conditions was that the court must be satisfied that counsel can respond to any reassessment. *Id*. This condition was in response to the trustee's concern that the proposed fee procedure would discriminate in favor of professionals. The panel noted that "so long as the court is certain that fees paid out can, if necessary, be recovered there is no reason why discrimination would occur." *Id.*

15. Similarly, in *In re Dandy Lion Inns*, 120 B.R. 1015 (D. Neb 1990), a Nebraska district court, following Knudsen, understood that monthly fees paid to professionals must be subject to recovery upon reassessment. *Id*. at 1017. In *In re Lockwood*, 46 Bankr. Ct. Dec. 132 (Bankr. D. Neb. 2006), Chief Judge Mahoney noted that "the case law is clear that pro rata distribution among administrative claimants is mandated by § 726(b) and may require disgorgement from interim payments to professionals in order to equalize the distribution." *Id*. at

---

[2] McKesson filed its Request for Payment of Administrative Claim, in the amount of approximately $36 million, on March 29, 2019 [Dk. No. 782] (the "McKesson Administrative Claim"). As mentioned above, Debtors filed the Administrative Claim Objection on May 21, 2019, which included an objection to the McKesson Administrative Claim. A hearing on the Administrative Claim Objection is scheduled for May June 28, 2019.

*1 (citing, among others, *Specker Motor Sales Co. v. Eisen*, 393 F.3d 659 (6th Cir. 2014)).  See also *In re Kaiser Steel Corp.*, 74 B.R. 885, 891 (Bankr. D. Colo. 1987) ("Certainly, it is clear that if some administrative expenses are paid on an interim basis and it is ultimately determined that there will be insufficient funds to similarly pay all other administrative claims, those who have received interim payments may be required to disgorge funds so that all administrative claims share pro rata.").

16. The principle that interim payment of professional fees cannot prejudice the rights of other administrative claimants was also discussed in a slightly different (but equally applicable) context in *Stumpf v. Creel & Atwood, P.C. (In re Lockwood Corp.)*, 216 B.R. 628 (Bankr. D. Neb. 1997).  In *Stumpf,* the Chapter 7 trustee sought disgorgement of Chapter 11 fees after conversion of the case to Chapter 7.  In ordering disgorgement, the court noted that "the clear majority of courts that have addressed this issue have uniformly held a cause of action for disgorgement does exist if the Chapter 7 estate is administratively insolvent." *Id*. at 635.

17. Despite the required parity among all administrative claims, the Third Amended Plan does just the opposite.  Most administrative creditors are not paid in full, but instead share *pro rata* in the Administrative Claims Reserve.  Third Amended Plan, Art.II.A.  Yet, the Third Amended Plan appears to pay the administrative claims of estate professionals in full.  Third Amended Plan, Art.II.B.  To justify this result, Debtors have pointed to a purported professional fee carve out in connection with their post-petition financing.  On February 14, 2019, the Court entered the Final Order . . . Authorizing Debtors and Debtors in possession to Obtain Postpetition Financing [etc.] [Dk. No. 425] (the "DIP Order").  Section 2.3 of the DIP Order contains a purported professional fee carve-out.  Section 2.3(d)(v) provides that ". . . the Carve Out shall be senior to all liens and claims securing the Loan Agreement, the Adequate Protection Liens, and the Diminution in Value Claims and any and all other forms of adequate protection, liens or claims securing the Post-Petition Obligations or the Pre-Petition Obligations."

18. Yet, there are provisions of the DIP Order that prove the interim professional fee payments were not true "carve outs," but rather payments out of cash collateral, without any

corresponding reduction of the obligations owed to the secured lenders. For example, section 2.3(d) of the DIP Order provides that:

> The Agent and the Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Case under any chapter of the Bankruptcy Code. Nothing in this Final Financing Order shall be construed to obligate the Agent or the Lenders . . . in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

19. In addition, section 2.4 of the DIP Order provides that:

> Payment of the Carve-Out, whether by or on behalf of the Agent or any Lender, shall not and shall not be deemed to reduce the Post-Petition Obligations, and shall not and shall not be deemed to subordinate any of any of (sic) Agent's or Lender's liens and security interests in the Pre-Petition Collateral, any other Collateral, the Pre-Petition Adequate Protection Super Priority Claim . . . or the Post-Petition Superpriority Claim to any junior pre- or post-petition lien, interest or claim in favor of any other party.

20. If the Lenders are not responsible for the payment of professional fees (indeed, the Lenders are expected to be paid in full by mid-July 2019), if payment of the Carve Out does not reduce the obligations owed to the Lenders (it did not), and if payment of the Carve-Out does not subordinate the Lenders' liens to the rights of professionals (in apparent contradiction to section 2.3(d)(v) quoted above), then notwithstanding the words used, this is not an actual "carve-out." As aptly described by several other courts, "carve out" is defined as "to set aside,

8

cut into pieces or reserve something, which typically belongs to someone else, for a specific purpose; typically to pay professionals or the U.S. Trustee." *In re Blackwood Associates, L.P.*, 187 B.R. 856, 860 (Bankr. E.D.N.Y. 1995) (citing *In re FYM Clinical Laboratory, Inc.*, No. 90 B 10954, 1993 WL 288541, at 5 n. 4 (Bankr.S.D.N.Y. June 17, 1993)). In this case, notwithstanding the words used in several financing documents, there is not an actual "carve out." Rather, the lenders have permitted estate assets to pay professional fees and expenses, without any corresponding reduction in the amount of the Debtors' obligations to its secured creditors.

    **C.**    **Plan Confirmation Order**

21. McKesson reserves the right to review and consent to any final form of order confirming the Third Amended Plan. In that regard, McKesson has worked with Debtors regarding language relating the third party releases. Assuming the Court confirms the Third Amended Plan, the parties have agreed on the following language:

> "McKesson Corporation ("McKesson") shall be deemed to have opted out of the third-party releases authorized under Article X.A and Article X.E of the Plan, except with respect to Sun Capital. Notwithstanding anything contained in the Plan or this Confirmation order, neither the Plan nor the Confirmation Order affects McKesson's right to pursue any actions against any non-Debtor entity, other than Sun Capital (the "McKesson Actions"). Neither the Plan nor this Confirmation Order shall confer jurisdiction over the McKesson Actions to the Bankruptcy Court.

**IV.**    **CONCLUSION**

22. For these reasons, McKesson does not and cannot support confirmation of the Third Amended Plan. Nevertheless, if the Court is inclined to confirm the Plan, McKesson reserves its rights, as set forth herein.

Dated: June 6, 2019

CLINE WILLIAMS WRIGHT JOHNSON & OLDFATHER, L.L.P.

/s/ Michael J. Whaley
Richard P. Garden, Jr., #17685
Michael J. Whaley, #19390
Cline Williams Wright Johnson Oldfather, L.L.P.
Sterling Ridge
12910 Pierce Street, Suite 200
Omaha, NE  68124
Telephone:    (402) 397-1700
rgarden@clinewilliams.com
mwhaley@clinewilliams.com

and

BUCHALTER
A Professional Corporation

/s/ Jeffrey K. Garfinkle
Jeffrey K. Garfinkle (admitted *pro hac vice*)
Paul S. Arrow (admitted *pro hac vice*)
18400 Von Karmen Avenue
Irvine, CA 92612
Tel: (949) 760-0182
jgarfinkle@buchalter.com
parrow@buchalter.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of June, 2019, I caused the above document to be filed in the Bankruptcy Court's CM/ECF system which gave electronic notification electronically upon all parties who filed an appearance or requested notice by electronic filing in this case.

/s/ Michael J. Whaley

BN 36653898v4