IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. BK 19-80064-TLS |
| | ) | Chapter 11 |
| SPECIALTY RETAIL SHOPS HOLDING | ) | |
| CORP., *et al*[1] | ) | |
| | ) | |
| Debtors. | ) | |

## NOTICE OF APPEAL FROM CONFIRMATION ORDER

McKesson Corporation ("McKesson"), by and through its undersigned counsel, hereby

appeals to the Bankruptcy Appellate Panel for the Eighth Circuit pursuant to 28 U.S.C. § 158(b)

from the Order Confirming the Third Amended Joint Plan of Reorganization of Specialty Retail

Shops Holding Corp. and its Affiliated Debtors [Bk. Dk. No. 1557] (the "Confirmation Order").

A copy of the Confirmation Order is attached hereto as Exhibit 1.

The parties to the Confirmation Order appealed from are the following:

| Attorneys for Specialty Retail Shops Holding Corp. and its affiliated debtors | Attorneys for McKesson Corporation |
|---|---|
| James J. Niemeier<br>Michael T. Eversden<br>McGrath North Mullin & Kratz, PC LLO<br>First National Tower, Suite 3700<br>1601 Dodge Street<br>Omaha, Nebraska 68192<br>Telephone: (401) 341-3070<br>jneimeier@mcgrathnorth.com | Richard P. Garden, Jr., #17685<br>Michael J. Whaley, #19390<br>Cline Williams Wright Johnson<br>Oldfather, L.L.P.<br>Sterling Ridge<br>12910 Pierce Street, Suite 200<br>Omaha, Nebraska 68144<br>Telephone: (402) 397-1700<br>rgarden@clinewilliams.com<br>mwhaley@clinewilliams.com |

---

[1]    The Debtors in these Chapter 11 cases are: Specialty Retail Shops Holding Corp.; Pamida Stores Operating Co., LLC; Pamida Transportation LLC; Penn-Daniels, LLC; Place's Associates' Expansion, LLC; Retained R/E SPE, LLC; Shopko Finance, LLC; Shopko Gift Card Co., LLC; Shopko Holding Company, LLC; Shopko Institutional Care Services Co., LLC; Shopko Optical Manufacturing, LLC; Shopko Properties, LLC; Shopko Stores Operating Co., LLC; SVS Trucking, LLC.

BN 36784654v1

| | |
|---|---|
| Steven Serajeddini<br>Travis Bayer<br>Kirkland & Ellis LLP<br>Kirkland & Ellis International LLP<br>300 North La Salle<br>Chicago, Illinois 60654<br>(312) 862-2000<br>Steven.serajeddini@kirkland.com<br>Travis.bayer@kirkland.com | Jeffrey K. Garfinkle<br>Paul S. Arrow<br>Buchalter Nemer<br>A Professional Corporation<br>18400 Von Karman Avenue, Suite 800<br>Irvine, California 92612<br>Telephone: (949) 760-1121<br>jgarfinkle@buchalter.com<br>parrow@buchalter.com |
| Attorney for US Trustee<br><br>Jerry L. Jensen<br>Acting Assistant U.S. Trustee<br>U.S. Trustee's Office<br>111 S. 18th Plaza, Suite 1148<br>Omaha, Nebraska 68102<br>(402) 221-4302<br>Jerry.l.jensen@usdoj.gov | |

Dated: June 21, 2019          CLINE WILLIAMS WRIGHT JOHNSON &
                              OLDFATHER, L.L.P.


                              /s/ Michael J. Whaley
                              Richard P. Garden, Jr., #17685
                              Michael J. Whaley, #19390
                              Cline Williams Wright Johnson
                              Oldfather, L.L.P.
                              Sterling Ridge
                              12910 Pierce Street, Suite 200
                              Omaha, NE  68124
                              Telephone:    (402) 397-1700
                              rgarden@clinewilliams.com
                              mwhaley@clinewilliams.com

                              and

BN 36784654v1

BUCHALTER
A Professional Corporation


/s/ *Jeffrey K. Garfinkle*
Jeffrey K. Garfinkle (admitted *pro hac vice*)
Paul S. Arrow (admitted *pro hac vice*)
18400 Von Karman Avenue
Irvine, CA 92612
Tel: (949) 760-1121
jgarfinkle@buchalter.com
parrow@buchalter.com


4814-2037-3658, v. 1

3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) | Case No. 19-80064-TLS |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER CONFIRMING THE THIRD**
**AMENDED JOINT CHAPTER 11 PLAN OF SPECIALTY**
**RETAIL SHOPS HOLDING CORP. AND ITS DEBTOR AFFILIATES**

Specialty Retail Shops Holding Corp. and its debtor affiliates, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "Debtors"):[2]

a.    commenced, on January 16, 2019 (the "Petition Date"), the Chapter 11 cases
(the "Chapter 11 Cases") by filing voluntary petitions in the United States
Bankruptcy Court for the District of Nebraska (the "Bankruptcy Court") for relief
under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b.    continued to operate their businesses and manage their properties as debtors in
possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

c.    filed, on January 16, 2019, *the Joint Chapter 11 Plan of Reorganization of Specialty
Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 55], the
*Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Specialty
Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 54], and the
*Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the
Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with
Respect to Confirmation of the Debtors' Proposed Joint Chapter 11 Plan, (III)
Approving the Forms of Ballots and Notices in Connection Therewith, (IV)*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida
Transportation, LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained
R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); ShopKo Holding
Company, LLC (0171); ShopKo Institutional Care Services Co., LLC (7112); ShopKo Optical Manufacturing,
LLC (6346); ShopKo Properties, LLC (0865); ShopKo Stores Operating Co., LLC (6109); SVS Trucking, LLC
(0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

[2]    Capitalized terms used but not otherwise defined in these findings of fact, conclusions of law, and order
(collectively, the "Confirmation Order") have the meanings given to them in the *Third Amended Joint Chapter
11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates*, attached hereto as **Exhibit A** (as may
be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements
thereto, the "Plan").  The rules of interpretation set forth in Section 1.2 of the Plan apply to this Confirmation
Order.

**EXHIBIT**
**1**

*Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 53];

d.    filed, on February 12, 2019, the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 392];

e.    filed, on February 12, 2019, the *First Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 393];

f.    filed, on March 1, 2019, the *Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 570];

g.    filed, on March 1, 2019, the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 571];

h.    obtained, on March 1, 2019, entry of the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 572] (the "Disclosure Statement Order") approving the Disclosure Statement, solicitation procedures (the "Solicitation Procedures"), and related notices, forms, and ballots (collectively, the "Solicitation Packages");

i.    caused the Solicitation Packages and notice of the Confirmation Hearing and the deadline for objecting to confirmation of the Plan to be distributed on or about March 4, 2019 (the "Solicitation Date"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the Affidavit of Service of Solicitation Materials [Docket No. 655] (the "Solicitation Affidavit");

j.    caused notice of the Confirmation Hearing (the "Confirmation Hearing Notice") to be published on March 7, 2019, in the national edition of *USA Today* and the *Omaha World-Herald*, as evidenced by the Affidavit of Publication [Docket Nos. 594 and 595 ] (the "Publication Affidavit");

k.    filed, on May 14, 2019, the *Notice of Filing of Supplement to the Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. on and its Debtor Affiliates* [Docket No. 1308] (the "Initial Plan Supplement");

l.    filed, on May 17, 2019, the *Notice of Filing Amended Plan Supplement* [Docket No. 1340] (the "First Amended Plan Supplement" and together with the Initial Plan Supplement and as may further be amended, modified, or supplemented, the "Plan Supplement");

m.      filed, on May 21, 2019, the *Notice of Global Settlement of Plan Issues Among the Debtors, Creditors' Committee, Sun Capital Partners, and Lenders* [Docket No. 1361];

n.      filed, on May 23, 2019, the *Debtors' Brief in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 1426] (the "Confirmation Brief");

o.      filed, on May 23, 2019, the *Declaration of Robert J. Duffy in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 1427] (the "Duffy Declaration");

p.      filed, on May 23, 2019, the *Declaration of Craig Johnson of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 1428] (the "Voting Report");

q.      filed, on May 23, 2019, the *Declaration of Adam W. Verost in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and its Debtor Affiliates* [Docket No. 1421] (the "Verost Declaration");

r.      filed, on May 31, 2019, the *Debtors' Motion for Entry of an Order (I) Modifying the Debtors' Chapter 11 Plan, (II) Confirming the Debtors' Modified Chapter 11 Plan, and (III) Granting Related Relief* [Docket No. 1494]; and

s.      filed, on May 31, 2019, the *Third Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and Its Debtor Affiliates* [Docket No. 1495].

This Bankruptcy Court having:

t.      entered the Disclosure Statement Order on March 1, 2019 [Docket No. 572];

u.      continued the Confirmation Hearing on March 20, 2019 [Docket No. 703];

v.      continued the Confirmation Hearing on April 4, 2019 [Docket No. 915];

w.      continued the Confirmation Hearing on April 29, 2019 [Docket No. 1174];

x.      set April 5, 2019 at 5:00 p.m. (prevailing Central Time) as the deadline for filing objections in opposition to the Plan;

y.      set May 22, 2019 at 5:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan;

z.      set May 28, 2019 at 9:30 a.m. (prevailing Central Time) as the date and time for the commencement of the Confirmation Hearing in accordance with Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

3

aa.    reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Voting Report, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

bb.    held the Confirmation Hearing;

cc.    heard the statements and arguments made by counsel with respect to Confirmation;

dd.    considered all oral representations, live testimony, written direct testimony, designated deposition testimony, exhibits, documents, filings, and other evidence presented at the Confirmation Hearing;

ee.    entered rulings on the record at the Confirmation Hearing held on May 28–29, 2019 (the "Confirmation Ruling");

ff.    overruled any and all objections to the Plan and to Confirmation and all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated; and

gg.    taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases; and all evidence proffered or adduced and all arguments made at the hearings held before the Bankruptcy Court during the pendency of these Chapter 11 Cases.

NOW, THEREFORE, the Bankruptcy Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby; and the record of the Chapter 11 Cases and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted in the Confirmation Order; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact, conclusions of law, and order:

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY FOUND AND DETERMINED THAT:

**A. Finding of Fact and Conclusions of Law.**

1.     The findings of fact and the conclusions of law set forth in this Confirmation Order constitute findings of fact and conclusions of law in accordance with rule 52 of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Bankruptcy Rules 7052 and 9014. All findings of fact and conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to Confirmation are hereby incorporated into this Confirmation Order to the extent not inconsistent herewith.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such.  To the extent any finding of fact or conclusion of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, it is adopted as such.

**B. Jurisdiction and Venue.**

2.     Venue in this Bankruptcy Court was proper as of the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Bankruptcy Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska.  The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

**C. Eligibility for Relief.**

3.     The Debtors were and continue to be entities eligible for relief under section 109 of the Bankruptcy Code.

**D.  Commencement and Joint Administration of the Chapter 11 Cases.**

4.      On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing

voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On January 16, 2019 the

Bankruptcy Court entered an order [Docket No. 25] authorizing the joint administration of the

Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b).  The Debtors have operated their

businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11

Cases.

**E.  Appointment of the Creditors' Committee.**

5.      On January 18, 2019, the U.S. Trustee appointed the Official Committee of

Unsecured Creditors (the "Creditors' Committee") to represent the interests of the unsecured

creditors of the Debtors in the Chapter 11 Cases [Docket No. 95].

**F.  Plan Supplement.**

6.      The Plan Supplement complies with the terms of the Plan, and the Debtors provided

good and proper notice of the filing in accordance with the Bankruptcy Code, the Bankruptcy

Rules, the Disclosure Statement Order, and the facts and circumstances of the Chapter 11 Cases.

No other or further notice is or will be required with respect to the Plan Supplement.   All

documents included in the Plan Supplement are integral to, part of, and incorporated by reference

into the Plan.  Subject to the terms of the Plan, the Debtors have reserved the right to alter, amend,

update, or modify the Plan Supplement before the Effective Date, subject to compliance with the

Bankruptcy Code and the Bankruptcy Rules.

**G.  Judicial Notice; Objections Overruled.**

7.      The Bankruptcy Court takes judicial notice of (and deems admitted into evidence

for purposes of Confirmation) the docket of these Chapter 11 Cases maintained by the clerk of the

Bankruptcy Court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during these Chapter 11 Cases. Any resolution or disposition of objections to Confirmation explained or otherwise ruled upon by the Bankruptcy Court on the record at the Confirmation Hearing is hereby incorporated by reference. All unresolved objections, statements, and reservations of rights are hereby overruled on the merits.

### H. Disclosure Statement Order.

8.      On March 1, 2019, the Bankruptcy Court entered the Disclosure Statement Order [Docket No. 572], and subsequently continued the Confirmation Hearing [Docket Nos. 703, 915, 1174], which, among other things, fixed April 5, 2019 at 5:00 p.m. (prevailing Central Time) as the deadline for objecting to the Plan (the "Plan Objection Deadline"), May 22, 2019 at 5:00 p.m. (prevailing Central Time) as the deadline for voting to accept or reject the Plan (the "Voting Deadline"), and May 28, 2019, at 9:30 a.m. (prevailing Central Time) as the date and time for the Confirmation Hearing.

### I. Transmittal and Mailing of Materials; Notice.

9.      The Debtors provided due, adequate, and sufficient notice of the Plan, the Disclosure Statement, the Disclosure Statement Order, the Solicitation Packages, the Confirmation Hearing Notice, the Plan Supplement, and all the other materials distributed by the Debtors in connection with the Confirmation of the Plan in compliance with the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Nebraska (the "Local Bankruptcy Rules"), and the procedures set forth in the Disclosure Statement Order. The Debtors provided due, adequate, and sufficient notice of the Voting and Plan Objection Deadline, the Confirmation Hearing (as may be

continued from time to time), and any applicable bar dates and hearings described in the Disclosure Statement Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the Disclosure Statement Order.  No other or further notice is or shall be required.

**J.  Solicitation.**

10.    The Debtors solicited votes for acceptance and rejection of the Plan in good faith, and such solicitation complied with sections 1125 and 1126, and all other applicable sections, of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, the Disclosure Statement Order, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

**K.  Voting Report.**

11.    Before the Confirmation Hearing, the Debtors filed the Voting Report.  The Voting Report was admitted into evidence during the Confirmation Hearing.  The procedures used to tabulate ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

12.    As set forth in the Plan, Holders of Claims in Class 2, Class 3 and Class 4 (collectively, the "Voting Classes") were eligible to vote on the Plan in accordance with the Solicitation Procedures.  Holders of Claims and Interests in Class 1 (the "Deemed Accepting Class") are Unimpaired and conclusively presumed to accept the Plan and, therefore, did not vote to accept or reject the Plan.  Holders of Intercompany Claims in Classes 5 and 6 either are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or Impaired and conclusively deemed to reject the Plan, and, therefore, are not entitled to vote to accept or reject the Plan.  Holders of Interests in Classes 7 and 8 (the "Deemed Rejecting Class")

are Impaired under the Plan, are entitled to no recovery under the Plan, and are therefore deemed to have rejected the Plan.

13.     As evidenced by the Voting Report, Class 3 voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

14.     Based on the foregoing, and as evidenced by the Voting Report, at least one Impaired Class of Claims (excluding the acceptance by any insiders of any of the Debtors) has voted to accept the Plan in accordance with the requirements of sections 1124 and 1126 of the Bankruptcy Code.

**L.  Bankruptcy Rule 3016.**

15.     The Plan and all modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and the Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Disclosure Statement and the Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

**M.  Burden of Proof.**

16.     The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, the applicable evidentiary standard for Confirmation.  Further, the Debtors have proven the elements of sections 1129(a) and 1129(b) by clear and convincing evidence.  Each witness who testified on behalf of the Debtors in connection with Confirmation was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

**N. Compliance with the Requirements of Section 1129 of the Bankruptcy Code.**

17.     The Plan complies with all applicable provisions of section 1129 of the Bankruptcy

Code as follows:

**a. Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

18.     The Plan complies with all applicable provisions of the Bankruptcy Code, including

sections 1122 and 1123, as required by section 1129(a)(1) of the Bankruptcy Code.

**i.     Sections 1122 and 1123(a)(1)—Proper Classification.**

19.     The Plan satisfies the requirements of sections 1122 and 1123(a)(1) of the

Bankruptcy Code.  Article III of the Plan provides for the separate classification of Claims and

Interests into eight different Classes, based on differences in the legal nature or priority of such

Claims and Interests and the consent of certain Holders of such Claims to such separate

classification (other than Administrative Claims, DIP Claims, Professional Fee Claims, and

Priority Tax Claims, which are addressed in Article II of the Plan and are not required to be

designated as separate Classes by section 1123(a)(1) of the Bankruptcy Code).  Valid business,

factual, and legal reasons exist for the separate classification of such Claims and Interests, such

classifications were not implemented for any improper purpose and do not unfairly discriminate

between, or among, holders of Claims and Interests.  Each Class of Claims or Interests contains

only Claims or Interests that are substantially similar to the other Claims or Interests within that

Class.

**ii.     Section 1123(a)(2)—Specification of Unimpaired Classes.**

20.     The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

Article III of the Plan specifies that Claims in Class 1 are Unimpaired under the Plan and Claims

and Interests in Classes 5 and 6 are either Impaired or Unimpaired under the Plan.  In addition,

Article II of the Plan specifies that Professional Fee Claims and DIP Claims are Unimpaired, although the Plan does not classify these Claims.

### iii.   Section 1123(a)(3)—Specification of Treatment of Impaired Classes.

21.   The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies the treatment of each Impaired Class under the Plan.

### iv.   Section 1123(a)(4)—No Discrimination.

22.   The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. Article III of the Plan provides the same treatment to each Claim or Interest in any particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest.

### v.   Section 1123(a)(5)—Adequate Means for Plan Implementation.

23.   The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code. The Plan and the various documents included in the Plan Supplement provide adequate and proper means for the Plan's execution and implementation, including:  (a) the Schedule of Assumed Executory Contract and Unexpired Leases; (b) the Schedule of Rejected Executory Contract and Unexpired Leases; (c) the appointment of the Plan Administrator; (d) the Wind-Down Budget and Wind-Down Milestones; (e) the cancellation of certain existing agreements, obligations, instruments, Claims, and Interests; (f) the continuance of certain agreements, obligations, instruments, and Interests; (g) the vesting of the assets of the Debtors' Estates in the applicable Reorganized Debtors; and (h) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents in furtherance of the Plan.

### vi.      Section 1123(a)(6)—Non-Voting Equity Securities.

24.      The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. The Plan does not provide for the issuance of equity or other securities of the Debtors, including non-voting equity securities.

### vii.     Section 1123(a)(7)—Directors, Officers, and Trustees.

25.      The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Article IV.G of the Plan discharges all of the Debtors' officers, directors, members, and managers from their duties effective as of the Effective Date without any further action. Article IV.G also provides for the continuation of the Reorganized Debtors and the appointment of the Plan Administrator. The manner for selection of the Plan Administrator is set forth in the Plan and Plan Supplement. The selection of the Meta Advisors as the Plan Administrator is consistent with the interests of Holders of Claims and Interests and public policy.

### b.  Section 1123(b)—Discretionary Contents of the Plan.

26.      The Plan's discretionary provisions comply with section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code. Thus, the Plan satisfies section 1123(b).

### i.       Impairment/Unimpairment of Any Class of Claims or Interests.

27.      Pursuant to the Plan, Article III of the Plan impairs or leaves Unimpaired, as the case may be, each Class of Claims and Interests, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

### ii.      Assumption and Rejection of Executory Contracts and Unexpired Leases.

28.      Article V of the Plan provides for the rejection of the Debtors' Executory Contracts and Unexpired Leases as of the Confirmation Date, effective as of the Effective Date, unless such Executory Contract or Unexpired Lease:  (a) is specifically described in the Plan as to be assumed

in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (e) is a D&O Liability Insurance Policy.  Additionally, as part of the Plan Supplement, the Debtors have filed a Schedule of Rejected Executory Contracts and Unexpired Leases with specified rejection dates.   Entry of this Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### iii.    Compromise and Settlement.

29.    In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan and with the support of the Credit Agreement Primary Agent, DIP Lenders, and Term Loan Lenders, and the Creditors' Committee, the provisions of the Plan constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that all Holders of Claims and Interests may have with respect to any Allowed Claim or Interest, as applicable, or any distribution to be made on account of such Allowed Claim or Interest.  Such compromise and settlement is fair, equitable, and reasonable and in the best interests of the Debtors and their Estates.

30.    The Plan incorporates an integrated compromise and settlement with Sun Capital (the "Settlement") of potential Claims, issues and disputes regarding Sun Capital, the Debtors and the Debtors' officers and directors designed to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties in interest.  Pursuant to the Settlement, upon the Settlement

Effective Date:  (a) the Debtors and each of their respective current and former officers, directors, members, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, shall be deemed released and discharged by each other Releasing Party from any and all Settled Claims, and (b) Sun Capital shall be deemed released and discharged by each other Releasing Party from the Settled Claims.  The Settlement, including the payment of the Settlement Amount, and the distributions and other benefits provided for under the Plan, including the release of all Settled Claims as set forth above, the releases set forth in Articles X.D and E and the exculpation set forth in Article X.F, shall be in full satisfaction of all Settled Claims, regardless of whether any of the foregoing Settled Claims are identified in the Plan or could have been asserted. Each component of the compromise and settlement, including the treatment of Claims and Interests pursuant to the Plan, is an integral, integrated and inextricably linked part of the Settlement.

31.     Upon the Settlement Effective Date, the *Motion of the Official Committee of Unsecured Creditors for Reconsideration of Order Granting Application to Employ Ducera Partners, LLC, as Financial Advisor to Special Committee of Independent Directors* [Docket No. 447], *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Claims on Behalf of the Bankruptcy Estates and Granting Related Relief* [Docket No. 641], *Motion for an Order Pursuant to 11 U.S.C. § 1112(b) and 11 U.S.C. § 105(a) Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Docket No. 1152], *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1155], *Official Committee of Unsecured*

*Creditors' (I) Objection to Certain Representations, Covenants, and Waivers In Favor of Prepetition ABL and Term Loan Agent Pursuant to Final Financing Order and (II) Objection to the Claims Asserted By the Agent and the Lenders Against the Debtors* [Docket No. 1221], and *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Lien Challenge Claims on Behalf of the Bankruptcy Estates* [Docket No. 1222] shall be deemed withdrawn with prejudice.

32.    Based upon the representations and arguments of counsel to the Debtors, all other testimony either actually given or proffered, other evidence introduced at the Confirmation Hearing and the full record of the Chapter 11 Cases, this Confirmation Order constitutes the Bankruptcy Court's approval of the Settlement, because, among other things: (a) the Settlement reflects a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to expeditiously exit chapter 11, on the other hand; (b) absent the Settlement, there is a likelihood of complex and protracted litigation, with the attendant expense, inconvenience and delay that has a possibility to derail the Debtors' chapter 11 efforts; (c) each of the parties supporting the Settlement are represented by counsel that is recognized as being knowledgeable, competent, and experienced; (d) the Settlement is the product of arm's-length bargaining and good faith negotiations between sophisticated parties, including the Settlement Parties; and (e) the Settlement is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, the Reorganized Debtors, their respective Estates and property, creditors, and other parties in interest, will maximize the value of the Estates and is essential to the successful implementation of the Plan.  Based on the foregoing, the Settlement satisfies the requirements of applicable Eighth Circuit law for approval of settlements and compromises pursuant to Bankruptcy Rule 9019.

33.     The releases of Sun Capital and the Debtors' directors, officers and managers contained in Article X.A of the Plan are an integral component of the Settlement.  Sun Capital and the Debtors' directors, officers and managers:  (a) made a substantial and valuable contribution to the Debtors' restructuring including, with respect to Sun Capital, the payment of the Settlement Amount; and (b) invested significant time and effort to make the restructuring a success and preserve the value of the Debtors' estates.  Litigation by the Debtors against Sun Capital and the Debtors' directors, officers and managers would be a distraction to the Debtors' business and restructuring and would decrease rather than increase the value of the Estates.  The release of Sun Capital and the Debtors' directors, officers and managers contained in the Plan have the consent (including deemed consent) of the Debtors and the Releasing Parties and are in the best interests of the estates.  Sun Capital would not make the Settlement Payment absent the releases that are contained in the Plan.

### iv.     Debtor Release.

34.     In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, the releases of claims and Causes of Action by the Debtors described in Article X.D of the Plan (the "Debtor Release") represent a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019 and is an essential provision of the Plan. The Debtors' or the Reorganized Debtors' pursuit of any such claims against the Released Parties is not in the best interests of the Estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims.  The Plan, including the Debtor Release, was negotiated by sophisticated parties represented by able counsel and financial advisors.  The Debtor Release is therefore the result of an arm's-length negotiation process.

35.     The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.  The Debtor Release, which includes by reference each of

the related provisions and definitions contained in the Plan, is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by such releases; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to such release. In light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Release to the Plan, the Debtor Release is approved.

### v.   Release by Holders of Claims and Interests.

36.   The release by the Releasing Parties (the "Third-Party Release"), set forth in Article X.E of the Plan, is an essential provision of the Plan. The scope of the Third-Party Release in the Plan is appropriately tailored under the facts and circumstances of these Chapter 11 Cases, and the Releasing Parties received due and adequate notice of the Third- Party Release. The Third-Party Release is: (a) consensual; (b) in exchange for the good and valuable consideration provided by the Released Parties; (c) a good-faith settlement and compromise of the claims and Causes of Action released by the Third-Party Release; (d) materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, and is important to the overall objectives of the Plan to finally resolve certain Claims among or against certain parties in interest in the Chapter 11 Cases; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; (g) a bar to any of the Releasing Parties asserting any claim or Cause of Action released by the Third-Party Release against any of the Released Parties; and (h) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

37.   The Third-Party Release is an integral part of the Plan. Like the Debtor Release, the Third-Party Release facilitated participation of the Released Parties in both the Plan and the

chapter 11 processes generally.   The Third-Party Release is instrumental to the Plan and was critical in incentivizing the Released Parties to support the Plan and preventing potentially significant and time-consuming litigation regarding the parties' respective rights and interests.

38.     Furthermore, the Third-Party Release is consensual as the Releasing Parties were provided adequate notice of the chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan, and voting creditors and interest holders were given the opportunity to opt out of the Third-Party Release, and the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the ballots.   Among other things, the Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third-Party Release, and no other disclosure or notice is necessary.  The Third-Party Release is specific in language, integral to the Plan, a condition of the Settlement, and given for substantial consideration.   In light of the foregoing, the Third-Party Release is approved, including the release of the Settlement Parties by any party who otherwise opted out of the Third-Party Release.

### vi.     Exculpation.

39.     The exculpation provisions set forth in Article X.F of the Plan are essential to the Plan (the "Exculpation").   The Exculpation is essential to the Plan and appropriately affords protection to certain parties who constructively participated in and contributed to the Debtors' chapter 11 process.  The record in the Chapter 11 Cases fully supports the Exculpation, which is appropriately tailored to protect the Exculpated Parties from inappropriate litigation.

### vii.     Injunction.

40.     The injunction provisions set forth in Article X.G of the Plan are essential to the Plan and are necessary to implement the Plan, the Debtor Release, the Third-Party Release, and

the Exculpation provisions in Article X of the Plan.  Such injunction provisions are appropriately tailored to achieve those purposes.

### viii.    Preservation of Claims and Causes of Action.

41.    Article IV.H.11 of the Plan appropriately provides for the preservation by the Debtors of certain Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Causes of Action not released by the Debtors or exculpated under the Plan shall vest in the Plan Administrator as provided by the Plan.  On the Settlement Effective Date, all Avoidance Actions against the Debtors' vendors and landlords shall be deemed waived, relinquished, and extinguished (other than with respect to any Holder of a Claim or Interest set forth in this Confirmation Order that "opted out" of granting releases by timely objecting to the Plan's third-party release provisions, unless otherwise ordered by the Bankruptcy Court on or before Confirmation) (the "Vendor/Landlords Release"), and no such Avoidance Action shall revert to the Debtors, the Reorganized Debtors, their successors, or any chapter 11 or chapter 7 trustee.  The Plan Administrator, on and after the Effective Date, may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action (other than Avoidance Actions waived, relinquished, released or otherwise extinguished under the Plan including the Vendor/Landlords Release), whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

42.    The Plan is specific with respect to the Causes of Action to be retained by the Debtors, and the Plan and Plan Supplement provide meaningful disclosure with respect to the potential Causes of Action that the Reorganized Debtors may retain, and all parties in interest received adequate notice with respect to such Causes of Action.  The provisions regarding Causes of Action in the Plan are appropriate and in the best interests of the Debtors, their respective

19

Estates, and Holders of Claims and Interests.  For the avoidance of any doubt, Causes of Action released or exculpated under the Plan will not be retained by the Reorganized Debtors or Plan Administrator.

### ix.    Lien Releases.

43.    Except as otherwise specifically provided in this Confirmation Order, the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, or executed in connection therewith, to implement the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors (the "Lien Releases").  Subject to the funding of the Professional Fee Escrow Account, all Liens securing the Prepetition ABL Claims, DIP Claims, Term Loan Secured Claims, or any other Obligations (as defined in the DIP Agreement) shall continue in full force and effect on and after the Effective Date and nothing in the Plan shall or shall be construed to release, discharge, relieve, limit or impair in any way the rights of any Holder of a Prepetition ABL Claims, DIP Claims, or Term Loan Secured Claim or any Lien securing any such Claim until such Claims are Satisfied as set forth in Article II.C and Article III.B of the Plan.  The provisions of the Lien Releases are appropriate, fair, equitable and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

x.      **Additional Plan Provisions.**

44.      The other discretionary provisions of the Plan, including the Plan Supplement, are appropriate and consistent with applicable provisions of the Bankruptcy Code, including, without limitation, provisions for the allowance of certain Claims and Interests, treatment of indemnification obligations, and the retention of court jurisdiction.

c.      **Section 1123(d)—Cure of Defaults.**

45.      Article V.C of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.   Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash, subject to the limitations described in Article V.C of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.   Any disputed cure amounts will be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law.   As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts and Unexpired Leases in accordance with section 365(b)(1) of the Bankruptcy Code.   Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

d.      **Section 1129(a)(2)—Debtors' Compliance with the Applicable Provisions of the Bankruptcy Code.**

46.      The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129, and with Bankruptcy Rules 2002, 3017, 3018, and 3019.

47.    The Debtors and their agents solicited votes to accept or reject the Plan after the Bankruptcy Court approved the adequacy of the Disclosure Statement, pursuant to section 1125(a) of the Bankruptcy Code and the Disclosure Statement Order.

48.    The Debtors and their agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e), and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation provisions set forth in Article X.F of the Plan.

49.    The Debtors and their agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

**e.    Section 1129(a)(3)—Proposal of Plan in Good Faith.**

50.    The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation.  The Debtors' good faith is evident from the facts and the record of the Chapter 11 Cases, the Disclosure Statement, the hearing on the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases.

51.     The Plan is the product of good faith, arm's-length negotiations by and among the Debtors, the Debtors' directors, officers and managers, the Credit Agreement Primary Agent, the DIP Lenders, the Creditors' Committee, and certain other stakeholders involved in the Chapter 11 Cases.  The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' and such other parties' good faith, serve the public interest, and assure fair treatment of holders of Claims and Interests.  Consistent with the overriding purpose of chapter 11, the Debtors filed the Chapter 11 Cases and the Plan was negotiated and proposed with the legitimate purpose of maximizing stakeholder value and for no ulterior purpose.

**f.   Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable.**

52.     The procedures set forth in the Interim Compensation Order and the Plan for the Bankruptcy Court's review and ultimate determination of the fees and expenses paid or to be paid by the Debtors or the Reorganized Debtor, as applicable, in connection with these Chapter 11 Cases or in connection with the Plan and incident to these Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

**g.   Section 1129(a)(5)—Disclosure of Directors, Officers and Managers and Consistency with the Interests of Creditors and Public Policy.**

53.     Because the Plan provides for the liquidation of the Estates' assets and resignation of the Debtors' officers, directors, and managers, section 1129(a)(5) of the Bankruptcy Code does not apply. To the extent section 1129(a)(5) of the Bankruptcy Code applies to the Reorganized Debtors, the Debtors have satisfied the requirements of this provision by, among other things, disclosing the identity and compensation of the Plan Administrator.

**h.   Section 1129(a)(6)—Rate Changes.**

54.     Section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory

commission and therefore will not require governmental regulatory approval.

### i. Section 1129(a)(7)—Best Interests of Holders of Claims and Interests.

55.     The Debtors have demonstrated that the Plan is in the best interests of their creditors

and equity holders and the requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied.

The evidence in support of the Plan that was proffered or adduced at the Confirmation Hearing,

and the facts and circumstances of the Chapter 11 Cases, establishes that each Holder of Allowed

Claims or Interests in each Class will recover as much or more value under the Plan on account of

such Claim or Interest, as of the Effective Date, than the amount such Holder would receive if the

Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

### j. Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Certain Impaired Classes; Fairness of Plan with Respect to Deemed Rejecting Class.

56.     The Deemed Accepting Classes are Unimpaired under the Plan and are deemed to

have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Nevertheless, because

the Plan has not been accepted by the Classes 2 and 4 (the "Rejecting Classes"), the Debtors seek

Confirmation under section 1129(b), solely with respect to such Classes, rather than section

1129(a)(8), of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with

respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate

unfairly and is fair and equitable with respect to the Deemed Rejecting Class and thus satisfies

section 1129(b) of the Bankruptcy Code with respect to such Class as described further below.  As

a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

**k. Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

57.     The treatment of Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims under Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**l.   Section 1129(a)(10)—Acceptance by at Least One Impaired Class.**

58.     The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As set forth in the Voting Report, one Impaired Class that was entitled to vote on the Plan has voted to accept the Plan.  Specifically, Holders of Claims in Class 3 voted to accept the Plan.  As such, with respect to each Debtor's Plan there is either at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code).

**m. Section 1129(a)(11)—Feasibility of the Plan.**

59.     The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.   The evidence supporting the Plan proffered or adduced by the Debtors at or before the Confirmation Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other persuasive evidence; (c) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization; and (d) establishes that the Debtors will have sufficient funds available to meet their obligations under the Plan.

**n.  Section 1129(a)(12)—Payment of Statutory Fees.**

60.     The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article II.D of the Plan provides for the payment of all fees payable pursuant to section 1930(a) of

the Judicial Code, as determined by the Bankruptcy Court at the Confirmation Hearing in accordance with section 1128 of the Bankruptcy Code.

    **o.  Section 1129(a)(13)—Retiree Benefits.**

61.    The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).  Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

    **p.  Section 1129(a)(14), (15), and (16)—Domestic Support Obligations, Individuals, and Nonprofit Corporations.**

62.    The Debtors do not owe any domestic support obligations, are not individuals, and are not nonprofit corporations.  Therefore, sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

    **q.  Section 1129(b)—Confirmation of Plan Over Nonacceptance of Impaired Classes.**

63.    Notwithstanding the fact that the Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because:  the Plan does not discriminate unfairly and is fair and equitable with respect to the Claims and Interests in the Rejecting Classes.  As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied.  After entry of this Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Class.

    **r.  Section 1129(c)—Only One Plan.**

64.    The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases.

**s.  Section 1129(d)—Principal Purpose of the Plan.**

65.    The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.    As evidenced by its terms, the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act, 15 U.S.C. § 77e.

**t.  Section 1129(e)—Not Small Business Cases.**

66.    The Chapter 11 Cases are not small business cases, and accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

**u.  Satisfaction of Confirmation Requirements.**

67.    Based upon the foregoing and all other pleadings and evidence proffered or adduced at or prior to the Confirmation Hearing, the Plan and the Debtors, as applicable, satisfy all the requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code.

**v.  Good Faith.**

68.    The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders.  The Plan is the product of extensive collaboration among the Debtors and key stakeholders and accomplishes this goal.  Accordingly, the Debtors or the Reorganized Debtors, as appropriate, have been, are, and will continue acting in good faith if they proceed to:  (a) consummate the Plan, the Restructuring Transactions, and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed or contemplated by this Confirmation Order.  Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**w.  Disclosure: Agreements and Other Documents.**

69.    The Debtors have disclosed all material facts, to the extent applicable, regarding: (a) the identity of the Plan Administrator and selection process therefore; (b) the method and

manner of distributions under the Plan; (c) the adoption, execution, and implementation of the other matters provided for under the Plan, including those involving corporate action to be taken by or required of the Debtors or Reorganized Debtors, as applicable; (d) the exemption under section 1146(a) of the Bankruptcy Code; (e) the retained Causes of Action; and (f) the adoption, execution, and delivery of all contracts, leases, instruments, securities, releases, indentures, and other agreements related to any of the foregoing.

### x. Conditions to Effective Date.

70.    The Plan shall not become effective unless and until the conditions set forth in Article XI.A of the Plan have been satisfied or waived pursuant to Article XI.B of the Plan.

### y. Implementation.

71.    All documents and agreements necessary to implement the transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, and all other relevant and necessary documents have been negotiated in good faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.  The documents and agreements are essential elements of the Plan and entry into and consummation of the transactions contemplated by each such document or agreement is in the best interests of the Debtors, the estates, and the holders of Claims and Interests.  The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.  The Debtors are authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

**z.  Vesting of Assets.**

72.  Except as otherwise provided (i) in the Plan, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, in each case to the extent of the Credit Agreement Primary Agent's consent, or (ii) herein at paragraph 41, on the Effective Date the assets of the Debtors shall vest in the Reorganized Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances; *provided* that, subject to funding the Professional Fee Escrow Account, the collateral, or proceeds of sales of such collateral, of the Reorganized Debtors securing the DIP Claims, Prepetition ABL Claims, and Term Loan Secured Claims shall remain subject to the liens and claims of the Credit Agreement Primary Agent and Lenders (as defined in the DIP Agreement) to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets until such DIP Claims, Prepetition ABL Claims, and Term Loan Secured Claims are Satisfied as set forth in Article II.C and Article III.B of the Plan.

73.  On and after the Effective Date, except as otherwise provided for in the Plan, the Financing Orders, or the Asset Purchase Agreement, the Debtors and the Reorganized Debtors may operate their business and use, acquire, or dispose of property in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action with the prior written consent of the Credit Agreement Primary Agent; *provided* that the Debtors and the Reorganized Debtors shall not need the consent of the Credit Agreement Primary Agent following the date on which all DIP Claims and Term Loan Secured Claims are Satisfied as set forth in Article II.C and Article III.B of the Plan and this Order.

**aa. Treatment of Executory Contracts and Unexpired Leases.**

74.     Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the occurrence of the Confirmation Date, the Plan provides for the assumption or rejection of certain Executory Contracts and Unexpired Leases, effective as of the Effective Date except where otherwise indicated.   The Debtors' determinations regarding the assumption or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Debtors, are necessary to the implementation of the Plan and are in the best interests of the Debtors, their Estates, holders of Claims and Interests and other parties in interest in the Chapter 11 Cases.

**bb. Surcharge Motion.**

75.     Upon entry of this Confirmation Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any successor shall be charged against the Credit Agreement Primary Agent, the Term Loan B-1 Agent, or any DIP Lender, their respective Claims or the Collateral (as defined in the DIP Agreement) pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise.

**cc. Objections.**

76.     All parties have had a full and fair opportunity to litigate all issues raised in the objections to Confirmation of the Plan, or which might have been raised, and the objections have been fully and fairly litigated  or resolved, including by agreed-upon reservations of rights as set forth in this Confirmation Order.

## II. <u>ORDER</u>

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

77.     This Confirmation Order confirms the Plan attached hereto in its entirety as modified herein.

78.     This Confirmation Order approves the Plan Supplement, including the documents contained therein, as they may be amended through and including the Effective Date in accordance with and as permitted by the Plan.  The terms of the Plan, the Plan Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part of this Confirmation Order; *provided* that if there is any direct conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control solely to the extent of such conflict.

79.     All Holders of Claims that voted to accept the Plan are conclusively presumed to have accepted the Plan.

80.     The terms of the Plan, the Plan Supplement, all exhibits thereto, and this Confirmation Order shall be effective and binding as of the Effective Date on all parties in interest, including, but not limited to:  (a) the Debtors; (b) the Credit Agreement Primary Agent; (b) the Creditors' Committee; and (c) all holders of Claims and Interests, subject to the provisions of paragraph 173 hereof; *provided* that the Settlement and the releases provided in connection with the Settlement and the Vendor/Landlords Release shall become effective on the Settlement Effective Date.

81.     The failure to include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document, agreement, or exhibit does not impair the effectiveness of that article, section, or provision; it being the intent of the Bankruptcy Court that the Plan, the Plan Supplement, and any related document, agreement, or exhibit are approved in their entirety.

## A.     Objections.

82.     To the extent that any objections (including any reservations of rights contained therein) to Confirmation have not been withdrawn, waived, or settled before entry of this

Confirmation Order, are not cured by the relief granted in this Confirmation Order, or have not

been otherwise resolved as stated on the record of the Confirmation Hearing, all such objections

(including any reservation of rights contained therein) are hereby overruled in their entirety and

on their merits.

**B.    Plan Modifications.**

83.    On May 21, 2019, the Debtors made certain modifications to the Plan (the "Plan

Modifications").  The Plan Modifications neither materially adversely affect the treatment of any

Claim against or Interest in any of the Debtors under the Plan nor require resolicitation of votes on

the Plan under section 1126 of the Bankruptcy Code or Bankruptcy Rules 3018 or 3019.  After

giving effect to the Plan Modifications, the Plan continues to meet all applicable requirements of

the Bankruptcy Code.  The disclosure of the Plan Modifications on the record at the Confirmation

Hearing constitute due and sufficient notice thereof.  Accordingly, in accordance with section 1127

of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan is properly before this Court and all

Holders of Claims who voted to accept the Plan or who are conclusively presumed to accept the

Plan are deemed to have accepted the Plan as modified by the Plan Modifications.  No Holder of

a Claim who has voted to accept the Plan shall be permitted to change its vote as a consequence

of the Plan Modifications.

**C.    Findings of Fact and Conclusions of Law.**

84.    The findings of fact and the conclusions of law set forth in this Confirmation Order

constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made

applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusions of

law announced by the Bankruptcy Court at the Confirmation Hearing in relation to Confirmation,

including the Confirmation Ruling, are hereby incorporated into this Confirmation Order.  To the

extent that any of the following constitutes findings of fact or conclusions of law, they are adopted

as such.  To the extent any finding of fact or conclusion of law set forth in this Confirmation Order
(including any findings of fact or conclusions of law announced by the Bankruptcy Court at the
Confirmation Hearing and incorporated herein) constitutes an order of this Bankruptcy Court, it is
adopted as such.

### D.    Post-Confirmation Modification of the Plan.

85.    Subject to the limitations and terms contained in Article XII.A of the Plan, the
Debtors are hereby authorized to amend or modify the Plan at any time prior to the substantial
consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and
Bankruptcy Rule 3019, without further order of this Bankruptcy Court; *provided* until such time
as the DIP Claims and Term Loan Secured Claims are Satisfied as set forth in Article II.C and
Article III.B of the Plan, any such amendments or modifications shall require the consent of the
Credit Agreement Primary Agent (not to be reasonably withheld).

### E.    Plan Classification Controlling.

86.    The terms of the Plan shall solely govern the classification of Claims and Interests
for purposes of the distributions to be made thereunder and the classifications set forth on the
ballots tendered to or returned by the holders of Claims or Interests in connection with voting on
the Plan:  (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do
not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual
classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied
upon by any holder of a Claim or Interest as representing the actual classification of such Claim
or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors
except for voting purposes.

**F.      General Settlement of Claims and Interests.**

87.      Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of the Settled Claims, and of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. All distributions made to holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

**G.      Restructuring Transactions.**

88.      On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall take all actions to effectuate the Restructuring Transactions, including, without limitation: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation,

conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Restructuring Transactions; (e) all transactions necessary to provide for the purchase of substantially all of the assets of, or Interests in, any of the Debtors by one or more Entities to be wholly owned by the reorganized Debtors, which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### H.   Corporate Action.

89.   On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (1) the implementation of the Restructuring Transactions; (2) the selection and appointment of the Plan Administrator; (3) the Wind-Down Budget and Wind-Down Milestones; and (4) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals

contemplated by Article IV.H.8 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**I.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.**

90.    Except as otherwise provided in the Plan or this Confirmation Order, on and after the Effective Date, the Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible including overseeing the Store Closing GOB Sales in accordance with the Store Closing Liquidation Agreement as authorized under the Store Closing GOB Sales Order (as each such term is defined in the DIP Agreement), in accordance with the Wind-Down Budget and Wind-Down Milestones, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) establishing and funding the Distribution Reserve Accounts in accordance with the Wind-Down Budget, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Asset Purchase Agreement, if any, and the Financing Orders (as applicable), and (h) administering the Plan in an efficacious manner.  The Reorganized Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, Financing Orders (as applicable) and (iii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

91.    Upon the Effective Date, Meta Advisors shall be the Plan Administrator.  Any successor to the Plan Administrator shall be selected by the current or former members of the

Creditors' Committee, if the Creditors' Committee is disbanded.  The Plan Administrator shall act for the Debtors and the Reorganized Debtors, as applicable, in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or sale director of the Debtors and the Reorganized Debtors, as applicable, shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Debtors and Reorganized Debtors, as applicable, and shall succeed to the powers of the Reorganized Debtors' managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors and the Reorganized Debtors, as applicable.  The foregoing shall not limit the authority of the Debtors, Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Debtors, Reorganized Debtors, as applicable and the Purchaser.  After the Confirmation Date, the Debtors, Reorganized Debtors, or Plan Administrator, as applicable, shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court.

**J.      Plan Implementation Authorization.**

92.      The Debtors or the Reorganized Debtors, as the case may be, and their respective directors, officers, members, agents, and attorneys, financial advisors, and investment bankers are authorized and empowered from and after the date hereof to negotiate, execute, issue, deliver,

implement, file, or record any contract, instrument, release, or other agreement or document related to the Plan, as the same may be modified, amended and supplemented, and to take any action necessary or appropriate to implement, effectuate, consummate, or further evidence the Plan in accordance with its terms and the terms hereof, or take any or all corporate actions authorized to be taken pursuant to the Plan or this Confirmation Order, whether or not specifically referred to in the Plan or any exhibit thereto, without further order of the Bankruptcy Court.  To the extent applicable, any or all such documents shall be accepted upon presentment by each of the respective state filing or recording offices and filed or recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law.  Pursuant to section 303 of the General Corporation Law of the State of Delaware and any comparable provision of the business corporation laws of any other state, as applicable, no action of the Debtors or Reorganized Debtors' boards of directors will be required to authorize the Debtors or Reorganized Debtors, as applicable, to enter into, execute and deliver, adopt or amend, as the case may be, any such contract, instrument, release, or other agreement or document related to the Plan, and following the Effective Date, each of the Plan documents will be a legal, valid, and binding obligation of the Debtors or Reorganized Debtors, as applicable, enforceable against the Debtors and the Reorganized Debtors in accordance with the respective terms thereof.  The Reorganized Debtors may also, consistent with the Plan, take any additional steps on and after the Effective Date to consolidate and streamline their organization, including, among other things, the merger, liquidation, or consolidation of one or more of the Debtors or Reorganized Debtors.

**K.    Cancellation of Notes, Instruments, Certificates, and Other Documents.**

93.    On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or

obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised.

**L.**     **Approval of Consents and Authorization to Take Acts Necessary to Implement Plan.**

94.     This Confirmation Order shall constitute all authority, approvals, and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, or agreements, and any amendments or modifications thereto.

**M.**     **The Settlement and Release of the Settlement Parties by the Releasing Parties.**

**a.**   *The Settlement*

95.     The following Settlement, as set forth in the Plan including under Article X.A and incorporated into this Confirmation Order in its entirety, and each component of the Settlement (including the findings of facts and conclusions of law regarding the Settlement as set forth in Section I of this Confirmation Order), are hereby approved, authorized and so-ordered in all respects pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019:

**Pursuant to the Settlement, upon the Settlement Effective Date, (a) the Debtors and each of their respective current and former officers, directors, members, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity of such, shall be deemed released and discharged by each other Releasing Party from any and all Settled Claims, and (b) Sun Capital shall be deemed released and discharged by each other Releasing Party from the Settled Claims.  The Settlement provided for herein, including the payment of the Settlement Amount, and the distributions and other benefits provided for under the Plan, including the release of all Settled Claims as set forth above, the releases set forth in Article X.D and E and the exculpation set forth in Article X.F, shall be in full satisfaction of all Settled Claims, regardless of whether any of the foregoing Settled Claims are identified herein or could have been asserted.**

96.     Notwithstanding any non-occurrence of the Effective Date, upon the Settlement Effective Date, such order shall serve as a separate or independent order approving the Settlement in all respects and the releases provided in connection with the Settlement as set forth in paragraph 95 above and in Article X.A of the Plan shall be valid and binding upon the Settlement Effective Date whether or not the Effective Date occurs.

97.     The compromises and settlements embodied in the Settlement constitutes a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The Plan is deemed a motion to approve the good-faith compromise and settlement pursuant to which the Settlement Parties settle all Claims, Interests, and Causes of Action pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan.

98.     This Confirmation Order constitutes the Court's approval of the Settlement, as well as a finding by the Court that the Settlement is in the best interests of the Debtors, their Estates, and the Holders of Claims, Interests, and Causes of Action, and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.

**b.   *All Third-Party Release "Opt-Out" Objections Overruled.***

99.     Other than as specifically noted in this Confirmation Order, the Settlement and the release of the Settlement Parties in Article X.A of the Plan shall be binding on all Holders of Claims and Interests including all such Holders that filed objections to the Third-Party Release by seeking to "opt-out" from being a "Released Party" or "Releasing Party" under the Plan, with all such objections being expressly overruled as to the Settlement.

**N.     The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.**

100.    The following releases, injunctions, exculpations, and related provisions set forth in Article X of the Plan are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action on the part of this Bankruptcy Court or any other party:

**c.   *Debtor Release.***

101.    **Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, Plan Administrator, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, Plan Administrator, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any**

Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

(a) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Documents;

(b) any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the New Shopko Interests) pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d) the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any

42

Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

    **d.** *Release by Holders of Claims or Interests.*

102. **Except as otherwise ordered by the Bankruptcy Court on or before Confirmation, as of the Effective Date, each Releasing Party is deemed to have released and discharged each other Released Party, including the Debtors or Reorganized Debtors, as applicable, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:**

    **(a) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the other Restructuring Documents;**

    **(b) any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;**

    **(c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the**

issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d) the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

e. *Exculpation*.

103.    Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Settlement, the Asset Sales, the Asset Purchase Agreement, the Exit Facility Credit Agreement, the Exit Facility Documents, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and

implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

f.  *Injunction*.

104.    **Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan and/or the Settlement, are permanently enjoined, from and after the Effective Date, or with respect to the Settlement Parties from and after the Settlement Effective Date, from taking any of the following actions against, as applicable, the Debtors or Reorganized Debtors, the Settlement Parties, or the other Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with**

**or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan and/or the Settlement.**

O.    **Indemnification.**

105.    The Court hereby denies the Debtors' request for authorization of the Debtors to indemnify any Insured Person for Loss (as such terms are defined in the D&O Liability Insurance Policies).

P.    **Assumption and Cure of Executory Contracts and Unexpired Leases.**

106.    The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article V of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption or rejection, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.

107.    For the avoidance of doubt, on the Confirmation Date, except otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts and Unexpired Leases shall be deemed rejected in accordance with the provisions and

requirements of sections 365 and 1123 of the Bankruptcy Code, effective as of the Effective Date, other than any Executory Contract or Unexpired Lease that: (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (e) is a D&O Liability Insurance Policy.  Unless otherwise specified on a schedule to the Plan or Plan Supplement notice sent to a given party, each Executory Contract and Unexpired Lease listed or to be listed thereon shall include any and all modifications, amendments, supplements, restatements and other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed thereon.

108.    Unless a party to an Executory Contract objects to the cure amounts identified in the Plan Supplement and any amendments thereto, as applicable, the Debtors shall pay such cure amounts in accordance with the terms of the Plan and the assumption of any Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any disputed cure amounts shall be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law.

**Q.**    **Rejection of Executory Contracts and Unexpired Leases.**

109.    The Plan Supplement constituted sufficient notice of the rejection of the store leases listed thereon.  This Confirmation Order constitutes approval of such assumptions or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Plan Supplement pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the effective date of rejection (the "Rejection Date") for each lease of non-residential real property shall be the date mutually agreed to by the Debtors and the landlord or, if not mutually agreed, the later of (i) the Effective Date, and (ii) the date the Debtors relinquish control of the premises by notifying the affected landlord in writing of the Debtors' surrender of the premises and (A) turning over keys, key codes, and security codes, if any, to the affected landlord or (B) notifying the affected landlord in writing that the keys, key codes, and security codes, if any, are not available, but the landlord may rekey the leased premises.

110.    Pursuant to 11 U.S.C. § 554(a), the Debtors are authorized to abandon, and are deemed to have abandoned, any remaining personal property located in a store associated with the rejected Unexpired Lease as of the Rejection Date (the "Abandoned Property").  Landlord counterparties may, in their sole discretion and without further delay, notice to any party, or order of this Bankruptcy Court, utilize and/or dispose of such Abandoned Property without notice or liability to the Debtors or any third parties and, to the extent applicable, the automatic stay is modified to allow such disposition.  Landlord counterparties reserve any and all rights to assert Claims for any costs of disposing of such Abandoned Property in accordance with the Plan, and the Debtors, the Creditors' Committee and other parties in interest reserve any and all rights to object to any such claims.

**R.      Provisions Governing Distributions.**

111.    The distribution provisions of Article VI of the Plan shall be, and hereby are,

approved in their entirety.  Except as otherwise set forth in the Plan or this Confirmation Order,

the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable, shall make all

distributions required under the Plan.  The timing of distributions required under the Plan or this

Confirmation Order shall be made in accordance with and as set forth in the Plan or this

Confirmation Order, as applicable.

**S.      Release of Liens.**

112.    Except as otherwise specifically provided in this Confirmation Order, the Plan, or

in any contract, instrument, release, or other agreement or document created pursuant to the Plan,

or executed in connection therewith, to implement the Plan, the mortgages, deeds of trust, Liens,

pledges, encumbrances, or other security interests against any property of the Debtors' Estates or

rights related to any Claim or Interest shall be terminated, null and void, and of no effect.  Subject

to the funding of the Professional Fee Escrow Account, all Liens securing the Prepetition ABL

Claims, DIP Claims, Term Loan Secured Claims, or any other Obligations (as defined in the DIP

Agreement) shall continue in full force and effect on and after the Effective Date and nothing in

this Confirmation Order shall or shall be construed to release, discharge, relieve, limit or impair in

any way the rights of any Holder of a Prepetition ABL Claims, DIP Claims, or Term Loan Secured

Claims or any Lien securing any such Claim.  The provisions of the Lien Releases are appropriate,

fair, equitable and reasonable and in the best interests of the Debtors, their Estates, and Holders of

Claims and Interests.

**T.      Post-Confirmation Notices, Professional Compensation, and Bar Dates.**

113.    In accordance with Bankruptcy Rules 2002 and 3020(c), no later than ten Business

Days after the Effective Date, the Reorganized Debtors must cause notice of Confirmation and

49

occurrence of the Effective Date (the "Notice of Effective Date") to be served by United States

mail, first-class postage prepaid, by hand, by overnight courier service, or by electronic service to

all parties served with the Confirmation Hearing Notice; *provided*, that no notice or service of any

kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a

Confirmation Hearing Notice but received such notice returned marked "undeliverable as

addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason,

unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that

Entity's new address.  For those parties receiving electronic service, filing on the docket is deemed

sufficient to satisfy such service and notice requirements.

114.   To supplement the notice procedures described in the preceding sentence, no later

than 10 Business Days after the Effective Date, the Reorganized Debtors must cause the Notice of

Confirmation, modified for publication, to be published on one occasion in *USA Today* (national

edition).  Mailing and publication of the Notice of Effective Date in the time and manner set forth

in this paragraph will be good, adequate, and sufficient notice under the particular circumstances

and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice

is necessary.

115.   Solely for purposes of lien recordation, the Notice of Effective Date will have the

effect of an order of the Bankruptcy Court, will constitute sufficient notice of the entry of this

Confirmation Order to filing and recording officers, and will be a recordable instrument

notwithstanding any contrary provision of applicable non-bankruptcy law.

116.   Professionals or other Entities asserting a Professional Fee Claim for services

rendered prior to the Confirmation Date must File an application for final allowance of such

Professional Fee Claim no later than 45 days after the Effective Date.  The Reorganized Debtors

shall pay Professional Fee Claims in Cash in the amount this Bankruptcy Court allows, including

from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

117.    Except as otherwise provided in the Plan, requests for payment of Administrative Claims must be Filed no later than the Administrative Claim Bar Date.  Holders of Administrative Claims that are required to File and serve a request for such payment of such Administrative Claims that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any action by the Bankruptcy Court.

118.    Notwithstanding any provision of the Plan or this Confirmation Order to the contrary, counterparties to Assumed Executory Contracts or Unexpired Leases who (a) have filed an objection to the Debtors' proposed Cure Claim pursuant to the Disclosure Statement Order or (b) agree with the Cure Claim listed by the Debtors in the Schedule of Assumed Executory Contracts and Unexpired Leases (as amended, supplemented, or modified from time to time), shall not be required to assert an Administrative Claim for such asserted Cure Claims.

**U.      Notice of Subsequent Pleadings.**

119.    Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date will be limited to the following parties:  (a) the Reorganized Debtors and their counsel; (b) the U.S. Trustee; (c) the DIP Lenders, (d)  any party known to be directly affected by the relief sought by such pleadings; and (e) any party that specifically requests additional notice in writing to the Debtors or Reorganized

Debtors, as applicable, or files a request for notice under Bankruptcy Rule 2002 after the Effective

Date.  The Notice and Claims Agent shall not be required to file updated service lists.

**V.      Section 1146 Exemption.**

120.    Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property

pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee,

intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage

recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or

governmental assessment, to the fullest extent contemplated by section 1146(a) of the Bankruptcy

Code, and upon entry of this Confirmation Order, the appropriate state or local governmental

officials or agents shall forgo the collection of any such tax or governmental assessment and accept

for filing and recordation any of the foregoing instruments or other documents pursuant to such

transfers of property without the payment of any such tax, recordation fee, or governmental

assessment.

**W.      Preservation of Causes of Action.**

121.    Except as otherwise provided in the Plan or this Confirmation Order (including the

Settlement, Debtor Release, the Vendor/Landlords Release, and the Third-Party Release) or in any

contract, instrument, release or other agreement entered into or delivered in connection with the

Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors

shall have vested in them as of the Effective Date, and the Reorganized Debtors shall retain and

may enforce, any claims, demands, rights, defenses and causes of action that the Debtor or the

Estate may hold against any Entity.  Each Reorganized Debtor or its successor may pursue such

retained claims, demands, rights, defenses or causes of action, as appropriate, and may settle such

claims after the Effective Date without notice to parties in interest or approval of this Bankruptcy

Court.

### X.      Reports.

122.      After the Effective Date, the Debtors, Reorganized Debtors, and Plan Administrator, as applicable, will have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtors were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, and monthly or quarterly reports for Professionals; *provided* that the Debtors will comply with the U.S. Trustee's quarterly reporting requirements.  From Confirmation through the Effective Date the Debtors will file such reports as are required under the Local Bankruptcy Rules.

### Y.      Effectiveness of All Actions.

123.      Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, before, or after the Effective Date pursuant to this Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the Debtors and/or the Reorganized Debtors and their respective directors, officers, members, or stockholders, and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

### Z.      Binding Effect.

124.      On the date of and after entry of this Confirmation Order and subject to the occurrence of the Effective Date (other than the terms of the Settlement and the Vendor/Landlords Release which shall be effective on the Settlement Effective Date), the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties

to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors; *provided* that the Settlement and the releases provided in connection with the Settlement and the Vendor/Landlords Release shall become effective on the Settlement Effective Date.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or Interest has voted on the Plan.

125.    Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders entered in the Chapter 11 Cases, all documents and agreements executed by the Debtors as authorized and directed thereunder and all motions or requests for relief by the Debtors pending before this Bankruptcy Court as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Reorganized Debtors and their respective successors and assigns.

126.    The Plan, all documents and agreements executed by the Debtors in connection therewith, this Confirmation Order, and all prior orders of the Bankruptcy Court in the Chapter 11 Cases shall be binding against and binding upon and shall not be subject to rejection, modification, or avoidance by any Chapter 7 or Chapter 11 trustee appointed in any of the Chapter 11 Cases or any Successor Cases (as defined in the DIP Orders).

## AA.    Claims Reconciliation Process.

127.    The procedures and responsibilities for, and costs of, reconciling Disputed Claims shall be as set forth in the Plan or as otherwise ordered by the Bankruptcy Court.

## BB.    Release Matters.

128.    The following parties shall be deemed to have opted out of the third-party release under Article X.E of the Plan, and are not "Releasing Parties" except with respect to the Settlement

Parties:  Marshall Pottery [Docket No. 965]; Oracle America, Inc., successor in interest to BEA

Systems, Inc., MICROS Systems, Inc., and Hyperion Systems Solutions, Inc. and Oracle Credit

Corporation ("Oracle") [Docket Nos. 978/1441]; Sobel Westex, Inc. [Docket No. 970]; and I.J.K.

Limited [Docket No. 1167].

## CC.   Certain Claim Matters.

129.   To the extent a Holder of an Administrative or Priority Claim timely filed an

objection to the Plan on account of section 1129(a)(9) of the Bankruptcy Code, or is otherwise

specifically listed below, (each a "Specified Claim Objector"), and except to the extent that an

Administrative or Priority Claim has already been paid during the Chapter 11 Cases or a Holder

of an Allowed Administrative or Priority Claim and the Debtors agree to less favorable treatment,

each such Holder of an Allowed Administrative or Priority Claim shall receive in full satisfaction

of its Allowed Administrative or Priority Claim, Cash equal to the amount of such Allowed

Administrative or Priority Claim within no more than 30 days of such allowance.  For the

avoidance of doubt, the Specified Claim Objectors are limited to:  Hilsinger Company [Docket

No. 788]; Patton Group Limited Partnership [Docket No. 936]; Quincy 28-13, LLC [Docket No.

937]; Cole SH L'Anse MI, LLC [Docket No. 940]; ARCP SH Larned KS, LLC, VEREIT SH

Nephi UT, LLC, ARCP SH Valentine NE, LLC, ARCP SH Broken Bow NE, LLC, VEREIT SH

Cokota MN, LLC, VEREIT SH Cherokee IA, LLC, VEREIT SH Webster City IA, LLC, and

VEREIT SH Ballard UT, LLC [Docket No. 941]; National Retail Properties, Inc., Realty Income

Corporation, Haile Tekle and Hiwot Tekle, and St. Croix Trail, LLC [Docket No. 942]; SFI

Limited Partnership 100 [Docket Nos. 949/1406]; Elizabeth Trainor LLC [Docket No. 952];

Flintlock Capital, LLC [Docket No. 953]; Menasha, LLC, RMD Menasha, LLC, E&A Menasha,

LLC, and Genna Menasha, LLC, as tenants in common [Docket No. 954]; Robin Manitowoc, LLC

and Bobo Manitowoc, LLC, as tenants in common [Docket No. 956]; Ellsworth, LLC [Docket No.

957]; Blue Buffalo Company, Ltd. [Docket No. 959]; SHS Building, LLC, Boise Shopko LLC,

GFS Building, LLC, and Foothill Shadows, LLC [Docket No. 966]; Thompson Associates Corp.

[Docket No. 968]; Lund 144 Center, LLC and Overland Wolf Building Partnership [Docket No.

969]; SVK Capital, LLC [Docket No. 973]; 5 G Corporation [Docket No. 974]; Oracle [Docket

Nos. 978/1441]; Ron's Supermarket, Inc. [Docket No. 979]; Capview Income & Value Fund IV,

LP [Docket No. 980]; Menard, Inc. [Docket No. 984]; Payless ShoeSource, Inc. [Docket Nos.

1047/1056]; Well Nampa, LLC [Docket No. 1140]; Spirit SPE Portfolio 2006-1, LLC and Spirit

Portfolio 2006-2, LLC [Docket No. 1164]; Spectrum America Supply Chain Solutions Inc.

[Docket No. 1240]; iStar Jewelry, LLC [Docket No. 1247]; BrainStorm Products, LLC [Docket

No. 1301]; Beaver Development LLC [Docket No. 1374]; Davidson Children's Trust 1 and 2

[Docket Nos. 1376/1423]; Harr Properties [Docket No. 1409]; FIDC XXIII LLC, FIDC XXX

LLC, FIDC XXXVI LLC, and FIDC 50 LLC [Docket No. 1422]; Kranthi Realty LLC [Docket

No. 1425]; McKesson Corporation [Docket No. 1431]; Halbert Family Trust [Docket No. 1434];

East E Street Realty, LLC [Docket No. 1438]; higi SH LLC; Column Financial, Inc., with respect

to those certain ground and operating leases relating to Debtor store numbers 70,72,73 and 91

[Docket Nos. 851/1164]; TRC Master Fund LLC [Docket No. 1477], Tianjin QianBaiyi Furniture

Co. LTD [Docket No. 1532]; Sixteenth Street Development [Docket No. 1534]; the filers of the

Employee Objection [Docket No. 1440]:  Brooke Hutchison, Trudy Koch, Jenelle Yaunk, Susan

Craft, and Daniel Fleeman; and the following individuals: Krista Gardner, Chris Bailey, Patricia

Brock, Shaton Back, Karen Lowery, Temple Moser, Cindy Funke, Jason Bailey, Kristi Van

Beckum, Rita Ruth Carson, Crystal Cooper, Christopher Lebutzki,  Abigail Reger, Justin Crockett,

Kristin A. Higgins, Jennie Ostler, Lara McCloe, Brandalee Glowac, Harold Davies, Wendy

Stammers, Michael Schreiner, Emily Reger, Shawn Plienis, Melanie J. Pickell, Christine Keys,

Tyler Splinter, Sara Huwaldt, Priscilla Mendiola, Mary Jones, Brooklyn Henderson, Julie Kelly,

Amber Brill, Carol Neneman, Christine Cook, Danielle Stachewicz, Diane Cherubini, Gina Brownell-Adametz, Heather Dee Book, Janet Michelle Bird, Karen Rogers, Kathleen Walsh Karle, Laurie Renee Lawrence, Leah Carty-Blanton, Melissa Jo Stamp, Nola M Allen, Patricia Berardi, RaeDean Stamp, Robert Warren Farr, Sandra Anderson, Savannah Lea Williams, Teresa Lynn Dearing, Thomas Hayenga, Twila Taylor, Penny Lynn Smuin, Karen Lynn Dougherty, Lisa Marie Barnes, and Gale McKinney (the "Represented Employees"); to the extent this Court authorizes the formation of a class of employees that includes the Represented Employees and those similarly situated (the "Putative Employee Class"), the Putative Employee Class shall be deemed to be a Specified Claim Objector; and Spirit Master Funding III, LLC and Spirit Master Funding VIII, LLC.

**DD. Surety Claim Matters.**

130.    Notwithstanding Article II.A. of the Plan, to the extent a surety with valid and enforceable subrogation rights, including a presently contingent valid and enforceable subrogation right,  timely filed an objection to the Plan on account of section 1129(a)(9) of the Bankruptcy Code (each a "Surety Claim Objector"), and such Surety Claim Objector is or becomes entitled to an Allowed Administrative Claim or Priority Claim on account of such rights (the "Surety Claim"), except to the extent that such Surety Claim has already been paid during the Chapter 11 Cases or a Holder of such Allowed Surety Claim and the Debtors agree to less favorable treatment, each such Holder of an Allowed Surety Claim shall receive in full satisfaction of its Allowed Surety Claim, Cash equal to the amount of such Allowed Surety Claim, which may be paid from the Administrative Claims Reserve or the Priority Claims Reserve, as applicable.  For the avoidance of doubt, the Surety Claim Objector is limited to Westchester Fire Insurance Company.

**EE.    Priority Tax Claim Matters.**

131.    To the extent a Holder of a Priority Tax Claim timely filed an objection to the Plan on account of section 1129(a)(9) of the Bankruptcy Code (each a "Tax Claim Objector"), and except to the extent that a Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment, each such Holder of an Allowed Priority Tax Claim shall receive in full satisfaction of its Allowed Priority Tax Claim, Cash, on terms in accordance with the requirements of section 1129(a)(9)(C), equal to the amount of such Allowed Priority Tax Claim.  For the avoidance of doubt, the Tax Claim Objectors are limited to:  the State of Ohio, Department of Taxation, Ohio Bureau of Workers' Compensation, and Ohio Department of Job and Family Services (collectively, the "Ohio Taxing Authorities") [Docket No. 893] and the State of Wisconsin, Department of Revenue [Docket No. 767].  The Ohio Taxing Authorities shall be deemed to have opted out of the third-party release under Article X.E of the Plan, except with respect to the Settlement Parties.

**FF.    Certain Texas Tax Claim Matters.**

132.    Notwithstanding any other provisions contained in the Plan or this Confirmation Order, with respect to the claims filed by Texas Taxing Authorities,[3] the Reorganized Debtor shall pay the Texas Taxing Authorities' Allowed Other Secured Claims no later than 30 days after the the expiration of the Claims Objection Bar Date if no objection to the Texas Taxing Authorities' Other Secured Claim has been Filed; provided that, if an objection to the Texas Taxing Authorities' Other Secured Claim is Filed, any such Claim shall be paid no later than 15 days following the date, if any, the Bankruptcy Court enters a Final Order determining such Claim is an Allowed

---

[3]    "Texas Taxing Authorities" in this paragraph includes the following parties:  County of Bosque, County of Brewster, Cotulla Independent School District, Jack County Appraisal District, County of La Salle, County of Ward, and County of Winkler.

Other Secured Claim.  The Texas Taxing Authorities shall retain their valid and enforceable liens for these taxes (as ultimately Allowed) with the same validity, extent and priority under Texas state law upon the proceeds from the sale of their collateral, regardless of whether such proceeds are held by the Debtors or another party, until all the Texas Taxing Authorities' Allowed Other Secured Claims are paid in full.  If the Texas Taxing Authorities' Allowed Other Secured Claims are not paid in full on or before January 31, 2020, then they shall be entitled to be paid with interest at the rate of one percent per month from the Effective Date of the Plan.

**GG.  Certain Texas Tax Claim Matters.**

133.    Notwithstanding any other provisions contained in the Plan or this Confirmation Order, with respect to the claims filed by Texas Taxing Authorities,[4] the Reorganized Debtor shall pay the Texas Taxing Authorities' Allowed Other Secured Claims within 30 days after the Allowance of such Claims.  The Texas Taxing Authorities shall retain their valid and enforceable liens for these taxes (as ultimately Allowed) with the same validity, extent and priority under Texas state law upon the proceeds from the sale of their collateral, regardless of whether such proceeds are held by the Debtors or another party, until all the Texas Taxing Authorities' Allowed Other Secured Claims are paid in full.  If the Texas Taxing Authorities' Allowed Other Secured Claims are not paid in full on or before January 31, 2020, then they shall be entitled to be paid with interest at the rate of one percent per month from the Effective Date of the Plan.

**HH.  Texas Comptroller Matters.**

134.    Notwithstanding any term in the Plan or this Confirmation Order to the contrary:

(a) the Texas Comptroller of Public Accounts' (the "Comptroller") and Texas Workforce

---

[4]    "Texas Taxing Authorities" in this paragraph includes the following parties: The County of Bosque, Texas and The County of Brewster [Docket 740]; and Andrews County Tax Office, Andrews Independent School District, Brewster County Tax Office, Lamb County Appraisal District, Presidio County Tax Office, Dallam County Appraisal District, Dallam County Tax Office, Ochiltree County Appraisal District, and Baylor County Appraisal District [Docket No. 1119]

Commission's ("TWC") setoff rights are preserved under section 553 of the Bankruptcy Code; (b) to the extent the Comptroller's or TWC's Allowed Priority Tax Claims, if any, are not paid in full in Cash on the Effective Date, such Priority Tax Claims shall, at a minimum, be paid by regular, monthly installment payments in cash over a period not to exceed five years after the date of the order for relief under section 301 of the Bankruptcy Code, all as required section 1129(a)(9)(C) of the Bankruptcy Code, along with interest in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, as applicable; (c) the chapter 11 cases shall have no effect on the Comptroller's or TWC's rights as to non-debtor third parties other than with respect to the Settlement Parties; (d) neither the Comptroller nor TWC shall be required to file any proofs of claim or requests for payment in the Debtors' chapter 11 cases for any liability described in section 503(b)(1)(B) and (C) of the Bankruptcy Code and such liabilities shall be determined, resolved, and paid when due under and in accordance with the laws of the state of Texas; and (e) the Comptroller and TWC may amend any Proof of Claim against any Debtor after the Effective Date without leave.

## II.    Certain Setoff Matters.

135.    For the avoidance of doubt, nothing in the Plan or Confirmation Order shall modify the rights, if any, of National Retail Properties, Inc., Realty Income Corporation, Haile Tekle and Hiwot Tekle, and St. Croix Trail, LLC [Docket No. 942]; Sobel Westex, Inc. [Docket No. 970]; H20 Furnishings, LLC [Docket No. 975]; Capview Income & Value Fund IV, LP [Docket No. 980]; J.M. Smucker Company and Ainsworth Pet Nutrition, LLC [Docket No. 1368]; and Halbert Family Trust [Docket No. 1434] to assert any right of setoff or recoupment that such parties may have pursuant to applicable bankruptcy or non-bankruptcy law, and all rights and defenses of the Debtors or Reorganized Debtors related thereto shall be preserved.

**JJ.    Cigna Contracts.**

136.    Prior to and following the Petition Date, Cigna Health and Life Insurance Company ("Cigna") performed administrative services for Debtors' self-insured employee healthcare benefits plan pursuant to the ASO Agreement.   Under the ASO Agreement, Cigna processes healthcare claims of Debtors' employees ("Employee Healthcare Claims"), and causes the Employee Healthcare Claims that are eligible for payment under the Plan ("Payable Claims") to be funded by the Debtors through Debtors' segregated non-interest bearing Plan bank account at JPMorgan Chase Bank, N.A., account number ending in 3367 ("Plan Bank Account").

137.    Prior to and following the Petition Date, Life Insurance Company of North America provided group insurance benefits for Debtors' employee benefits plan under a Blanket Accident Policy effective January 1, 2009, including all amendments, riders, schedules, certificates, renewal caveats and addendums related thereto ("LINA Policy").

138.    The Debtors have terminated the ASO Agreement and the LINA Policy effective as of June 30, 2019 ("Termination Date").   However, the Debtors have elected to fund Employee Healthcare Claims that will have been incurred, but not submitted, processed and paid prior to the Termination Date ("Run-Out Claims"), for the twelve-month period following the Termination Date, and have provided for the funding of the Run-Out Claims in the Wind-Down Budget.

139.    To facilitate payment of the Run-Out Claims, to resolve the *Objection of Cigna to Debtors' Second Amended Joint Chapter 11 Plan* [Docket No. 1159], and based on the agreement of Debtors and Cigna:

(i)    As of the Effective Date, control of the Plan Bank Account shall be transferred to the Plan Administrator.

(ii)    Following the Effective Date, the Plan Administrator shall perform all of the Debtor's obligations under the ASO Agreement, including the obligation to fund the payment of eligible Run-Out Claims ("Run-Out Claims Obligations").

(iii)   During any period between the Effective Date of the Plan and the Termination Date, Cigna shall process the Employee Benefits Claims received between the Effective Date and the Termination Date, in accordance with the ASO Agreement, and shall cause Payable Claims to be paid to the extent that a sufficient balance remains in the Plan Bank Account to fund such payment.

(iv)   Following the Termination Date, Cigna shall process Run-Out Claims that are submitted to Cigna between the Termination Date and June 30, 2020 ("Run-Out Claims Termination Date"), in accordance with the ASO Agreement, and shall cause such Run-Out Claims that are Payable Claims to be paid to the extent that a sufficient balance remains in the Plan Bank Account to fund such payment.

(v)   Cigna shall not be required to process Run-Out Claims received after the Run-Out Claims Termination Date, or to cause the payment of any Payable Claims to the extent that the balance of the Benefits Plan Bank Account is insufficient to fund the payment of such claims.

(vi)   If, at any time, the Plan Administrator fails to meet the Run-Out Claims Obligations, Cigna shall cease the processing and payment of Run-Out Claims and shall promptly notify the Plan Administrator of such failure and the amount ("Funding Amount") necessary to meet the then-current Run-Out Claims Obligations.  If the Funding Amount is not deposited into the Plan Bank Account within five (5) business days of the aforementioned notification, all Run-Out Claims not previously processed and paid, will not be processed or paid, and Cigna shall have no further obligations under the ASO Agreement.

(vii)   Not later than August 15, 2020, the Plan Administrator, with the cooperation of Cigna, shall take necessary action to transfer any balance remaining in the Plan Bank Account, less any outstanding check liability (the "Plan Bank Account Balance"), to a bank account designated by the Plan Administrator.

(viii)   Provided that Cigna has completed its obligations hereunder, Cigna's responsibilities under the ASO Agreement shall be deemed fully performed as of the Run-Out Termination Date, and Cigna shall be deemed released from any liability, including liability under 11 U.S.C. § 547, 548, 549 and 550, arising from or relating to the ASO Agreement.

(ix)   Notwithstanding anything in the Plan or this Order to the contrary: (i) the ASO Agreement shall be assumed, provided, however, in lieu of cure, any accrued and unpaid obligations shall pass through confirmation of the Plan and survive assumption, so that nothing in this Order or 11 U.S.C. § 365 shall affect the parties' obligations under the ASO Agreement; and (ii) the LINA Policy shall not be assumed or rejected under the Plan, but shall be deemed to have passed through confirmation of the Plan and validly terminated effective as of the Termination Date.

**KK.** **Chubb Insurance Contracts.**

140. Notwithstanding anything to the contrary in this Confirmation Order, the Plan (including, without limitation, Articles V.E and VI.I thereof), the Restructuring Documents, any bar date notice or claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, requires a party to opt out of any releases, or confers Bankruptcy Court jurisdiction):

(i)     On the Effective Date, each of the insurance policies that were issued at any time by ACE American Insurance Company, Federal Insurance Company and/or each of their affiliates and successors (collectively, the "Chubb Companies") to the Debtors (each as amended, modified or supplemented and together with any agreements, instruments, exhibits or addenda thereto, including any D&O Liability Insurance Policies issued by the Chubb Companies, collectively, the "Chubb Insurance Contracts") shall be assumed pursuant to sections 105 and 365 of the Bankruptcy Code and the Plan Administrator shall be liable in full for all of the obligations thereunder, regardless of when they arise;

(ii)    nothing shall alter, modify, amend, affect, impair or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Debtors (or, after the Effective Date, the Plan Administrator), the Chubb Companies, or any other individual or entity, as applicable, under the Chubb Insurance Contracts; any such rights and obligations shall be determined under the Chubb Insurance Contracts and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred;

(iii)   nothing alters or modifies the duty, if any, that the Chubb Companies have to pay claims covered by the Chubb Insurance Contracts and their rights, if any, under the Chubb Insurance Contracts to seek payment or reimbursement from the Debtors (or after the Effective Date, the Plan Administrator) or draw on any collateral or security therefor, regardless of whether a claim arises before or after the Effective Date, and without the need or requirement for the Chubb Companies to file or serve any objection to a proposed cure amount, proof of claim, or a request, application, claim, proof or motion for payment or allowance of any Administrative Claim and shall not be subject to any bar date or similar deadline governing cure amounts, proofs of claim, or Administrative Claims; and

(iv)    the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article X.G. of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against the Chubb Companies under applicable non-bankruptcy law to proceed with their claims; (II) the Chubb

Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against the Chubb Companies under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) the Chubb Companies to draw against any or all of the collateral or security provided by or on behalf of the Debtors at any time and to hold the proceeds thereof as security for the obligations of the Debtors (or, after the Effective Date, the Plan Administrator) and/or apply such proceeds to the obligations of the Debtors (or, after the Effective Date, the Plan Administrator) under the Chubb Insurance Contracts, in such order as the Chubb Companies may determine; and (IV) the Chubb Companies to cancel any of the Chubb Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Chubb Insurance Contracts.

**LL.**    **Oracle Contracts.**

141.    Notwithstanding anything in the Plan or this Confirmation Order, in resolution of the objection and supplemental objection filed by Oracle, the Debtors will file an amended Schedule of Assumed Executory Contracts and Unexpired Leases to reflect that the contracts or license agreements with Oracle identified to be utilized by the Debtors after the Effective Date (the "Post Effective Date Contracts") will be assumed and cured, rather than included in the rejection notices. At the same time, Debtors also shall amend their rejection schedules to be mutually acceptable to Oracle and Debtors, to allow for clarification of certain inconsistencies in same. Oracle shall file its objection, if any, to the assumption of the Post Effective Date Contracts, including with regard to cure amounts, within three business days after same day service (electronic service acceptable) of the amended Schedule of Assumed Executory Contracts and Unexpired Leases. The Debtors and Oracle will work in good faith to determine the cure amounts owed, if any, under the Post Effective Date Contracts, and the Debtors will cure any monetary default determined to be owed under the Post Effective Date Contracts, including any going forward sums required to keep Oracle current during the extended period of use of the Post-

Effective Date Contracts. Oracle retains all rights to file an administrative, rejection or other claim against Debtors, and also retains its release opt out, except with respect to the Settlement Parties.

**MM.   Optical Sale Obligations.**

142.   On April 29, 2019, Shoptikal LLC, as purchaser, and Specialty Retail Shops Holding Corp., as seller, entered into that certain Asset Purchase Agreement (the "APA"). For the avoidance of doubt, nothing in this Confirmation Order or the Plan shall act as a release of any obligation of the APA parties pursuant to, or any Claim arising out of, the APA, the Transition Services Agreement (as defined in the APA), or any related document. In the event of any conflict between the Schedule of Rejected Executory Contract included in the Plan Supplement, the APA, and this Court's order approving the optical sale [Docket No. 1204] (the "Sale Order"), the provisions of the APA and Sale Order shall control.

**NN.       Jimco Claims.**

143.   The Debtors have reached a settlement and compromise with Jimco Lamp & Manufacturing Co. ("Jimco") to resolve Jimco's *Objection to Confirmation of Second Amended Joint Chapter 11 Plan of Specialty Retail Shops Holding Corp. and Its Debtor Affiliates* [Docket No. 931]. This settlement and compromise pursuant to and in connection with the Plan complies with the requirements of § 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. As part of the settlement, the parties have agreed to a release of the Debtors' chapter 5 claims and causes of action against Jimco, if any. Both parties acknowledge that the consideration exchanged provides value to the Debtors' bankruptcy estates and is explicitly intended to include a full, complete and final resolution of Jimco's liability, if any, for any and all transfers made by the Debtors to Jimco, whether prior to, on or after the Petition Date. On the Effective Date, the Debtors (on behalf of themselves, the bankruptcy estates, and any all successors and assigns of any kind, specifically including, without limitation, any bankruptcy trustees (chapter 7 or chapter 11), any

receivers, and any other fiduciaries to the company of any kind), do forever release, acquit and forever discharge Jimco from any and all claims, causes of action, and/or liability of any kind whatsoever, whether known or unknown, whether fixed or contingent, whether liquidated or unliquidated, whether disputed or undisputed, arising from, related to or in connection with (i) any and all transfers made by the Debtors to Jimco, whether prior to, on or after the Petition Date, and (ii) from any and all claims and causes of action that were or could have been asserted against Jimco under chapter 5 of the Bankruptcy Code.  For the sake of clarity, the Debtors' release, acquittal and discharge of Jimco's liability, if any, for any and all claims, causes of action, and/or liability of any kind whatsoever under chapter 5 of the Bankruptcy Code, as set forth herein, shall be binding on any and all of the Debtors' successors and assigns, specifically including, without limitation, any and all subsequently appointed bankruptcy trustees, receivers or fiduciaries of the Debtors of any kind.

**OO.    Sobel Westex Claims.**

144.    Sobel Westex, Inc. doing business as Baltic Linen ("Sobel") timely filed a proof of claim against ShopKo Stores Operating Co., LLC in the amount of $2,023,884.92 (the "Sobel POC") which has been designated Claim Number 1643 and which includes a section 503(b)(9) claim in the amount of $78,621.36, with the remainder being a general unsecured claim.  The Sobel POC is hereby allowed in full, and Sobel's section 503(b)(9) claim is allowed in its full amount of $78,621.36.  Notwithstanding anything to the contrary in the Plan or this Order, Sobel shall be deemed to have opted out of the third-party release under Article X.E of the Plan, except with respect to the Settlement Parties.  Notwithstanding anything to the contrary in the Solicitation Procedures Order, the Disclosure Statement, the Plan, any ballot for voting on the Plan, this Order, any amendment or supplement to any of the foregoing items, or in any document executed or delivered pursuant to or relative to the Plan or this Order including, without limitation,

any Plan Supplement, Exhibit, or trust agreement, any and all claims, demands, causes of action, damages, losses or rights that any of the Debtors, the Reorganized Debtors, or their respective trustee(s), plan administrator(s), litigation trustee(s), estate representative(s) or their respective successors or assigns may have against Sobel and/or its successors or assigns as a result of any matter, transaction or occurrence through the date hereof including (without limitation) any causes of action under sections 362, 502, 510, and 542-553 of the Bankruptcy Code are hereby waived, released, and forever discharged and are not retained under the Plan, and shall not be pursued.  The waiver, release and discharge set forth in the preceding sentence is binding on the Debtors, the Reorganized Debtors, any chapter 11 trustee, chapter 7 trustee, plan administrator, litigation trustee or estate representative for any of them, and any other person or entity appointed or empowered to pursue Sobel for any demands, causes of action, damages, losses or rights, and on all of their respective attorneys, agents, representatives, successors and assigns.  In consideration for the foregoing waiver, release and discharge, Sobel has agreed to accept $58,966.02 as payment in full of its allowed section 503(b)(9) claim and ShopKo Stores Operating Co., LLC shall pay such amount to Sobel upon the Effective Date.

**PP.    Payless Matters.**

145.    Notwithstanding anything in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, the Debtors shall continue to perform their obligations (including, but not limited, remitting payments and proceeds of sales) under that certain License Agreement, dated July 23, 1999, between Shopko Stores, Inc. and Payless ShoeSource, Inc. ("Payless") (as may be amended, modified or supplemented from time to time, the "1999 License Agreement") and that certain License Agreement (Washington Shopko Big Box Stores) between ShopKo Stores Operating Co. and Payless ShoeSource, Inc. (as may be amended, modified or supplemented from time to time the "Washington License Agreement" and together with the 1999 License Agreement,

the "Payless License Agreements") and the Payless License Agreements shall not be deemed rejected until the later of (i) June 30, 2019, (ii) the date by which have the Debtors have sold all Payless inventory in Debtors' possession under the License Agreements, or (iii) the date by which the Debtors have remitted to Payless all outstanding proceeds of sale or other payments required under the Payless License Agreements (the "Payless Rejection Date").  Payless shall be entitled to assert an Allowed Administrative Claim for any obligations due and owing to Payless pursuant to the License Agreements for the period between the Petition Date and the Payless Rejection Date that are not otherwise paid in the ordinary course of business.  Payless shall retain all rights with respect to its asserted Other Secured Claim in the amount of $2,227,333.88 (together with any of Payless' Allowed Administrative Claims, the "Payless Claim"), and the Debtors retain all rights (including any objections or defenses) with respect to such Payless Claim.  Until the Payless Claim is satisfied in full from any source of available recovery, Payless shall be deemed to "opt-out" of the releases in the Plan and shall not be a "Releasing Party" with respect to any claims arising out of or related to the Payless Claim up to the amount of the Payless Claim, other than with respect to the Settlement Parties (to the extent the Court approves such third-party releases).

**QQ.    American Asphalt Matters.**

146.   On April 3, 2019, American Asphalt of Wisconsin, a division of Mathy Construction Company ("American Asphalt"), filed its Limited Objection to confirmation of the Plan [Docket No. 906].  American Asphalt asserts a secured claim and statutory lien under Wisconsin construction lien law for work and improvements furnished under a contract with Debtor Shopko Stores Operating Co., LLC ("Shopko Stores") with respect to real estate located at 1100 East Riverview Expressway, Wisconsin Rapids, WI 54494 (the "Location").  The Debtors refer to their operating store at the Location as Store #00012.  As of the Petition Date, SMTA Shopko Portfolio I, LLC ("SMTA Shopko"), an affiliate of Spirit Realty L.P. and/or Shopko Note

68

Holding, LLC, owned at least a substantial portion of the real property located at the Location. Upon information and belief based on filings made in these bankruptcy cases, the real property owned by SMTA Shopko at the Location was sold in late March 2019 to an affiliate of Monarch Alternative Capital LP (Monarch Alternative Capital LP and all of its affiliates, including 1100 E. Riverview Expressway, LLC, the Monarch affiliate understood by American Asphalt to be the current owner of real property at the Location, will be referred to individually and collectively as "Monarch").  In addition to maintaining a leasehold interest with respect to the real property now-owned by Monarch at the Location, Shopko Stores also owns "2 Outlots" located at the Location.

147.    For the avoidance of doubt, and in resolution of the American Asphalt Limited Objection, nothing contained in the Plan or this Order, including without limitation Article IV(G)(7) and Articles X(B), X(D), X(F), and X(H) of the Plan, shall release, enjoin, extinguish, discharge, limit, prohibit, hinder, delay, or otherwise prejudice in any way the rights, claims, and/or Liens of American Asphalt, including the right to file and/or pursue notices, claims, and/or actions under applicable Wisconsin lien laws as against Monarch, SMTA Shopko, and/or any other non-Debtor owner of real property that is or becomes a proper party to any such claims or actions filed by American Asphalt with respect to the Location.

**RR.    Column Financial Matters.**

148.    Prior to the entry of this Order, the Debtors paid to Column Financial, Inc. ("Column") the sum of $375,000.00, (the "Deficiency Amount") which was on account of all then-unpaid amounts due and payable as of May 28, 2019, pursuant to section 365(d)(3) of the Bankruptcy Code in respect of four (4) ground lease properties operated by Column (or entities under its control) and leased to the Debtors (each a "CS Lease").

149.    The Debtors will promptly pay, with respect to each CS Lease, all unpaid postpetition amounts that have or become due and payable pursuant to section 365(d)(3) of the

Bankruptcy Code through the later of the date of the Debtors' (a) surrender of the property in the condition specified in the applicable CS Lease and (b) rejection of the CS Lease, as applicable (such date for each lease, the "Applicable Date").

150.    With respect to each CS Lease, the parties will reserve rights regarding Debtors' obligations relating to (i) January, 2019 rent, and (ii) any bill relating to a CS Lease that is received after the Applicable Date but which relates (all or partially) to the period prior to the Applicable Date (the amounts referenced in clauses (i) and (ii) hereof, the "Reserved Amounts").

151.    In the event the Deficiency Amount exceeds the then-unpaid amount that was actually due and payable under section 365(d)(3) of the Bankruptcy Code as of May 28, 2019, and the Debtors otherwise timely comply with their obligations under each CS Lease through the Applicable Date, Column will, (i) apply such excess to (a) the Reserved Amounts, if any, to the extent that the Reserved Amounts are deemed to be Allowed Administrative Claims (with the Debtors to promptly pay the deficiency, if any, and Column to promptly return the remainder to the Debtors, if any, after application to any such Allowed Administrative Claims); and/or (ii) promptly return such excess amount to the Debtors to the extent that the Reserved Amounts are not deemed to be Allowed Administrative Claims.

152.    In consideration of the payments and covenants described above, Column has withdrawn its objection to the Plan.

**SS.    CGP Matters.**

153.    CGP Canadian, Ltd., CGP Seymour, Ltd., CGSK Tulia, Ltd., CGP Orofino, LLC, CGP Comanche, Ltd., CGP Jacksboro, Ltd., CGP Cotulla, Ltd., CGP Prosser, LLC, and CGP Clifton, Ltd. (collectively, "CGP") shall not provide releases under Article X.A or Article X.E of the Plan with respect to (a) any causes of action arising out of or related to the facts (the "CGP Causes of Action") set forth in the complaint filed on May 6, 2019, at Docket No. 1 in the action

entitled *CGP Canadian, Ltd. et al v. Sun Capital Partners Group, Inc., et al.*, No. 19-80602

(DMM) (S.D. Fl. 2019) (the "<u>Complaint</u>") currently pending in the United States District Court

for the Southern District of Florida (the "<u>Florida Litigation</u>") as against (i) the defendants named

in the Complaint and (ii) Sun Capital (as defined in the Plan), provided that causes of action may

be asserted against an individual only with approval of a court of competent jurisdiction after a

showing of direct evidence of involvement by the individual in the facts set forth in the Complaint

((i) and (ii) collectively, the "<u>Sun Parties</u>") and (b) the Released Parties that are not Settlement

Parties.  For the avoidance of doubt, CGP shall be deemed a releasor and shall provide the third-

party releases under Article X.A and Article X.E of the Plan to (a) any Settlement Party that is not

a Sun Party, and (b) to the Sun Parties for all claims and causes of action other than the CGP

Causes of Action.

154.    After, but not later than 30 calendar days following, the Confirmation Date, the Sun

Parties shall have standing to and may file a motion in the Bankruptcy Court to obtain a

determination as to whether the CGP Causes of Action are or were:  property of the Debtors or

their Estates, subject to the automatic stay, and/or were released by the Debtors, the Reorganized

Debtors, the Plan Administrator, or their Estates under Article X.D of the Plan, to the extent

consistent with Section 1123(b)(3)(A) of the Bankruptcy Code (the "<u>Bankruptcy Motion</u>").  CGP

and the Sun Parties consent to the Bankruptcy Court's jurisdiction solely with regard to the

Bankruptcy Motion and agree to be subject to the Bankruptcy Court's ruling on the Bankruptcy

Motion (the "<u>Bankruptcy Court Ruling</u>"); provided, however, the parties reserve any right to

appeal the Bankruptcy Court Ruling and any right to seek a stay pending appeal of the Bankruptcy

Court Ruling.  CGP and the Sun Parties shall work in good faith on a briefing schedule for the

Bankruptcy Motion and shall use commercially reasonable efforts to obtain a Bankruptcy Court

Ruling within 90 days following the Settlement Effective Date.  CGP and the Sun Parties hereby

stipulate that (a) no party shall seek or take (or request Bankruptcy Court approval to seek or take) any discovery on the Bankruptcy Motion unless such discovery is ordered *sua sponte* by the Bankruptcy Court and (b) solely for purposes of the Bankruptcy Motion, the Bankruptcy Court shall apply the same standard as applicable to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when considering the allegations in the Complaint and whether it may consider evidence outside of the Complaint.  If the Bankruptcy Court denies the Bankruptcy Motion without prejudice, then the Sun Parties shall be free to assert the same arguments asserted in the Bankruptcy Motion in the Florida Litigation after further development of the factual record, and all of CGP's defenses to such arguments shall be preserved.

155.    It is hereby ordered, and the CGP and the Sun Parties so stipulate, that the proceedings in Florida Litigation shall be stayed, and the Sun Parties time to answer or otherwise respond to the Complaint shall be extended, until the earlier of (a) 30 days after the later to occur of entry of the Bankruptcy Court Ruling or expiration of any stay pending appeal of the Bankruptcy Court Ruling (to the extent obtained by a party), or (b) the expiration of the 30-day period for commencement of the Bankruptcy Motion if no such motion is filed.  CGP and the Sun Parties shall make any filings in the Florida Litigation necessary to memorialize this stay and extension of time to answer or otherwise respond to the Complaint.

156.    Notwithstanding anything herein to the contrary, nothing in this Order shall limit the defenses that can be asserted by the Sun Parties in the Florida Litigation.  CGP's consent to jurisdiction in the Bankruptcy Court for purposes of the Bankruptcy Motion shall not be deemed consent to jurisdiction in the Bankruptcy Court for any other purpose relating to the Causes of Action or the Florida Litigation.

157.    CGP and the Debtors further agree that, in full and final satisfaction of all Claims asserted in the applications of CGP [Docket Nos. 818, 819, 822, 823] (collectively, the "CGP

Applications") (a) CGP Canadian, Ltd. shall receive an Allowed Administrative Claim of

$2,455.36, (b) CGP Seymour, Ltd. shall receive an Allowed Administrative Claim of $13,298.97,

(c) CGSK Tulia, Ltd. shall receive an Allowed Administrative Claim of $11,707.26, and (d) CGP

Orofino, LLC shall receive an Allowed Administrative Claim of $14,246.56. Upon entry of this

Confirmation Order, the CGP Applications shall be deemed withdrawn with prejudice, and any

objection filed by the Debtors to the CGP Applications is deemed withdrawn solely with respect

to the CGP Applications. For avoidance of doubt, the foregoing payments shall not be in

satisfaction of any general unsecured claims of CGP in the Chapter 11 Cases.

**TT.  McKesson Matters.**

158.  McKesson Corporation ("McKesson") shall be deemed to have opted out of the

third-party releases authorized under Article X.A and Article X.E of the Plan, except with respect

to Sun Capital. Notwithstanding anything contained in the Plan or this Confirmation order, neither

the Plan nor the Confirmation Order affects McKesson's right to pursue any actions against any

non-Debtor entity, other than Sun Capital (the "McKesson Actions"). Neither the Plan nor this

Confirmation Order shall confer jurisdiction over the McKesson Actions to the Bankruptcy Court.

**UU.  Blackhawk Matters.**

159.  In final satisfaction of all disputes between Blackhawk Network, Inc. and

Blackhawk Network California, Inc. (together, "Blackhawk"), Blackhawk Engagement Solutions,

Inc. ("BES"), and the Debtors, including the claims and objections raised in Blackhawk's objection

to the Plan [Docket No. 1379] and proof of Claim [Claim No. 1275] (the "Blackhawk Proof of

Claim"), upon the Effective Date: (a) BES shall be authorized to setoff any amounts owed by the

Debtors against amounts BES owes to the Debtors and retain any remaining amounts held by BES

owed to the Debtors; (b) the Debtors shall release Blackhawk and BES from any and all claims,

causes of action, suits, debts, sums of money, controversies, claims to property, damages,

judgments, and demands whatsoever, in law or equity, known or unknown, asserted or unasserted, including any causes of action arising out of chapter 5 of the Bankruptcy Code; (c) Blackhawk and BES shall be deemed to have opted out of the third-party release under Article X.E of the Plan, except with respect to the Settlement Parties; and (d) Blackhawk shall receive an Allowed General Unsecured Claim in the amount asserted in the set forth in the Blackhawk Proof of Claim less the amount retained by BES pursuant to the foregoing clause (a).

**VV.**    **Provisions Relating to the Senior Note Claims and the Indenture Trustee.**

   **a.** *Payment of the Indenture Trustee Fees and Treatment of the Senior Note Claims*

160.    Notwithstanding anything in the Plan to the contrary or this Confirmation Order, on or as soon as reasonably practicable after the Settlement Effective Date, the Debtors or Reorganized Debtors (as applicable) shall pay the Indenture Trustee in Cash up to $200,000 of any reasonable and documented Indenture Trustee Fees incurred by the Indenture Trustee without the need for the Indenture Trustee to file fee applications with the Bankruptcy Court.  The Indenture Trustee shall not be entitled to assert any Claims for Indenture Trustee Fees against the Debtors or Reorganized Debtors in excess of $200,000, and shall waive any such Indenture Trustee Fee Claims against the Debtors or Reorganized Debtors in excess of $200,000; provided that the foregoing shall not affect or impair (i) the Claims asserted by the Indenture Trustee on behalf of the holders of the 9.25% Senior Notes due 2022 (the "Senior Note Claims") issued pursuant that certain Indenture dated March 12, 1992 (as amended, modified or supplemented) by and among Shopko Stores Operating Co., LLC, as Issuer, and the Indenture Trustee (the "Indenture"), which Claims shall be treated as Class 4 Claims to the extent Allowed, and (ii) the Indenture Trustee's right under the Indenture to exercise any lien or other priority in payment against distributions on account of the Senior Note Claims (the "Charging Lien").

161.    The Senior Note Claims shall be deemed to be Allowed General Unsecured Claims not subject to objection, challenge, reduction, offset, avoidance, setoff, recharacterization, impairment, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense or disallowance under applicable law in the amount of $5,744,934.12, which amount is exclusive of the Indenture Trustee Fees.

### b. *Survival of the Indenture for Limited Purposes and Discharge of the Indenture Trustee*

162.    Notwithstanding anything in the Plan or this Confirmation Order to the contrary, the Indenture shall continue in effect solely to the extent necessary to (i) allow the holders of Senior Note Claims to receive distributions under the Plan, (ii) allow the Debtors, the Reorganized Debtors, the Disbursing Agent, the Plan Administrator, and the Indenture Trustee to make post-Effective Date Distributions or take such other action pursuant to the Plan or this Confirmation Order on account of the Senior Note Claims and to otherwise exercise their rights and discharge their obligations related to the interests of the holders of such Claims in accordance with the Plan and this Confirmation Order, (iii) allow the Indenture Trustee to enforce any obligations owed thereto under the Plan and this Confirmation Order (including seeking compensation and reimbursement for any reasonable and documented fees and expenses pursuant to the Charging Lien) and allow the Indenture Trustees to maintain any right of indemnification, contribution, subrogation or any other Claim it may have under the Senior Notes Indenture; provided that the Indenture Trustee shall not receive more than the $200,000 in Indenture Trustee Fees from the Debtors or Reorganized Debtors as provided above in paragraph 160, (iv) permit the Indenture Trustee to perform any function necessary to effectuate the foregoing, and (v) permit the Indenture Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Indenture, provided that nothing in herein shall affect the discharge of

Claims pursuant to the Bankruptcy Code, this Confirmation Order, or the Plan or result in any liability or expense to the Debtors or the Reorganized Debtors. For the avoidance of any doubt, the Indenture Trustee shall be entitled to assert its Charging Lien arising under and in accordance with the Indenture and any ancillary document, instrument, or agreement to obtain payment of the Indenture Trustee Fees and nothing in the Plan or this Confirmation Order shall be deemed to impair, waive or extinguish any rights of the Indenture Trustee with respect to the Charging Lien.

163.   Except for the foregoing, on and after the Effective Date, all duties and responsibilities of the Indenture Trustee shall be fully discharged (i) unless otherwise specifically set forth in or provided for under the Plan, the Plan Supplement, or this Confirmation Order, and (ii) except with respect to such other rights of the Indenture Trustee that, pursuant to the Indenture, survive termination of the Indenture. Subsequent to the performance by the Indenture Trustee of its obligations pursuant to the Plan and Confirmation Order, the Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Indenture.

**c.   *Distributions to Holders of Senior Note Claims***

164.   Distributions on account of Allowed Senior Note Claims shall be made by the Debtors, the Reorganized Debtors, the Plan Administrator or the Disbursing Agent, as applicable, to the Indenture Trustee. If a Distribution is made to the Indenture Trustee, the Indenture Trustee, in its capacity as disbursing agent, shall administer the Distributions in accordance with the provisions of the Plan, this Confirmation Order, and the Indenture and shall have no liability for acts taken in accordance with the Plan, this Confirmation Order, and the Indenture.

165.   At the election of the Indenture Trustee, in its sole discretion, the Indenture Trustee may require, as a condition to receiving any distribution under the Plan and this Confirmation Order, the Holder of a Senior Notes Claim that is evidenced by a certificate, instrument, or note to surrender such Holder's certificate, instrument, or note representing such Senior Notes Claim to

the Indenture Trustee in accordance with the requirements set forth in this paragraph 165. Upon

surrender of such certificates, the Indenture Trustee shall cancel and destroy such certificates. If

the record holder of a note is DTC or its nominee or another securities depository or custodian

thereof, and such note is represented by a global security held by or on behalf of DTC or such

other securities depository or custodian, then the beneficial holder of such note shall be deemed to

have surrendered such holder's security, note, debenture or other evidence of indebtedness upon

surrender of such global security by DTC or such other securities depository or custodian thereof.

To the extent that the Indenture Trustee requires the surrender of certificates, a holder of a Senior

Notes Claim evidenced by such certificate may not receive a distribution unless and until (a) such

certificates, notes, or other instruments are surrendered, or (b) any relevant Holder provides to the

Indenture Trustee an affidavit of loss or such other documents as may be required by the Debtors,

Plan Administrator or Reorganized Debtor, as applicable, together with an appropriate indemnity

in the customary form. Any such Holder who holds physical certificates and fails to surrender

such certificates, notes, or other instruments, or otherwise fails to deliver an affidavit of loss and

indemnity within three (3) months of the Effective Date, shall be deemed to have no further Senior

Notes Claim and shall not participate in any distribution, and the distribution that would otherwise

have been made to such Holder shall be distributed pro rata to all Holders who held a Claim

pursuant to the applicable Indenture and complied with the foregoing requirements. For the

avoidance of doubt, the foregoing provisions regarding surrender of the certificates evidencing a

Senior Notes Claim shall only apply in circumstances in which physical certificates evidencing

such claims have been issued and the Indenture Trustee elects to require such surrender by issuing

a notice to holders of Senior Notes Claims seeking surrender of such certificates. If such election

is made, the Indenture Trustee shall only be required to use its best efforts to obtain the surrender

of the certificates.

**WW.   Professional Compensation and Reimbursement Claims.**

166.   Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**XX.   Nonseverability of Plan Provisions upon Confirmation.**

167.   Notwithstanding the possible applicability of Bankruptcy Rules 3020(e), 6004(h), 6006(d), 7062, 9014, or otherwise, the terms and conditions of this Confirmation Order will be effective and enforceable immediately upon its entry.  Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Bankruptcy Court is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified except as provided by the Plan or this Confirmation Order; and (c) nonseverable and mutually dependent; *provided* that (1) the Settlement and the releases provided in connection with the Settlement and the Vendor/Landlords Release shall become effective on the Settlement Effective Date; and (2) the waiver under section 506(c) shall be in effect upon entry of this Confirmation Order.

**YY.   Waiver or Estoppel.**

168.   Except as otherwise set forth in the Plan or this Confirmation Order, each holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the

right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel (or any other Entity), if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court before the Confirmation Date.

**ZZ.    Authorization to Consummate.**

169.    The Debtors are authorized to consummate the Plan, including the Restructuring Transactions contemplated thereby, at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article XI of the Plan.  The substantial consummation of the Plan, within the meaning of sections 1101(2) and 1127 of the Bankruptcy Code, is deemed to occur on the first date, on or after the Effective Date, on which distributions are made in accordance with the terms of the Plan to holders of any Allowed Claims or Interests (as applicable).

**AAA.    Injunctions and Automatic Stay.**

170.    Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the closing of these Chapter 11 Cases.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

**BBB.    Surcharge Motion.**

171.    Upon entry of this Confirmation Order, (i) no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any successor case(s) shall be charged against the Credit Agreement Primary Agent, the Term Loan B-1 Agent, any DIP Lender or any Term Loan Lender or their respective claims or the Collateral (as defined in the DIP

Agreement) pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise; and (ii) the *Debtors' Motion for an Order (I) Authorizing the Debtors to Surcharge Certain Collateral, (II) Allowing the Lenders' Secured Claim in an Amount that Accounts for the Surcharge, and (III) Granting Related Relief* [Docket No. 656] is hereby dismissed with prejudice, without the need for any further action by the Debtors, Reorganized Debtors, the Plan Administrator or the Court to effectuate such dismissal.

**CCC.   Effect of Financing Orders.**

172.    On and after entry of this Confirmation Order, and notwithstanding the occurrence of the Effective Date, until all Prepetition ABL Claims, DIP Claims, Term Loan Secured Claims and all other Obligations (as defined in the DIP Agreement) are Satisfied as set forth in Article II.C and Article III.B of the Plan, the DIP Agreement and the Financing Orders shall continue in full force and effect and be binding on all parties to the same extent for all purposes, including, without limitation:  (a) allowing the Credit Agreement Primary Agent, DIP Lenders, and Term Loan Lenders (as applicable) to receive distributions from the Debtors or the Reorganized Debtors, as applicable, under the Plan and to make further distributions to the Credit Agreement Primary Agent, DIP Lenders, Term Loan B Lenders, and Term Loan B-1 Lenders (as applicable) on account of the Claims held by such parties; (b) permitting the making of loans and advances and the use of cash collateral under the terms and conditions of the DIP Agreement and the Financing Orders, which loans, advances, use of cash collateral, and all Obligations arising in connection therewith, shall be secured by the Collateral (as defined in the DIP Agreement) and entitled to all of the rights, protections, liens and interests under the DIP Agreement and the Financing Orders; (c) preserving the rights of Credit Agreement Primary Agent, DIP Lenders, Term Loan B Lenders and Term Loan B-1 Lenders (as applicable) to receive Payment in Full of all amounts due under the DIP Agreement and the Financing Orders; and (d) preserving the rights of the Credit

Agreement Primary Agent, DIP Lenders, Term Loan B Lenders and Term Loan B-1 Lenders (as applicable) to indemnification from the Debtors and the Reorganized Debtors (as applicable) pursuant and subject to the terms of the DIP Agreement and the Financing Orders and the Plan.  Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or otherwise, any releases, waivers, acknowledgments, findings of fact or conclusions of law granted or otherwise set forth in the DIP Agreement or Financing Orders shall survive entry of this Confirmation Order and remain in full force and effect at all times on and after the Effective Date.

**DDD.  Dissolution of the Creditors' Committee.**

173.    Except to the extent provided in the Plan, on the Effective Date, the Creditors' Committee shall dissolve, and the members of the Creditors' Committee and their respective officers, employees, counsel, advisors and agents shall be released and discharged from further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, except with respect to (i) prosecuting any fee applications of the Professionals for the Creditors' Committee, including payment thereon, or seeking reimbursement of expenses for members of the Creditors' Committee; and (ii) prosecuting or participating in any appeals or stays of orders relating to the Plan until such time as such orders become Final Orders. Upon dissolution of the Creditors' Committee, the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

**EEE.  Effect of Non-Occurrence of Conditions to the Effective Date.**

174.    Notwithstanding the entry of this Confirmation Order, if the Effective Date does not occur the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:    (1) constitute a waiver or release of any Claims or Interests;

(2) prejudice in any manner the rights of the Debtors, the Creditors' Committee, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect; *provided* that (i) all actions, waivers, releases, undertakings, rulings, acknowledgments, and other provisions set forth in paragraph 171 of this Confirmation Order shall not be null or void and shall continue in full force and effect and shall be binding upon the Debtors, any successor to the Debtors, the Reorganized Debtors, the Plan Administrator, and to any chapter 11 or chapter 7 Trustee appointed in these cases regardless of whether the Effective Date occurs; and (ii) if the Settlement Effective Date occurs, (a) the Settlement shall continue in full force and effect and shall not be null and void, and all actions to occur upon the Settlement Effective Date shall continue to be approved and authorized, and (b) the Vendor/Landlord Release shall be and remain in full force and effect and shall be binding upon the Debtors, any successor to the Debtors, the Reorganized Debtors, the Plan Administrator, and to any chapter 11 or chapter 7 Trustee appointed in these cases.

**FFF.   Miscellaneous.**

175.    Nothing in this Confirmation Order shall be deemed to (a) grant or authorize liens on the Debtors' leasehold interests in real property or (b) grant or authorize rights in the Debtors' leasehold interests in real property to any party in a manner inconsistent with applicable law, including with respect to the terms of the leases.

**GGG.  Effect of Conflict Between Plan and Confirmation Order.**

176.    In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

**HHH.  Retention of Jurisdiction.**

177.    This Bankruptcy Court retains jurisdiction over the Chapter 11 Cases, all matters

arising out of or related to the Chapter 11 Cases and the Plan, the matters set forth in Article XIII,

and other applicable provisions of the Plan.

**III.    Waiver of 14-Day Stay.**

178.    Notwithstanding Bankruptcy Rule 3020(e), and to the extent applicable,

Bankruptcy Rules 6004(h), 7062, and 9014, this Confirmation Order is effective immediately and

not subject to any stay.

**JJJ.    Final Order.**

179.    This Confirmation Order is a Final Order and the period in which an appeal must

be filed will commence upon entry of this Confirmation Order.

Omaha, Nebraska
Dated: June 11, 2019                                    /s/Thomas L. Saladino
                                                        UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SPECIALTY RETAIL SHOPS HOLDING CORP., *et al.*,[1] | ) Case No. 19-80064 (TLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**THIRD AMENDED JOINT CHAPTER 11 PLAN OF
SPECIALTY RETAIL SHOPS HOLDING CORP. AND ITS DEBTOR AFFILIATES**

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Travis Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

-and-

Steven Serajeddini (admitted *pro hac vice*)
Daniel Rudewicz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

*Co-Counsel to the Debtors and Debtors in Possession*

James J. Niemeier (NE Bar No. 18838)
Michael T. Eversden (NE Bar No. 21941)
Lauren R. Goodman (NE Bar No. 24645)
**McGRATH NORTH MULLIN & KRATZ, PC LLO**
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Telephone:        (402) 341-3070

Dated:  May 31, 2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Specialty Retail Shops Holding Corp. (0029); Pamida Stores Operating Co., LLC (6157); Pamida Transportation LLC (4219); Penn-Daniels, LLC (0040); Place's Associates' Expansion, LLC (7526); Retained R/E SPE, LLC (6679); Shopko Finance, LLC (1152); Shopko Gift Card Co., LLC (2161); Shopko Holding Company, LLC (0171); Shopko Institutional Care Services Co., LLC (7112); Shopko Optical Manufacturing, LLC (6346); Shopko Properties, LLC (0865); Shopko Stores Operating Co., LLC (6109); SVS Trucking, LLC (0592).  The location of the Debtors' service address is: 700 Pilgrim Way, Green Bay, Wisconsin 54304.

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**.................................................................................................**1**
    A.    Defined Terms ........................................................................................... 1
    B.    Rules of Interpretation ............................................................................ 13
    C.    Computation of Time .............................................................................. 13
    D.    Governing Law ....................................................................................... 13
    E.    Reference to Monetary Figures ............................................................... 14
    F.    Controlling Document ............................................................................. 14
    G.    Nonconsolidated Plan ............................................................................. 14

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS**.........................**14**
    A.    Administrative Claims and Priority Tax Claims ..................................... 14
    B.    Professional Compensation ..................................................................... 15
    C.    DIP Claims ............................................................................................. 16
    D.    Statutory Fees ......................................................................................... 16

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**............**16**
    A.    Summary of Classification ...................................................................... 16
    B.    Treatment of Claims and Interests .......................................................... 17
    C.    Special Provision Governing Unimpaired Claims ................................... 20
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 20
    E.    Elimination of Vacant Classes ............................................................... 20
    F.    Voting Classes; Presumed Acceptance by Non-Voting Classes .............. 20
    G.    Subordinated Claims and Interests .......................................................... 20

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ..................................**20**
    A.    General Settlement of Claims .................................................................. 20
    B.    Restructuring Transactions ...................................................................... 21
    C.    Cancelation of Notes, Instruments, Certificates, and Other Documents ......... 21
    D.    Exemption from Certain Taxes and Fees ................................................. 21
    E.    Surcharge Resolution .............................................................................. 21
    F.    Asset Sales .............................................................................................. 22
    G.    The Asset Sale Restructuring .................................................................. 22

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......................**26**
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ........... 26
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ............ 26
    C.    Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases ........................................................... 26
    D.    Indemnification Obligations .................................................................... 27
    E.    Director and Officer Liability Insurance ................................................. 27
    F.    Run-Out Claims ...................................................................................... 27
    G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 28
    H.    Reservation of Rights .............................................................................. 28
    I.    Nonoccurrence of Effective Date ........................................................... 28

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ......................................**28**
    A.    Timing and Calculation of Amounts to Be Distributed .......................... 28
    B.    Disbursing Agent .................................................................................... 29
    C.    Rights and Powers of Disbursing Agent ................................................. 29
    D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ............ 29
    E.    Manner of Payment. ................................................................................ 30
    F.    Tax Issues and Compliance with Tax Requirements ............................... 30
    G.    Allocations ............................................................................................. 30

H.      No Postpetition Interest on Claims ...................................................................30
I.      Setoffs and Recoupment .................................................................................31
J.      Claims Paid or Payable by Third Parties..........................................................31

**ARTICLE VII. THE PLAN ADMINISTRATOR ...................................................................31**
A.      The Plan Administrator....................................................................................31
B.      Wind Down .....................................................................................................33
C.      Exculpation, Indemnification, Insurance and Liability Limitation ...................34
D.      Tax Returns.....................................................................................................34
E.      Dissolution of the Reorganized Debtors ...........................................................34

**ARTICLE VIII. RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR...................34**
A.      Establishment of Reserve Accounts ..................................................................34
B.      Undeliverable Distribution Reserve ..................................................................34
C.      Wind-Down Reserve.........................................................................................35
D.      Other Secured Claims Reserve..........................................................................35
E.      Administrative Claims Reserve .........................................................................36
F.      Priority Claims Reserve ...................................................................................36
G.      GUC Asset Sale Reserve ..................................................................................36
H.      Distribution Proceeds/Priority Waterfall...........................................................37
I.      The General Account and Distribution Reserve Account Adjustments ...............37

**ARTICLE IX. PROCEDURES FOR RESOLVING CONTINGENT,    UNLIQUIDATED, AND
DISPUTED CLAIMS....................................................................................................38**
A.      Allowance of Claims.........................................................................................38
B.      Claims Administration Responsibilities.............................................................38
C.      Estimation of Claims........................................................................................38
D.      Adjustment to Claims Without Objection ..........................................................39
E.      Time to File Objections to Claims .....................................................................39
F.      Disallowance of Claims ....................................................................................39
G.      Amendments to Claims .....................................................................................39
H.      No Distributions Pending Allowance .................................................................39
I.      Distributions After Allowance ..........................................................................39

**ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS...........40**
A.      Compromise and Settlement of Claims, Interests, and Controversies ...............40
B.      Term of Injunctions or Stays............................................................................40
C.      **Release of Liens**...............................................................................................40
D.      **Debtor Release**................................................................................................41
E.      **Release by Holders of Claims or Interests** .....................................................42
F.      **Exculpation**.....................................................................................................42
G.      **Injunction**.......................................................................................................43
H.      Protection Against Discriminatory Treatment ....................................................43
I.      Recoupment .....................................................................................................43
J.      Subordination Rights........................................................................................44

**ARTICLE XI. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ................................................................................................................44**
A.      Conditions Precedent to the Effective Date .......................................................44
B.      Waiver of Conditions .......................................................................................44
C.      Substantial Consummation ...............................................................................44
D.      Effect of Nonoccurrence of Conditions to the Effective Date .............................45

**ARTICLE XII. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN............45**
A.      Modification and Amendments ..........................................................................45
B.      Effect of Confirmation on Modifications ...........................................................45

    C.      Revocation or Withdrawal of the Plan ..................................................................45

**ARTICLE XIII. RETENTION OF JURISDICTION** ................................................................**45**

**ARTICLE XIV. MISCELLANEOUS PROVISIONS** ...............................................................**47**
    A.      Immediate Binding Effect.................................................................................47
    B.      Additional Documents ......................................................................................47
    C.      Dissolution of the Creditors' Committee ..........................................................47
    D.      Reservation of Rights.......................................................................................48
    E.      Termination of Consent Rights .........................................................................48
    F.      Successors and Assigns.....................................................................................48
    G.      Service of Documents .......................................................................................48
    H.      Entire Agreement .............................................................................................49
    I.      Exhibits ...........................................................................................................49
    J.      Nonseverability of Plan Provisions ...................................................................49
    K.      Votes Solicited in Good Faith ..........................................................................49
    L.      Waiver or Estoppel...........................................................................................49

**INTRODUCTION**

Capitalized terms used in this chapter 11 plan shall have the meanings set forth in Article I.A.  The Debtors propose this Plan for the resolution of outstanding Claims against, and Interests in, the Debtors.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan for each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (d) all DIP Claims.

2.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, except as otherwise set forth in the Plan or a Final Order, which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date; *provided* that Filing requests for payment of Administrative Claims is not required, where the Plan, Bankruptcy Code, or a Final Order does not require such Filing.

3.      "*Administrative Claims Reserve*" means the account to be established by the Reorganized Debtors with the Administrative Claims Reserve Amount to fund distributions to Holders of Allowed Administrative Claims pursuant to Article VIII.E.

4.      "*Administrative Claims Reserve Amount*" means an amount equal to the lesser of (a) the total amount of Allowed Administrative Claims and Disputed Administrative Claims estimated by the Debtors (in consultation with the Creditors' Committee and subject to the Creditors' Committee's consent (not to be unreasonably withheld)) to become Allowed Administrative Claims, and (b) the Distribution Proceeds, to the extent known on the Effective Date, to be allocated and paid to the Holders of Allowed Administrative Claims and Disputed Administrative Claims estimated by the Debtors (in consultation with the Creditors' Committee and subject to the Creditors' Committee's consent (not to be unreasonably withheld)) to become Allowed Administrative Claims.

5.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

6.      "*ASO Agreement*" means the Administrative Services Only Agreement, effective January 1, 2017, including all cover agreements, amendments, disclosures, appendices, schedules, benefit booklets and rate information related thereto through which Cigna Health and Life Insurance Company processes healthcare claims of the Debtors' employees for the Debtors' self insured employee healthcare benefits plan.

7.        "*Asset Purchase Agreement*" means one or more asset purchase agreements pursuant to which the Asset Sales are consummated, in each case in form and substance reasonably acceptable to Credit Agreement Primary Agent.

8.        "*Asset Sales*" means the sale or sales of all, substantially all, or certain of the Debtors' assets under this Plan pursuant to an Asset Purchase Agreement or as otherwise authorized by order of the Bankruptcy Court or the Bankruptcy Code in each case with the consent of the Credit Agreement Primary Agent (such consent not to be unreasonably withheld).

9.        "*Asset Sale Restructuring*" means a restructuring under this Plan providing for the Asset Sales.

10.        "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, (I) no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes and (II) the Revolving Loan A Lenders, Revolving Loan A-1 Lenders, Term Loan B Lenders, and Term Loan B-1 Lender(s) shall not be required to file a Proof of Claim. A Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

11.        "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the debtors in possession, the Estates, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

12.        "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time, as applicable to the Chapter 11 Cases.

13.        "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Nebraska having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the District of Nebraska.

14.        "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

15.        "*Bar Date*" means the dates established by the Bankruptcy Court by which Proofs of Claim must be Filed; *provided* that the Claims of the Revolving Loan A Lenders, Revolving Loan A-1 Lenders, Term Loan B Lenders, and Term Loan B-1 Lender(s) shall not be subject to the Bar Date

16.         "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

17.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

18.      "*Cash Consideration*" means any proceeds paid or payable in Cash by buyers to the Debtors in connection with the Asset Sales; *provided, however*, that Cash Consideration includes any Cash or Cash equivalents returned (whether before or after the Effective Date) to the Debtors or their Estates, including (a) the return of any deposits of Cash or Cash equivalents and (b) the release of Cash or Cash equivalents used to collateralize any of the Debtors' surety bonds, insurance policies, or utility contracts.

19.      "*Causes of Action*" means any claims, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

20.      "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

21.      "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, asserted against a Debtor.

22.      "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

23.      "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent or the Bankruptcy Court.

24.      "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

25.      "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

26.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

27.      "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court, if any, to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

28.      "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.      "*Consummation*" means the occurrence of the Effective Date.

30.      "*Credit Agreement*" means that certain Third Amended and Restated Loan and Security Agreement, dated as of February 7, 2012 (as amended, restated, supplemented, or otherwise modified from time to time), by and among Shopko, as borrower, and certain of its subsidiaries as borrowers or guarantors, certain lenders party thereto, the Credit Agreement Primary Agent, and the Term Loan B-1 Agent.

31.     "*Credit Agreement Primary Agent*" means Wells Fargo Bank, N.A., in each of its capacities as Agent, Collateral Agent, and Term Loan B Agent (as each term is defined in the Credit Agreement), under the Credit Agreement.

32.     "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

33.     "*Cure Claim*" means a monetary Claim based upon a Debtor's defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

34.     "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include:  (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

35.     "*Cure/Assumption Objection Deadline*" means the date that is 14 days after filing of the Schedule of Assumed Executory Contracts and Unexpired Leases with the Plan Supplement and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Schedule of Assumed Executory Contracts and Unexpired Leases after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, or an Executory Contract or Unexpired Lease proposed to be assumed by the Debtors or Reorganized Debtors is proposed to be assigned to a third party after the filing of the initial Schedule of Assumed Executory Contracts and Unexpired Leases, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) 14 days after service of the amended Schedule of Assumed Executory Contracts and Unexpired Leases with such modification and (b) the date of the scheduled Confirmation Hearing.

36.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

37.     "*Debtors*" means, collectively, each of the following (the debtors and debtors in possession in the Chapter 11 Cases):  (a) Specialty Retail Shops Holding Corp.; (b) Pamida Stores Operating Co., LLC; (c) Pamida Transportation LLC; (d) Penn-Daniels, LLC; (e) Place's Associates' Expansion, LLC; (f) Retained R/E SPE, LLC; (g) Shopko Finance, LLC; (h) Shopko Gift Card Co., LLC; (i) Shopko Holding Company, LLC; (j) Shopko Institutional Care Services Co., LLC; (k) Shopko Optical Manufacturing, LLC; (l) Shopko Properties, LLC; (m) Shopko Stores Operating Co., LLC; and (n) SVS Trucking, LLC.

38.     "*DIP Agreement*" means the Credit Agreement, as amended and modified by that certain Ratification and Amendment Agreement, dated as of January 16, 2019, by and among the Debtors and the DIP Lenders, as it may be amended, restated, supplemented, or otherwise modified from time to time.

39.     "*DIP Claim*" means any Claim in favor of any DIP Lender against any of the Debtors arising under the Financing Agreements or the Financing Orders on or after the Petition Date, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and all other Obligations (as defined in the DIP Agreement) arising under the DIP Agreement as well as the adequate protection claims granted by any of the Financing Orders.

40.     "*DIP ABL Lenders*" means, collectively, the Revolving Loan A Lenders and Revolving Loan A-1 Lenders (as each is defined in the DIP Agreement) from time to time party to the DIP Agreement.

41.     "*DIP Lenders*" means, collectively, the lenders from time to time party to the DIP Agreement.

42.     "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as

to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

43.    "*Disbursing Agent*" means the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, or the Entity or Entities selected by the Debtors, the Reorganized Debtors, or the Plan Administrator to make or facilitate distributions contemplated under the Plan.

44.    "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

45.    "*Disputed*" means a Claim that is not yet Allowed.

46.    "*Distribution Proceeds*" means all Cash of the Debtors available on the Effective Date, after funding the Professional Fee Escrow Account, and thereafter all Cash of the Debtors from all sources including without limitation the Settlement Amount, the revenues and proceeds of all assets of the Debtors and proceeds from all Causes of Action, available for use and distribution in accordance with the priorities set forth under Article VIII.H hereof.

47.    "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions hereunder, which shall be the later of (a) thirty-days after the Effective Date or (b) such other date as designated in a Final Order of the Bankruptcy Court.

48.    "*Distribution Reserve Accounts*" means the Administrative Claims Reserve, the Priority Claims Reserve, the Undeliverable Distribution Reserve, the Wind-Down Reserve, the Other Secured Claims Reserve, and the GUC Asset Sale Reserve established pursuant to this Plan.

49.    "*DTC*" means the Depository Trust Company.

50.    "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors, subject to the consent of the Credit Agreement Primary Agent (not to be unreasonably withheld), on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article XI.A hereof have been satisfied or waived (in accordance with Article XI.B); and (c) the Plan is declared effective.

51.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

52.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

53.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Credit Agreement Primary Agent; (c) the Creditors' Committee and its respective members; (d) Sun Capital; and (e) with respect to each of the foregoing Entities described in clauses (a) and (b), such Entities' respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants.

54.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

55.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

56.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

57.    "*Final Order*" means:  (a) an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction; or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Case (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

58.    "*Financing Orders*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to use cash collateral and enter into the DIP Agreement and incur postpetition obligations thereunder.

59.    "*General Account*" means a general account maintained at an institution acceptable to Wells Fargo Bank, N.A.:  (a) into which shall be deposited revenues and proceeds of all assets of the Debtors, including proceeds of the Asset Sales, and Cash of the Debtors in an amount in excess of the amount required to fund and adequately maintain the Distribution Reserve Accounts as described in Articles VIII.H and VIII.I. (*provided* that the General Account shall not include funds required to be deposited into the Distribution Reserve Accounts); (b) from which shall be made payments to any Distribution Reserve Account (other than GUC Asset Sale Reserve) in an amount sufficient to adequately maintain such Distribution Reserve Account as described in Article VIII.I.; and (c) from which payments shall be made according to the priority set forth in Article VIII.H

60.    "*General Unsecured Claim*" means any Claim other than:  (a) an Administrative Claim; (b) a Secured Tax Claim; (c) an Other Secured Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) a Term Loan Secured Claim; (g) an Intercompany Claim; (h) a DIP Claim; or (i) a Section 510(b) Claim; *provided* that General Unsecured Claims shall include Credit Agreement Deficiency Claims, if any.

61.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

62.    "*GUC Asset Sale Reserve*" means a separate, segregated account to be established and maintained by the Plan Administrator at an institution acceptable to Wells Fargo Bank, N.A. and funded with the Distribution Proceeds pursuant to Article VIII.G. hereof.

63.     "*Holder*" means an Entity holding a Claim or Interest, as applicable.

64.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

65.    "*Indenture Trustee*" means Delaware Trust Company, solely in its capacity as indenture trustee under the that certain Indenture, dated as of March 12, 1992 (as amended, modified, or supplemented from time to time) between Shopko Stores, Inc., as successor issuer, and Delaware Trust Company.

66.     "*Indenture Trustee Fees*" means the compensation, fees, expenses, disbursements, and indemnity claims of the Indenture Trustee, including any fees, expenses, and disbursements of attorneys, advisors, or agents retained or utilized by the Indenture Trustee.

67.     "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate.

68.     "*Intercompany Interest*" means, other than an Interest in Shopko, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

69.     "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

70.     "*Interim Compensation Order*" means the order of the Bankruptcy Court establishing procedures for interim compensation and reimbursement of expenses for professionals.

71.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, as applicable to the Chapter 11 Cases.

72.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

73.     "*Notice and Claims Agent*" means Prime Clerk LLC.

74.     "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

75.     "*Other Secured Claim*" means any Secured Claim other than Claims arising under the Credit Agreement.

76.     "*Other Secured Claims Reserve*" means the account to be established and maintained by the Plan Administrator and funded with the Other Secured Claims Reserve Amount pursuant to Article VIII.D.

77.     "*Other Secured Claims Reserve Amount*" means Cash in an amount to be determined by the Debtors, which amount shall be funded by the Debtors and used by the Plan Administrator for the payment of Allowed Other Secured Claims to the extent that such Other Secured Claims have not been satisfied pursuant to Article III.B.2 on or before the Effective Date.

78.     "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

79.     "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

80.     "*Plan*" means this plan, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto.

81.     "*Plan Administrator*" means the person selected by the Creditors' Committee and reasonably acceptable to the Debtors and the Credit Agreement Primary Agent to administer the Plan Administrator Assets.  All costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Plan Administrator Assets, subject to and in accordance with the Wind-Down Budget.

82.     "*Plan Administrator Assets*" means on the Effective Date, all assets of the Estates vested in the Reorganized Debtors to be administered by Plan Administrator, and, thereafter, all assets held from time to time by Reorganized Debtors to be administered by Plan Administrator.

83.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 14 days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement.  The Plan Supplement shall include the following:  (a)  Schedule of Assumed Executory Contracts and Unexpired Leases; (b)  a list of retained Causes of Action; (e) Asset Purchase Agreement, if any; (f) the identity of the Plan Administrator and the compensation of the Plan Administrator, if any; (c) the Wind-Down Budget, (d) the Wind-Down Milestones; and (e) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article XII of the Plan; *provided* that the Debtors shall not amend the Schedule of Assumed Executory Contracts and Unexpired Leases or Schedule of Rejected Executory Contracts and Unexpired Leases after seven days prior to the Confirmation Hearing.

84.    "*Prepetition ABL Claim*" means any Claim derived from or based upon the Prepetition ABL Loans.

85.    "*Prepetition ABL Lenders*" means, collectively, the lenders providing Revolving Loan A and Revolving Loan A-1 loans and commitments prior to the Petition Date pursuant to the Credit Agreement.

86.    "*Prepetition ABL Loans*" means, collectively, the Revolving Loan A and Revolving Loan A-1 provided by Prepetition ABL Lenders to Debtors prior to the Petition Date.

87.    "*Priority Claims*" means, collectively, Priority Tax Claims and Other Priority Claims.

88.    "*Priority Claims Reserve*" means the account to be established by the Reorganized Debtors at an institution acceptable to Wells Fargo Bank, N.A. with the Priority Claims Reserve Amount to fund distributions to Holders of Allowed Priority Claims (excluding Professional Fee Claims and DIP Claims) pursuant to Article VIII.F.

89.    "*Priority Claims Reserve Amount*" means an amount equal to the lesser of (a) an amount equal to the total amount of Allowed Priority Claims, and Disputed Priority Claims estimated by the Debtors (in consultation with the Creditors' Committee and subject to the Creditors' Committee's consent (not to be unreasonably withheld)) to become Allowed Priority Claims, and (b) the Distribution Proceeds, to the extent known on the Effective Date, to be allocated and paid to the Holders of Allowed Priority Claims and Disputed Priority Claims estimated by the Debtors (in consultation with the Creditors' Committee and subject to the Creditors' Committee's consent (not to be unreasonably withheld)) to become Allowed Priority Claims, according to the priority set forth in Article VIII.F.

90.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

91.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

92.    "*Professional*" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

93.    "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been previously paid.

94.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Reorganized Debtors in an amount equal to the total Professional Fee Reserve Amount on the Effective Date.

95.      "*Professional Fee Reserve Amount*" means the aggregate amount of Professional Fee Claims that the Professionals estimate they have incurred or will incur in rendering services to the Estates prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B.3 of this Plan.

96.      "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases.

97.      "*Purchaser*" means the purchaser under the Asset Purchase Agreement, together with its successors and permitted assigns (including any and all of its wholly-owned Affiliates to which it assigns any of its rights or obligations under the Asset Purchase Agreement).

98.      "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

99.      "*Released Party*" means each of the following in their capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Debtors' current and former officers, directors, and managers; (c) the Credit Agreement Primary Agent; (d) the DIP Lenders; (e) the Term Loan B-1 Agent and Term Loan Lenders; (f) the Settlement Parties; and (g) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case solely in their capacity as such; *provided* that any Holder of a Claim or Interest that elects to "opt out" of granting releases by timely objecting to the Plan's third-party release provisions shall not be a "Released Party."

100.      "*Releasing Party*" means, collectively, and in each case solely in its capacity as such:  (a) the Debtors, the Debtors' Estates, and the Reorganized Debtors; (b) the Credit Agreement Primary Agent; (c) the DIP Lenders; (d) the Term Loan B-1 Agent and Term Loan Lenders; (e) each Holder of a Claim or Interest entitled to vote to accept or reject the Plan that (i) votes to accept the Plan or (ii) votes to reject the Plan or does not vote to accept or reject the Plan but does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; (f) each Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan; (g) each Holder of a Claim or Interest that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by timely objecting to the Plan's third-party release provisions; (h) with respect to the Settlement and releases of Sun Capital contained in Article X.A, all Holders of Claims and Interests other than those noted in the Confirmation Order that affirmatively elected to "opt out" of being a Releasing Party with respect to Sun Capital by timely objecting to the Settlement's third-party release provisions; and (i) with respect each of the foregoing Entities described in clauses (a) through (h), such Entities' current and former affiliates, and such Entities' and such affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns.

101.      "*Reorganized Debtors*" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including Reorganized Shopko.

102.      "*Reorganized Shopko*" means either:  (a) Shopko, or any successor thereto, as reorganized pursuant to and under the Plan; or (b) a new corporation or limited liability company designated by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Shopko Interests to be distributed or sold pursuant to the Plan, or any other successor to the foregoing, including the Purchaser.

103.      "*Reorganized Shopko Board*" means the New Board of Reorganized Shopko on and after the Effective Date.

104.      "*Restructuring*" means the restructuring of the Debtors on the terms of the Plan.

9

105.    "*Restructuring Documents*" means the Plan, the Disclosure Statement, the Plan Supplement, and the various agreements and other documents formalizing or implementing the Plan and the transactions contemplated thereunder.

106.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors reasonably determine to be necessary to implement the Restructuring, as described in more detail in Article IV.B herein.

107.    "*Retained Causes of Action List*" means a list of all retained Claims and Causes of Action of the Debtors, identified in the Plan Supplement.

108.    "*Revolving Loan A*" means the total Revolving Loans A made pursuant to (and as defined in) the Credit Agreement, made by or on behalf of certain lenders for the ratable accounts of such lenders, pursuant to the Credit Agreement.

109.    "*Revolving Loan A Lenders*" means, collectively, the lenders providing loans and commitments under the Revolving Loan A.

110.    "*Revolving Loan A-1*" means the total Revolving Loans A-1 made pursuant to (and as defined in) the Credit Agreement, made by or on behalf of certain lenders for the ratable accounts of such lenders, pursuant to the Credit Agreement.

111.    "*Revolving Loan A-1 Lenders*" means, collectively, the lenders providing loans and commitments under the Revolving Loan A-1.

112.    "*Run-Out Claims*" means the employee healthcare claims that were incurred, but not submitted, processed and paid under the ASO Agreement prior to the rejection date of the ASO Agreement, if any.

113.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned by the Debtors or the Reorganized Debtors, as applicable, pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan, which shall be in form and substance acceptable to the Debtors.

114.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan, which shall be in form and substance acceptable to the Debtors.

115.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

116.    "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

117.    "*Secured*" means, when referring to a Claim:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim, in each case subject to the consent of the Credit Agreement Primary Agent.

118.     "*Secured Tax Claim*" means any Secured Claim against any of the Debtors that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

119.     "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

120.     "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

121.     "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

122.     "*Settled Claims*" means all Claims and Causes of Action made, or which could have been made, against the Settlement Parties in any way related to the Debtors, including, but not limited to, any Claims or Causes of Action on account of actual fraudulent transfer, constructive fraudulent transfer, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, unjust enrichment, tortious interference with contract, and illegal dividends under state law.

123.     "*Settlement*" means the settlement of the Settled Claims on the terms set forth in Article X.A.

124.     "*Settlement Amount*" means $15,500,000 in Cash that will be contributed to the Debtors on the Settlement Effective Date as part of the Settlement, which amount shall be applied first to the DIP Claims and Term Loan Secured Claims owing to the Credit Agreement Primary Agent and Lenders and then distributed in accordance with Article VIII.H hereof.

125.     "*Settlement Effective Date*" means, with respect to the Settlement, the date no later than 15 days after the Confirmation Date (or the first Business Day thereafter if such 15th day is not a Business Day) that is the earliest date on which all the following events have occurred (or such other date as the Debtors, the Credit Agreement Primary Agent, the Creditors' Committee, and Sun Capital may agree upon (such agreement not to be unreasonably withheld) prior to 15 days after the Confirmation Date):  (a) the Confirmation Order has become a Final Order; (b) the Debtors have received the Settlement Amount; (c) all DIP Claims, Prepetition ABL Claims, and Term Loan Secured Claims have been, or will be upon closing of the Settlement, Satisfied as set forth in Article II.C and Article III.B; and (d) the Debtors have filed a notice on the docket stating that the Settlement has become effective.

126.     "*Settlement Parties*" means (a) the Debtors, and each of their respective current and former officers, directors, members, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such and (b) Sun Capital.

127.     "*Shopko*" means Specialty Retail Shops Holding Corp.

128.     "*Special Committee*" means the special committee created by the board of directors of Shopko.

129.     "*Spirit*" means Spirit Realty L.P., Shopko Note Holding, LLC, and their affiliates.

130.     "*Store Closing GOB Sales Order*" means the order of the Bankruptcy Court approving the Debtors' going out of business sales in accordance with section 363 of the Bankruptcy Code, entered on February 8, 2019 [Docket No. 364].

131.     "*Sun Capital*" means (a) Sun Capital Partners, Inc., Sun SKO, LLC, Sun Capital Partners IV, LP, SKO Group Holding, LLC, Sun Capital Partners Management IV, LLC, and each of their respective current and former affiliates, parents, equity holders, shareholders, stockholders, subsidiaries and co-investors, successors, assigns, equity holders, shareholders, stockholders, officers, directors, members, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers,

consultants, representatives, insurers and other professionals, each in their capacity as such, and (b) Donald Roach, Casey Lanza, Rick Walters, T. Scott King, Christopher Metz, David Mezzanotte, Aaron Wolfe, Bruce Roberson, Clarence (Bud) Terry, Michael McConvery, and Melissa Klafter, each in their capacity as an individual in clause (a) of this definition and as an officer and/or director of the Debtor.

132.    "*Term Loan Lenders*" means, collectively, the Term Loan B Lenders and the Term Loan B-1 Lenders.

133.    "*Term Loans*" means, collectively, the Term Loan B and the Term Loan B-1.

134.    "*Term Loan B*" means the total Term Loan B Commitments made pursuant to (and as defined in) the Credit Agreement, made by or on behalf of certain lenders for the ratable accounts of such lenders, pursuant to the Credit Agreement.

135.    "*Term Loan B Claim*" means any Claim derived from or based upon the Term Loan B.

136.    "*Term Loan B Lenders*" means, collectively, the lenders providing loans and commitments under the Term Loan B.

137.    "*Term Loan B-1*" means the total Term Loan B-1 Commitments made pursuant to (and as defined in) the Credit Agreement made by or on behalf of Spirit for the ratable account of Spirit, pursuant to the Credit Agreement.

138.    "*Term Loan B-1 Agent*" means Spirit, in its capacity as administrative and collateral agent of the Term Loan B-1, on behalf of itself as a lender pursuant to the terms of the Credit Agreement and any replacement or successor agent on behalf of Spirit as the Term Loan B-1 lenders.

139.    "*Term Loan B-1 Claim*" means any Claim derived from or based upon the Term Loan B-1.

140.    "*Term Loan B-1 Lenders*" means, collectively, the lenders providing loans and commitments under the Term Loan B-1.

141.    "*Term Loan Secured Claim*" means any Claim derived from or based upon the Term Loans, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges and obligations pursuant to the Credit Agreement and Financing Orders, as well as the adequate protection claims granted by any of the Financing Orders.

142.    "*Term Loan Secured Claim Recovery Amount*" means the amount of Term Loan Secured Claims comprising (a) accrued and unpaid principal, (b) accrued but unpaid interest (at the non-default contract rate), and (c) accrued and unpaid fees and expenses.

143.    "*Undeliverable Distribution Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIII.B hereof.

144.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Nebraska.

145.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

146.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

147.    "*Voting Deadline*" means May 22, 2019 at 5:00 p.m. (prevailing Central Time).

148.    "*Wind Down*" means the wind down and dissolution of the Debtors' Estates following the Effective Date as set forth in Article VIII.C hereof.

149.    "*Wind-Down Amount*" means Cash in an amount to be determined by the Debtors, which amount shall be funded by the Debtors and used by the Plan Administrator to fund the Wind Down.

150.    "*Wind-Down Budget*" has the meaning set forth in Article VII.A.2.

151.    "*Wind-Down Milestones*" means the deadlines, set forth in the Plan Supplement and approved by the Credit Agreement Primary Agent, by which the Plan Administrator must complete certain aspects of the Wind Down.

152.    "*Wind-Down Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIII.C.

B.    *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Debtors, the Reorganized Debtors, or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to

the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

G.      *Nonconsolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims and Priority Tax Claims*

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, and except to the extent that an Administrative Claim or Priority Tax Claim has already been paid during the Chapter 11 Cases or a Holder of an Administrative Claim or Priority Tax Claim and the applicable Debtor(s) agree to less favorable treatment,(a) each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Administrative Claims Reserve and any applicable distributions according to the priorities set forth in Article VIII.H and I., and (b) each Holder of an Allowed Priority Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Priority Claims Reserve and any applicable distributions according to the priorities set forth in Section 507 of the Bankruptcy Code as set forth in Article VIII.H and I.

14

The failure to object to Confirmation by a Holder of an Allowed Administrative Claim or Priority Tax Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, that the Holders of such Claims shall be deemed to consent to the treatment on account of such Claims as provided herein.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

Any amounts remaining in the Administrative Claims Reserve and in the Priority Claims Reserve after payment of all Allowed Administrative Claims, Allowed Priority Claims, and amounts reserved for estimated Allowed Administrative and Priority Claims, as applicable, shall promptly be transferred to the General Account and shall be distributed as set forth in Article VIII.H and Article VIII.I. without any further action or order of the Bankruptcy Court.

B.      *Professional Compensation*

1.      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 45 days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Reorganized Debtors or the Plan Administrator, as applicable, shall pay the full unpaid amount of such Allowed Administrative Claim in Cash.

2.      Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount; *provided* that the Professional Fee Escrow Account shall be funded *first* from Cash held in the Pre-Carve Out Trigger Notice Reserve (as defined in the Financing Orders), and *second* from Cash on hand on the Effective Date.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all Allowed amounts owing to the Professionals have been paid in full, any amount remaining in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims will be paid by the Reorganized Debtors.

3.      Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the

Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

C.      *DIP Claims*

As of the Confirmation Date, the DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Agreement and Financing Orders, including principal, interest, fees, and expenses.

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction of the Allowed DIP Claims, each Holder of an Allowed DIP Claim will be paid all Distribution Proceeds available for distribution under Article VIII.H hereof until such Allowed DIP Claims are Satisfied. As used in this paragraph, "Satisfied" shall mean, in each case to the extent authorized by the Financing Orders: the indefeasible payment in full in Cash of all liquidated DIP Claims; the cancelation, backing, or cash collateralization of letters of credit under the DIP Agreement in accordance with the terms of the Financing Agreements (as defined in the DIP Agreement); or in the case of any contingent Obligations (as defined in the DIP Agreement), including any payments that have been provisionally credited to the Obligations and any continuing obligations (contingent or otherwise) that the Reorganized Debtors shall have furnished the Credit Agreement Primary Agent with cash collateral or an indemnification from a Person, and pursuant to terms and conditions, in each case which are satisfactory to the Credit Agreement Primary Agent; Reorganized Debtors shall have furnished the Credit Agreement Primary Agent with cash collateral in an amount satisfactory to the Credit Agreement Primary Agent in its discretion to secure payment of liabilities in respect of matters or circumstances known to Credit Agreement Primary Agent at the time which are reasonably expected to result in any actual loss, cost, damage or expense (including attorneys' fees and legal expenses) to the Credit Agreement Primary Agent or any DIP Lender; and the termination of the Credit Agreement Primary Agent's and DIP Lenders' obligation to extend credit under the Financing Agreements (as defined in the DIP Agreement).

D.      *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, to the extent applicable, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      *Summary of Classification*

Claims and Interests, except for DIP Claims, Administrative Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. Except as otherwise provided in this Plan, a Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

1.      Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Impaired | Entitled to Vote |
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote |
| 7 | Interests in Shopko | Impaired | Deemed to Reject |
| 8 | Section 510(b) Claims | Impaired | Deemed to Reject |

B.      *Treatment of Claims and Interests*

Subject to Article VI hereof, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.      <u>Class 1 – Other Secured Claims</u>

a.      *Classification*: Class 1 consists of Other Secured Claims against any Debtor.

b.      *Treatment*: Each Holder of an Allowed Other Secured Claim will receive, at the Debtors' election: (a) payment in full in Cash, which may come from the Other Secured Claims Reserve; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired.

c.      *Voting*: Class 1 is Unimpaired. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 – Other Priority Claims</u>

a.      *Classification*: Class 2 consists of Other Priority Claims.

b.      *Treatment*: Each Holder of an Allowed Other Priority Claim will receive its Pro Rata share of the Priority Claims Reserve in accordance with the priorities set forth in section 507 of the Bankruptcy Code. The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

    c.    *Voting*:  Class 2 is Impaired.  Holders of Other Priority Claims are entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Term Loan Secured Claims</u>

    a.    *Classification*:  Class 3 consists of all Term Loan Secured Claims.

    b.    *Treatment*:  As of the Confirmation Date, the Term Loan Secured Claims shall be Allowed Claims in the full amount outstanding under the Credit Agreement and Financing Orders, including all principal, interest, fees, and expenses.

Each Holder of an Allowed Term Loan Secured Claim shall receive its Pro Rata share of, in accordance with section 6.4 of the Credit Agreement: (a) Cash equal to the outstanding amount of the Term Loan Secured Claim Recovery Amount until the Term Loan Secured Claims are Satisfied (as defined below); or (b) such other amount as may be agreed upon by such Holder of an Allowed Term Loan Secured Claim and the Debtors.

As used in this paragraph, "Satisfied" shall mean: the indefeasible payment in full in Cash of all liquidated Term Loan Secured Claims in an amount not to exceed the Term Loan Secured Claim Recovery Amount; in the case of any contingent Obligations (as defined in the DIP Agreement), including any payments that have been provisionally credited to the Obligations and any continuing obligations (contingent or otherwise), that the Reorganized Debtors shall have furnished the Credit Agreement Primary Agent with cash collateral or an indemnification from a Person, and pursuant to terms and conditions, in each case which are satisfactory to the Credit Agreement Primary Agent; the Reorganized Debtors shall have furnished the Credit Agreement Primary Agent with cash collateral in an amount satisfactory to the Credit Agreement Primary Agent in its discretion to secure payment of liabilities in respect of matters or circumstances known to Credit Agreement Primary Agent at the time which are expected to result in any actual loss, cost, damage or expense (including attorneys' fees and legal expenses) to the Credit Agreement Primary Agent or any Term Loan Lender; the Debtors or Reorganized Debtors, as applicable, shall have delivered to the Credit Agreement Primary Agent a payoff letter in form and substance acceptable to the Credit Agreement Primary Agent; and the termination of the Credit Agreement Primary Agent's and DIP Lenders' obligation to extend credit under the Financing Agreements (as defined in the DIP Agreement).

    c.    *Voting*:  Class 3 is Impaired.  Holders of Allowed Term Loan Secured Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – General Unsecured Claims</u>

    a.    *Classification*:  Class 4 consists of all General Unsecured Claims.

*Treatment*: Each Holder of a General Unsecured Claim will receive its Pro Rata share of the Distribution Proceeds as provided in Article VIII.H hereof.

    b.    *Voting*:  Class 4 is Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – Intercompany Claims</u>

    a.    *Classification*:  Class 5 consists of all Intercompany Claims.

b.    *Treatment*: Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors; *provided* that no distributions shall be made on account of any such Intercompany Claims.

c.    *Voting*: Class 5 is either Unimpaired, and the Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and the Holders of Allowed Intercompany Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Intercompany Interests</u>

a.    *Classification*: Class 6 consists of all Intercompany Interests.

b.    *Treatment*: Each Allowed Intercompany Interest shall be Reinstated for administrative convenience or canceled and released without any distribution on account of such interests at the option of the Debtors.

*Voting*: Class 6 is either Unimpaired, and the Holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and the Holders of Allowed Intercompany Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7 – Interests in Shopko</u>

a.    *Classification*: Class 7 consists of all Interests in Shopko.

b.    *Treatment*: Each Allowed Interest in Shopko shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Shopko shall be entitled to any recovery or distribution under the Plan on account of such Interests.

c.    *Voting*: Class 7 is Impaired. Holders of Interests in Shopko are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

8.    <u>Class 8 – Section 510(b) Claims</u>

a.    *Classification*: Class 8 consists of all Section 510(b) Claims.

b.    *Treatment*: Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist.

c.    *Voting*: Class 8 is Impaired. Holders of Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims and Interests. The Debtors reserve the right to modify the Plan in accordance with Article XII hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

G.      *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of the Settled Claims, and of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

B.      *Restructuring Transactions*

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including:  (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Restructuring Transactions; (e) all transactions necessary to provide for the purchase of substantially all of the assets of, or Interests in, any of the Debtors by one or more Entities to be wholly owned by Reorganized Shopko or any other Entity pursuant to the Asset Purchase Agreement, which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C.      *Cancelation of Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised.

D.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the Asset Sales, or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

E.      *Surcharge Resolution*

Upon entry of the Confirmation Order, (i) no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any successor shall be charged against the Credit Agreement Primary Agent, the Term Loan B-1 Agent, or any DIP Lender, their respective claims or the Collateral (as defined in the DIP Agreement) pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise; and (ii) the *Debtors' Motion for an Order (I) Authorizing the Debtors to Surcharge Certain Collateral, (II) Allowing the Lenders' Secured Claim in an Amount that Accounts for the Surcharge, and (III) Granting Related Relief* [Docket No. 656] shall be dismissed with prejudice, without the need for any further action by the Debtors, Reorganized Debtors, the Plan Administrator or the Court to effectuate such dismissal.  For the avoidance of doubt, the Confirmation Order shall expressly approve and authorize the foregoing terms, each of which shall become effective and irrevocable immediately upon entry of the Confirmation Order.

F.      *Asset Sales*

On the Effective Date, the Debtors shall consummate the Asset Sales, if any, and, among other things, the acquired assets, as set forth in the Asset Purchase Agreement, shall be transferred to and vest in the Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the Asset Purchase Agreement and Confirmation Order; *provided that*, notwithstanding anything to the contrary set forth in the Plan, Plan Supplement, Confirmation Order or otherwise, the Liens, claims, and rights of the Credit Agreement Primary Agent and DIP Lenders set forth in the Financing Orders shall continue in full force and effect on and after the Effective Date until all DIP Claims are paid in full in Cash and all Term Loan Secured Claims are Satisfied or otherwise satisfied with the consent of the Holders of such Claims.  The Purchaser shall be deemed not to be a successor of the Debtors.  On the Effective Date, the Purchaser shall pay to the Debtors the proceeds from the Asset Sales, as and to the extent provided for in the Asset Purchase Agreements.  The Confirmation Order shall: (a) approve the Asset Purchase Agreement, if any; and (b) authorize the Debtors or Reorganized Debtors, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement, if any, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code.

G.      *The Asset Sale Restructuring*

1.      Vesting of Assets

Except as otherwise provided in the Plan, the Asset Purchase Agreement (if any), or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, in each case to the extent of the Credit Agreement Primary Agent's consent, on the Effective Date, the assets of the Debtors shall vest in the Reorganized Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances; *provided* that, subject to funding the Professional Fee Escrow Account, the collateral, or proceeds of sales of such collateral, of the Reorganized Debtors securing the DIP Claims, Prepetition ABL Claims, and Term Loan Secured Claims shall remain subject to the liens and claims of the Credit Agreement Primary Agent and Lenders (as defined in the DIP Agreement) to the same extent as such liens and claims were enforceable against the Debtors and the Debtors' assets until such DIP Claims, Prepetition ABL Claims, and Term Loan Secured Claims are Satisfied as set forth in Article II.C and Article III.B.  On and after the Effective Date, except as otherwise provided for in the Plan, the Financing Orders, or the Asset Purchase Agreement, the Debtors and the Reorganized Debtors may operate their business and use, acquire, or dispose of property in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action with the prior written consent of the Credit Agreement Primary Agent; *provided* that the Debtors and the Reorganized Debtors shall not need the consent of the Credit Agreement Primary Agent following the date on which all DIP Claims and Term Loan Secured Claims are Satisfied as set forth in Article II.C and Article III.B.

2.      Sources of Consideration for Plan Distributions

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date, including the Settlement Amount, and the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date.

Notwithstanding anything to the contrary in the Plan or in the Asset Purchase Agreements, on the Effective Date, any Cause of Action not settled, released, discharged, enjoined, or exculpated under the Plan on or prior to the Effective Date shall vest in the Reorganized Debtors and shall be subject to administration by the Plan Administrator in consultation with the Credit Agreement Primary Agent; *provided* that the Plan Administrator shall not need to consult with the Credit Agreement Primary Agent following the date on which all DIP Claims and Term Loan Secured Claims are Satisfied as set forth in Article II.C and Article III.B; *provided, further*, that all Avoidance Actions against the Debtors' vendors and landlords (other than with respect to any Holder of a Claim or Interest set forth in the Confirmation Order that "opted out" of granting releases by timely objecting to the Plan's third-party release provisions, unless otherwise ordered by the Bankruptcy Court on or before Confirmation) shall be deemed waived, relinquished, and extinguished on the Settlement Effective Date and such Avoidance Actions shall not vest in the Reorganized Debtors.

22

3.    Reorganized Debtors

On and after the Effective Date, the Reorganized Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible  including overseeing the Store Closing GOB Sales in accordance with the Store Closing Liquidation Agreement as authorized under the Store Closing GOB Sales Order (as each such term is defined in the DIP Agreement), in accordance with the Wind-Down Budget and Wind-Down Milestones, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) establishing and funding the Distribution Reserve Accounts in accordance with the Wind-Down Budget, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Asset Purchase Agreement, if any, and the Financing Orders (as applicable), and (h) administering the Plan in an efficacious manner.  The Reorganized Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, Financing Orders (as applicable) and (iii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

4.    Plan Administrator

The Plan Administrator shall act for the Reorganized Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or sole director of the Reorganized Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Reorganized Debtors, and shall succeed to the powers of the Reorganized Debtors' managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Reorganized Debtors. The foregoing shall not limit the authority of the Reorganized Debtors or the Plan Administrator, as applicable, to continue the employment any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Reorganized Debtors and the Purchaser.  The Debtors, after the Confirmation Date, and the Reorganized Debtors, or Plan Administrator after the Effective Date, shall be permitted to make payments to employees pursuant to employment programs then in effect, and to implement additional employee programs and make payments thereunder, without any further notice to or action, order, or approval of the Bankruptcy Court.

5.    Financing Orders

Subject to the funding of the Professional Fee Escrow Account, notwithstanding anything to the contrary set forth in the Plan, Plan Supplement, Confirmation Order or otherwise, the Liens, claims, and rights of the Credit Agreement Primary Agent and DIP Lenders set forth in the Financing Orders shall continue in full force and effect on and after the Effective Date until all DIP Claims and Term Loan Secured Claims are paid in full in Cash or otherwise satisfied with the consent of the Holder of such Claim.

6.    Dissolution and Board of the Debtors

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to its affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall:  (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of Shopko under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of Shopko or any of its affiliates.

7.      Release of Liens

Except as otherwise expressly provided herein, on the Effective Date, all Liens on any property of any Debtors or the Reorganized Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors or the Reorganized Debtors shall be automatically discharged and released; *provided, however,* that notwithstanding anything to the contrary set forth in this Plan, subject to the funding of the Professional Fee Escrow Account, until the DIP Claims are Satisfied in accordance with Article II.C hereof  and the Term Loan Secured Claims are Satisfied in accordance with Article III.B.3 hereof, (a) all Liens of the Credit Agreement Primary Agent and Lenders (as defined in the DIP Agreement) on any property of any Debtors or the Reorganized Debtors shall remain valid, binding, and in full effect on and after the Effective Date, (b) all property of the Debtors and Reorganized Debtors shall remain subject to the Liens and claims of the Credit Agreement Primary Agent and Lenders and shall continue to secure all Obligations (as defined in the DIP Agreement), DIP Claims and Term Loan Secured Claims owing to the Credit Agreement Primary Agent and Lenders, and (c) all guarantees of any Debtors or the Reorganized Debtors in favor of the Credit Agreement Primary Agent or Lenders shall be reaffirmed and remain in full force and effect.

8.      Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (a) consummation of the Asset Sales; and (b) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan or corporate structure of the Debtors or Reorganized Debtors, shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

9.      Indenture Trustee Fees

On or as soon as reasonably practicable after the Settlement Effective Date, the Debtors or Reorganized Debtors (as applicable) shall pay the Indenture Trustee in Cash up to $200,000 of any reasonable and documented Indenture Trustee Fees incurred by the Indenture Trustee without the need for the Indenture Trustee to file fee applications with the Bankruptcy Court.  The Indenture Trustee shall not be entitled to assert any Claims, including the Indenture Trustee Fees, against the Debtors or Reorganized Debtors in excess of $200,000, and shall waive any such Claims against the Debtors or Reorganized Debtors.

10.    Effectuating Documents; Further Transactions

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Reorganized Debtors, the Plan Administrator, and the officers and members thereof are, authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

11.    Preservation of Causes of Action

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the Plan Administrator all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of the Plan.  On the Settlement Effective Date, all Avoidance Actions against the Debtors' vendors and landlords (other than with respect to any Holder of a Claim or Interest set forth in the Confirmation Order that "opted out" of granting releases by timely objecting to the Plan's third-party release provisions, unless otherwise ordered by the Bankruptcy Court on or before Confirmation) shall be deemed waived, relinquished, and extinguished, and no such Avoidance Action shall revert to the Reorganized Debtors.

The Plan Administrator, on and after the Effective Date, may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Causes of Action (other than Avoidance Actions waived, relinquished, released, or otherwise extinguished under the Plan), whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them.  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  The Plan Administrator reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

12.    Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Shopko, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Shopko.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Shopko in accordance with the Bankruptcy Code and the Bankruptcy Rules.

25

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the latest to occur of: (1) 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) 30 days after the Debtors provide notice of surrender of possession to a landlord of a rejected lease where surrender occurs after entry of an order approving such rejection; and (3) 30 days after notice of any rejection that occurs after the Effective Date.  **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Reorganized Debtors, or the property for any of the foregoing without the need for any objection by the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors, the Purchaser, or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment. Notwithstanding the foregoing, nothing herein shall prevent the Reorganized Debtors from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court or in the Asset Purchase Agreement, at least seven days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure Claim. To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of, the Bankruptcy Court.

D.    *Indemnification Obligations*

All indemnification obligations of the Debtors arising under or pursuant to the Credit Agreement, DIP Agreement, or any other of the Financing Agreements (as defined in the DIP Agreement) in place as of the Effective Date shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

E.    *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

F.    *Run-Out Claims*

No later than five (5) business days prior to the earlier of (i) the Plan objection deadline, and (ii) the Voting Deadline, the Debtors shall provide Cigna Health and Life Insurance Company with written notice of its decision as to whether or not the Debtors propose to assume or reject the ASO Agreement under the Plan. Such decision shall be revocable only with the consent of Cigna Health and Life Insurance Company, provided such consent cannot be unreasonably withheld.

If the Debtors propose to reject the ASO Agreement, such notice shall include the Debtors' decision as to whether: (i) the payment of Run-Out Claims prior to the effective date of rejection of the ASO Agreement will continue to be funded by the Debtors or a successor thereto during the twelve (12) month period following such rejection, and the source of such funding; or (ii) the payment of Run-Out Claims will <u>not</u> be funded, in which case

such notice shall include the name and contact information of a representative of the Debtors or their successor to whom Cigna Health and Life Insurance Company can direct inquiries from former employees whose healthcare claims will not be paid.  Such decision shall be revocable only with the consent of Cigna Health and Life Insurance Company, provided such consent cannot be unreasonably withheld.

Pursuant to the *Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 98] and corresponding motion [Docket No. 23], the Debtors are authorized to pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs (as defined in such motion) in the ordinary course of business and continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto.  Such Employee Compensation and Benefits Programs included health insurance programs and medical plans such as the ASO Agreement.  Thus, until the Effective Date the Debtors have the authority to pay such Run-Out Claims. To the extent there are Run-Out Claims that were incurred before the Petition Date but have not yet been paid, such claimants may submit a Proof of Claim. To the extent a Run-Out Claim was incurred from the Petition Date to the Effective Date but has not yet been paid, claimants may submit a request for payment of an Administrative Claim.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (or such Holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a

date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIIIX of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent*

Distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent*

1.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities subject to the Wind-Down Budget (as applicable); and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out of pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors to the extent such fees and expenses are set forth in the Wind-Down Budget (as applicable).

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims, except as otherwise provided in this Article VI, or Interests shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent:  (a) to the signatory set forth on any of the Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Disbursing Agent,

the Reorganized Debtors, or the Plan Administrator, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

      3.        Minimum Distributions

Holders of Allowed Claims entitled to distributions of $100 (whether Cash or otherwise) or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claim against the Debtors, the Reorganized Debtors or the Plan Administrator, as applicable, or their property.

      4.        Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtor, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

E.      *Manner of Payment.*

Unless otherwise set forth herein, all distributions of Cash to the Holders of Allowed Claims under the Plan shall be made by the Disbursing Agent. At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Tax Issues and Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Plan Administrator, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors or the Plan Administrator, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

G.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

H.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim; *provided* that interest may accrue on the Prepetition ABL Claims, the DIP Claims and Term Loan Secured Claims in accordance with the terms of the DIP Agreement and Financing Orders until paid in full in Cash or otherwise satisfied with the consent of the Holder of such Claim.

I.      *Setoffs and Recoupment*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or their successors of any such Claim it may have against the Holder of such Claim.

J.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor, such Claim shall be Disallowed without an objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized Debtors on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything herein to the contrary, nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.
THE PLAN ADMINISTRATOR**

A.      *The Plan Administrator*

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and the Reorganized Debtors, including:  (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Reorganized Debtor in accordance with the Wind-Down Milestones, Wind-Down Budget, including overseeing the Store Closing GOB Sales in accordance with the Store Closing Liquidation Agreement and Store Closing GOB Sales Order (as each such term is defined in the DIP Agreement); (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Distribution Reserve Accounts in accordance with the Wind-Down Budget; (3) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (4) establishing and maintaining bank accounts

in the name of the Reorganized Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Reorganized Debtors; (7) administering and paying taxes of the Reorganized Debtors, including filing tax returns; (8) representing the interests of the Reorganized Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, in each case of the forgoing clauses (1-9) strictly in accordance with the Wind-Down Milestones and Wind-Down Budget.  The Plan Administrator shall provide the Credit Agreement Primary Agent with all non-privileged budgets, records, projections, financial information, reports and other information that the Credit Agreement Primary Agent (or its consultants and advisors) may reasonably request.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator (which shall be acceptable to the Credit Agreement Primary Agent).  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Reorganized Debtors shall be terminated.

1.    Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down Milestones and Wind-Down Budget, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the assets of the Reorganized Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

2.    Wind-Down Budget

The Debtors shall include in the Plan Supplement, in form and substance satisfactory to Credit Agreement Primary Agent, a 13-week statement of cash receipts and disbursements (which shall include the funding of the Distribution Reserve Accounts, as applicable, and the Professional Fee Escrow Account) and amount of Term Loan Secured Claims outstanding for the consecutive 13 weeks immediately following the Effective Date, setting forth on a weekly basis, the anticipated uses of the Distribution Proceeds (the "**Wind-Down Budget**", as may be updated, amended or modified from time to time with the written consent of the Credit Agreement Primary Agent). The Wind-Down Budget shall be filed with the Plan Supplement; *provided* that the Wind-Down Budget and Wind-Down Milestones shall be of no further force and effect upon the DIP Claims and the Term Loan Secured Claims being Satisfied in accordance with Article II.C and Article III.B.3 hereof.

3.    Retention of Professionals

a.    The Plan Administrator shall have the right, subject to the Wind-Down Budget, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Reorganized Debtors from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator to the extent set forth in the Wind-Down Budget.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

b.    Until all Term Loan Secured Claims are paid or otherwise satisfied in full, the Credit Agreement Primary Agent shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Credit Agreement Primary Agent, are necessary or desirable to assist the Credit Agreement Primary Agent.  The fees and expenses of such professionals shall be paid by the Reorganized Debtors from the Distribution Proceeds within five business days of submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Credit Agreement Primary Agent's retained

32

professionals shall be made in the ordinary course of business from the Distribution Proceeds and shall not be subject to the approval of the Bankruptcy Court.

        4.        Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

        5.        Plan Administrator Expenses

All costs, expenses, and obligations incurred by the Plan Administrator in administering this Plan, the Reorganized Debtors, or in any manner connected, incidental, or related thereto, in effecting distributions from the Reorganized Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget.  Such costs, expenses, and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

B.       *Wind Down*

On and after the Effective Date, the Plan Administrator will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Wind-Down Milestones and Wind-Down Budget, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates in accordance with the Wind-Down Milestones and Wind-Down Budget.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (1) cause the Debtors and the Reorganized Debtors, as applicable, to comply with, and abide by, the terms of the Asset Purchase Agreement and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions in accordance with the Wind-Down Milestones and Wind-Down Budget as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to the Reorganized Debtors as set forth herein, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  Notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

Notwithstanding anything to the contrary set forth in this Plan, the Plan Supplement, the Disclosure Statement or otherwise, at all times on and after the Confirmation Date through the date on which the Term Loan Secured Claims are Satisfied in accordance with Article III.B.3 hereof, (i) the Debtors, the Reorganized Debtors, and the Plan Administrator shall maintain the cash management system of the Debtors (including all deposit accounts, as in effect immediately prior to the Confirmation Date, in all respects unless otherwise agreed in writing by the Credit Agreement Primary Agent); and (ii) assume, ratify, and reaffirm all agreements (including all deposit account control agreements) related to the deposit accounts of the Debtors, Reorganized Debtors, and Plan Administrator.

C.      *Exculpation, Indemnification, Insurance and Liability Limitation*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Reorganized Debtors.  The Plan Administrator may obtain, at the expense of the Reorganized Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Reorganized Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

Notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

D.      *Tax Returns*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

E.      *Dissolution of the Reorganized Debtors*

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Reorganized Debtors shall be deemed to be dissolved without any further action by the Reorganized Debtors, including the filing of any documents with the secretary of state for the state in which the Reorganized Debtors is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Reorganized Debtors in and withdraw the Reorganized Debtors from applicable state(s).

## ARTICLE VIII.
## RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR

A.      *Establishment of Reserve Accounts*

The Plan Administrator shall establish each of the Distribution Reserve Accounts (which may be affected by either establishing a segregated account at an institution acceptable to Wells Fargo Bank, N.A. or establishing book entry accounts, in the sole discretion of the Plan Administrator).

B.      *Undeliverable Distribution Reserve*

1.      Deposits

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VI.D.4 of the Plan.

2.      Forfeiture

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within three months after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Reorganized Debtors, or their respective properties or assets.  In such cases, any Cash or other property held by the Reorganized Debtors in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary, and shall promptly be transferred to the General Account to be distributed according to the priority set forth in Article VIII.H without any further action or order of the Bankruptcy Court; *provided* that any undeliverable or unclaimed distribution on account of an Allowed General Unsecured Claim shall be transferred to the GUC Asset Sale Reserve.

3.      Disclaimer

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Claim Holder or (ii) obtain an executed Internal Revenue Service Form W-9 from any Claim Holder; *provided* that, in his or her sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

4.      Distribution from Reserve

Within 15 Business Days after the Holder of an Allowed Claim satisfies the requirements of the Plan such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution or such other time as the Plan Administrator determines (*provided* that satisfaction occurs within the time limits set forth in Article VI.D.4 of the Plan), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, to the General Account.

C.      *Wind-Down Reserve*

Following payment in full of all Prepetition ABL Claims, DIP Claims, and Term Loan Secured Claims as set forth in Article II.C and Article III.B., the Plan Administrator shall establish the Wind-Down Reserve by depositing Cash, in accordance with the Wind-Down Budget, in the amount of the Wind-Down Amount into the Wind-Down Reserve.  The Wind-Down Reserve shall be used by the Plan Administrator solely to satisfy the expenses of the Reorganized Debtors and the Plan Administrator as set forth in the Plan and Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Reorganized Debtors and the storage of records and documents shall constitute expenses of the Reorganized Debtors and shall be paid from the Wind-Down Reserve to the extent set forth in the Wind-Down Budget.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.  Any amounts remaining in the Wind-Down Reserve after payment of all expenses of the Reorganized Debtors and the Plan Administrator shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.H without any further action or order of the Bankruptcy Court.

D.      *Other Secured Claims Reserve*

Following payment in full of all Prepetition ABL Claims, DIP Claims, and Term Loan Secured Claims as set forth in Article II.C and Article III.B., and after funding of the Wind-Down Reserve, the Plan Administrator shall establish the Other Secured Claims Reserve by depositing Cash, in accordance with the Wind-Down Budget, in the amount of the Other Secured Claims Reserve Amount into the Other Secured Claims Reserve.  The Other Secured Claims Reserve Amount shall be used to pay Allowed Other Secured Claims in accordance with the Wind-Down Budget.  If all or any portion of an Other Secured Claim shall become a Disallowed Claim, then the amount on

deposit in the Other Secured Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Other Secured Claims Reserve, shall remain in the Other Secured Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Other Secured Claims Reserve is sufficient to ensure that all Allowed Other Secured Claims will be paid in accordance with the Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court. Any amounts remaining in the Other Secured Claims Reserve after satisfaction of all Allowed Other Secured Claims shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.H without any further action or order of the Bankruptcy Court.

E.    *Administrative Claims Reserve*

Following payment in full of all Prepetition ABL Claims, DIP Claims, and Term Loan Secured Claims as set forth in Article II.C and Article III.B., and after funding of the Wind-Down Reserve and the Other Secured Claims Reserve, the Plan Administrator shall establish the Administrative Claims Reserve by depositing Cash up to the amount of the Administrative Claims Reserve Amount into the Administrative Claims Reserve in accordance with the Wind-Down Budget. The Administrative Claims Reserve shall be used to pay Holders of all Allowed Administrative Claims (excluding Professional Fee Claims and DIP Claims) their respective Pro Rata share of the Administrative Claims Reserve, to the extent that such Allowed Administrative Claims have not been paid in full on or before the Effective Date. If all or any portion of an Administrative Claims shall become a Disallowed Claim, then the amount on deposit in the Administrative Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Administrative Claims Reserve, shall remain in the Administrative Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Administrative Claims Reserve is sufficient to ensure that all Allowed Administrative Claims will be paid in accordance with the Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court. Any amounts remaining in the Administrative Claims Reserve after payment of all Allowed Administrative Claims (excluding Professional Fee Claims and DIP Claims) shall promptly be transferred to the General Account and shall be allocated in accordance with Article VIII.I. without any further action or order of the Bankruptcy Court.

F.    *Priority Claims Reserve*

Following payment in full of all Prepetition ABL Claims, DIP Claims, and Term Loan Secured Claims as set forth in Article II.C and Article III.B., and after funding of the Wind-Down Reserve, the Other Secured Claims Reserve and the Administrative Claims Reserve, the Plan Administrator shall establish the Priority Claims Reserve by depositing Cash up to the amount of the Priority Claims Reserve Amount into the Priority Claims Reserve in accordance with the Wind-Down Budget. The Priority Claims Reserve shall be used to pay Holders of all Allowed Priority Claims their respective Pro Rata share of the Priority Claims Reserve pursuant to the priorities set forth in section 507 of the Bankruptcy Code, to the extent that such Allowed Priority Claims have not been paid in full on or before the Effective Date. If all or any portion of a Priority Claim shall become a Disallowed Claim, then the amount on deposit in the Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Priority Claims Reserve, shall remain in the Priority Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Priority Claims Reserve is sufficient to ensure that all Allowed Priority Claims will be paid in accordance with the Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court. Any amounts remaining in the Priority Claims Reserve after payment of all Allowed Priority Claims shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in Article VIII.H without any further action or order of the Bankruptcy Court.

G.    *GUC Asset Sale Reserve*

Following payment in full of all Prepetition ABL Claims, DIP Claims, and Term Loan Secured Claims as set forth in Article II.C and Article III.B., and after funding the Wind-Down Reserve, the Other Secured Claims Reserve, the Administrative Claims Reserve and the Priority Claims Reserve, the Plan Administrator shall establish

and thereafter maintain the GUC Asset Sale Reserve in a separate, segregated account by depositing the Distribution Proceeds allocated to General Unsecured Claims, pursuant to the priority set forth in Article VIII.H, into the GUC Asset Sale Reserve.  The GUC Asset Sale Reserve shall be used to pay Allowed General Unsecured Claims on a Pro Rata basis, *provided* that the Plan Administrator may, in his sole discretion, donate the funds in the GUC Asset Sale Reserve to a suitable charitable organization (for example, the American Bankruptcy Institute Endowment Fund, CARE, or similar organization) without any further action or order of the Bankruptcy Court if distribution of the funds to Holders of Allowed General Unsecured Claims on a Pro Rata basis is not feasible.

H.      *Distribution Proceeds/Priority Waterfall*

After the funding of the Professional Fee Escrow Account, the Plan Administrator shall deliver to the Credit Agreement Primary Agent, on a daily basis, all Distribution Proceeds available for distribution from time to time to the Holders of Allowed DIP Claims until such claims are Satisfied in accordance with Article II.A hereof.

After the DIP Claims have been paid in full, the Plan Administrator shall deliver to the Credit Agreement Primary Agent, on a daily basis, all Distribution Proceeds available for distribution from time to time to the Holders of Allowed Term Loan Secured Claims in accordance with Article III.B.3 hereof, to be paid on account of and pursuant to the priority set forth in the Credit Agreement.

After the Term Loan Secured Claims have been Satisfied pursuant to Article III.B.3. hereof and the priority set forth in the Credit Agreement, the delivery of a payoff letter in form and substance reasonably acceptable to the Credit Agreement Primary Agent, and the funding of the Wind-Down Reserve, to the extent there are sufficient funds in any applicable Distribution Reserve Account to make a distribution, funds shall be allocated and paid to the applicable Holders of Allowed Claims from such Distribution Reserve Account (in each case on a Pro Rata basis) until paid in full from time to time.  The Distribution Reserve Accounts shall be funded to pay Claims in the following priority: (i) *first*, on account of the Other Secured Claims, (ii) *second*, on account of all Allowed Administrative Claims; (ii) *third,* on account of all Allowed Priority Claims, and (iii) *fourth*, on account of any Allowed General Unsecured Claims, subject to the provisions of Article VIII.G.

Notwithstanding anything to the contrary in this Plan or otherwise, no Claim (other than Claims paid from the Professional Fee Escrow Account) shall be paid and none of the Distribution Reserve Accounts shall be funded by the Debtors, Reorganized Debtors, or Plan Administrator prior to the DIP Claims and Term Loan Secured Claims being Satisfied as set forth in Article II.A and Article III.B.3 of this Plan.

I.      *The General Account and Distribution Reserve Account Adjustments*

The Plan Administrator shall determine the amount of Cash required to adequately maintain each of the Distribution Reserve Accounts (other than the GUC Asset Sale Reserve).  Other than with respect to amounts held in the GUC Asset Sale Reserve, if after making and giving effect to any determination referred to in the immediately preceding sentence, the Plan Administrator determines that any Distribution Reserve Account (i) does not contain Cash in an amount sufficient to adequately maintain such Distribution Reserve Account (other than the GUC Asset Sale Reserve), then at any such time the Plan Administrator, with the prior consent of the Credit Agreement Primary Agent (which consent shall be required only until the DIP Claims and the Term Loan Secured Claims have been paid in full or otherwise satisfied), shall transfer Cash from the General Account, to the extent Cash is available in the General Account until the deficit in such Distribution Reserve Account is eliminated, or (ii) contains Cash in an amount in excess of the amount then required to adequately maintain such Distribution Reserve Account, then at any such time the Plan Administrator shall transfer such surplus Cash to the General Account to be used or distributed according to the priority set forth in this Article VIII.I.  Any funds in the General Account not needed to eliminate a Distribution Reserve Account deficit shall be allocated and paid in the following priority (in each case on a Pro Rata basis):  (u) *first*, on account of the DIP Claims that have not yet been paid in full; (v) *second*, on account of the Allowed Term Loan Secured Claims (up to the amount of the Term Loan Secured Claim Recovery Amount) pursuant to the priority set forth in the Credit Agreement; (x) *third*, on account of all Other Secured Claims, (x) *fourth*, on account of all Allowed Administrative Claims; (y) *fifth*, on account of the Allowed Priority Claims, and (z) *sixth*, on account of all Allowed General Unsecured Claims.

Notwithstanding anything foregoing or in the Plan to the contrary, the Plan Administrator may, after the Term Loan Secured Claims have been Satisfied in accordance with Article III.B.3 hereof, transfer Cash from the General Account or from any Distribution Reserve Account to the Wind-Down Reserve to fund wind-down expenses pursuant to any amended or modified Wind-Down Budget or as otherwise necessary or appropriate.

**ARTICLE IX.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors or the Plan Administrator, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.    *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to: (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise.

C.    *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, Reorganized Debtors, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, without an objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors or the Plan Administrator, as applicable.  All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors or the Plan Administrator, as applicable, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the Effective Date and except as otherwise provided in the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court, the Reorganized Debtors, or the Plan Administrator, as applicable, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court to the maximum extent provided by applicable law.

H.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors or the Plan Administrator, as applicable.

I.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

## ARTICLE X.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the Settled Claims, the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, including the Settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, may compromise and settle any Claims and Causes of Action against other Entities.

Pursuant to the Settlement, upon the Settlement Effective Date, (a) the Debtors, and each of their respective current and former officers, directors, members, managers, principals, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, shall be deemed released and discharged by each other Releasing Party from any and all Settled Claims, and (b) Sun Capital shall be deemed released and discharged by each other Releasing Party from the Settled Claims. The Settlement provided for herein, including the payment of the Settlement Amount, and the distributions and other benefits provided for under the Plan, including the release of all Settled Claims as set forth above, the releases set forth in Article X.D and E and the exculpation set forth in Article X.F, shall be in full satisfaction of all Settled Claims, regardless of whether any of the foregoing Settled Claims are identified herein or could have been asserted.

Upon the Settlement Effective Date, the *Motion of the Official Committee of Unsecured Creditors for Reconsideration of Order Granting Application to Employ Ducera Partners, LLC, as Financial Advisor to Special Committee of Independent Directors* [Docket No. 447], *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Claims on Behalf of the Bankruptcy Estates and Granting Related Relief* [Docket No. 641], *Motion for an Order Pursuant to 11 U.S.C. § 1112(b) and 11 U.S.C. § 105(a) Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Docket No. 1152], *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1155], *Official Committee of Unsecured Creditors' (I) Objection to Certain Representations, Covenants, and Waivers In Favor of Prepetition ABL and Term Loan Agent Pursuant to Final Financing Order and (II) Objection to the Claims Asserted By the Agent and the Lenders Against the Debtors* [Docket No. 1221], and *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Committee to Prosecute Certain Lien Challenge Claims on Behalf of the Bankruptcy Estates* [Docket No. 1222] shall be deemed withdrawn with prejudice.

B.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

C.      **Release of Liens**

**Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other**

security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.  Subject to the funding of the Professional Fee Escrow Account, all Liens securing the Prepetition ABL Claims, DIP Claims, Term Loan Secured Claims, or any other Obligations (as defined in the DIP Agreement) shall continue in full force and effect on and after the Effective Date and nothing in this Plan shall or shall be construed to release, discharge, relieve, limit or impair in any way the rights of any Holder of a Prepetition ABL Claims, DIP Claims, or Term Loan Secured Claims or any Lien securing any such Claim.

D.    *Debtor Release*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, Plan Administrator, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, Plan Administrator, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

(a)    the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Documents;

(b)    any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(c)    the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the New Shopko Interests) pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)    the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth above, which includes by reference each of the related provisions and definitions contained herein, *and further*, shall constitute the Bankruptcy Court's finding that the releases set forth above are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases set forth above; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases set forth above against any of the Released Parties.

41

E.    *Release by Holders of Claims or Interests*

Except as otherwise ordered by the Bankruptcy Court on or before Confirmation, as of the Effective Date, each Releasing Party is deemed to have released and discharged each other Released Party, including the Debtors or Reorganized Debtors, as applicable, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a)    the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the other Restructuring Documents;

(b)    any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(c)    the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)    the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release set forth above, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the third-party release set forth above is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the third-party release set forth above against any of the Released Parties.

F.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Asset Purchase Agreement, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other

**agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

G.    *Injunction*

**Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, or with respect to the Settlement Parties from and after the Settlement Effective Date, from taking any of the following actions against, as applicable, the Debtors or Reorganized Debtors, the Settlement Parties, or the other Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

H.    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

I.    *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup against such Claim any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has provided notice of such recoupment in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

## ARTICLE XI.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article XI.B hereof):

1.      all conditions precedent to the effectiveness of the Asset Purchase Agreement, if any, shall have been satisfied or duly waived;

2.      the Confirmation Order shall have been duly entered in form and substance acceptable to Credit Agreement Primary Agent and in full force and effect;

3.      the Settlement Effective Date shall have occurred;

4.      all DIP Claims, Prepetition ABL Claims, and Term Loan Secured Claims are Satisfied as set forth in Article II.C and Article III.B;

5.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring;

6.      all Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and

7.      the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Plan.

B.      *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article XI may be waived only by consent of the Debtors and the Credit Agreement Primary Agent without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      *Effect of Nonoccurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE XII.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to:  (a) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article X hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J.1 hereof;

14.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.      hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

21.      enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

22.      hear any other matter not inconsistent with the Bankruptcy Code;

23.      enter an order closing the Chapter 11 Cases; and

24.      enforce the injunction, release, and exculpation provisions provided in Article X hereof.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article XI.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order, shall be immediately effective and enforceable and deemed binding upon the Debtors or Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

D.    *Reservation of Rights*

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

E.    *Termination of Consent Rights*

Notwithstanding anything to the contrary herein, once the DIP Claims and Term Loan Secured Claims are Satisfied as set forth in Article II.C and Article III.B, any consent rights of the Credit Agreement Primary Agent, the DIP Lenders, the Term Loan B-1 Agent, or the Term Loan Lenders contained herein shall terminate.

F.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to, the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    *Service of Documents*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

the Debtors:    Specialty Retail Shops Holding Corp.
700 Pilgrim Way
Green Bay, Wisconsin 54304
Attn.: Russ Steinhorst

with copies to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn.: Patrick J. Nash, Jr., P.C. and Travis Bayer

-and-

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn.: Steven Serajeddini and Daniel Rudewicz

-and-

McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Attn.: James J. Niemeier

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a

renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or for a fee via PACER at: https://www.neb.uscourts.gov.

J.      *Nonseverability of Plan Provisions*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors, Reorganized Shopko, or Plan Administrator, as applicable, will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.      *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

Respectfully submitted, as of the date first set forth above,

SPECIALTY RETAIL SHOPS HOLDING CORP. (on behalf of itself and all other Debtors)

By:   */s/ Russell Steinhorst*
Name:   Russell Steinhorst
Title:   Chief Executive Officer